## CAUSE NO.  D-1-GN-20-004508

| | |
|---|---|
| WC TEAKWOOD PLAZA, LLC<br>*Plaintiff,* | IN THE DISTRICT COURT OF |
| v. | TRAVIS COUNTY, TEXAS |
| 8209 BURNET LP<br>*Defendant.* | 261ST JUDICIAL DISTRICT |

| Tab | Date | Document |
|---|---|---|
| 1 | 08/31/2020 | Original Petition and Application for Temporary Restraining Order |
| 2 | 08/31/2020 | Temporary Restraining Order |
| 3 | 09/01/2020 | Notice of Hearing on Application for Temporary Restraining Order |
| 4 | 09/03/2020 | Motion to Dismiss by BancorpSouth Bank |
| 5 | 09/08/2020 | Notice of Nonsuit – Affiliated Commercial Services Inc. |
| 6 | 09/08/2020 | Notice of Nonsuit – BancorpSouth Bank |
| 7 | 09/09/2020 | Response in Opposition to Plaintiff's Application for Temporary Injunction |
| 8 | 09/09/2020 | Business Records Affidavit |
| 9 | 09/09/2020 | Proposed Temporary Injunction |
| 10 | 09/15/2020 | Order Denying Application for Temporary Injunction |
| 11 | 09/21/2020 | Answer to Original Petition |

# TAB 1

CAUSE NO. _____

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC and AFFILIATED COMMERCIAL SERVICES, INC. | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | TRAVIS COUNTY, TEXAS |
| v. | § § | _____ JUDICIAL DISTRICT |
| | § § | |
| 8201 BURNET LP, and BANCORPSOUTH BANK | § § | |
| Defendant. | | |

### PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY AND PERMANENT INJUNCTION

WC Teakwood Plaza, LLC, Texas a limited liability corporation, ("Borrower") and Affiliated Commercial Services, Inc., a Texas Corporation ("Bidder", together with Borrower, the "Plaintiffs") file this Plaintiffs' Original Petition and Application for Temporary Restraining Order, Temporary and Permanent Injunction against 8201 Burnet, LP ("Anonymous Lender") a foreign entity not authorized to do business in Texas, and BancorpSouth Bank, a Mississippi banking corporation, ("Bank" together with Anonymous Lender, the "Defendants") in support thereof shows the Court the following:

### I. SUMMARY

1. Defendant, BancorpSouth Bank is a financial institution doing business in Travis County and is being served by serving Michael J. Durrschmidt at Hirsch and Westheimer, 1415 Louisiana Street, 36th Floor Wedge International Tower, Houston, Texas 77002 Phone: 713-223-5181 FAX: 713-223-9319 , or wherever an agent for service of process may be found. BancCorpSouth Bank is the original lender of a mortgage loan to Plaintiff in the original principal sum of

$7,600,000 ("Loan").

2. Defendant, 8201 Burnet, LP  is a recently formed, anonymous shell entity, not authorized to do business in Texas by the Texas Secretary of State,  with layers of nominee managers and lawyers, designed to surreptitiously protect, hide and shield the identities of their principals, that is the purported holder of a mortgage note on a valuable real property owned by WC Teakwood Plaza, LLC. Anonymous Lender allegedly purchased the Loan on August 21, 2020 and is being provided notice through its counsel,  Christopher L. Dodson Bracewell LLP, 711 Louisiana, Suite 2300, Houston, Texas 77002 Email: chris.dodson@bracewell.com and Mark Riley Mark Riley, Phone: (713) 822-8935; Email: Riley@Riley-CPA-Law.com, or wherever its agent for service of process may be found.

3. On August 21, 2020, Borrower notified the Bank that it had become aware of not only certain state, county and city restrictions that prevent a non-judicial foreclosure sale from properly proceeding as required under the Texas Property Code, without express approval of the Mayor of the City of Austin. Borrower requested that Bank either confirm mayoral approval for the sale or confirm withdrawal of the sale.

4. Bank replied that it needed to discuss the foregoing with its client and would need until August 24, 2020 to provide a response. In the intervening period, Bank allegedly sold the Loan to Anonymous Lender, which Bank informed Borrower of on August 24, 2020.  Though Bank acknowledged the impact of the aforementioned restrictions on the ability to conduct a public sale in accordance with the Texas Property Code, Bank attempted to wash its hands of the issues by indicating to Borrower that as Bank had sold the Loan (albeit *after* it was noticed of the restriction issues by Borrower), it "no longer controlled the disposition of the

collateral" and directed Borrower to a mailing address for Anonymous Lender. Borrower had
to follow up again for email or phone contact information, and was provided information for
counsel Mark Riley.

5.   Borrower then received correspondence from counsel Chris Dodson on behalf of Anonymous
Lender to inform it that in spite of the in place orders restricting gathering for public
foreclosure sales, it nonetheless intended to pursue the purportedly scheduled non judicial
foreclosure sale on September 1, 2020, despite the in place restrictions.

6.   On August 25, 2020, Anonymous Lender tried to argue that other foreclosure sales occurred
in August without express mayoral approval. However, Borrower informed Anonymous
Lender that it received from the Mayor of Austin correspondence specifically in response to
a query on foreclosure sales in which the Mayor confirmed that as of August 26, 2020, no
authorization or approval had been given for such a gathering.

7.   Further, on August 25, 2020 Anonymous Lender tried to argue that the AG Guidance Letter
does not deserve the weight Borrower recommends. Contrary to this assertion, the Travis
County Tax Office has given deference to the same AG Guidance Letter in canceling all
public tax foreclosure sales, and specifically referencing the AG Guidance Letter as support
for having done so.

8.   Anonymous Lender asserts that "there is no evidence or suggestion that the September 1
foreclosure sale for this Property will be attended by more than 10 willing bidders, so it would
be inappropriate to preemptively cancel the foreclosure sale on this basis." Bidder has
informed Anonymous Lender that it wishes to attend the foreclosure sale but as the gathering
for this sale will likely be a violation of law and subject it to civil and criminal prosecution

and/or result in a voidable or void sale, Bidder and its agents are restricted from attending this proposed non-judicial foreclosure sale.

9. By asserting that so long as less than 10 people intend to attend the foreclosure sale for this property, the sale will satisfy the public sale requirement, Lender completely misinterprets the impact of the Standing Orders on its ability to conduct a non-judicial foreclosure sale in accordance with the Texas Property Code. Gatherings for **all** foreclosure sales occur on the first Tuesday of each month. There are typically greater than 10 persons in attendance at minimum, due to the administrative persons who are typically in attendance which include but are not limited to trustees, lenders, bidders, security and other interested parties who track and attend such public sales each month in a populous county such as Travis County.

10. Thus, because the standing orders presently prevent Bidder and other interested public sale participants from being able to attend the proposed sale, Anonymous Lender cannot satisfy the public sale requirement on September 1, 2020 and should be enjoined from attempting to conduct a sale that violates Borrower's statutory rights and Bidder's right to participate in a public foreclosure auction (Bidder's sole claim under this petition).

11. Nonetheless, in an obvious effort to steal Plaintiff's property in the cover of a global pandemic, Anonymous Lender insists on holding a non-judicial foreclosure sale for which it is certain that willing bidders will not be able to attend due to the state, county and city orders preventing the gathering of more than 10 persons without mayoral approval, which the Lender does not have.

12. This is an application for this Court to enjoin Anonymous Lender from attempting to proceed with a non judicial foreclosure sale on September 1, 2020,  on the steps of the Travis County

Courthouse located at 1000 Guadalupe Street, Austin, Texas, as doing so would be in violation of Borrower's statutory right to a public sale under the Texas Property Code and would deny Bidder's and other interested parties from attending the sale casing irreparable damage to both due to the unique nature of real estate, Bidder's only claim hereunder. The circumstances surrounding this motion are extraordinary and unprecedented. There is good cause.

13. If Plaintiffs application is not granted, harm is imminent because Borrower's statutory rights under the Texas Property Code will be violated and Borrower may wrongfully lose the use and possession of its unique property in a sale conducted in violation of the Texas Property Code and will cause Plaintiff damage, by creating a cloud on title due to the void sale. Because of the numerous overlapping governmental orders restricting such public gatherings, Bidder will be harmed due to its inability to bid at the non-judicial foreclosure sale. Plaintiffs have no adequate remedy at law because Plaintiffs claims against Defendants involve real property that is unique in nature and cannot be replaced by a money judgment.

14. Defendants have been given notice of the Application for Temporary Restraining Order and Temporary injunction. Plaintiffs request that this Court enjoin, restrain and prohibit Defendants and any person or entity acting in concert with Defendants, from taking any action in exercising the power of foreclosure, including but not limited to foreclosing on the property and note at the September 1, 2020, Travis County Foreclosure Sale purporting to claim defaults on the agreements related to the Subject Property, legally described per the description contained in the Notice of Trustee's Sale, attached hereto as Exhibit A.

15. By virtue of the foregoing, Plaintiffs have demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction or other equitable

remedy against Defendants.  In order to preserve the status quo and the property and rights of Plaintiffs during the pendency of this action, the Defendants should be cited to appear and show cause why Defendants should not be temporarily enjoined, restrained, and prohibited, and any person or entity acting in concert with Defendants, from foreclosing on the Borrower's property in a foreclosure sale where Bidder cannot attend.

16. Plaintiffs' application for a temporary restraining order is authorized by Texas Civil Practice and Remedies Code § 65.011 since Plaintiffs are entitled to a writ of injunction or order of restraint under the principal of equity.  Furthermore, irreparable injury to the Plaintiffs is threatened and as such it is necessary to preserve the status quo.

## CAUSES OF ACTION

17. **<u>Breach of Contract.</u>**  Borrower incorporates by reference herein for all purposes the allegation of the preceding paragraphs verbatim.

   a. Plaintiff Borrower and Defendant Bank are parties to a valid enforceable contract directly between the parties.  Anonymous Lender, abused an existing contractual or fiduciary relationship with Bank, while seeking to take advantage of tightening credit market during a global pandemic and rush to wrongfully foreclose on valuable unique real property while rebuffing all good faith attempts by Plaintiff Borrower to resolve the loan.

   b. Defendant Bank and Defendant Anonymous Lender have breached their agreements and its contract with Plaintiff Borrower.  As a beneficiary and/or a party to all of these contracts, Defendants conspiracy to convert Borrower's property and Anonymous Lender breach has injured Plaintiff Borrower.

   c. Plaintiff Borrower is entitled to recover is damages against Defendant Bank and

Defendant Anonymous Lender for it actual, consequential, and out-of-pocket damages, court costs, attorneys fees, expenses and interest.

18. **Fraud.** Plaintiff Borrower and Plaintiff Bidder incorporates by reference herein for all purposes the allegation of the preceding paragraphs verbatim.  Additionally, alternatively, and without waiver of the foregoing, Defendants have committed fraud against Plaintiffs. Defendant Bank made representations to Plaintiff Borrower that it needed time to consider a postponement of its prior noticed foreclosure due governmental orders while unbeknownst to Plaintiff Borrower, Defendant Bank was secretly working with Defendant Anonymous Lender to use confidential information on the terms of the loan between the parties to effectuate a loan sale.

19. On information and belief, at the time that Defendant Bank made the representations to Plaintiff Borrower, it knew the representations were false or made such representations recklessly, making positive assertions of fact without knowledge of its truth and Defendant Bank made such representations with the intent that Plaintiff act on them.  Plaintiff Borrower did act in reliance to its harm.

20. **Declaratory Judgment.**  Plaintiff Borrower and Plaintiff Bidder incorporate by reference herein for all purposes the allegation of the preceding paragraphs verbatim.  Additionally, alternatively, and without waiver of the foregoing, pursuant to Texas Civil Practices and Remedies Code, section 37.003, Plaintiff Borrower requests the Court determine the rights and obligations of the parties with respect to the rights and obligations of the Bank and Anonymous Lender to post the Subject property for foreclosure and sell the Subject Property at what is in essence a private sale.  A present, actual, and justiciable controversy exists in that Plaintiffs are seeking judicial determination that they are entitled to the process of conducting

a legitimate public sale under the contracts between the parties.

21. Plaintiff seeks attorney's fees pursuant to Texas Civil Practices and Remedies Code, section 37.009, and seeks determination if and what amount of attorney's fees for violation of agreements and certain provisions of Texas law would be proper.

## II. ARGUMENTS AND AUTHORITIES

22. There are currently there are currently three orders that restrict gatherings in excess of 10 persons in Austin, Texas, where the September 1, 2020 foreclosure sale would take place.

   a. ***Executive Order GA-28 (as amended)*** issued by Governor Abbot provides that outdoor gatherings in excess of 10 people are prohibited ***unless the mayor of the city in which the gathering is held . . . approves of the gathering***. (emphasis added).

      i. Executive Order GA-28's application to foreclosure sales was specifically addressed in an informal guidance letter issued by the Attorney General's office, as further detailed below, in which the Attorney General's office confirmed that foreclosure sales may not satisfy the public requirement without express approval from the city mayor to hold the sale gathering.

   b. ***Order No 202-16 by the County Judge of Travis County***, after reciting the restrictions in place on outdoor gatherings under GA-28, provides "any gatherings that exceed 10 people are hereby PROHIBITED, except as permitted by current Governor's Proclamations and Orders."

   c. ***Order No 20200815-019 issued by the Mayor of the City of Austin***, after reciting the restrictions in place on outdoor gatherings under GA-28, provides in relevant part that through December 15, 2020 "Further, pursuant to the Governor's Order, and the advice of the local Health Authority, gatherings or presence at any outdoor area, event, or establishment of more than 10 persons are PROHIBITED except at provided in this Section."

23. Governor Abbott's Executive Order 28 which prohibits gatherings of more than ten (10) persons is in direct contradiction with the requirement for a "public sale" under Texas Property Code

Section 51.002(a) ("a sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month."

24. The impact of GA-28 on the ability to hold foreclosure sales in satisfaction of the public sale requirement was specifically discussed and addressed in the Texas Attorney General's Guidance Letter, which provides in relevant part:

> With this background in mind, we address your question concerning attendance limitations. Governor Abbott ordered in Executive Order GA-28 that "every business in Texas shall operate at no more than 50 percent of the total listed occupancy of the establishment." This general limitation, however, is subject to several exceptions.
>
> One such exception is found in paragraph five of the order, which limits outdoor gatherings to 10 persons or fewer without approval by the mayor or, in the case of unincorporated territory, the county judge in whose jurisdiction the gathering occurs. Accordingly, to the extent a foreclosure sale occurs outdoors, **attendance at the sale is limited to 10 persons or fewer unless greater attendance is approved by the relevant mayor or county judge**.
>
> **If a foreclosure sale is subject to, and not exempted from, the 10-person attendance limit imposed in Executive Order GA-28, it should not proceed if one or more willing bidders are unable to participate because of the attendance limit.** "[A] sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month." **The purpose of the public sale requirement is to "secure the attendance of purchasers and obtain a fair price for the property." Strict compliance with the Property Code is required for a trustee to properly make a foreclosure sale**. If an attendance limit precludes the conduct of a public sale for the purpose of securing sufficient bidders to obtain a fair price, the propriety of a foreclosure auction may be called into question. **Accordingly, to the extent attendance at a foreclosure sale is limited to ten or fewer persons, and that limit precludes the attendance of one or more willing bidders who otherwise would have appeared in person, the sale should not go forward as it likely would not comport with the Property Code requirement that the sale be a "public sale."** (internal citations omitted) (*emphasis added*)

25. The relevant order and documentation referenced in paragraphs 22-24 above are attached hereto as (Exhibit B).

26. The Travis County Tax Office has acknowledged the AG Guidance Letter's impact on the ability to satisfy the public sale requirements of the Texas Property Code by indicating on its website that **"Tax foreclosure sales are canceled until further notice"** and providing a link (accessed by clicking on "*Learn More"*) to the AG Guidance Letter indicating that in light of GA-28 foreclosure sales should not occur. This information can be found directly on the Travis County Tax Office website: https://tax-office.traviscountytx.gov/properties/foreclosed/upcoming-sales/list

27. Further, on August 26, 2020, Borrower received written confirmation from the Mayor of the City of Austin that no mayoral approval or authorization has been given for outdoor gatherings in excess of ten (10) people for the proposed foreclosure sale in Austin, Texas (Exhibit C).

28. Bidder is unable to participate in the proposed non-judicial foreclosure sale due to the standing orders and the likelihood it will be subject to civil or criminal prosecution for the violation thereof.

29. In light of the foregoing, Plaintiffs respectfully requests that this Court issue a Temporary Restraining Order as well as Temporary and Permanent Injunction to maintain the status quo and to enjoin Anonymous Lender's attempt to conduct a non-judicial foreclosure on the Borrower's property.

## **CONCLUSION**

30. For the reasons set forth above, Plaintiffs move this Court for an entry of a Temporary Restraining Order as well as Temporary and Permanent Injunction to maintain the status quo and to enjoin Anonymous Lender's wrongful attempt to foreclose on Borrower's property in a civil conspiracy with the Bank to convert Borrower's property.

31. Plaintiffs have shown a probability of recovery on the merits of its claim that

Anonymous Lender's actions fail to comply with the Texas Property Code, and that the Defendants have colluded to deprive Borrower of its collateral in order to realize a windfall. Further, balancing the equities, Anonymous Lender is secure in its economic position as the underlying real estate is worth at approximately three times the outstanding debt, such that a temporary restraining order would not prejudice or harm Anonymous Lender while the underlying disputes are resolved. By contrast, should Borrower be deprived of its unique and valuable real estate, and Bidder denied because of governmental regulation the opportunity to appear at a public to bid and purchase the same, they would be irreparably harmed. *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Investments, LLC*, 481 S.W.3d 336, 350 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("every piece of real estate is unique, and if foreclosure were allowed before a full determination of the underlying claim, the homeowner would be irreparably harmed.")

32. Plaintiffs are ready and willing to post a bond as required by Texas law, and requests that the Court set the bond for an amount not to exceed $10,000 for the temporary restraining order and again for the temporary injunction.

33. Anonymous Lender is not likely to be prejudiced by such an injunction as demonstrated by its significant equity cushion of millions of dollars of value in the Property in excess of the  outstanding Loan.

34. Finally, issuing the requested temporary restraining order will maintain the status quo until such time as this Court can take evidence to determine whether a temporary injunction to protect Plaintiffs' respective rights to a public sale should be entered. Plaintiffs reserve the right to further amend their petition.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants, be cited to appear and answer herein, and upon final hearing hereof, Plaintiffs have and recover judgment of and from Defendants as follows:

1. Injunctive relief in the form of a Temporary Restraining Order and a Temporary injunction after notice to Defendants, and all necessary writs prayed for herein;

2. Actual damages in an amount as determined by the Court and within the Court's jurisdiction;

3. Reasonable attorneys' fees, expenses of litigation, and court costs;

4. Pre-judgment interest and post-judgment interest at the maximum rates allowed by law; and

5. Such other relief, both general and special, at law and in equity, to which the Plaintiff may show itself justly entitled.


**MANFRED STERNBERG & ASSOCIATES, P.C.**


_____

Manfred Sternberg
SBN: 19175775
1700 Post Oak Blvd. Suite 600
Houston, TX 77056
Telephone:  (713) 622-4300
Facsimile:   (713) 622-9899
Email: manfred@msternberg.com
**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of August, 2020, a true and correct copy of the foregoing was forwarded via the Court's electronic filing service and e-mail to the following:

Christopher L. Dodson
Bracewell LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
Email: chris.dodson@bracewell.com

Mark Riley
Phone: (713) 822-8935
Email: Riley@Riley-CPA-Law.com

ATTORNEYS FOR DEFENDANTS

Michael J. Durrschmidt
Hirsh & Westheimer
1415 Louisiana, 36th Floor
Houston, Texas 77002
Email: mdurrschmidt@hirschwest.com

ATTORNEYS FOR DEFENDANT BANCORPSOUTH

Manfred Sternberg

## <u>VERIFICATION</u>

STATE OF TEXAS     §
          §
COUNTY OF TRAVIS   §

BEFORE ME, the undersigned authority, on this day personally appeared Jeremy Stoler authorized agent of WC Teakwood Plaza LLC, Plaintiff in the above-entitled and numbered cause; that he has read the above and foregoing Petition and Application for Temporary Restraining Order and that the facts contained therein are within my personal knowledge and they are all true and correct.

        FURTHER AFFIANT SAYETH NOT.

        _____

STATE OF TEXAS     §
          §
COUNTY OF HARRIS   §

BEFORE ME, the undersigned authority, on this day personally appeared Manfred Sternberg authorized agent of Affiliated Commercial Services, Inc., Plaintiff in the above-entitled and numbered cause; that he has read the above and foregoing Petition and Application for Temporary Restraining Order and that declare that the facts contained therein are within my personal knowledge and they are all true and correct.

        FURTHER AFFIANT SAYETH NOT.

        _____

## JURAT

My name is MANFRED STERNBERG, my date of birth is August 28, 1960, and my address is 1110 Guinea Drive, Houston, TX 77055. I declare under penalty of perjury that every statement in the foregoing Declaration is within my personal knowledge and is true and correct:

Executed in Harris County, State of Texas on the 31st day of August 3l, 2020.

DECLARANT

_____

MANFRED STERNBERG

# **EXHIBIT A**

‖‖‖‖‖‖‖‖‖ 6 pgs    202040410

## NOTICE OF TRUSTEE'S SALE

STATE OF TEXAS      §
                     §           KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TRAVIS    §

WHEREAS, WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company (the "*Grantor*"), executed a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017, and recorded April 27, 2017 in the Official Public Records of Travis County, Texas (the "*Records*") under Document No. 2017066579 (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Deed of Trust*");

WHEREAS, the Grantor, pursuant to the Deed of Trust, conveyed to T. Gerry Gamble (the "*Original Trustee*") for the benefit of First State Bank Central Texas, its successors and assigns ("*Beneficiary*"), all of the personal property, real property and premises described and referred to in the Deed of Trust (the "*Mortgaged Property*"), including the following described property located in Travis County, Texas:

> 3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBE DBY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

WHEREAS, the Deed of Trust secures payment of that certain Promissory Note dated April 26, 2017, executed by Grantor, as Maker, and payable to the order of Beneficiary, in the original stated amount of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00) (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Note*");

WHEREAS, BancorpSouth Bank, a Mississippi banking corporation (the "*Holder*"), is the successor by merger to Beneficiary;

WHEREAS, the Holder is the current legal owner and holder of the indebtedness secured by the Deed of Trust (the "*Indebtedness*") and, if, for any reason, Holder prefers to appoint a substitute trustee to act instead of the trustee named in the Deed of Trust, Holder has the full power to appoint, at any time and

1

without any formality other than by written instrument, one or more successor or alternate successor trustees, each of whom shall succeed to all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Holder has named, constituted and appointed in writing BRADLEY E. RAUCH, a resident of Harris County, Texas, ZACHARY SCHNEIDER, a resident of Harris County, Texas, ANGELA ZAVALA, a resident of Travis County, Texas, and also MICHELLE JONES, a resident of Travis County, Texas, as Substitute Trustees, each with the power to act independently (and without the joinder of the others) under and by virtue of the Deed of Trust and to hold possess and execute all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Grantor has defaulted in the performance of its obligations under the Note and the Deed of Trust, and notice of such defaults have been waived, and/or have occurred, and Grantor has failed to cure such default(s);

WHEREAS, acceleration of maturity and demand have been made upon Grantor for payment of the Indebtedness, and/or have been waived, and/or have occurred;

WHEREAS, the proceeds of the Note were used for commercial purposes, and the Mortgaged Property was not to be used by the debtor for residential purposes;

WHEREAS, the Holder has called upon and requested either or any of Bradley E. Rauch, Zachary Schneider, Angela Zavala, Michelle Jones, or any additional substitute trustee appointed pursuant to the terms of the Deed of Trust, as Substitute Trustees, to perform the Trustee's duties under the Deed of Trust and to post, mail and file, or have posted, mailed, and filed, notice and to sell the Mortgaged Property without prejudice and without creating an election not to proceed against any other collateral securing the obligations of the Grantor to the Holder, and without waiving any rights or remedies which the Holder has against the Grantor or any other parties obligated for payment of the Indebtedness;

NOW, THEREFORE, the undersigned Substitute Trustee, at the request of the Holder, hereby gives notice that after due posting of this Notice as required by the Deed of Trust and law, a Substitute Trustee will sell on **September 1, 2020** (that being the first Tuesday of said month, as provided for in Texas

20170804.20190907/3778368.1

Property Code Sec. 51.002) at public auction to the highest bidder for cash, at THE REAR "SALLYPORT" OF THE TRAVIS COUNTY COURTHOUSE, 1000 GUADALUPE STREET, AUSTIN, TEXAS 78701, said location having been designated by the County Commissioners' Court of Travis County, Texas (or such other location as may be designated by said County Commissioners' Court), the sale to begin no earlier than 1:00 o'clock p.m. and no later than three (3) hours after such time, the Mortgaged Property, including without limitation, all personal property described in the Deed of Trust, owned by the Grantor, Grantor's heirs, legal representatives, successors and assigns, and originally covered by the Deed of Trust, whether or not herein specifically described.

THE SALE OF THE PROPERTY IS "AS IS" AND "WHERE IS" AND WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND BY THE SUBSTITUTE TRUSTEE OR HOLDERS OF SAID INDEBTEDNESS, EXPRESS, IMPLIED, STATUTORY, QUASI-STATUTORY OR OTHERWISE, ANY WARRANT OR MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE BEING EXPRESSLY DISCLAIMED. NEITHER THE HOLDER NOR THE TRUSTEE OR SUBSTITUTE TRUSTEE MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE COMPLIANCE WITH LAWS, RULES, AGREEMENTS, OR SPECIFICATIONS, NOR WITH RESPECT TO CONDITION, QUALITY, CAPACITY, DESIGN, OPERATION, ABSENCE OF ANY LATENT DEFECTS OR ANY OTHER WARRANTY OR REPRESENTATION WHATSOEVER WITH RESPECT TO THE PROPERTY, ALL OF WHICH ARE EXPRESSLY WAIVED BY PURCHASER(S).

THE NEXT PAGE IS THE SIGNATURE PAGE

WITNESS BY HAND this **7th** day of **August, 2020**.

Zachary Schneider, Trustee

COUNTY OF HARRIS      §
                              §
STATE OF TEXAS        §

       This document was acknowledged before me on this, the **7th** day of **August, 2020**, by Zachary Schneider, Trustee.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

**Name and Address of Substitute Trustees:**

Mr. Bradley E. Rauch
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002



KAREN M. WADE
My Notary ID # 7848256
Expires June 30, 2023

Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

Angela Zavala
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

Michelle Jones
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

**AFTER RECORDING, PLEASE RETURN TO:**

Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

4

## EXHIBIT "A"

### Legal Description

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "B" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

5

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

1) S 76° 04' 00" E, A DISTANCE OF 139.48 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

2) N 13° 53' 50" E, A DISTANCE OF 53.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 5.62 FEET;

THENCE, N 60° 26' 08" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 154.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 50" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 24.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.



**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas

202040410

Aug 10, 2020 11:12 AM
Fee: $3.00          MACEDOS

29170F04.20190907/3778368 1

# **EXHIBIT B**



GOVERNOR GREG ABBOTT

June 26, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
8:45 AM O'CLOCK

JUN 2 6 2020

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

> Executive Order No. GA-28 relating to the targeted response to the COVID-19
> disaster as part of the reopening of Texas.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

# 𝕰𝖝𝖊𝖈𝖚𝖙𝖎𝖛𝖊 𝕺𝖗𝖉𝖊𝖗

## BY THE
## GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**June 26, 2020**

### EXECUTIVE ORDER
### GA 28

*Relating to the targeted response to the COVID-19 disaster*
*as part of the reopening of Texas.*

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, in each subsequent month effective through today, I have renewed the disaster declaration for all Texas counties; and

WHEREAS, the Commissioner of the Texas Department of State Health Services (DSHS), Dr. John Hellerstedt, has determined that COVID-19 continues to represent a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, I have issued executive orders and suspensions of Texas laws in response to COVID-19, aimed at protecting the health and safety of Texans and ensuring an effective response to this disaster; and

WHEREAS, I issued Executive Order GA-08 on March 19, 2020, mandating certain social-distancing restrictions for Texans in accordance with guidelines promulgated by President Donald J. Trump and the Centers for Disease Control and Prevention (CDC); and

WHEREAS, I issued Executive Order GA-14 on March 31, 2020, expanding the social-distancing restrictions for Texans based on guidance from health experts and the President; and

WHEREAS, I subsequently issued Executive Orders GA-16, GA-18, GA-21, GA-23, and GA-26 from April through early June 2020, aiming to achieve the least restrictive means of combatting the threat to public health by continuing certain social-distancing restrictions, while implementing a safe, strategic plan to Open Texas; and

WHEREAS, as Texas reopens in the midst of COVID-19, increased spread is to be expected, and the key to controlling the spread and keeping Texas residents safe is for all Texans to consistently follow good hygiene and social-distancing practices, especially those set forth in the minimum standard health protocols from DSHS; and

WHEREAS, due to recent substantial increases in COVID-19 positive cases, and increases in the COVID-19 positivity rate and hospitalizations resulting from COVID-19, targeted and temporary adjustments to the reopening plan are needed to achieve the

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
8:45AM O'CLOCK

JUN 2 6 2020

*Governor Greg Abbott*
June 26, 2020

*Executive Order GA-28*
Page 2

least restrictive means for reducing the growing spread of COVID-19 and the resulting imminent threat to public health, and to avoid a need for more extreme measures; and

WHEREAS, everyone must act safely, and to that end, this executive order and prior executive orders provide that all persons should follow the health protocols from DSHS, which whenever achieved will mean compliance with the minimum standards for safely reopening, but which should not be used to fault those who act in good faith but can only substantially comply with the standards in light of scarce resources and other extenuating COVID-19 circumstances; and

WHEREAS, the "governor is responsible for meeting … the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and the legislature has given the governor broad authority to fulfill that responsibility; and

WHEREAS, failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable under Section 418.173 by a fine not to exceed $1,000, and may be subject to regulatory enforcement;

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, and in accordance with guidance from DSHS Commissioner Dr. Hellerstedt and other medical advisors, the Governor's Strike Force to Open Texas, the White House, and the CDC, do hereby order the following on a statewide basis effective at noon on June 26, 2020:

Every business establishment in Texas shall operate at no more than 50 percent of the total listed occupancy of the establishment; *provided, however, that*:

1. There is no occupancy limit for the following:
   a. any services listed by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) in its Guidance on the Essential Critical Infrastructure Workforce, Version 3.1 or any subsequent version;
   b. religious services, including those conducted in churches, congregations, and houses of worship;
   c. local government operations, including county and municipal governmental operations relating to licensing (including marriage licenses), permitting, recordation, and document-filing services, as determined by the local government;
   d. child-care services;
   e. youth camps, including but not limited to those defined as such under Chapter 141 of the Texas Health and Safety Code, and including all summer camps and other daytime and overnight camps for youths; and
   f. recreational sports programs for youths and adults;

2. Except as provided below by paragraph number 5, this 50 percent occupancy limit does not apply to outdoor areas, events, or establishments, except that the following outdoor areas or outdoor venues shall operate at no more than 50 percent of the normal operating limits as determined by the owner:
   a. professional, collegiate, or similar sporting events;
   b. swimming pools;
   c. water parks;
   d. museums and libraries;
   e. zoos, aquariums, natural caverns, and similar facilities; and

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
8:45am O'CLOCK

JUN 2 6 2020

      f.  rodeos and equestrian events;

3. This 50 percent occupancy limit does not apply to the following establishments that operate with at least six feet of social distancing between work stations:

    a.  cosmetology salons, hair salons, barber shops, nail salons/shops, and other establishments where licensed cosmetologists or barbers practice their trade;

    b.  massage establishments and other facilities where licensed massage therapists or other persons licensed or otherwise authorized to practice under Chapter 455 of the Texas Occupations Code practice their trade; and

    c.  other personal-care and beauty services such as tanning salons, tattoo studios, piercing studios, hair removal services, and hair loss treatment and growth services;

4. Amusement parks shall operate at no more than 50 percent of the normal operating limits as determined by the owner;

5. For any outdoor gathering in excess of 100 people, other than those set forth above in paragraph numbers 1, 2, or 4, the gathering is prohibited unless the mayor of the city in which the gathering is held, or the county judge in the case of a gathering in an unincorporated area, approves of the gathering, and such approval can be made subject to certain conditions or restrictions not inconsistent with this executive order;

6. For dine-in services by restaurants that have less than 51 percent of their gross receipts from the sale of alcoholic beverages, the occupancy limit shall remain at 75 percent until 12:01 a.m. on June 29, 2020, at which time such restaurants may only operate at up to 50 percent of the total listed occupancy of the restaurant, subject to paragraph number 9 below;

7. People shall not visit bars or similar establishments that hold a permit from the Texas Alcoholic Beverage Commission (TABC) and are not restaurants as defined above in paragraph number 6; provided, however, that the use by such bars or similar establishments of drive-thru, pickup, or delivery options for food and drinks is allowed to the extent authorized by TABC;

8. People shall not use commercial rafting or tubing services, including rental of rafts or tubes and transportation of people for the purpose of rafting or tubing;

9. For any business establishment that is subject to a 50 percent "total listed occupancy" limit or "normal operating limit," and that is in a county that has filed with DSHS, and is in compliance with, the requisite attestation form promulgated by DSHS regarding minimal cases of COVID-19, the business establishment may operate at up to 75 percent of the total listed occupancy or normal operating limit of the establishment;

10. For purposes of this executive order, facilities with retractable roofs are considered indoor facilities, whether the roof is opened or closed;

11. Staff members are not included in determining operating levels, except for manufacturing services and office workers;

12. Except as provided in this executive order or in the minimum standard health protocols recommended by DSHS, found at www.dshs.texas.gov/coronavirus, people should not be in groups larger than ten and should maintain six feet of social distancing from those not in their group;

13. People over the age of 65 are strongly encouraged to stay at home as much as possible; to maintain appropriate distance from any member of the household who has been out of the residence in the previous 14 days; and, if leaving the

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
8:45AM O'CLOCK

JUN 2 6 2020

home, to implement social distancing and to practice good hygiene, environmental cleanliness, and sanitation;

14. In providing or obtaining services, every person (including individuals, businesses, and other legal entities) should use good-faith efforts and available resources to follow the minimum standard health protocols recommended by DSHS;

15. Nothing in this executive order or the DSHS minimum standards precludes requiring a customer to follow additional hygiene measures when obtaining services. Individuals are encouraged to wear appropriate face coverings, but no jurisdiction can impose a civil or criminal penalty for failure to wear a face covering;

16. People shall not visit nursing homes, state supported living centers, assisted living facilities, or long-term care facilities unless as determined through guidance from the Texas Health and Human Services Commission (HHSC). Nursing homes, state supported living centers, assisted living facilities, and long-term care facilities should follow infection control policies and practices set forth by HHSC, including minimizing the movement of staff between facilities whenever possible; and

17. For the remainder of the 2019-2020 school year, public schools may resume operations for the summer as provided by, and under the minimum standard health protocols found in, guidance issued by the Texas Education Agency (TEA). Private schools and institutions of higher education are encouraged to establish similar standards. Notwithstanding anything herein to the contrary, schools may conduct graduation ceremonies consistent with the minimum standard health protocols found in guidance issued by TEA.

Notwithstanding anything herein to the contrary, the governor may by proclamation add to the list of establishments or venues that people shall not visit.

This executive order shall supersede any conflicting order issued by local officials in response to the COVID-19 disaster, but only to the extent that such a local order restricts services allowed by this executive order, allows gatherings prohibited by this executive order, or expands the list or scope of services as set forth in this executive order. Pursuant to Section 418.016(a) of the Texas Government Code, I hereby suspend Sections 418.1015(b) and 418.108 of the Texas Government Code, Chapter 81, Subchapter E of the Texas Health and Safety Code, and any other relevant statutes, to the extent necessary to ensure that local officials do not impose restrictions in response to the COVID-19 disaster that are inconsistent with this executive order, provided that local officials may enforce this executive order as well as local restrictions that are consistent with this executive order.

All existing state executive orders relating to COVID-19 are amended to eliminate confinement in jail as an available penalty for violating the executive orders. To the extent any order issued by local officials in response to the COVID-19 disaster would allow confinement in jail as an available penalty for violating a COVID-19-related order, that order allowing confinement in jail is superseded, and I hereby suspend all relevant laws to the extent necessary to ensure that local officials do not confine people in jail for violating any executive order or local order issued in response to the COVID-19 disaster.

This executive order supersedes Executive Order GA-26, but does not supersede Executive Orders GA-10, GA-13, GA-17, GA-19, GA-24, GA-25, or GA-27. This

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
8:45AM O'CLOCK

JUN 2 6 2020

executive order shall remain in effect and in full force unless it is modified, amended, rescinded, or superseded by the governor.  This executive order may also be amended by proclamation of the governor.



Given under my hand this the 26th day of June, 2020.

GREG ABBOTT
Governor

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
8:45Am O'CLOCK

JUN 2 6 2020



GOVERNOR  GREG  ABBOTT

July 2, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30PM O'CLOCK

JUL 0 2 2020

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

A proclamation amending Executive Order GA-28 relating to mass gatherings in Texas during the disaster posed by the novel coronavirus (COVID-19).

The original proclamation is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

# PROCLAMATION

**BY THE**

## Governor of the State of Texas

---

**TO ALL TO WHOM THESE PRESENTS SHALL COME:**

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, in each subsequent month effective through today, I have renewed the disaster declaration for all Texas counties; and

WHEREAS, I issued Executive Order GA-28 on June 26, 2020, relating to the targeted response to the COVID-19 disaster as part of the reopening of Texas; and

WHEREAS, additional measures are needed to slow the spread of COVID-19 in Texas;

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby amend paragraph numbers 5 and 12 of Executive Order GA-28, effective at 12:01 p.m. on July 3, 2020, to read as follows:

5. For any outdoor gathering in excess of 10 people, other than those set forth above in paragraph numbers 1, 2, or 4, the gathering is prohibited unless the mayor of the city in which the gathering is held, or the county judge in the case of a gathering in an unincorporated area, approves of the gathering, and such approval can be made subject to certain conditions or restrictions not inconsistent with this executive order;

12. Except as provided in this executive order or in the minimum standard health protocols recommended by DSHS, found at www.dshs.texas.gov/coronavirus, people shall not be in groups larger than 10 and shall maintain six feet of social distancing from those not in their group;

This proclamation shall remain in effect and in full force for as long as Executive Order GA-28 is in effect and in full force, unless otherwise modified, amended, rescinded, or superseded by the governor.

IN TESTIMONY WHEREOF, I have hereunto signed my name and have officially caused the Seal of State to be affixed at my office in the City of Austin, Texas, this the 2nd day of July, 2020.

GREG ABBOTT
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30pm O'CLOCK

JUL 0 2 2020

*Governor Greg Abbott*
July 2, 2020

*Proclamation*
Page 2

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30PM O'CLOCK

JUL 0 2 2020



# KEN PAXTON

ATTORNEY GENERAL OF TEXAS

August 1, 2020

Honorable Bryan Hughes
Texas Senate
P.O. Box 12068
Capitol Station
Austin, TX 78711

Dear Senator Hughes,

You ask whether local governmental bodies have authority to limit in-person attendance at a judicial or non-judicial foreclosure sale to 10 persons or fewer. Your question concerns local emergency orders restricting or delaying such sales during the current COVID-19 pandemic. We conclude that a foreclosure sale of residential or commercial real property that is conducted outdoors is subject to the limitation on outdoor gatherings in excess of 10 persons imposed by Executive Order GA-28. Accordingly, an outdoor foreclosure sale may not proceed with more than 10 persons in attendance unless approved by the mayor in whose jurisdiction the sale occurs, or if in an unincorporated area, the county judge. However, to the extent a sale is so limited, and willing bidders who wish to attend are not allowed to do so as a result, the sale should not proceed as it may not constitute a "public sale" as required by the Texas Property Code.

When a mortgage loan is in default, a mortgagee may elect to institute either a judicial foreclosure or, when permitted by the deed of trust, a non-judicial foreclosure.[1] A judicial foreclosure begins with a lawsuit to establish the debt and fix the lien.[2] The judgment in a foreclosure lawsuit generally provides that an order of sale issue to any sheriff or constable directing them to seize the property and sell it under execution in satisfaction of the judgment.[3] After the sale is completed, the sheriff or other officer must provide to the new buyer possession of the property within 30 days.[4]

---

[1] *Bonilla v. Roberson*, 918 S.W.2d 17, 21 (Tex. App.—Corpus Christi 1996, no writ).

[2] *Id.* at 21.

[3] Tex. R. Civ. P. 309; *but see id.* (excepting judgments against executors, administrators, and guardians from orders of sale). The procedures for the sale under judicial foreclosure generally follow the same procedures as sales under non-judicial foreclosures. *Compare id.* 646a–648 *with* Tex. Prop. Code § 51.002.

[4] Tex. R. Civ. P. 310.

A non-judicial foreclosure, in turn, must be expressly authorized in a deed of trust.[5] The Property Code prescribes the minimum requirements for a non-judicial sale of real property under a power of sale conferred by a deed of trust or other contract lien.[6] The Code requires that a sale under a non-judicial foreclosure be "a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month," unless that day is January 1 or July 4, in which cases the sale must be held on the first Wednesday of the month.[7] The deed of trust or other loan document can establish additional requirements, and if such requirements are established, those requirements must likewise be satisfied in order for there to be a valid foreclosure sale.[8]

We understand that many foreclosure sales in Texas, both judicial and non-judicial, are held outdoors. Frequently, such sales occur on the steps of a courthouse.

With this background in mind, we address your question concerning attendance limitations. Governor Abbott ordered in Executive Order GA-28 that "every business in Texas shall operate at no more than 50 percent of the total listed occupancy of the establishment."[9] This general limitation, however, is subject to several exceptions. One such exception is found in paragraph five of the order, which limits outdoor gatherings to 10 persons or fewer without approval by the mayor or, in the case of unincorporated territory, the county judge in whose jurisdiction the gathering occurs.[10] Accordingly, to the extent a foreclosure sale occurs outdoors, attendance at the sale is limited to 10 persons or fewer unless greater attendance is approved by the relevant mayor or county judge.

While certain services are exempt from the outdoor gathering limitation in Executive Order GA-28, we do not conclude that foreclosure sales are included within them. Executive Order GA-28 exempts from its limitations on outdoor gatherings services described in paragraphs 1, 2, and 4 of the order. Relevant here, paragraph 1 exempts from capacity limitations, *inter alia*, "any services listed by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Workforce, Version 3.1 or any subsequent version."[11] (CISA Guidance). Among the services listed in version 3.1 of

---

[5] *See* TEX. PROP. CODE § 51.002.

[6] *See id.* § 51.002.

[7] *Id.* §§ 51.002(a), (a-1); *see also id.* § 51.002(h) (requiring a sale to be held on or after the 90th day after the date the commissioners court records a designation of a sale at an area other than an area at the county courthouse).

[8] *See Bonilla*, 918 S.W.2d at 21.

[9] Gov. Greg Abbott Exec. Order GA-28.

[10] *Id.* at 3 (as amended by Gov. Greg Abbott Proc. of July 2, 2020).

[11] *Id.* at 2.

the CISA Guidance are "[r]esidential and commercial real estate services, including settlement services."[12]

A court's main objective in construing the law is to give effect to the intent of its provisions.[13] And there is no better indication of that intent than the words that are chosen.[14] One dictionary defines a "service" as "[w]ork that is done for others as an occupation or business."[15] A periodic foreclosure auction conducted at a courthouse—whether by an officer of the court, an attorney, an auction professional, or another person serving as trustee[16]—does not constitute the type of dedicated real estate service work contemplated by the CISA Guidance. Accordingly, we conclude that outdoor foreclosure sales are not exempted from the 10-person attendance limitation imposed by paragraph 5 of Executive Order GA-28.

If a foreclosure sale is subject to, and not exempted from, the 10-person attendance limit imposed in Executive Order GA-28, it should not proceed if one or more willing bidders are unable to participate because of the attendance limit. "[A] sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a *public sale* at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month."[17] The purpose of the public sale requirement is to "secure the attendance of purchasers and obtain a fair price for the property."[18] Strict compliance with the Property Code is required for a trustee to properly make a foreclosure sale.[19] If an attendance limit precludes the conduct of a public sale for the purpose of securing sufficient bidders to obtain a fair price, the propriety of a foreclosure auction may be called into question. Accordingly, to the extent attendance at a foreclosure sale is limited to ten or fewer persons, and that limit precludes the attendance of one or more willing bidders who otherwise would have appeared in person, the sale should not go forward as it likely would not comport with the Property Code requirement that the sale be a "public sale."

---

[12] *See* Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response, at 16, available at https://www.cisa.gov/sites/default/files/publications/Version_3.1_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers.pdf.

[13] *See Summers*, 282 S.W.3d at 437.

[14] *See id.* ("Where text is clear, text is determinative of that intent.").

15 Am. Heritage Dictionary (5th ed. 2020), available at https://www.ahdictionary.com/word/search.html?q=service; *see also Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) (applying an undefined term's ordinary meaning, unless the context of the law in which the term appears suggests a different or more precise definition).

[16] The Texas Property Code does not set forth specific professional requirements for a foreclosure trustee, providing only that "[o]ne or more persons may be authorized to exercise the power of sale under a security instrument." TEX. PROP. CODE § 51.007(a).

[17] TEX. PROP. CODE § 51.002(a) (emphasis added).

[18] *Reisenberg v. Hankins*, 258 S.W. 904, 910 (Tex. Civ. App.–Amarillo 1924, writ dismissed w.o.j.).

[19] *Myrad Props. v. LaSalle Bank Nat'l Assoc.*, 252 S.W.3d 605, 615 (Tex. App.–Austin 2008), *rev'd on other grounds*, 300 S.W.3d 746 (Tex. 2009).

We trust this letter provides you with the advice you were seeking. Please note this letter is not a formal Attorney General opinion under section 402.042 of the Texas Government Code; rather, it is intended only to convey informal legal guidance.

Sincerely,

Ryan Bangert
Deputy First Assistant Attorney General

**STAYS IN FILE**

## ORDER BY THE COUNTY JUDGE OF TRAVIS COUNTY

### County Judge Order 2020-16; Relating to the COVID-19 Community Restrictions

**Whereas,** on March 6, 2020, a Declaration of Local Disaster was issued by the Travis County Judge to allow the County of Travis ("County" or "Travis County"), Texas, to take measures to reduce the possibility of exposure to COVID-19 and promote the health and safety of Travis County residents; and

**Whereas,** on March 13, 2020, a Declaration of State of Disaster was issued by Governor Greg Abbott to take additional steps to prepare for, respond to, and mitigate the spread of COVID-19 to protect the health and welfare of Texans; and

**Whereas,** the virus that causes COVID-19 is contagious and spreads through person-to-person contact, especially in group settings; and

**Whereas,** on June 18, 2020, the County Judge issued Order 2020-12, requiring all commercial entities in Travis County that provide goods or services directly to the public to develop and implement a Health and Safety Policy related to COVID-19 which, at a minimum, shall require that all employees and visitors to the commercial entity's business premises or other facilities wear face coverings;

**Whereas,** on June 26, 2020 the Governor issued Executive Order GA-28 ("GA-28"), related to the reopening of services and business, with reduced occupancy limits and gathering restrictions for individuals and businesses, as well as continuing recommended health protocols and social distancing measures to attempt to mitigate increased transfer of COVID-19 associated with the expanding commercial and social interactions; and

**Whereas,** on July 2, 2020, the Governor issued a Proclamation to amend paragraph 5 of GA-28 to prohibit any outdoor gathering in excess of 10 people, except as specifically exempted in paragraphs 1, 2 and 4 of GA-28, unless approved by the county judge or mayor, subject to conditions and restrictions not inconsistent with GA-28; and

**Whereas,** the Governor's Proclamation of July 2, 2020 also amended paragraph 12 of GA-28 to state "except as provided in this executive order or in the minimum standard health protocols recommended by DSHS, found at www.dshs.texas.gov/coronavirus, people shall not be in groups larger than 10 and shall maintain six feet of social distancing from those not in their group;" and

**Whereas,** on July 2, 2020, the Governor further issued Executive Order GA-29, which requires every person in Texas to wear a face covering over the nose and mouth when inside a commercial entity or other building open to the public, or when in an outdoor public space whenever not feasible to maintain six (6) feet of social distancing from persons outside one's household, and except as provided in the order; and

**Whereas,** on July 9, 2020, the County Judge issued Order 2020-14, effective July 11, 2020, prohibiting any gatherings in excess of 10 people and requiring face coverings, except as permitted by the Governor's orders; and

**Whereas,** as of August 13, 2020, Travis County has experienced 23,718 confirmed cases of COVID-19, with 263 current hospitalizations and 328 deaths as a result of the disease, and although infection rates have currently leveled somewhat, the Health Authority expects the number of infections to rise if current rules regarding masking, social distancing, hygiene, and other health protocols are lifted; and

**Whereas,** Dr. Mark Escott, the interim Health Authority for Austin/Travis County, continues to encourage people to stay home except when necessary and finds that the area still needs to increase testing and contact tracing capabilities, to maintain social distancing and hygiene, and to wear face coverings to provide for the safety of the public while businesses are reopening and when individuals are outside their household; and

**Whereas,** COVID-19 continues to menace the health of County residents and the economy, and the Health Authority has advised on the need for continued vigilance by individuals and County businesses in complying with mandatory health measures; and

**Whereas,** the County Judge has determined that extraordinary emergency measures must be taken to try and mitigate the effects of this public health emergency and to facilitate a response to the public health threat; and

**Whereas,** pursuant to Government Code section 418.108(g), a County Judge is authorized to control ingress and egress from a local disaster area, and control the movement of persons and the occupancy of premises in that disaster area; and

**Whereas,** this Order shall cover all individuals currently living within Travis County, including but not limited to all of the cities and municipalities within the boundaries of Travis County and specifically listed in **Exhibit A**.

## NOW THEREFORE, I, COUNTY JUDGE OF TRAVIS COUNTY, PURSUANT TO THE AUTHORITY VESTED BY TEXAS GOVERNMENT CODE CHAPTER 418, HEREBY FIND AND ORDER THAT:

Effective as of 12:00 a.m., Sunday, August 16, 2020 ("Effective Date"), and continuing through 11:59 p.m. on December 15, 2020 unless extended, modified or terminated early by the Travis County Judge or as otherwise indicated below:

1. **Public Health Emergency**. That this Order shall continue the local disaster declaration and public health emergency for Travis County for the period specified herein and shall incorporate and adopt the most recent orders issued by Governor Greg Abbott including GA-28, as amended by Proclamation issued July 2, 2020, GA-29 issued July 2, 2020, and any subsequent orders or proclamations by the Governor relating to the COVID-19 disaster.

2. **Gatherings**. Any gatherings that exceed 10 people are hereby PROHIBITED, except as permitted by current Governor's Proclamations and Orders.

3. Pursuant to the Governor's Order GA-28, there is no occupancy limit for the following:
   a. any services listed by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) in its Guidance on the Essential Critical Infrastructure Workforce, Version3. 1 or any subsequent version;
   b. religious services conducted in churches, congregations, and houses of worship;
   c. local government operations, including county and municipal governmental operations relating to licensing (including marriage licenses), permitting, recordation, and document-filing services, as determined by the local government;
   d. child-care services;
   e. youth camps, including but not limited to those defined as such under Chapter 141 of the Texas Health and Safety Code, and including all summer camps and other daytime and overnight camps for youths; and
   f. recreational sports programs for youths and adults;

   All participants in lawful gatherings or groups expressly permitted by this Order or the Governor's Order are nonetheless subject to the face covering behaviors set forth in Sections 6 and 7 of this Order and **Exhibits B and C,** including or as may be limited by any other requirements imposed by the Governor's Order. Nothing in this Order prohibits the gathering of members of a household within the household's residence.

4. Pursuant to the Governor's Order GA-28, the outdoor gathering ban in section 2 of this Order does not apply to the following outdoor areas, events, or establishments, except that the following outdoor areas or outdoor venues shall operate at no more than 50 percent of the normal operating limits as determined by the owner:
   a. professional, collegiate, or similar sporting events;
   b. swimming pools;
   c. water parks;
   d. museums and libraries;
   e. zoos, aquariums, natural caverns, and similar facilities; and
   f. rodeos and equestrian events;

5. Pursuant to the Governor's Order GA-28, the outdoor gathering ban in section 2 of this Order does not apply to amusement parks and carnival, except that amusement parks and carnivals shall operate at no more than 50 percent of the normal operating limits as determined by the owner;

6. **Face Covering Requirements**. In accordance with the Governor's Order GA-29, every person in Travis County IS REQUIRED to wear a face covering over their nose and mouth when inside a commercial entity or other building open to the public, or when in an outdoor public space whenever not feasible to maintain six (6) feet of social distancing from persons outside one's household; provided however that this face covering requirement does not apply to the following:
   a. any person younger than 10 years of age;

b. any person with a medical condition or disability that prevents wearing a face covering;

c. any person while the person is consuming food or drink, or is seated at a restaurant to eat or drink;

d. any person while the person is (1) exercising outdoors or engaging in physical activity outdoors, and (2) is maintaining a safe distance from other people not in the same household;

e. any person while the person is driving alone or with passengers who are part of the same household as the driver;

f. any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or a need for specific access to the face, such as while visiting a bank or while obtaining a personal care service involving the face, but only to the extent necessary for the temporary removal;

g. any person while the person is in a swimming pool, lake, or similar body of water;

h. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

i. any person who is actively providing or obtaining access to religious worship, but wearing a face covering is strongly encouraged; or

j. any person while the person is giving a speech for a broadcast or to an audience; and

k. Not excepted from this face-covering requirement is any person attending a protest or demonstration involving more than 10 people and who is not practicing safe social distancing of six feet from other people not in the same household.

l. any person who is alone, or in the presence of only members of the same household or residence, in a separate room or single space not accessible to the public, and not in an indoor common area.

7. **Social Distancing and Hygiene**. All persons should practice Social Distancing and Hygiene as defined below, except when in the presence of only members of one's own household or residence, or when otherwise exempted by this Order. Parents and Guardians of children under 10 are responsible for maintaining social distance between child members of their household and others' households. For purposes of this Order, and as outlined in the Guidelines from the CDC and Austin/Travis County Health Authority (attached as **Exhibit B**). Social Distancing and Hygiene include maintaining at least a six-foot distance from other individuals, washing hands with soap and water for at least 20 seconds as frequently as possible or using hand sanitizer with at least 60% alcohol, covering coughs or sneezes (into the sleeve or elbow, not into hands), regularly cleaning high-touch surfaces, and not shaking hands.

8. **Mandatory Health and Safety Policy – Commercial Entities**. All commercial entities in Travis County that provide goods or services directly to the public must develop and implement a health and safety policy or plan ("Health and Safety Policy") related to preventing transmission of the COVID-19 virus. Travis County includes all municipalities within the boundaries of Travis County listed in Exhibit A. The Health and Safety Policy must require, at a minimum, that all employees, customers and visitors to the commercial entity's business premises or other facilities wear face coverings over their nose and mouth

when in an area or performing an activity which will necessarily involve close contact or proximity to co-workers, other individuals or members of the public where six feet of separation is not feasible, and subject to the exceptions in Section 6. The Health and Safety Policy required to be developed and implemented by this Order may also include the implementation of other mitigating measures designed to control and reduce the transmission of COVID-19 such alternative methods of service for those unable to wear mask or temperature checks or health screenings. A copy of a sample Health and Safety Policy and sign is attached as **Exhibit D**, and can also be found on the Travis County website.

Commercial entities must post the Health and Safety Policy required by this Order in a conspicuous location sufficient to provide notice to employees, customers and visitors of all health and safety requirements. **Failure to develop and implement the Health and Safety Policy required by this Order may result in a fine not to exceed $1,000 for each violation.**

9. **Extension of Deadlines**. Notwithstanding the expiration of this Order, all deadlines or expiration dates imposed by County code, order, rule, or regulation for site plans, subdivisions, development permits, and similar development applications or approvals are extended until March 15, 2021, or the date they would have normally expired, whichever is later.

10. **Prior Orders**. This Order is issued in accordance with and incorporates by reference all declarations, findings, and recitations set out in the preamble to this Order. This Order replaces and supersedes County Judge Orders 2020-12 and 2020-14 in their entirety, and replaces and supersedes Sections 1, and 3 through 7 of the Travis County Judge's Prevention Guidelines and Order of June 16, 2020 (Order 2020-11). Section 2 (Prevention Guidelines) and Section 8 of the County Judge's Prevention Guidelines and Order of June 16, 2020 (Order 2020-11), including the Recommendations of the Health Authority, Face Covering recommendations and Construction Guidance set forth in exhibits B, C and D, remain in effect.

11. The Austin Public Health Department and the Travis County Clerk will post this Order on their websites. In addition, the owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public asking for a copy. If any subsection, sentence, clause, phrase, or word of this Order or any application of it to any person, structure, gathering, or circumstance is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, then such decision will not affect the validity of the remainder of this Order and its application.

12. **Savings Clause**. If any provision of this Order or its application to any person or circumstance is held to be invalid, then the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

13. **ENFORCEMENT**. That the Travis County Sheriff's Office, the Travis County Fire Marshal's Office, and other peace officers are hereby authorized to enforce this Order and the Governor's Executive Orders.

   a. A violation of Section 2 of this Order (Gatherings) may be punishable through criminal or civil enforcement and may result in a fine not to exceed $1,000. A criminal violation of Section 2 of this Order is a misdemeanor punishable by fine only.

   b. For a violation of Section 6 of this Order (Face Covering Requirements), and following a verbal or written warning for a first-time violator of this face covering requirement, a person's second violation shall be punishable by a fine not to exceed $250.00. Each subsequent violation shall be punishable by a fine not to exceed $250.00 per violation.

   c. A violation of Section 8 (Mandatory Health and Safety Policy) may be punishable through civil enforcement and may result in a fine not to exceed $1,000.

14. This Order incorporates by reference the following:

   a. **Exhibit A**: List of Cities and Municipalities within Travis County Jurisdiction Covered by this Order

   b. **Exhibit B**: Recommendations and Requirements by the Austin / Travis County Health Authority for Individuals, Families and Businesses

   c. **Exhibit C:** Face Covering Behaviors

   d. **Exhibit D:** Sample Health and Safety Policy and Sign

**ORDERED** this the 14th day of August, 2020, in the County of Travis, Texas.

_Samuel T. Biscoe_

County Judge
County of Travis, Texas

Filed with the Clerk of Travis County, this 14th day of August, 2020.

_Dana DeBeauvoir_

Dana DeBeauvoir, County Clerk

**Exhibit A: List of Cities and Municipalities within Travis County Jurisdiction covered by the Order**

- City of Austin
- City of Bee Cave
- City of Cedar Park
- City of Creedmoor
- City of Elgin
- City of Jonestown
- City of Lago Vista
- City of Lakeway
- City of Leander
- City of Manor
- City of Mustang Ridge
- City of Pflugerville
- City of Rollingwood
- City of Round Rock
- City of Sunset Valley
- City of West Lake Hills
- Village of Briarcliff
- Village of Point Venture
- Village of San Leanna
- Village of The Hills
- Village of Volente
- Village of Webberville

## Exhibit B

## Austin/Travis County Health Authority
## Requirements and Recommendations
## for Individuals, Families and Businesses

I. **Individuals**  All individuals shall comply with the Governor's Minimum Standard Health Protocols, checklist for all individuals, found at:
https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Checklist-Individuals.pdf

    A. **COVID-19 Positive Individuals**, Suspected Positives, those currently being tested, and Untested Individuals with cough, fever, sore throat, chills, muscle aches, loss of smell, loss of taste, shortness of breath, vomiting, and/or diarrhea shall:

        i.   Not leave their residence without a mask or fabric face covering to prevent the spread to others.

        ii.   Be permitted to do the following while wearing a mask or fabric face covering:

            a.   Seek medical care or emergency medical care related or unrelated to COVID-19. In doing so, they shall notify first responders at the time of the call to 9-1-1 or prior to visiting other healthcare providers that they have tested positive for COVID-19, or been exposed to individuals who have tested positive, are suspected positive for COVID-19 or untested individuals with cough and/or fever.

            b. Walk or exercise alone in the immediate vicinity of their residence.

            c. Seek testing for COVID-19.

        iii. Not leave the County without prior notification to Austin Public Health at APH.Preparedness@austintexas.gov.

        iv. Practice Social Distancing and Hygiene within the residence, observe hygiene practices for prevention of household spread in accordance with the Centers for Disease Control (CDC) guidelines.

        v.   Notify Austin Public Health if the residence does not allow for physical separation from other household contacts (separate room and bathroom).

        vi. Notify Austin Public Health if a member of their household is over the age of 65 and/or if they have underlying medical conditions identified by the CDC of increasing the risk of complications from COVID-19.

vii. Remain in home quarantine for at least 10 days following the onset of their illness and at least three days (72 hours) after the conclusion of their illness (resolution of fever without medications and improvement in cough and shortness of breath), whichever is longer.

B. **Household Members of COVID-19 Positive Individuals, Suspected Positives, those currently being tested, or Untested Individuals with cough, fever, sore throat, chills, muscle aches, loss of smell, loss of taste, shortness of breath, vomiting, and/or diarrhea shall:**

i. Not leave the residence without a mask or fabric face covering to prevent the spread to others.

ii. Be permitted to do the following while wearing a mask or fabric face covering:

a. Seek medical care or emergency medical care related or unrelated to COVID-19. In doing so, they shall notify first responders at the time of the call to 9-1-1 or prior to visiting other healthcare providers that they have been exposed to individuals who have tested positive, are suspected positive for COVID-19 or untested individuals with cough and/or fever.

b. Walk or exercise alone in the immediate vicinity of their residence.

iii. Not leave the County without prior notification to Austin Public Health at APH.Preparedness@austintexas.gov.

iv. Practice Social Distancing and Hygiene within the residence, observe hygiene practices for prevention of household spread in accordance with CDC guidelines.

v. Notify Austin Public Health if the residence does not allow for physical separation from other household contacts (separate room and bathroom).

vi. Notify Austin Public Health or your Primary Care Provider if they develop symptoms consistent with COVID-19 as defined by the CDC.

vii. Remain in home quarantine for at least 14 days since the last contact with an individual known or suspected to be COVID-19 positive, regardless of the presence of symptoms.

C. Individuals should refrain from reporting to work when falling within any of the following criteria:

i. Has signs or symptoms of a COVID-19 infection, such as cough, fever, sore throat, chills, muscle aches, loss of smell, loss of taste, shortness of breath, vomiting, and/or diarrhea;

ii.   Has a fever greater than 99.6°F;

iii.  In the previous 14 days has had contact with someone with a confirmed diagnosis of COVID-19 and did not have the appropriate personal protective equipment designated by the Centers for Disease Control and Prevention (CDC); is under investigation for COVID-19; or is ill with a respiratory illness; or

iv.  Has traveled to an area the World Health Organization or CDC considers a "Hotspot."

If someone in a household has tested positive for COVID-19, or is awaiting results of a COVID-19 test, and a member of the household is an employee of an government service or CISA industry, an exception may be made by Austin Public Health allowing that member of the household to voluntarily return to work after finding the risk of reduced essential services is greater than the risk of infection.

**D. Vulnerable Populations**

i.   Vulnerable populations include people who:

a. Are 65 years old and older; or

b. Have certain health conditions such as heart disease, lung disease, diabetes, kidney disease, Human Immunodeficiency Virus (HIV), Acquired Immune Deficiency Syndrome (AIDS), and weakened immune systems.

ii.  Vulnerable Individuals shall:

a. Avoid group gatherings unless it is essential;

b. Avoid people who are sick,

c. Wear a mask or fabric face covering at all times when in public, and

d. Comply with the Governor's Special Guidance for Texans Over 65, found at: https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Special-Guidance-For-Texans-Over-65.pdf

**E. Individual Gatherings**

i.   All social indoor or outdoor gatherings outside of a single household or dwelling should be avoided or minimized. No more than 10 individuals may stand or gather together, except as expressly permitted by this Order or the Governor's Order.

ii.  Do not attend any events or gatherings if sick.

iii. For household and other gatherings permitted by the Order:

    a. Have hand washing capabilities, hand sanitizers, and tissues available;

    b. Frequently clean high-touch surface areas like countertops, doorknobs, and handrails; and

    c. Find ways to create physical space (minimum of six (6) feet distance between people) to minimize close contact as much as possible.

    d. Find ways to ensure six feet of social distancing from another group or gathering.

**F. Schools and Daycare. To the extent that schools and daycare are open under current orders:**

  i. Do not have your child attend school or daycare if sick.

  ii. If you have a child with chronic health conditions, consult the child's doctor about school and daycare attendance.

  iii. Frequently re-educate students and staff regarding Social Distancing and Hygiene and Face Covering behaviors and ensure that appropriate signs are posted.

  iv. Explore remote teaching and online options to continue learning.

**II.**   **Businesses** shall operate only to the extent permitted by order of the Texas Governor.

**III.**   **Businesses** and services permitted to operate by the Governor's Order shall comply with the following:

**A.** To prevent stigma and discrimination in the workplace, employers shall only adhere to the recommendations described in this Order to determine risk of COVID-19. Employers should contact their own human resources advisors and shall not make determinations of risk based on race, color, religion, sex, sexual orientation, gender identity, age, familial status, disability, marital status, student status, creed, or national origin. To the extent possible, employers should maintain confidentiality of people with suspected or confirmed COVID-19.

**B.** Employers shall only allow persons in and around their premises that are: (1) essential employees not subject to any of the criteria in Section 1 of this Exhibit, (2) delivery personnel, suppliers, customers or members of the public practicing Social Distancing and Hygiene and Face Covering behaviors as set forth in Sections 2, 3, and 5 (Mandatory Health Plans) of this Order, and (3) persons with legal authority to enter such as law enforcement.

C. Prior to allowing employees into its facility, employers shall ask all employees if they meet any of the criteria in Section I of this Exhibit, and shall direct employees to return home or other appropriate shelter and services if the employee is exhibiting symptoms and presenting a threat of infecting others.

D. Employers shall immediately separate an employee who becomes sick or demonstrates a temperature greater than 99.6°F while at work from other employees and send that employee home or to other appropriate shelter and services.

E. Human resources departments shall create alternate work plans to help employees remain productive while keeping the workforce safe and healthy.

F. Employers are strongly encouraged to require employees (either those exhibiting symptoms or all employees) to undergo a COVID-19 symptom check and non-invasive temperature readings prior to entering a worksite; however, **employers are not mandated to take the temperature of employees prior to entrance to its worksite**. If the employer does take employees' temperatures and/or has first-hand knowledge that the employee's temperature exceeds 99.6°F, then the employer shall prohibit the employee from entering the facility or property.

G. Employers shall create and implement an infectious disease response plan.

H. Employers shall comply with the Governor's Minimum Standard Health Protocols, checklist for employers, found at:
https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Checklist-Employers.pdf

I. Where appropriate employers shall:

   i.   Suspend nonessential employee travel;

   ii.  Prohibit employees working within six (6) feet of one another unless necessary to provide continuity of essential services;

   iii. Minimize or cancel in-person meetings and conferences including canceling. postponing or moving to on-line formats for all indoor or outdoor gatherings of any number of people.

   iv.  Require employees to stay home when they are sick and maximize flexibility in sick leave benefits.

   v.   Permit sick employees to stay home without providing a doctor's note.

   vi.  Utilize telecommuting options to minimize person-to-person interaction.

vii.  Alter, stagger or otherwise schedule or separate employees or teams of employees so not all employees are present at one time but are present at alternative days and times, unless necessary to provide continuity of essential services.

viii. Limit or restrict the number of customers or visitors permitted in a workplace at one time.

ix.  Ensure that individuals (employees and clients) queuing inside and outside of the business or workplace can maintain six (6) feet of separation.

x.   Designate special separate shopping times for high-risk clients as designated by the CDC.

xi.  Increase the use and capability of on-line, drive-thru, curbside, or delivery services.

xii. Provide hand washing capabilities, hand sanitizers, and tissues.

xiii. Clean high-touch surface areas like countertops, doorknobs, and handrails at least twice per day with CDC recommended surface cleaners for COVID-19.

xiv. Require and allow employees to practice the Face Covering Behaviors as set forth in Sections 3 and 5 and **Exhibit C** of this Order.

# Exhibit C

## Face Covering Behaviors

A significant percentage of individuals with the COVID-19 virus lack symptoms. Because an infected person can transmit the virus to others before showing any symptoms, the covering of a person's nose and mouth when outside their home or residence is necessary to help prevent the spread of COVID-19. This is consistent with the findings of the CDC and Austin-Travis County Health Authority

Unless you already have your own personal used masks that cannot be donated, the fabric face coverings recommended are not surgical masks or N-95 respirators, which are critical supplies that must continue to be reserved for healthcare workers and first responders. Staying home is the best way to help reduce the spread of the virus, but if an individual must leave their place of residence, wearing a fabric face covering shall be used as outlined in this Exhibit and this Order. **Wearing a face covering is not a substitute for maintaining 6-feet social distancing and hand washing, as these remain important steps to slowing the spread of the virus.**

**The public in general and employers and employees shall adhere to the following:**

a.  All persons ten years of age and older shall wear some form of covering over their nose and mouth, such as a commercially made or homemade mask, scarf, or bandana, when outside of his or her residence.

b.  This section shall not apply to:

 1.  any person younger than 10 years of age;

 2.  any person with a medical condition or disability that prevents wearing a face covering;

 3.  any person while the person is eating or drinking, or is seated at a restaurant to eat or drink;

 4.  any person while the person is (a) exercising outdoors or engaging in physical activity outdoors and (b) maintaining a safe distance from others not in the same household;

 5.  any person while the person is driving alone or with passengers of the same household as the driver;

 6.  any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or the need for specific access to the face, such as while visiting a bank or while obtaining a personal care service involving the face, but only to the extent necessary for the temporary removal;

 7.  any person while the person is in a swimming pool, lake, or similar body of water;

8. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

9. any person who is actively providing or obtaining access to religious worship. but wearing a face covering is strongly encouraged;

10. any person while the person is giving a speech for a broadcast or to an audience;

11. any person while temporary removal of the face covering is necessary for communication by or with a person who is hearing impaired; or

12. any person while alone, or in the presence of only members of the same household or residence, in a separate room or single space not accessible to the public, and not in an indoor common area

    Parents and Guardians of children under 10 shall be responsible for appropriately masking children when outside their residence.

c. All non-residents in nursing homes, retirement and long-term care facilities shall wear a fabric face covering as provided for in this Exhibit and Order (Face Coverings), except as otherwise required by an order issued by the Health Authority. In addition, residents in facilities with confirmed COVID-19 cases shall follow requirements of **Exhibit B**, except when doing so poses a greater mental or physical health, safety or security risk.

d. All COVID-19 Positive Individuals, Suspected Positives, those currently being tested, and untested individuals with cough, fever, sore throat, chills, muscle aches, loss of smell, loss of taste, shortness of breath, vomiting, and/or diarrhea and household members of same category of individuals shall not leave their residence without a mask or cloth face covering to prevent the spread to others.

e. All individuals working for a business shall wear a mask or cloth face covering whenever in public and whenever performing job duties in the presence of others.

f. Unless you already have your own personal used masks that cannot be donated, medical grade (N95) and surgical masks should be reserved and used only by medical professionals and first responders.

Examples of how to make cloth face coverings can be found online including guidance from the CDC and guidance from Austin/ Travis County Health Authority.

g. The fabric face covering should:

1. fit snugly but comfortably against the side of the face,
2. be secured with ties or ear loops,
3. include multiple layers of fabric,
4. allow for breathing without restriction, and

5.  be able to be laundered and machine dried without damage or change to shape.

h.  Employers shall require and allow employees to practice Face Covering Behaviors as set forth in the Order and this **Exhibit C**.

i.  Even with the use of appropriate face coverings, individuals shall maintain six feet of social distancing whenever possible.

j.  Individuals should avoid touching their face and should wash their hands or use hand sanitizer.

k.  For further information, individuals can access information at https://traviscountytx.gov/news/2020/1945-novel-coronavirus-covid-19-information and www.AustinTexas.gov/COVID19.

# Health and Safety Policy

**POLICY.** The virus that causes COVID-19 can be spread to others by infected persons who have few or no symptoms. Because of the hidden nature of this threat, it is the policy of this business to require the following:

**1. FACE COVERING REQUIRED IN ORDER TO ENTER PREMISES.** All persons over the age of ten (10), including employees, customers, visitors, invitees and contractors ("Patrons"), who enter this business must wear a face covering over their nose and mouth, such as a homemade mask, scarf, bandana, or handkerchief.

The requirement of face covering does not apply if covering the nose and mouth poses a greater mental or physical health, safety, or security risk, such as anyone who has trouble breathing, or is unconscious, incapacitated, or otherwise unable to remove the cover without assistance.

**2. SOCIAL DISTANCING PROTOCOLS.** Even with the use of appropriate face coverings, individuals should maintain six feet of social distancing whenever possible.

a. Employees should not work within six (6) feet of one another, except to the extent necessary to provide services;

b. Patrons should maintain six (6) feet of separation from other individuals outside their household, to the extent feasible when inside the business premises.

c. Patrons of the business queuing or waiting inside or on the premises of the business must maintain six (6) feet of separation from other individuals outside their household.

**3. VIOLATIONS.** Patrons who do not wear a face covering may be asked to leave the premises, and may not be provided goods or services until the face covering requirements are followed.

**4. NOTICE AND SIGNAGE.** Notice of this Health and Safety Policy will be posted in a conspicuous location of the business. Sample signage is attached.

# ALL CUSTOMERS
# WEAR FABRIC FACE COVERINGS





## PER CITY AND COUNTY ORDER, ALL CUSTOMERS MUST BE WEARING A FACE COVERING

Cloth face coverings should—

- fit snugly but comfortably against the side of the face

- be secured with ties or ear loops

- include multiple layers of fabric

- allow for breathing without restriction

- ability to be laundered

## Fabric face coverings are not a substitute for physical distancing measures. Continue to maintain 6-feet when outside your home.

DIY face cover instructions available at <u>austintexas.gov/covid19</u>





04/13/2020



**FILED AND RECORDED**

OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir, County Clerk

Travis County, Texas

**2020145196**

Aug 14, 2020 02:31 PM

Fee: $0.00          WELLINB

## STAY HOME, MASK, AND OTHERWISE BE SAFE

### ORDER NO. 20200815-019

BY

### THE MAYOR OF THE CITY OF AUSTIN

DCC RECEIVED AT
AUG 14 '20 PM4:52

**WHEREAS,** on March 6, 2020, I, Mayor Steve Adler, issued a Declaration of Local Disaster pursuant to Texas Government Code Chapter 418, ratified by City Council Resolution No. 20200312-074, to allow the City of Austin to take measures in response to the COVID-19 pandemic and protect the health and safety of Austin residents;

**WHEREAS,** on March 13, 2020, Governor Greg Abbott proclaimed a state-wide state of disaster due to the COVID-19 pandemic and has since issued numerous Executive Orders related to the pandemic, including Executive Orders GA-28 on June 26, 2020, amended on July 2, 2020, and GA-29 on July 2, 2020;

**WHEREAS,** as of August 14, 2020, Travis County has experienced 23,718 confirmed cases of COVID-19 and 328 deaths as a result of the disease;

**WHEREAS,** current protections must remain in place to ensure that ICUs do not reach capacity;

**WHEREAS,** the local Health Authority finds that the area still needs to increase testing and contact tracing capabilities, to maintain social distancing and hygiene, and to wear face coverings to provide for the safety of the public while businesses are reopening;

**WHEREAS,** infected persons can transmit the COVID-19 virus to others before showing any symptoms, and widespread and consistent use of face coverings over the nose and mouth when in public is a critical and necessary measure to help slow the spread of the virus while allowing local businesses to continuing to reopen and help the Austin economy recover;

**WHEREAS,** Governor Abbott has clarified that his plan to reopen the Texas economy includes maintaining the authority of local governments to require businesses to adopt and enforce health policies that include face covering requirements;

**WHEREAS,** by proclamation Governor Abbott amended GA-28 to ban outdoor gatherings of more than 10 persons, subject to certain exceptions;

**WHEREAS,** Governor Abbott issued Executive Order GA-29 requiring all persons in Texas over the age of 10, subject to certain exceptions, to wear masks while inside a commercial entity or other building or space open to the public, or when outside and unable to properly social distance;

**WHEREAS,** on August 14, 2020, the local Health Authority adopted, in accordance with Ordinance No. 20200709-003, new emergency rules that address operational requirements for schools that the local Health Authority finds are necessary to protect the public health; and

**WHEREAS,** COVID-19 continues to menace the health of Austin residents and the Austin economy, and the local Health Authority has advised on the need for continued vigilance by individuals and Austin businesses in complying with mandatory health measures;

**NOW THEREFORE, I, MAYOR OF THE CITY OF AUSTIN, PURSUANT TO THE AUTHORITY VESTED BY TEXAS GOVERNMENT CODE CHAPTER 418, HEREBY ORDER, EFFECTIVE AS OF 12:01 A.M. ON AUGUST 16, 2020, AND CONTINUING THROUGH DECEMBER 15, 2020, THAT IN THE CITY OF AUSTIN:**

**SECTION 1.** All individuals and business establishments are **ORDERED** to practice the social distancing, hygiene, and face covering behaviors set forth in Sections 2 through 5 and **Exhibits A and C**, unless excepted by this Order or otherwise provided by the Governor's Executive Orders GA-28 (as amended), GA-29, and any other executive order in effect (cumulatively referenced as the "Governor's Order"). Further, to the extent this Order does not mandate or directly address a course of action, all individuals and business establishments shall at a minimum comply with any emergency rules adopted by the local Health Authority and the health protocols otherwise recommended in the Governor's Open Texas Checklists, found at: https://gov.texas.gov/organization/opentexas.

Social gatherings of any size shall be avoided or minimized. Vulnerable individuals (those over 65, who are immunocompromised, or who have underlying health conditions putting them at increased risk of harm from COVID-19) shall particularly avoid groups of more than two beyond the members of their single household or residence.

**Further, pursuant to the Governor's Order and the advice of the local Health Authority, gatherings or presence at any outdoor area, event, or establishment of more than 10 persons are PROHIBITED except as provided in this Section.**

While it is recommended that everyone should avoid taking advantage of the following exceptions if reasonably possible, pursuant to the Governor's Order, there is no occupancy limit for the following:

a. any services listed by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) in its Guidance on the Essential Critical Infrastructure Workforce, Version 3.1, or any subsequent version;

b. religious services conducted in churches, congregations, and houses of worship;

c. local government operations;

d. child-care services;

e. youth camps, including but not limited to those defined as such under Chapter 141 of the Texas Health and Safety Code, and including all summer camps and other daytime and overnight camps for youths; and

f. recreational sports programs for youth and adults.

While it is recommended that everyone should avoid taking advantage of the following exceptions if reasonably possible, pursuant to the Governor's Order, the outdoor gathering ban in

this Section does not apply to the following outdoor areas, events, or establishments, except that the following outdoor areas or outdoor venues shall operate at no more than 50 percent of the normal operating limits as determined by the owner:

    a.  professional, collegiate, or similar sporting events;
    b.  swimming pools;
    c.  water parks;
    d.  museum and libraries;
    e.  zoos, aquariums, natural caverns, and similar facilities;
    f.  rodeos and equestrian events; and
    g.  amusement parks.

All participants in lawful gatherings or groups expressly permitted by this Order or the Governor's Order are nonetheless subject to the required social distancing, hygiene, and face covering behaviors set forth in Sections 2 through 5 and **Exhibits A and C,** including as may be limited by any other requirements imposed by the Governor's Order. Nothing in this Order prohibits the gathering of members of a household within the household's residence.

Nursing homes, retirement, and long-term care facilities may permit non-critical assistance visitors or providers to access their facilities, in accordance with the guidance and emergency rules issued by the Texas Health and Human Services Commission. All non-residents in nursing homes, retirement, and long-term care facilities must wear a fabric face covering as set forth in Section 3 (Face Covering Behaviors).

Each school that offers instruction to students in one or more grades, pre-kindergarten through grade 12, must follow the phased-in approach in **Exhibit E** unless it will result in a loss of funding from the Texas Education Agency (TEA).

**Wearing a face covering is not a substitute for maintaining 6-feet social distancing and hand washing, as these remain important steps to slowing the spread of the virus.**

If someone in a household is COVID-19 positive or is awaiting the results of a COVID-19 test, the entire household is **ORDERED** to isolate and not travel outside of the City of Austin except to seek medical attention until cleared by Austin Public Health. When seeking medical care or emergency medical care, a person must notify the healthcare provider in advance (or the 9-1-1 call taker and first responders in the event of an emergency) if they have tested positive for COVID-19 or show symptoms consistent with COVID-19 such as cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, vomiting, nausea, and/or diarrhea, or if they have been exposed to another individual who tested positive or displayed symptoms consistent with COVID-19.

**SECTION 2. Social Distancing and Hygiene**. All persons MUST practice social distancing except when in the presence of only members of one's own household or residence, when passing another individual is incidental and momentary, when dining in groups of 10 or less, or when otherwise exempted by this Order. Parents and guardians of children under 10 shall be responsible for maintaining social distance between child members of their household and others' households. For purposes of this Order, and as outlined in the guidelines from the CDC and

Austin/Travis County Health Authority, social distancing means maintaining at least a six-foot distance from other individuals, washing hands with soap and water for at least 20 seconds as frequently as possible or using hand sanitizer with at least 60% alcohol if soap and water are unavailable, covering coughs or sneezes (into the sleeve or elbow, not into hands), regularly cleaning high-touch surfaces, and not shaking hands.

   **SECTION 3. Individual Face Covering Behaviors:** Because an infected person can transmit the COVID-19 virus to others before showing any symptoms and for other reasons, the covering of a person's nose and mouth is necessary to help slow the spread of the virus. All persons, including those persons attending a protest or demonstration, MUST wear some form of covering that fits snugly over their nose and mouth, such as a commercially made or homemade fabric mask, scarf, bandana, when outside of his or her residence, however, that this face-covering requirement does not apply to the following:

   a.  any person younger than 10 years of age (though it is still recommended for children two years of age and older);

   b.  any person with a medical condition or disability that prevents wearing a face covering;

   c.  any person while the person is eating or drinking, or is seated at a restaurant to eat or drink;

   d.  any person while the person is (1) exercising outdoors or engaging in physical activity outdoors and (2) maintaining a safe distance from others not in the same household;

   e.  any person while the person is driving alone or with passengers of the same household as the driver;

   f.  any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or the need for specific access to the face, such as while visiting a bank or while obtaining a personal care service involving the face, but only to the extent necessary for the temporary removal;

   g.  any person while the person is in a swimming pool, lake, or similar body of water;

   h.  any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

   i.  any person who is actively providing or obtaining access to religious worship, but wearing a face covering is strongly encouraged;

   j.  any person while the person is giving a speech for a broadcast or to an audience;

   k.  any person while temporary removal of the face covering is necessary for communication by or with a person who is hearing impaired; or

   l.  any person who is alone, or in the presence of only members of the same household or residence, in a separate room or single space not accessible to the public, and not in an indoor common area.

Parents and guardians of children under the age of 10 are responsible for appropriately masking their children when outside their residence.

All non-residents in nursing homes, retirement and long-term care facilities shall wear a fabric face covering, except as otherwise required by an order issued by the Health Authority. In addition, residents in facilities with confirmed COVID-19 cases shall follow requirements of **Exhibit A**, except when doing so poses a greater mental or physical health, safety or security risk.

See **Exhibit C** for further direction and guidance on Face Covering Behaviors.

**SECTION 4.  Face Coverings at City Facilities.** Individuals over the age of six must wear face coverings at all times (subject only to the exceptions set forth in Section 3.b-3.l) while present on or in City property or facilities, unless expressly exempted by a City policy applicable to the premises or facility.

**SECTION 5.  Mandatory Face Covering Policies for Business Establishments (both Publicly Accessible and Accessible Only to Employees).** All businesses (including not-for-profit entities) and commercial entities (including without limitation condominium and multi-family residential, office common areas, and individual office spaces), and the operators of any venues or events open to the public, are **ORDERED** to implement and maintain in force and effect during the term of this Order a health and safety policy or plan related to preventing transmission of the COVID-19 virus.

The health and safety policy or plan must, at a minimum, require that all employees, customers, and visitors wear face coverings over their nose and mouth (subject only to the exceptions set forth in Section 3) while in any part of the business's or venue's premises or facility, and must require of and enforce this health and safety policy or plan as to all who enter upon or into the premises or facility.

The health and safety policy or plan required by this Section may also include the implementation of other mitigating measures designed to control and reduce the transmission of COVID-19 such as temperature checks or health screenings as reasonable and appropriate. This Order does not preclude a business or venue from adopting more stringent face covering or hygiene requirements than those required herein. All business establishments and venues subject to this Order must post conspicuous signage displaying the requirements of the health and safety policy or plan required by this Order at or near each entrance (on each entry door if feasible) to the premises in a manner sufficient to provide clear notice to employees, customers, and visitors at least of the face covering requirement. A sample health and safety policy and signage that is minimally compliant with this Section is attached as **Exhibit B** and can be obtained at http://austintexas.gov/page/printed-materials-and-required-signage.

Business employers shall require all employees to comply with the Face Covering Behaviors in this Section while present on the business premises or conducting the employer's business outside the employee's residence. See **Exhibit C** for further direction and guidance on Face Covering Behaviors.

**SECTION 6. Reopened Businesses**. All business establishments allowed to remain reopened by the Governor's Orders are strongly encouraged to operate at a capacity less than otherwise permitted to make it more feasible for customers and staff to maintain proper social distancing within their establishment, and to provide services remotely or in a manner maximizing social distancing (e.g., curb-side pickup, delivery, etc.) as much as possible.

**SECTION 7. City Deadlines.** Notwithstanding the expiration of this Order, all deadlines and expiration dates for site plans, subdivisions, zoning, building permits, and similar development applications or permits are extended until March 15, 2021, or the date they would have normally expired, whichever is later. All other deadlines or expiration dates imposed by City code, ordinance, rule, or regulation remain in effect as provided by the code provision, rule, or regulation, unless otherwise extended by separate order or ordinance.

A manufacturer that retools its business for the primary purpose of manufacturing and producing ventilators, masks, personal protective equipment, or any supplies necessary for Healthcare Operations and Critical Infrastructure may apply for a temporary permit or temporary change of use permit for such manufacturing. The Building Official may suspend any City ordinance, order or regulation which would prevent a manufacturer from retooling its business to produce such equipment in the official's sole discretion, and the official's decision on approving the permit is final.

**SECTION 8. Hospital, Pharmacy, and Clinic Data**. Hospitals, pharmacies, and clinics, or any other entity or person who performs or obtains testing for COVID-19, shall provide the Health Authority test results at least weekly on Thursdays and, beginning August 31, 2020, twice weekly on Mondays and Thursdays. The test results must include: PCR, antigen, antibody testing, and other information when specifically requested by the Health Authority; and must be provided in electronic form and in the manner directed by Austin Public Health. Any data that is required to be provided to the State under state law, shall be simultaneously provided to the City of Austin Health Authority if the individual is tested within the City of Austin or Travis County.

**SECTION 9. Retail, Restaurant Dine-In and Reopened Service Logs and Privacy Protection**. To assist in both the statewide and local contact tracing programs, all retail, restaurants and bars allowing indoor service and all reopened services are encouraged to maintain an activity log of, as reasonably possible, the contact information for all inside or sit-down customers and employees including the dates and times they were present in the business and the location they occupied for more than a passing moment. Voluntary maintaining of such a log may obviate the need for the Austin Public Health normal protocol otherwise of to publicly release, without limitation and in its discretion, the location where people with confirmed infections have been, with relevant dates and timeframes, so as to otherwise trace contacts.

To protect the privacy of customers, the logs shall be maintained only for a one-month period and shall be the property of the business, not the city. The log may be used only by public health authorities if needed for contact tracing. The logs shall not be part of a database and shall not be used for law enforcement purposes.

**SECTION 10. <u>Criminal Offense</u>.** A violation of this Order is a violation of Austin City Code Section 2-6-24 and a criminal offense. A violation of this Order may be punishable through criminal enforcement, except as limited by state order. Peace officers, City of Austin Code Department inspectors, and the Office of the Austin Fire Marshal are hereby authorized to enforce this Order and the Governor's Order. Except as provided below, a criminal violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000, but not by confinement. With respect to Section 5, each day or a portion of each day during which the violation occurs or continues constitutes a separate offense. An individual, rather than a business, who violates any provision of this Order concerning the mandatory wearing of face coverings shall first be given a verbal or written warning. Each subsequent violation is punishable by a fine not to exceed $250 per violation, but not by confinement.

A criminal violation of this Order may be enforced by the filing of a probable cause affidavit alleging the violation with the appropriate court or by issuing a citation to the person violating that contains written notice of the time and place the person must appear before a magistrate of this state, the name and address of the person charged, and the offense charged.

Enforcement of this Order is substantially reliant on self-regulation and a community commitment to public health and safety under the threat of COVID-19. If there is not widespread compliance with this Order, the City will increase enforcement efforts, as allowed by law.

**SECTION 11. Savings Clause.** If any provision of this Order or its application to any person or circumstance is held to be invalid, then the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**SECTION 12. Posting.** The Austin Public Health Department and the City Clerk will post this Order on their websites. In addition, the owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public asking for a copy.

**SECTION 13. Exhibits**. This Order incorporates by reference the following:

| | |
|---|---|
| **Exhibit A**: | Recommendations and Requirements by the Austin / Travis County Health Authority |
| **Exhibit B**: | Sample Business Health and Safety Policy and Signage |
| **Exhibit C**: | Face Covering Behaviors |
| **Exhibit D**: | Construction Requirements |
| **Exhibit E**: | Phased-in Approach to On-Campus Instruction Based on Risk-Based Stages |

**SECTION 14.** This order supersedes Order No. 20200702-017.

**ORDERED** this the _____ day of August 2020, in the City of Austin, Travis County, Texas, in witness whereof I subscribe my name and cause to be affixed the seal of the City of Austin.

20-01061-tmd  Doc#1-1  Filed 10/09/20  Entered 10/09/20 15:43:17  State Court Pleadings
Pg 65 of 609

**SECTION 10.  <u>Criminal Offense.</u>** A violation of this Order is a violation of Austin City Code Section 2-6-24 and a criminal offense. A violation of this Order may be punishable through criminal enforcement, except as limited by state order. Peace officers, City of Austin Code Department inspectors, and the Office of the Austin Fire Marshal are hereby authorized to enforce this Order and the Governor's Order.  Except as provided below, a criminal violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000, but not by confinement.  With respect to Section 5, each day or a portion of each day during which the violation occurs or continues constitutes a separate offense. An individual, rather than a business, who violates any provision of this Order concerning the mandatory wearing of face coverings shall first be given a verbal or written warning. Each subsequent violation is punishable by a fine not to exceed $250 per violation, but not by confinement.

A criminal violation of this Order may be enforced by the filing of a probable cause affidavit alleging the violation with the appropriate court or by issuing a citation to the person violating that contains written notice of the time and place the person must appear before a magistrate of this state, the name and address of the person charged, and the offense charged.

Enforcement of this Order is substantially reliant on self-regulation and a community commitment to public health and safety under the threat of COVID-19.  If there is not widespread compliance with this Order, the City will increase enforcement efforts, as allowed by law.

**SECTION 11. Savings Clause.**   If any provision of this Order or its application to any person or circumstance is held to be invalid, then the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**SECTION 12.  Posting.**  The Austin Public Health Department and the City Clerk will post this Order on their websites.  In addition, the owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public asking for a copy.

**SECTION 13. Exhibits**.  This Order incorporates by reference the following:

| | |
|---|---|
| **Exhibit A**: | Recommendations and Requirements by the Austin / Travis County Health Authority |
| **Exhibit B**: | Sample Business Health and Safety Policy and Signage |
| **Exhibit C**: | Face Covering Behaviors |
| **Exhibit D**: | Construction Requirements |
| **Exhibit E**: | Phased-in Approach to On-Campus Instruction Based on Risk-Based Stages |

**SECTION 14.** This order supersedes Order No. 20200702-017.

**ORDERED** this the 14th day of August 2020, in the City of Austin, Travis County, Texas, in witness whereof I subscribe my name and cause to be affixed the seal of the City of Austin.

Mayor, City of Austin

Filed with me, the City Clerk of the City of Austin, this ___ day of August 2020, by Mayor Steve Adler, whose signature I hereby attest under my hand and the seal of the City of Austin.

City Clerk

8

# Exhibit A

## Austin/Travis County Health Authority
## Requirements and Recommendations
## for Individuals, Families and Businesses

**I. Individuals** All individuals shall comply with the Governor's Minimum Standard Health Protocols, checklist for all individuals, found at:
https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Checklist-Individuals.pdf

  **A. COVID-19 Positive Individuals**, Suspected Positives, those currently being tested, and Untested Individuals with cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, fatigue, vomitin, nausea, and/or diarrhea shall:

   i.   Not leave their residence without a mask or fabric face covering to prevent the spread to others.

   ii.  Be permitted to do the following while wearing a mask or fabric face covering:

      a.  Seek medical care or emergency medical care related or unrelated to COVID-19. In doing so, they shall notify first responders at the time of the call to 9-1-1 or prior to visiting other healthcare providers that they have tested positive for COVID-19, or been exposed to individuals who have tested positive, are suspected positive for COVID-19 or untested individuals with cough and/or fever.

      b.  Walk or exercise alone in the immediate vicinity of their residence.

      c.  Seek testing for COVID-19.

   iii. Not leave the City of Austin without prior notification to Austin Public Health at APH.Preparedness@austintexas.gov.

   iv.  Practice Social Distancing and Hygiene within the residence, observe hygiene practices for prevention of household spread in accordance with the Centers for Disease Control (CDC) guidelines.

   v.   Notify Austin Public Health if the residence does not allow for physical separation from other household contacts (separate room and bathroom).

   vi.  Notify Austin Public Health if a member of their household is over the age of 65 and/or if they have underlying medical conditions identified by the CDC of increasing the risk of complications from COVID-19.

vii. Remain in home quarantine for at least 10 days following the first appearance of systems, at least 24 hours with no fever (without use of fever-reducing medication), and symptoms have improved.

**B**. **Household Members of COVID-19 Positive Individuals**, Suspected Positives, those currently being tested, or Untested Individuals with cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, vomiting, nausea, and/or diarrhea shall:

i. Not leave the residence without a mask or fabric face covering to prevent the spread to others.

ii. Be permitted to do the following while wearing a mask or fabric face covering:

a. Seek medical care or emergency medical care related or unrelated to COVID-19. In doing so, they shall notify first responders at the time of the call to 9-1-1 or prior to visiting other healthcare providers that they have been exposed to individuals who have tested positive, are suspected positive for COVID-19 or untested individuals with cough and/or fever.

b. Walk or exercise alone in the immediate vicinity of their residence.

iii. Not leave the City of Austin without prior notification to Austin Public Health at APH.Preparedness@austintexas.gov.

iv. Practice Social Distancing and Hygiene within the residence, observe hygiene practices for prevention of household spread in accordance with CDC guidelines.

v. Notify Austin Public Health if the residence does not allow for physical separation from other household contacts (separate room and bathroom).

vi. Notify Austin Public Health or your Primary Care Provider if they develop symptoms consistent with COVID-19 as defined by the CDC.

vii. Remain in home quarantine for at least 14 days after the last contact with an individual known or suspected to be COVID-19 positive, regardless of the presence of symptoms.

**C.** Individuals should refrain from reporting to work when falling within any of the following criteria:

i. Has signs or symptoms of a COVID-19 infection, such as cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, vomiting, nausea, and/or diarrhea;

ii. Has a fever greater than 99.6°F;

iii.  In the previous 14 days has had contact with someone with a confirmed diagnosis of COVID-19 and did not have the appropriate personal protective equipment designated by the Centers for Disease Control and Prevention (CDC); is under investigation for COVID-19; or is ill with a respiratory illness; or

iv.  Has traveled to an area the World Health Organization or CDC considers a "Hotspot."

If someone in a household has tested positive for COVID-19, or is awaiting results of a COVID-19 test, and a member of the household is an employee of an government service or CISA industry, an exception may be made by Austin Public Health allowing that member of the household to voluntarily return to work after finding the risk of reduced essential services is greater than the risk of infection.

**D. Vulnerable Populations**

i.  Vulnerable populations include people who:

a.  Are 65 years old and older; or

b.  Have certain health conditions such as heart disease, lung disease, diabetes, kidney disease, Human Immunodeficiency Virus (HIV), Acquired Immune Deficiency Syndrome (AIDS), and weakened immune systems.

ii.  Vulnerable Individuals shall:

a.  Avoid group gatherings unless it is essential;

b.  Avoid people who are sick,

c.  Wear a mask or fabric face covering at all times when in public, and

d.  Comply with the Governor's Special Guidance for Texans Over 65, found at:  https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Special-Guidance-For-Texans-Over-65.pdf

**E. Individual Gatherings**

i.  All social indoor or outdoor gatherings outside of a single household or dwelling should be avoided or minimized. No more than 10 individuals may stand or gather together, except as expressly permitted by this Order or the Governor's Order.

ii.  Do not attend any events or gatherings if sick.

iii.  For household and other gatherings permitted by the Order:

a. Have hand washing capabilities, hand sanitizers, and tissues available;

b. Frequently clean high-touch surface areas like countertops, doorknobs, and handrails; and

c. Find ways to create physical space (minimum of six (6) feet distance between people) to minimize close contact as much as possible.

d. Find ways to ensure six feet of social distancing from another group or gathering.

**F. Schools and Daycare. To the extent that schools and daycare are open under current orders:**

i. Do not have your child attend school or daycare if sick.

ii. If you have a child with chronic health conditions, consult the child's doctor about school and daycare attendance.

iii. Frequently re-educate students and staff regarding Social Distancing and Hygiene and Face Covering behaviors and ensure that appropriate signs are posted.

iv. Explore remote teaching and online options to continue learning.

**II.** **Businesses** shall operate only to the extent permitted by order of the Texas Governor.

**III.** **Businesses** and services permitted to operate by the Governor's Order shall comply with the following:

**A.** To prevent stigma and discrimination in the workplace, employers shall only adhere to the recommendations described in this Order to determine risk of COVID-19. Employers should contact their own human resources advisors and shall not make determinations of risk based on race, color, religion, sex, sexual orientation, gender identity, age, familial status, disability, marital status, student status, creed, or national origin. To the extent possible, employers should maintain confidentiality of people with suspected or confirmed COVID-19.

**B.** Employers shall only allow persons in and around their premises that are: (1) essential employees not subject to any of the criteria in Section I of this Exhibit, (2) delivery personnel, suppliers, customers or members of the public practicing Social Distancing and Hygiene and Face Covering behaviors as set forth in Sections 2, 3, and 5 (Mandatory Health Plans) of this Order, and (3) persons with legal authority to enter such as law enforcement.

**C.** Prior to allowing employees into its facility, employers shall ask all employees if they meet any of the criteria in Section I of this Exhibit, and shall direct employees to return home or other appropriate shelter and services if the employee is exhibiting symptoms and presenting a threat of infecting others.

**D.** Employers shall immediately separate an employee who becomes sick or demonstrates a temperature greater than 99.6°F while at work from other employees and send that employee home or to other appropriate shelter and services.

**E.** Human resources departments shall create alternate work plans to help employees remain productive while keeping the workforce safe and healthy.

**F.** Employers are strongly encouraged to require employees (either those exhibiting symptoms or all employees) to undergo a COVID-19 symptom check and non-invasive temperature readings prior to entering a worksite; however, **employers are not mandated to take the temperature of employees prior to entrance to its worksite**. If the employer does take employees' temperatures and/or has first-hand knowledge that the employee's temperature exceeds 99.6°F, then the employer shall prohibit the employee from entering the facility or property.

**G.** Employers shall create and implement an infectious disease response plan.

**H.** Employers shall comply with the Governor's Minimum Standard Health Protocols, checklist for employers, found at:
https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Checklist-Employers.pdf

**I.** Where appropriate employers shall:

    i.   Suspend nonessential employee travel;

    ii.   Prohibit employees working within six (6) feet of one another unless necessary to provide continuity of essential services;

    iii.   Minimize or cancel in-person meetings and conferences including canceling, postponing or moving to on-line formats for all indoor or outdoor gatherings of any number of people.

    iv.   Require employees to stay home when they are sick and maximize flexibility in sick leave benefits.

    v.   Permit sick employees to stay home without providing a doctor's note.

    vi.   Utilize telecommuting options to minimize person-to-person interaction.

vii.  Alter, stagger or otherwise schedule or separate employees or teams of employees so not all employees are present at one time but are present at alternative days and times, unless necessary to provide continuity of essential services.

viii. Limit or restrict the number of customers or visitors permitted in a workplace at one time.

ix.   Ensure that individuals (employees and clients) queuing inside and outside of the business or workplace can maintain six (6) feet of separation.

x.    Designate special separate shopping times for high-risk clients as designated by the CDC.

xi.   Increase the use and capability of on-line, drive-thru, curbside, or delivery services.

xii.  Provide hand washing capabilities, hand sanitizers, and tissues.

xiii. Clean high-touch surface areas like countertops, doorknobs, and handrails at least twice per day with CDC recommended surface cleaners for COVID-19.

xiv. Require and allow employees to practice the Face Covering Behaviors as set forth in Sections 3 and 5 and **Exhibit C** of this Order.

# Exhibit B

# SAMPLE HEALTH AND SAFETY POLICY & SIGNAGE
# [ATTACHED]

# <u>COVID-19 HEALTH & SAFETY POLICY</u>

**POLICY.**  The virus that causes COVID-19 can be spread to others by infected persons who have few or no symptoms. Because of the hidden nature of this threat, it is the policy of this business, as required by City and County Orders, to require the following:

1. **FACE COVERING REQUIRED IN ORDER TO ENTER PREMISES.** All persons over the age of ten (10), including employees, customers, visitors, invitees, and contractors ("Patrons"), who enter this business MUST wear a face covering over their nose and mouth, such as a commercially made or homemade mask, scarf, bandana, or handkerchief. This requirement does not apply if covering the nose or mouth poses a greater mental or physical health, safety, or security risk to the Patron, such as anyone having trouble breathing due to a medical condition, or is unconscious, incapacitated, or otherwise unable to remove the cover without assistance.

2. **SOCIAL DISTANCING PROTOCOLS.** Even with the use of appropriate face coverings, individuals should maintain six (6) feet of social distancing from others outside their own household whenever possible.

   a. Employees should not work within six (6) feet of one another, except to the extent necessary to provide services.

   b. Patrons should maintain six (6) feet of separation from others outside their own household to the extent feasible when inside these premises and must do so while queuing or waiting.

3. **VIOLATIONS.** Patrons who do not wear a face covering will be asked to leave the premises and may not be provided goods or services until the face covering requirements of this policy and City and County Orders are followed.

4. **NOTICE AND SIGNAGE.** Notice of this Health and Safety Policy will be posted in a conspicuous location on these premises.

# Exhibit C

## Face Covering Behaviors

A significant percentage of individuals with the COVID-19 virus lack symptoms. Because an infected person can transmit the virus to others before showing any symptoms, the covering of a person's nose and mouth when outside their home or residence is necessary to help prevent the spread of COVID-19. This is consistent with the findings of the CDC and Austin-Travis County Health Authority

Unless you already have your own personal used masks that cannot be donated, the fabric face coverings recommended are not surgical masks or N-95 respirators, which are critical supplies that must continue to be reserved for healthcare workers and first responders. Staying home is the best way to help reduce the spread of the virus, but if an individual must leave their place of residence, wearing a fabric face covering shall be used as outlined in this Exhibit and this Order. **Wearing a face covering is not a substitute for maintaining 6-feet social distancing and hand washing, as these remain important steps to slowing the spread of the virus.**

**The public in general and employers and employees shall adhere to the following:**

a.  All persons shall wear some form of covering over their nose and mouth, such as a commercially made or homemade mask, scarf, or bandana, when outside of his or her residence.

b.  This section shall not apply to:

1.  any person younger than 10 years of age (though masks are recommended for children two years of age and older);

2.  any person with a medical condition or disability that prevents wearing a face covering;

3.  any person while the person is eating or drinking, or is seated at a restaurant to eat or drink;

4.  any person while the person is (a) exercising outdoors or engaging in physical activity outdoors and (b) maintaining a safe distance from others not in the same household;

5.  any person while the person is driving alone or with passengers of the same household as the driver;

6.  any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or the need for specific access to the face, such as while visiting a bank or while obtaining a personal care service involving the face, but only to the extent necessary for the temporary removal;

7.  any person while the person is in a swimming pool, lake, or similar body of water;

8.  any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

9.  any person who is actively providing or obtaining access to religious worship, but wearing a face covering is strongly encouraged;

10. any person while the person is giving a speech for a broadcast or to an audience;

11. any person while temporary removal of the face covering is necessary for communication by or with a person who is hearing impaired; or

12. any person while alone, or in the presence of only members of the same household or residence, in a separate room or single space not accessible to the public, and not in an indoor common area

Parents and Guardians of children under 10 shall be responsible for appropriately masking children when outside their residence.

c.  All non-residents in nursing homes, retirement and long-term care facilities shall wear a fabric face covering as provided for in this Exhibit and set forth in Section 3 of this Order (Face Covering Behaviors), except as otherwise required by an order issued by the Health Authority. In addition, residents in facilities with confirmed COVID-19 cases shall follow requirements of **Exhibit A**, except when doing so poses a greater mental or physical health, safety or security risk.

d.  All COVID-19 Positive Individuals, Suspected Positives, those currently being tested, and untested individuals with cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, vomiting, nausea, and/or diarrhea and household members of same category of individuals shall not leave their residence without a mask or cloth face covering to prevent the spread to others.

e.  All individuals working for a business shall wear a mask or cloth face covering whenever in public and whenever performing job duties in the presence of others.

f.  Unless you already have your own personal used masks that cannot be donated, medical grade (N95) and surgical masks should be reserved and used only by medical professionals and first responders.

Examples of how to make cloth face coverings can be found online including guidance from the CDC and guidance from Austin/ Travis County Health Authority.

g.  The fabric face covering should:

1.  fit snugly but comfortably against the side of the face;

2.     be secured with ties or ear loops;

3.     include multiple layers of fabric;

4.     allow for breathing without restriction; and

5.     be able to be laundered and machine dried without damage or change to shape.

h.     Employers shall require and allow employees to practice Face Covering Behaviors as set forth in Section 3 and this **Exhibit C**.

i.     Even with the use of appropriate face coverings, individuals shall maintain six feet of social distancing whenever possible.

j.     Individuals should avoid touching their face and should wash their hands or use hand sanitizer.

k.     For further information, individuals can access information at https://traviscountytx.gov/news/2020/1945-novel-coronavirus-covid-19-information and www.AustinTexas.gov/COVID19.

# Exhibit D

# CONSTRUCTION REQUIREMENTS

**1.** The person in charge of the overall site ("Site Manager") shall ensure the following is implemented and maintained at the work site.  For sites not large enough by virtue of physical size or number of workers, or which do not have a general contractor, the responsibilities of a Site Manager in this document are also conferred on each subcontractor on a site.

a. Ensure workers practice the Social Distancing and Face Covering Behaviors as set forth in Sections 2 and 3 and **Exhibits A** and **C** of this Order during non-construction activities and, to the greatest extent possible, during construction activities, with careful attention paid to "choke points" and "high-risk areas" where workers are at greater risk to closely gather, such as hallways, hoists and elevators, and break areas;

(1) Follow healthy work practices in **Exhibit A** of this Order;

(2) Ensure all workers wear a fabric face covering consistent with Section 3 and **Exhibit C** of this Order;

(3) For all construction sites within the City, except as noted, Site Manager shall:

i.   Institute staggered shifts for sites with more than 10 active workers and post at these sites, in languages understood by all persons working there, a notice showing the sizes and types of shift crews working there, and directions on how the Site Manager is limiting crew sizes and rotating shifts.

ii.  Every day before the commencement of work, for and understood by each worker, conduct a jobsite pre-screening of the general health of each worker, provide a briefing reiterating the COVID-19 safety requirements, and check for personal protective equipment.

iii. Ensure that the site has at least one handwashing station with soap or hand sanitizer and one portable restroom stocked with hand soap and/or hand sanitizer with at least 60% alcohol for every 15 workers, and the handwashing station and restroom(s) must be spaced six feet apart or more from each other.

iv.  Mandate handwashing of at least twenty seconds for workers as follows:

(a)  Before workers begin work;
(b)  After workers remove gloves;
(c)  Before and after the use of high-touch items such as tools, electronic devices or multi-user devices;
(d)  Before and after any meal or restroom breaks; and
(e)  After a worker's shift or work time ends.

v.  Prohibit the use of community water coolers and provide individual water bottles or instruct workers to bring their own.

vi.  Ensure that shared tools are disinfected between users, and that common areas (lunch and break areas, toolbox talk areas, large equipment, electronic devices etc.) and collective touch points (doorknobs, counters, keyboards, etc.) are cleaned and disinfected at least twice a day.

vii. Post in a conspicuous place or places on a site where notices to employees are customarily posted, once such signage is made available by the City, a sign in English and Spanish providing the Social Distancing and Hygiene and Face Covering Behaviors as set forth in Sections 2 and 3 and **Exhibits A** and **C** of this Order, the Requirements and Recommendations for Employees in **Exhibit A** of this Order, and information for workers to submit complaints of any violations.

viii. Post at least one Austin Public Health "Help Prevent Disease" sign at each entrance and on each portable restroom door (available for download and print at: http://www.austintexas.gov/sites/default/files/files/Health/General%20Hygiene%20F lyer%20Final2-1-eng-051120.pdf).

ix. Provide single use disposable paper towels and no-touch trash receptacles.

x. Keep toilets clean, sanitary, and operational at all times and ensure proper disposal of waste from these facilities.

xi. Designate a COVID-19 Safety Monitor who has the authority to enforce these rules and shall be on-site at all times.  The contact information for the Safety Monitor must be made available to the City.  The Safety Monitor may also be the Site Manager and shall advise the City if that is the case when providing their contact information.

b.  If a worker at a construction site is confirmed to have contracted COVID-19, the Site Manager shall immediately send the worker home, notify Austin Public Health, and follow all directions from Austin Public Health concerning that worker and workers that may have come in contact with the infected worker.

c.  The Site Manager shall ensure that every worker who enters a jobsite has signed in and shall keep a list of and contact information for every worker that enters the jobsite every day for the purpose of identifying and notifying workers if they have shared a jobsite with someone who has been confirmed to have COVID-19.

d.  All Construction Industry employers are encouraged to observe the following employment practices for the health of the workers, the health of the community generally, and for the benefit of the overall economy of the City:

(1) Take no adverse action against a worker who declines to work at a construction site if the worker believes in good faith that the site presents an imminent health risk of the worker or others due to COVID-19.

(2) Take no adverse action against a worker who has been quarantined, or advised to self-quarantine, due to possible exposure to COVID-19.

(3) Do not contest a claim for unemployment benefits filed by a worker temporarily furloughed as the result of the closure of a construction site due to COVID-19.

e. Continuing review of health conditions. The City will continue to monitor closely the health condition of the community and the statistical models for the likely spread of the COVID-19 virus in the community on an ongoing basis. If this evidence indicates that the City's ability to provide adequate care for those with serious cases of COVID-19 is significantly compromised, additional emergency orders or guidance may be issued. All persons in the construction industry should be aware of this risk and are strongly encouraged to take all feasible steps to eliminate person-to-person contact at construction sites, and to practice the City's Social Distancing and Hygiene and Face Covering Behaviors at all times.

# Exhibit E
# Phased-in Approach to On-Campus Instruction Based on Risk-Based Stages

Each school must follow this phased-in approach unless following this approach will result in a loss of funding from the Texas Education Agency (TEA). The percentages described below also apply to school gatherings and sports activities. A school can determine the stage by checking http://www.austintexas.gov/page/covid-19-risk-based-guidelines.

## COVID-19: Risk-Based Stages for Phased-in Learning

| | CDC Level of Community Transmission | On-campus Population |
|---|---|---|
| Stage 1 | No to minimal transmission | Up to 100% on-campus learning |
| Stage 2 | Minimal to moderate transmission | Up to 75% on-campus learning |
| Stage 3 | Substantial, controlled transmission | Up to 50% on-campus learning |
| Stage 4 | Substantial, uncontrolled transmission | Up to 25% on-campus learning |
| Stage 5 | Widespread uncontrolled transmission threatening our healthcare infrastructure | 100% virtual learning |

# EXHIBIT C

**Maryann Norwood**

| | |
|---|---|
| **From:** | Adler, Steve <Steve.Adler@austintexas.gov> |
| **Sent:** | Wednesday, August 26, 2020 6:41 PM |
| **To:** | Maryann Norwood |
| **Cc:** | Varghese, Lesley; Shack, Barbara; Clark, Janine |
| **Subject:** | Re: Urgent Clarification Regarding Foreclosure Sales in Austin, Texas |

Ms. Norwood:

This email is to confirm that I have neither approved nor authorized any outdoor gatherings in Austin, Texas, in excess of 10 persons, except as specifically allowed by the Governor. This restriction on such gatherings, which does not specify or call out call out particular types of gathering, are found in *Order No 20200815-019 issued by the Mayor of the City of Austin* and remain in effect through December 15, 2020.

Steve Adler
Mayor of the City of Austin

---

**From:** Maryann Norwood
**Sent:** Wednesday, August 19, 2020 6:13 PM
**To:** lesley.varghese@austintexas.gov; steve.adler@austintexas.gov
**Cc:** Barbara.shack@austintexas.gov
**Subject:** Urgent Clarification Regarding Foreclosure Sales in Austin, Texas

Mayor Adler and Ms. Varghese:

This letter is in follow-up to my contact with your offices yesterday through the City of Austin website. I am writing to request clarification from your office that foreclosure sales may not be held in Austin, Texas without your express approval so long as governmental orders remain in place prohibiting outdoor gatherings in excess of 10 persons.

There are currently three orders that restrict such gatherings:

1. ***Executive Order GA-28 (as amended)*** (*Addendum A*) issued by Governor Abbot provides that outdoor gatherings in excess of 10 people are underlined prohibitedunless the mayor of the city in which the gathering is held . . . approves of the gathering.
   a. Executive Order GA-28's application to foreclosure sales was specifically addressed in an informal guidance letter issued by the Attorney General's office (*Addendum B*), as further detailed below, in which the Attorney General's office confirmed that foreclosure sales may  not satisfy the public requirement without express approval from the city mayor to hold the sale gathering.

2. ***Order No 202-16 by the County Judge of Travis County*** (*Addendum C*), after reciting the restrictions in place on outdoor gatherings under GA-28, provides "any gatherings that exceed 10 people are hereby PROHIBITED, except as permitted by current Governor's Proclamations and Orders."

3. ***Order No 20200815-019 issued by the Mayor of the City of Austin*** (*Addendum D*) , after reciting the restrictions in place on outdoor gatherings under GA-28, provides in relevant part that through December 15, 2020 "Further, pursuant to the Governor's Order, and the advice of the local Health Authority, gatherings or presence at any outdoor area, event, or establishment of more than 10 persons are PROHIBITED except at provided in this Section."

As you know, Texas is generally considered to be the most lender-friendly state, as non-judicial foreclosures can be completed in as short as 21 days. The protection for owners against such lender-friendly and expeditious foreclosure is the assurance that foreclosures will only be conducted when there is strict compliance with Texas Property Code Section 51.002.

Governor Abbott's Executive Order 28 which prohibits gatherings of more than 10 persons is in direct contradiction with the requirement for a "public sale" under Texas Property Code Section 51.002(a) ("a sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month."

This impact of GA-28 on the right to hold foreclosure sales in satisfaction of the public sale requirement was specifically discussed and addressed in by the Attorney General of the State of Texas in a letter to Senator Bryan Hughes on August 1, 2020 ("AG Guidance Letter"). The AG Guidance Letter provides in relevant part:

> *With this background in mind, we address your question concerning attendance limitations. Governor Abbott ordered in Executive Order GA-28 that "every business in Texas shall operate at no more than 50 percent of the total listed occupancy of the establishment." This general limitation, however, is subject to several exceptions. One such exception is found in paragraph five of the order, which limits outdoor gatherings to 10 persons or fewer without approval by the mayor or, in the case of unincorporated territory, the county judge in whose jurisdiction the gathering occurs. Accordingly, to the extent a foreclosure sale occurs outdoors, **attendance at the sale is limited to 10 persons or fewer unless greater attendance is approved by the relevant mayor or county judge**.*
>
> *. . .*
>
> ***If a foreclosure sale is subject to, and not exempted from, the 10-person attendance limit imposed in Executive Order GA-28, it should not proceed if one or more willing bidders are unable to participate because of the attendance limit.*** *"[A] sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month." **The purpose of the public sale requirement is to "secure the attendance of purchasers and obtain a fair price for the property." Strict compliance with the Property Code is required for a trustee to properly make a foreclosure sale**. If an attendance limit precludes the conduct of a public sale for the purpose of securingsufficient bidders to obtain a fair price, the propriety of a foreclosure auction may be called into question. **Accordingly, to the extent attendance at a foreclosure sale is limited to ten or fewer persons, and that limit precludes the attendance of one or more willing bidders who otherwise would have appeared in person, the sale should not go forward as it likely would not comport with the Property Code requirement that the sale be a "public sale."***

(internal citations omitted)

In light of the standing orders above, and given that you have not approved outdoor gatherings in excess of 10 people in Austin, Texas, foreclosure sales held in Austin, Texas cannot satisfy the public sale requirement as outlined above.

Nevertheless, there are at least 35 properties listed for foreclosure in Austin, Texas for September 1, 2020, which indicates that lenders are attempting to go forward with the foreclosure sales despite the restrictions. Attached *Addendum E* is a listing of those noticed sales as found on the Travis County real property records website.

In light of the foregoing, we write to request that you formally clarify, by way of order, that foreclosure sales may not occur in Austin, Texas without your express approval. This clarification is necessary to protect citizens and constituents in the Austin community and time is of the essence.

Respectfully,

<image001.jpg>

Maryann Norwood | Corporate Counsel

World Class

814 Lavaca Street | Austin, TX 78701

T 512.420.4144 | F 512.597.0612 | M 512.962.3528

mnorwood@world-class.com | www.world-class.com

The information contained in this e-mail is strictly confidential and for the intended use of the addressee only and may also be privileged or otherwise protected by other legal rules. Any disclosure, use or copying of the information by anyone other than the intended recipient is prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and delete this message from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender does not accept liability for any errors or omissions in the contents of this message or for any damage sustained as a result of software viruses and advise that you carry out your own virus checks before opening any attachment. This email contains the views of the author and should not be interpreted as the views of World Class Holding Company, LLC or its affiliates.

**CAUTION:** This email was received at the City of Austin, from an EXTERNAL source. Please use caution when clicking links or opening attachments. If you believe this to be a malicious and/or phishing email, please forward this email to cybersecurity@austintexas.gov.

<Letter to the Honorable Mayor Adler.pdf><Addenda A through E.pdf>

CAUSE NO. _____

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC and | § | IN THE DISTRICT COURT OF |
| AFFILIATED COMMERCIAL SERVICES, | § | |
| INC. | § | TRAVIS COUNTY, TEXAS |
|       Plaintiffs, | § | |
| | § | |
|   v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| | § | |
| 8209 BURNET, LP, AND | § | |
| BANCORPSOUTH BANK | § | |
|       Defendant. | | |

## TEMPORARY RESTRAINING ORDER

This Court, having heard and considered WC Teakwood Plaza, LLC, Texas a limited liability corporation, ("Borrower") and Affiliated Commercial Services, Inc., a Texas Corporation ("Bidder", together with Borrower, the "Plaintiffs") Petition for a Temporary Restraining Order, and all evidence and arguments of counsel with notice to 8209 Burnet, LP, a foreign entity not authorized to do business in Texas, and BancorpSouth Bank, a Mississippi banking corporation, it appears to the Court that immediate and irreparable injury, loss, or damage will result to WC Teakwood Plaza, LLC unless a Temporary Restraining Order is issued to restrain 8209 Burnet, LP, from such Lender from attempting to proceed with a non judicial foreclosure sale on September 1, 2020, on the steps of the Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas, as doing so would be in violation of Borrower's statutory right to a public sale under the Texas Property Code and would deny Bidder's and other interested parties from attending the sale casing irreparable damage to both due to the unique nature of real estate, Bidder's only claim hereunder

ORDERED that this Temporary Restraining Order will be operative until the _____ day of September, 2020, and pending the hearing ordered below. It is further ORDERED that 8209 Burnet, LP,  and BancorpSouth Bank or any of its officers, agents, servants, employees, attorneys, representatives, or any persons in active concert or participation with them who receive actual notice of this Order are hereby restrained from taking any action in exercising the power of foreclosure, including but not limited to posting or foreclosing on the property described as follows:

**EXHIBIT A Legal Description**


    Plaintiff shall file with the Clerk a bond executed by Plaintiff in the sum of _____, payable to the Travis County District Clerk to be deposited into the Registry of the Court,  approved and conditioned as the law requires. It is, further,

    ORDERED that WC Teakwood Plaza, LLC,'s Petition for a Temporary Injunction, as contained in its verified Original Petition, will be heard before the Captioned Court on the _____ day of _____, 2020, at _____ _____.m.

    SIGNED this ____ day of _____, 2020.


                                    _____
                                    JUDGE PRESIDING

APPROVED AS TO FORM AND SUBSTANCE:

_____

Manfred Sternberg
SBN: 19175775
1700 Post Oak Blvd. Suite 600
Houston, TX 77056
Telephone:   (713) 622-4300
Facsimile:   (713) 622-9899
Email: manfred@msternberg.com

**COUNSEL FOR PLAINTIFF**

# EXHIBIT A

# TEAKWOOD PLAZA

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 51' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

    1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

    2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

# TAB 2

8/31/2020 8:53 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-20-004508
Jessica A. Limon

CAUSE NO. D-1-GN-20-004508

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC and | § | IN THE DISTRICT COURT OF |
| AFFILIATED COMMERCIAL SERVICES, | § | |
| INC. | § | TRAVIS COUNTY, TEXAS |
| Plaintiffs, | § | |
| | § | |
| v. | § | 261st JUDICIAL DISTRICT |
| | § | |
| | § | |
| 8209 BURNET, LP, AND | § | |
| BANCORPSOUTH BANK | § | |
| Defendant. | | |

## TEMPORARY RESTRAINING ORDER

This Court, having heard and considered WC Teakwood Plaza, LLC, Texas a limited liability corporation, ("Borrower") and Affiliated Commercial Services, Inc., a Texas Corporation ("Bidder", together with Borrower, the "Plaintiffs") Petition for a Temporary Restraining Order, and all evidence and arguments of counsel with notice to 8209 Burnet, LP, a foreign entity not authorized to do business in Texas, and BancorpSouth Bank, a Mississippi banking corporation, it appears to the Court that immediate and irreparable injury, loss, or damage will result to WC Teakwood Plaza, LLC unless a Temporary Restraining Order is issued to restrain 8209 Burnet, LP, from such Lender from attempting to proceed with a nonjudicial foreclosure sale on September 1, 2020, on the steps of the Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas, as doing so would be in violation of Borrower's statutory right to a public sale under the Texas Property Code and would deny Bidder's and other interested parties from attending the sale casing irreparable damage to both due to the unique nature of real estate, Bidder's only claim hereunder

IT IS ORDERED that this Temporary Restraining Order will be operative until the 14th day of September, 2020, and pending the hearing ordered below. It is further ORDERED that 8209 Burnet, LP,  and BancorpSouth Bank or any of its officers, agents, servants, employees, attorneys, representatives, or any persons in active concert or participation with them who receive actual notice of this Order are hereby restrained from taking any action in exercising the power of foreclosure, including but not limited to posting or foreclosing on the property described as follows:

**EXHIBIT A Legal Description**

Plaintiff shall file with the Clerk a bond executed by Plaintiff in the sum of $1000, payable to the Travis County District Clerk to be deposited into the Registry of the Court, approved and conditioned as the law requires. It is, further,

IT IS ORDERED that the Clerk shall issue notice to Respondent, 8209 Burnet, LP, and BancorpSouth Bank, to appear, and Respondent is hereby ORDERED to appear by videoconference at the hearing on Petitioner's Request for Temporary Injunction at **8:30 a.m. on September 10, 2020**. The purpose of the hearing is to determine whether the relief requested in the Application for temporary Injunction should be granted along with any other relief deemed necessary and equitable.

The hearing will be conducted using Zoom videoconference technology. Since several cases are scheduled at 8:30 a.m., your case may be called later in the day on September 10, 2020, and you must be available when your case is called.  Once your case is assigned to a specific court, you will be provided information with specific credentials to participate in this videoconference court proceeding.   When  you  are  served  with  notice  of  the  hearing,  please  email Travis.CivilCourts@traviscountytx.gov with your contact information.

SIGNED this  **31**  day of  **August**_____, 2020, at 8:43 P.M.

_____
JUDGE PRESIDING

2

# EXHIBIT A
# TEAKWOOD PLAZA

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 0 " , ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

Unofficial Copy — Travis County District Clerk — Velva L Price

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

    1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

    2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1...FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Envelope ID: 45856075
Status as of 9/1/2020 2:17 PM CST

Associated Case Party: WC Teakwood Plaza, LLC

| Name | BarNumber | Email | Timestamp Submitted | Status |
|------|-----------|-------|---------------------|--------|
| Manfred Sternberg | | manfred@msternberg.com | 8/31/2020 8:53:13 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Mark Riley | | Riley@Riley-CPA-Law.com | 8/31/2020 8:53:13 PM | SENT |
| Christopher Dodson | | chris.dodson@bracewell.como | 8/31/2020 8:53:13 PM | ERROR |
| Michael J.Durrschmidt | | mdurrschmidt@hirschwest.com | 8/31/2020 8:53:13 PM | SENT |

Unofficial copy Travis Co. District Clerk Velva L. Price

# TAB 3

9/1/2020 2:06 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-20-004508**
**Norma Ybarra**

CAUSE NO. D-1-GN-20-004508

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC and AFFILIATED COMMERCIAL SERVICES, INC. | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| 8209 BURNET, LP, and BANCORPSOUTH BANK | § § | |
| Defendants. | § | 261st JUDICIAL  DISTRICT |

## <u>NOTICE OF HEARING</u>

Please be advised that Plaintiffs' Application for Temporary Injunction has been set for

hearing on Thursday, September 10, 2020 at 9:00 a.m. Central Time on the Central Docket of

Travis County, Texas in accordance with the Court's August 31, 2020 Temporary Restraining

Order entered in this case.  Per the Third Amended Emergency Order Regarding COVID-19, the

hearing will take place via Zoom.  Announcements will be taken until Wednesday, September 2,

2020 at 5:00 p.m.  The total time needed for the entire hearing for all participants is 3 hours.

Respectfully submitted,

BRACEWELL LLP

By: /s/ W. Stephen Benesh
    W. Stephen Benesh
    State Bar No. 02132050
    Email:  steve.benesh@bracewell.com
    111 Congress Avenue, Suite 2300
    Austin, Texas 78701
    713-223-2300 (Telephone)
    713-221-1212 (Facsimile)

    Christopher L. Dodson
    State Bar No. 24050519
    Email:  chris.dodson@bracewell.com
    Jaclyn Carr
    State Bar No. 24093776

Email: jaclyn.carr@bracewell.com
Robert P. Grattan
State Bar No. 24116452
Email: bob.grattan@bracewell.com
711 Louisiana, Suite 2300
Houston, Texas  77002
713-223-2300 (Telephone)
800-404-3970 (Facsimile)

ATTORNEYS FOR DEFENDANT
8209 BURNET, LP

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record pursuant to the Texas Rules of Civil Procedure on September 1, 2020 as follows:

Manfred Sternberg
1700 Post Oak Blvd., Suite 600
Houston, Texas 77056
Counsel for Plaintiffs

*/s/ Christopher L. Dodson*
Christopher L. Dodson

#6227529

2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Diana Alday on behalf of W Benesh
Bar No. 2132050
diana.alday@bracewell.com
Envelope ID: 45878942
Status as of 9/3/2020 3:56 PM CST

Associated Case Party: WC Teakwood Plaza, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Manfred Sternberg | | manfred@msternberg.com | 9/1/2020 2:06:19 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Riley | | Riley@Riley-CPA-Law.com | 9/1/2020 2:06:19 PM | SENT |
| Michael J.Durrschmidt | | mdurrschmidt@hirschwest.com | 9/1/2020 2:06:19 PM | SENT |
| Christopher Dodson | | chris.dodson@bracewell.como | 9/1/2020 2:06:19 PM | ERROR |

Associated Case Party: 8209 Burnet, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| W. Stephen Benesh | | steve.benesh@bracewell.com | 9/1/2020 2:06:19 PM | SENT |
| Jaclyn Carr | | jaclyn.carr@bracewell.com | 9/1/2020 2:06:19 PM | SENT |
| Christopher L.Dodson | | chris.dodson@bracewell.com | 9/1/2020 2:06:19 PM | SENT |
| Robert P.Grattan | | bob.grattan@bracewell.com | 9/1/2020 2:06:19 PM | SENT |

# TAB 4

9/3/2020 3:29 PM
**Velva L. Price
District Clerk
Travis County
D-1-GN-20-004508
Alexus Rodriguez**

CAUSE NO. D-1-GN-20-004508

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC, and | § | IN THE DISTRICT COURT OF |
| AFFILIATED COMMERCIAL SERVICES, | § | |
| INC. | § | |
| *Plaintiffs,* | § | TRAVIS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| 8209 BURNET, LP, and, | § | |
| BANCORPSOUTH BANK | § | |
| | § | |
| | § | |
| *Defendants.* | § | 261ST JUDICIAL DISTRICT |

### BANCORPSOUTH BANK'S MOTION TO DISMISS BASELESS CAUSE OF ACTION

COMES NOW, BancorpSouth Bank ("**Bancorp**"), and asks the Court to dismiss WC Teakwood Plaza, LLC's ("**Teakwood**") and Affiliated Commercial Services, Inc.'s ("**ACS**") (Teakwood and ACS are collectively the "**Plaintiffs**") causes of action that have no basis in law or fact.

### INTRODUCTION

1.    Teakwood and ACS sued Bancorp and 8209 Burnet L.P. ("**Burnet**") for Breach of Contract, Fraud, and Declaratory Judgment and seeking a Temporary Restraining Order and a Temporary and Permanent Injunction.

2.    Bancorp did not breach the contract with Teakwood and was solely exercising its right under the loan documents to sell the promissory note, no fraudulent misrepresentations were made by Bancorp.

3.    ACS has been identified by the Plaintiffs' counsel as a potential bidder at a foreclosure sale. The Petition contains no cause of action by ACS against Bancorp.

## BACKGROUND

4.      Teakwood entered into numerous loan documents with First State Central Bank, which merged with Bancorp on or about January 15, 2018, and Bancorp became successor by merger to such loan documents. The loan documents include but are not limited to: (1) that certain promissory note dated April 26, 2017 in the original principal amount of $7,600,000.00, paid to the order of First State Bank Central Texas (the "**Note**"); (2) that certain Deed of Trust on 3.395 acres of land situated in the City of Austin, Travis County, Texas being all of Lot 2 and portion of Lot 1, Allandale North Section Five, a subdivision in Travis County, Texas (the "**Property**"), dated April 26, 2017, executed by Teakwood, and recorded in the Official Public Records of Travis County, Texas under Document No. 2017066579 (the "**Deed of Trust**"); and (3) that certain loan agreement between Teakwood and First State Bank Central Texas, dated April 26, 2017 (the "**Loan Agreement**" and collectively with the Note, Deed of Trust, and any other documents executed by Teakwood, or any other party in connection with the loan, the "**Loan Documents**"). A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A**.

5.      Among other defaults, Teakwood failed to make payments due under the Note and the Note became delinquent. By letter dated July 2, 2020, Bancorp demanded payment of past due amounts due and owing on the Note by July 12, 2020. *See* **Exhibit B**, Affidavit of Brian A. Buescher and Exhibit 1 attached thereto. No payments were received and on July 23, 2020 Bancorp accelerated the total unpaid principal balance, interest, fees and expenses, and attorney's fees due and owing on the Note and demanded prompt payment thereof. *See* Buescher Affidavit and Exhibit 2 attached thereto. Teakwood did not make any payment to Bancorp.

6.      The Loan Agreement expressly provides that Bancorp may freely assign its rights and obligations. The last sentence of Section 8.05 of the Loan Agreement states:

> **Lender, however, may freely assign, whether by assignment, participation or otherwise, its rights and obligations hereunder, and is hereby authorized to disclose such to any such assignee or participant (or proposed assignee or participant) any financial or other information in its knowledge or possession regarding any Loan Party or relating to the Indebtedness.**

In addition, Section 8.07 of the Loan Agreement states:

> **Lender may freely assign, whether by sale or transfer, all or any portion of its rights in and to all or a portion of the Indebtedness including the Note to any third party or any Loan Party, including, but not limited to, a sale, transfer or assignment to any Guarantor, Grantor or other obligor on the Indebtedness.**

Both Sections expressly grant Bancorp the right to freely sell the Note.

7.     On or about August 11, 2020, Bancorp provided notice to Teakwood that the Property had been posted for foreclosure sale on September 1, 2020. *See* Buescher Affidavit and Exhibit 3 attached thereto.

8.     On Friday, August 21, 2020, Teakwood sent, via an email, a letter to the undersigned counsel for Bancorp. This letter detailed Teakwood's rationale for why a non-judicial foreclosure could not proceed on September 1, 2020. This letter demanded a response by 5:00 pm on Friday, August 21, 2020. The undersigned counsel for Bancorp replied that he would need to discuss Teakwood's request with his clients and would not be able to respond to the letter by 5:00 pm on August 21, 2020 and requested an extension of Teakwood's arbitrary deadline to 5:00 pm, Monday, August 24, 2020.

9.     On August 24, 2020, the undersigned counsel for Bancorp provided notice to Teakwood that the lien, Note, and Loan Documents had been sold and Bancorp no longer had any involvement in the scheduled non-judicial foreclosure of the Property.

## ARGUMENT & AUTHORITIES

10.     Bancorp files this motion to dismiss Teakwood's causes of action under the authority of Texas Rule of Civil Procedure 91a. Tex. R. Civ. P. 91a.1, 91a.2. Under Rule 91a, the Court can dismiss a cause of action that has no basis in law or fact. Tex. R. Civ. P. 91a.1.

### A.  *Breach of Contract*

11.     The Court should dismiss Teakwood's breach of contract cause of action because it has no basis in law. Tex. R. Civ. P. 91a.1, 91a.2. A cause of action has no basis in law if the allegations, taken as true, together with inference reasonably drawn from them, do not entitle the plaintiff to the relief sought. Tex. R. Civ. P. 91a.1; *see In re Essex Ins. Co.*, 450 S.W.3d 524, 527-28 (Tex. 2014). Teakwood's cause of action for breach of contract has no basis in law because the contract was breached by Teakwood by their failure to pay amounts due and owing thereunder. Furthermore, the Loan Agreement specifically provided that Bancorp may freely sell the Note; therefore, the sale of the Note to Burnet could not be considered a breach of contract. Finally, Bancorp owes no fiduciary duty to Teakwood and was free to sell the Note without notice to Teakwood.

12.     As stated above, Teakwood failed to make payments due and owing under the Loan Documents. Their breach of the Loan Documents led to Bancorp demanding payment of past due amounts, accelerating payment of the entire unpaid principal balance, interest, fees and expenses, and attorney fees, and the posting the Property for foreclosure.

13.     In conjunction with exercising its remedies to seek foreclosure of the lien on the Property pursuant to the Loan Documents, Bancorp also negotiated the sale of the Note to Burnet. The express wording of the Loan Agreement authorizes Bancorp to the sell the Note; therefore, there was no breach of contract when the Note was sold by Bancorp to Burnet.

14.     The sale was in compliance with Bancorp's rights under the Loan Documents, namely to seek payment on past due and owing amounts and when those amounts were not paid to accelerate the indebtedness, and foreclose on the Property or sell the Note.

15.     Bancorp owed no fiduciary obligations to Teakwood. As Texas courts have held, the lender/borrower relationship is not a fiduciary relationship. *1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital*, 192 S.W.3d 20, 36 (Tex. App. – Houston [14th Dist.] 2005, pet. denied); *Manufacturers Hanover Trust Co. v. Kingston Inv. Corp.*, 819 S.W.2d 607, 610 (Tex. App. – Houston [1st Dist.] 1991, no writ). Since there is no fiduciary relationship between Bancorp (the lender) and Teakwood (the borrower), Bancorp owed no duty to Teakwood.

### B.  *Fraud and Declaratory Judgment*

16.     The Court should dismiss Plaintiffs' fraud and declaratory judgment causes of action because they have no basis in fact. Tex. R. Civ. P. 91a.1, 91a.2. A cause of action has no basis in fact in no reasonable person could believe the facts pleaded. Tex. R. Civ. P. 91a.1. Plaintiffs' causes of action for fraud and declaratory judgment lack factual support that there was fraud, misrepresentations, or a conspiracy between Bancorp and Burnet. Bancorp and Burnet entered into an arms-length, good faith transaction and acted in conformity with the Loan Documents.

17.     There is no allegation of any statement by Bancorp to ACS. Further, requesting a one-day extension of Teakwood's arbitrary deadline is justifiable and Teakwood did not alter its condition or in any way rely on anything in granting the one day extension.

18.     Plaintiffs, in their Petition, make reference to a "conspiracy to convert" Teakwood's property. Plaintiffs Original Petition and Application for Temporary Restraining Order, Temporary and Permanent Injunction ¶ 17b. While the cause of action of conspiracy is not pled

by the Plaintiffs, the existence of a conspiracy requires the commission of an unlawful act committed by one or more of the members of the conspiracy. *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019), reh'g denied (Sept. 6, 2019). In this case Bancorp was contractually authorized by the Loan Agreement to sell the Note. The subsequent sale of the Note is not actionable as a conspiracy as it was authorized by the Loan Agreement.

19.    Furthermore, Bancorp did not make any fraudulent misrepresentations to Teakwood regarding the foreclosure on the Property. In paragraph 18, of the Petition Teakwood alleges that Bancorp made misrepresentations to Teakwood about the scheduled foreclosure. Teakwood's Original Petition and Application for Temporary Restraining Order, Temporary and Permanent Injunction ¶ 18. The only facts that could presumably support this allegation are found in paragraphs 3 and 4 of the Petition. *See id.* at ¶¶ 3-4. However, there was no misrepresentation by Bancorp. Teakwood contacted Bancorp at 12:14 pm detailing their rationale for why the foreclosure could not proceed and demanded an answer by that same day (a Friday) by 5:00 pm. Teakwood was granted a Temporary Restraining Order by the Court on August 31, 2020 and Teakwood suffered no harm as the foreclosure did not occur.

20.    In Texas, a declaratory judgment action requires there be a justiciable controversy between the parties. *See* Tex. Const. art. V, § 8; *see also Sub-Surface Const. Co. v. Bryant-Curington, Inc.*, 533 S.W.2d 452, 456 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.). Plaintiff's cause of action for a declaratory judgment fails because there is not a justiciable controversy between Bancorp and Teakwood or ACS. Bancorp sold the lien, Note, and Loan Documents to Burnet. Bancorp no longer has any legal relationship with Teakwood, Bancorp never had a legal relationship with ACS, and Bancorp, after August 24, 2020, had no involvement with the foreclosure and sale of the Property.

**ATTORNEY'S FEES & COSTS**

21.     Under Rule 91a, the prevailing party on a motion to dismiss must be awarded reasonable and necessary attorney's fees and all costs incurred as a result of plaintiff's cause of action. *See* Tex. R. Civ. P. 91a.7. Therefore, if the Court grant's Bancorp's motion to dismiss, either in whole or in part, the Court must award Bancorp reasonable and necessary attorney's fees and costs incurred as a result of corresponding with opposing counsel, corresponding with client, preparing this motion to dismiss, preparing for the hearing on this motion to dismiss, and attending the hearing on this motion to dismiss. *See id.*

**CONCLUSION**

22.     The express wording of the Loan Agreement authorized Bancorp to the sell the Note, therefore there was no breach of contract when the Note was sold by Bancorp to Burnet. Further, it was Teakwood that breached the Note, Loan Agreement, and other Loan Documents when it became delinquent on the Note. Bancorp acted at all time in conformity with the Loan Documents and it was Teakwood who materially breached the contract. Bancorp does not owe any fiduciary duty to Teakwood that would preclude the sale of the Note or even require Bancorp to provide notice of the Note sale to Teakwood. In addition, Bancorp and Burnet negotiated for the sale of the Note in good faith and at arm's length, there was no fraud to foreclose on the Property in contravention with Teakwood's rights. Finally, Bancorp never made any fraudulent misrepresentation to Teakwood regarding the sale of the Note or the foreclosure of the Property.

**PRAYER**

WHEREFORE PREMISES CONSIDERED, BancorpSouth Bank asks the Court to set this motion for hearing and after hearing, grant this motion and sign an order dismissing the challenged

causes of action and award BancorpSouth Bank reasonable and necessary attorney's fees, costs, and any further relief BancorpSouth Bank is justly entitled.

Respectfully submitted,

HIRSCH & WESTHEIMER, P.C.

By: _/s/ Michael J. Durrschmidt_
    Michael J. Durrschmidt
    State Bar No. 06287650
    Brian A. Buescher
    State Bar No. 24007717
    1415 Louisiana St, 36th Floor
    Houston, Texas 77002
    Telephone: (713) 223-5181
    Telecopier: (713) 223-9319
    Email: mdurrschmidt@hirschwest.com
    Email: bbuescher@hirschwest.com

**ATTORNEYS FOR DEFENDANT,
BANCORPSOUTH BANK**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21 day of September, 2020, a true and correct copy of the foregoing Motion to Dismiss Baseless Cause of Action was served via electronic filing and/or electronic mail and or first class mail on the parties below.

Manfred Sternberg
Manfred Sternberg & Associates
1700 Post Oak Blvd., Suite 600
Houston, Texas 77056
*Via eserve*

Christopher L. Dodson
Bracewell LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
*Via eserve*

    _/s/ Brian A. Buescher_
    Brian A. Buescher

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Marina Moreno on behalf of Michael Durrschmidt
Bar No. 06287650
mmoreno@hirschwest.com
Envelope ID: 45964632
Status as of 9/4/2020 9:14 AM CST

Associated Case Party: WC Teakwood Plaza, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Manfred Sternberg | | manfred@msternberg.com | 9/3/2020 3:29:14 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Riley | | Riley@Riley-CPA-Law.com | 9/3/2020 3:29:14 PM | SENT |
| Christopher Dodson | | chris.dodson@bracewell.como | 9/3/2020 3:29:14 PM | ERROR |
| Michael J.Durrschmidt | | mdurrschmidt@hirschwest.com | 9/3/2020 3:29:14 PM | SENT |

Associated Case Party: BancorpSouth Bank

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brian Buescher | | bbuescher@hirschwest.com | 9/3/2020 3:29:14 PM | SENT |

Unofficial copy Travis County District Clerk Velva L. Price

## LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is made and delivered as of April _Uc_, 2017 (the "Effective Date"), by and between WC TEAKWOOD PLAZA, LLC ("Borrower") and FIRST STATE BANK CENTRAL TEXAS ("Lender"). For and in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender agree as follows:

### ARTICLE I.  DEFINITIONS

1.01 <u>Defined Terms</u>.  In addition to terms defined elsewhere in this Agreement, the following terms, as used in this Agreement, shall have the meanings set forth below.  The singular number shall be deemed to include the plural, the masculine gender shall include the feminine and neuter genders, and vice versa.

"**Collateral**" shall mean, as the context dictates, the Real Property and the Personal Property given, collaterally assigned, pledged or granted or to be given to secure the Indebtedness and all of the respective owner(s) rights, title and interest in and to the same.

"**Default**" shall mean any condition or event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

"**GAAP**" shall mean generally accepted accounting principles consistently applied.

"**Grantor(s)**" shall mean any Loan Party who shall own an interest in any property that is to be subject to a Lien which secures any of the Indebtedness.

"**Guarantor(s)**" shall mean, as the context dictates, any person(s) (other than the Borrower) who shall, at any time, guarantee or otherwise be or become obligated for the repayment or the performance of all or any part of the Indebtedness.

"**Improvements**" shall mean all existing and future buildings, structures and other improvements made to the Land, along with all fixtures and permanently installed machinery and equipment on the Land and personal property owned by a Loan Party and used to maintain or service the improvements on the Land.

"**Indebtedness**" shall mean all loans, advances, indebtedness, obligations and liabilities of Borrower to Lender under any Loan Document, together with all other indebtedness, obligations and liabilities whatsoever of Borrower to Lender, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, voluntary or involuntary, known or unknown, or originally payable to Lender or to a third party and subsequently acquired by Lender including, without limitation, any: late charges; loan fees or charges; overdraft indebtedness; costs incurred by Lender in establishing, determining, continuing or defending the validity or priority of any Lien or in pursuing any of its rights or remedies under any Loan Document or in connection with any proceeding involving Lender as a

Unofficial copy, Travis Co. District Clerk, Velva L. Price

**Exhibit A**

result of any financial accommodation to Borrower; debts, obligations and liabilities for which Borrower would otherwise be liable to the Lender were it not for the invalidity or enforceability of them by reason of any Bankruptcy, insolvency or other law or for any other reason; and reasonable costs and expenses of attorneys and paralegals, whether any suit or other action is instituted, and to court costs if suit or action is instituted, and whether any such fees, costs or expenses are incurred at the trial court level or on appeal, in Bankruptcy, in administrative proceedings, in probate proceedings or otherwise; provided, however, that the term Indebtedness shall not include any consumer loan to the extent treatment of such loan as part of the Indebtedness would violate any law, rule or regulation.

"**Land**" shall mean the following described real property:

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

"**Lease**" shall mean, individually and collectively, each lease that encumbers the Land by and between each respective tenant thereto as tenant (each and collectively the "Tenant") and Borrower as landlord.

"**Lien**" shall mean any valid and enforceable interest in any property, whether real, personal or mixed, securing an indebtedness, obligation or liability owed to or claimed by any person other than the owner of such property, whether such indebtedness is based on the common law or any statute or contract.

"**Loan**" shall mean, in general, that portion of the Indebtedness evidenced by the Note and the Loan Documents.

"**Loan Documents**" shall mean collectively, this Agreement, the Note and any other promissory notes evidencing Indebtedness, any approved subordination agreement, any reimbursement agreement or other documentation executed in connection with any letter of credit, and any other documents, instruments or agreements evidencing, governing, securing, guaranteeing or otherwise relating to or executed pursuant to or in connection with any of the Indebtedness or any Loan Document (whether executed and delivered prior to, concurrently with or subsequent to this Agreement), as such documents may have been or may hereafter be amended from time to time.

"**Loan Party**" shall mean Borrower and each other person who shall be liable for the payment or performance of any of the Indebtedness including any Guarantors, if any, and any Grantor who shall own any property that is subject to a Lien which secures any of the Indebtedness.

"**Material Adverse Effect**" shall mean any act, event, condition or circumstance which could materially and adversely affect the business, operations, condition (financial or

Unofficial copy Travis Co. District Clerk Velva L. Price

otherwise), performance or assets of any Loan Party, the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party or by which it is bound or the enforceability of any Loan Document.

"**Maximum Legal Rate**" shall mean the maximum rate of nonusurious interest per annum permitted to be paid by Borrower or, if applicable, another Loan Party or received by Lender with respect to the applicable portion of the Indebtedness from time to time under applicable state or federal law as now or as may be hereafter in effect, including Chapter 1 D of Title 79 Vernon's Texas Civil Statutes (and as the same may be incorporated by reference in other Texas statutes), but otherwise without limitation, that rate based upon the "weekly ceiling rate" (as defined in §303 of the Texas Finance Code).

"**Note**" shall mean the Promissory Note of even date in the principal sum of SEVEN MILLION SIX HUNDRED THOUSAND AND 10/100 DOLLARS ($7,600,000.00) executed by Borrower and payable to the order of Lender and all modifications, renewals, rearrangements, extensions and increases thereof.

"**Permitted Encumbrances**" shall mean: (a) Liens in favor of the Lender; (b) Liens for taxes, assessments or other governmental charges which are not yet due and payable, incurred in the ordinary course of business and for which no interest, late charge or penalty is attaching or which are being contested in good faith by appropriate proceedings and, if requested by Lender, bonded in amount and manner satisfactory to Lender; (c) Liens, not delinquent, arising in the ordinary course of business and created by statute in connection with worker's compensation, unemployment insurance, social security and similar statutory obligations; (d) Liens of mechanics, materialmen, carriers, warehousemen or other like statutory or common law liens securing obligations incurred in good faith in the ordinary course of business without violation of any Loan Document that are not yet due and payable; and (e) Liens existing as of the date hereof which have been specifically disclosed in writing to Lender and have been approved by Lender in writing.

"**Person**" or "**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, association, trust, estate, unincorporated association, joint stock company, government, municipality, political subdivision or agency, or other entity.

"**Personal Property**" shall mean all machinery, equipment, fixtures and other tangible personal property or intangible personal property given or to be given by a Loan Party to secure the Indebtedness in which Lender has or is to have a security interest or rights.

"**Real Property**" shall mean, the Land and the Improvements given, pledged or granted or to be pledged to secure the Indebtedness.

"**Required Accounting Method**" shall mean, with respect to the financial covenants contained herein, cash basis accounting principles, consistently applied for any individual Guarantor and GAAP (accrued basis) for each other Loan Party.

1.02    <u>Accounting Terms</u>. All accounting terms not specifically defined in this Agreement shall be determined and construed in accordance with the Required Accounting Method.

Unofficial copy Travis co. District clerk Vona L. Price

## ARTICLE II. FEES AND MAXIMUM INTEREST RATE

2.01   Fees. Upon Borrower's execution hereof, Borrower shall pay to Lender an origination fee in the amount of $76,000.00, as well as Lender's out-of-pocket costs, expenses and advances expended towards the closing including reasonable attorney fees and title company fees.

2.02   Maximum Interest Rate. At no time shall any interest rate in respect of any Indebtedness, exceed the Maximum Legal Rate. In the event that any interest is charged or otherwise received by Lender in excess of the Maximum Legal Rate, Borrower hereby acknowledges and agrees that any such excess interest shall be the result of an accidental and bona fide error, and any such excess shall be deemed to have been payment of principal, and not of interest, and shall be applied, first, to reduce the principal Indebtedness then outstanding, second, any remaining excess, if any, shall be applied to reduce any other Indebtedness, and third, any remaining excess, if any, shall be returned to Borrower. Notwithstanding the foregoing or anything to the contrary contained in this Agreement or any other Loan Document, but subject to all limitations contained in this Section, if at any time any rate of interest applicable to any portion of the Indebtedness is computed on the basis of the Maximum Legal Rate, any subsequent reduction in the rate of interest that would otherwise be applicable shall not reduce such applicable interest rate thereafter payable below the Maximum Legal Rate until the aggregate amount of interest accrued equals the total amount of interest that would have accrued if interest had, at all times, been computed solely on the basis of such applicable interest rate. This Section shall control all agreements between the Borrower and the Lender.

## ARTICLE III.  REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants, and such representations and warranties shall be deemed to be continuing representations and warranties during the entire life of this Agreement, and so long as Lender shall have any commitment or obligation to make any loans or issue any letter of credit and so long as any Indebtedness remains unpaid and outstanding under any Loan Document, as follows:

3.01   Due Authorization.   Each Loan Party has all requisite power and authority to execute, deliver and perform its obligations under each Loan Document to which it is a party or is otherwise bound, all of which have been duly authorized by all necessary action, and are not in contravention of law or the terms of any Loan Party's organizational or other governing documents.

3.02   Title to Property. Each Loan Party has good title to all property and assets purported to be owned by it, including those assets identified on the financial statements most recently delivered by Borrower to Lender.

3.03   Encumbrances. There are no security interests or other Liens or encumbrances on, and no financing statements on file with respect to, any of the Collateral of Borrower, except for Permitted Encumbrances.

3.04 <u>Non-contravention</u>. The execution, delivery and performance by each Loan Party of the Loan Documents to which such Loan Party is a party or otherwise bound, are not in contravention of the terms of any indenture, agreement or undertaking to which any such Loan Party is a party or by which it is bound, except to the extent that such terms have been waived or that failure to comply with any such terms would not have a Material Adverse Effect.

3.05 <u>Actions, Suits, Litigation or Proceedings</u>. There are no actions, suits, litigation or proceedings, at law or in equity, and no proceedings before any arbitrator or by or before any governmental authority, pending, or, to the best knowledge of Borrower, threatened against or affecting any Loan Party, which, if adversely determined, could materially impair the right of any Loan Party to carry on its business substantially as now conducted or could have a Material Adverse Effect. No Loan Party is under investigation by, or is operating under any restrictions imposed by, any governmental authority.

3.06 <u>Bankruptcy</u>. No Loan Party is involved as a debtor or obligor in any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or litigation proceeding, and to the best knowledge of Borrower, no such proceeding is contemplated by or threatened against any Loan Party.

3.07 <u>Accuracy of Information</u>. All financial statements previously furnished to Lender have been prepared in accordance with the Required Accounting Method and fairly present the financial condition of Borrower and, the results of Borrower's operations as of the dates and for the periods covered thereby, and since the date(s) of said financial statements, there has been no material adverse change in the financial condition of Borrower or any other person covered by such financial statements. Each Loan Party is solvent, able to pay its debts as they mature, has capital sufficient to carry on its business and has assets the fair market value of which exceed its liabilities, and no Loan Party will be rendered insolvent, under-capitalized or unable to pay debts generally as they become due by the execution or performance of any Loan Document to which it is a party or by which it is otherwise bound.

3.08 <u>Enforceability of Agreement and Loan Documents</u>. Each Loan Document has been duly executed and delivered by duly authorized officer(s) or other representative(s) of each Loan Party, and constitutes the valid and binding obligations of each such respective executing Loan Party, enforceable in accordance with their respective terms, except to the extent that enforcement thereof may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting the enforcement of creditors' rights generally at the time in effect.

## ARTICLE IV. GENERAL NOTE TERMS AND ADVANCE REQUIREMENTS

4.01 <u>Permitted Use</u>. Lender and Borrower agree that the proceeds of the Note are to be used for the purpose of the refinancing existing debt on a retail strip center located on the Real Property (the "Permitted Use").

4.02 <u>Deed of Trust</u>. The Note is primarily secured by a first lien Deed of Trust ("Deed of Trust") on the Real Property.

4.03    <u>Additional Collateral</u>.  The Note shall be additionally secured by the following collateral:

   A.    Collateral Assignment of Leases and Rents with respect to the Real Property.

4.04    <u>Disbursement of Note Proceeds</u>.  The proceeds of the Note may be disbursed for the Permitted Use in one or more installments as provided for herein or in the Note.

4.05    <u>Limitation on Note Funding</u>.  Lender shall lend to Borrower under the Note such amounts as Borrower shall request up to, but not exceeding the lesser of (a) 75% of the appraised value of the Real Property, and (b) $7,600,000.00.  Borrower shall execute and deliver to Lender the Note to evidence the Loan.  Payment of the Note shall be secured by the Deed of Trust and the liens, security interest and collateral assignments created or evidenced by the other Loan Documents.  Lender's commitment is not revolving in nature and any amount paid hereunder which reduces the outstanding unpaid principal amount of the Loan may not be re-borrowed.

4.06    **Legal Lending Limit.  Any provision in the Loan Documents to the contrary notwithstanding, Lender shall have no obligation to make any advance under the Note or under any of the other Loan Documents if, as a result of such advance, Lender would be in violation of any applicable federal or state statute, law, regulation, or interpretation thereof, whether effective or prospective, regarding lending limits imposed upon Lender, including but not limited to the Garn-St. Germain Depository Institutions Act of 1982, the Federal Reserve Act, the Texas Finance Code and applicable interpretive letters issued by the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation and or the Texas Department of Banking.**

4.07    <u>Conditions to Lender's Obligations</u>.  Notwithstanding anything contained to the contrary in the Note, this Agreement or in any of the other Loan Documents, Lender shall have no liability or obligation under this Agreement, the Note, or any of the other Loan Documents until the following matters are received, reviewed by Lender and completed or resolved to the satisfaction of Lender:

   A.    Lender shall have received originals of the Policies or Certificates of Insurance for each of the Required Insurance Policies as set forth in Article VI hereof.

   B.    Lender shall have received fully executed and complete Loan Documents.

   C.    Receipt of one or more fully executed Participation Agreement(s) with such third party lender(s) as Lender deems necessary or advisable.

   D.    Lender shall have received an appraisal ("Appraisal") of the Land and Improvements valued on an "as completed" basis reflecting a loan to value ratio of less than or equal to 75%.

E. Lender shall have received an Environmental Site Assessment report on the Real Property in form and content satisfactory to Lender.

In the event that Lender does advance funds prior to the above conditions being met, no such event of funding shall be a waiver by Lender of Borrower's obligations to meet the conditions set forth above as a condition to any subsequent advance of Loan proceeds, or an assumption or occurrence of any further liability or obligation by Lender under this Agreement, the Note or any of the other Loan Documents until the said above matters are received, reviewed by Lender and completed or resolved to the satisfaction of Lender.

## ARTICLE V. AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until all instruments and agreements evidencing each and every loan, letter of credit and other financial accommodation by the Lender to the Borrower or any Loan Party are fully discharged and terminated, and thereafter, so long as any Indebtedness remains outstanding, it will, and, as applicable, it will cause each Loan Party who is within its control or under common control to:

5.01    Preservation of Existence, Payment of Taxes. Preserve and maintain its existence and preserve and maintain such of its rights, licenses, permits, franchise agreements, branding agreements and privileges as are material to the business and operations conducted by it; qualify and remain qualified to do business in each jurisdiction in which such qualification is material to its business and operations or ownership of its properties, continue to conduct and operate its business substantially as conducted and operated during the present and preceding calendar year; at all times maintain, preserve and protect all of its property and keep the same in good repair, working order and condition; and from time to time make, or cause to be made, all needed and proper repairs, renewals, replacements, betterments and improvements thereto. File, on or before their respective due dates, all federal, state, local and foreign tax returns which are required to be filed, or obtain extensions for filing such tax returns, and pay all taxes which have become due pursuant to those returns or pursuant to any assessments received by any such party, as the case may be, except to the extent such tax payments are being actively and diligently contested in good faith by appropriate proceedings and, if requested by Lender, have been bonded or reserved in an amount and manner satisfactory to Lender.

5.02    Keeping of Books. Keep proper books of record and account in which full and correct entries shall be made of all of its financial transactions and its assets and businesses so as to permit the presentation of financial statements prepared in accordance with the Required Accounting Method; and permit Lender, or its representatives, at reasonable times and intervals upon reasonable advance notice on a confidential basis, at Borrower's cost and expense, to examine its books and records and to discuss its financial matters with its officers and independent certified public accountants.

5.03    Reporting Requirements. Furnish to Lender, or cause to be furnished to Lender, the financial statements and reports of each applicable Loan Party as provided for in that certain Agreement to Provide Financial Statements of even date by and among Lender and each applicable Loan Party.

5.04   <u>Further Assurances; Financing Statements</u>. Furnish Lender, at Borrower's cost and expense, upon Lender's request and in form satisfactory to Lender (and execute and deliver or cause to be executed and delivered), such additional pledges, assignments, mortgages, Lien instruments or other security instruments, consents, acknowledgments, subordinations, financing statements and other documents pertaining to any or all of the property and rights which may now or hereafter secure or be intended as security for any portion of the Indebtedness as Lender may require to effectuate more fully the purposes of any Loan Document.

5.05   <u>Applicable Law and Environmental Covenants</u>. Comply with all applicable laws, rules, regulations, orders decrees and directives of every governmental or quasi-governmental authority pertaining to hazardous waste, hazardous substances and other hazardous, toxic or dangerous materials ("Hazardous Material") including those governing the use, generation, manufacture, storage, disposal or treatment of same including but not limited to CERCLA, RCRA, SARA, the federal Clean Water Act and the Texas Water Code and those otherwise intended to regulate or improve health, safety or the environment and or relating to the release or threatened release of hazardous waste or any hazardous substance ("Environmental Laws"), and maintain all permits, licenses and approvals required under applicable Environmental Laws. Promptly notify Lender, in writing, as soon as Borrower becomes aware of any condition or circumstance which makes any of the environmental representations or warranties set forth in this Agreement or in the Loan Documents incomplete, incorrect or inaccurate in any material respect as of any date. Promptly notify Lender, in writing, as soon as Borrower becomes aware of any condition or circumstance which may indicate a violation of any Environmental Law; and promptly provide to Lender, immediately upon receipt thereof, copies of any material correspondence, notice, pleading, citation, indictment, complaint, order, decree, or other document from any source asserting or alleging a violation of any Environmental Law by Borrower, or of any circumstance or condition which requires or may require, a financial contribution by Borrower or a clean-up, removal, remedial action or other response by or on behalf of Borrower under applicable Environmental Law, or which seeks damages or civil, criminal or punitive penalties from Borrower of any violation or alleged violation of any Environmental Law. Provide to Lender a Phase 1 environmental site assessment (and if recommended by the Phase 1 report, a Phase 2 environmental review each performed in accordance with then existing industry standards) in the event that Lender has reason to believe that there may have been a release or a violation of any of the Environmental Laws on any Real Property as collateral for the Note, all at Borrower's sole cost and expense. **Borrower hereby agrees to indemnify, defend and hold Lender, and any of Lender's past, present and future officers, directors, shareholders, employees, representatives and consultants, harmless from any and all claims, losses, damages, suits, penalties, costs, liabilities, obligations and out-of-pocket expenses (including, without limitation, reasonable legal expenses and attorneys' fees) incurred or arising out of any claim, loss or damage of any property, injuries to or death of any persons, contamination of or adverse effects on the environment, or other violation of any applicable Environmental Law, in any case, caused by Borrower or in any way related to any property owned or operated by Borrower or due to any acts of Borrower or any of its officers, directors, shareholders, employees, consultants and/or representatives INCLUDING ANY CLAIMS, LOSSES, DAMAGES, SUITS, PENALTIES, COSTS, LIABILITIES, OBLIGATIONS OR**

EXPENSES, RESULTING FROM LENDER'S OWN NEGLIGENCE; provided however, that the foregoing indemnification shall not be applicable, and Borrower shall not be liable for any such claims, losses, damages, suits, penalties, costs, liabilities, obligations or expenses, to the extent (but only to the extent) the same arise or result from any GROSS NEGLIGENCE OR WILLFUL MISCONDUCT of Lender or any of its agents or employees. The indemnities from Borrower contained herein shall survive the termination of this Agreement and the payment of the Note but shall terminate with respect to any claims arising out of any occurrences after Borrower no longer owns the Property due to Lender's foreclosure. The terms "hazardous waste", "hazardous substance", "disposal", "release", and "threatened release", as used in this Agreement, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. Section 6901, et seq. ("RCRA"), or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

5.06  <u>Governmental and Other Approvals</u>.  Apply for, obtain and/or maintain in effect, as applicable, all authorizations, consents, approvals, licenses, qualifications, exemptions, filings, declarations and registrations (whether with any court, governmental agency, regulatory authority, securities exchange or otherwise) which are necessary in connection with the execution, delivery and/or performance by any Loan Party of any Loan Document to which it is a party.

5.07  <u>Lease</u>.  Take all such actions as are commercially reasonable to maintain each Lease in full force and effect. Lender shall have the right, but no obligation, to cure any events of default by Borrower under the Lease in order to protect the Lease rights as collateral for Lender. Any such monetary amount as may be advanced by Lender may come from any then unadvanced portion of the Note, or may be advanced from Lender's own funds, which in either event, shall be deemed as a protective advance by Lender which shall be part of the Indebtedness evidenced by the Note and secured by the Loan Documents.

## ARTICLE VI. INSURANCE

6.01  <u>Insurance</u>.

A.  <u>Required Insurance</u>.  Borrower shall, at Borrower's sole cost and expense, obtain, maintain or cause to be obtained and maintained the minimum insurance requirements set forth in this Agreement ("Required Insurance") beginning on the date this Agreement and, except as expressly provided to the contrary herein, continuing for as long any portion of the Loan is unadvanced or unpaid, and providing at least the following coverages:

(1)     Property Insurance.  Insurance with respect to the Improvements and
        Personal Property with coverage at least as broad as that provided by the
        current version of Insurance Services Office, Inc. ("ISO") ISO Form CP 10
        30 Causes of Loss - Special Form (formerly referred to as an "all-risk"
        policy). Each such Property Insurance policy shall be maintained insuring
        against any peril now or hereafter included within the classification "Cause
        of Loss - Special Form" in amounts at all times sufficient to prevent Lender
        from becoming a co-insurer within the terms of the Policy and under
        applicable law, but in any event such Property Insurance Policies shall be
        maintained in an amount which, after application of the deductible, shall be
        equal to the full insurable value of the Improvements and Personal
        Property.   The term "full insurable value" shall mean the actual
        replacement cost of the Improvements and Personal Property (without
        taking into account any depreciation and exclusive of excavations, footings
        and foundations, landscaping and paving) determined annually by an
        insurer, a recognized independent insurance broker or an independent
        appraiser selected and paid by Borrower and in no event less than the
        coverage required pursuant to the terms of any Lease (the "Replacement
        Cost").   Each such Property Insurance policy shall not contain any
        protective safeguard warranties.

(2)     Liability Insurance.  Commercial General Liability insurance (Occurrence
        Basis) with coverage at least as broad as ISO Form CG 00 01 and including
        liability claims for bodily injury, death and property damage liability,
        insurance against any and all claims, including all legal liability to the
        extent insurable and imposed upon Lender and all court costs and legal fees
        and expenses, arising out of or connected with the possession, use, leasing,
        operation, maintenance or condition of the Property in such amounts as are
        generally available at commercially reasonable premiums and are generally
        required by institutional lenders for properties comparable to the Property
        but in any event for a limit per occurrence of at least $1,000,000 and an
        annual aggregate of at least $2,000,000.

(3)     Flood Insurance.  If required by Lender or applicable banking regulations,
        flood insurance in an amount at least equal to the greater of (A) the
        Replacement Cost together with business interruption coverage and (B) the
        maximum limit of coverage available for the Property under the National
        Flood Insurance Act of 1968, The Flood Disaster Protection Act of 1973
        and the National Flood Insurance Reform Act of 1994, as each may be
        amended (the "Flood Insurance Acts");

(4)     Other Insurance.  Such other insurance with respect to the Collateral
        Property or on any replacements or substitutions or additions or increased
        coverage limits as may from time to time be reasonably required by Lender
        against other insurable hazards or casualties which at the time are
        commonly insured against in the case of property similarly situated,
        including, without limitation, sinkhole, mine subsidence, earthquake and

Unofficial copy Travis County District Clerk - Velva L. Price

environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

B.     <u>General Requirements</u>. All insurance policies for the Required Insurance shall be for a term of not less than one (1) year and obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), and shall be issued by one or more other domestic primary insurer(s) having a general policy rating of A or better and a financial class of X or better by A.M. Best Company, Inc. (or if a rating of A.M. Best Company Inc. is no longer available, a similar rating from a similar or successor service). All insurers providing Required Insurance shall be authorized and admitted to issue insurance in the state in which the Collateral Property is located. Each Policy which is a liability policy shall name Lender as an additional insured. Each Policy which is a property insurance policy shall name Lender as insured under a standard mortgagee clause (also referred to as a "lender loss payable" clause and a "closed clause" or "standard/union" clause). Each Policy which is a property insurance policy shall also contain: (i) a standard "non-contributory mortgagee" endorsement or its equivalent relating, *inter alia*, to recovery by Lender notwithstanding the negligent or willful acts or omission of Borrower; (ii) to the extent available at commercially reasonable rates, a waiver of subrogation endorsement as to Lender; and (iii) an endorsement providing for a deductible per loss of an amount not more than that which is customarily maintained by prudent owners of similar properties in the general vicinity of the Property, but in no event in excess of **$25,000** except in the case of windstorm, flood, or earthquake the deductible shall not be in excess of **$25,000** without Lender's prior approval. All Policies shall contain (i) a provision that such Policies shall not be denied renewal, materially changed (other than to increase the coverage provided), cancelled or terminated, nor shall they expire, without at least thirty (30) days' prior written notice to Lender in each instance; and (ii) include effective waivers by the insurer of all claims for applicable premiums ("Insurance Premiums") against any mortgagee, loss payees, additional insureds and named insureds (other than Borrower). All Policies shall be endorsed to be primary, with any applicable policies of Lender being excess, secondary and noncontributing. No Policy shall contain any endorsement restricting, limiting or excluding coverage in any manner without the prior written approval of Lender.

C.     <u>Evidence of Insurance</u>.

    (1)     Insurance must be evidenced by an ACORD ™ Form 25 Certificate of Liability Insurance for each policy for liability coverages; and an ACORD ™ Form 28 Evidence of Commercial Property Insurance (2003 edition) for each property policy (or if required by Lender, an ACORD ™ Form 27 to the extent the Collateral is residential property or personal property) for such applicable property policies (each a "Certificate of Insurance");

    (2)     Each Certificate of Insurance shall be delivered to Lender prior to commencing operations at the Property and at least 30 days prior to the expiration of current policies;

Unofficial copy Travis County District Clerk Dana Debeauvoir Price

(3)     Each Certificate of Insurance shall must show the Lender as certificate holders (with Lender's mailing address), show Borrower as the "Named Insured", show the insurance companies producing each coverage and the policy number and policy date of each coverage, name the producer of the certificate (with correct address and telephone number) and have the signature of the authorized representative of the producer, specify the additional insured status (on a separate ACORD ™ Form 45) and/or waivers of subrogation, state the amounts of all deductibles and self-insured retentions, show the primary status and aggregate limit per project where required and be accompanied by copies of all required additional insured endorsements; and

(4)     In addition to the Certificates of Insurance, Borrower shall provide to Lender the originals or true and correct copies of each of the Policies and all endorsements thereon comprising the Required Insurance. In the event of the acquisition of a new Policy, a temporary insurance binder (evidenced by ACORD ™ Form 75) shall then be provided to Lender; the underlying actual Policy and all endorsements thereon or a true and correct copy thereof shall be delivered to Lender prior to the expiration of the applicable binder. Evidence of insurance with respect to all renewal and replacement Policies for Required Insurance shall be delivered to Lender not less than fifteen (15) days prior to the expiration date of any of the Policies which evidence shall bear notations evidencing payment of Insurance Premiums. Originals or evidence of such replacement Policies shall be delivered to Lender promptly after Borrower's receipt thereof but in any case within thirty (30) days after the effective date thereof and not less than fifteen (15) days prior to the termination of the then existing Policies previously delivered to Lender.

D.      Forms

(1)     If the forms of Policies, endorsements, certificates, or evidence of insurance required by this Agreement are superseded or discontinued, Lender will have the right to require other equivalent forms; and

(2)     Any policy or endorsement form other than a form specified in this Agreement must be approved in advance by Lender; and

(3)     If requested in writing by Lender, Borrower will provide to Lender a certified copy of any or all insurance policies or endorsements required by this Agreement.

E.      Force Placed Insurance. Borrower's failure to obtain and maintain the required insurance will constitute a material breach of, and default under, this Agreement. If Borrower fails to remedy such breach within two (2) days after notice from Lender, Lender may, in addition to any other remedy available to Lender, at

Lender's option, purchase such insurance, at Borrower's expense. Borrower will indemnify the Lender against any claims arising from Borrower's failure to purchase and/or maintain the insurance coverages required by this Agreement.

Pursuant to Texas Finance Code Section 307.052, the Borrower or Grantor (as applicable, the "Debtor") as owner of the Collateral is notified as follows:

(1) **DEBTOR IS REQUIRED TO (I) KEEP THE COLLATERAL INSURED AGAINST DAMAGE IN THE AMOUNT THE LENDER SPECIFIES; (II) PURCHASE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THIS STATE OR AN ELIGIBLE SURPLUS LINES INSURER; AND (III) NAME THE LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS.**

(2) **THE DEBTOR MUST DELIVER TO THE LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF THE PREMIUMS.**

(3) **IF THE DEBTOR FAILS TO MEET ANY REQUIREMENT LISTED IN SUBPARAGRAPH (1) OR (2) IMMEDIATELY ABOVE, THE LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF THE DEBTOR AT THE DEBTOR'S EXPENSE.**

F. <u>Prohibited Act</u>. Borrower shall comply with all insurance requirements and shall not bring or keep or permit to be brought or kept any article upon any of the Real Property or cause or permit any condition to exist thereon which would be prohibited by an insurance requirement, or would invalidate the insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Collateral Property pursuant to this Agreement and shall not purchase any additional amounts of insurance that would cause Lender to become a co-insurer within the terms of the Policies.

G. <u>Proof of Loss</u>. During an Event of Default, Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. Nothing in this paragraph shall require Lender to incur any expense or take any action.

H. <u>No Waiver</u>. The failure of Lender to demand full compliance by Borrower with respect to the minimum coverages and terms outlined herein will not constitute a waiver by Lender with respect to Borrower's obligation to maintain such coverages.

Borrower will purchase such additional insurance policies and/or endorsements or increase the policy limits of any policy set forth herein, if required by Lender.

I.  <u>Indemnity and Waiver by Borrower</u>. Borrower also agrees to indemnify, defend and save Lender harmless from any and all claims, losses, costs, damages, liabilities, obligations and expenses, including, without limitation, reasonable attorneys' fees, incurred by Lender and waives as to the Lender, all claims and losses arising, or alleged to arise, from all of the following during Borrower's period of ownership of the Property:

(1)  the use, nonuse, possession, occupation, condition, operation, design, construction, acquisition, repair, maintenance or management of the Property;

(2)  failure by Borrower to maintain, or cause to be maintained, the Required Insurance;

(3)  any violation of or failure by a Loan Party to comply with applicable law;

(4)  any breach of a Loan Party's applicable covenants, representations or warranties under this Agreement or any other Loan Document; and

(5)  defending or protecting the Liens which secure or purport to secure all or any portion of the Indebtedness, whether existing under any Loan Document or otherwise or the priority thereof, or in enforcing the obligations of Borrower or any other Person under or pursuant to any Loan Document, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or connected with the Collateral or any Loan Document.

THE INDEMNITIES AND WAIVERS OF BORROWER CONTAINED IN THIS AGREEMENT,

(1)  ARE INDEPENDENT OF THE REQUIRED INSURANCE,

(2)  **WILL NOT BE LIMITED BY ANY ONE ACTION RULE UNDER WORKERS' COMPENSATION OR SIMILAR EMPLOYEE BENEFIT ACTS OR ANY PROHIBITION AGAINST THE RIGHT OF CONTRIBUTION FROM JOINT TORTFEASORS UNDER COMPARATIVE NEGLIGENCE STATUTES,**

(3)  WILL SURVIVE REPAYMENT OF THE LOAN OR FORECLOSURE OF THE COLLATERAL BY LENDER OR EXECUTION BY GRANTOR OF A DEED IN LIEU OF FORECLOSURE WITH RESPECT TO THE COLLATERAL, and

(4)   **WILL APPLY EVEN IF THE LOSS IS CAUSED IN PART BUT NOT IN WHOLE BY THE ORDINARY NEGLIGENCE OR STRICT LIABILITY OF THE LENDER, BUT WILL NOT APPLY TO THE EXTENT THE LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE LENDER.**

All applicable law affecting the validity or enforceability of any indemnity or waiver contained in this Agreement is made a part of such provision and will operate to amend such indemnity or waiver to the minimum extent necessary to bring the provision into conformity with applicable law and cause the provision, as modified, to continue in full force and effect.

J.    <u>Blanket Policies</u>. Unless Lender requires Borrower to obtain a separate Policy or Policies the insurance coverage required may be effected under a blanket Policy or Policies covering the Real Property; provided that any such blanket Policy shall specify, except in the case of commercial general liability insurance, the premises address of each building, the portion of the total coverage of such Policy that is allocated to the Real Property, and shall in any case provide the same protection as would a separate policy insuring only the Real Property and otherwise comply with all other respects with the requirements of this Agreement.

### ARTICLE VII.  EVENTS OF DEFAULT

7.01   <u>Events of Default</u>. The occurrence or existence of any of the following conditions or events shall, after applicable notice and failure to cure as provided for in Section 7.03, constitute an "Event of Default" hereunder: (a) material breach of any representation or warranty contained in this Agreement or any other Loan Document or material default in the observance or performance of any of the other conditions, covenants or agreements of any Loan Party set forth in this Agreement or any other Loan Document; (b) any default or event of default as the case may be, shall occur under any other Loan Document and shall continue beyond the applicable grace period, if any; (c) any change in the management or control of Borrower involving the replacement or removal of Natin Paul, whether by reason of incapacity, death, resignation, termination or otherwise which, in Lender's sole judgment, could become a Material Adverse Effect; subject to Section 7.04 hereof; (d) any change in the ownership of Borrower, whether by reason of incapacity, death, or otherwise which, in Lender's sole judgment, could become a Material Adverse Effect; subject to Section 7.04 hereof; provided however that from and after the date hereof a cumulative change of up to 100% of the ownership interests in Borrower shall not be deemed an Event of Default, so long as Lender is timely notified of the change in ownership of Borrower and Borrower is owned at least 50% directly or indirectly by Natin Paul and is controlled directly or indirectly by Natin Paul; and (e) if, during the loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Indebtedness.

7.02   <u>Interim Remedies After Default</u>. Upon and after a Default by any Loan Party under any of the Loan Documents, regardless of whether a Loan Party is entitled to notice and/or an

opportunity to cure a Default, whether said notice or right to cure is provided for under the Loan Documents or provided by law, and regardless of whether said Default has matured into an Event of Default, each Loan Party hereto agrees that whether or not a Loan Party is given notice of the Default and whether or not, at the point in time of determination, the right to cure period has lapsed, Lender shall have the following rights, all without any prior notice to the applicable Loan Party:

A.   Lender shall not be obligated to further process any draw requests that have been submitted, or to fund any remaining portion of any draw requests that have been approved by Lender;

B.   Lender shall continue to have the right to post advances to the Note for interest carry to the extent of any accrued and unpaid interest on the Note but only to the extent that interest carry is available under the Budget for the Loan;

C.   Lender shall have the right to post advances to the Note for protective advances for the benefit of Lender as otherwise provided for in the Loan Documents; and

D.   Lender shall have the right to seek any equitable remedies available under law to protect any of the collateral securing the Note.

7.03   **Notice of Default and Right to Cure.** Any provision of this Loan Agreement or any of the Loan Documents to the contrary notwithstanding, Borrower and Guarantors shall not be in default under this Loan Agreement or the Loan Documents unless:

A.   in the case of a breach of a monetary covenant, Lender shall have given the applicable Loan Party written notice of such monetary breach setting forth the due date and the amount due on such date and Borrower shall not have cured the breach of the monetary covenant within ten (10) days after delivery of said notice; and

B.   in the case of a breach of a non-monetary covenant, Lender shall have given Borrower or other applicable Loan Party, written notice of such non-monetary breach setting forth in reasonable detail the nature and extent of such failure and Borrower or other applicable Loan Party, shall not have cured the breach of the non-monetary covenant within thirty (30) days after delivery of said notice;

provided however, all notices required under this paragraph regarding breaches, and all other notices permitted in this Loan Agreement or in the other Loan Documents, shall be in writing and shall be deemed to be delivered when delivered personally or when deposited with the United States Postal Service, postage prepaid, by registered or certified mail, return receipt requested, addressed to the Borrower, the Guarantors, other applicable Loan Party or the Lender, as the case may be, at the respective addresses given below or elsewhere in the Loan Documents, or to such other changed address, the notice of which change is given pursuant hereto or as otherwise provided elsewhere in the Loan Documents; and

provided further, however, that with respect to notices of monetary default, Borrower shall only be entitled to receive and Lender shall only be required to give two (2) such notices in

any one twelve (12) month period from the date hereof and cumulative total of six (6) such notices during the term hereof, such that after the second notice in any twelve (12) month period or after the sixth such notice during the term hereof, Borrower and any other applicable Loan Party shall no longer be entitled to any notice and right to cure for monetary events of default.

7.04    <u>Death or Incapacity of a Guarantor</u>. Any provision herein or in the Loan Documents to the contrary notwithstanding, the Lender shall waive the death or incapacity of Natin Paul as a default hereunder or under any of the Loan Documents executed in connection with the Note including direct or indirect effects on the ownership, control or management of the Borrower, or the legal ability of Natin Paul to perform under his guaranty agreement as Guarantor so long as within ninety (90) days from the date of death or adjudication of incapacity, a replacement guarantor acceptable to Lender in Lender's sole discretion has expressly assumed and ratified the deceased or incapacitated Guarantor's obligations under the guaranty agreement in the form of a replacement guaranty or assumption of guaranty, all in form and subject to such conditions as are acceptable to Lender in its sole discretion. References herein to the incapacity of an individual Guarantor shall mean that a court of competent jurisdiction has declared the individual as legally incompetent under applicable state law.

7.05    <u>Remedies Upon Event of Default</u>. Upon the occurrence and at any time during the existence or continuance of any Event of Default, but without impairing or otherwise limiting the Lender's right to demand payment of all or any portion of the Indebtedness which is payable on demand, at Lender's option, Lender may give notice to Borrower declaring all or any portion of the Indebtedness remaining unpaid and outstanding, whether under the notes evidencing the Indebtedness or otherwise, to be due and payable in full without presentation, demand, protest, notice of dishonor, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby expressly waived, whereupon all such Indebtedness shall immediately become due and payable. Furthermore, upon the occurrence of a Default or Event of Default and at any time during the existence or continuance of any Default or Event of Default, but without impairing or otherwise limiting the right of Lender, if reserved under any Loan Document, to make or withhold financial accommodations at its discretion, to the extent not yet disbursed, any commitment by Lender to make any further loans or, if applicable, issue any further letters of credit shall automatically terminate. The foregoing rights and remedies are in addition to any other rights, remedies and privileges Lender may otherwise have or which may be available to it, whether under this Agreement, any other Loan Document, by law, or otherwise.

7.06    <u>Setoff</u>. In addition to any other rights or remedies of Lender under any Loan Document, by law or otherwise, upon the occurrence and during the continuance or existence of any Event of Default, Lender may, at any time and from time to time, without notice to Borrower (any requirements for such notice being expressly waived by Borrower), setoff and apply against any or all of the Indebtedness (whether or not then due), in any manner and in any order of preference which the Lender, in its sole discretion, chooses any or all deposits (general or special, time or demand, provisional or final) at any time held by Borrower (whether owned outright or held with a third party) and other indebtedness at any time owing by Lender to or for the credit or for the account of Borrower, and any property of Borrower, from time

Unofficial copy from website of Official Records of David L. Price

to time in possession or control of Lender, irrespective of whether or not Lender shall have made any demand hereunder or for payment of the Indebtedness and although such obligations may be contingent or unmatured, regardless of whether any Collateral then held by Lender is adequate to cover the Indebtedness and regardless of whether the exercise of such right of set-off results in loss of interest or other penalty under the terms of the certificate of deposit or account agreement. The rights of Lender under this Section are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which Lender may otherwise have. Borrower hereby grants Lender a Lien on and security interest in all such deposits, indebtedness and other property as additional collateral for the payment and performance of the Indebtedness.

7.07    <u>Waiver of Defaults</u>.  No Default or Event of Default shall be waived by Lender except in a written instrument specifying the scope and terms of such waiver and signed by an authorized officer of Lender, and such waiver and shall be effective only for the specific time(s) and purpose(s) given.  No single or partial exercise of any right, power or privilege hereunder, or any delay in the exercise thereof, shall preclude other or further exercise of Lender's rights.  No waiver of any Default or Event of Default shall extend to any other or further Default or Event of Default.  No forbearance on the part of Lender in enforcing any of Lender's rights or remedies under any Loan Document shall constitute a waiver of any of its rights or remedies.  Borrower expressly agrees that this Section may not be waived or modified by Lender by course of performance, estoppel or otherwise.

7.08    <u>Receiver</u>.  Lender, in any action or suit to foreclose upon any of the Collateral, shall be entitled, without notice or consent, and completely without regard to the adequacy of any security for the Indebtedness, to the appointment of a receiver of the business and premises in question, and of the rents and profits derived therefrom.  This appointment shall be in addition to any other rights, relief or remedies afforded Lender.  Such receiver, in addition to any other rights to which the receiver shall be entitled, shall be authorized to sell, foreclose or complete foreclosure on Collateral for the benefit of Lender, pursuant to provisions of applicable law.

7.09    <u>Application of Proceeds of Collateral</u>.  Notwithstanding anything to the contrary set forth in any Loan Document, after an Event of Default, the proceeds of any of the Collateral, together with any offsets, voluntary payments, and any other sums received or collected in respect of the Indebtedness, may be applied towards the Indebtedness in such order and manner as determined by Lender in its sole and absolute discretion.

## ARTICLE VIII.  MISCELLANEOUS

8.01    <u>Notices</u>. Any notice, certificate, consent, determination or other communication required or permitted to be given or made under this Agreement shall be in writing and shall be effectively given and made if (i) delivered personally, (ii) sent by prepaid courier service or mail, or (iii) sent prepaid by fax or other similar means of electronic communication, in each case to the following respective addresses:

| If to Borrower: | WC TEAKWOOD PLAZA, LLC |
|---|---|
| | 401 Congress Avenue, 33rd Floor |
| | Austin, Texas 78701 |
| Phone: | (512) 327-3300 |
| Fax: | (512) 322-9238 |
| E-mail address: | Npaul@wccapitalgroup,com |

| With copy to: | WORLD CLASS CAPITAL GROUP, LLC |
|---|---|
| | 767 Fifth Avenue, 16th Floor |
| | New York, New York 10153 |
| | Attention: Samuel Mizrahi |
| Phone: | (917) 702-3344 |
| E-mail address: | smizrahi@wccapitalgroup.com |

| If to Lender: | FIRST STATE BANK CENTRAL TEXAS |
|---|---|
| | P. O. Box 6136 |
| | Temple, Texas 76503-6136 |
| Phone: | (512) 231-8821 |
| Fax: | (512) 231-1625 |
| Email address: | vivienen@fsbcentex.com |

Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a regular Business Day and the communication is so delivered, faxed or sent prior to 4:30 p.m. (local recipient time) on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day. Any such communication sent by mail shall be deemed to have been given and made and to have been received on the earlier of actual receipt or the fifth Business Day following the mailing thereof, provided however that no such communication shall be mailed during any actual or apprehended irregular disruption of postal services. Any such communication given or made in any other manner shall be deemed to have been given or made and to have been received only upon actual receipt in writing.

8.02    Governing Law.  Each Loan Document shall be deemed to have been delivered in the State of Texas, and shall be governed by and construed and enforced in accordance with the laws of the State of Texas, and applicable federal law except to the extent that the Uniform Commercial Code or other personal property law or real property law of another jurisdiction where Collateral is located is applicable, and except to the extent expressed to the contrary in any Loan Document.

8.03    Costs and Expenses.  The Borrower agrees to pay Lender, on demand, all reasonable costs and expenses in connection with the preparation, execution, delivery and administration of this Agreement, the Note, the Loan Documents, and the other documents to be delivered hereunder, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Lender with respect thereto and with respect to advising the Lender as to its rights and responsibilities under this Agreement and/or under any of the other Loan

Documents.  Borrower shall pay Lender, on demand, all costs and expenses, including, without limitation, reasonable attorneys' fees and legal expenses, incurred by Lender in perfecting, revising, protecting or enforcing any of its rights or remedies against any Loan Party or any Collateral, or otherwise incurred by Lender in connection with any Default or Event of Default or the enforcement of the Loan Documents or the Indebtedness. Following Lender's demand upon Borrower for the payment of any such costs and expenses, and until the same are paid in full, the unpaid amount of such costs and expenses shall constitute Indebtedness and shall bear interest at the highest default rate of interest provided in any Loan Document.

8.04    Receipt of Payments by Lender. Any payment by Borrower of any of the Indebtedness made by mail will be deemed tendered and received by Lender only upon actual receipt thereof by Lender at the address designated for such payment, whether or not Lender has authorized payment by mail or in any other manner, and such payment shall not be deemed to have been made in a timely manner unless actually received by Lender on or before the date due for such payment, time being of the essence. Borrower expressly assumes all risks of loss or liability resulting from non-delivery or delay of delivery of any item of payment transmitted by mail or in any other manner. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and any failure to pay the entire amount then due shall constitute and continue to be an Event of Default. Borrower waives the right to direct the application of any and all payments received by Lender hereunder at any time or times after the occurrence and during the continuance of any Default. Borrower further agrees that after the occurrence and during the continuance of any Default, Lender shall have the continuing exclusive right to apply and to reapply any and all payments received by Lender at any time or times, whether as voluntary payments, proceeds from any Collateral, offsets, or otherwise, against the Indebtedness in such order and in such manner as Lender may, in its sole discretion, deem advisable, notwithstanding any entry by Lender upon any of its books and records. Borrower hereby expressly agrees that, to the extent that Lender receives any payment or benefit of or otherwise upon any of the Indebtedness, and such payment or benefit, or any part thereof, is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid to a trustee, receiver, or any other Person under any bankruptcy act, state or federal law, common law, equitable cause or otherwise, then to the extent of such payment or benefit, the Indebtedness, or part thereof, intended to be satisfied shall be revived and continued in full force and effect as if such payment or benefit had not been made or received by Lender, and, further, any such repayment by Lender shall be added to and be deemed to be additional Indebtedness.

8.05    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of Borrower and Lender and their respective heirs, administrators, executors, successors and assigns. The foregoing shall not authorize any assignment or transfer by Borrower, of any of its respective rights, duties or obligations hereunder, such assignments or transfers being expressly prohibited. Lender, however, may freely assign, whether by assignment, participation or otherwise, its rights and obligations hereunder, and is hereby authorized to disclose to any such assignee or participant (or proposed assignee or participant) any financial or other information in its knowledge or possession regarding any Loan Party or relating to the Indebtedness.

8.06    <u>Participation</u>. Borrower expressly recognizes and agrees that Lender may sell to other lenders participations in the loans incurred by Borrower pursuant hereto. As security for the due payment and performance of all Indebtedness of Borrower to Lender under this Agreement and/or any other of the Loan Documents, whether now existing or hereafter arising, and to such lenders by reason of such participations, Borrower hereby grants to Lender and to such lenders a lien on and security interest in (i) any and all deposits or other sums at any time credited by or due from Lender and such lenders or either or any of them, to Borrower, whether in regular or special depository accounts or otherwise, (ii) any and all money, securities and other property of Borrower, and the proceeds thereof now or hereafter held or received by or in transit to Lender and such lenders or either or any of them, from or for Borrower whether for safekeeping, custody, pledge, transmission, collection or otherwise. Any such deposit, sums, monies, securities and other property may at any time be set-off, appropriated and applied by the Lender and by such lenders, or either or any of them, against any Indebtedness whether now existing or hereafter arising to Lender and to such lenders, or either or any of them, under this agreement or the Note or otherwise, whether or not such Indebtedness is then due or secured by any collateral or, if it is so secured, whether or not such collateral held by Lender or such lenders is considered to be adequate.

8.07    <u>Sale of Loan</u>. Lender may freely assign, whether by sale or transfer, all or any portion of its rights in and to all or any portion of the Indebtedness including the Note to any a third party or any Loan Party, including, but not limited to, a sale, transfer or assignment to any Guarantor, Grantor or other obligor on the Indebtedness.

8.08    <u>Election of Remedies</u>. Lender shall have all of the rights and remedies granted in the Loan Documents and available at law or in equity and these same rights and remedies shall be cumulative and may be pursued separately, successively, or concurrently against Borrower, any Guarantor, Grantor, other Loan Party or any collateral property covered under the Loan Documents, at the sole discretion of Lender.

8.09    <u>Indulgence</u>. No delay or failure of Lender in exercising any right, power or privilege hereunder or under any of the Loan Documents shall affect such right, power or privilege. Any single or partial exercise thereof shall not preclude any further exercise thereof.

8.10    <u>Amendment and Waiver</u>. No course of dealings by the Lender, its officers, employees, consultants, or agents in the exercise of any right hereunder, under the Note, or under any other of the Loan Documents shall operate as a waiver thereof. No amendment or waiver of any provision of any Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance(s) and for the specific time(s) and purpose(s) for which given.

8.11    <u>Severability</u>. In case any one or more of the obligations of any Loan Party under any Loan Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining obligations of such Loan Party shall not in any way be affected or impaired thereby, and such invalidity, illegally or unenforceability in one

jurisdiction shall not affect the validity, legality or enforceability of the obligations of such Loan Party under any Loan Document in any other jurisdiction. Each term, covenant, and condition of this Agreement and/or any of the other Loan Documents shall be valid and enforceable to the fullest extent permitted by law.

8.12   <u>Reliance on and Survival of Various Provisions</u>.  All terms, covenants, agreements, representations and warranties of any Loan Party made in any Loan Document, or in any certificate, report, financial statement or other document furnished by or on behalf of any Loan Party in connection with any Loan Document shall be deemed to have been relied upon by Lender, notwithstanding any investigation heretofore or hereafter made by Lender or on Lender's behalf.  All representations and warranties of the Borrower herein or in the other Loan Documents and all covenants and agreements herein and in the other Loan Documents, shall survive until repayment in full of the Indebtedness.

8.13   <u>Execution of Loan Documents in Counterparts</u>.  Each original of the Loan Documents executed in connection with the Loan including the Note may be executed as counterpart originals and may   contains multiple original signature pages and/or corresponding acknowledgments.  Two or more counterparts of any particular Loan Document may be executed and/or acknowledged and one or more of the multiple original signature pages from one counterpart of that particular Loan Document executed in connection with the Loan may be replaced by one or more original signature pages from other counterparts thereof, in order to produce fully executed counterparts, each of which shall be considered as an original, and all of which shall constitute the same agreement or document.

8.14   <u>Document Retention Policy</u>.  Each undersigned Loan Party understands and agrees that (i) Lender's document retention policy may involve the imaging of executed Loan Documents including the Note, as well as other miscellaneous documents, papers, reports and other correspondence, and the destruction of the paper originals, and (ii) each undersigned Loan Party waives any right that any Loan Party may have to claim that the imaged copies of the Loan Documents (other than the Note) and other miscellaneous documents, papers and other correspondence related thereto are not originals.

8.15   <u>NOTICE UNDER SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE</u>.

**AN AGREEMENT FOR A LOAN IN WHICH THE AMOUNT INVOLVED IN THE LOAN EXCEEDS $50,000.00 IN VALUE IS NOT ENFORCEABLE UNLESS THE AGREEMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE BOUND OR BY THAT PARTY'S AUTHORIZED REPRESENTATIVE.**

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT SUBJECT TO SUBSECTION (b) OF SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE SHALL BE DETERMINED SOLELY FROM THE WRITTEN LOAN DOCUMENTS, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THE LOAN DOCUMENTS.**

**THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

8.16    <u>Captions</u>. The captions, headings, and arrangements used in this agreement are for convenience only and do not in any manner affect, limit, amplify, or modify the terms and provisions hereof.

8.17    <u>Form and Substance</u>. All documents, certificates, insurance policies, and other items required to be executed and/or delivered to Lender, whether under this Agreement or under any of the other Loan Documents, shall be in form and substance satisfactory to Lender.

8.18    <u>Borrower In Control</u>. In no event shall Lender's rights and interests under the Loan Documents be construed to give Lender the right to control, or be deemed to indicate that Lender is in control of, the business, management or properties of Borrower or the daily management functions and operating decisions to be made by Borrower.

8.19    <u>No Third Party Beneficiary</u>. This Agreement is made for the sole protection and benefit of Borrower and Lender and is not intended for the protection or benefit of any other Person, and no other Person shall be deemed to have any privity of contract hereunder nor any right of action of any kind hereon, or be entitled to rely hereon to any extent whatsoever.

8.20    <u>Number and Gender</u>. Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. The duties, covenants, obligations, and warranties of each party defined as Borrower under this Agreement shall be joint and several obligations of each such Borrower.

8.21    <u>References</u>. The words "herein," "hereof," "hereunder" and other words of similar import when used in this Agreement refer to this Agreement as a whole, and not to any particular article, section or subsection.

8.22    <u>Ambiguities</u>. Borrower and Lender acknowledge that they were each represented by counsel or had the opportunity to be represented by counsel and waived such right in connection with this Agreement, that each of them and/or their respective counsel reviewed this Agreement to their satisfaction, that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, and that the language in all parts of this Agreement shall in all cases be construed as a whole and in accordance with its fair meaning.

8.23    <u>Exhibits</u>. The exhibits attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail; provided however, that any

attached metes and bounds description of the Land shall control over the summary description defining the Land herein.

8.24 <u>Time of the Essence</u>. Time is of the essence with respect to the dates, terms and provisions of this Agreement, and as to each and every other Loan Document executed in connection herewith.

8.25 <u>Independent Party</u>. It is mutually understood and agreed that Borrower is an independent party in the performance of all activities, functions, duties and obligations pursuant to this Agreement and the other Loan Documents, and that nothing contained in this Agreement or in any of the other Loan Documents is intended or shall be construed in any manner or under any circumstances whatsoever as creating or establishing the relationship of co-partners, a partnership or joint venture, or joint ownership between Lender and Borrower, or with any officers, employees, agents, brokers or contractors, for any purpose or in any manner whatsoever. Borrower hereby agrees not to represent to anyone that Borrower is an agent of Lender or has authority to act on behalf of Lender.

8.26 <u>Days and Deadlines</u>. As used in this Agreement, "*days*" shall mean and refer to calendar days. However, if a deadline falls or notice is required on a Saturday, Sunday, or a legal banking holiday, then the deadline or notice shall be extended to the next calendar day which is not a Saturday, Sunday, or a legal banking holiday. As may be used in this Agreement, the term "*Business Day*" means any day which is not a Saturday, Sunday, or a legal banking holiday.

8.27 **GOVERNING LAW AND VENUE**. THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THE LOAN DOCUMENTS ARE DEEMED EXECUTED IN AND ARE PERFORMABLE BY EACH LOAN PARTY IN BELL COUNTY, TEXAS. Any action or proceeding under or in connection with the Loan Documents against Borrower or any other party ever liable for payment of any sums of money payable on the Loan Documents may be brought in any state court located in Bell County, Texas, or in the federal court in Bell County, Texas. Borrower and each such other party hereby irrevocably: (i) submits to the nonexclusive jurisdiction of such courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.

Executed in one more counterpart originals to be effective on the Effective Date defined on page 1 hereof.

WC TEAKWOOD PLAZA, LLC, a Delaware
limited liability company

By:     WC Teakwood Plaza Mezz, LLC, a
        Delaware limited liability company,
        Manager

By: _____
     Nathan ... President

Address:     ... Congress Avenue, 33rd Floor
             Austin, Texas 78701

FIRST STATE BANK CENTRAL TEXAS

By: _____
Printed Name: _____
Title: _____

Address:     6500 North Mopac Expressway,
             Building One, Suite 1101
             Austin, Texas 78731

JNG17\FSBCT\WCTEAKWD\h17121LnAgrv2.wpd
April 10, 2017 (12:44pm)                    25                    LOAN AGREEMENT

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

    1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

    2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

## BUSINESS RECORDS AFFIDAVIT/DECLARATION

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Brian A. Buescher, personally known by me to be the person whose name is subscribed below, and who, upon his/her oath, stated as follows:

1. My name is Brian A. Buescher. I am over 21 years of age, of sound mind, and capable of making this sworn statement. I am an associate attorney at Hirsch & Westheimer, P.C. ("**H&W**") and co-counsel for BancorpSouth Bank ("**Bancorp**"). I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am over the age of 21 years, of sound mind, and capable of making this declaration.

3. I am personally familiar with H&W's representation of Bancorp with respect to its lending relationship with WC Teakwood Plaza, LLC ("**Teakwood**"). I am familiar with the manner in which H&W's records are created and maintained by virtue of my duties and responsibilities.

4. Attached is a demand letter from H&W on behalf of Bancorp to Teakwood dated July 2, 2020 (the "**Demand Letter**") as Exhibit 1, an acceleration letter from H&W on behalf of Bancorp to Teakwood dated July 23, 2020 (the "**Acceleration Letter**") as Exhibit 2, and a foreclosure notice letter from H&W on behalf of Bancorp to Teakwood dated August 11, 2020 (the "**Foreclosure Letter**") as Exhibit 3. These records are true and correct copies of the original records. The records were made at or near the time of each act, event, condition, opinion, or diagnosis set forth. It is the regular practice of H&W for this type of record to be made by, or from information transmitted by, persons with knowledge of the matters set forth in the records. The records were kept by H&W in the course of regularly conducted business activity. It is the regular practice of H&W to make the records.

5. Any third-party records and documents were obtained by H&W and incorporated into the business records of H&W as permanent records in the regular course of its business. It is the normal course of H&W's business to receive such records and to incorporate these records into its file. H&W routinely and consistently relies on the accuracy of such records and has relied on the accuracy of the contents of these records.

FURTHER AFFIANT SAYETH NOT.

_____
BRIAN A. BUESCHER

**Exhibit B**

STATE OF TEXAS §
§
COUNTY OF HARRIS §

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned notary public, on this _____3_____ rd day of September 2020.

_____
Notary Public in and for the State of Texas

DAVID SUCEC
My Notary ID # 126284411
Expires October 10, 2023

20170804.20190907/3805338.1



**HIRSCH & WESTHEIMER**
*Attorneys and Counselors*

T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

July 2, 2020

*Via CMRRR: 9414 7266 9904 2167 5063 83
and First Class U.S. Mail*

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Re:  Promissory Note (the "Note") dated April 26, 2017 in the original principal sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or "Borrower") and payable to BancorpSouth Bank, as successor by merger to First State Bank Central Texas, secured by a Deed of Trust, Security Agreement and Financing Statement dated April 29, 2017 on 3.95 Acres in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the "Collateral" or the "Property") and guaranteed by Natin Paul and World Class Capital Group, LLC (collectively the "Guarantors").

Dear Sir or Madam:

This law firm represents BancorpSouth Bank, successor by merger to First State Bank Central Texas (the "Bank") in connection with the above-referenced Note. As you know, the Note is delinquent.

Pursuant to the Collateral Assignment of Leases and Rents dated April 26, 2017, executed by the Borrower for the benefit of the Bank, please provide us with the names, addresses, the current lease for each tenant occupying a rental space on the Property, and the current rent roll for the Property.

Demand is hereby made for the immediate payment of the delinquent payments. The Note is currently past due in the amount of One Hundred Ninety-Four Thousand Three Hundred Twenty-Five and 86/100 Dollars ($194,325.86). In the event the Bank has not received $194,325.86 by 4:30 p.m. C.S.T. on July 12, 2020, then the Bank will accelerate the Note and has instructed us thereafter to take legal action against the Maker and Guarantor and pursue the Bank's remedies as to the Collateral.

**Exhibit 1**

20170804.20190907/3724640.1

WC Teakwood Plaza, LLC
July 2, 2020
Page 2

If any payment by check is returned due to insufficient funds or for any other reason, "good funds" will not have been received. No extension of time will be granted due to the return of payment. The Bank reserves the right to accept or reject a partial payment of the total due without waiving any of its rights herein or otherwise.

The Bank reserves all of its rights, remedies, and recourses against the Maker and Guarantors under the Note and Guaranty Agreements. This demand for payment is being made pursuant to section 38.001 of the Texas Civil Practice and Remedies Code and, as such, the Maker and Guarantors may be liable, in accordance with the terms of the Note and Guaranty Agreements, not only for the outstanding principal balance due and owing together with interest as it accrues at the pre- and post-maturity rate, but also for collection costs, including attorney fees.

By transmitting this demand to you, nothing is intended to suggest that all of the Bank's rights and remedies have been set forth. Nothing contained in this letter is a waiver of the Bank's rights or remedies, under the Note or any of the other loan documents, at law or in equity. Specifically, but not by way of limitation, the Maker and Guarantors continue to waive all notices consistent with the loan documents.

The Maker and Guarantors are not entitled to rely upon any oral statements made or purported to be made by or on behalf of the Bank in connection with any alleged agreement by the Bank to refrain from exercising any of its rights in connection with the indebtedness. Acceptance by the Bank, or any other parties, on behalf of the Bank, of any debt service payment does not, and will not, constitute a waiver of any of the rights, remedies or recourses available under the loan documents, at law, or in equity. Application of such payments should in no way be construed as a modification, rearrangement, or extension of the existing loan documents.

*This is an attempt to collect a debt and any information will be used for that purpose.*

Sincerely,

HIRSCH & WESTHEIMER, P.C.


By: */s/ Michael J. Durrschmidt*
    Michael J. Durrschmidt

20170804.20190907/3724640.1

WC Teakwood Plaza, LLC
July 2, 2020
Page 3

cc:   Natin Paul
      c/o World Class
      814 Lavaca St.
      Austin, Texas 78701
      Attn: Natin Paul
      *Via CMRRR: 9414 7266 9904 2167 5063 90*

      World Class Capital Group, LLC
      c/o World Class
      814 Lavaca St.
      Austin, Texas 78701
      Attn: Natin Paul
      *Via CMRRR: 9414 7266 9904 2167 5064 06*

      Linda Thong
      World Class
      244 Fifth Avenue, Suite 2200
      New York, New York 10001
      *Via CMRRR: 9414 7266 9904 2167 5064 13*

      Maryann Norwood
      World Class
      814 Lavaca St.
      Austin, Texas 78701
      *Via email: mnorwood@world-class.com*

20170804.20190907/3724640.1



T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

July 23, 2020

NOTICE OF ACCELERATION

*Via CMRRR: 9414 7266 9904 2167 5072 05
and U.S. First Class Mail*

WC Teakwood Plaza
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

RE:    Promissory Note (the "*Note*") dated April 26, 2017 in the original principal sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("*Maker*" or "*Borrower*") and payable to BancorpSouth Bank, as successor by merger to First State Bank Central Texas, secured by a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017 (the "*Deed of Trust*") on 3.95 Acres in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the "*Collateral*") and guaranteed by Natin Paul and World Class Capital Group, LLC (collectively the "*Guarantors*"), the Collateral Assignment of Leases and Rents dated April 26, 2017 (the "*Assignment of Rents*"), the Loan Agreement dated April 26, 2017 (the "*Loan Agreement*"), and any other documents executed by Borrower, or any other party in connection with the loan (together with the Note, Deed of Trust, Assignment of Rents, and Loan Agreement collectively referred to hereinafter as the "*Loan Documents*").

Dear Sir/Madam:

As you know, this law firm represents BancorpSouth Bank, successor by merger to First State Bank Central Texas (the "*Bank*") in connection with the above-referenced Note, Guaranties, and Loan Documents.

By letter dated and sent to you on July 2, 2020, this firm, on behalf of the Lender, notified you that the Note was in default for delinquent payment and that the Lender may accelerate the entire outstanding balance of the Note and foreclose the collateral securing the Note under the Deed of Trust if the default was not cured by July 12, 2020. The Lender has informed our firm that the default was not cured on or before July 12, 2020 or within the additional time that has elapsed to the date of this letter. Therefore, the entire indebtedness owing on the Note, and all interest accrued but unpaid thereon, is hereby **ACCELERATED** and due and payable in full.

Pursuant to the terms of the Note and the other Loan Documents, the Lender hereby accordingly requires immediate payment of the entire unpaid balance due under the Note and all interest accrued but unpaid thereon, and all costs and fees in enforcing the Lender's rights under the Note and the Loan Documents. If you intend to pay the indebtedness in full, you may contact Bill Babineaux of BancorpSouth Bank

1415 Louisiana    36th Floor    Houston, Texas 77002    T. 713 223 5181    hirschwest.com

**Exhibit 2**

WC Teakwood Plaza, LLC
July 23, 2020
Page 2

at 315 Settlers Trace Blvd., Lafayette, LA 70508, phone no. (337) 354-8902 o obtain the outstanding balance of the amounts due and owing under the Note and the Loan Documents. Payment in full will not be considered made unless the Lender receives "good funds" in the form of cash, a cashier's check or money order in the full amount due and owing at the time. If any such cashier's check or money order is returned to us for insufficient funds or for any other reason, "good funds" will not have been received.

The Lender may seek to foreclose its Collateral unless payment of the full indebtedness is made in good funds as described above and delivered to Bill Babineaux at the address set forth above.

THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

ASSERT AND PROTECT YOUR RIGHTS AS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES. IF YOU OR YOUR SPOUSE IS SERVING ON ACTIVE MILITARY DUTY, INCLUDING ACTIVE MILITARY DUTY AS A MEMBER OF THE TEXAS NATIONAL GUARD OR THE NATIONAL GUARD OF ANOTHER STATE OR AS A MEMBER OF A RESERVE COMPONENT OF THE ARMED FORCES OF THE UNITED STATES, PLEASE SEND WRITTEN NOTICE OF THE ACTIVE MILITARY SERVICE TO THE SENDER OF THIS NOTICE IMMEDIATELY.

IF YOU WERE A SERVICE MEMBER IN MILITARY SERVICE AT ANYTIME WITHIN THE LAST NINE (9) MONTHS, PLEASE CONTACT THE SENDER OF THIS NOTICE IMMEDIATELY UPON RECEIPT OF THIS LETTER. YOU MAY BE ENTITLED TO CERTAIN PROTECTIONS AFFORDED UNDER THE SERVICE MEMBERS CIVIL RELIEF ACT.

Nothing contained in this letter is a waiver of the Lender's rights or remedies under the Note, Deed of Trust, Guaranties, or any of the other Loan Documents, at law or in equity. Accordingly, but not by way of limitation, you continue to waive all demands and notices in connection with the Note, including presentment, demand, and notice of dishonor, consistent with the terms of the Note.

Should this law firm file a lawsuit on behalf of the Lender, then the Lender will also seek recovery of its legal fees and expenses incurred in the prosecution of its rights under the Loan Documents, as well as all past due interest and costs.

Neither you nor any other party shall be entitled to rely upon any oral statements made or purported to be made by or on behalf of the Lender in connection with any alleged agreement by the Lender to refrain from exercising any of its rights in connection with the indebtedness. Acceptance by the Lender, or any other parties on behalf of the Lender, of any payment does not and will not constitute a waiver of any of the rights, remedies or recourses available under the Loan Documents, at law, or in equity. Application of such payments should in no way be construed as a modification, rearrangement, or extension of the existing Loan Documents.

20170804.20190907/3763545.1

WC Teakwood Plaza, LLC
July 23, 2020
Page 3

Sincerely,

HIRSCH & WESTHEIMER, P.C.

By: /s/ Michael J. Durrschmidt
Michael J. Durrschmidt

cc:    Natin Paul
       c/o World Class
       814 Lavaca St.
       Austin, Texas 78701
       Attn: Natin Paul
       *Via CMRRR: 9414 7266 9904 2167 5070 2*

       World Class Capital Group, LLC
       c/o World Class
       814 Lavaca St.
       Austin, Texas 78701
       Attn: Natin Paul
       *Via CMRRR: 9414 7266 9904 2167 5070 83*

       Linda Thong
       World Class
       244 Fifth Avenue, Suite 2200
       New York, New York 10001
       *Via CMRRR: 9414 7266 9904 2167 5071 44*

       Maryann Norwood
       World Class
       814 Lavaca St.
       Austin, Texas 78701
       *Via email: mnorwood@world-class.com*



**HIRSCH & WESTHEIMER**

*Attorneys and Counselors*

T. 713.220.9173
F. 713.223.9319
zschneider@hirschwest.com

August 11, 2020

*Via CMRRR #9414 7266 9904 2167 5059 28*
*and First Class U.S. Mail*
WC Teakwood Plaza
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Promissory Note (the "*Note*") dated April 26, 2017 in the original principal sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("*Maker*" or "*Borrower*") and payable to BancorpSouth Bank, as successor by merger to First State Bank Central Texas, secured by a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017 (the "*Deed of Trust*") on 3.95 Acres in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the "*Collateral*") and guaranteed by Natin Paul and World Class Capital Group, LLC (collectively the "*Guarantors*"), the Collateral Assignment of Leases and Rents dated April 26, 2017 (the "*Assignment of Rents*"), the Loan Agreement dated April 26, 2017 (the "*Loan Agreement*"), and any other documents executed by Borrower, or any other party in connection with the loan (together with the Note, Deed of Trust, Assignment of Rents, and Loan Agreement collectively referred to hereinafter as the "*Loan Documents*").

Dear Sir/Madam:

As you know, this law firm represents BancorpSouth Bank, successor by merger to First State Bank Central Texas (the "*Bank*") in connection with the above-referenced Note, Guaranties, and Loan Documents.

As you are also aware, the Maker has defaulted under the terms of the Note and the Deed of Trust due to, among other things, the failure of the Maker to make the required monthly payments under the Note.  This firm, on behalf of the Lender, sent you written notice on July 2, 2020 of such defaults and provided you an opportunity to cure such defaults, which were not timely cured and remain uncured as of the date of this letter.  This firm also sent you written notice on July 23, 2020 that the Note had been accelerated and was immediately due and payable in full.  You may contact the undersigned to verify the amount of indebtedness due and owing under the Note, Deed of Trust, and all related loan documents.

Please find enclosed a **Notice of Trustee's Sale** which was posted **August 10, 2020**, at the County Courthouse of Travis County, Texas (at the place regularly used by the public for posting of such notices) and is being filed in the Office of the County Clerk of Travis County, Texas.

The foreclosure sale shall take place as provided in the Notice of Trustee's Sale on **September 1, 2020**.  The foreclosure sale will be conducted pursuant to the

1415 Louisiana   36th Floor   Houston, Texas 77002   T. 713 223 5181   *hirschwest.com*

**Exhibit 3**

WC Teakwood Plaza, LLC
August 11, 2020
Page 2

enclosed Notice of Trustee's Sale, Section 51.002 of the Texas Property Code, and other applicable law.

This is an attempt to collect a debt and any information will be used for that purpose.

Very truly yours,

HIRSCH & WESTHEIMER, P.C.

By: _____
Zachary V Schneider

cc:   Natin Paul
      c/o World Class
      814 Lavaca St.
      Austin, Texas 78701
      *Via CMRRR# 9414 7266 9904 2167 5059 45*

      World Class Capital Group, LLC
      c/o World Class
      814 Lavaca St.
      Austin, Texas 78701
      Attn: Natin Paul
      *Via CMRRR# 9414 7266 9904 2167 5059 42*

      Linda Thong
      World Class
      244 Fifth Avenue, Suite 2200
      New York, New York 10001
      *Via CMRRR# 9414 7266 9904 2167 5059 59*

      Maryann Norwood
      World Class
      814 Lavaca St.
      Austin, Texas 78701
      *Via email: mnorwood@world-class.com*

      Brian Elliott
      World Class Global Business Services
      814 Lavaca St.
      Austin, Tx 78701
      *Via CMRRR# 9414 7266 9904 2167 5056 07,*
      **First Class Mail and Email: belliott@world-class.com**

Unofficial copy Travis Co. District Clerk Velva L. Price



|||||||||| 6 pgs    202040410

## NOTICE OF TRUSTEE'S SALE

STATE OF TEXAS      §
                    §          KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF TRAVIS    §

        WHEREAS, WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company (the "*Grantor*"), executed a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017, and recorded April 27, 2017 in the Official Public Records of Travis County, Texas (the "*Records*") under Document No. 2017066579 (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Deed of Trust*");

        WHEREAS, the Grantor, pursuant to the Deed of Trust, conveyed to T. Gerry Gamble (the "*Original Trustee*") for the benefit of First State Bank Central Texas, its successors and assigns ("*Beneficiary*"), all of the personal property, real property and premises described and referred to in the Deed of Trust (the "*Mortgaged Property*"), including the following described property located in Travis County, Texas:

            3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBE DBY METES AND BOUNDS ON <u>EXHIBIT "A"</u> ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

        WHEREAS, the Deed of Trust secures payment of that certain Promissory Note dated April 26, 2017, executed by Grantor, as Maker, and payable to the order of Beneficiary, in the original stated amount of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00) (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Note*");

        WHEREAS, BancorpSouth Bank, a Mississippi banking corporation (the "*Holder*"), is the successor by merger to Beneficiary;

        WHEREAS, the Holder is the current legal owner and holder of the indebtedness secured by the Deed of Trust (the "*Indebtedness*") and, if, for any reason, Holder prefers to appoint a substitute trustee to act instead of the trustee named in the Deed of Trust, Holder has the full power to appoint, at any time and

1

Unofficial copy Travis Co. District Clerk Velva L. Price

without any formality other than by written instrument, one or more successor or alternate successor

trustees, each of whom shall succeed to all the estate, rights, powers and duties conferred upon the Original

Trustee in the Deed of Trust and by applicable law;

WHEREAS, Holder has named, constituted and appointed in writing BRADLEY E. RAUCH, a

resident of Harris County, Texas, ZACHARY SCHNEIDER, a resident of Harris County, Texas, ANGELA

ZAVALA, a resident of Travis County, Texas, and also MICHELLE JONES, a resident of Travis County,

Texas, as Substitute Trustees, each with the power to act independently (and without the joinder of the

others) under and by virtue of the Deed of Trust and to hold possess and execute all the estate, rights, powers

and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Grantor has defaulted in the performance of its obligations under the Note and the

Deed of Trust, and notice of such defaults have been waived, and/or have occurred, and Grantor has failed

to cure such default(s);

WHEREAS, acceleration of maturity and demand have been made upon Grantor for payment of

the Indebtedness, and/or have been waived and/or have occurred;

WHEREAS, the proceeds of the Note were used for commercial purposes, and the Mortgaged

Property was not to be used by the debtor for residential purposes;

WHEREAS, the Holder has called upon and requested either or any of Bradley E. Rauch, Zachary

Schneider, Angela Zavala, Michelle Jones, or any additional substitute trustee appointed pursuant to the

terms of the Deed of Trust, as Substitute Trustees, to perform the Trustee's duties under the Deed of Trust

and to post, mail and file, or have posted, mailed, and filed, notice and to sell the Mortgaged Property

without prejudice and without creating an election not to proceed against any other collateral securing the

obligations of the Grantor to the Holder, and without waiving any rights or remedies which the Holder has

against the Grantor or any other parties obligated for payment of the Indebtedness;

NOW, THEREFORE, the undersigned Substitute Trustee, at the request of the Holder, hereby gives

notice that after due posting of this Notice as required by the Deed of Trust and law, a Substitute Trustee

will sell on **September 1, 2020** (that being the first Tuesday of said month, as provided for in Texas

2

20170804.20190907/3778368.1

Property Code Sec. 51.002) at public auction to the highest bidder for cash, at THE REAR "SALLYPORT" OF THE TRAVIS COUNTY COURTHOUSE, 1000 GUADALUPE STREET, AUSTIN, TEXAS 78701, said location having been designated by the County Commissioners' Court of Travis County, Texas (or such other location as may be designated by said County Commissioners' Court), the sale to begin no earlier than 1:00 o'clock p.m. and no later than three (3) hours after such time, the Mortgaged Property, including without limitation, all personal property described in the Deed of Trust, owned by the Grantor, Grantor's heirs, legal representatives, successors and assigns, and originally covered by the Deed of Trust, whether or not herein specifically described.

THE SALE OF THE PROPERTY IS "AS IS" AND "WHERE IS" AND WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND BY THE SUBSTITUTE TRUSTEE OR HOLDERS OF SAID INDEBTEDNESS, EXPRESS, IMPLIED, STATUTORY, QUASI-STATUTORY OR OTHERWISE, ANY WARRANTY OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE BEING EXPRESSLY DISCLAIMED. NEITHER THE HOLDER NOR THE TRUSTEE OR SUBSTITUTE TRUSTEE MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE COMPLIANCE WITH LAWS, RULES, AGREEMENTS, OR SPECIFICATIONS, NOR WITH RESPECT TO CONDITION, QUALITY, CAPACITY, DESIGN, OPERATION, ABSENCE OF ANY LATENT DEFECTS OR ANY OTHER WARRANTY OR REPRESENTATION WHATSOEVER WITH RESPECT TO THE PROPERTY, ALL OF WHICH ARE EXPRESSLY WAIVED BY PURCHASER(S).

THE NEXT PAGE IS THE SIGNATURE PAGE

20170804.20190907/3778368.1

WITNESS BY HAND this 7th day of August, 2020.

_____
Zachary Schneider, Trustee

COUNTY OF HARRIS      §
                       §
STATE OF TEXAS        §

      This document was acknowledged before me on this, the 7th day of August, 2020, by Zachary Schneider, Trustee.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

<u>Name and Address of Substitute Trustees:</u>
Mr. Bradley E. Rauch
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

Angela Zavala
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

Michelle Jones
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

<u>AFTER RECORDING, PLEASE RETURN TO</u>:
Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002



KAREN M. WADE
My Notary ID # 7846256
Expires June 30, 2023

20170804.20190907/3778368.1

4

**EXHIBIT "A"**

**Legal Description**

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (1.0') R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 66 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 61° 03' 42" E, A DISTANCE OF 0.71 FEET;

Unofficial copy Travis Co. District Clerk Velva L. Price

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES;

1) S 76° 04' 00" E, A DISTANCE OF 139.49 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

2) N 13° 52' 00" E, A DISTANCE OF 53.53 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.92 FEET)

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 26.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.



**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir

Dana DeBeauvoir, County Clerk
Travis County, Texas

**202040410**

Aug 10, 2020 11:12 AM

Fee: $3.00      MACEDOS

6

20170504.20190007/5778368 1

# TAB 5

9/8/2020 12:00 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-20-004508
Alexus Rodriguez

## CAUSE NO. D-1-GN-20-004508

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC and AFFILIATED COMMERCIAL SERVICES, INC. | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| | § | TRAVIS COUNTY, TEXAS |
| v. | § § | |
| | § | 261st JUDICIAL DISTRICT |
| | § | |
| | § | |
| 8209 BURNET, LP, AND | § | |
| BANCORPSOUTH BANK | § | |
| Defendants. | | |

### AFFILIATED COMMERCIAL SERVICES, INC.'S
### NOTICE OF NONSUIT WITHOUT PREJUDICE

AFFILIATED COMMERCIAL SERVICES, INC., a plaintiff herein, hereby gives notice to this

Court and to all parties to this suit that it is taking a nonsuit without prejudice of its entire case

against all Defendants, effective immediately on the filing of this notice.

**MANFRED STERNBERG & ASSOCIATES, P.C.**


_____
Manfred Sternberg
SBN: 19175775
1700 Post Oak Blvd. Suite 600
Houston, TX 77056
Telephone:   (713) 622-4300
Facsimile:    (713) 622-9899
Email: manfred@msternberg.com
**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the above foregoing document to be served upon all parties to this lawsuit in accordance with Rule 21a of the Texas Rules of Civil Procedure electronically by transmission to an electronic filing service provider for service through the state's electronic filing manager, email, and/or facsimile on this 7th  day of September, 2020.

_____

Manfred Sternberg

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Manfred Sternberg on behalf of Manfred Sternberg
Bar No. 19175775
manfred@msternberg.com
Envelope ID: 46015871
Status as of 9/8/2020 10:30 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Dana LKirkpatrick | | dana@msternberg.com | 9/7/2020 7:11:07 AM | SENT |
| Christopher Dodson | | chris.dodson@bracewell.como | 9/7/2020 7:11:07 AM | ERROR |
| Mark Riley | | Riley@Riley-CPA-Law.com | 9/7/2020 7:11:07 AM | SENT |
| Michael J.Durrschmidt | | mdurrschmidt@hirschwest.com | 9/7/2020 7:11:07 AM | SENT |

Associated Case Party: 8209 Burnet, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher L.Dodson | | chris.dodson@bracewell.com | 9/7/2020 7:11:07 AM | SENT |
| W. Stephen Benesh | | steve.benesh@bracewell.com | 9/7/2020 7:11:07 AM | SENT |
| Jaclyn Carr | | jaclyn.carr@bracewell.com | 9/7/2020 7:11:07 AM | SENT |
| Robert P.Grattan | | bob.grattan@bracewell.com | 9/7/2020 7:11:07 AM | SENT |

Associated Case Party: WC Teakwood Plaza, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Manfred Sternberg | | manfred@msternberg.com | 9/7/2020 7:11:07 AM | SENT |

Associated Case Party: BancorpSouth Bank

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brian Buescher | | bbuescher@hirschwest.com | 9/7/2020 7:11:07 AM | SENT |

# TAB 6

9/8/2020 12:00 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-20-004508
Alexus Rodriguez

**CAUSE NO. D-1-GN-20-004508**

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC and AFFILIATED COMMERCIAL SERVICES, INC. | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | TRAVIS COUNTY, TEXAS |
| v. | § § § | 261st JUDICIAL DISTRICT |
| | § § | |
| 8209 BURNET, LP, AND BANCORPSOUTH BANK | § § | |
| Defendants. | | |

**WC TEAKWOOD PLAZA, LLC**
**NOTICE OF NONSUIT WITHOUT PREJUDICE**
**AS TO DEFENDANT BANCORPSOUTH BANK**

WC TEAKWOOD PLAZA, LLC, Plaintiff herein, hereby gives notice to this Court and to all parties to this suit that it is taking a nonsuit without prejudice of its entire case against Defendant Bankcorpsouth Bank, effective immediately on the filing of this notice.

**MANFRED STERNBERG & ASSOCIATES, P.C.**

Manfred Sternberg
SBN: 19175775
1700 Post Oak Blvd. Suite 600
Houston, TX 77056
Telephone:  (713) 622-4300
Facsimile:  (713) 622-9899
Email: manfred@msternberg.com
**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the above foregoing document to be served upon all parties to this lawsuit in accordance with Rule 21a of the Texas Rules of Civil Procedure electronically by transmission to an electronic filing service provider for service through the state's electronic filing manager, email, and/or facsimile on this 7th day of September, 2020.

_____

Manfred Sternberg

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Manfred Sternberg on behalf of Manfred Sternberg
Bar No. 19175775
manfred@msternberg.com
Envelope ID: 46015868
Status as of 9/8/2020 10:33 AM CST

Associated Case Party: 8209 Burnet, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Christopher L.Dodson | | chris.dodson@bracewell.com | 9/7/2020 7:07:56 AM | SENT |
| W. Stephen Benesh | | steve.benesh@bracewell.com | 9/7/2020 7:07:56 AM | SENT |
| Jaclyn Carr | | jaclyn.carr@bracewell.com | 9/7/2020 7:07:56 AM | SENT |
| Robert P.Grattan | | bob.grattan@bracewell.com | 9/7/2020 7:07:56 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mark Riley | | Riley@Riley-CPA-Law.com | 9/7/2020 7:07:56 AM | SENT |
| Christopher Dodson | | chris.dodson@bracewell.como | 9/7/2020 7:07:56 AM | ERROR |
| Michael J.Durrschmidt | | mdurrschmidt@hirschwest.com | 9/7/2020 7:07:56 AM | SENT |
| Dana LKirkpatrick | | dana@msternberg.com | 9/7/2020 7:07:56 AM | SENT |

Associated Case Party: WC Teakwood Plaza, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Manfred Sternberg | | manfred@msternberg.com | 9/7/2020 7:07:56 AM | SENT |

Associated Case Party: BancorpSouth Bank

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brian Buescher | | bbuescher@hirschwest.com | 9/7/2020 7:07:56 AM | SENT |

# TAB 7

9/9/2020 11:37 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-20-004508**
**Gilberto Rios**

CAUSE NO. D-1-GN-20-004508

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| | § | |
| 8209 BURNET, L.P., | § | |
| Defendant. | § | |
| | § | 261st JUDICIAL  DISTRICT |

## DEFENDANT 8209 BURNET, LP'S RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY INJUNCTION

Defendant lender 8209 Burnet, L.P. ("Defendant" or "Lender") files this Response in Opposition to Plaintiff borrower WC Teakwood Plaza, LLC's ("Borrower") Application for Temporary Injunction ("Application") as follows:

### I.     PRELIMINARY STATEMENT

1.     Infamous Austin real estate developer Nate Paul and his World Class entities are at it again. The facts here mirror those of dozens of other Nate Paul litigations over the past year— unable and unwilling to pay his lenders because of bankruptcies, litigation, and criminal investigations, Mr. Paul's entities do their best to delay foreclosures and additional bankruptcies by suing their lenders (and sometimes their principals), trying to divert the Court's attention to red herrings, and otherwise lashing out.  In fact, an affiliate of Borrower, WC 4th and Colorado, LP, unsuccessfully made some identical arguments to those made here related to an August foreclosure sale in *Colorado Third Street, LLC v. WC 4th and Colorado, LP*, Cause No. D-1-GN-20-002781. In spite of those arguments, Judge Gamble denied WC 4th and Colorado, LP's request to enjoin a foreclosure sale in August, the August foreclosure sale was set to go forward, and the borrower filed for bankruptcy to avoid foreclosure.

1

2.      This very same strategy is on display again and should not be countenanced.  There is no legitimate reason to enjoin Lender's foreclosure here. Foreclosure is Lender's rightful remedy under the Texas Property Code and its contracts with Borrower and Mr. Paul. To enjoin Lender's foreclosure remedy is to deprive Lender of the benefit of its bargain, to treat Lender differently than all other lenders in Travis County, and irreparably harm Lender during the period preceding a trial on the merits. All the while, Mr. Paul would decline to make payments and continue to collect and divert rents from Lender. This would turn equity on its head.

3.      For over six months, Borrower has made no effort to pay on its real estate loan with an outstanding balance of approximately $7.39 million in principal and interest (the "Loan"). Because the Note is in default, Lender possesses the agreed-upon, contractual right to foreclose on the property that serves as collateral for the Loan. Rather than facing this undeniable reality, Borrower has filed its Application in an effort to delay Lender's proper exercise of its foreclosure right. But Borrower's Application fails to articulate any valid or sufficient reason to enjoin foreclosure; Borrower's sundry arguments are a distraction, a smokescreen, intended to put off the inevitable.  Despite what Borrower says, non-judicial foreclosure sales have continued in Travis County during the entire pandemic; they occurred each of the last few months and they will occur next month.  Enjoining Lender here would be to treat Lender differently than all others with a foreclosure remedy in Travis County and would contravene the various applicable COVID-related orders.

4.      Borrower cannot meet its burden of demonstrating a probable right to the relief it seeks—the lynchpin of any injunction application—irreparable injury, or that the equities weigh in its favor. Borrower's Application should therefore be denied.

2

## II.    FACTUAL BACKGROUND

### A.    The Property and the Loan Documents

5.      Borrower owns a fee simple interest in property located in Austin.  On April 26, 2017, the Borrower executed a Promissory Note (the "Note") evidencing a $7,600,000 commercial real estate loan (the "Loan") in favor of BancorpSouth Bank, as successor by merger to First State Bank Central Texas ("Original Lender").  (Ex. 1, Promissory Note.)  The Loan was memorialized in, among other things, a Loan Agreement (the "Loan Agreement") between the Original Lender and the Borrower.  (Ex. 2, Loan Agreement.)  Borrower agreed that the "Lender may freely assign, whether by sale or transfer, all or any portion of its rights in and to all or any portion of the indebtedness including the Note to any third party…."  (*Id.* at Art. 8.07, 8.05.)

6.      The Loan is secured by certain real property, together with improvements thereon, located at 8209 Burnett Road, Austin, Texas (the "Property"). The Borrower granted the Original Lender a first priority deed of trust lien on and security interest in the Property pursuant to that certain pursuant to that Deed of Trust, Security Agreement and Financing Statement, dated April 26, 2017 (the "Deed of Trust").  (Ex. 3, Deed of Trust.)  The Deed of Trust was recorded in the real property records of Travis County, Texas ("Real Property Records") on April 27, 2017 under Instrument Number 2017066579.  Borrower agreed that Original Lender and Assignees would be entitled to the remedy of non-judicial foreclosure if an uncured Event of Default exists.  (*Id.* at 3.02.)  The Deed further provides that "Beneficiary may freely assign, whether by sale or transfer, all or any portion of its lien rights hereunder…."  (*Id.* at Art. 7.09.)

7.       As additional security for the Loan, Borrower executed and delivered to Original Lender a Collateral Assignment of Leases and Rents dated April 26, 2017 (the "Assignment of Rents"), and recorded at 2017066580 in Travis County, Texas pursuant to which, Lender as

Assignee, is entitled to collect rents, revenues, issues, profits, proceeds, receipts, income, accounts, and other receivables on Property. (Ex. 16, Assignment of Rents.)

8.     In connection with the Loan, Natin Paul and World Class Capital Group, LLC ("Guarantors") executed a Guaranty Agreement (the "Guaranty") dated April 26, 2017.  (Ex. 4, Guaranty.).  In doing so, Guarantors unconditionally guaranteed to Lender the obligation to pay the indebtedness represented by the Note.  (*Id.* at 1.)  The Note, Loan Agreement, Deed of Trust, and Guaranty are collectively referred to herein as the "Loan Documents."

## B.     Assignment of the Loan and Loan Documents

9.     On August 21, 2020, Original Lender and Lender entered into the Assignment of Note and Security Instruments (the "Assignment"), under which the Original Lender assigned all its rights, title, and interests under the Loan Documents and in connection with the Loan to Lender, including the Loan Agreement, the Note, the Deed of Trust, the Guaranty, the Collateral Assignment of Leases and Rents, and the UCC Financing Statement.  (Ex. 5, Assignment.)  The Assignment was recorded in the Real Property Records on August 24, 2020 under Instrument Number 2020151969.  Borrower was provided with notice of the Assignment.  (Ex. 6, Notice of Assignment; Ex. 7, Ltr. to M. Norwood.)

## C.     It is undisputed that the Note is in default and Lender is entitled to foreclose.

10.     Borrower has not made a payment on the Note since February 9, 2020. BancorpSouth's Rule 91a Mot. at ¶5; (Ex. 8, Notice of Default; Ex. 9, Bayne Aff. at ¶8.) According to the Loan Documents, Lender may accelerate the entire outstanding balance of the Note if a default in payment obligations occurs.  (Ex. 2 at Art. 7.05 (Loan Agreement); Ex. 3 at Art. 3.01 (Deed of Trust).)  On July 2, 2020, the Original Lender sent the Borrower, its Guarantors, and Borrower's legal counsel a notice of default and its intent to accelerate the Note in the event of a failure to cure.  (Ex. 8.)  On July 23, Original Lender sent Borrower and Guarantors a Notice

of Acceleration, informing them that "the entire indebtedness owing on the Note, and all interest accrued and unpaid thereon, is hereby **ACCELERATED** and due and payable in full" and that "Lender may seek to foreclose its Collateral unless payment of the full indebtedness is made[.]" (Ex. 10, Notice of Acceleration.) Borrower has made no payments on the Note since receiving the Notice of Default or Notice of Acceleration.  (Ex. 9 at ¶8.)

**D.      Events leading up to the September 1 foreclosure sale.**

11.      On August 10, 2020, with the Event of Default uncured, Original Lender posted and recorded the Notice of Substitute Trustee's Sale scheduled for September 1, 2020.   (Ex. 11, Notice of Trustee's Sale; Ex. 12, Affidavit of Filing and Posting.)  On August 11, 2020, Original Lender served Borrower and Guarantors with the Notice of Substitute Trustee's Sale.  (Ex. 13, Foreclosure Notice Letter; Ex. 14, Aff. of Mailing.)  On August 31, 2020, one day before the foreclosure sale, visiting Judge Gary Harger issued a temporary restraining order enjoining the September 1 foreclosure sale.  (Ex. 15, TRO Order.)

12.      While Lender's foreclosure remedy was enjoined, Lender's understanding is that other non-judicial foreclosure sales occurred in Travis County on September 1 at the Travis County Courthouse.  (Ex. 15, Recorded Deeds from September 1 Foreclosure Sale.)  They also occurred in July and August.  (Exs. 18, 19.)  In addition, there are 19 properties posted for October foreclosure.  (Ex. 17, October Foreclosure Postings.)

13.      Unless payment is made on the Note, Lender intends to post, record, and serve Borrower with a Notice of Substitute Trustee's sale for the October 6, 2020 foreclosure sale. Lender intends to fully comply with all state, city, and county COVID orders in conducting the foreclosure sale.

### III.    ARGUMENTS AND AUTHORITIES

14.     "A temporary injunction is an extraordinary remedy and does not issue as a matter

of right." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "To obtain a temporary

injunction, [an] applicant must plead and prove three specific elements: (1) a cause of action; (2)

a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the

interim." *Id.*

15.     Lender is the current owner and holder of the Loan Documents by assignment from

Original Lender, and therefore is the party entitled to foreclose on the Property.  Lender is

registered to business in Texas.  (Ex. 20, App. for Registration.)  Borrower does not—because it

cannot—deny being in default of its contractual obligations under the Loan Documents.  Nor can

Borrower claim that foreclosure is impermissible under the Loan Documents.

16.     Instead, Borrower asks the Court to enjoin Lender from foreclosing by claiming

that the 10-person limit on gatherings prohibits non-judicial foreclosures from occurring in Travis

County.  This is demonstrably false, as foreclosures have proceeded in Travis County every month

since the 10-person gathering limitation was entered by Governor Abbott.  Further, County Judge

Biscoe has expressly declined to enter an order prohibiting non-judicial foreclosures from

proceeding.  Borrower's Application fails to articulate any valid or sufficient reason to enjoin

foreclosure.

**A.    Lender is the owner and holder of the Loan Documents and Borrower cannot claim
       otherwise.**

17.     Without any evidence, Borrower obliquely challenges Lender's status as the holder

of the Loan Documents.  (TI App. at ¶¶2, 4.)  Lender has provided Borrower with all

documentation required to prove its status as record holder and owner of the Loan Documents.

The Assignment is on file in the real property records and notice of the Assignment was provided

to Borrower by both the Original Lender and the Lender.  (Exs. 5, 6.)  The Loan Documents expressly allow Original Lender to assign the Loan Documents without limitation.  The Original Lender admits that it assigned its interest and rights in the Loan Documents to Lender. BancorpSouth's Rule 91a Mot. at ¶¶9, 11, 13-14, 22.  Borrower thereafter non-suited the Original Lender in this case.  There is no legitimate dispute—and certainly no evidence—that Lender is not the holder of the Loan Documents, or that Borrower is in default and that Lender is therefore entitled to foreclose.

18.      In Texas, a recorded assignment is sufficient to evidence an assignee's ownership of loan documents, entitling the assignee to enforce any rights in the loan documents.  *Schuetz v. Source One Mortgage Services Corp.*, No. 03-15-00522-CV, 2016 WL 4628048, at *4 (Tex. App.—Austin Sept. 1, 2016, no pet.) (finding party entitled to enforce provisions in deed of trust where it submitted evidence of note, deed of trust, and assignments of the note and deed of trust establishing a chain of title and record ownership); *Bierwirth v. BAC Home Loans Servicing, LP*, 2014 WL 712520, at *4 (Tex. App.—Austin Feb. 20, 2014, no pet.) (same).  These cases are consistent with Texas statute: Texas Property Code § 51.002(a) defines mortgagee with the right to foreclose as the "last person to whom the security interest has been assigned of record."

19.      Here, Borrower has been provided with: (1) a copy of the recorded Assignment showing Lender as the assignee of the Loan Documents; and (2) a Notice of Assignment from the Original Lender.  (*See* Exs. 6–7.)  The recorded Assignment, in conjunction with the Note, Loan Agreement, recorded Deed of Trust, and Loan Modification, are sufficient to establish Lender as the sole record and beneficial owner of the Loan Documents.  (Exs. 1–3, 5.)[1]

---

[1] Moreover, in Texas, "[b]orrowers have limited standing to challenge their lenders' assignments of their promissory notes and DOTs."  *Ferguson* v. *Bank of New York Mellon Corp.*, 802 F.3d 777, 780 (5th Cir. 2015).  A borrower only has standing to challenge an assignment on the basis that the assignment is void. *Id.*; *Melendez v. Citimortgage*, Inc., No. 03–14–0029–CV, 2015 WL 5781103 (Tex. App.—Austin Oct. 2,

**B.      Borrower cannot establish a substantial probability of success on its claims.**

20.      The lynchpin of any injunction application is substantial probability of success. Borrower asserts claims against Lender for declaratory judgement, breach of contract, and fraud.[2] None of these claims have any merit, much less a substantial probability of success.

*1.      Borrower does not have a substantial probability of success on its declaratory judgment claim*

21.      Borrower seeks a judicial determination that it is "entitled to the process of conducting a legitimate public sale under the contracts between the parties." (TI. App. at ¶20.) It asks the Court to adopt its unsupported determination that "state, county, and city restrictions on gatherings prevent a non-judicial foreclosure sale from properly proceeding as required under the Texas Property Code, without express approval of the Mayor of the City of Austin." (*Id.* at ¶3.) But, contrary to Borrower's suggestion, there is no prohibition on non-judicial foreclosure sales in Travis County.  And there is no evidence that the non-judicial foreclosure sale cannot be conducted pursuant to the applicable gathering rules.  To the contrary, non-judicial foreclosure sales have continued in Travis County and Lender intends to comply with all applicable COVID-related orders in conducting any foreclosure sale.

a.      <u>There are no state, city, or county COVID orders or guidance prohibiting non-judicial foreclosure sales in Travis County.</u>

22.      On July 2, Governor Abbott issued a proclamation restricting outdoor gatherings in excess of 10 persons, unless approved by local authorities.  (Ex. 21, Proclamation dated July 2, 2020.)  The proclamation does not apply to "local government operations." (*Id.*)  The City of Austin and Travis County have issued orders in line with that proclamation, but both expressly

_____

2015, no pet.) (mem. op.).  Borrower has no claim that the Assignment of the Loan Documents is void.  To the contrary, the Loan Documents gave the Original Lender unfettered right to assign the Loan Documents. (Ex. 2, Art. 8.07, 8.05; Ex. 3, Art. 7.09.)

[2] In the face of a Rule 91a motion, Borrower non-suited its claims against Original Lender.

declined to cancel foreclosure sales.  (Exs. 22–23.)  In fact, Judge Biscoe informed Lender's representatives that he "ha[d] not issued an order regarding such [non-judicial foreclosure] sales and d[id] not plan to."  (Ex. 24, Email from Judge Biscoe.)  Non-judicial foreclosure sales have proceeded on the courthouse steps in each of the months since Governor Abbott, the Mayor, and the County Judge issued their COVID-related orders.  (Exs. 15, 18, 19.)  There is therefore no evidence that non-judicial foreclosure sales cannot go forward under the current orders.[3]

23.     Instead of relying on the applicable COVID orders, Borrower mischaracterizes a letter from an assistant attorney general dated August 2.  In that letter, Ryan Bangert issued "Informal Guidance" recommending that a "sale should not go forward" *if* the 10-person limit would "preclude[] the attendance of one or more willing bidders who otherwise would have appeared in person."  (Ex. 25, Informal Guidance at 3.)  The Informal Guidance makes clear that for purposes of calculating the total number of persons in attendance for any given sale, it only matters if "willing bidders" are not permitted to attend under the 10-person limit.  (*Id.* at 3.) Contrary to Borrower's suggestion, this Informal Guidance does not state that public foreclosure sales of any size cannot go forward without mayoral approval.

24.     As an initial matter, the Informal Guidance is not an order and it has no binding effect.  As it must, the Informal Guidance states "this letter is not a formal Attorney General opinion under section 402.042 of the Texas Government Code; rather, it is intended only to convey informal legal guidance."  (*Id.* at 4.)  Attorney general opinions, especially informal ones, are "not controlling on the courts."  *See Comm'rs Ct. of Titus Cty. v. Agan*, 940 S.W.2d 77, 82 (Tex. 1997) (disagreeing with Attorney General's opinion).

---

[3] The email from Mayor Adler attached to the Application also does not state that foreclosure sales are prohibited in the City of Austin. (TI App. at ¶6.)  Instead, Mayor Adler's email states that he has "neither approved nor authorized any outdoor gatherings in Austin, Texas, in excess of **10 persons**." (Ex. 26 (emphasis added).)

25.     But, regardless, the Informal Guidance does not prohibit the foreclosure sale from proceeding.  In fact, foreclosure sales were conducted in Travis County in August and Lender's understanding is that they also occurred in September—both after the Informal Guidance was issued.  (Exs. 15, 19.)

> b.  <u>Borrower's complaints are premature and not subject to determination by declaratory judgment.</u>

26.     Because there is no order prohibiting a non-judicial foreclosure sale, the requested declaratory judgment cannot be used to enjoin the foreclosure sale in its entirety.  *See, e.g.*, *Paulsen v. Tex. Equal Access to Justice Found.*, 23 S.W.3d 42, 46–47 (Tex. App.—Austin 1999, pet. denied) (parties not entitled to advisory opinion where no evidence of an imminent threat or intention to breach contract); *City of Garland v. Louton*, 691 S.W.2d 603, 605 (Tex. 1985) (parties not entitled to declaratory judgment on constitutionality of referendum statute before election).  The most Borrower could hope to do is prospectively enjoin any violation of applicable COVID-related orders.  But there is no evidence that will happen and certainly no imminent harm as Lender has stated—and states again here—that it will comply with all applicable COVID-related orders is conducting the foreclosure sale.

27.     Borrower has submitted no evidence in support of its contention that the foreclosure sale will violate any COVID-related orders, instead baldly claiming that "Lender insists on holding a non-judicial foreclosure sale for which it is certain that willing bidders will not be able to attend due to the state, county and city orders preventing the gathering of more than 10 persons[.]"  (TI. App. at ¶11.)  The issue of whether more than ten persons will be present at the foreclosure sale is premature and speculative, and therefore not ripe for declaratory judgment.  Lender has confirmed that it will not move forward with the foreclosure sale if any willing bidders are unable to attend because of the 10-person limit on gatherings.

28.     Moreover, there is no legal basis to Borrower's claim because in Texas a real property foreclosure under a deed of trust need not be "commercially reasonable." *Huddleston v. Texas Commerce Bank–Dallas*, 756 S.W.2d 343, 346 (Tex. App.—Dallas 1988, writ denied). "[A] mortgagee owes but one duty to the mortgagor, to conduct the sale properly." *RTC v. Westridge Court Joint Venture*, 815 S.W.2d 327, 332 (Tex. App.—Houston [1st Dist.] 1991, writ denied). Any potential impact a COVID-related order might have on the fairness of the public sale is purely speculative and is not actionable against Lender in any event. *See Huddleston*, 756 S.W.2d at 346. Simply because less people might want to attend does not make the sale "unfair" or impermissible. *See id.*

29.     As further evidence of Borrower's premature, speculative complaints, since the 10-person gathering limit was implemented, foreclosure sales occurred in July and August, and it is Lender's understanding that they occurred in September.  (Exs. 15, 18, 19.)   As of the date of filing this response, 19 more foreclosure sales have been noticed to occur at that same location on October 6, 2020.  (Ex. 17.)  Travis County Judge Sam Biscoe informed Lender's representatives that he "ha[d] not issued an order regarding such [non-judicial foreclosure] sales and d[id] not plan to."  (Ex. 24.)  Foreclosure sales continue in Travis County, and Borrower's contentions to the contrary are unavailing.  Borrower cannot self-declare that the foreclosure sale should be canceled based on pure speculation as to how many persons might show up to the sale (too many or few).

    c.    <u>Borrower's affiliate made these same arguments, supported by the same authority, in an unsuccessful effort to enjoin a non-judicial foreclosure sale last month.</u>

30.     It is important to note that an affiliate of Borrower, WC 4th and Colorado, LP, unsuccessfully made these very same arguments, supported by the very same state and local governmental proclamations, in an effort to enjoin an August foreclosure sale in *Colorado Third Street, LLC v. WC 4th and Colorado, LP*, Cause No. D-1-GN-20-002781.  However, Judge

11

Gamble rejected these arguments and denied WC 4th and Colorado, LP's request to enjoin a foreclosure sale in August.  (Ex. 27, Order Denying TI.)  Among other things, the AG's Informal Guidance was proffered to Judge Gamble, but she declined to reconsider her order.  Borrower is hoping for a different and – in Borrower's view – a better result than its affiliate obtained from Judge Gamble on the same facts and law just a few weeks ago.

2.    *Borrower's claim for breach of contract fails.*

31.    Borrower cannot establish a substantial likelihood of success on its breach of contract claim.  Borrower cannot establish that (1) it has complied with the terms of the contract, or (2) that Lender has breached a contract.  *Schlumberger Ltd. v. Rutherford*, 472 S.W.3d 881, 892 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

32.    With respect to the first element, Borrower has been in breach of its obligations under the Loan Documents since March 2020 for failure to make payment on the Loan.  (Ex. 28, Loan History.)  Borrower does not claim otherwise anywhere in its Application or Petition.  Since Borrower's breach preceded any alleged breach by Lender, Borrower cannot recover for any subsequent breach.  *See Interceramic, Inc. v. South Orient R.R., Co.*, 999 S.W.2d 920, 924 (Tex. App.—Texarkana 1999, pet. denied).

33.    With respect to the second element, the Loan Documents expressly provide Lender with the right to foreclose under the circumstances.  The Deed of Trust provides: "upon the occurrence of any Event of Default, [Lender] shall have the option, without declaring the entire Indebtedness due, to proceed with foreclosure[.]"  (Ex. 3, Art. 3.01.)  As explained above, an Event of Default occurred due to Borrower's failure to cure delinquent payments under the Note.  (Ex. 28, Payoff Statement; Ex. 3 at Art. 3.01(A).)  Lender cannot be found in breach by simply exercising its bargained-for rights under the Loan Documents to foreclose on the Property.  Borrower's attempt to impose additional duties on Lender not found in the Loan Documents finds

12

no support in the law. *K3C Inc. v. Bank of Am., N.A.*, 204 F. App'x 455, 461 (5th Cir. 2006) ("the relationship between a borrower and lender is not one that gives rise to a formal fiduciary relationship."); *Lovell v. W. Nat. Life Ins. Co.*, 754 S.W.2d 298, 303 (Tex. App.—Amarillo 1988, writ denied) (same).

*3.     Borrower's fraud claim must fail.*

34.     Borrower cannot establish a substantial likelihood of success on its amorphous fraud claim. (TI App. at ¶18.)   To support its fraud claim, Borrower relies on an alleged misrepresentation made by a non-party (the Original Lender): "Defendant [Original Lender] made representations to Plaintiff Borrower that it needed time to consider a postponement of its prior noticed foreclosure due [to] governmental orders," but unbeknownst to Borrower, Original Lender "secretly work[ed] with [Lender] to use confidential information on the terms of the loan…to effectuate a loan sale."   (*Id*.) Borrower does not identify a single misrepresentation or fraudulent act committed by Lender, and Borrower has now abandoned its claims against Original Lender in the face of a Rule 91a motion.   Therefore, it is unclear whether Borrower still asserts this claim against Borrower, but in any event, Borrower cannot establish a substantial likelihood of fraud for numerous reasons.

35.     First, the misrepresentation allegedly made by Original Lender relates to the now-enjoined September foreclosure.   Whatever misconduct is alleged against Original Lender related to a past foreclosure has no bearing on whether the Court should enjoin a future foreclosure.

36.     Second, the Original Lender's representation was too vague or imprecise to be considered a material misrepresentation.   *See, e.g., In re Media Arts Grp.*, 116 S.W.3d 900, 910 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (employee's statement "don't worry about it" was too vague to be a material misrepresentation that agreement would not be enforced).

13

37.     Third, Borrower has no evidence that Original Lender's statement was false. *Casstevens v. Smith*, 269 S.W.3d 222, 232 (Tex. App.—Texarkana 2008, pet. denied) (no evidence that statement by Defendants promising to work with Plaintiff to resolve property-ownership issues was false when it was made).  Borrower's suggestion that Original Lender's statement must have been false because of its "secret" negotiations with Lender to effectuate a sale of the Loan must be rejected.  (TI. App. at ¶18.)  In the Loan Documents, Borrower expressly agreed that Lender may freely assign the Loan Documents.  (Ex. 2, at Art. 8.07.)  There was nothing improper about Original Lender negotiating a loan sale with Lender.

38.     Finally, since the September foreclosure was enjoined, Borrower's fraud claim fails because Borrower was not injured by Original Lender's statement. *See Zorrilla*, 469 S.W.3d at 153 (plaintiff must prove it suffered an injury to prevail on fraud claim).

**C.      Lender is entitled to foreclose on the Property.**

*1.      It is undisputed that the entire amount of the Note is due and owing and has not been paid.*

39.     The Note is in default and Borrower does not dispute this fact.  Borrower has failed to pay the full amount due and owing under the Loan.  (Ex. 9 at ¶8, 11; Ex. 28, Payoff Statement). As of September 1, 2020, the amount of outstanding principal and interest on the Note is $7,387,112.96.  (Ex. 9 at ¶10.)

*2.      Lender has established all contractual prerequisites to be entitled to foreclose.*

40.     Borrower's request for temporary injunction should be denied where Lender can establish there was a default that permitted it to proceed with foreclosure under the Deed of Trust. *Alpha Adventure Ranch at Nocona, LLC v. Warrior Golf Mgmt., LLC*, No. 02-19-00030-CV, 2019 WL 6768123, at *2 (Tex. App.—Fort Worth Dec. 12, 2019, no pet.) (finding court correct in

14

denying injunction seeking to prevent foreclosure where record established default entitling noteholder to foreclose).

41.     The Deed of Trust provides "upon the occurrence of any Event of Default," Lender may "proceed with foreclosure[.]"  (Ex. 3, Art. 3.02.)  An "Event of Default" occurs when "[a]fter applicable notice and failure to cure [within 10 days] as provided for in the Loan Agreement, [Borrower] shall fail, refuse or neglect to promptly pay or cause there to be paid all Indebtedness due and payable under the Note[.]"  (*Id.* at Art. 3.01(A); Ex. 2, Art. 7.03.)  The Deed of Trust and Loan Agreement allow Lender to accelerate the entire indebtedness of the Note upon the occurrence of any Event of Default, without providing "further notice of intention to accelerate." (Ex. 3, Art. 3.01; Ex. 2, Art. 7.05.)  Here, Borrower's failure to make payment on the Note in accordance with the terms of the Loan Documents after notice and an opportunity to cure constitutes an Event of Default, which allowed Lender to accelerate the Note.  (Ex. 3, Art. 3.01(A); Ex. 2, Art. 7.01.)

42.     On July 2, 2020, a notice of default and demand for payment of delinquent payments was made to Borrower and Guarantors.  (Ex. 8.)  The notice also informed Borrower that if payment was not received within ten days, then the Original Lender would "accelerate the Note" and take any further legal action necessary.  (*Id*.)  The written notice was sent to the Borrower and Guarantors by certified mail to all required notice addresses and by email.  (*Id.*; Ex. 29, Notice of Updated Notice Address.)

43.     On July 19, although not required by the Loan Documents, Original Lender sent Borrower and Guarantors a Notice of Acceleration, demanding full payment of the Note. (Ex. 10; Ex. 3, Art. 3.01.)  Borrower has had over two months since the Notice of Default was sent to cure its default and avoid foreclosure but it has not done so.  Lender is entitled to foreclose.

D.      **Borrower cannot demonstrate irreparable harm.**

44.      "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204.  "In a temporary-injunction hearing, the burden is on the applicant to prove that his damages cannot be calculated, not on the non-movant to disprove that notion." *McGlothlin v. Kliebert*, 672 S.W.2d 231, 232 (Tex. 1984).  Moreover, "the mere fact that the subject matter is real estate does not" automatically satisfy the requirement that "an inadequate remedy of law [is] established by the evidence." *Sw. Sav. & Loan Ass'n v. Mullaney Const. Co., Inc.*, 771 S.W.2d 205, 207 (Tex. App.—El Paso 1989, no writ).  Borrower cannot meet this burden of proof.

45.      Borrower also cannot satisfy the irreparable injury requirement because its alleged injury is not imminent. *Jones v. Jefferson Cty.*, 15 S.W.3d 206, 213 (Tex. App.—Texarkana 2000, pet. denied).  An applicant's fear or apprehension of the possibility of injury is insufficient; the applicant must prove that respondent intends to harm the applicant. *Id.*  Here, there is no evidence that Borrower will be harmed because bidders will be precluded from bidding at the Property's foreclosure sale.  Borrower's fear that willing bidders *might* be precluded from bidding is insufficient to constitute irreparable harm.  *See Jones*, 15 S.W.3d at 213.  Lender has confirmed that it will comply with all applicable laws and COVID-orders in proceeding with the foreclosure.

46.      Moreover, Borrower fails to show that the alleged harm it may suffer from a wrongful disposition of the Property cannot be calculated and recovered in the form of damages.  Courts recognize a mortgagee's right to recover money damages including lost equity in property for an alleged wrongful foreclosure. *See Reyna v. State National Bank*, 911 S.W.2d 851, 855–56 (Tex. App.—Fort Worth 1995, writ denied).  Assuming there is a defect in the sale leading to a "grossly inadequate sales price," which is denied, Borrower would have a legal remedy. *Id.*

47.     Borrower also complains that it will lose its equity in the Property if Lender is allowed to foreclose.  (TI App. at ¶33.)  The mere fear of losing one's equity is not an adequate ground for an injunction.  *Branch Banking and Trust, Co. v. TCI Luna Ventures, LLC* (Tex. App.—Dallas 2013, no pet.) ("[M]erely that the sale may not bring the best price is not a basis to enjoin a foreclosure sale.").

**E.     The equities weigh in favor of denying Borrower's request for a Temporary Injunction.**

48.     An injunction may also be denied based upon a balancing of equities in the case.  *Universal Health Servs., Inc.*, 24 S.W.3d at 578.  There are several equitable considerations relevant here, each of which weighs in favor of denying the injunction.

49.     First, to obtain equity to avoid a foreclosure sale, a party "must affirmatively demonstrate [its] ability to pay the full amount due on the note."  *Grella v. Berry*, 647 S.W.2d 15, 18 (Tex. App.—Houston [1st Dist.] 1982, no writ); *Ginther-Davis Center, Ltd. v. Houston Nat. Bank*, 600 S.W.2d 856, 864 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) ("[A] debtor seeking equitable relief from a foreclosure sale must first tender the full sum of the admitted debt.").  Here, there are significant doubts that Borrower is able to pay the full amount due on the Note, including Borrower's failure to pay 2019 property taxes, penalty and interest in the amount of $248,303.88 and failure to remit any payments toward the Note since February 2020.  (Ex. 30, 2020 Tax Certificate; Ex. 9 at ¶8.)  Additionally, at least twenty of Mr. Paul's entities, including entities that the Guarantors have provided guarantees for, have filed for Chapter 11 bankruptcy, which also implies that Borrower is not in a position to pay the debt owed on the Note.

50.     Second, if Lender is enjoined from foreclosing until a trial on the merits, the Court would essentially be re-writing an unambiguous contract allowing Lender to foreclose.  *See Orix Capital Markets, LLC v. La Villita Motor Inns. J.V.*, 329 S.W.3d 30, 45 (Tex. App.—San Antonio

2010, pet. denied) (reversing 18 month injunction because court rewrote an unambiguous contract that entitled note holder, upon default, to institute foreclosure proceedings). Instead, the Court should weigh in favor of enforcing the Loan as written and deny Borrower's Application.

51.     Finally, if Lender is enjoined from exercising its contractual right to foreclose, all the while, Mr. Paul would decline to make payments and continue to collect and divert rents from Lender. This would turn equity on its head.

**F.     If Borrower's Application is granted, the Court should require Borrower to post a substantial bond.**

52.     In the unlikely event that the Court grants Borrower's Application, Borrower should be required to post a substantial bond because such an injunction, if wrongfully issued, would cause significant harm to Lender. *See* Tex. R. Civ. P. 684. "The purpose of a bond as a condition to the granting of a temporary injunction is to secure the payment for the party against whom the injunction is issued including the amount of the monetary damages which it sustains as a result of the injunction, and costs, in the event the injunction is subsequently held to be wrongfully issued and is dissolved." *Williard Capital Corp. v. Johnson*, No. 14-16-00636-CV, 2017 WL 3567914, at *4 (Tex. App.—Houston [14th Dist.] Aug. 17, 2017, no pet.). Relevant considerations in setting the bond amount include the value and lost use of the subject property, lost profits suffered by the plaintiff, and any required payments during the injunction's term. *See, e.g., Franklin Sav. Ass'n v. Reese*, 756 S.W.2d 14, 16 (Tex. App.—Austin 1988, no pet.).

53.     Here, the costs that Lender will incur include the wasting of the Property resulting from the Borrower's failure to maintain and repair the property, including roof damage and leaking; the loss of rental income of $43,307.53 per month; risks associated with the failure to pay 2019 taxes of $206,919.90 with penalty and interest of $41,383.98 which continues to accrue; risks associated with the failure to pay 2020 taxes as they come due; risk associated with the continued

18

loss of escrowed tenant payments for common area charges, property taxes and insurance; and the risk of additional Mechanic's Liens on the Property in addition to the $855,670.57 existing Mechanic's Liens that continue to accrue interest.  For these reasons, if the Court grants an injunction, the Court must also, as required by law, set a bond in an amount sufficient to protect Lender from the damages it is incurring and will continue to incur as a result of a wrongful delay of the foreclosure sale.

54.      Given that the Property is income producing and given Borrower's inability to pay, if an injunction is granted, Lender suggests a bond in the amount of $250,000 be required, and an expedited trial be scheduled.  (Ex. 9 at ¶12; Ex. 31, Demand to Borrower re Tenant Rents.)

### IV.      CONCLUSION

For the reasons stated herein, Defendant 8209 Burnet, L.P. respectfully requests that the Court deny Plaintiff WC Teakwood Plaza, LLC's Application for Temporary Injunction. Defendant also requests such additional relief to which it may be justly entitled.

Respectfully submitted,

BRACEWELL LLP

By: /s/ W. Stephen Benesh
    W. Stephen Benesh
    State Bar No. 02132050
    Email:  steve.benesh@bracewell.com
    111 Congress Avenue, Suite 2300
    Austin, Texas 78701
    713-223-2300 (Telephone)
    713-221-1212 (Facsimile)

    Christopher L. Dodson
    State Bar No. 24050519
    Email:  chris.dodson@bracewell.com
    Jaclyn Carr
    State Bar No. 24093776
    Email: jaclyn.carr@bracewell.com
    Robert P. Grattan

19

State Bar No. 24116452
Email: bob.grattan@bracewell.com
711 Louisiana, Suite 2300
Houston, Texas  77002
713-223-2300 (Telephone)
713-221-1212 (Facsimile)

ATTORNEYS FOR DEFENDANT 8209
BURNET, L.P.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record pursuant to the Texas Rules of Civil Procedure on September 9, 2020.

Manfred Sternberg
1700 Post Oak Blvd., Suite 600
Houston, Texas 77056
Counsel for Plaintiffs

_/s/ W. Stephen Benesh_
W. Stephen Benesh

CAUSE NO. D-1-GN-20-004508

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| | § | |
| 8209 BURNET, L.P., | § | |
| Defendant. | § | |
| | § | 261st JUDICIAL  DISTRICT |

## ORDER DENYING APPLICATION FOR TEMPORARY INJUNCTION

On September 10, 2020, the Court held an evidentiary hearing on the Application for Temporary Injunction filed by Plaintiff WC Teakwood Plaza, LLC.  After considering the evidence presented at the hearing, any post-hearing evidence submitted by the parties, the pleadings, the briefing provided by the parties, the legal authorities provided by the parties, and the arguments advanced by counsel, the Court hereby determines that the Temporary Injunction should be, in all respects, DENIED.

IT IS THEREFORE ORDERED, that WC Teakwood Plaza, LLC's Application for Temporary Injunction is, on all grounds, DENIED.

SIGNED this _____ day of September, 2020.


_____
JUDGE SULAK

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Diana Alday on behalf of W Benesh
Bar No. 2132050
diana.alday@bracewell.com
Envelope ID: 46073364
Status as of 9/11/2020 11:29 AM CST

Associated Case Party: WC Teakwood Plaza, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Manfred Sternberg | | manfred@msternberg.com | 9/9/2020 11:37:11 AM | SENT |

Associated Case Party: BancorpSouth Bank

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brian Buescher | | bbuescher@hirschwest.com | 9/9/2020 11:37:11 AM | SENT |

Associated Case Party: 8209 Burnet, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher L.Dodson | | chris.dodson@bracewell.com | 9/9/2020 11:37:11 AM | SENT |
| W. Stephen Benesh | | steve.benesh@bracewell.com | 9/9/2020 11:37:11 AM | SENT |
| Jaclyn Carr | | jaclyn.carr@bracewell.com | 9/9/2020 11:37:11 AM | SENT |
| Robert P.Grattan | | bob.grattan@bracewell.com | 9/9/2020 11:37:11 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Dana LKirkpatrick | | dana@msternberg.com | 9/9/2020 11:37:11 AM | SENT |
| Christopher Dodson | | chris.dodson@bracewell.como | 9/9/2020 11:37:11 AM | ERROR |
| Mark Riley | | Riley@Riley-CPA-Law.com | 9/9/2020 11:37:11 AM | SENT |
| Michael J.Durrschmidt | | mdurrschmidt@hirschwest.com | 9/9/2020 11:37:11 AM | SENT |

# ⧣ 11379300

SCANNED
5-17-17

## PROMISSORY NOTE

$7,600,000.00                                                    April 26, 2017

For value received, after date, without grace and in the manner, on the dates and in the amounts herein stipulated, the undersigned, WC TEAKWOOD PLAZA, LLC ("Maker"), promises to pay to FIRST STATE BANK CENTRAL TEXAS ("Payee"), a state banking association, or order, in lawful money of the United States of America, at P. O. Box 6136, Temple, Bell County, Texas, or at such other place designated in writing by Payee, or other holder hereof:

(1)    The principal sum of SEVEN MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($7,600,000.00), together with interest from the date hereof, on the principal amount remaining unpaid hereunder from time to time outstanding, at a rate per annum equal to the lesser of (a) the rate (the "Contract Rate"), which is equal to the sum of the prime interest rate (the "Base Rate") published in <u>The Wall Street Journal</u> (herein defined), plus ONE AND NO/100 percent (1.00%) per annum, which Base Rate shall be variable and shall be adjusted on each annual anniversary of this Note (this "Note") during the term hereof, effective at the commencement of business on the day of any such change in the Base Rate; or, (b) the Maximum Rate (as herein defined);

(2)    This Note shall be due and payable in sixty (60) monthly installments, the first fifty-nine (59) of which, shall be in the amount of FORTY-FOUR THOUSAND FOUR HUNDRED TWENTY-EIGHT AND 83/100 DOLLARS ($44,428.83) each (the "Installment Sum"), with the first installment, in the amount of the Installment Sum, being due and payable on May 9, 2017, and additional installments in the amount of the Installment Sum shall be due and payable on the same day of each and every consecutive month thereafter until April 9, 2022 (the "Maturity Date"), the maturity hereof, at which time the final installment of all unpaid principal and all accrued and unpaid interest shall be due and payable in full; and,

Interest shall accrue on a basis of actual days over a year of 365 or 366 days, as the case may be.

The periodic payment amount of principal and interest specified above has been calculated to allow for the full amortization of a debt in the amount of this Note at the current interest rate over an amortization term of three hundred (300) months beginning on the date of this Note (the "Amortization Period"). Notwithstanding the amount of the monthly principal and interest payment referenced above, it is the intention of Maker and Payee that the monthly principal and interest payment allow for full amortization of the principal balance of this Note over the remaining term of the Amortization Period. This Note provides for a variable interest rate to be adjusted annually. Therefore, Payee shall have the unilateral right in Payee's sole discretion to change the amount of the monthly payments of principal and interest at any time during the term hereof, if the interest rate on this Note changes, in order to cause the then current monthly payment to be adequate to amortize the then remaining principal balance of this Note over the then remaining term of the Amortization Period.

All scheduled payments as made shall be applied first to the interest then accrued, and the balance, if any, to the principal.

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 7, 2017 (12:32pm)

INITIAL FOR IDENTIFICATION    NOTE

Notwithstanding the foregoing, if at any time the Contract Rate shall exceed the Maximum Rate and thereafter, the Contract Rate shall become less than the Maximum Rate, the rate of interest payable hereunder shall, at the option of Payee, be the Maximum Rate until the cumulative interest received by Payee or other holder hereof, equals the interest which would have been received at the Contract Rate.

This Note may be prepaid at any time, and from time to time, in whole or in part, without penalty or premium. Any prepayment shall be applied in any order at Payee's discretion as among any then unpaid collections costs or charges for which Maker is liable (either hereunder or under the terms of any document securing the payment hereof), accrued but unpaid interest hereof, or the principal hereof. In the case of partial prepayments, any amount of the partial prepayment that is applied by Payee to the principal hereof shall be applied in the inverse order of maturity, if applicable, such that the then remaining number of scheduled principal installments, if any, shall be reduced accordingly, but no such partial prepayment of principal shall reduce the amount of any scheduled installment of principal on any subsequent principal installment due date, until the entire indebtedness evidenced by this Note is fully paid, it being the intention that any such partial prepayment of principal shall advance the final maturity date hereof, but shall not affect, prior to such new final maturity, the amount or payment due date of any such scheduled principal installment.

If payment of principal or interest on this Note shall become due on a Saturday, Sunday or public holiday as defined under the laws of the State of Texas, such payment shall be made on the next succeeding business day and such extension of time shall in such case be included in computing interest in connection with such payment. Any check, draft, money order or other instrument given in payment of all or any portion hereof may be accepted by the holder hereof and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the holder hereof except to the extent that actual cash proceeds of such instrument are unconditionally received by the holder and applied to this Note in the manner herein provided. Maker agrees not to send Payee payments marked "paid in full", "without recourse", or similar language. If Maker sends such a payment, Payee may accept it without losing any of Payee's rights under this Note, and Maker shall remain obligated to pay any further amount owed to Payee. All written communications concerning disputed amounts from Maker, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount shall be mailed or delivered to Payee at the following address: P. O. Box 6136, Temple, Texas 76503-6136.

In the event any check used to make a payment to Payee is dishonored for any reason, Maker shall pay to Payee, in addition to any other amounts to which Payee may be entitled hereunder, a reasonable processing fee of $30.00 (or the maximum amount provided from time to time in Section 3.506.(b) of the Texas Business and Commerce Code as it may be amended). This processing fee should be paid once with respect to each dishonor of a check. It is further agreed that the imposition of any such processing fee shall in no way prejudice or limit Payee's rights or remedies against Maker under this Note or any of the loan documents or any other instrument securing or executed in connection with this Note.

Payments received by Payee in Payee's banking offices after 2:00 p.m. local time for purposes of posting of payments shall be considered as received on the next succeeding business day of Payee (excluding Saturdays, Sundays, and public holidays as defined under the laws of the State of Texas). Payments which are otherwise scheduled for the 29th, 30th or 31st day of any particular month that does not have the regularly scheduled day (e.g. - February, April, June, September or November) shall instead be due and payable on the last day of that particular month.

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 6, 2017 (3:09pm)

2

INITIAL FOR IDENTIFICATION                    NOTE

As an alternative to matured unpaid monthly installment amounts accruing interest at the Maximum Rate (or such lesser default rate as may be specified herein), in the event any installment (but not the principal amount due upon Maturity) shall become overdue for a period in excess of ten (10) calendar days, a late payment charge equal to a reasonable amount not to exceed five percent (5%) of the amount of each installment may be charged by the holder hereof for the purpose of defraying the expense incident to handling such delinquent payments. This late charge should be paid only once, but promptly, as to each respective late payment. The provisions of this paragraph shall not limit Payee's right to compel prompt performance under this Note, or grant an option to Maker to make late payments and the charging of such late fee shall not waive any default under this Note.

It is especially agreed that if an Event of Default be made in any of the payments of principal and/or interest due hereon beyond the notice and cure period in the Loan Agreement or if there is an Event of Default in any of the covenants or provisions set forth in the Loan Agreement of even date by and between Maker and Payee ("Loan Agreement"), or in any Deed of Trust, Security Agreement or other security document given to secure the payment hereof, or should any maker, endorser or guarantor revoke, or dispute the validity of, or liability under this Note or any guaranty of the indebtedness evidenced by this Note, or become insolvent or commit any act of bankruptcy or make an assignment for the benefit of creditors or enter into any type of creditor workout, or authorize the filing or file a voluntary Petition in Bankruptcy or should a receiver of any of their property be appointed, or should involuntary bankruptcy proceedings be filed or threatened against any of said parties, or should there occur commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Maker or by any governmental agency against any collateral securing this Note, including a garnishment of any of Maker's accounts, including deposit accounts, with Payee, then, in any such event, after applicable notice and failure to cure as provided for in the Loan Agreement, at the option of the holder hereof, at any time thereafter, without further notice, the unpaid principal of this Note and all accrued interest shall at once become due and payable and, at the option of Payee, shall bear interest at the rate aforesaid from the date of such default or event. Failure to exercise any of said options shall not constitute a waiver on the part of the holder hereof of the right to exercise the same at any other time. Terms not defined herein are as defined in the Loan Agreement.

For the purposes hereof, the term "Base Rate" shall mean the domestic "Prime Rate" as published in The Wall Street Journal on that day under the section entitled "Money Rates". If this section of The Wall Street Journal reflects more than one rate as being the domestic Prime Rate, then the highest domestic rate shall be the Base Rate. On days when The Wall Street Journal is not published, the Base Rate shall be the Prime Rate stated in the most recently published edition of The Wall Street Journal. In the event that The Wall Street Journal ceases to be published altogether, or ceases to publish the Prime Rate then Payee, its successors or assigns, shall establish and use a new Base Rate disclosed to the Maker which closely approximates the Prime Rate, as defined above; provided, however, that such new Base Rate is reasonably available to and verifiable by the Maker. The rate is used by Payee as a general reference rate of interest, taking into account such factors as Payee may deem appropriate. It is understood that many of Payee's commercial or other loans are priced in relation to such rate, but it is not necessarily the lowest or best rate actually charged to some customers of Payee and that Payee may make various commercial or other loans at rates of interest having no relationship to such rate.

It is further agreed that if Payee seeks to enforce collection on this Note or to realize on any collateral securing this Note, including Payee's hiring an attorney, for the purposes of bringing suit upon or establishing this debt in any manner in any court, or for judicial or non-judicial foreclosure, then in any of said events,

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 6, 2017 (3:09pm)

3

INITIAL FOR IDENTIFICATION          NOTE

EXHIBIT NO. 1                                          EX. 1-003

Maker, any endorsers and guarantors hereof, promise to pay Payee's or other holder's reasonable attorney's fees and costs of collection, including, but not limited to, pre-foreclosure expenses, environmental report fees, unpaid ad valorem taxes, insurance premiums and appraisal fees, all of which sums shall become a part of the principal hereof.

It is the intention of the parties hereto to comply with applicable usury laws; accordingly, notwithstanding any provision to the contrary in this Note, or in any of the documents securing the payment hereof or otherwise relating hereto, in no event shall this Note or such documents require the payment or permit the collection of interest in excess of the maximum permitted by such laws. If any such excess of interest is contracted for, charged or received under this Note or under the terms of the documents securing the payment hereof, or otherwise relating hereto, or in the event the maturity of the indebtedness evidenced by this Note is accelerated in whole or in part, or in the event that all or any part of the principal or interest of this Note shall be prepaid, so that under any such circumstances the amount of interest contracted for, charged or received under this Note or under any of the instruments securing the payment hereof or otherwise relating hereto, on the amount of principal actually outstanding from time to time under this Note shall exceed the maximum amount of interest permitted by applicable usury laws, then in any such event, (a) the provisions of this paragraph shall govern and control, (b) any such excess which may have been collected shall, at final maturity of said indebtedness, either be applied as a credit against the then unpaid principal amount hereof or refunded to Maker, at Payee's option, and (c) upon such final maturity, the effective rate of interest shall automatically be reduced to the maximum lawful contract rate allowed under the applicable usury laws. Without limiting the foregoing, all calculations as to the rate of interest contracted for, charged or received under this Note or under such other documents which are made for the purposes of determining whether such rate exceeds the maximum lawful contract rate shall be made, to the extent permitted by applicable usury laws, by amortizing, prorating, allocating and spreading, in equal parts, during the period of the full stated term of the loan evidenced hereby, all interest at any time contracted for, charged or received from Maker or otherwise by Payee in connection with such indebtedness. NOTWITHSTANDING any term or provision of this Note to the contrary, Maker confirms to Payee that neither Maker nor its legal counsel, if any, is aware that this Note, or the transaction in connection with which the Note was issued, is or may be usurious in any respect. To induce Payee to make the loan evidenced by this Note, Maker agrees with and covenants to Payee that if at any time Maker believes or discovers that any term or provision of this Note or any action taken by Payee in connection with this Note is or may be in violation of the usury laws or any other applicable law, Maker will immediately give notice to Payee specifying with particularity the nature and extent of any such potential violation of the usury laws or any other applicable law, and afford to Payee a reasonable period (of not less than 60 days) within which to cure same. Maker agrees with and covenants to Payee that in no instance will Maker make any claim, bring any suit, prosecute or otherwise assert any cause of action, claim, counterclaim, or defense in respect of any violation of the usury laws or any other applicable law, unless, as a condition precedent thereto, Maker has given to Payee such notice and afforded to Payee such opportunity to cure as provided in this paragraph.

This Note and the Maximum Rate of nonusurious interest applicable to the loan evidenced hereby shall be governed by the laws of the United States of America and the State of Texas in effect on the date of the loan evidenced hereby, and, to the extent allowed by law, as now or as may hereafter be in effect. Unless changed in accordance with law, the applicable method of calculating the usury ceiling rate under Texas law shall be the weekly ceiling rate from time to time in effect, as provided for in Texas Finance Code Sections 303.002, 303.003 and 303.009; provided however, that the ceiling rate provided for in Texas Finance Code subsection 303.009(d) (which regulates certain open-end account credit agreements) shall not apply to the loan evidenced hereby.

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 6, 2017 (3:09pm)

4

INITIAL FOR IDENTIFICATION          NOTE

As further security for this Note, Maker grants to Payee a first lien and contractual right of set-off in and to all money and property of Maker now or at any time hereafter coming within the custody or control of the Payee, including (without limitation) all certificates of deposit and other accounts, whether such certificates of deposit and/or accounts have matured or not, and whether the exercise of such right of set-off results in loss of interest or other penalty under the terms of the certificate of deposit or account agreement. It is further agreed that the Payee shall have a first lien on all deposits and other sums at any time credited by or due from the Payee to Maker or any guarantor, as security for the payment of this Note, and Payee, at its option and whether before, upon or after acceleration of the maturity of this Note (however said maturity may be brought about) may without notice and without any liability, hold all or any part of any such deposits or other sums until all amounts owing on this Note have been paid in full, and/or Payee may apply or set-off all or any part of any such deposits or other sums credited by or due from Payee to or against any sums due on this Note in any manner and in any order of preference which the Payee, in its sole discretion, chooses. This includes all accounts Maker holds jointly with someone else and all accounts Maker may open in the future.

The Maker, endorsers and guarantors hereof and all other persons who are or may become liable for all or any part of the obligations represented by this Note shall be considered as principals as to the making of this Note and shall have joint and several liability and except as provided for in the Loan Agreement, the Maker, endorsers and Guarantors hereof severally waive presentment for payment, protest, notice of protest, and of nonpayment, notices of intention to accelerate the maturity and notice of acceleration, as to this Note and as to each, every and all installments hereof, and consent to the renewal or extension of the time of payment hereof and to the release of all or any part of the security described herein or any person liable hereon upon the terms deemed by the holder hereof, in the holder's sole discretion, to be adequate. Any renewal or extension or release of any of such security or person may be made without notice to any of said parties and without affecting their liability.

Maker understands and agrees that (i) Payee's document retention policy may involve the imaging of executed loan documents and other miscellaneous documents, papers, reports and other correspondence, and the destruction of the paper originals, and (ii) the Maker hereby waives any right that Maker may have to claim that the imaged copies of the loan documents, other than this Note, and other miscellaneous documents, papers and other correspondence related thereto are not originals.

The payment of this Note is guaranteed by NATIN PAUL and WORLD CLASS CAPITAL GROUP, LLC. The payment of this Note is secured by a Collateral Assignment of Leases and Rents and by a Deed of Trust of even date herewith to T. GERRY GAMBLE, TRUSTEE, covering the following described real property:

> 3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

**GOVERNING LAW AND VENUE**.  THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS NOTE IS DEEMED EXECUTED

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 6, 2017 (3:09pm)

5

INITIAL FOR IDENTIFICATION          NOTE

IN AND IS PERFORMABLE IN BELL COUNTY, TEXAS.  Any action or proceeding under or in connection with this Note against Maker or any other party ever liable for payment of any sums of money payable on this Note may be brought in any state court located in Bell County, Texas, or in the federal court in Bell County, Texas. Maker and each such other party hereby irrevocably: (i) submits to the nonexclusive jurisdiction of such courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.

**DEFAULT INTEREST.**  If an Event of Default exists as defined in the Loan Agreement, the outstanding principal balance of this Note shall, at the option of the Payee, bear interest at a rate (the "Default Rate") as follows: (i) in the event of a monetary default, interest on the loan shall accrue at a rate equal to the lesser of: (a) eighteen percent (18%) per annum, and (b) the maximum lawful rate permitted by applicable usury law (the "Maximum Rate"); and (ii) in the event of a non-monetary default, interest on the loan shall accrue at a rate equal to the lesser of (y) five percent (5%) over the contractual rate of interest under the loan documents, and (z) the maximum lawful rate. If interest has accrued at the Default Rate during any period, the difference between such accrued interest and interest which would have accrued at the Note Rate during such period shall be payable on demand.  If a court of competent jurisdiction determines that any interest charged has exceeded the maximum rate allowed by law, the excess of the amounts collected over the legal rate of interest will be applied to the indebtedness as a principal prepayment without premium, retroactively, as of the date of receipt, or returned to the borrower if the indebtedness has been fully paid.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in this Note, Maker further covenants and agrees with Payee as follows:

(1)     In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or non-judicial foreclosure sale, Maker agrees as follows. Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Maker agrees that Payee shall be entitled to seek a deficiency judgment from Maker and any other party obligated on this Note equal to the difference between the amount owing on this Note and the amount for which the Property was sold pursuant to judicial or non-judicial foreclosure sale. Maker expressly recognizes that this Section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Maker and other persons against whom recovery of deficiencies is sought or any guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Maker further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Maker, any guarantor, and others against whom recovery of a deficiency is sought.

(2)     Alternatively, in the event the waiver provided for in Subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time): (i) the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or

EXHIBIT NO. 1                                                    EX. 1-006

expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than twelve (12) months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including, without limitation, utilities expenses, Property management fees, taxes and assessments (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least ten (10) years experience in appraising Property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factor set forth above.

WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company

By:   WC Teakwood Plaza Mezz, LLC, a
      Delaware limited liability company,
      Manager

By: _____
     Natin Paul, President

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

    1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

    2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

ALLONGE
($7,600,000.00)


ALLONGE

Reference is hereby made to that certain promissory note executed by WC Teakwood Plaza, LLC, dated April 26, 2017, payable to the order of First State Bank, Central Texas, a Texas state banking association, in the original principal amount of $7,600,000.00, bearing loan number 11379300.  The undersigned BancorpSouth Bank is the owner and holder of said note as successor by merger to First State Bank, Central Texas, a Texas state banking association.

It is intended that this Allonge be attached to and become a part of said note and that the endorsement below shall be effective to assign said note as if set forth on the reverse of the original of said note.

PAY TO THE ORDER OF: 8209 Burnet, L.P., WITHOUT RECOURSE.


Dated: August _21_ , 2020


BANCORPSOUTH BANK

By: _____

Name: _Billy I Babineaux Sr_

Title: _SVP_

# LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is made and delivered as of April __26__, 2017 (the "Effective Date"), by and between WC TEAKWOOD PLAZA, LLC ("Borrower") and FIRST STATE BANK CENTRAL TEXAS ("Lender"). For and in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE I.  DEFINITIONS

1.01    Defined Terms.  In addition to terms defined elsewhere in this Agreement, the following terms, as used in this Agreement, shall have the meanings set forth below.  The singular number shall be deemed to include the plural, the masculine gender shall include the feminine and neuter genders, and vice versa.

"**Collateral**" shall mean, as the context dictates, the Real Property and the Personal Property given, collaterally assigned, pledged or granted or to be given to secure the Indebtedness and all of the respective owner(s) rights, title and interest in and to the same.

"**Default**" shall mean any condition or event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

"**GAAP**" shall mean generally accepted accounting principles consistently applied.

"**Grantor(s)**" shall mean any Loan Party who shall own an interest in any property that is to be subject to a Lien which secures any of the Indebtedness.

"**Guarantor(s)**" shall mean, as the context dictates, any person(s) (other than the Borrower) who shall, at any time, guarantee or otherwise be or become obligated for the repayment or the performance of all or any part of the Indebtedness.

"**Improvements**" shall mean all existing and future buildings, structures and other improvements made to the Land, along with all fixtures and permanently installed machinery and equipment on the Land and personal property owned by a Loan Party and used to maintain or service the improvements on the Land.

"**Indebtedness**" shall mean all loans, advances, indebtedness, obligations and liabilities of Borrower to Lender under any Loan Document, together with all other indebtedness, obligations and liabilities whatsoever of Borrower to Lender, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, voluntary or involuntary, known or unknown, or originally payable to Lender or to a third party and subsequently acquired by Lender including, without limitation, any: late charges; loan fees or charges; overdraft indebtedness; costs incurred by Lender in establishing, determining, continuing or defending the validity or priority of any Lien or in pursuing any of its rights or remedies under any Loan Document or in connection with any proceeding involving Lender as a

EXHIBIT NO. 2                                                    EX. 2-001

result of any financial accommodation to Borrower; debts, obligations and liabilities for which Borrower would otherwise be liable to the Lender were it not for the invalidity or enforceability of them by reason of any Bankruptcy, insolvency or other law or for any other reason; and reasonable costs and expenses of attorneys and paralegals, whether any suit or other action is instituted, and to court costs if suit or action is instituted, and whether any such fees, costs or expenses are incurred at the trial court level or on appeal, in Bankruptcy, in administrative proceedings, in probate proceedings or otherwise; provided, however, that the term Indebtedness shall not include any consumer loan to the extent treatment of such loan as part of the Indebtedness would violate any law, rule or regulation.

"**Land**" shall mean the following described real property:

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

"**Lease**" shall mean, individually and collectively, each lease that encumbers the Land by and between each respective tenant thereto as tenant (each and collectively the "Tenant") and Borrower as landlord.

"**Lien**" shall mean any valid and enforceable interest in any property, whether real, personal or mixed, securing an indebtedness, obligation or liability owed to or claimed by any person other than the owner of such property, whether such indebtedness is based on the common law or any statute or contract.

"**Loan**" shall mean, in general, that portion of the Indebtedness evidenced by the Note and the Loan Documents.

"**Loan Documents**" shall mean collectively, this Agreement, the Note and any other promissory notes evidencing Indebtedness, any approved subordination agreement, any reimbursement agreement or other documentation executed in connection with any letter of credit, and any other documents, instruments or agreements evidencing, governing, securing, guaranteeing or otherwise relating to or executed pursuant to or in connection with any of the Indebtedness or any Loan Document (whether executed and delivered prior to, concurrently with or subsequent to this Agreement), as such documents may have been or may hereafter be amended from time to time.

"**Loan Party**" shall mean Borrower and each other person who shall be liable for the payment or performance of any of the Indebtedness including any Guarantors, if any, and any Grantor who shall own any property that is subject to a Lien which secures any of the Indebtedness.

"**Material Adverse Effect**" shall mean any act, event, condition or circumstance which could materially and adversely affect the business, operations, condition (financial or

otherwise), performance or assets of any Loan Party, the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party or by which it is bound or the enforceability of any Loan Document.

**"Maximum Legal Rate"** shall mean the maximum rate of nonusurious interest per annum permitted to be paid by Borrower or, if applicable, another Loan Party or received by Lender with respect to the applicable portion of the Indebtedness from time to time under applicable state or federal law as now or as may be hereafter in effect, including Chapter 1 D of Title 79 Vernon's Texas Civil Statutes (and as the same may be incorporated by reference in other Texas statutes), but otherwise without limitation, that rate based upon the "weekly ceiling rate" (as defined in §303 of the Texas Finance Code).

**"Note"** shall mean the Promissory Note of even date in the principal sum of SEVEN MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($7,600,000.00) executed by Borrower and payable to the order of Lender and all modifications, renewals, rearrangements, extensions and increases thereof.

**"Permitted Encumbrances"** shall mean:  (a) Liens in favor of the Lender; (b) Liens for taxes, assessments or other governmental charges which are not yet due and payable, incurred in the ordinary course of business and for which no interest, late charge or penalty is attaching or which are being contested in good faith by appropriate proceedings and, if requested by Lender, bonded in an amount and manner satisfactory to Lender; (c) Liens, not delinquent, arising in the ordinary course of business and created by statute in connection with worker's compensation, unemployment insurance, social security and similar statutory obligations; (d) Liens of mechanics, materialmen, carriers, warehousemen or other like statutory or common law Liens securing obligations incurred in good faith in the ordinary course of business without violation of any Loan Document that are not yet due and payable; and (e) Liens existing as of the date hereof which have been specifically disclosed in writing to Lender and have been approved by Lender in writing.

**"Person"** or **"person"** shall mean any individual, corporation, partnership, joint venture, limited liability company, association, trust, estate, unincorporated association, joint stock company, government, municipality, political subdivision or agency, or other entity.

**"Personal Property"** shall mean all machinery, equipment, fixtures and other tangible personal property or intangible personal property given or to be given by a Loan Party to secure the Indebtedness in which Lender has or is to have a security interest or rights.

**"Real Property"** shall mean, the Land and the Improvements given, pledged or granted or to be pledged to secure the Indebtedness.

**"Required Accounting Method"** shall mean, with respect to the financial covenants contained herein, cash basis accounting principles, consistently applied for any individual Guarantor and GAAP (accrued basis) for each other Loan Party.

1.02    Accounting Terms.  All accounting terms not specifically defined in this Agreement shall be determined and construed in accordance with the Required Accounting Method.

## ARTICLE II. FEES AND MAXIMUM INTEREST RATE

2.01   Fees. Upon Borrower's execution hereof, Borrower shall pay to Lender an origination fee in the amount of $76,000.00, as well as Lender's out-of-pocket costs, expenses and advances expended towards the closing including reasonable attorney fees and title company fees.

2.02   Maximum Interest Rate. At no time shall any interest rate in respect of any Indebtedness, exceed the Maximum Legal Rate. In the event that any interest is charged or otherwise received by Lender in excess of the Maximum Legal Rate, Borrower hereby acknowledges and agrees that any such excess interest shall be the result of an accidental and bona fide error, and any such excess shall be deemed to have been payment of principal, and not of interest, and shall be applied, first, to reduce the principal Indebtedness then outstanding, second, any remaining excess, if any, shall be applied to reduce any other Indebtedness, and third, any remaining excess, if any, shall be returned to Borrower. Notwithstanding the foregoing or anything to the contrary contained in this Agreement or any other Loan Document, but subject to all limitations contained in this Section, if at any time any rate of interest applicable to any portion of the Indebtedness is computed on the basis of the Maximum Legal Rate, any subsequent reduction in the rate of interest that would otherwise be applicable shall not reduce such applicable interest rate thereafter payable below the Maximum Legal Rate until the aggregate amount of interest accrued equals the total amount of interest that would have accrued if interest had, at all times, been computed solely on the basis of such applicable interest rate. This Section shall control all agreements between the Borrower and the Lender.

## ARTICLE III. REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants, and such representations and warranties shall be deemed to be continuing representations and warranties during the entire life of this Agreement, and so long as Lender shall have any commitment or obligation to make any loans or issue any letter of credit and so long as any Indebtedness remains unpaid and outstanding under any Loan Document, as follows:

3.01   Due Authorization.   Each Loan Party has all requisite power and authority to execute, deliver and perform its obligations under each Loan Document to which it is a party or is otherwise bound, all of which have been duly authorized by all necessary action, and are not in contravention of law or the terms of any Loan Party's organizational or other governing documents.

3.02   Title to Property. Each Loan Party has good title to all property and assets purported to be owned by it, including those assets identified on the financial statements most recently delivered by Borrower to Lender.

3.03   Encumbrances. There are no security interests or other Liens or encumbrances on, and no financing statements on file with respect to, any of the Collateral of Borrower, except for Permitted Encumbrances.

3.04 <u>Non-contravention</u>. The execution, delivery and performance by each Loan Party of the Loan Documents to which such Loan Party is a party or otherwise bound, are not in contravention of the terms of any indenture, agreement or undertaking to which any such Loan Party is a party or by which it is bound, except to the extent that such terms have been waived or that failure to comply with any such terms would not have a Material Adverse Effect.

3.05 <u>Actions, Suits, Litigation or Proceedings</u>. There are no actions, suits, litigation or proceedings, at law or in equity, and no proceedings before any arbitrator or by or before any governmental authority, pending, or, to the best knowledge of Borrower, threatened against or affecting any Loan Party, which, if adversely determined, could materially impair the right of any Loan Party to carry on its business substantially as now conducted or could have a Material Adverse Effect. No Loan Party is under investigation by, or is operating under any restrictions imposed by, any governmental authority.

3.06 <u>Bankruptcy</u>. No Loan Party is involved as a debtor or obligor in any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or litigation proceeding, and to the best knowledge of Borrower, no such proceeding is contemplated by or threatened against any Loan Party.

3.07 <u>Accuracy of Information</u>. All financial statements previously furnished to Lender have been prepared in accordance with the Required Accounting Method and fairly present the financial condition of Borrower and, the results of Borrower's operations as of the dates and for the periods covered thereby; and since the date(s) of said financial statements, there has been no material adverse change in the financial condition of Borrower or any other person covered by such financial statements. Each Loan Party is solvent, able to pay its debts as they mature, has capital sufficient to carry on its business and has assets the fair market value of which exceed its liabilities, and no Loan Party will be rendered insolvent, under-capitalized or unable to pay debts generally as they become due by the execution or performance of any Loan Document to which it is a party or by which it is otherwise bound.

3.08 <u>Enforceability of Agreement and Loan Documents</u>. Each Loan Document has been duly executed and delivered by duly authorized officer(s) or other representative(s) of each Loan Party, and constitutes the valid and binding obligations of each such respective executing Loan Party, enforceable in accordance with their respective terms, except to the extent that enforcement thereof may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting the enforcement of creditors' rights generally at the time in effect.

## ARTICLE IV. GENERAL NOTE TERMS AND ADVANCE REQUIREMENTS

4.01 <u>Permitted Use</u>. Lender and Borrower agree that the proceeds of the Note are to be used for the purpose of the refinancing existing debt on a retail strip center located on the Real Property (the "Permitted Use").

4.02 <u>Deed of Trust</u>. The Note is primarily secured by a first lien Deed of Trust ("Deed of Trust") on the Real Property.

4.03    Additional Collateral. The Note shall be additionally secured by the following collateral:

    A.    Collateral Assignment of Leases and Rents with respect to the Real Property.

4.04    Disbursement of Note Proceeds. The proceeds of the Note may be disbursed for the Permitted Use in one or more installments as provided for herein or in the Note.

4.05    Limitation on Note Funding. Lender shall lend to Borrower under the Note such amounts as Borrower shall request up to, but not exceeding the lesser of (a) 75% of the appraised value of the Real Property, and (b) $7,600,000.00. Borrower shall execute and deliver to Lender the Note to evidence the Loan. Payment of the Note shall be secured by the Deed of Trust and the liens, security interest and collateral assignments created or evidenced by the other Loan Documents. Lender's commitment is not revolving in nature and any amount paid hereunder which reduces the outstanding unpaid principal amount of the Loan may not be re-borrowed.

4.06    **Legal Lending Limit. Any provision in the Loan Documents to the contrary notwithstanding, Lender shall have no obligation to make any advance under the Note or under any of the other Loan Documents if, as a result of such advance, Lender would be in violation of any applicable federal or state statute, law, regulation, or interpretation thereof, whether effective or prospective, regarding lending limits imposed upon Lender, including but not limited to the Garn-St. Germain Depository Institutions Act of 1982, the Federal Reserve Act, the Texas Finance Code and applicable interpretive letters issued by the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation and or the Texas Department of Banking.**

4.07    Conditions to Lender's Obligations. Notwithstanding anything contained to the contrary in the Note, this Agreement or in any of the other Loan Documents, Lender shall have no liability or obligation under this Agreement, the Note, or any of the other Loan Documents until the following matters are received, reviewed by Lender and completed or resolved to the satisfaction of Lender:

    A.    Lender shall have received originals of the Policies or Certificates of Insurance for each of the Required Insurance Policies as set forth in Article VI hereof.

    B.    Lender shall have received fully executed and complete Loan Documents.

    C.    Receipt of one or more fully executed Participation Agreement(s) with such third party lender(s) as Lender deems necessary or advisable.

    D.    Lender shall have received an appraisal ("Appraisal") of the Land and Improvements valued on an "as completed" basis reflecting a loan to value ratio of less than or equal to 75%.

E.     Lender shall have received an Environmental Site Assessment report on the Real
Property in form and content satisfactory to Lender.

In the event that Lender does advance funds prior to the above conditions being met, no such event
of funding shall be a waiver by Lender of Borrower's obligations to meet the conditions set forth
above as a condition to any subsequent advance of Loan proceeds, or an assumption or occurrence
of any further liability or obligation by Lender under this Agreement, the Note, or any of the other
Loan Documents until the said above matters are received, reviewed by Lender and completed or
resolved to the satisfaction of Lender.

## ARTICLE V. AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until all instruments and agreements evidencing each and every loan,
letter of credit and other financial accommodation by the Lender to the Borrower or any Loan Party are fully
discharged and terminated, and thereafter, so long as any Indebtedness remains outstanding, it will, and, as
applicable, it will cause each Loan Party who is within its control or under common control to:

5.01     Preservation of Existence, Payment of Taxes. Preserve and maintain its existence and
preserve and maintain such of its rights, licenses, permits, franchise agreements, branding
agreements and privileges as are material to the business and operations conducted by it;
qualify and remain qualified to do business in each jurisdiction in which such qualification
is material to its business and operations or ownership of its properties, continue to conduct
and operate its business substantially as conducted and operated during the present and
preceding calendar year; at all times maintain, preserve and protect all of its property and
keep the same in good repair, working order and condition; and from time to time make, or
cause to be made, all needed and proper repairs, renewals, replacements, betterments and
improvements thereto. File, on or before their respective due dates, all federal, state, local
and foreign tax returns which are required to be filed, or obtain extensions for filing such
tax returns, and pay all taxes which have become due pursuant to those returns or pursuant
to any assessments received by any such party, as the case may be, except to the extent such
tax payments are being actively and diligently contested in good faith by appropriate
proceedings and, if requested by Lender, have been bonded or reserved in an amount and
manner satisfactory to Lender.

5.02     Keeping of Books. Keep proper books of record and account in which full and correct
entries shall be made of all of its financial transactions and its assets and businesses so as
to permit the presentation of financial statements prepared in accordance with the Required
Accounting Method; and permit Lender, or its representatives, at reasonable times and
intervals upon reasonable advance notice on a confidential basis, at Borrower's cost and
expense, to examine its books and records and to discuss its financial matters with its
officers and independent certified public accountants.

5.03     Reporting Requirements. Furnish to Lender, or cause to be furnished to Lender, the
financial statements and reports of each applicable Loan Party as provided for in that certain
Agreement to Provide Financial Statements of even date by and among Lender and each
applicable Loan Party.

5.04    Further Assurances; Financing Statements. Furnish Lender, at Borrower's cost and expense, upon Lender's request and in form satisfactory to Lender (and execute and deliver or cause to be executed and delivered), such additional pledges, assignments, mortgages, Lien instruments or other security instruments, consents, acknowledgments, subordinations, financing statements and other documents pertaining to any or all of the property and rights which may now or hereafter secure or be intended as security for any portion of the Indebtedness as Lender may require to effectuate more fully the purposes of any Loan Document.

5.05    Applicable Law and Environmental Covenants. Comply with all applicable laws, rules, regulations, orders decrees and directives of every governmental or quasi-governmental authority pertaining to hazardous waste, hazardous substances and other hazardous, toxic or dangerous materials ("Hazardous Material") including those governing the use, generation, manufacture, storage, disposal or treatment of same including but not limited to CERCLA, RCRA, SARA, the federal Clean Water Act and the Texas Water Code and those otherwise intended to regulate or improve health, safety or the environment and or relating to the release or threatened release of hazardous waste or any hazardous substance ("Environmental Laws"), and maintain all permits, licenses and approvals required under applicable Environmental Laws. Promptly notify Lender, in writing, as soon as Borrower becomes aware of any condition or circumstance which makes any of the environmental representations or warranties set forth in this Agreement or in the Loan Documents incomplete, incorrect or inaccurate in any material respect as of any date. Promptly notify Lender, in writing, as soon as Borrower becomes aware of any condition or circumstance which may indicate a violation of any Environmental Law; and promptly provide to Lender, immediately upon receipt thereof, copies of any material correspondence, notice, pleading, citation, indictment, complaint, order, decree, or other document from any source asserting or alleging a violation of any Environmental Law by Borrower, or of any circumstance or condition which requires or may require, a financial contribution by Borrower or a clean-up, removal, remedial action or other response by or on behalf of Borrower under applicable Environmental Law, or which seeks damages or civil, criminal or punitive penalties from Borrower or any violation or alleged violation of any Environmental Law. Provide to Lender a Phase 1 environmental site assessment (and if recommended by the Phase 1 report, a Phase 2 environmental review each performed in accordance with then existing industry standards) in the event that Lender has reason to believe that there may have been a release or a violation of any of the Environmental Laws on any Real Property as collateral for the Note, all at Borrower's sole cost and expense. **Borrower hereby agrees to indemnify, defend and hold Lender, and any of Lender's past, present and future officers, directors, shareholders, employees, representatives and consultants, harmless from any and all claims, losses, damages, suits, penalties, costs, liabilities, obligations and out-of-pocket expenses (including, without limitation, reasonable legal expenses and attorneys' fees) incurred or arising out of any claim, loss or damage of any property, injuries to or death of any persons, contamination of or adverse effects on the environment, or other violation of any applicable Environmental Law, in any case, caused by Borrower or in any way related to any property owned or operated by Borrower or due to any acts of Borrower or any of its officers, directors, shareholders, employees, consultants and/or representatives INCLUDING ANY CLAIMS, LOSSES, DAMAGES, SUITS, PENALTIES, COSTS, LIABILITIES, OBLIGATIONS OR**

EXPENSES, RESULTING FROM LENDER'S OWN NEGLIGENCE; provided however, that the foregoing indemnification shall not be applicable, and Borrower shall not be liable for any such claims, losses, damages, suits, penalties, costs, liabilities, obligations or expenses, to the extent (but only to the extent) the same arise or result from any GROSS NEGLIGENCE OR WILLFUL MISCONDUCT of Lender or any of its agents or employees. The indemnities from Borrower contained herein shall survive the termination of this Agreement and the payment of the Note but shall terminate with respect to any claims arising out of any occurrences after Borrower no longer owns the Property due to Lender's foreclosure. The terms "hazardous waste", "hazardous substance", "disposal", "release", and "threatened release", as used in this Agreement, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. Section 6901, et seq. ("RCRA"), or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

5.06    Governmental and Other Approvals. Apply for, obtain and/or maintain in effect, as applicable, all authorizations, consents, approvals, licenses, qualifications, exemptions, filings, declarations and registrations (whether with any court, governmental agency, regulatory authority, securities exchange or otherwise) which are necessary in connection with the execution, delivery and/or performance by any Loan Party of any Loan Document to which it is a party.

5.07    Lease. Take all such actions as are commercially reasonable to maintain each Lease in full force and effect. Lender shall have the right, but no obligation, to cure any events of default by Borrower under the Lease in order to protect the Lease rights as collateral for Lender. Any such monetary amount as may be advanced by Lender may come from any then unadvanced portion of the Note, or may be advanced from Lender's own funds, which in either event, shall be deemed as a protective advance by Lender which shall be part of the Indebtedness evidenced by the Note and secured by the Loan Documents.

### ARTICLE VI. INSURANCE

6.01    Insurance.

A.    Required Insurance. Borrower shall, at Borrower's sole cost and expense, obtain, maintain or cause to be obtained and maintained the minimum insurance requirements set forth in this Agreement ("Required Insurance") beginning on the date this Agreement and, except as expressly provided to the contrary herein, continuing for as long any portion of the Loan is unadvanced or unpaid, and providing at least the following coverages:

(1)    Property Insurance.  Insurance with respect to the Improvements and Personal Property with coverage at least as broad as that provided by the current version of Insurance Services Office, Inc. ("ISO") ISO Form CP 10 30 Causes of Loss - Special Form (formerly referred to as an "all-risk" policy). Each such Property Insurance policy shall be maintained insuring against any peril now or hereafter included within the classification "Cause of Loss - Special Form" in amounts at all times sufficient to prevent Lender from becoming a co-insurer within the terms of the Policy and under applicable law, but in any event such Property Insurance Policies shall be maintained in an amount which, after application of the deductible, shall be equal to the full insurable value of the Improvements and Personal Property.  The term "full insurable value" shall mean the actual replacement cost of the Improvements and Personal Property (without taking into account any depreciation, and exclusive of excavations, footings and foundations, landscaping and paving) determined annually by an insurer, a recognized independent insurance broker or an independent appraiser selected and paid by Borrower and in no event less than the coverage required pursuant to the terms of any Lease (the "Replacement Cost").  Each such Property Insurance policy shall not contain any protective safeguard warranties.

(2)    Liability Insurance. Commercial General Liability insurance (Occurrence Basis) with coverage at least as broad as ISO Form CG 00 01 and including liability claims for bodily injury, death and property damage liability, insurance against any and all claims, including all legal liability to the extent insurable and imposed upon Lender and all court costs and legal fees and expenses, arising out of or connected with the possession, use, leasing, operation, maintenance or condition of the Property in such amounts as are generally available at commercially reasonable premiums and are generally required by institutional lenders for properties comparable to the Property but in any event for a limit per occurrence of at least **$1,000,000** and an annual aggregate of at least **$2,000,000**.

(3)    Flood Insurance.  If required by Lender or applicable banking regulations, flood insurance in an amount at least equal to the greater of (A) the Replacement Cost together with business interruption coverage and (B) the maximum limit of coverage available for the Property under the National Flood Insurance Act of 1968, The Flood Disaster Protection Act of 1973 and the National Flood Insurance Reform Act of 1994, as each may be amended (the "Flood Insurance Acts");

(4)    Other Insurance.  Such other insurance with respect to the Collateral Property or on any replacements or substitutions or additions or increased coverage limits as may from time to time be reasonably required by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated, including, without limitation, sinkhole, mine subsidence, earthquake and

EXHIBIT NO. 2    EX. 2-010

environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

B.   General Requirements. All insurance policies for the Required Insurance shall be for a term of not less than one (1) year and obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), and shall be issued by one or more other domestic primary insurer(s) having a general policy rating of A or better and a financial class of X or better by A.M. Best Company, Inc. (or if a rating of A.M. Best Company Inc. is no longer available, a similar rating from a similar or successor service). All insurers providing Required Insurance shall be authorized and admitted to issue insurance in the state in which the Collateral Property is located. Each Policy which is a liability policy shall name Lender as an additional insured. Each Policy which is a property insurance policy shall name Lender as insured under a standard mortgagee clause (also referred to as a "lender loss payable" clause and a "closed clause" or "standard/union" clause). Each Policy which is a property insurance policy shall also contain: (i) a standard "non-contributory mortgagee" endorsement or its equivalent relating, *inter alia,* to recovery by Lender notwithstanding the negligent or willful acts or omission of Borrower; (ii) to the extent available at commercially reasonable rates, a waiver of subrogation endorsement as to Lender; and (iii) an endorsement providing for a deductible per loss of an amount not more than that which is customarily maintained by prudent owners of similar properties in the general vicinity of the Property, but in no event in excess of **$25,000** except in the case of windstorm, flood, or earthquake, the deductible shall not be in excess of **$25,000** without Lender's prior approval. All Policies shall contain (i) a provision that such Policies shall not be denied renewal, materially changed (other than to increase the coverage provided), cancelled or terminated, nor shall they expire, without at least thirty (30) days' prior written notice to Lender in each instance; and (ii) include effective waivers by the insurer of all claims for applicable premiums ("Insurance Premiums") against any mortgagee, loss payees, additional insureds and named insureds (other than Borrower). All Policies shall be endorsed to be primary, with any applicable policies of Lender being excess, secondary and noncontributing. No Policy shall contain any endorsement restricting, limiting or excluding coverage in any manner without the prior written approval of Lender.

C.   Evidence of Insurance.

(1)   Insurance must be evidenced by an ACORD ™ Form 25 Certificate of Liability Insurance for each policy for liability coverages; and an ACORD ™ Form 28 Evidence of Commercial Property Insurance (2003 edition) for each property policy (or if required by Lender, an ACORD ™ Form 27 to the extent the Collateral is residential property or personal property) for such applicable property policies (each a "Certificate of Insurance");

(2)   Each Certificate of Insurance shall be delivered to Lender prior to commencing operations at the Property and at least 30 days prior to the expiration of current policies;

EXHIBIT NO. 2                              EX. 2-011

(3)     Each Certificate of Insurance shall must show the Lender as certificate holders (with Lender's mailing address), show Borrower as the "Named Insured", show the insurance companies producing each coverage and the policy number and policy date of each coverage, name the producer of the certificate (with correct address and telephone number) and have the signature of the authorized representative of the producer, specify the additional insured status (on a separate ACORD ™ Form 45) and/or waivers of subrogation, state the amounts of all deductibles and self-insured retentions, show the primary status and aggregate limit per project where required and be accompanied by copies of all required additional insured endorsements; and

(4)     In addition to the Certificates of Insurance, Borrower shall provide to Lender the originals or true and correct copies of each of the Policies and all endorsements thereon comprising the Required Insurance. In the event of the acquisition of a new Policy, a temporary insurance binder (evidenced by ACORD ™ Form 75) shall then be provided to Lender; the underlying actual Policy and all endorsements thereon or a true and correct copy thereof shall be delivered to Lender prior to the expiration of the applicable binder. Evidence of insurance with respect to all renewal and replacement Policies for Required Insurance shall be delivered to Lender not less than fifteen (15) days prior to the expiration date of any of the Policies which evidence shall bear notations evidencing payment of Insurance Premiums. Originals or evidence of such replacement Policies shall be delivered to Lender promptly after Borrower's receipt thereof but in any case within thirty (30) days after the effective date thereof and not less than fifteen (15) days prior to the termination of the then existing Policies previously delivered to Lender.

D.     Forms

(1)     If the forms of Policies, endorsements, certificates, or evidence of insurance required by this Agreement are superseded or discontinued, Lender will have the right to require other equivalent forms; and

(2)     Any policy or endorsement form other than a form specified in this Agreement must be approved in advance by Lender; and

(3)     If requested in writing by Lender, Borrower will provide to Lender a certified copy of any or all insurance policies or endorsements required by this Agreement.

E.     Force Placed Insurance. Borrower's failure to obtain and maintain the required insurance will constitute a material breach of, and default under, this Agreement. If Borrower fails to remedy such breach within two (2) days after notice from Lender, Lender may, in addition to any other remedy available to Lender, at

JNG17\FSBCT\WCTEAKWD\h17121LnAgrv2.wpd
April 10, 2017 (12:44pm)                    12                    LOAN AGREEMENT

EXHIBIT NO. 2                    EX. 2-012

Lender's option, purchase such insurance, at Borrower's expense. Borrower will indemnify the Lender against any claims arising from Borrower's failure to purchase and/or maintain the insurance coverages required by this Agreement.

Pursuant to Texas Finance Code Section 307.052, the Borrower or Grantor (as applicable, the "Debtor") as owner of the Collateral is notified as follows:

(1)    **DEBTOR IS REQUIRED TO (I) KEEP THE COLLATERAL INSURED AGAINST DAMAGE IN THE AMOUNT THE LENDER SPECIFIES; (II) PURCHASE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THIS STATE OR AN ELIGIBLE SURPLUS LINES INSURER; AND (III) NAME THE LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS.**

(2)    **THE DEBTOR MUST, DELIVER TO THE LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF THE PREMIUMS.**

(3)    **IF THE DEBTOR FAILS TO MEET ANY REQUIREMENT LISTED IN SUBPARAGRAPH (1) OR (2) IMMEDIATELY ABOVE, THE LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF THE DEBTOR AT THE DEBTOR'S EXPENSE.**

F.    <u>Prohibited Acts</u>. Borrower shall comply with all insurance requirements and shall not bring or keep or permit to be brought or kept any article upon any of the Real Property or cause or permit any condition to exist thereon which would be prohibited by an insurance requirement, or would invalidate the insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Collateral Property pursuant to this Agreement and shall not purchase any additional amounts of insurance that would cause Lender to become a co-insurer within the terms of the Policies.

G.    <u>Proof of Loss</u>. During an Event of Default, Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. Nothing in this paragraph shall require Lender to incur any expense or take any action.

H.    <u>No Waiver</u>. The failure of Lender to demand full compliance by Borrower with respect to the minimum coverages and terms outlined herein will not constitute a waiver by Lender with respect to Borrower's obligation to maintain such coverages.

Borrower will purchase such additional insurance policies and/or endorsements or increase the policy limits of any policy set forth herein, if required by Lender.

I.     <u>Indemnity and Waiver by Borrower</u>. Borrower also agrees to indemnify, defend and save Lender harmless from any and all claims, losses, costs, damages, liabilities, obligations and expenses, including, without limitation, reasonable attorneys' fees, incurred by Lender and waives as to the Lender, all claims and losses arising, or alleged to arise, from all of the following during Borrower's period of ownership of the Property:

(1)     the use, nonuse, possession, occupation, condition, operation, design, construction, acquisition, repair, maintenance or management of the Property;

(2)     failure by Borrower to maintain, or cause to be maintained, the Required Insurance;

(3)     any violation of or failure by a Loan Party to comply with applicable law;

(4)     any breach of a Loan Party's applicable covenants, representations or warranties under this Agreement or any other Loan Document; and

(5)     defending or protecting the Liens which secure or purport to secure all or any portion of the Indebtedness, whether existing under any Loan Document or otherwise or the priority thereof, or in enforcing the obligations of Borrower or any other Person under or pursuant to any Loan Document, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or connected with the Collateral or any Loan Document.

THE INDEMNITIES AND WAIVERS OF BORROWER CONTAINED IN THIS AGREEMENT,

(1)     ARE INDEPENDENT OF THE REQUIRED INSURANCE,

(2)     **WILL NOT BE LIMITED BY ANY ONE ACTION RULE UNDER WORKERS' COMPENSATION OR SIMILAR EMPLOYEE BENEFIT ACTS OR ANY PROHIBITION AGAINST THE RIGHT OF CONTRIBUTION FROM JOINT TORTFEASORS UNDER COMPARATIVE NEGLIGENCE STATUTES,**

(3)     WILL SURVIVE REPAYMENT OF THE LOAN OR FORECLOSURE OF THE COLLATERAL BY LENDER OR EXECUTION BY GRANTOR OF A DEED IN LIEU OF FORECLOSURE WITH RESPECT TO THE COLLATERAL, and

EXHIBIT NO. 2          EX. 2-014

(4) **WILL APPLY EVEN IF THE LOSS IS CAUSED IN PART BUT NOT IN WHOLE BY THE ORDINARY NEGLIGENCE OR STRICT LIABILITY OF THE LENDER, BUT WILL NOT APPLY TO THE EXTENT THE LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE LENDER.**

All applicable law affecting the validity or enforceability of any indemnity or waiver contained in this Agreement is made a part of such provision and will operate to amend such indemnity or waiver to the minimum extent necessary to bring the provision into conformity with applicable law and cause the provision, as modified, to continue in full force and effect.

J. Blanket Policies. Unless Lender requires Borrower to obtain a separate Policy or Policies the insurance coverage required may be effected under a blanket Policy or Policies covering the Real Property; provided that any such blanket Policy shall specify, except in the case of commercial general liability insurance, the premises address of each building, the portion of the total coverage of such Policy that is allocated to the Real Property, and shall in any case provide the same protection as would a separate policy insuring only the Real Property and otherwise comply with all other respects with the requirements of this Agreement.

## ARTICLE VII. EVENTS OF DEFAULT

7.01 Events of Default. The occurrence or existence of any of the following conditions or events shall, after applicable notice and failure to cure as provided for in Section 7.03, constitute an "Event of Default" hereunder: (a) material breach of any representation or warranty contained in this Agreement or any other Loan Document or material default in the observance or performance of any of the other conditions, covenants or agreements of any Loan Party set forth in this Agreement or any other Loan Document; (b) any default or event of default, as the case may be, shall occur under any other Loan Document and shall continue beyond the applicable grace period, if any; (c) any change in the management or control of Borrower involving the replacement or removal of Natin Paul, whether by reason of incapacity, death, resignation, termination or otherwise which, in Lender's sole judgment, could become a Material Adverse Effect; subject to Section 7.04 hereof; (d) any change in the ownership of Borrower, whether by reason of incapacity, death, or otherwise which, in Lender's sole judgment, could become a Material Adverse Effect; subject to Section 7.04 hereof; provided however that from and after the date hereof a cumulative change of up to 100% of the ownership interests in Borrower shall not be deemed an Event of Default, so long as Lender is timely notified of the change in ownership of Borrower and Borrower is owned at least 50% directly or indirectly by Natin Paul and is controlled directly or indirectly by Natin Paul; and (e) if, during the loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Indebtedness.

7.02 Interim Remedies After Default. Upon and after a Default by any Loan Party under any of the Loan Documents, regardless of whether a Loan Party is entitled to notice and/or an

opportunity to cure a Default, whether said notice or right to cure is provided for under the Loan Documents or provided by law, and regardless of whether said Default has matured into an Event of Default, each Loan Party hereto agrees that whether or not a Loan Party is given notice of the Default and whether or not, at the point in time of determination, the right to cure period has lapsed, Lender shall have the following rights, all without any prior notice to the applicable Loan Party:

A.  Lender shall not be obligated to further process any draw requests that have been submitted, or to fund any remaining portion of any draw requests that have been approved by Lender;

B.  Lender shall continue to have the right to post advances to the Note for interest carry to the extent of any accrued and unpaid interest on the Note but only to the extent that interest carry is available under the Budget for the Loan;

C.  Lender shall have the right to post advances to the Note for protective advances for the benefit of Lender as otherwise provided for in the Loan Documents; and

D.  Lender shall have the right to seek any equitable remedies available under law to protect any of the collateral securing the Note.

7.03  Notice of Default and Right to Cure. Any provision of this Loan Agreement or any of the Loan Documents to the contrary notwithstanding, Borrower and Guarantors shall not be in default under this Loan Agreement or the Loan Documents unless:

A.  in the case of a breach of a monetary covenant, Lender shall have given the applicable Loan Party written notice of such monetary breach setting forth the due date and the amount due on such date and Borrower shall not have cured the breach of the monetary covenant within ten (10) days after delivery of said notice; and

B.  in the case of a breach of a non-monetary covenant, Lender shall have given Borrower or other applicable Loan Party, written notice of such non-monetary breach setting forth in reasonable detail the nature and extent of such failure and Borrower or other applicable Loan Party, shall not have cured the breach of the non-monetary covenant within thirty (30) days after delivery of said notice;

provided however, all notices required under this paragraph regarding breaches, and all other notices permitted in this Loan Agreement or in the other Loan Documents, shall be in writing and shall be deemed to be delivered when delivered personally or when deposited with the United States Postal Service, postage prepaid, by registered or certified mail, return receipt requested, addressed to the Borrower, the Guarantors, other applicable Loan Party or the Lender, as the case may be, at the respective addresses given below or elsewhere in the Loan Documents, or to such other changed address, the notice of which change is given pursuant hereto or as otherwise provided elsewhere in the Loan Documents; and

provided further, however, that with respect to notices of monetary default, Borrower shall only be entitled to receive and Lender shall only be required to give two (2) such notices in

any one twelve (12) month period from the date hereof and cumulative total of six (6) such notices during the term hereof, such that after the second notice in any twelve (12) month period or after the sixth such notice during the term hereof, Borrower and any other applicable Loan Party shall no longer be entitled to any notice and right to cure for monetary events of default.

7.04    Death or Incapacity of a Guarantor.  Any provision herein or in the Loan Documents to the contrary notwithstanding, the Lender shall waive the death or incapacity of Natin Paul as a default hereunder or under any of the Loan Documents executed in connection with the Note including direct or indirect effects on the ownership, control or management of the Borrower, or the legal ability of Natin Paul to perform under his guaranty agreement as Guarantor so long as within ninety (90) days from the date of death or adjudication of incapacity, a replacement guarantor acceptable to Lender in Lender's sole discretion has expressly assumed and ratified the deceased or incapacitated Guarantor's obligations under the guaranty agreement in the form of a replacement guaranty or assumption of guaranty, all in form and subject to such conditions as are acceptable to Lender in its sole discretion. References herein to the incapacity of an individual Guarantor shall mean that a court of competent jurisdiction has declared the individual as legally incompetent under applicable state law.

7.05    Remedies Upon Event of Default.  Upon the occurrence and at any time during the existence or continuance of any Event of Default, but without impairing or otherwise limiting the Lender's right to demand payment of all or any portion of the Indebtedness which is payable on demand, at Lender's option, Lender may give notice to Borrower declaring all or any portion of the Indebtedness remaining unpaid and outstanding, whether under the notes evidencing the Indebtedness or otherwise, to be due and payable in full without presentation, demand, protest, notice of dishonor, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby expressly waived, whereupon all such Indebtedness shall immediately become due and payable. Furthermore, upon the occurrence of a Default or Event of Default and at any time during the existence or continuance of any Default or Event of Default, but without impairing or otherwise limiting the right of Lender, if reserved under any Loan Document, to make or withhold financial accommodations at its discretion, to the extent not yet disbursed, any commitment by Lender to make any further loans or, if applicable, issue any further letters of credit shall automatically terminate. The foregoing rights and remedies are in addition to any other rights, remedies and privileges Lender may otherwise have or which may be available to it, whether under this Agreement, any other Loan Document, by law, or otherwise.

7.06    Setoff.  In addition to any other rights or remedies of Lender under any Loan Document, by law or otherwise, upon the occurrence and during the continuance or existence of any Event of Default, Lender may, at any time and from time to time, without notice to Borrower (any requirements for such notice being expressly waived by Borrower), setoff and apply against any or all of the Indebtedness (whether or not then due), in any manner and in any order of preference which the Lender, in its sole discretion, chooses any or all deposits (general or special, time or demand, provisional or final) at any time held by Borrower (whether owned outright or held with a third party) and other indebtedness at any time owing by Lender to or for the credit or for the account of Borrower, and any property of Borrower, from time

EXHIBIT NO. 2                                    EX. 2-017

to time in possession or control of Lender, irrespective of whether or not Lender shall have made any demand hereunder or for payment of the Indebtedness and although such obligations may be contingent or unmatured, regardless of whether any Collateral then held by Lender is adequate to cover the Indebtedness and regardless of whether the exercise of such right of set-off results in loss of interest or other penalty under the terms of the certificate of deposit or account agreement. The rights of Lender under this Section are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which Lender may otherwise have. Borrower hereby grants Lender a Lien on and security interest in all such deposits, indebtedness and other property as additional collateral for the payment and performance of the Indebtedness.

7.07    Waiver of Defaults. No Default or Event of Default shall be waived by Lender except in a written instrument specifying the scope and terms of such waiver and signed by an authorized officer of Lender, and such waiver and shall be effective only for the specific time(s) and purpose(s) given. No single or partial exercise of any right, power or privilege hereunder, or any delay in the exercise thereof, shall preclude other or further exercise of Lender's rights. No waiver of any Default or Event of Default shall extend to any other or further Default or Event of Default. No forbearance on the part of Lender in enforcing any of Lender's rights or remedies under any Loan Document shall constitute a waiver of any of its rights or remedies. Borrower expressly agrees that this Section may not be waived or modified by Lender by course of performance, estoppel or otherwise.

7.08    Receiver. Lender, in any action or suit to foreclose upon any of the Collateral, shall be entitled, without notice or consent, and completely without regard to the adequacy of any security for the Indebtedness, to the appointment of a receiver of the business and premises in question, and of the rents and profits derived therefrom. This appointment shall be in addition to any other rights, relief or remedies afforded Lender. Such receiver, in addition to any other rights to which the receiver shall be entitled, shall be authorized to sell, foreclose or complete foreclosure on Collateral for the benefit of Lender, pursuant to provisions of applicable law.

7.09    Application of Proceeds of Collateral. Notwithstanding anything to the contrary set forth in any Loan Document, after an Event of Default, the proceeds of any of the Collateral, together with any offsets, voluntary payments, and any other sums received or collected in respect of the Indebtedness, may be applied towards the Indebtedness in such order and manner as determined by Lender in its sole and absolute discretion.

## ARTICLE VIII. MISCELLANEOUS

8.01    Notices. Any notice, certificate, consent, determination or other communication required or permitted to be given or made under this Agreement shall be in writing and shall be effectively given and made if (i) delivered personally, (ii) sent by prepaid courier service or mail, or (iii) sent prepaid by fax or other similar means of electronic communication, in each case to the following respective addresses:

| If to Borrower: | WC TEAKWOOD PLAZA, LLC |
| | 401 Congress Avenue, 33rd Floor |
| | Austin, Texas 78701 |
| Phone: | (512) 327-3300 |
| Fax: | (512) 322-9238 |
| E-mail address: | Npaul@wccapitalgroup.com |
| | |
| With copy to: | WORLD CLASS CAPITAL GROUP, LLC |
| | 767 Fifth Avenue; 16th Floor |
| | New York, New York 10153 |
| | Attention: Samuel Mizrahi |
| Phone: | (917) 702-3344 |
| E-mail address: | smizrahi@wccapitalgroup.com |
| | |
| If to Lender: | FIRST STATE BANK CENTRAL TEXAS |
| | P. O. Box 6136 |
| | Temple, Texas 76503-6136 |
| Phone: | (512) 231-8821 |
| Fax: | (512) 231-1625 |
| Email address: | vivienen@fsbcentex.com |

Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a regular Business Day and the communication is so delivered, faxed or sent prior to 4:30 p.m. (local recipient time) on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day. Any such communication sent by mail shall be deemed to have been given and made and to have been received on the earlier of actual receipt or the fifth Business Day following the mailing thereof; provided however that no such communication shall be mailed during any actual or apprehended irregular disruption of postal services. Any such communication given or made in any other manner shall be deemed to have been given or made and to have been received only upon actual receipt in writing.

8.02    Governing Law. Each Loan Document shall be deemed to have been delivered in the State of Texas, and shall be governed by and construed and enforced in accordance with the laws of the State of Texas, and applicable federal law except to the extent that the Uniform Commercial Code or other personal property law or real property law of another jurisdiction where Collateral is located is applicable, and except to the extent expressed to the contrary in any Loan Document.

8.03    Costs and Expenses. The Borrower agrees to pay Lender, on demand, all reasonable costs and expenses in connection with the preparation, execution, delivery and administration of this Agreement, the Note, the Loan Documents, and the other documents to be delivered hereunder, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Lender with respect thereto and with respect to advising the Lender as to its rights and responsibilities under this Agreement and/or under any of the other Loan

Documents. Borrower shall pay Lender, on demand, all costs and expenses, including, without limitation, reasonable attorneys' fees and legal expenses, incurred by Lender in perfecting, revising, protecting or enforcing any of its rights or remedies against any Loan Party or any Collateral, or otherwise incurred by Lender in connection with any Default or Event of Default or the enforcement of the Loan Documents or the Indebtedness. Following Lender's demand upon Borrower for the payment of any such costs and expenses, and until the same are paid in full, the unpaid amount of such costs and expenses shall constitute Indebtedness and shall bear interest at the highest default rate of interest provided in any Loan Document.

8.04    Receipt of Payments by Lender. Any payment by Borrower of any of the Indebtedness made by mail will be deemed tendered and received by Lender only upon actual receipt thereof by Lender at the address designated for such payment, whether or not Lender has authorized payment by mail or in any other manner, and such payment shall not be deemed to have been made in a timely manner unless actually received by Lender on or before the date due for such payment, time being of the essence. Borrower expressly assumes all risks of loss or liability resulting from non-delivery or delay of delivery of any item of payment transmitted by mail or in any other manner. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and any failure to pay the entire amount then due shall constitute and continue to be an Event of Default. Borrower waives the right to direct the application of any and all payments received by Lender hereunder at any time or times after the occurrence and during the continuance of any Default. Borrower further agrees that after the occurrence and during the continuance of any Default, Lender shall have the continuing exclusive right to apply and to reapply any and all payments received by Lender at any time or times, whether as voluntary payments, proceeds from any Collateral, offsets, or otherwise, against the Indebtedness in such order and in such manner as Lender may, in its sole discretion, deem advisable, notwithstanding any entry by Lender upon any of its books and records. Borrower hereby expressly agrees that, to the extent that Lender receives any payment or benefit of or otherwise upon any of the Indebtedness, and such payment or benefit, or any part thereof, is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid to a trustee, receiver, or any other Person under any bankruptcy act, state or federal law, common law, equitable cause or otherwise, then to the extent of such payment or benefit, the Indebtedness, or part thereof, intended to be satisfied shall be revived and continued in full force and effect as if such payment or benefit had not been made or received by Lender, and, further, any such repayment by Lender shall be added to and be deemed to be additional Indebtedness.

8.05    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of Borrower and Lender and their respective heirs, administrators, executors, successors and assigns. The foregoing shall not authorize any assignment or transfer by Borrower, of any of its respective rights, duties or obligations hereunder, such assignments or transfers being expressly prohibited. Lender, however, may freely assign, whether by assignment, participation or otherwise, its rights and obligations hereunder, and is hereby authorized to disclose to any such assignee or participant (or proposed assignee or participant) any financial or other information in its knowledge or possession regarding any Loan Party or relating to the Indebtedness.

EXHIBIT NO. 2                                    EX. 2-020

8.06   Participation. Borrower expressly recognizes and agrees that Lender may sell to other lenders participations in the loans incurred by Borrower pursuant hereto. As security for the due payment and performance of all Indebtedness of Borrower to Lender under this Agreement and/or any other of the Loan Documents, whether now existing or hereafter arising, and to such lenders by reason of such participations, Borrower hereby grants to Lender and to such lenders a lien on and security interest in (i) any and all deposits or other sums at any time credited by or due from Lender and such lenders or either or any of them, to Borrower, whether in regular or special depository accounts or otherwise, (ii) any and all money, securities and other property of Borrower, and the proceeds thereof now or hereafter held or received by or in transit to Lender and such lenders or either or any of them, from or for Borrower whether for safekeeping, custody, pledge, transmission, collection or otherwise. Any such deposit, sums, monies, securities and other property may at any time be set-off, appropriated and applied by the Lender and by such lenders, or either or any of them, against any Indebtedness whether now existing or hereafter arising to Lender and to such lenders, or either or any of them, under this agreement or the Note or otherwise, whether or not such Indebtedness is then due or secured by any collateral or, if it is so secured, whether or not such collateral held by Lender or such lenders is considered to be adequate.

8.07   Sale of Loan. Lender may freely assign, whether by sale or transfer, all or any portion of its rights in and to all or any portion of the Indebtedness including the Note to any a third party or any Loan Party, including, but not limited to, a sale, transfer or assignment to any Guarantor, Grantor or other obligor on the Indebtedness.

8.08   Election of Remedies. Lender shall have all of the rights and remedies granted in the Loan Documents and available at law or in equity and these same rights and remedies shall be cumulative and may be pursued separately, successively, or concurrently against Borrower, any Guarantor, Grantor, other Loan Party or any collateral property covered under the Loan Documents, at the sole discretion of Lender.

8.09   Indulgence. No delay or failure of Lender in exercising any right, power or privilege hereunder or under any of the Loan Documents shall affect such right, power or privilege. Any single or partial exercise thereof shall not preclude any further exercise thereof.

8.10   Amendment and Waiver. No course of dealings by the Lender, its officers, employees, consultants, or agents in the exercise of any right hereunder, under the Note, or under any other of the Loan Documents shall operate as a waiver thereof. No amendment or waiver of any provision of any Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance(s) and for the specific time(s) and purpose(s) for which given.

8.11   Severability. In case any one or more of the obligations of any Loan Party under any Loan Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining obligations of such Loan Party shall not in any way be affected or impaired thereby, and such invalidity, illegally or unenforceability in one

EXHIBIT NO. 2                                    EX. 2-021

jurisdiction shall not affect the validity, legality or enforceability of the obligations of such Loan Party under any Loan Document in any other jurisdiction. Each term, covenant, and condition of this Agreement and/or any of the other Loan Documents shall be valid and enforceable to the fullest extent permitted by law.

8.12   Reliance on and Survival of Various Provisions.  All terms, covenants, agreements, representations and warranties of any Loan Party made in any Loan Document, or in any certificate, report, financial statement or other document furnished by or on behalf of any Loan Party in connection with any Loan Document shall be deemed to have been relied upon by Lender, notwithstanding any investigation heretofore or hereafter made by Lender or on Lender's behalf. All representations and warranties of the Borrower herein or in the other Loan Documents and all covenants and agreements herein and in the other Loan Documents, shall survive until repayment in full of the Indebtedness.

8.13   Execution of Loan Documents in Counterparts.  Each original of the Loan Documents executed in connection with the Loan including the Note may be executed as counterpart originals and may  contains multiple original signature pages and/or corresponding acknowledgments.  Two or more counterparts of any particular Loan Document may be executed and/or acknowledged and one or more of the multiple original signature pages from one counterpart of that particular Loan Document executed in connection with the Loan may be replaced by one or more original signature pages from other counterparts thereof, in order to produce fully executed counterparts, each of which shall be considered as an original, and all of which shall constitute the same agreement or document.

8.14   Document Retention Policy. Each undersigned Loan Party understands and agrees that (i) Lender's document retention policy may involve the imaging of executed Loan Documents including the Note, as well as other miscellaneous documents, papers, reports and other correspondence, and the destruction of the paper originals, and (ii) each undersigned Loan Party waives any right that any Loan Party may have to claim that the imaged copies of the Loan Documents (other than the Note) and other miscellaneous documents, papers and other correspondence related thereto are not originals.

8.15   **NOTICE UNDER SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE:**

**AN AGREEMENT FOR A LOAN IN WHICH THE AMOUNT INVOLVED IN THE LOAN EXCEEDS $50,000.00 IN VALUE IS NOT ENFORCEABLE UNLESS THE AGREEMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE BOUND OR BY THAT PARTY'S AUTHORIZED REPRESENTATIVE.**

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT SUBJECT TO SUBSECTION (b) OF SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE SHALL BE DETERMINED SOLELY FROM THE WRITTEN LOAN DOCUMENTS, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THE LOAN DOCUMENTS.**

**THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

8.16    Captions. The captions, headings, and arrangements used in this agreement are for convenience only and do not in any manner affect, limit, amplify, or modify the terms and provisions hereof.

8.17    Form and Substance. All documents, certificates, insurance policies, and other items required to be executed and/or delivered to Lender, whether under this Agreement or under any of the other Loan Documents, shall be in form and substance satisfactory to Lender.

8.18    Borrower In Control. In no event shall Lender's rights and interests under the Loan Documents be construed to give Lender the right to control, or be deemed to indicate that Lender is in control of, the business, management or properties of Borrower or the daily management functions and operating decisions to be made by Borrower.

8.19    No Third Party Beneficiary. This Agreement is made for the sole protection and benefit of Borrower and Lender and is not intended for the protection or benefit of any other Person, and no other Person shall be deemed to have any privity of contract hereunder nor any right of action of any kind hereon, or be entitled to rely hereon to any extent whatsoever.

8.20    Number and Gender. Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. The duties, covenants, obligations, and warranties of each party defined as Borrower under this Agreement shall be joint and several obligations of each such Borrower.

8.21    References. The words "herein," "hereof," "hereunder" and other words of similar import when used in this Agreement refer to this Agreement as a whole, and not to any particular article, section or subsection.

8.22    Ambiguities. Borrower and Lender acknowledge that they were each represented by counsel or had the opportunity to be represented by counsel and waived such right in connection with this Agreement, that each of them and/or their respective counsel reviewed this Agreement to their satisfaction, that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, and that the language in all parts of this Agreement shall in all cases be construed as a whole and in accordance with its fair meaning.

8.23    Exhibits. The exhibits attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail; provided however, that any

attached metes and bounds description of the Land shall control over the summary description defining the Land herein.

8.24 <u>Time of the Essence</u>. Time is of the essence with respect to the dates, terms and provisions of this Agreement, and as to each and every other Loan Document executed in connection herewith.

8.25 <u>Independent Party</u>. It is mutually understood and agreed that Borrower is an independent party in the performance of all activities, functions, duties and obligations pursuant to this Agreement and the other Loan Documents, and that nothing contained in this Agreement or in any of the other Loan Documents is intended or shall be construed in any manner or under any circumstances whatsoever as creating or establishing the relationship of co-partners, a partnership or joint venture, or joint ownership between Lender and Borrower, or with any officers, employees, agents, brokers or contractors, for any purpose or in any manner whatsoever. Borrower hereby agrees not to represent to anyone that Borrower is an agent of Lender or has authority to act on behalf of Lender.

8.26 <u>Days and Deadlines</u>. As used in this Agreement, "*days*" shall mean and refer to calendar days. However, if a deadline falls or notice is required on a Saturday, Sunday, or a legal banking holiday, then the deadline or notice shall be extended to the next calendar day which is not a Saturday, Sunday, or a legal banking holiday. As may be used in this Agreement, the term "*Business Days*" means any day which is not a Saturday, Sunday, or a legal banking holiday.

8.27 **GOVERNING LAW AND VENUE.** THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THE LOAN DOCUMENTS ARE DEEMED EXECUTED IN AND ARE PERFORMABLE BY EACH LOAN PARTY IN BELL COUNTY, TEXAS. Any action or proceeding under or in connection with the Loan Documents against Borrower or any other party ever liable for payment of any sums of money payable on the Loan Documents may be brought in any state court located in Bell County, Texas, or in the federal court in Bell County, Texas. Borrower and each such other party hereby irrevocably: (i) submits to the nonexclusive jurisdiction of such courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.

EXHIBIT NO. 2                                    EX. 2-024

Executed in one more counterpart originals to be effective on the Effective Date defined on page 1 hereof.

WC TEAKWOOD PLAZA, LLC, a Delaware
limited liability company

By:    WC Teakwood Plaza Mezz, LLC, a
Delaware limited liability company,
Manager

By: _____
Natin Paul, President

Address:    401 Congress Avenue, 33rd Floor
Austin, Texas 78701

FIRST STATE BANK CENTRAL TEXAS

By: _____
Printed Name: _____
Title: _____

Address:    6500 North Mopac Expressway,
Building One, Suite 1101
Austin, Texas 78731

EXHIBIT NO. 2                    EX. 2-025

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

ELECTRONICALLY RECORDED          2017066579

TRV          30          PGS

50  CTOT  17-298207.mm

## DEED OF TRUST, SECURITY AGREEMENT
## AND FINANCING STATEMENT

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL
PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE
FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS
AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN
THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR
DRIVER'S LICENSE NUMBER.

THE STATE OF TEXAS §
 §
COUNTY OF TRAVIS §

  WC TEAKWOOD PLAZA, LLC (herein called "Grantor"), for and in consideration of the indebtedness hereinafter described, has granted, bargained, transferred, sold and conveyed, and by these presents does grant, bargain, transfer, sell and convey, in trust, unto T. GERRY GAMBLE, TRUSTEE and unto Trustee's successors in this trust and Trustee's substitutes and assigns (herein called "Trustee"), forever, for the use and benefit of the Beneficiary (hereafter defined) all and singular the property hereinafter described situated in the County of TRAVIS, State of Texas, to-wit:  (a)

   3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES (all such real property in this subsection (a) herein sometimes called the "Land");

(b) all rights, titles, interests, estates, reversions and remainders now owned or hereafter acquired by Grantor in and to the Land and in and to all other properties covered hereby and all other lands now owned or hereafter acquired by Grantor abutting, adjacent or contiguous to the Land; (c) all buildings and other improvements now or hereafter situated on the Land and in and to the properties covered hereby (herein sometimes called the "Improvements"); (d) all rights, titles and interests now owned or hereafter acquired by Grantor in and to all drainage easements, easements, licenses, parking rights, streets and rights-of-way of every kind and nature adjoining, serving, belonging, appertaining or otherwise affording access, ingress and or egress to or otherwise benefitting the Land whether now existing or hereafter arising and all public or private utility connections thereto and all appurtenances, tenements, hereditaments, franchises, servitudes, rights, ways, privileges and prescriptions thereto; (e) all goods, equipment, fixtures, manufactured housing, mobile homes, furnishings, inventory, crops, other farm products, timber, shrubs, and any other vegetation, and any and all other personal property of any kind or character defined in and subject to the applicable provisions of the Texas Business and Commerce Code as now adopted and existing and as it may hereafter be amended or succeeded (herein called the "Uniform Commercial Code") now owned or hereafter acquired by Grantor and now or hereafter affixed to, planted or grown on, located on or within, or severed from the Land or the Improvements, and any and all personal property purchased with a portion of the proceeds of the Note (hereinafter defined), regardless of the location of such property, and all replacements thereof, substitutions therefor, additions thereto, and proceeds and products thereof, including without limitation, all rights, titles and interests of Grantor now owned or hereafter acquired in and to any of such personal property that may be subject to any title retention or security agreement superior in lien or security interest to the lien or security interest of this Deed of Trust, Security Agreement and Financing Statement (herein called "Deed of Trust"); (f) all rights and interests of Grantor now owned or hereafter acquired in and to (i) all development rights, rights as declarant, all rights to enforce easements, covenants and restrictions that benefit the Land and or Improvements, and all contracts, subcontracts, building permits, and plans and specifications relating to the Improvements and all deposits, funds, accounts, contract rights, instruments, documents, general intangibles (including but not limited to, trademarks, trade names and symbols used in connection therewith), contracts for deed, notes or chattel paper arising from or by virtue of any transactions relating to the Land or the Improvements; (ii) all water rights, all right, title and interest of

EXHIBIT NO. 3    EX. 3-001

Grantor in and to any and all wastewater capacity reservations of any kind or character covering the Land or Improvements, issued or which may be issued by any governmental agencies having jurisdiction thereof, and all other rights relating to sewage treatment capacity, water capacity and utilities serving the Land or Improvements, including easements, agreements, usage rights and course of dealings concerning irrigation, drainage lines, sheet-flow, surface drainage, flood control, drainage facilities and detention ponds (said rights described in this subparagraph (ii) being collectively sometimes called "Utilities Rights"), permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Land or the Improvements; (iii) all proceeds and proceeds of proceeds arising from or by virtue of the sale, lease or other disposition of any of the real or personal property covered hereby; (iv) all proceeds and proceeds of proceeds (including premium refunds) payable or to be payable under each policy of insurance relating to the Land or the Improvements; and (v) all proceeds and proceeds of proceeds arising from the taking of all or any part of the Land or any rights appurtenant thereto, including, but not limited to, change of grade of streets, curb cuts or other rights of access, for any public or quasi-public use under any law, or by right of eminent domain, or by private or other purchase in lieu thereof (all of the items described in (e) and (f), inclusive, being herein called the "Goods"); and (g) without limiting the foregoing, any and all rights, royalties, rents, revenues, profits, benefits, leases, statutory landlord's liens, security interests, contracts, accounts, general intangibles (including but not limited to, trademarks, trade names and symbols used in connection therewith), money, instruments, chattel paper, insurance proceeds, documents, tenements, hereditaments and appurtenances now owned or hereafter acquired by Grantor and appertaining to, generated from, arising out of or belonging to any of the foregoing (all of the foregoing items described in (g) being herein called the "Intangibles" and all of the foregoing items described in (a) through (g), inclusive, being herein called the "Mortgaged Property"). All of the Goods which constitute tangible personal property shall be deemed to be part of and affixed to the Land for all purposes to the maximum extent permitted by law.

TO HAVE AND TO HOLD the Mortgaged Property, unto Trustee, and Trustee's successors in this trust, and Trustee's assigns, forever, to secure the payment of the Indebtedness (hereafter defined) and to secure the performance of the covenants, agreements, and obligations of the Grantor herein contained, and Grantor does hereby bind Grantor, and Grantor's respective heirs, personal representatives, successors and assigns, to warrant and forever defend the Mortgaged Property unto Trustee, and Trustee's successors and assigns, forever, against the claim or claims of all persons whomsoever claiming or to claim the same, or any part thereof.

### ARTICLE I. INDEBTEDNESS SECURED

1.01    This conveyance is made in trust, however, to secure and enforce the payment and performance of all of the following obligations (herein collectively called the "Indebtedness"):

A.    All sums due or to become due pursuant to that one certain promissory note (herein called the "Note"), of even date herewith, executed by WC TEAKWOOD PLAZA, LLC (sometimes also referred to herein as the "Borrower"), payable to the order of FIRST STATE BANK CENTRAL TEXAS (said party or any subsequent owner or holder of the Note being herein called "Beneficiary"), whose address is as specified below, in the original principal amount of SEVEN MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($7,600,000.00) bearing interest at the rate therein stated and finally maturing April 9, 2022, the Note providing that, if default occurs, the unpaid principal thereof and all accrued unpaid interest thereon may, at Beneficiary's option, be declared due and payable prior to the stated maturity thereof and providing further for the payment of attorneys' fees and other expenses of collection under certain circumstances;

B.    All funds advanced by Beneficiary to or for the benefit of Borrower and/or Grantor pursuant to the Loan Agreement ("Loan Agreement") of even date herewith by and between Borrower and Beneficiary; and

C.    All funds advanced by Beneficiary relating to costs or expenses that are Grantor's obligations hereunder and/or made to or for the benefit of Borrower and/or Grantor pursuant to any other document securing or relating to the Indebtedness or otherwise, and all other debts, obligations and liabilities of Grantor and/or Borrower to Beneficiary of whatever kind or character, whether now existing or hereafter arising, secured or unsecured, direct or indirect,

JNG17\FSBCT\WCTEAKWD\17121DTv3.wpd
April 11, 2017 (1:02pm)      2             DEED OF TRUST

fixed or contingent, primary or secondary, whether then due, not due or past due, and whether joint or several or both, including, without limitation, all present and future debts, obligations and liabilities of Grantor and/or Borrower (i) as principal, surety, endorser, guarantor, accommodation party or otherwise, (ii) arising by virtue of open accounts, overdraft, operation of law or otherwise, (iii) as a member of any partnership, joint venture, company, firm, trust or other association, or (iv) payable to or in favor of third parties and hereafter acquired by Beneficiary with or without the knowledge, consent or insistence of Grantor and/or Borrower. The payment of all such debts, obligations and liabilities of Grantor and/or Borrower shall not terminate this Deed of Trust unless the lien created hereby is released in writing by Beneficiary, it being contemplated that Grantor and/or Borrower from time to time will become additionally indebted to Beneficiary, all of which indebtedness shall be secured by this Deed of Trust until the lien hereof is so released in writing by Beneficiary; and

D.     All renewals, rearrangements, modifications and extensions of any of the foregoing.

1.02     The Indebtedness shall be payable at the address specified in the Note or at such other place as Beneficiary from time to time may hereafter designate in writing; and, unless otherwise expressly provided in the instruments evidencing the Indebtedness, all portions of the Indebtedness shall bear interest from the due date thereof until paid at the same rate per annum as provided in the Note for interest accruing on past due amounts; provided however, in no event shall Beneficiary compute the interest in a manner that would cause Beneficiary to contract for, charge or receive interest that would exceed the maximum legal contract rate of interest that Beneficiary may charge.

1.03     All payments received by Beneficiary, whether designated as payments of principal or interest, shall be applied to the principal or interest of the Indebtedness or to expenses and liabilities provided for herein, or any combination of the foregoing, as directed by Beneficiary at Beneficiary's option, exercised in its sole discretion.

## ARTICLE II.  COVENANTS OF GRANTOR

2.01     In order to secure payment of the Indebtedness, and performance of Grantor's obligations hereunder, Grantor covenants and agrees with Beneficiary and with Trustee as follows:

A.     Grantor shall pay or cause there to be paid when due all of the Indebtedness, together with the interest and all other charges accruing thereon and thereunder in accordance with the terms of the Note and all other instruments evidencing, securing or otherwise relating to the Indebtedness.

B.     Grantor represents and warrants that (1) Grantor has good and indefeasible title in fee simple to the Mortgaged Property, (2) unless otherwise herein provided and in Beneficiary's title insurance policy, the Mortgaged Property is free from restrictions, easements, outstanding mineral or royalty interests, liens and security interests, (3) the Land has legal and sufficient access, for its intended use, to a public roadway, either by direct access or by virtue of Grantor's rights in one or more easements, which are part of the Mortgaged Property, and (4) Grantor has full right and authority to make this conveyance. Grantor agrees to maintain and preserve Grantor's legal existence and all related rights, franchises and privileges. If Grantor is an entity other than an individual, Grantor shall not amend its Articles of Formation or other governing documents that govern the formation or operation of Grantor or change its name or identity without Beneficiary's prior written consent. For purposes hereof, the term "Articles of Organization" shall include, as they exist on the date hereof, (a) Grantor's Articles of Formation or Articles of Incorporation and By-Laws, if Grantor is a corporation, (b) Grantor's Partnership Agreement or Joint Venture Agreement, if Grantor is a general partnership or joint venture, (c) Grantor's Limited Partnership Agreement and Certificate of Limited Partnership or Certificate of Formation, if Grantor is a limited partnership or a registered limited liability partnership, (d) the Trust Agreement creating Grantor, if Grantor

JNG17\FSBCT\WCTEAKWD\17121DTv3.wpd
April 11, 2017 (1:02pm)                                                   3                                              DEED OF TRUST

is a trust or (e) Grantor's Articles of Organization, Articles of Formation, Company Agreement, Operating Agreement and/or and Regulations, if Grantor is a limited liability company.

C.     Grantor shall promptly obtain, pay for and deliver to Beneficiary and maintain insurance policies with proof of premiums paid for at least one year in advance providing extended coverage for all Improvements and other property covered by this Deed of Trust against damage by fire, lightning and such other risks as Beneficiary shall reasonably require, all in amounts reasonably required by Beneficiary, but in any event in an amount at least equal to the Indebtedness, but not exceeding 100% of full replacement cost of all Improvements and all other property covered by this Deed of Trust, such insurance to be written on a replacement cost form promulgated by the Texas State Board of Insurance and with insurers that are authorized to do business in Texas or an eligible surplus lines insurer, but in any event with companies approved by Beneficiary, with (1) loss made payable to Beneficiary pursuant to the standard mortgagee clause promulgated by the Texas State Board of Insurance, without contribution; and (2) provision that (a) each of said policies shall not be terminated, reduced or limited, regardless of any breach of the representations and agreements set forth therein, and (b) no such policy shall be canceled, endorsed or amended to any extent unless the issuer thereof shall have first given Beneficiary at least thirty (30) days' prior written notice.  If Grantor fails to furnish such policies, Beneficiary, at Beneficiary's option, may procure such insurance at Grantor's expense.  All renewal and substitute policies of insurance shall be delivered to the office of Beneficiary, premiums paid for at least one year, at least fifteen (15) days before expiration of the insurance protection to be replaced by such renewal or substituted policies.  In case of loss to the Mortgaged Property, so long as the Grantor is not then in default under the Loan Agreement, Beneficiary shall allow Grantor to use the proceeds for the repair of the Improvements or for the erection of new improvements in their place, but Beneficiary shall not be obligated to see to the proper application of any amounts so paid to Grantor.  Except as provided for in the preceding sentence, in case of loss to the Mortgaged Property, Beneficiary, at Beneficiary's option, shall be entitled to receive and retain the proceeds of the insurance policies, applying the same toward payment of the Indebtedness in such manner as Beneficiary may elect, or at Beneficiary's option, Beneficiary may pay the same over wholly or in part to Grantor for the repair of the Improvements or for the erection of new improvements in their place, or for any other purpose satisfactory to Beneficiary, but Beneficiary shall not be obligated to see to the proper application of any amounts so paid to Grantor.  If insurance proceeds are to be paid to Grantor for rebuilding, disbursement shall be made on such terms and subject to such conditions as Beneficiary may specify including those provided for in Section 2.01Y hereof; and any insurance proceeds in excess of the Indebtedness shall be refunded by Beneficiary to Grantor.  Regardless of whether the insurance proceeds payable to Grantor are sufficient to pay the full costs of repair and restoration of the Mortgaged Property, except in the event Beneficiary elects to apply the insurance proceeds towards the payment of the Indebtedness as provided for herein, Grantor shall promptly commence and carry out the repair, replacement, restoration and rebuilding of any and all of the Improvements damaged or destroyed so as to return same, to the extent practicable, to the same form and condition as existed immediately prior to such damage to or destruction thereof, with such modifications or additions as may be required to comply with applicable laws, ordinances, rules and regulations of all governmental agencies having jurisdiction thereof.  Grantor shall not permit or carry on any activity within or relating to the Mortgaged Property that is prohibited by the terms of any insurance policy covering any part of the Mortgaged Property or which permits cancellation of or increase in the premium payable for any insurance policy covering any part of the Mortgaged Property.  In the event of a foreclosure of this Deed of Trust, the purchaser of the Mortgaged Property shall succeed to all the rights of Grantor, including any right to unearned premiums, in and to all policies of insurance assigned and delivered to Beneficiary pursuant to the provisions of this instrument.  Regardless of the types or amounts of insurance required and approved by Beneficiary, Grantor shall assign and deliver to Beneficiary all

policies of insurance that insure against any loss or damage to the Mortgaged Property, as collateral and further security for the payment of the Indebtedness. Grantor also shall obtain and maintain in force and effect at Grantor's expense such liability and other insurance policies and protection as Beneficiary from time to time may require. Furthermore, if any portion of the Mortgaged Property is situated in an area, or is subsequently designated in an area, having special flood hazards (as defined in the Flood Disaster Protection Act of 1973, as amended from time to time, or any similar legislation), Grantor shall provide flood insurance to Beneficiary in an amount equal to the replacement cost of the improvements or the maximum amount of flood insurance available, whichever is the lesser.

D.   Grantor shall pay, prior to delinquency, all taxes, assessments, ground rents, maintenance charges, all other charges and impositions (herein called the "Impositions") now or hereafter assessed, levied or otherwise charged against the Mortgaged Property, or any part thereof, and shall promptly furnish proof, satisfactory in form and substance to Beneficiary, of such payment. Without the prior written express consent of Beneficiary, Grantor shall not be permitted to allow a third party or a property tax lender to finance the payment of ad valorem property taxes if any such related lien would result in a lien that is or is claimed to be superior to this Deed of Trust. Grantor shall not defer the collection of or payment of taxes on the Mortgaged Property, in the event deferral of such taxes is permitted under applicable law. In the event of the passage after date of this Deed of Trust of any law, ordinance, or regulation, deducting from the Mortgaged Property for the purposes of taxation any lien thereon, or changing in any way the laws now in force for the taxation of mortgages, deeds of trust, or indebtedness secured thereby, or the manner of the operation of any such taxes so as to affect the interest of Beneficiary, then and in such event, Grantor shall bear and pay the full amount of such taxes, unless the payment thereof by Grantor would be unlawful or if the payment thereof would constitute usury or render the Indebtedness wholly or partially usurious. If Grantor fails to pay any such taxes and assessments, Beneficiary may pay the same, together with all costs and penalties thereon, at Grantor's expense; provided, however, that if for any reason payment by Grantor or by Beneficiary of any such new or additional taxes would be unlawful or if the payment thereof would constitute usury or render the Indebtedness wholly or partially usurious, Beneficiary, at Beneficiary's option, may declare the unpaid Indebtedness with all accrued interest thereon to be immediately due and payable, or Beneficiary, at Beneficiary' option, may pay the amount or portion of such taxes which otherwise would render the Indebtedness unlawful or usurious, in which event Grantor shall concurrently therewith pay the remaining lawful and non-usurious portion or balance of said taxes. Grantor represents and warrants that Grantor has paid all ad valorem property taxes ("Ad valorem Taxes") that are assessed or assessable against all property that Grantor owns or has an interest in which are taxable by the State of Texas or any taxing unit thereunder under the Texas Tax Code, whether said property is real, personal, mixed, tangible or intangible (the "Taxable Assets"), regardless of whether the Taxable Assets are pledged or assigned as collateral to Beneficiary. Grantor will pay all Ad valorem Taxes on the Taxable Assets before they are past due. Upon demand by Beneficiary, Grantor shall provide to Beneficiary, on or before January 31st in each year, written evidence in form and content satisfactory to Beneficiary of payment of all Ad valorem Taxes (and any and all related interest, penalties, court costs, and fees imposed by the taxing units) against Grantor's Taxable Assets and an accurate listing of all tax account numbers for all applicable taxing units which pertain to any of the Taxable Assets. Grantor represents and warrants to Beneficiary that all exemptions claimed by Grantor against any of the Ad valorem Taxes are valid exemptions under Texas law. Grantor represents and warrants to Beneficiary that Grantor has properly and accurately rendered for taxation all Taxable Assets and has filed all required rendition statements and property reports required by the Texas Tax Code. Grantor agrees that Grantor's execution of this document shall evidence Grantor's authority that any such rendition statements and/or property reports may be made available to Beneficiary by any applicable appraisal district or taxing unit.

E.   Grantor represents to Beneficiary that to Grantor's knowledge and belief no eminent domain proceedings affecting the Mortgaged Property or any part thereof are pending or threatened, nor has Grantor received notice of any proposed condemnation or other like proceeding affecting the Mortgaged Property, and no part of the Mortgaged Property has been transferred in lieu of condemnation or other like proceeding, and no Certificate of Taking for a limited or indefinite term has been issued with respect to the Mortgaged Property. In the event Grantor acquires knowledge or notice that any entity (public or private) having the right of eminent domain (herein called a "Condemning Authority") may or does intend to acquire or has threatened to institute or has instituted condemnation proceedings to acquire the Mortgaged Property, any part thereof or any interest therein, Grantor shall promptly give Beneficiary written notice of full details with regard thereto. Beneficiary shall be notified of, and, if the condemnation proceeds are anticipated to exceed $750,000.00, have the right to participate in all negotiations with any Condemning Authority and Grantor shall not grant to any Condemning Authority any right, title or interest in or to the Mortgaged Property or any part thereof (in lieu of eminent domain or condemnation proceedings or otherwise), if the condemnation proceeds are anticipated to exceed $750,000.00, without the prior written consent of Beneficiary to, and the joinder of Beneficiary with Grantor in, any such grant. Grantor has transferred and assigned, and does hereby transfer and assign unto Beneficiary (i) the full amount of and right to receive and be paid the full amount of all consideration and, or, damages for injury or damage to the Mortgaged Property paid or to be paid by any Condemning Authority for and, or, by virtue of the grant, in lieu of eminent domain or condemnation proceeding, of any right, title or interest in the Mortgaged Property, and (ii) all judgments, decrees and awards or payments for the taking of and, or, for injury or damage to the Mortgaged Property (including but not limited to all awards and judgments pursuant to any condemnation proceedings), including interest thereon. Beneficiary shall apply all sums actually paid to and received by Beneficiary pursuant to any such grant, judgment, decree or award first to reimbursement of all costs and expenses (including but not limited to attorneys' fees) incurred by Beneficiary in connection with any such matters, and the balance shall be applied to the Indebtedness in such manner as Beneficiary may elect, subject to the terms hereof. Beneficiary shall have the right, if the condemnation proceeds are anticipated to exceed $750,000.00, to participate in any such condemnation proceedings and Beneficiary is hereby authorized, in the name of Grantor, to direct the conduct of any such proceedings, compromise and settle any such proceedings and, or, to execute and deliver valid satisfactions of, and to appeal from, any award, judgment or decree in any such condemnation proceeding. In case of condemnation awards with respect to the Mortgaged Property, so long as the Grantor is not then in default under the Loan Agreement, Beneficiary shall allow Grantor to use the proceeds for the repair of the Improvements or for the erection of new improvements in their place, but Beneficiary shall not be obligated to see to the proper application of any amounts so paid to Grantor. Except as provided for in the preceding sentence, in case of condemnation awards with respect to the Mortgaged Property, Beneficiary, at Beneficiary's option, shall be entitled to receive and retain the condemnation awards, applying the same toward payment of the Indebtedness in such manner as Beneficiary may elect, or at Beneficiary's option, Beneficiary may pay the same over wholly or in part to Grantor for the repair of the Improvements or for the erection of new improvements in their place, or for any other purpose satisfactory to Beneficiary, but Beneficiary shall not be obligated to see to the proper application of any amounts so paid to Grantor. If the proceeds of any grant in lieu of threatened condemnation or condemnation proceedings are to be paid to Grantor to be used in rebuilding, restoration or repair of the Mortgaged Property, then the disbursement of such proceeds shall be on such terms and subject to such conditions as Beneficiary may specify including those provided for in Section 2.01Y hereof. In the event that as a result of any grant in lieu of threatened condemnation or of any such judgment, decree or award and notwithstanding application by Beneficiary of the proceeds thereof in any manner herein provided, Beneficiary nevertheless determines that the payment of the Indebtedness or performance of any obligations under this Deed of Trust

EXHIBIT NO. 3                      EX. 3-006

is impaired, Beneficiary, without demand, notice or presentment to Grantor, may declare all of the Indebtedness immediately due and payable.

F.    Grantor shall keep every part of the Mortgaged Property maintained in at least its current condition and presenting a first-class appearance, make promptly all repairs, renewals and replacements necessary to such end, prevent waste to any part of the Mortgaged Property, and do promptly all else necessary to such end; and Grantor shall promptly discharge all claims for labor performed and material furnished therefor, and shall promptly discharge or bond over any lien of mechanics or materialmen therefor to attach to any part of the Mortgaged Property.  Grantor shall guard every part of the Mortgaged Property from removal, destruction and damage, and shall not do or suffer to be done any act whereby the value of any part of the Mortgaged Property may be lessened.  No building, improvement or other property now or hereafter covered by the lien or security interest of this Deed of Trust shall be removed, demolished or materially altered or enlarged, nor shall any new building or other improvements be constructed, without the prior written consent of Beneficiary.  Grantor shall not release, modify or allow to terminate any easement that benefits the Mortgaged Property, and shall not initiate, join in, or consent to any change in any private restrictive covenants, zoning ordinances or other public or private restrictions limiting or defining the uses that may be made of the Mortgaged Property or any part thereof without the prior express written consent of Beneficiary which consent shall be unreasonably withheld, delayed or conditioned.  Grantor at all times shall comply with and perform all obligations and maintain the Mortgaged Property in compliance with, and shall not cause or permit the Mortgaged Property to be in violation of any obligation imposed by any applicable environmental, air quality, water, zoning, planning, building, health, fire, traffic, safety, wetlands, endangered species, coastal and other governmental or regulatory rules, laws, statutes, regulations, ordinances and restrictive covenants relating to the Mortgaged Property (collectively the "Applicable Governmental Law") and the existence, use and operation thereof.  Grantor represents and warrants to Beneficiary that the Mortgaged Property does currently comply with, and its intended use shall comply fully with (and no notices of violation have been received in connection with) Applicable Governmental Law with respect to the Mortgaged Property.  Grantor represents and warrants to Beneficiary that zoning approval (if applicable) for the Property is not dependent upon the ownership or use of any other property or rights which are not included within the definition of the Property and covered by this Deed of Trust.  In the event Grantor discovers any previously unknown or undiscovered violation of Applicable Governmental Law, Grantor shall immediately notify Beneficiary in writing and Grantor shall immediately take any such corrective action as may be necessary to bring the premises into compliance with Applicable Governmental Law.  Beneficiary and Beneficiary's agents or representative shall have access to the Mortgaged Property at all reasonable times upon reasonable notice in order to inspect same and verify Grantor's compliance with Grantor's duties and obligations under this document.  Grantor shall not, without the prior written consent of Beneficiary, engage in or permit any mining or drilling activities on the Land.

G.    If, without the prior written consent of Beneficiary, which consent may be given or withheld by Beneficiary in the exercise of its sole and absolute discretion, (a) all or any part of the Mortgaged Property, or any interest therein, is sold, transferred or otherwise conveyed, or (b) any contract or instrument for the sale, transfer or conveyance of all or any part of the Mortgaged Property, or any legal, equitable, beneficial or other interest therein, is entered into, or (c) [intentionally deleted], or (d) any lien or encumbrance is hereafter created or arises covering all or any part of the Mortgaged Property, or any interest therein (including but not limited to a tax lien or transfer of a tax lien as contemplated by Texas Tax Code Chapter 32, or as allowed to property tax lenders under Texas Finance Code Chapter 351), or all or any part of the Mortgaged Property, or any interest therein, is hereafter pledged or encumbered in any manner, or (e) any easement, right-of-way or any other right whatsoever with respect to the Mortgaged Property (excluding leasing activity occurring as a result of

the exercise of sound business judgment of Grantor and in accordance with local market leasing standards), is hereafter created or granted, or released, modified or allowed to terminate, or (f) all or any portion of the Mortgaged Property, or any interest therein, is leased or possession thereof is transferred, for any purpose, including, without limitation, one or more oil, gas or other mineral leases, for a period longer than one (1) year (excluding leasing activity occurring as a result of the exercise of sound business judgment of Grantor and in accordance with local market leasing standards) (any of the above being hereinafter called a "Transfer" or collectively "Transfers"), and irrespective of whether any such Transfers are done directly or indirectly, voluntarily or involuntarily, by written instrument (whether or not filed for record), by operation of law or otherwise, then Beneficiary may, at its option, declare all or any part or parts of the Indebtedness immediately due and payable, and Beneficiary shall be entitled to exercise any and all rights and remedies provided under this Deed of Trust and under any other document securing payment of the Indebtedness or executed in connection therewith. Grantor shall immediately notify Beneficiary in writing of any Transfer (herein called "Transfer Notice") by certified mail, postage prepaid, return receipt requested, addressed to Beneficiary at the address set out herein (or to such other address as Beneficiary may have designated by notice to Grantor) or by any other method of notice in accordance with Article VIII of the Loan Agreement. The consent of Beneficiary to any Transfer may be given or withheld for any reason in the exercise of Beneficiary's sole and absolute discretion, unless in connection with the Transfer all of the Indebtedness as determined by Beneficiary shall be paid in full. Without limiting the foregoing or being limited thereby, Beneficiary's consent (1) may be withheld even though the Transfer will not (i) jeopardize or impair the security for the Indebtedness or Beneficiary's ability or right to enforce its liens and security interests against such security, or (ii) increase the risk of default in the payment of Indebtedness hereunder, or (iii) increase in the likelihood that Beneficiary may have to resort to other collateral for the payment of the Indebtedness, or (iv) release or discharge any person or party liable, directly or indirectly, for the payment of the Indebtedness, and (2) may be conditioned upon, any one or more of, (a) an increase in the rate of interest payable on the Indebtedness or any part thereof to a rate acceptable to Beneficiary or the rearrangement or acceleration of the payment of the Indebtedness or any part thereof, (b) the payment to Beneficiary of a transfer fee, in an amount determined by Beneficiary, and all costs and expenses, including, without limitation, attorneys' fees, incurred by Beneficiary in connection with the Transfer or the giving of its consent, (c) the assumption or guarantee of the Indebtedness or any part thereof, by any party determined by Beneficiary to be necessary or desirable, (d) the payment of any part of the Indebtedness whether then otherwise due or not and regardless of whether the payment source would be from Grantor, Borrower, any other person liable for the Indebtedness or from any or all proceeds from the Mortgaged Property, (e) the pledge of additional collateral to secure the payment thereof, or (f) the amendment, modification, rearrangement or other change in any of terms and provisions of any document evidencing the Indebtedness, or any part thereof, or in any of the terms and provisions of any document securing the payment of the Indebtedness or any part thereof. The option of Beneficiary may be exercised at any time after the occurrence of the Transfer and until one (1) year after receipt by Beneficiary of said Transfer Notice; and if no such Transfer Notice is received by Beneficiary, then there shall be no limitation on the period of time within which Beneficiary may exercise said option.

H.  In the event the ownership of the Mortgaged Property or any part thereof becomes vested in a person other than Grantor, Beneficiary, at Beneficiary's option, may deal with such successor or successors in interest with reference to this Deed of Trust, the Mortgaged Property and the Indebtedness in the same manner and to the same extent as with Grantor, without in any way vitiating or discharging Grantor's liability hereunder or upon the Indebtedness. No sale of the Mortgaged Property and no forbearance on the part of Beneficiary, or extension of the time for the payment of the Indebtedness, shall operate to release, discharge, modify, change or affect, either in whole or in part, any liability of

Grantor or the liability of any guarantors or sureties of Grantor or of any other party liable for payment of the Indebtedness.

I. In the event any part of the Indebtedness is not secured by this Deed of Trust, all payments hereafter made by Grantor or any other person shall be applied first to the part of the Indebtedness not so secured until such part is paid in full. In the event any lien or security interest securing part of the Indebtedness does not cover or apply to all of the Mortgaged Property, then all payments paid hereunder by Grantor or any other person shall be applied first to the part of such Indebtedness which is not secured by all of the Mortgaged Property and then to that part which is so secured by all of the Mortgaged Property.

J. Grantor hereby unconditionally and presently assigns to Beneficiary all presently owing or future rents, royalties, issues, profits, revenue, income and other benefits derived or arising from (i) the Mortgaged Property, or (ii) the use or enjoyment of any portion thereof or interest therein, or (iii) any lease or agreement pertaining thereto (all of which being collectively hereinafter called "Rents and Profits"), such assignment being upon the following terms; (a) until receipt from Beneficiary of notice of the occurrence of a Default (as defined herein), each lessee may pay Rents and Profits directly to Grantor, but after Default Grantor covenants to hold all Rents and Profits so paid in trust for the use and benefit of Beneficiary; (b) upon receipt from Beneficiary of notice that a Default exists, each lessee is hereby authorized and directed to pay directly to Beneficiary all Rents and Profits thereafter accruing; and the receipt of Rents and Profits by Beneficiary shall be a release of such lessee's obligation to pay Rents and Profits to the extent of all amounts so paid; (c) Rents and Profits so received by Beneficiary shall be applied by Beneficiary first to the expenses, if any, of collection and then in accordance with Section 1.03 of this Deed of Trust; (d) without impairing its rights hereunder, Beneficiary may, at its option, at any time and from time to time, release to Grantor Rents and Profits so received by Beneficiary, or any part thereof; (e) Beneficiary shall not be liable for its failure to collect, or its failure to exercise diligence in the collection of Rents and Profits, but shall be accountable only for Rents and Profits that it shall actually receive; and (f) the assignment contained in this Section 2.01 J. shall terminate upon the release of this Deed of Trust by Beneficiary, but no lessee shall be required to take notice of termination until a copy of such release shall have been delivered to such lessee. As between Beneficiary and Grantor, and any person claiming through or under Grantor, other than any lessee who has not received notice of Default pursuant to Section 2.01 J. (b), the assignment contained in this Section 2.01 J. is intended to be unconditional and presently effective and the provisions of Sections 2.01 J. (a) and 2.01 J. (b) are intended solely for the benefit of each lessee and shall never inure to the benefit of the Grantor or any person claiming through or under Grantor, other than a lessee who has not received such notice. It shall never be necessary for Grantor to institute legal proceedings of any kind whatsoever to enforce the provisions of this Section 2.01 J. No reference in this 2.01 J to leases or rents shall be deemed to allow any Transfer in violation of Section 2.01 G of the Deed of Trust.

K. In addition to the foregoing, on any such Default, Beneficiary shall also have the right, but no obligation (i) either directly or through an action for forcible entry and detainer or other legal action, to take exclusive possession of the Mortgaged Property, remove all persons and property therefrom without being guilty of trespass or incurring any liability to Grantor or Grantor's tenants or assigns, (ii) rent the same for the account of Grantor, and employ such agents and attorneys as Beneficiary may deem necessary with respect thereto, and (iii) take possession of all books and records of Grantor that relate to the Mortgaged Property or any part thereof. Further, on any such Default, Beneficiary shall have the right, but no obligation, to have a receiver appointed to take possession of the Mortgaged Property and to collect the Rents and Profits, all without any notice to Grantor and without regard to the solvency or insolvency of Grantor or any other person liable for any part of the Indebtedness and without any showing as to the inadequacy of the Mortgaged Property as security. Beneficiary, or

EXHIBIT NO. 3                                            EX. 3-009

Beneficiary's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Mortgaged Property before or after giving notice of default to Grantor. However, Beneficiary, or Beneficiary's agents or a judicially appointed receiver, may do so at any time when a default occurs. The rights provided for in this Section 2.01, are cumulative of all other rights of Beneficiary, including those under Texas Property Code Chapter 64 and any separate Assignments of Rents, and no action of Beneficiary hereunder shall in any way minimize, subordinate or affect in any way the liens, security interests or rights or remedies hereunder of Beneficiary or any rights of a purchaser of the Mortgaged Property at a sale hereunder. Beneficiary shall not be deemed to be a mortgagee in possession prior to taking possession of the Mortgaged Property and shall not be obligated to perform or discharge any obligation of Grantor under any lease or other agreement, appear in or defend any action or proceeding relating to the same or the Mortgaged Property, to take any action hereunder, or to expend any money, incur any expenses or perform or discharge any obligation, duty or liability under any lease or other agreement, or assume any obligation or responsibility for any security or other deposit delivered to Grantor by any lessees and not delivered to Beneficiary, nor shall Beneficiary be liable in any way for any injury or damage to any person or property sustained by any person, or other legal entity in or about the Mortgaged Property; and Grantor hereby agrees to indemnify Beneficiary and hold Beneficiary harmless against and from any and all liability, loss or damage which Beneficiary may or might incur under any lease or other agreement or under or by reason of this Deed of Trust and of and from any and all claims and demands whatsoever which may be asserted against Beneficiary by reason of any alleged obligation or undertaking on its part to perform or discharge any of the terms of any lease or other agreement (excluding Beneficiary's gross negligence and willful misconduct); and should Beneficiary incur any such liability, loss or damage under any lease or other agreement or under or by reason of this Deed of Trust, or in defense against any such claims or demands, the amount thereof, including all costs, expenses and reasonable attorneys' fees, together with interest thereon at the maximum lawful rate of interest permitted by applicable law, shall be secured hereby, and Grantor shall reimburse Beneficiary therefor immediately upon demand.

L.     Grantor will not, without Beneficiary's consent, (i) execute an assignment of any of its right, title or interest in the Rents and Profits, or (ii) unless required to do so by the terms of the lease, terminate or consent to the cancellation or surrender of any lease of the Mortgaged Property or any part thereof, now or hereafter existing; provided however, Grantor may terminate a lease as a result of Beneficiary's election to apply insurance or condemnation proceeds towards the Indebtedness from a loss or taking that directly affects the leased premises with respect to that lease, (iii) modify any lease of the Mortgaged Property or any part thereof so as to reduce the unexpired term thereof, to decrease the amount of rent payable thereunder, or release or discharge, in whole or in part, the lessee or any guarantor of lessee's liability under the lease from any obligation under the lease, or (iv) accept prepayment of any installments of rent to become due under any of such leases in excess of one month, except prepayments in the nature of security for the performance of the lessee thereunder, or (v) in any other manner impair the value of the Mortgaged Property or the security of this Deed of Trust. Grantor shall not execute any lease of all or any portion of the Mortgaged Property except for leases that contemplate actual occupancy by the lessee thereunder, and will at all times promptly and faithfully perform, or cause to be performed, each covenant, condition and agreement contained in each lease of the Mortgaged Property now or hereafter existing, on the part of lessor thereunder to be kept and performed. Grantor shall furnish to Beneficiary, within ten (10) days after a request by Beneficiary to do so, a written statement containing the names of all lessees of the Mortgaged Property, the terms of their respective leases, the space occupied and the rentals payable thereunder, and such other information relative to such lessees and leases as Beneficiary may request, together with copies of any and all written leases then existing which affect or pertain to the Mortgaged Property.

EXHIBIT NO. 3                                    EX. 3-010

M.   To the extent that any advance of funds by Beneficiary is used to pay any indebtedness secured by an outstanding lien, security interest, charge or encumbrance against the Mortgaged Property or any part thereof, such funds have been advanced by Beneficiary at Grantor's request, shall constitute a part of the Indebtedness, and Beneficiary shall be subrogated to any and all rights, power, equities, liens and security interests owned or granted to any owner or holder of such indebtedness, irrespective of whether said security interests, liens, charges or encumbrances are transferred to Beneficiary or are released of record.

N.   Grantor agrees that Grantor shall execute and deliver such other and further documents and do and perform such other acts as may be reasonably necessary and proper in Beneficiary's judgment to carry out the intention of the parties as herein expressed and to effect the purposes of this Deed of Trust and the loan transaction referred to herein. Without limitation of the foregoing, Grantor agrees to execute and deliver such documents as may be necessary to cause the liens and security interests granted hereby to cover and apply to any property placed in, on or about the Mortgaged Property in addition to, or replacement or substitution for, any of the Mortgaged Property, and to execute and deliver such documents requested by Beneficiary as Beneficiary may deem necessary or desirable to transfer to Beneficiary the Utilities Rights.

O.   In order to further secure the Indebtedness, Grantor shall pay to Beneficiary, upon Beneficiary's request, in addition to all amounts of principal, interest and other sums required to be paid by the terms of the Note, this Deed of Trust or any other instruments evidencing, securing or otherwise relating to the Indebtedness, on the first day of each calendar month hereafter until the Indebtedness shall be paid in full, a sum determined from time to time by Beneficiary to be equal to 1/12th of (i) all Impositions, as herein defined, and (ii) all premiums for insurance required to be maintained in force and effect by Grantor pursuant to the foregoing terms hereof. Beneficiary shall not be required to post any bond for any such amount so deposited with it by Grantor and shall not be required to pay any interest or other compensation for or on account of any such sums so deposited with it. Likewise, Beneficiary shall not be liable for any failure to pay any such taxes or other charges or premiums for which deposit has been made with it pursuant to the foregoing provisions. Beneficiary may use and invest any such sums so deposited with it without any duty or obligation to compensate Grantor for the use thereof or for any profit or benefit therefrom realized by Beneficiary. If the amount of the deposits paid to Beneficiary are insufficient to pay all of the Impositions and insurance premiums as and when same become due, Beneficiary may, but shall have no obligation to notify Grantor of the amount of such deficiency and, if so notified, Grantor shall deposit the full amount necessary to satisfy such deficiency with Beneficiary within five (5) days after its receipt of such notice of deficiency. Any sale and conveyance of the Mortgaged Property shall serve as a transfer by Grantor to the grantee of the Mortgaged Property of all of its rights to any sums then held by Beneficiary pursuant to the terms of this paragraph. Beneficiary shall have the right, at its option and without being required to do so, to advance its own funds for the purpose of paying any of the Impositions or insurance premiums, and any such amounts so paid shall bear interest from the date advanced at the maximum lawful rate of interest permitted by applicable law, now or hereafter mentioned, until the full amount thereof shall be paid in full and all such sums so advanced shall constitute a part of the Indebtedness and shall be secured by this Deed of Trust. Grantor hereby grants to Beneficiary a security interest in and right of setoff against any and all funds so held by Beneficiary in order to additionally secure the payment and performance of the Indebtedness and Grantor's observance of the covenants in this Deed of Trust and any other instruments securing the payment of the Indebtedness or relating thereto, and Beneficiary shall be entitled, at any time and without notice, demand or presentment to Grantor, to set off all or any part of such funds in said account against any sums then due and payable on the Indebtedness in such manner, order or priority, as determined by Beneficiary. In the event of a Default resulting in foreclosure, such conversion of such amounts so

EXHIBIT NO. 3                                    EX. 3-011

deposited with Beneficiary to the exclusive and sole ownership of Beneficiary shall be automatic without the necessity of any action on the part of the Beneficiary.

P.    Grantor shall keep proper books and records of accounts in accordance with generally accepted accounting principles, or other comprehensive basis of accounting, applied on a consistent basis, except as may be disclosed in the footnotes to such financial statements. Beneficiary shall have the right to examine the books of account of the Grantor, to discuss the affairs, finances and accounts of the Grantor and also the Mortgaged Property and Grantor's operation thereof, and to be informed as to the same by Grantor's officers or other duly authorized representatives, all at such times designated by Beneficiary. Grantor shall further furnish from time to time to Beneficiary, upon request, copies of balance sheets of Grantor, copies of statements of income and retained earnings of Grantor, and copies of statements of changes in financial position of Grantor, covering such periods of time and containing such reasonable detail as Beneficiary shall from time to time request, prepared and\or certified by a person or firm acceptable to Beneficiary.

Q.    Grantor represents and agrees that if Grantor is an individual, no part of the Mortgaged Property constitutes or shall constitute any part of Grantor's business, residential, urban or rural homestead.

R.    Grantor, at any time and from time to time, shall furnish promptly upon request, a written statement or affidavit, in such form as may be required by Beneficiary, stating the unpaid balance of the Note and that there are no offsets or defenses against full payment of the Note and performance of the terms hereof or of any document securing payment of the Note or executed in connection therewith, or if there are any such offsets and defenses, specifying them in reasonable detail.

S.    Grantor shall comply with all laws, ordinances, rules and regulations of all governmental or quasi-governmental agencies relating to the Mortgaged Property or any part thereof and shall secure and maintain in full force and affect all contracts, franchises, permits and licenses necessary or desirable for the construction and/or the efficient operation of the Improvements and/or business conducted on the Mortgaged Property.

T.    Grantor shall reimburse Beneficiary and Trustee for all reasonable attorneys' fees and other reasonable out-of-pocket costs and expenses of any kind which either of them may incur in connection with any collection, foreclosure or any legal proceedings or matters related to the Indebtedness including, but not limited to collection, judicial or non-judicial foreclosure, condemnation proceedings, probate proceedings or bankruptcy proceedings and reasonable out-of-pocket costs incurred relating to appraisals, environmental reports, inspection reports, title searches, ad valorem property taxes and insurance.

U.    Grantor shall not, without the prior written consent of Beneficiary, engage in or permit any person to conduct geologic and geophysical surveys, or investigate, explore, prospect, drill, mine for or produce, store, treat or transport oil, gas and all other minerals or engage in activities related thereto on the Land.

V.    Grantor hereby agrees that Beneficiary shall be entitled to obtain at any time, and from time to time, when deemed appropriate by Beneficiary (but no more frequently than annually if there is no default), a current appraisal of the Mortgaged Property from an appraiser acceptable to Beneficiary. The appraisals shall be at the sole cost and expense of Grantor.

W.    The terms "hazardous waste", "hazardous substance", "disposal", "release", and "threatened release", as used in this Deed of Trust, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and

JNG17\FSBCT\WCTEAKWD\17121DTv3.wpd
April 11, 2017 (1:02pm)          12          DEED OF TRUST

Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. Section 6901, et. seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos. Grantor represents and warrants to Beneficiary that: (a) during the period of Grantor's ownership of the Mortgaged Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, or about the Mortgaged Property; (b) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Beneficiary in writing, (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance by any prior owners or occupants of the Mortgaged Property or (ii) any actual litigation or litigation threatened in writing or written claims of any kind by any person relating to such matters; and (c) except as previously disclosed to and acknowledged by Beneficiary in writing, (i) neither Grantor nor any tenant, contractor, agent or other authorized user of the Mortgaged Property shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, or about the Mortgaged Property and (ii) should any such activity occur, it shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation those laws, regulations, and ordinances described above. Grantor further represents and warrants to Beneficiary that Grantor has no knowledge of or reason to believe that there have been or currently are any underground storage tanks located under the Mortgaged Property. Grantor authorizes Beneficiary and its agents to enter upon the Mortgaged Property to make such inspections and tests as Beneficiary may deem appropriate, from time to time, to determine compliance, or the continued compliance of the Mortgaged Property with this section of this Deed of Trust or to verify the then current environmental condition of the Mortgaged Property. Any inspections or tests made by Beneficiary shall be at Grantor's sole cost and expense and shall be for Beneficiary's purposes only and shall not be construed to create any responsibility or liability on the part of Beneficiary to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Mortgaged Property for hazardous waste. Grantor hereby (a) releases and waives any future claims against Beneficiary for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Beneficiary against any and all claims, losses, liabilities, damages, penalties, and expenses which Beneficiary may directly or indirectly sustain or suffer resulting from a breach of this section of this Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to or during Grantor's ownership or interest in the Mortgaged Property, whether or not the same was or should have been known to Grantor. The provisions of this section of this Deed of Trust, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and release of the lien of this Deed of Trust and shall not be affected by Beneficiary's acquisition of any interest in the Mortgaged Property, whether by foreclosure or otherwise.

X.    Grantor represents and warrants to Beneficiary that during Grantor's ownership of the Mortgaged Property neither Grantor nor any other person has committed any act or omission, or has consented to any act or omission, with respect to the Mortgaged Property, which would afford the federal government or any state or local government the right or remedy of forfeiture of all or any part of the Mortgaged Property, any other collateral securing the Note or the Indebtedness described herein, or any property (including but not limited to money paid) delivered to Beneficiary or any other party in performance of Grantor's obligations arising in connection with the Indebtedness, or any interest in or income, profits or proceeds of any of the property described in this sentence (the Mortgaged Property and such property, income, profits or proceeds collectively in this paragraph being referred to as the "Assets").

EXHIBIT NO. 3                                          EX. 3-013

Grantor agrees not to engage in any act or permit any act or omission to exist which would afford the federal government or any state or local government the right or remedy of forfeiture of all or any part of the Assets. Without limiting the generality of the preceding sentence, the filing of any charges or the commencement or threatened commencement of any proceeding against Grantor or any other person liable on the Indebtedness, or against any of the Assets or anyone having an interest in, or use or possession of any of the Assets, which allows or could afford the federal government or any state or local government the right or remedy to forfeit any of such Assets, shall constitute, at Beneficiary's election, an event of default under this Deed of Trust and all Indebtedness described herein and secured hereby. Grantor shall protect, indemnify and hold harmless Beneficiary, its directors, officers, employees, agents, attorneys, successors and assigns from and against any and all loss, damage, cost, expense or liability (including attorneys fees and costs) directly or indirectly arising out of or attributable to any failure of the representations or breach of any agreement set forth in this paragraph.

Y.    After the happening of (a) any casualty to the Mortgaged Property or any part thereof or (b) the taking of any portion of the Mortgaged Property either under condemnation or eminent domain or through settlement in lieu of proceedings under the power of eminent domain (said clauses (a) and (b) being referred to in this Section 2.01 Y as a "Loss"), Grantor shall give prompt written notice of the Loss to Beneficiary. Notwithstanding any provision in this Deed of Trust to the contrary, Beneficiary shall make the proceeds of insurance relating to a casualty loss or Grantor's portion of the award paid in condemnation or eminent domain or in settlement in lieu thereof (all such proceeds and awards being hereinafter referred to in this Section 2.01 Y as the "Proceeds") available to Grantor to pay all or a portion of the costs of repair or restoring the Mortgaged Property to as nearly as practicable to the condition of the Mortgaged Property immediately preceding the Loss, provided that such funds shall be made available to Grantor only on compliance with the following conditions (collectively, the "Required Conditions"): (i) within ninety (90) days of a Loss, Grantor shall notify Beneficiary of Grantor's intention to use the Proceeds to repair or restore the Mortgaged Property to as nearly as practicable their condition immediately prior to the Loss; (ii) no Event of Default hereunder or under the Note or any other Loan Documents shall otherwise have occurred and be continuing; (iii) Beneficiary shall have determined, in its reasonable judgment, that sufficient funds (including the Proceeds) are available or committed on terms reasonably satisfactory to Beneficiary to complete and pay for the restoration and repair of the Mortgaged Property in accordance with all then applicable building code requirements and such funds (including the Proceeds) shall be delivered to and held by Beneficiary during the course of such repair and restoration for administration in accordance with the provisions of the Loan Agreement and this Section 2.01 Y; (iv) Grantor shall furnish to Beneficiary plans and specifications for the repair or restoration of the Mortgaged Property in form reasonably satisfactory to Beneficiary; (v) business interruption or rent loss insurance or other funds available to Grantor shall be dedicated and sufficient to pay during the period required to restore or repair the Mortgaged Property the required payments of principal of and interest on the Note and all unabated operating expenses of the Mortgaged Property; (vi) compliance by Grantor under the terms of any lease which is affected by the Loss; (vii) the repair and restoration must be able to be completed no later than 90 days prior to the maturity date of the Note; (viii) the Loss must not allow any of the retail tenants nor any office tenant to terminate its lease; and (ix) the general contractor selected by Grantor to perform the work of repairing or restoring the Mortgaged Property (in this Section 2.01 Y, the "Contractor") shall be a general contractor approved by Beneficiary, and the contract between Grantor and the Contractor and an estimated progress schedule shall be submitted to, and approved by Beneficiary. Beneficiary may condition its approval of Contractor on, among other things, a review of the Contractor's financial statements satisfactory to Beneficiary. Any funds required in addition to the Proceeds to complete and pay for the cost of restoring the Mortgaged Property shall be the first funds applied to pay such costs; thereafter, as such restoration or repair progresses, Beneficiary will make periodic payments from the Proceeds

EXHIBIT NO. 3                    EX. 3-014

to Grantor and/or the Contractor or otherwise in accordance with the general procedures of Beneficiary applicable to the disbursement of construction loans at the time of such damages or destruction (and subject to the submission of the required documentation). Until disbursed to pay for the cost of repairing or restoring the Mortgaged Property, Beneficiary shall have a security interest in the Proceeds and other funds at any time held by it pursuant to this paragraph.

Except to the extent that Proceeds are received by Beneficiary and applied to the Indebtedness secured hereby, nothing herein contained shall be deemed to excuse Grantor from repairing or maintaining the Mortgaged Property or restoring all damage or destruction to the Mortgaged Property, regardless of the availability or sufficiency of Proceeds. The application or release by Beneficiary of any Proceeds shall not cure or waive any default or notice of default under this Deed of Trust or invalidate any act done pursuant to such notice. In the case of a partial taking pursuant to a condemnation or exercise of the right of eminent domain, the amount of impairment of the value of the collateral (not eliminated through a restoration or repair of the Mortgaged Property) shall be paid to Beneficiary and applied to as a partial prepayment of the Note.

Notwithstanding any other provision of this Section 2.01Y, if in the reasonable determination of Beneficiary the total amount of Proceeds is equal to or less than $100,000.00 and the repair and restoration of the Mortgaged Property can be completed in less than one hundred eighty (180) days and provided no Event of Default has otherwise occurred and is continuing, Beneficiary shall, upon request of Grantor, permit Grantor to apply for and receive the Proceeds directly from the issuer or condemnor, provided the Grantor shall apply such Proceeds solely to the prompt and diligent commencement and completion of such repairs or restoration.

Provided the Grantor complies with this Section 2.01Y and has completely satisfied the Required Conditions described above, any default arising by virtue of the condemnation or destruction of improvements shall be deemed to have been waived by the Beneficiary.

2.02    If, while this Deed of Trust is in force, the title of Trustee to the Mortgaged Property, or any part thereof, or any interest therein, shall be endangered or shall be attacked directly or indirectly, Grantor hereby authorizes Beneficiary, at Grantor's cost and expense, to take all necessary and proper steps for the defense of said title, including the employment of counsel, the prosecution or defense of litigation, and the compromise or discharge of any such claims made against said title.

2.03    All costs, expenses, and attorneys' fees incurred by Grantor, or by Beneficiary on Grantor's behalf, in performing and complying with Grantor's covenants herein or which are the obligations of Grantor herein shall be borne solely by Grantor. Beneficiary shall have the right, at its option and without being required to do so, to advance its own funds for the purpose of paying any of the Grantor's obligations or liabilities herein. All out-of-pocket costs, expenses and reasonable attorney's fees incurred by Beneficiary relating to or otherwise in pursuance of any covenant herein contained shall be due and payable by Grantor to Beneficiary upon demand at the place where the Note is payable and all of such sums shall bear interest at the maximum lawful rate of interest permitted by applicable law, now or hereafter enacted, to be charged to and paid by Grantor from and after the date of Beneficiary's making such payment. The sum of each such payment shall be added to the Indebtedness and thereafter shall form a part of the same and shall be secured by this Deed of Trust. Beneficiary shall be automatically subrogated to all the rights of the person, corporation, or body politic receiving such payment made by Beneficiary. Grantor does hereby appoint Beneficiary as its agent and attorney-in-fact to do, make, procure, execute and deliver, in the name of and on behalf of Grantor, without notice to Grantor, all acts, things, moneys, assignments, affidavits, financing statements, instruments and assurances as Beneficiary, from time to time, may deem proper or necessary in order to protect, assure or enforce its interests as created by and provided under this Deed of Trust or any other document evidencing, securing payment or otherwise relating to the Indebtedness. The power of attorney herein

granted to Beneficiary shall be deemed to be coupled with an interest, shall not terminate on disability of Grantor, and may not be revoked or terminated until the Indebtedness shall have been paid in full.

2.04   Grantor, on behalf of Grantor and Grantor's heirs, devisees, personal representatives, successors or assigns, hereby waives to the full extent permitted by law, any right to assert any statute or rule of law pertaining to the marshaling of assets, a sale in inverse order of alienation, the exemption of homestead, the administration of estates of incompetents or decedents, or any other matter whatever, to defeat, reduce or affect the lien, security interest or other rights of Beneficiary under the terms hereof.

2.05   In the event that there be a trustee's sale hereunder, and, if at the time of such sale, Grantor, or Grantor's heirs, personal representatives, successors or assigns, is or are occupying the Mortgaged Property so sold, each and all shall immediately surrender and deliver possession of the Mortgaged Property so sold to the purchaser at such sale, and in the event of their failure to do so, they shall thereupon become the tenant of the purchaser at such sale, which tenancy shall be a tenancy at sufferance, terminable at the will of such purchaser as landlord, at a rental per day determined by such purchaser, such rental to be due and payable daily to such purchaser. An action of forcible entry and detainer, and any other legal proceedings may be brought by any purchaser if the tenant holds over after a demand in writing for possession of any of the Mortgaged Property; and this Deed of Trust and the trustee's deed delivered at such sale shall constitute the lease and agreement under which any such tenant's possession arose.

2.06   The covenants herein contained shall inure to the benefit of Beneficiary and Trustee, their respective heirs, personal representatives, successors and assigns, and shall be binding upon the respective heirs, personal representatives, successors and assigns of Grantor and any other party now or hereafter liable for payment of the Indebtedness, but nothing in this paragraph shall constitute an authorization for Grantor to sell, transfer, lease or in any way dispose of the Mortgaged Property or any part thereof if otherwise prohibited by any of the terms hereof.

2.07   Pursuant to Texas Finance Code § 307.052, this Deed of Trust shall evidence notice by Beneficiary to Grantor of and Grantor's agreement to the following:

A.   THE GRANTOR IS REQUIRED TO (i) KEEP THE COLLATERAL INSURED AGAINST DAMAGE IN THE AMOUNT THE BENEFICIARY SPECIFIES; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS;

B.   THE GRANTOR MUST, IF REQUIRED BY THE BENEFICIARY, DELIVER TO THE BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF THE PREMIUMS; AND,

C.   IF THE GRANTOR FAILS TO MEET ANY REQUIREMENT LISTED IN PARAGRAPH (A) OR (B), THE BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF THE GRANTOR AT THE GRANTOR'S EXPENSE.

D.   Nothing in this notice shall impair or be deemed a waiver by Beneficiary of any of Beneficiary's rights under Chapters 1 through 9 of the Texas Business and Commerce Code, or Beneficiary's other remedies, rights, or options available to Beneficiary under any law, rule, regulation, ruling, court order or agreement.

E.   Grantor will be given written notice in accordance with applicable Texas law if the Beneficiary places collateral protection insurance during the term of the Indebtedness on

EXHIBIT NO. 3                                    EX. 3-016

Grantor's behalf and at Grantor's expense. Insurance placed by the Beneficiary may be considerably more costly than comparable insurance Grantor could obtain for Grantor's own account and may not satisfy any need Grantor may have for property damage coverage or any mandatory liability insurance requirements imposed by applicable law. Any amounts disbursed by the Beneficiary to place collateral protection insurance in connection with the Indebtedness would become additional debt and will be secured by this Deed of Trust or other security interest instrument signed by Grantor securing the Indebtedness, shall bear interest at the applicable note interest rate of the Indebtedness from the date of disbursement of any such amounts until paid, and will be payable with such interest thereon upon notice to Grantor from Beneficiary requesting payment.

## ARTICLE III. DEFAULT AND REMEDIES

3.01    The term "Default" or "Event of Default" as used in this Deed of Trust shall mean the occurrence of one or more of the following:

A.    After applicable notice and failure to cure as provided for in the Loan Agreement, Grantor shall fail, refuse or neglect to promptly pay or cause there to be paid all Indebtedness due and payable under the Note, under this Deed of Trust or under any instrument relating to or securing the payment of the Indebtedness or any part thereof, as the same shall become due and payable;

B.    After applicable notice and failure to cure as provided for in the Loan Agreement, Grantor shall fail to keep and perform (or shall fail to furnish evidence of the performance of) any of the covenants or agreements contained herein or in the Note or in any other document evidencing, securing payment of, or otherwise relating to, the Indebtedness (collectively the "Loan Documents") including but not limited to the Loan Agreement of even date herewith by and between Borrower and Beneficiary;

C.    Grantor, or any other person liable for the Indebtedness, or any portion thereof, files a voluntary petition in bankruptcy or for corporate reorganization, makes an assignment for the benefit of any creditor, or is the subject of an Order of Relief entered in any bankruptcy, insolvency, reorganization, rehabilitation or other such proceeding;

D.    The Mortgaged Property or any property owned by a person now or hereafter liable for payment of the Indebtedness, or any interest therein or portion thereof, is placed under control or in the custody of any court or receiver;

E.    [Intentionally deleted];

F.    Dissolution, termination, cessation of business, merger or similar event affecting Grantor or any other party now or hereafter liable for payment of the Indebtedness or any part thereof or any material adverse change in the business, operations or financial condition of Grantor or any other party now or hereafter liable for payment of the Indebtedness or any part thereof;

G.    [Intentionally deleted];

H.    If, during the loan application process, Grantor or any persons or entities acting at the direction of Grantor or with Grantor's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Beneficiary (or failed to provide Beneficiary with material information) in connection with the Indebtedness; or if Beneficiary discovers that any statement, representation, or warranty in the Note, this Deed of Trust or in any other document or instrument delivered to or relied upon by Beneficiary in connection with the Indebtedness is false, misleading or erroneous in any respect;

EXHIBIT NO. 3                    EX. 3-017

I.    Grantor admits in writing Grantor's inability to pay its debts generally as they become due;

J.    Grantor abandons any of the Mortgaged Property;

K.    If anyone (besides Beneficiary) applies for or consents to the appointment of a custodian, trustee, or liquidator of Grantor (or any of them) or of any guarantor of or surety for the performance of any obligation hereunder or of all or a substantial part of Grantor's assets;

L.    Grantor institutes or voluntarily is or becomes a party to any judicial proceedings intended to effect a discharge of the debts of Grantor (or any of them) or of any guarantor or surety, in whole or in part, or to effect a postponement of the maturity or the collection thereof or to effect a suspension of any of the rights or powers of Beneficiary granted in the Note, this Deed of Trust or in any other document or instrument evidencing or securing payment of the Indebtedness;

M.    An order, judgment or decree shall be entered by any court of competent jurisdiction appointing a trustee, custodian or liquidator of Grantor (or any of them) or of any guarantor or surety or of all or any substantial part of the assets of Grantor (or any of them) or any such guarantor or surety, or if Grantor (or any of them) or any guarantor or surety shall fail to pay any money judgment against it at least ten (10) days prior to the date on which the assets of Grantor (or any of them) or any such guarantor or surety may be sold to satisfy such judgment; or

N.    If Grantor (or any of them) or any such guarantor or surety shall fail to have discharged within a period of thirty (30) days after the commencement thereof any attachment, sequestration, or similar proceeding against any assets of Grantor (or any of them) or of any guarantor or surety, or if any of the assets of Grantor (or any of them) or of any such guarantor or surety are levied upon, sequestered, garnished, attached or otherwise seized by or through any similar process.

Upon the occurrence of any Event of Default, Beneficiary, at Beneficiary's option, and without further notice of intention to accelerate, notice of acceleration or notice of any kind or nature whatsoever, demand or presentment, all of which are hereby expressly waived by Grantor and any and all other parties liable with respect to the Indebtedness or any part thereof, to the extent not prohibited by law, may declare the entire unpaid Indebtedness (other than interest therein which has not yet accrued) immediately due and payable, whereupon it shall be so due and payable, and may exercise or invoke all rights and remedies granted hereunder or in any other instrument securing payment of or relating to the Indebtedness and all rights and remedies available at law or in equity.

3.02    In addition, upon the occurrence of any Event of Default, Beneficiary shall have the option, without declaring the entire Indebtedness due, to proceed with foreclosure either through the courts or by directing Trustee to proceed as if under a full foreclosure, conducting the sale as hereinafter provided. Such sale may be made subject to the unmatured portion of the Note or other Indebtedness without any effect thereon, but as to such unmatured portion of the Note or other Indebtedness, this Deed of Trust shall remain in full force and effect just as though no sale had been made under the provisions of this paragraph. In addition, several sales may be made hereunder without exhausting the right of sale for any unmatured portion of the Note or other Indebtedness, it being the intention of the parties hereto to provide for a foreclosure and sale of the security for any matured portion of the Indebtedness without exhausting the power to foreclose and to sell the security for any other portion of the Indebtedness whether matured at the time or subsequently maturing.

3.03    Upon the occurrence of any Event of Default, Grantor hereby authorizes and empowers Trustee, at any time thereafter, at the request of Beneficiary (which request is hereby conclusively presumed), to sell to any third party, including Beneficiary, at public sale the Mortgaged Property or any part thereof, or any interest therein, to the highest bidder, for cash, at the area of the county courthouse in which

EXHIBIT NO. 3                                    EX. 3-018

the Land (or any part thereof to be sold) is situated, as designated by the Commissioner's Court of such county as the area in which foreclosure sales are to take place, as evidenced by the designation of such area recorded in the real property records of the county in which the Land (or any part thereof to be sold) is situated, and, if no area is so designated, then in the area designated in the Notice of Sale as being the area for foreclosure sales to take place, between the hours of 10:00 a.m. and 4:00 p.m. of the first Tuesday of any month, after Trustee, or Trustee's agent, has given notice of the time, place and terms of said sale, and the property to be sold (such property in this Section 3.03 being called the "Posted Mortgaged Property"), by posting (or by having any person acting for Trustee post) for at least twenty-one (21) days preceding the date of the sale, written notice of the proposed sale at the Courthouse door of said county in which the Posted Mortgaged Property is situated and as otherwise required by the applicable provisions of the Texas Property Code, as then amended. If the Posted Mortgaged Property is in more than one county, one such notice of sale shall be posted at the courthouse door of each county in which part of the Posted Mortgaged Property is situated and the Posted Mortgaged Property may be sold in any one of such counties, and the notice so posted shall designate in which county the Posted Mortgaged Property shall be sold. In addition to such posting of notice, Trustee (or any person acting for Trustee), at least twenty-one (21) days preceding the date of the sale, shall file a copy of such written notice of the proposed sale in the office of the county clerk of the county in which the sale is to be made, and if the Posted Mortgaged Property is situated in more than one county, a copy of such written notice of sale shall be so filed in the office of the county clerk of each county in which any of the Posted Mortgaged Property is situated. In addition to such posting and filing of notice, Beneficiary (or any person acting for Beneficiary), at least twenty-one (21) days preceding the date of the sale, shall serve written notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to records of Beneficiary and as otherwise required by the applicable provision of the Texas Property Code, as then amended. Service of such notice shall be completed upon deposit of the notice, enclosed in a postpaid wrapper, properly addressed to such debtor at said debtor's most recent address as shown by the records of Beneficiary, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. Grantor agrees that no notice of any sale other than as set out in this paragraph need be given by Trustee, Beneficiary or any other person. Grantor designates as Grantor's address for the purposes of such notice, the address set out below, and each other debtor, if any, obligated to pay the Indebtedness agrees that such address shall likewise constitute such other debtor's address for such notice, unless a different address is designated by such other debtor; no change of such address or designation of a different address shall be binding on Beneficiary until thirty (30) days after Beneficiary has received notice of such change sent to Beneficiary by certified mail postage prepaid, return receipt requested, addressed to Beneficiary at the address for Beneficiary set out herein (or to such other address as Beneficiary may have designated by notice given as above provided to Grantor and such other debtors). Any change of address of Beneficiary shall be effective three (3) business days after written notice thereof addressed to Grantor and sent by regular United States mail, postage prepaid, has been deposited in the care and custody of the United States Postal Service. Grantor authorizes and empowers Trustee to sell the Posted Mortgaged Property, or any part thereof (which partial sale shall be governed by Section 3.07 hereof) or any interest therein, as an entirety or in parcels, by one sale or by several sales held at one time or at different times as the Trustee shall deem advisable at the time of sale, and to execute and deliver to the purchaser or purchasers thereof good and sufficient deed or deeds of conveyance thereof and bills of sale with covenants of general warranty binding on Grantor and Grantor's heirs, personal representatives, successors and assigns. Trustee making such sale shall receive the proceeds thereof and shall apply the same (or if Beneficiary is the successful bidder, Beneficiary shall allocate its bid price) as follows: (i) to the payment of all expenses of taking possession of, maintaining, leasing, repairing, equipping, guarding, improving, advertising, selling, and conveying the Mortgaged Property or part thereof, and /or prosecuting or otherwise collecting Rents, proceeds, premiums, or other sums including reasonable attorneys' fees, and a reasonable fee or commission to Trustee (which Trustee's fee shall not exceed five percent (5%) of the sales proceeds thereof or sums so received); (ii) to the remainder of the Indebtedness as follows: first, to any other expenses or liabilities of Grantor and/or Borrower comprising part of the Indebtedness, second, to the remaining accrued but unpaid interest, third, to the matured portion of

EXHIBIT NO. 3

EX. 3-019

principal of the Indebtedness, and fourth, to prepayment of the unmatured portion, if any, of principal of the Indebtedness applied to installments of principal in inverse order of maturity; (iii) the balance, if any and to the extent applicable, remaining after the full and final payment of the Indebtedness and full performance and discharge of the Obligations, to the holder or beneficiary of any inferior liens covering the Mortgaged Property, if any, in order of the priority of such inferior liens (Trustee and Beneficiary shall hereby be entitled to rely exclusively upon a commitment for title insurance issued to determine such priority); and (iv) the cash balance, if any, to Grantor and Grantor's respective heirs, personal representatives, successors or assigns. Payment of the purchase price to Trustee shall satisfy the obligation of the purchaser at such sale therefor, and such purchaser shall not be bound to look after the application thereof. Notwithstanding the foregoing, if any person or party other than the then owners of the Mortgaged Property shall notify Beneficiary or Trustee of a claim to said sums or any part thereof prior to disbursement thereof by Trustee, then Trustee or Beneficiary or both of them at their option, may interplead all or any part of said funds into a court of competent jurisdiction, and in such event, Beneficiary and Trustee each shall be entitled to recover from such sums so deposited an amount equal to the attorneys' fees and other costs and expenses incurred by them or either of them, in connection with such proceeding, to the full extent permitted by all applicable laws.

3.04    Grantor hereby ratifies and confirms any and all acts that Trustee shall do lawfully by virtue hereof. Grantor hereby agrees, on behalf of Grantor and Grantor's respective heirs, personal representatives, successors and assigns, that the recitals contained in any deed or deeds or other instrument executed in due form by any Trustee, acting under the provisions of this instrument, shall be prima facie evidence of the facts recited, and that it shall not be necessary to prove in any court, otherwise than by such recitals, the existence of the facts essential to authorize the execution and delivery of such deed or deeds or other instrument and the passing of title thereby, and all prerequisites and requirements of any sale or sales shall be conclusively presumed to have been performed, and all persons subsequently dealing with the Mortgaged Property purported to be conveyed by such deed or deeds or other instrument, including without limitation, the purchaser or purchasers thereof, shall be fully protected in relying upon the truthfulness of such recitals. Trustee, acting in accordance with the terms hereof, shall not be personally liable for any action taken pursuant hereto.

3.05    Beneficiary may bid, and being the highest bidder therefor, become the purchaser of any or all of the Mortgaged Property at any trustee's or foreclosure sale hereunder and shall have the right to credit the amount of the bid upon the unpaid amount of the Indebtedness in lieu of cash payment.

3.06    The purchaser at any trustee's or foreclosure sale hereunder may disaffirm any easement granted, or lease or other agreement made in violation of any provision of this Deed of Trust, and may take immediate possession of the Mortgaged Property free from and notwithstanding the terms of, such grant of easement, lease or other agreement.

3.07    The sale or sales by the Trustee of less than the whole of the Mortgaged Property shall not exhaust the power of sale herein granted, and the Trustee is specifically empowered to make successive sale or sales, under such power, of such portion of or interest in the Mortgaged Property and in such order as Trustee may determine until the whole of the Mortgaged Property shall be sold; and if the proceeds of such sale or sales of less than the whole of such Mortgaged Property shall be less than the aggregate of the Indebtedness and the expense of executing this trust, this Deed of Trust shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale or sales had been made; provided, however, that Grantor shall never have the right to require that the Mortgaged Property be sold, as an entirety or in parcels, but Beneficiary shall have the right, as a matter of Beneficiary's sole discretion, to request the Trustee to sell the Mortgaged Property as an entirety or to sell any portion of or interest in the Mortgaged Property. In addition, if any sale hereunder is not completed or is defective in the opinion of Beneficiary, such sale shall not exhaust the power of sale hereunder, and Beneficiary shall have the right to have a subsequent sale or sales to be made by the Trustee.

EXHIBIT NO. 3                                    EX. 3-020

3.08    In the event Trustee mails, files and/or posts the notices of foreclosure sale as required hereunder, Beneficiary may decide not to proceed with a foreclosure sale on the date set forth in such notice, and such decision shall in no manner prevent Beneficiary from directing the Trustee to give notice of a foreclosure sale, as provided herein, at any future date, nor effect a waiver of any of Beneficiary's rights and remedies hereunder. Further, in the event a foreclosure sale is commenced hereunder by Trustee, Beneficiary, at any time prior to the completion of such sale, may direct such Trustee to abandon the sale and may thereafter institute suit for foreclosure of any of the liens and security interests created by this Deed of Trust. If Beneficiary shall so elect to institute a suit for collection of the Indebtedness or any part thereof and for foreclosure of the liens and security interests evidenced hereby, it is agreed further that Beneficiary, at any time before entry of final judgment, may cause such suit to be dismissed and thereafter direct and require that Trustee proceed to sell the Mortgaged Property, or any part thereof, in accordance with the terms hereof, including but not limited to, the terms of Section 3.03 hereof and the terms of the Uniform Commercial Code, as herein provided.

3.09    Each and all of the rights, powers and remedies hereunder are cumulative of and in addition to all other rights, powers and remedies herein contained or contained in any other instrument or document evidencing, securing or otherwise relating to the Indebtedness or which Beneficiary may have under all applicable laws. None of the terms and provisions hereof and no action or omission by or on behalf of Beneficiary shall ever make Beneficiary a trustee for, or otherwise create a trust, partnership or other fiduciary relationship between, Beneficiary and Grantor.

3.10    Upon the occurrence of an Event of Default by Grantor as set out in Section 3.01, Beneficiary may, without limitation of any other rights or remedies of Beneficiary, exercise the rights and remedies set forth in Section 2.01.J. hereof.

## ARTICLE IV. SUBSTITUTE AND SUCCESSOR TRUSTEE

4.01    If Trustee shall die or become disqualified from acting in the execution of this trust, or shall fail or refuse to execute the same when requested by Beneficiary so to do, or if, for any reason, Beneficiary shall prefer to appoint a substitute trustee to act instead of the herein named Trustee, Beneficiary shall have full power to appoint, at any time and without any formality other than by written instrument executed by Beneficiary, one or more successor or alternate successor trustees, each of whom shall succeed to all the estate, rights, powers and duties of Trustee named herein, and no notice of such appointment need be given to Grantor or to any other person or filed for record in any public office. Such appointment may be executed by Beneficiary or any agent of Beneficiary and, if Beneficiary is a corporation or other entity, such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any executive officer of the corporation or otherwise.

## ARTICLE V. DEFEASANCE

5.01    All of the covenants and agreements of Grantor herein shall survive the execution and delivery of this document and shall continue in force until an express written release hereof is executed by Beneficiary. Accordingly, if Grantor shall perform faithfully each and all of the covenants and agreements herein contained and shall pay the Indebtedness in full, and shall satisfy all obligations secured hereby, then, and then only, this conveyance shall be released upon Grantor's written request and at Grantor's expense, by documentation in form and substance satisfactory to Beneficiary. No release of this conveyance or the lien thereof shall be valid unless executed by Beneficiary.

## ARTICLE VI. SECURITY AGREEMENT

6.01    To further secure the payment and performance of the Indebtedness and Grantor's observance of the covenants of this Deed of Trust and any other instruments securing the payment of the Indebtedness or relating thereto, Grantor hereby grants a security interest to Beneficiary in and to all the Goods and Intangibles, and the products and proceeds thereof (all of the Goods, and Intangibles, and the proceeds

JNG17\FSBCT\WCTBAKWD\J17121D'Tv3.wpd
April 11, 2017 (1:02pm)                            21                            DEED OF TRUST

and products thereof being herein called the "Collateral", provided, however, (a) the mention of proceeds of Collateral herein shall not be construed as an authorization for the sale or surrender by Grantor of the Collateral, and (b) the term Collateral as used in this Article VI shall be included in the term "Mortgaged Property" when used in this Deed of Trust). This document shall constitute a security agreement as well as a mortgage and deed of trust. The following applies with respect to the Collateral:

A.  In addition to and cumulative of any other remedies granted in this Deed of Trust to Beneficiary, Beneficiary, upon default hereunder, may proceed under Chapter 9 of the Uniform Commercial Code as to all or any part of the Collateral and shall have and may exercise with respect to all or any part of the Collateral all of the rights, remedies and powers of a secured party under the Uniform Commercial Code, including, without limitation, the right and power to repossess, retain and sell, at public or private sale or sales, or otherwise dispose of, lease or utilize the Collateral or any part thereof and dispose of the proceeds and products in any manner authorized or permitted under the applicable provisions of the Uniform Commercial Code, and to apply the proceeds and products thereof toward payment of Beneficiary's attorneys' fees and other expenses and costs of pursuing, searching for, receiving, taking, keeping, storing, advertising, and selling the Collateral thereby incurred by Beneficiary, and toward payment of the Indebtedness in such order and manner as Beneficiary may elect consistent with the provisions of the Uniform Commercial Code. Nothing in this Article VI shall be construed to impair or limit any other right or power to which Beneficiary may be entitled at law or in equity.

B.  Among the rights of Beneficiary upon default and acceleration of the Indebtedness pursuant to the provisions hereof, and without limitation, Beneficiary shall have the right (but not the obligation), without being deemed guilty of trespass and without liability for damages thereby occasioned, and to the extent such may now or hereafter be permitted under Texas law (i) to enter upon any premises where the Collateral may be situated and take possession of the Collateral, or render it unusable, or dispose of the Collateral on Grantor's premises, and Grantor agrees not to resist or to interfere, and (ii) to take any action deemed necessary or appropriate or desirable by Beneficiary at Beneficiary's option and in Beneficiary's discretion, to repair, refurbish or otherwise prepare the Collateral for sale, lease or other use or disposition as herein authorized. Beneficiary, at Beneficiary's discretion, may require Grantor to assemble the Collateral and make it available to Beneficiary at a place designated by Beneficiary that is reasonably convenient to both parties.

C.  Beneficiary shall give Grantor notice, by certified mail, postage prepaid, of the time and place of any public sale of any of the Collateral or of the time after which any private sale or other intended disposition thereof is to be made by sending notice to Grantor at the address of Grantor as specified below at least ten (10) days before the time of the sale or other disposition, which provisions for notice Grantor and Beneficiary agree are reasonable and shall fully satisfy any requirement for giving of any such notice; notwithstanding the foregoing, Grantor further agrees that, upon the occurrence of an Event of Default, Beneficiary may sell or otherwise dispose of all or any part of the Mortgaged Property which is subject to the Uniform Commercial Code in the manner provided therein or as provided in this Deed of Trust, or under both the Uniform Commercial Code and this Deed of Trust, as Beneficiary may determine, and any and all proceeds received at any such sale shall be applied in the manner set forth in Section 3.03 hereof.

D.  To the extent such now or hereafter may be permitted under Texas law, Beneficiary is authorized to execute and/or file financing statements and continuation statements under the Uniform Commercial Code with respect to the Collateral without joinder of Grantor in such execution or filing. Grantor shall execute and deliver to Beneficiary such financing statements, continuation statements and other documents relating to the Collateral or any portion thereof as Beneficiary may reasonably request from time to time to preserve and

maintain the perfection and control of the Collateral and the priority of the security interest created by this Deed of Trust and shall pay to Beneficiary on demand any expenses and attorneys' fees incurred by Beneficiary in connection with the preparation, execution, filing and perfection and continuation of the liens and security interest of this Deed of Trust and of any financing statements, continuation statements, partial releases, termination statements or other documents necessary or desirable to continue or confirm Beneficiary's security interest, or any modification thereof, and in connection with any Uniform Commercial Code searches performed by Beneficiary. This document or any reproduction of this document may be filed by Beneficiary and shall be sufficient as a financing statement. All or part of the Collateral is or is to become fixtures on the real estate constituting a portion of the Mortgaged Property, but this statement shall not impair or limit the effectiveness of this document as a security agreement or financing statement for other purposes, and, without limitation of any other provision hereof, this Deed of Trust shall constitute a fixture financing statement and, as such, shall be filed for record in the real estate records of each county in which the Land, or any part thereof, is located. Grantor shall not change Grantor's name, identity, structure or location without the prior express written consent of Beneficiary. The name of the record owner of the Land is the party or parties defined herein as Grantor.

E.  Grantor represents that, except for the security interest granted hereby in the Collateral, Grantor is the owner of the Collateral free of any adverse claim, security interest or encumbrance, and Grantor shall defend the Collateral against all claims and demands of any person at any time claiming the same or any interest therein. Grantor has not heretofore allowed or caused there to be filed any financing statement and no financing statement allowed or authenticated by Grantor is now on file in any public office except those statements, true and correct copies of which have been delivered to Beneficiary. So long as any amount remains unpaid on the Indebtedness, Grantor shall not allow and there shall not be filed in any public office any such financing statement or statements affecting the Collateral other than financing statements in favor of Beneficiary hereunder unless the express prior written consent and approval of the Beneficiary shall have first been obtained.

F.  The security interest granted herein shall not be construed or deemed to constitute Beneficiary or Trustee as a trustee or mortgagee in possession of the Mortgaged Property so as to obligate Beneficiary or Trustee to lease the Mortgaged Property or attempt to do the same, or take any action, incur any expenses or perform or discharge any obligation, duty or liability with respect to the Mortgaged Property or any part thereof or otherwise.

G.  Grantor's address is as stated below and Beneficiary's address is as stated below. Either party may notify the other of a new address in the manner specified in Section 3.03 above.

6.02  Grantor does hereby further grant and assign to Beneficiary a security interest in and right of setoff against all deposits and other sums now or at any time hereafter credited by or due from Beneficiary to Grantor, as security for the payment and performance of the Indebtedness and Grantor's observance of the covenants of this Deed of Trust and any other instruments securing the payment of the Indebtedness or relating thereto. In the event of any Default, Beneficiary, at its option, at any time thereafter and without notice, demand or presentment to Grantor, may hold all or any part of any such deposits or other sums until the Indebtedness shall have been paid in full, or may apply or set off all or any part of such deposits or sums credited by or due from Beneficiary to or against any sums then due on the Indebtedness in any manner and in such order of preference as Beneficiary, in its sole discretion, shall determine.

## ARTICLE VII. MISCELLANEOUS

7.01  In the event Beneficiary shall elect to invoke any of the rights or remedies provided for herein, but shall thereafter determine to withdraw or discontinue same for any reason, Beneficiary shall have the unqualified right to do so, whereupon all parties shall be automatically restored and returned to their

JNG17\FSBCT\WCTEAKWD\J17121DTv3.wpd
April 11, 2017 (1:02pm)

23

DEED OF TRUST

respective positions regarding the Indebtedness and this Deed of Trust as shall have existed prior to the invocation of Beneficiary's rights hereunder and the rights, powers and remedies of Beneficiary hereunder shall be and remain in full force and effect.

7.02    Any part of the Mortgaged Property, or any interest therein, may be released by Beneficiary without affecting Beneficiary's liens, security interests and other rights against the remainder of the Mortgaged Property; provided however, that nothing in this paragraph shall obligate Beneficiary to consider or grant any partial releases of the Land or the Mortgaged Property. The lien, security interest and other rights hereby granted shall not affect or be affected by any other security taken or acquired by the Beneficiary for the Indebtedness or any part thereof. The taking of additional security, or the modification, extension, renewal or increase of the Indebtedness or any part thereof, shall at no time release or impair the liens, security interests and the rights granted hereby, or affect the liability of any endorser, guarantor, surety, or any other party liable on the Indebtedness, or improve the right or priority of any junior lien holder; and this Deed of Trust, as well as any instrument given to secure any modification, renewal, extension or increase of the Indebtedness, or any part thereof, shall be and remain a first and prior lien and security interest on all of the Mortgaged Property not expressly released, unless otherwise herein provided. Any such release, the taking of additional collateral, or the modification, extension, renewal or increase of the Indebtedness or any part thereof shall be on any such terms as Grantor, Borrower and Beneficiary may agree to, and may be effected without notice to or consent of any endorser, guarantor, surety, or any other person now or hereafter obligated for the payment of the whole or any part of the Indebtedness, or any other third party, including any permitted subordinate lienholder (except for such notice and/or consent that may be agreed to by Beneficiary in writing). Any other lienholder of record whether now existing or hereafter arising is hereby given notice that all such rights of Grantor, Borrower and/or Beneficiary to modify, extend, renew or increase the Indebtedness secured hereby shall not be deemed to prejudice any other existing or future lienholder, and any other liens on the Mortgaged Property are and shall be subject to this limitation. At Beneficiary's request, Borrower and/or Grantor shall provide to Beneficiary a modification endorsement from a title company acceptable to Beneficiary covering the modification, extension or renewal of the Indebtedness, and in case of any increase, a new loan policy issued by a title insurance underwriter acceptable to Beneficiary; all at Borrower's sole cost and expense.

7.03    The invalidity, or unenforceability in particular circumstances, of any provision of this Deed of Trust shall not extend beyond such provision or such circumstances and no other provision of this Deed of Trust shall be affected thereby. It is the intention of the parties hereto to comply with the applicable usury laws, now or hereafter enacted (herein called "Applicable Usury Laws"); accordingly, notwithstanding any provisions to the contrary in the Note, in any document evidencing or securing the Indebtedness, in this Deed of Trust or in any document securing payment of the Indebtedness or otherwise relating thereto, in no event shall the Note or such documents require the payment or permit the collection of interest in excess of the maximum amount permitted by such Applicable Usury Laws. If any such excess of interest is contracted for, charged or received, under the Note or any document evidencing the Indebtedness, under this Deed of Trust or under the terms of any of the other documents securing payment of the Indebtedness or otherwise relating thereto, or in the event the maturity of any of the Indebtedness is accelerated in whole or in part, or in the event that all or part of the principal or interest of the Indebtedness shall be prepaid, so that under any of such circumstances, the amount of interest contracted for, charged or received, under the Note or any document evidencing the Indebtedness, under this Deed of Trust or under any document securing payment of the Indebtedness or otherwise relating thereto, on the amount of principal actually outstanding from time to time under the Note and other document evidencing or securing the Indebtedness, shall exceed the maximum amount of interest permitted by the Applicable Usury Laws, then in any such event (a) the provisions of this paragraph shall govern and control, (b) neither Grantor nor any other person or entity now or hereafter liable for the payment of the Note or any document evidencing the Indebtedness shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum amount of interest permitted by the Applicable Usury Laws, (c) any such excess that may have been collected shall be either applied as a credit against the then unpaid principal amount hereof or refunded to Grantor, at the Beneficiary's option, and (d) the effective rate of interest

shall be automatically reduced to the maximum lawful contract rate allowed under the Applicable Usury Laws. Without limitation of the foregoing, all calculations of the rate of interest contracted for, charged or received under the Note, or any document evidencing the Indebtedness, under this Deed of Trust or under such other documents that are made for the purpose of determining whether such rate exceeds the maximum lawful contract rate, shall be made, to the extent permitted by the Applicable Usury Laws, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the loans evidenced by the Note or the documents evidencing the Indebtedness, all interest at any time contracted for, charged or received from Grantor or otherwise by Beneficiary in connection with such loans.

7.04    Beneficiary may accept any payment tendered by Grantor after the due date of such payment or after acceleration of maturity of the Indebtedness and may apply the same to the principal, interest thereon or attorneys' fees and expenses of collection, or any combination thereof, as determined by Beneficiary, whether such payment was designated as a payment of principal, interest or otherwise; any such acceptance of a late payment shall not constitute a waiver of the rights of Beneficiary thereafter to accelerate the maturity of the Indebtedness because of such default and foreclose the liens securing the payment thereof or, if the maturity of the Indebtedness has theretofore been accelerated, such acceptance of late payment shall not constitute a reinstatement of the Indebtedness or otherwise affect the rights of Beneficiary to proceed with foreclosure of the liens securing the payment thereof. It is expressly agreed that (a) no waiver of any default on the part of Grantor or breach of any of the provisions of this Deed of Trust shall be considered a waiver of any other or subsequent default or breach, and no delay or omission in exercising or enforcing the rights and powers herein granted shall be construed as a waiver of such rights and powers, and likewise no exercise or enforcement of any rights or powers hereunder shall be held to exhaust such rights and powers, and every such right and power may be exercised from time to time; (b) any failure by Beneficiary to insist upon the strict performance by Grantor of any of the terms and provisions hereof shall not be deemed to be a waiver of any of the terms and provisions hereof, and Beneficiary, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Grantor of any and all of the terms and provisions of this Deed of Trust; (c) neither Grantor nor any endorser, guarantor, surety, nor any other person now or hereafter obligated for the payment of the whole or any part of the Indebtedness shall be relieved of such obligation by reason of the failure of Beneficiary or Trustee to comply with any request of Grantor, or of any other person so obligated, to take action to foreclose this Deed of Trust or otherwise enforce any of the provisions of this Deed of Trust or of any obligations secured by this Deed of Trust, or by reason of the release, regardless of consideration, of the whole or any part of the security held for the Indebtedness, or by reason of the subordination in whole or in part by Beneficiary of the lien, security interest or other rights evidenced hereby, or by reason of any agreement or stipulation with any subsequent owner or owners of the Mortgaged Property renewing or extending the time of payment or modifying the terms of the Indebtedness or this Deed of Trust without first having obtained the consent of Grantor or such other person, and in the latter event, Grantor and all such other persons shall continue liable to make such payments according to the terms of any such agreement of renewal, extension or modification unless expressly released and discharged in writing by Beneficiary; (d) regardless of consideration, and without the necessity for any notice to or consent by the holder of any subordinate lien or security interest on the Mortgaged Property, Beneficiary may release the obligation of anyone at any time liable for any of the Indebtedness or any part of the security held for the Indebtedness and may renew or extend the time of payment or otherwise modify the terms of the documents evidencing or securing the Indebtedness or this Deed of Trust without impairing or affecting the lien or security interest of this Deed of Trust or the priority of such lien or security interest over any subordinate lien or security interest; (e) the holder of any subordinate lien or security interest shall have no right to terminate any leases affecting the Mortgaged Property whether or not such lease be subordinate to this Deed of Trust; and (f) Beneficiary may resort for the payment of the Indebtedness to any security therefor held by Beneficiary in such order and manner as Beneficiary may elect.

7.05    The terms and provisions of this Deed of Trust shall be governed by and construed in accordance with the laws of the State of Texas.

JNG17\FSBCT\WCTBAKWD\17121DTv3.wpd
April 11, 2017 (1:02pm)

DEED OF TRUST

7.06    Time is of the essence in the performance of this Deed of Trust.

7.07    Wherever used in this document, unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the words "Deed of Trust" shall mean this Deed of Trust, Security Agreement and Financing Statement and any modifications, renewals or supplements hereto, the word "Grantor", shall mean Grantor, Grantor's heirs, personal representatives, successors and assigns, and/or any subsequent owner or owners of the Mortgaged Property, or any part thereof or any interest therein, the word "Beneficiary" shall mean Beneficiary and/or any subsequent transferee, assignee, owner or holder of the Note or any interest therein at the time in question, the word "Note" shall mean the Note secured by this Deed of Trust and any renewals, extensions and rearrangements thereof, the word "person" shall mean an individual, corporation, trust, partnership, joint venture or unincorporated association, and the pronouns of any gender shall include the other genders, and either the singular or plural shall include the other. In the event that the person who is the maker of the Note (herein called "Borrower") is not the same person as the Grantor, all terms and provisions of this Deed of Trust shall apply to and be binding on the Borrower, as well as the Grantor notwithstanding any term or provision contained herein to the contrary.

7.08    This Deed of Trust, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective on a grantor hereunder unless given in writing and signed by said party or parties sought to be charged or bound by the alteration or amendment.

7.09    Beneficiary may freely assign, whether by sale or transfer, all or any portion of its lien rights hereunder in and to all or any portion of the Indebtedness secured hereby to any purchaser of the Note or of any portion or participation in the Note, including, but not limited to, a sale, transfer or assignment to any guarantor or other obligor of the Indebtedness.

7.10    Notwithstanding anything to the contrary contained in this Deed of Trust, if any person executing this Deed of Trust is a "consumer" as defined in Regulation AA of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 227, or the Federal Trade Commission Credit Practices Act, 16 C.F.R. Part 444, as applicable, no lien or security interest created or evidenced by this Deed of Trust shall extend to or cover a nonpossessory lien or security interest in "household goods", other than a purchase money lien or security interest, in accordance with such regulations as applicable.

## WAIVER OF CERTAIN LAWS

7.11    ADDITIONAL COVENANTS. In addition to the covenants and agreements made in this Deed of Trust, Grantor further covenants and agrees with Beneficiary as follows:

A.      In the event an interest in any of the Mortgaged Property is foreclosed upon pursuant to a judicial or non-judicial foreclosure sale, Grantor agrees as follows. Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Grantor agrees that Beneficiary shall be entitled to seek a deficiency judgment from Borrower, Grantor and any other party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Mortgaged Property was sold pursuant to judicial or non-judicial foreclosure sale. Grantor expressly recognizes that this Section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Borrower, Grantor and other persons against whom recovery of deficiencies is sought or any guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Mortgaged Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure

sale price is equal to the fair market value of the Mortgaged Property for purposes of calculating deficiencies owed by Borrower, Grantor, any guarantor, and others against whom recovery of a deficiency is sought.

B.  Alternatively, in the event the waiver provided for in Subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Mortgaged Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time): (i) the Mortgaged Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Mortgaged Property will be repaired or improved in any manner before a resale of the Mortgaged Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Mortgaged Property for cash promptly (but no later than twelve (12) months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Mortgaged Property, including, without limitation, brokerage commissions, title insurance, a survey of the Mortgaged Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Mortgaged Property shall be further discounted to account for any estimated holding costs associated with maintaining the Mortgaged Property pending sale, including, without limitation, utilities expenses, Mortgaged Property management fees, taxes and assessments (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Mortgaged Property must be given by persons having at least ten (10) years experience in appraising Mortgaged Property similar to the Mortgaged Property and who have conducted and prepared a complete written appraisal of the Mortgaged Property taking into consideration the factor set forth above.

EXECUTED on or before the date(s) acknowledged below, to be effective April 26, 2017.

WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company

By:  WC Teakwood Plaza Mezz, LLC, a Delaware limited liability company, Manager

By: _____
Natin Paul, President

Address of GRANTOR:     401 Congress Avenue, 33rd Floor
                        Austin, Texas 78701

Address of TRUSTEE:     P. O. Box 6136
                        Temple, Texas 76503-6136

Address of BENEFICIARY: P. O. Box 6136
                        Temple, Texas 76503-6136

JNG17\FSBCT\WCTEAKWD\j17121DTv3.wpd
April 11, 2017 (1:41pm)                    27                              DEED OF TRUST

EXHIBIT NO. 3                                                      EX. 3-027

THE STATE OF Texas                    §

COUNTY OF Travis                      §

This instrument was acknowledged before me on the 18 day of April , 2017 , by Nalin Paul, President of WC Teakwood Plaza Mezz, LLC, a Delaware limited liability company, on behalf of said limited liability company, in its capacity as Manager of WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company, on behalf of said limited liability company.


LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846548

Notary Public in and for
The State of Texas

My commission expires: 10/3/20

AFTER RECORDING RETURN TO:
Loan Services
FIRST STATE BANK CENTRAL TEXAS
P. O. Box 6136
Temple, Texas 76503-6136

PREPARED BY:

OPPER & GAMBRELL, P.L.L.C.
8582 Katy Freeway, Suite 200
Houston, Texas 77024

**CTOT**

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

   1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

   2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
April 27 2017 08:39 AM
FEE: $ 142.00  2017066579

# GUARANTY AGREEMENT

THIS GUARANTY (the "Guaranty") is dated effective April **2̸ϯ̸**, 2017 and is executed by **NATIN PAUL and WORLD CLASS CAPITAL GROUP, LLC** (hereinafter collectively referred to as "Guarantor"), for value received, and to induce **FIRST STATE BANK CENTRAL TEXAS**, having an address at P. O. Box 6136, Temple, Texas 76503-6136 ("Lender"), to lend to **WC TEAKWOOD PLAZA, LLC**, having an address at 401 Congress Avenue, 33rd Floor, Austin, Texas 78701 ("Borrower"), the principal sum of **SEVEN MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($7,600,000.00)** (the "Loan"), evidenced by a certain promissory note (the note together with all extensions, renewals, modifications, substitutions, replacements, restatements and amendments thereof shall collectively be referred to as the "Note") dated of even date herewith, executed pursuant to the terms of that certain Loan Agreement dated of even date herewith by and between Lender and Borrower (the "Loan Agreement") and secured by, among other things, that certain Deed of Trust, Security Agreement and Financing Statement (together with any and all extensions, renewals, substitutions, replacements, amendments, modifications and/or restatements thereof, the "Security Instrument"), as described in Exhibit "A" attached hereto and made a part hereof for all purposes. Other than the Note, all of the documents and the Security Instrument now or hereafter executed by Borrower and/or others and by or in favor of Lender, which wholly or partially secure or guarantee payment of the Note or are otherwise executed and/or delivered in connection with the Loan including the Loan Agreement, together with any and all extensions, renewals, substitutions, replacements, amendments, modifications and/or restatements thereof, are referred to as the "Other Loan Documents".

(1)     Each undersigned Guarantor, jointly and severally (if more than one) hereby absolutely and unconditionally guarantees to Lender the prompt and unconditional payment and performance of the following (the "Guaranteed Obligations"):

   (a)     The entire Debt (as defined herein);

   (b)     The payment and performance of all of Borrower's monetary and non-monetary obligations to Lender under the Security Instrument and Other Loan Documents; and

   (c)     All costs and expenses, including reasonable fees and out of pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty.

(2)     If any of the Guaranteed Obligations shall become due and remain unpaid in whole or in part, each undersigned Guarantor will on demand (and without further notice of dishonor, and without any notice having been given to the Guarantor previous to such demand of the acceptance by the Lender of this Guaranty) pay to the Lender, its successors or assigns, at Lender's office in Temple, Bell County, Texas, the full amount due and owing on the Guaranteed Obligations and it shall not be necessary for the Lender, in order to enforce such payment by the Guarantor, to first institute suit, or exhaust its remedies against the Borrower, or others liable on the Guaranteed Obligations, or to enforce its rights or remedies against any security which shall have been given the Lender to secure any of the Guaranteed Obligations.

(3) It is expressly understood and agreed that this is a continuing guaranty and that the obligations of Guarantor hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Note, the Security Instrument, or the Other Loan Documents, a true copy of each of said documents Guarantor hereby acknowledges having received and reviewed.

(4) The term "Debt" as used in this Guaranty shall mean the principal sum evidenced by the Note and secured by the Security Instrument, or so much thereof as may be outstanding from time to time, together with interest thereon at the rate of interest specified in the Note and all other sums other than principal or interest which may or shall become due and payable pursuant to the provisions of the Note, the Security Instrument or the Other Loan Documents.

(5) Any indebtedness of Borrower to Guarantor now or hereafter existing (including, but not limited to, any rights to subrogation Guarantor may have as a result of any payment by Guarantor under this Guaranty), together with any interest thereon, shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior payment in full of the Guaranteed Obligations. Until payment in full of the Guaranteed Obligations (and including interest accruing on the Note after the commencement of a proceeding by or against Borrower under the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. Sections 101 et seq., and the regulations adopted and promulgated pursuant thereto (collectively, the "Bankruptcy Code") which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally), Guarantor agrees not to accept any payment or satisfaction of any kind of indebtedness of Borrower to Guarantor and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization. Further, if Guarantor shall comprise more than one person, firm or corporation, Guarantor agrees that until such payment in full of the Guaranteed Obligations, (a) no one of them shall accept payment from the others by way of contribution on account of any payment made hereunder by such party to Lender, (b) no one of them will take any action to exercise or enforce any rights to such contribution, and (c) if any of Guarantor should receive any payment, satisfaction or security for any indebtedness of Borrower to any of Guarantor or for any contribution by the others of Guarantor for payment made hereunder by the recipient to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate for application on account of, or as security for, the Guaranteed Obligations and until so delivered, shall be held in trust for Lender as security for the Guaranteed Obligations.

(6) Guarantor agrees that, with or without notice or demand, Guarantor will reimburse Lender, to the extent that such reimbursement is not made by Borrower, for all reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by Lender in connection with the collection of the Guaranteed Obligations or any portion thereof or with the enforcement of this Guaranty.

(7) All moneys available to Lender for application in payment or reduction of the Guaranteed Obligations may be applied by Lender in such manner and in such amounts and at such time or times and in such order and priority as Lender may see fit to the payment or reduction of such portion of the Guaranteed Obligations as Lender may elect.

(8)     Guarantor hereby waives notice of the acceptance hereof, presentment, protest, notice of protest, or any and all notice of intention to accelerate, non-payment, non-performance or non-observance, or other proof, or notice or demand, whereby to charge Guarantor therefor. Guarantor shall receive the same notice and opportunity to cure given Borrower under the Loan Agreement, Note or Security Instrument, if any. At any time or from time to time and any number of times, without notice to or consent of Guarantor and without affecting the liability of Guarantor, (a) the time for payment of the principal of or interest on the Debt may be extended or the Debt may be renewed in whole or in part; (b) the time for Borrower's performance of or compliance with any covenant or agreement contained in the Note, the Security Instrument or any of the Other Loan Documents, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived; (c) the maturity of the Debt may be accelerated as provided in the Note, the Security Instrument, or any of the Other Loan Documents; (d) the Note, the Security Instrument, or any of the Other Loan Documents may be modified or amended by Lender and Borrower in any respect, including any increase in the principal amount of the Debt; and (e) any security for the Guaranteed Obligations may be modified, exchanged, surrendered or otherwise dealt with or additional security may be pledged or mortgaged for the Debt.

(9)     Guarantor further agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired (a) by reason of the assertion by Lender of any rights or remedies which it may have under or with respect to either the Note, the Security Instrument, or the Other Loan Documents, against any person obligated thereunder or against any owner of all or any portion of the Mortgaged Property (as defined in the Security Instrument), or (b) by reason of any failure to file or record any of such instruments or to take or perfect any security intended to be provided thereby, or (c) by reason of the release or exchange of any property covered by the Security Instrument or other collateral for the Loan, or (d) by reason of Lender's failure to exercise, or delay in exercising, any such right or remedy or any right or remedy Lender may have hereunder or in respect to this Guaranty, or (e) by reason of the commencement of a case under the Bankruptcy Code by or against any person obligated under the Note, the Security Instrument or the Other Loan Documents, or the death of any Guarantor, or (f) by reason of any payment made on the Debt or any other indebtedness arising under the Note, the Security Instrument or the Other Loan Documents, whether made by Borrower or Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Guaranteed Obligations, nor shall it have the effect of reducing the liability of Guarantor hereunder. It is further understood, that if Borrower shall have taken advantage of, or be subject to the protection of, any provision in the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against Borrower, including the exercise of any option Lender has to declare the Debt or any of the other Guaranteed Obligations due and payable on the happening of any default or event by which under the terms of the Note, the Security Instrument or the Other Loan Documents, the Debt or any of the other Guaranteed Obligations shall become due and payable, Lender may, as against Guarantor, nevertheless, declare the Debt or any of the other Guaranteed Obligations due and payable and enforce any or all of its rights and remedies against Guarantor provided for herein.

(10)     Guarantor further covenants that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of the Note, the Security Instrument, or any of the Other Loan Documents, that Lender shall not be under a duty to protect, secure or insure any security or lien provided by the Security Instrument or other such collateral, and that other indulgences or forbearance may be granted under any or all of such documents, all of which may be made, done or suffered without notice to, or further consent of, Guarantor.

(11)     As a further inducement to Lender to make the Loan and in consideration thereof, Guarantor further covenants and agrees (a) Guarantor will maintain a domicile, place of business or an agent for service of process in the state in which the Mortgaged Property is located (the "Property Jurisdiction") and give prompt notice to Lender of the address of any such domicile, place of business and of the name and address of any new agent appointed by it, as appropriate, (b) the failure of Guarantor's agent for service of process to give it notice of any service of process will not impair or affect the validity of such service or of any judgment based thereon, (c) if, despite the foregoing, there is for any reason no agent for service of process of Guarantor available to be served, and if Guarantor at that time has no place of business in the Property Jurisdiction then Guarantor irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in or pursuant to the first paragraph hereof, Guarantor hereby waiving personal service thereof, (d) that within thirty days after such mailing, Guarantor so served shall appear or answer to any summons and complaint or other process and should Guarantor so served fail to appear or answer within said thirty-day period, said Guarantor shall be deemed in default and judgment may be entered by Lender against the said party for the amount as demanded in any summons and complaint or other process so served, (e) with respect to any claim or action arising hereunder, Guarantor (i) irrevocably submits to the nonexclusive jurisdiction of the courts of Bell County in the State of Texas and the United States District Court located in Temple, Texas, and appellate courts from any thereof, (ii) irrevocably waives any objection which it may have at any time to the laying on venue of any suit, action or proceeding arising out of or relating to this Guaranty brought in any such court, and (iii) irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum, and (f) nothing in this Guaranty will be deemed to preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

(12)     This is a guaranty of payment and not of collection and upon any occurrence of an event of default under the Note, the Security Instrument or the Other Security Documents, after applicable notice and failure to cure as provided for in the Loan Agreement, Lender may, at its option, proceed directly and at once, without further notice, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrower or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying against any of the mortgaged property or other collateral for the Loan. Guarantor hereby waives the pleading of any statute of limitations as a defense to the obligation hereunder.

(13)     Guarantor hereby represents, warrants and certifies to Lender the following:

(a) Neither the Guarantor nor any general partner or controlling stockholder or managing member of the Guarantor, as applicable, is currently a debtor in any bankruptcy, reorganization, insolvency or similar proceeding;

(b) No material adverse change in the financial condition of the Guarantor or any general partner or controlling shareholder or managing member of the Guarantor, as applicable, has occurred since the respective dates of the most recent financial statements submitted to Lender;

(c) The Guarantor is not presently insolvent, and entering into and performing its obligations under this Guaranty will not render the Guarantor insolvent. As used herein, the term "insolvent" means that the sum total of all of an entity's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all of such entity's non-exempt assets, i.e., all of the assets of the entity that are available to satisfy claims of creditors; and

(d) After the Loan is made and this Guaranty executed and delivered, the Guarantor will have sufficient working capital to pay all of the Guarantor's outstanding debts as they come due.

(14) As security for the payment of the Guaranteed Obligations, each Guarantor hereby grants to Lender a security interest in and a contractual pledge and assignment of, and a right to setoff and apply against this Guaranty or the Guaranteed Obligations or both, at any time and from time to time, to the fullest extent permitted by applicable law, (without demand upon or notice to Guarantor with respect to the right of setoff, any such demand or notice being hereby expressly waived by Guarantor to the fullest extent permitted by applicable law), any and all money, property, accounts, securities, documents, chattel paper, claims, demands, instruments, items or deposits of Guarantor, and each of them, or to which any of them is a party now, held or hereafter coming within Lender's custody or control, including, but not limited to certificates of deposit and other depository accounts, whether same shall have matured or the exercise of Lender's rights result in loss of interest or other penalty on any such deposit. Without prior notice to or demand upon any Guarantor, Lender may exercise any rights granted herein, as well as other rights and/or remedies at law or in equity, all of which are cumulative, at any time when a default has occurred in any of the Guaranteed Obligations and is continuing. If any notice is required by law, Guarantor hereby agrees that ten (10) days notice shall be deemed reasonable.

(15) Each reference herein to Lender shall be deemed to include its successors and assigns, to whose favor the provisions of this Guaranty shall also inure. Each reference herein to Guarantor shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty.

(16) If any party hereto shall be a partnership, the agreements and obligations on the part of Guarantor herein contained shall remain in force and application notwithstanding any changes in the individuals composing the partnership and the term "Guarantor" shall include any altered or successive partnerships but the predecessor partnerships and their partners shall not thereby be released from any obligations or liability hereunder.

(17)  Guarantor (and its representative, executing below, if any) has full power, authority and legal right to execute this Guaranty and to perform all its obligations under this Guaranty.

(18)  All understandings, representations and agreements heretofore had with respect to this Guaranty are merged into this Guaranty which alone fully and completely expresses the agreement of Guarantor and Lender.

(19)  This Guaranty may be executed in one or more counterparts by some or all of the parties hereto, each of which counterparts shall be an original and all of which together shall constitute a single agreement of Guaranty. The failure of any party hereto to execute this Guaranty, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder. The liability of the Guarantors hereunder shall be joint and several with the liability of any other guarantors under separate guaranties.

(20)  **GOVERNING LAW AND VENUE.** THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS GUARANTY IS DEEMED EXECUTED IN AND IS PERFORMABLE IN BELL COUNTY, TEXAS. Any action or proceeding under or in connection with this Guaranty against Guarantors or any other party ever liable for payment of any sums of money payable on this Guaranty may be brought in any state court located in Bell County, Texas, or in the federal court in Bell County, Texas. Each of the Guarantors and each such other party hereby irrevocably: (i) submits to the nonexclusive jurisdiction of such courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.

## WAIVER OF CERTAIN LAWS

(21)  Additional Covenants. In addition to the covenants and agreements made in this Guaranty, each Guarantor further covenants and agrees with Lender as follows:

(22)  In the event an interest in any of the Collateral Property is foreclosed upon pursuant to a judicial or non-judicial foreclosure sale, each Guarantor agrees as follows. Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, each Guarantor agrees that Lender shall be entitled to seek a deficiency judgment from Borrower, Guarantors and any other Loan Party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Collateral Property was sold pursuant to judicial or non-judicial foreclosure sale. Each Guarantor expressly recognizes that this Section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Borrower, Guarantors and other persons against whom recovery of deficiencies is sought or any guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Collateral Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Each Guarantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Collateral Property for purposes of calculating deficiencies owed by Borrower, Guarantors, any other guarantor, and others against whom recovery of a deficiency is sought.

(23)    Alternatively, in the event the waiver provided for in Subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Collateral Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time): (i) the Collateral Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Collateral Property will be repaired or improved in any manner before a resale of the Collateral Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Collateral Property for cash promptly (but no later than twelve (12) months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Collateral Property, including, without limitation, brokerage commissions, title insurance, a survey of the Collateral Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Collateral Property shall be further discounted to account for any estimated holding costs associated with maintaining the Collateral Property pending sale, including, without limitation, utilities expenses, Collateral Property management fees, taxes and assessments (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Collateral Property must be given by persons having at least ten (10) years experience in appraising Collateral Property similar to the Collateral Property and who have conducted and prepared a complete written appraisal of the Collateral Property taking into consideration the factor set forth above.

IN WITNESS WHEREOF, each Guarantor has duly executed this Guaranty on or before the respective date(s) acknowledged below, to be effective for all purposes as of the date first written above.

NATIN PAUL

Address:        7800 Cava Place
                Austin, Texas 78735

WORLD CLASS CAPITAL GROUP, LLC

By:

Natin Paul, Manager

Address:        401 Congress Avenue, 33rd Floor
                Austin, Texas 78701

**NOTICE UNDER SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE**

**A LOAN AGREEMENT IN WHICH THE AMOUNT INVOLVED IN THE LOAN AGREEMENT EXCEEDS $50,000.00 IN VALUE IS NOT ENFORCEABLE UNLESS**

**THE AGREEMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE
BOUND OR BY THAT PARTY'S AUTHORIZED REPRESENTATIVE.**

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT
SUBJECT TO SUBSECTION (b) OF SECTION 26.02 OF THE TEXAS BUSINESS
& COMMERCE CODE SHALL BE DETERMINED SOLELY FROM THE
WRITTEN LOAN AGREEMENT, AND ANY PRIOR ORAL AGREEMENTS
BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THE
LOAN AGREEMENT.**

**THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT
BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE
OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF
THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

_____
NATIN PAUL

WORLD CLASS CAPITAL GROUP, LLC

By: _____
Natin Paul, Manager

FIRST STATE BANK CENTRAL TEXAS

By: _____
Printed Name: _____ Niwe Nko
Title: _____ SVP

THE STATE OF TEXAS            §

COUNTY OF Travis _____      §

This instrument was subscribed and acknowledged before me on the 18 __ day of April _____,
201 7 __, by NATIN PAUL.

_____
Notary Public in and for
The State of T E X A S

My commission expires: 10 /3 /20 __

LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846548

THE STATE OF TEXAS       §

COUNTY OF __Travis__       §

     This instrument was subscribed and acknowledged before me on the __16__ day of __April__ , 201 __7__ , by Natin Paul, Manager of WORLD CLASS CAPITAL GROUP, LLC, a Texas limited liability company, on behalf of said limited liability company.

Notary Public in and for
The State of T E X A S

My commission expires: __10 /3 /20__



LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846648

## EXHIBIT A

### (DESCRIPTION OF NOTE AND SECURITY INSTRUMENT)

(1)    Promissory Note dated April __26__, 2017, in the amount of $7,600,000.00, executed by WC TEAKWOOD PLAZA, LLC, payable to the order of FIRST STATE BANK CENTRAL TEXAS; and

(2)    Deed of Trust, Security Agreement and Financing Statement dated April __26__, 2017 executed by WC TEAKWOOD PLAZA, LLC, for the benefit of FIRST STATE BANK CENTRAL TEXAS.

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*
Dana DeBeauvoir, County Clerk
Travis County, Texas
Aug 24, 2020 02:35 PM    Fee: $38.00
**2020151969**
*Electronically Recorded*

# This page is intentionally added for electronic file stamp.

MORTGAGE ASSIGNMENT
($7,600,000.00)

## ASSIGNMENT OF NOTE AND SECURITY INSTRUMENTS

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF TRAVIS | § | |

BANCORPSOUTH BANK, a Mississippi banking corporation (the successor by merger to First State Bank, Central Texas, a Texas state banking association) (the "*Assignor*") for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to Assignor in hand paid by 8209 Burnet, L.P., a Delaware limited partnership (the "*Assignee*"), the receipt and sufficiency of which are hereby acknowledged, has GRANTED, TRANSFERRED and ASSIGNED WITHOUT RECOURSE, and does hereby GRANT, TRANSFER and ASSIGN WITHOUT RECOURSE, unto the Assignee, the following:

(a)     Promissory Note executed by WC Teakwood Plaza, LLC, a Delaware limited liability company (the "*Borrower*"), and payable to the order of First State Bank, Central Texas, a Texas state banking association,  dated April 26, 2017, in the original principal amount of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00), bearing loan number 11379300, and as such note may have been thereafter modified, amended, restated, or extended (collectively, the "*Note*") held by Assignor as successor by merger to First State Bank, Central Texas;

(b)     All rights, titles, interests, liens, security interests, pledges, privileges, claims, demands and equities existing and to exist in connection with, pertaining to, governing, guaranteeing, renewing, extending, modifying, or as security for the payment of the Note including, without limitation, the following

(i)     Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017, executed by Borrower for the benefit of Assignor, and recorded in the Official Public Records of Travis County, Texas under Document No. 2017066579, as such deed of trust may have been thereafter further modified, amended, restated or extended;;

(ii)     Collateral Assignment of Leases and Rents dated April 26, 2017, executed by Borrower for the benefit of Assignor, and recorded in the Official Public Records of Travis County, Texas under Document No. 2017066580, as it may have been thereafter further modified, amended, restated or extended;

(iii)     Loan Agreement dated April 26, 2017, by and between the Assignor, the Borrower, the Guarantors;

1

20170804.20190907/3795663.1

       (iv)    UCC Financing Statement recorded on April 28, 2017 under File No. 17-0014544632 with the Texas Secretary of State and UCC Financing Statement recorded on May 1, 2017 under Travis County Clerk's File No. 2017068684;

       (v)    Guaranty Agreements dated April 26, 2017 executed by Natin Paul and World Class Capital Group, LLC (collectively, the "***Guarantors***") for the benefit of the Assignor.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THAT LOAN SALE AGREEMENT DATED AUGUST 21, 2020 (THE "***Loan Sale Agreement***") EXECUTED BY THE ASSIGNOR, AS SELLER, AND ASSIGNEE, AS PURCHASER, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT ASSIGNOR HAS NOT MADE AND HEREBY DISCLAIMS ANY AND ALL REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, REGARDING ANY ASPECT OF THE ASSETS OR THE UNDERLYING REALTY, PERSONALTY OR INTANGIBLE PROPERTY SECURING THE NOTE (THE "***Mortgaged Premises***"), INCLUDING, BUT NOT LIMITED TO THOSE RELATING TO ENFORCEABILITY OR TERMS OF THE ASSETS, THE NATURE AND CONDITION OF THE ASSETS AND THE MORTGAGED PREMISES (INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, AND THE SUITABILITY THEREOF FOR ANY AND ALL ACTIVITIES AND USES WHICH ASSIGNEE MAY ELECT TO CONDUCT THEREON, AND THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS OF THE COLLATERAL), THE COMPLIANCE OF THE ASSETS OR MORTGAGED PREMISES WITH ALL APPLICABLE LAWS, ORDINANCES, RULES OR REGULATIONS (INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LAWS); (B) THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHERWISE AFFECTING THE MORTGAGED PREMISES; AND (C) THE COMPLIANCE OF THE ASSETS OR THE MORTGAGED PREMISES, OR ITS OPERATION, WITH ANY APPLICABLE LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY.

ASSIGNEE, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, EXPRESSLY ACCEPTS THE ASSIGNMENT OF THE ASSETS SUBJECT TO ALL OF THE TERMS, CONDITIONS, AGREEMENTS, DISCLAIMERS AND REPRESENTATIONS CONTAINED IN THE LOAN SALE AGREEMENT, INCLUDING, WITHOUT LIMITATION, THOSE SET FORTH IN SECTIONS 9 AND 11 THEREOF.

TO HAVE AND TO HOLD the Assets, together and along with all rights, titles, interests, privileges, claims, demands and equities under the foregoing instruments now or hereafter owned by Assignor, Assignor's successors or assigns, in connection therewith or as security therefor unto Assignee, its successors or assigns forever.

This transfer and assignment is made WITHOUT WARRANTY OR RECOURSE WHATSOEVER, except as expressly set forth in the Loan Sale Agreement.

20170804 20190907/3795663.1

2

This transfer and assignment is made WITHOUT WARRANTY OR RECOURSE WHATSOEVER, except as expressly set forth in the Loan Sale Agreement.

EXECUTED effective on this the $\underline{21}$ day of August, 2020.

**BANCORPSOUTH BANK**

By: _____

Name: _Billy J. Babineaux Jr_

Title: _Sr. Vice President_

STATE OF _Louisiana_ §
~~County~~ Parish OF _Lafayette_ §

On _August 21_____, 2020 before me, _Renée Rodrigue_____, a notary public, personally appeared _Billy J. Babineaux, Jr_, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Renée Rodrigue_____
(Seal)

**After Recording, Return to:**

8203 Burnet, L.P.
2726 Bissonnet St. #240-244
Houston, Texas 77005-1352

RENEE RODRIGUE
Notary Public
ID Number 150401
My Commission is For Life

EXHIBIT NO. 5                                        EX. 5-004



**HIRSCH & WESTHEIMER**
*Attorneys and Counselors*

T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

August 21, 2020

*Via CMRRR: 9414 7266 9904 2167 5085 85*
*and First Class U.S. Mail*

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Re:   Promissory Note (the "Note") dated April 26, 2017 in the original principal
      sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or
      "Borrower") and payable to BancorpSouth Bank, as successor by merger
      to First State Bank Central Texas, secured by a Deed of Trust, Security
      Agreement and Financing Statement dated April 26, 2017 (the "Deed of
      Trust") on 3.395 Acres in the City of Austin, Travis County, Texas, being
      all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the
      "Collateral" or the "Property") and guaranteed by Natin Paul and World
      Class Capital Group, LLC (collectively the "Guarantors").

Dear Sir or Madam:

      On August 21, 2020, BancorpSouth Bank, successor by merger to First
State Bank Central Texas (the "**Bank**") sold to 8209 Burnet, L.P. (the
"**Purchaser**") all of the Bank's ownership, right, title and interest in the Note,
Deed of Trust, Guaranty and related documents and instruments (collectively
the "**Loan**").

      Any and all future payments on the Note and all communications
regarding the Loan should be made to

      8209 Burnet, L.P.
      500 West 2nd Street, #1900
      Austin, Texas 78701

1415 Louisiana   36th Floor   Houston, Texas 77002   T. 713 223 5181   *hirschwest.com*

20170804.20190907/3797011.1

EXHIBIT NO. 6                                    EX. 6-001

WC Teakwood Plaza, LLC
August 21, 2020
Page 2

Should you have any further questions, please direct your inquiries to the Purchaser.

Sincerely,

HIRSCH & WESTHEIMER, P.C.

By: */s/ Michael J. Durrschmidt*
Michael J. Durrschmidt

cc:  Natin Paul
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul
*Via CMRRR: 9414 7266 9904 2167 5085 54*

World Class Capital Group, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul
*Via CMRRR: 9414 7266 9904 2167 5085 78*

Linda Thong
World Class
244 Fifth Avenue, Suite 2200
New York, New York 10001
*Via CMRRR: 9414 7266 9904 2167 5086 15*

Maryann Norwood
World Class
814 Lavaca St.
Austin, Texas 78701
*Via email: mnorwood@world-class.com*

Brian Elliott
World Class Global Business Services
814 Lavaca St.
Austin, Tx 78701
*Via email: belliott@world-class.com*

20170804.20190907/3797011.1

EXHIBIT NO. 6

EX. 6-002

# BRACEWELL

August 25, 2020

**BY E-MAIL AND CMRRR**

Maryann Norwood
WC Teakwood Plaza, LLC
814 Lavaca Street
Austin, Texas 78701
mnorwood@world-class.com

Re:     September 1, 2020 foreclosure sale for that certain property secured by the Promissory Note (the "Note") dated April 26, 2017, in the original principal sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or "Borrower") and payable to 8209 Burnet, LP, a Delaware limited partnership ("Lender"), successor by assignment to BancorpSouth Bank, as successor by merger to First State Bank Central Texas (the "Loan"), secured by a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017 (the "Deed of Trust") on 3.95 Acres and the Loan in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the "Collateral" or the "Property") and guaranteed by Natin Paul and World Class Capital Group, LLC (collectively the "Guarantors")

Dear Ms. Norwood:

I write in response to your August 21, 2020 correspondence to Mr. Durrschmidt, counsel to BancorpSouth Bank ("Original Lender").  I am counsel to 8209 Burnet, LP, which on August 21, 2020, acquired from Original Lender all of Original Lender's rights, title, and interest in and to the Loan and the Loan Documents[1] under that certain Assignment of Note and Security Instruments, which was duly recorded on August 24, 2020, in the Office of the County Clerk of Travis County, Texas in Instrument No. 2020151969 and is attached hereto as Exhibit 1.  Original Lender sent you notice of such assignment on August 24, 2020, a copy of which is attached as Exhibit 2.

Lender is aware of the Attorney General's "Informal Guidance" but disagrees with Borrower's characterization of same in your letter.  Therefore, Lender does not agree to withdraw the Notice of Trustee's Sale of the Property schedule for September 1.

The Informal Guidance regarding foreclosure sales in Texas changes nothing in connection with the September 1 non-judicial foreclosure sale on the Property at issue.  Contrary to your characterization, the AG's "Informal Guidance" does not "confirm[] that foreclosure sales that have not been specifically approved by the Mayor of the city in which they will take place cannot satisfy the public sale requirement

---

[1] The Note, the Deed of Trust, the Collateral Assignment of Leases and Rents, the Guaranty Agreements and Financing Statements are collectively referred to herein as the "Loan Documents."

**Christopher L. Dodson**
Partner

T: +1.713.221.1373     F: +1.800.404.3970
711 Louisiana Street, Suite 2300, Houston, Texas 77002-2770
chris.dodson@bracewell.com     bracewell.com

EXHIBIT NO. 7                                        EX. 7-001

Maryann Norwood
August 25, 2020
Page 2

under Texas Property Code Chapter 51." Ltr. at 1. Rather, it states that a foreclosure sale may not proceed if more than 10 "willing bidders" are in attendance unless approved by the mayor. Exhibit 3.

While Borrower contends that the "proposed foreclosure sale will not satisfy the public sale requirement in the Texas Property Code," at this time, there is no evidence or suggestion that the September 1 foreclosure sale for this Property will be attended by more than 10 willing bidders, so it would be inappropriate to preemptively cancel the foreclosure sale on this basis. Ltr. at 3. Lender is aware of the relevant gathering restrictions, other state and local health and safety guidelines, and the AG's Informal Guidance, and Lender will fully comply therewith in conducting the foreclosure sale.

Moreover, the Informal Guidance states "this letter is not a formal Attorney General opinion under section 402.042 of the Texas Government Code; rather, it is intended only to convey informal legal guidance." Ex. 3 at 4. The Informal Guidance, therefore, does not deserve the weight Borrower recommends. Attorney general opinions, especially informal ones, are "not controlling on the courts." *See Comm'rs Ct. of Titus Cty. v. Agan*, 940 S.W.2d 77, 82 (Tex. 1997) (disagreeing with Attorney General's opinion).

Finally, as I am sure you are aware, your colleague, Brian Elliott, unsuccessfully made this same argument related to the August foreclosure sale in *Colorado Third Street, LLC v. WC 4th and Colorado, LP*, Cause No. D-1-GN-20-002781. In spite of this argument, a Travis County district court denied Mr. Elliott's request to enjoin a foreclosure sale in August. And after the issuance of this Informal Guidance, other foreclosure sales occurred in Travis County in August, without express Mayoral approval.

For all of these reasons, Lender intends to proceed with the posted foreclosure sale on September 1. If Borrower intends to seek legal action in connection with the Loan, we request that you provide us with notice as required by the Texas Rules and Travis County Local Rules.

Very truly yours,

Christopher L. Dodson

CLD
Enclosure

cc:     Mr. Brian Elliott
        814 Lavaca Street
        Austin, Texas 78701
        By Email: belliott@world-class.com

#6223895

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas
Aug 24, 2020 02:35 PM    Fee: $38.00
**2020151969**
*Electronically Recorded**

# This page is intentionally added for electronic file stamp.

MORTGAGE ASSIGNMENT
($7,600,000.00)

**ASSIGNMENT OF NOTE AND SECURITY INSTRUMENTS**

THE STATE OF TEXAS      §
                         §      KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TRAVIS      §

BANCORPSOUTH BANK, a Mississippi banking corporation (the successor by merger to First State Bank, Central Texas, a Texas state banking association) (the "***Assignor***") for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to Assignor in hand paid by 8209 Burnet, L.P., a Delaware limited partnership (the "***Assignee***"), the receipt and sufficiency of which are hereby acknowledged, has GRANTED, TRANSFERRED and ASSIGNED WITHOUT RECOURSE, and does hereby GRANT, TRANSFER and ASSIGN WITHOUT RECOURSE, unto the Assignee, the following:

    (a)    Promissory Note executed by WC Teakwood Plaza, LLC, a Delaware limited liability company (the "***Borrower***"), and payable to the order of First State Bank, Central Texas, a Texas state banking association, dated April 26, 2017, in the original principal amount of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00), bearing loan number 11379300, and as such note may have been thereafter modified, amended, restated, or extended (collectively, the "***Note***") held by Assignor as successor by merger to First State Bank, Central Texas;

    (b)    All rights, titles, interests, liens, security interests, pledges, privileges, claims, demands and equities existing and to exist in connection with, pertaining to, governing, guaranteeing, renewing, extending, modifying, or as security for the payment of the Note including, without limitation, the following

        (i)    Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017, executed by Borrower for the benefit of Assignor, and recorded in the Official Public Records of Travis County, Texas under Document No. 2017066579, as such deed of trust may have been thereafter further modified, amended, restated or extended;;

        (ii)    Collateral Assignment of Leases and Rents dated April 26, 2017, executed by Borrower for the benefit of Assignor, and recorded in the Official Public Records of Travis County, Texas under Document No. 2017066580, as it may have been thereafter further modified, amended, restated or extended;

        (iii)    Loan Agreement dated April 26, 2017, by and between the Assignor, the Borrower, the Guarantors;

1

20170804.20190907/3795663.1

(iv)    UCC Financing Statement recorded on April 28, 2017 under File No. 17-0014544632 with the Texas Secretary of State and UCC Financing Statement recorded on May 1, 2017 under Travis County Clerk's File No. 2017068684;

(v)    Guaranty Agreements dated April 26, 2017 executed by Natin Paul and World Class Capital Group, LLC (collectively, the "***Guarantors***") for the benefit of the Assignor.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THAT LOAN SALE AGREEMENT DATED AUGUST 21, 2020 (THE "***Loan Sale Agreement***") EXECUTED BY THE ASSIGNOR, AS SELLER, AND ASSIGNEE, AS PURCHASER, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT ASSIGNOR HAS NOT MADE AND HEREBY DISCLAIMS ANY AND ALL REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, REGARDING ANY ASPECT OF THE ASSETS OR THE UNDERLYING REALTY, PERSONALTY OR INTANGIBLE PROPERTY SECURING THE NOTE (THE "***Mortgaged Premises***"), INCLUDING, BUT NOT LIMITED TO THOSE RELATING TO ENFORCEABILITY OR TERMS OF THE ASSETS, THE NATURE AND CONDITION OF THE ASSETS AND THE MORTGAGED PREMISES (INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, AND THE SUITABILITY THEREOF FOR ANY AND ALL ACTIVITIES AND USES WHICH ASSIGNEE MAY ELECT TO CONDUCT THEREON, AND THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS OF THE COLLATERAL), THE COMPLIANCE OF THE ASSETS OR MORTGAGED PREMISES WITH ALL APPLICABLE LAWS, ORDINANCES, RULES OR REGULATIONS (INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LAWS); (B) THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHERWISE AFFECTING THE MORTGAGED PREMISES; AND (C) THE COMPLIANCE OF THE ASSETS OR THE MORTGAGED PREMISES, OR ITS OPERATION, WITH ANY APPLICABLE LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY.

ASSIGNEE, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, EXPRESSLY ACCEPTS THE ASSIGNMENT OF THE ASSETS SUBJECT TO ALL OF THE TERMS, CONDITIONS, AGREEMENTS, DISCLAIMERS AND REPRESENTATIONS CONTAINED IN THE LOAN SALE AGREEMENT, INCLUDING, WITHOUT LIMITATION, THOSE SET FORTH IN SECTIONS 9 AND 11 THEREOF.

TO HAVE AND TO HOLD the Assets, together and along with all rights, titles, interests, privileges, claims, demands and equities under the foregoing instruments now or hereafter owned by Assignor, Assignor's successors or assigns, in connection therewith or as security therefor unto Assignee, its successors or assigns forever.

This transfer and assignment is made WITHOUT WARRANTY OR RECOURSE WHATSOEVER, except as expressly set forth in the Loan Sale Agreement.

EXHIBIT NO. 7                                    EX. 7-005

This transfer and assignment is made WITHOUT WARRANTY OR RECOURSE WHATSOEVER, except as expressly set forth in the Loan Sale Agreement.

EXECUTED effective on this the _21_ day of August, 2020.

BANCORPSOUTH BANK

By: _____

Name: _Billy J. Babineaux Jr_

Title: _Sr. Vice President_

STATE OF _Louisiana_ §

~~COUNTY~~ Parish OF _Lafayette_ §

On _August 21_____, 2020 before me, _Renée Rodrigue_____, a notary public, personally appeared _Billy J. Babineaux, Jr_, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Renée Rodrigue_____
(Seal)

**After Recording, Return to:**

8203 Burnet, L.P.
2726 Bissonnet St. #240-244
Houston, Texas 77005-1352

RENEE RODRIGUE
Notary Public
ID Number 150401
My Commission is For Life

3

EXHIBIT NO. 7                    EX. 7-006



HIRSCH & WESTHEIMER
*Attorneys and Counselors*

T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

August 21, 2020

*Via CMRRR: 9414 7266 9904 2167 5085 85*
*and First Class U.S. Mail*

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Re:  Promissory Note (the "Note") dated April 26, 2017 in the original principal sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or "Borrower") and payable to BancorpSouth Bank, as successor by merger to First State Bank Central Texas, secured by a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017 (the "Deed of Trust") on 3.395 Acres in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the "Collateral" or the "Property") and guaranteed by Natin Paul and World Class Capital Group, LLC (collectively the "Guarantors").

Dear Sir or Madam:

On August 21, 2020, BancorpSouth Bank, successor by merger to First State Bank Central Texas (the "**Bank**") sold to 8209 Burnet, L.P. (the "**Purchaser**") all of the Bank's ownership, right, title and interest in the Note, Deed of Trust, Guaranty and related documents and instruments (collectively the "**Loan**").

Any and all future payments on the Note and all communications regarding the Loan should be made to

8209 Burnet, L.P.
500 West 2nd Street, #1900
Austin, Texas 78701

1415 Louisiana   36th Floor   Houston, Texas 77002   T. 713 223 5181   *hirschwest.com*

20170804.20190907/3797011.1

EXHIBIT NO. 7

EX. 7-007

WC Teakwood Plaza, LLC
August 21, 2020
Page 2


Should you have any further questions, please direct your inquiries to the Purchaser.

Sincerely,

HIRSCH & WESTHEIMER, P.C.


By: */s/ Michael J. Durrschmidt*
Michael J. Durrschmidt

cc:  Natin Paul
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul
*Via CMRRR: 9414 7266 9904 2167 5085 54*

World Class Capital Group, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul
*Via CMRRR: 9414 7266 9904 2167 5085 78*

Linda Thong
World Class
244 Fifth Avenue, Suite 2200
New York, New York 10001
*Via CMRRR: 9414 7266 9904 2167 5086 15*

Maryann Norwood
World Class
814 Lavaca St.
Austin, Texas 78701
*Via email: mnorwood@world-class.com*

Brian Elliott
World Class Global Business Services
814 Lavaca St.
Austin, Tx 78701
*Via email: belliott@world-class.com*

EXHIBIT NO. 7                    EX. 7-008



# KEN PAXTON

ATTORNEY GENERAL OF TEXAS

August 1, 2020

Honorable Bryan Hughes
Texas Senate
P.O. Box 12068
Capitol Station
Austin, TX 78711

Dear Senator Hughes,

You ask whether local governmental bodies have authority to limit in-person attendance at a judicial or non-judicial foreclosure sale to 10 persons or fewer. Your question concerns local emergency orders restricting or delaying such sales during the current COVID-19 pandemic. We conclude that a foreclosure sale of residential or commercial real property that is conducted outdoors is subject to the limitation on outdoor gatherings in excess of 10 persons imposed by Executive Order GA-28. Accordingly, an outdoor foreclosure sale may not proceed with more than 10 persons in attendance unless approved by the mayor in whose jurisdiction the sale occurs, or if in an unincorporated area, the county judge. However, to the extent a sale is so limited, and willing bidders who wish to attend are not allowed to do so as a result, the sale should not proceed as it may not constitute a "public sale" as required by the Texas Property Code.

When a mortgage loan is in default, a mortgagee may elect to institute either a judicial foreclosure or, when permitted by the deed of trust, a non-judicial foreclosure.[1] A judicial foreclosure begins with a lawsuit to establish the debt and fix the lien.[2] The judgment in a foreclosure lawsuit generally provides that an order of sale issue to any sheriff or constable directing them to seize the property and sell it under execution in satisfaction of the judgment.[3] After the sale is completed, the sheriff or other officer must provide to the new buyer possession of the property within 30 days.[4]

---

[1] *Bonilla v. Roberson*, 918 S.W.2d 17, 21 (Tex. App.—Corpus Christi 1996, no writ).

[2] *Id.* at 21.

[3] TEX. R. CIV. P. 309; *but see id.* (excepting judgments against executors, administrators, and guardians from orders of sale). The procedures for the sale under judicial foreclosure generally follow the same procedures as sales under non-judicial foreclosures. *Compare id.* 646a–648 *with* TEX. PROP. CODE § 51.002.

[4] TEX. R. CIV. P. 310.

A non-judicial foreclosure, in turn, must be expressly authorized in a deed of trust.[5] The Property Code prescribes the minimum requirements for a non-judicial sale of real property under a power of sale conferred by a deed of trust or other contract lien.[6] The Code requires that a sale under a non-judicial foreclosure be "a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month," unless that day is January 1 or July 4, in which cases the sale must be held on the first Wednesday of the month.[7] The deed of trust or other loan document can establish additional requirements, and if such requirements are established, those requirements must likewise be satisfied in order for there to be a valid foreclosure sale.[8]

We understand that many foreclosure sales in Texas, both judicial and non-judicial, are held outdoors. Frequently, such sales occur on the steps of a courthouse.

With this background in mind, we address your question concerning attendance limitations. Governor Abbott ordered in Executive Order GA-28 that "every business in Texas shall operate at no more than 50 percent of the total listed occupancy of the establishment."[9] This general limitation, however, is subject to several exceptions. One such exception is found in paragraph five of the order, which limits outdoor gatherings to 10 persons or fewer without approval by the mayor or, in the case of unincorporated territory, the county judge in whose jurisdiction the gathering occurs.[10] Accordingly, to the extent a foreclosure sale occurs outdoors, attendance at the sale is limited to 10 persons or fewer unless greater attendance is approved by the relevant mayor or county judge.

While certain services are exempt from the outdoor gathering limitation in Executive Order GA-28, we do not conclude that foreclosure sales are included within them. Executive Order GA-28 exempts from its limitations on outdoor gatherings services described in paragraphs 1, 2, and 4 of the order. Relevant here, paragraph 1 exempts from capacity limitations, *inter alia*, "any services listed by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Workforce, Version 3.1 or any subsequent version."[11] (CISA Guidance). Among the services listed in version 3.1 of

---

[5] *See* TEX. PROP. CODE § 51.002.

[6] *See id.* § 51.002.

[7] *Id.* §§ 51.002(a), (a-1); *see also id.* § 51.002(h) (requiring a sale to be held on or after the 90th day after the date the commissioners court records a designation of a sale at an area other than an area at the county courthouse).

[8] *See Bonilla*, 918 S.W.2d at 21.

[9] Gov. Greg Abbott Exec. Order GA-28.

[10] *Id.* at 3 (as amended by Gov. Greg Abbott Proc. of July 2, 2020).

[11] *Id.* at 2.

EXHIBIT NO. 7                                                              EX. 7-010

the CISA Guidance are "[r]esidential and commercial real estate services, including settlement services."[12]

A court's main objective in construing the law is to give effect to the intent of its provisions.[13] And there is no better indication of that intent than the words that are chosen.[14] One dictionary defines a "service" as "[w]ork that is done for others as an occupation or business."[15] A periodic foreclosure auction conducted at a courthouse— whether by an officer of the court, an attorney, an auction professional, or another person serving as trustee[16]—does not constitute the type of dedicated real estate service work contemplated by the CISA Guidance. Accordingly, we conclude that outdoor foreclosure sales are not exempted from the 10-person attendance limitation imposed by paragraph 5 of Executive Order GA-28.

If a foreclosure sale is subject to, and not exempted from, the 10-person attendance limit imposed in Executive Order GA-28, it should not proceed if one or more willing bidders are unable to participate because of the attendance limit. "[A] sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a *public sale* at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month."[17] The purpose of the public sale requirement is to "secure the attendance of purchasers and obtain a fair price for the property."[18] Strict compliance with the Property Code is required for a trustee to properly make a foreclosure sale.[19] If an attendance limit precludes the conduct of a public sale for the purpose of securing sufficient bidders to obtain a fair price, the propriety of a foreclosure auction may be called into question. Accordingly, to the extent attendance at a foreclosure sale is limited to ten or fewer persons, and that limit precludes the attendance of one or more willing bidders who otherwise would have appeared in person, the sale should not go forward as it likely would not comport with the Property Code requirement that the sale be a "public sale."

---

[12] *See* Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response, at 16, available at https://www.cisa.gov/sites/default/files/publications/Version_3.1_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers.pdf.

[13] *See Summers*, 282 S.W.3d at 437.

[14] *See id.* ("Where text is clear, text is determinative of that intent.").

[15] Am. Heritage Dictionary (5th ed. 2020), available at https://www.ahdictionary.com/word/search.html?q=service; *see also Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) (applying an undefined term's ordinary meaning, unless the context of the law in which the term appears suggests a different or more precise definition).

[16] The Texas Property Code does not set forth specific professional requirements for a foreclosure trustee, providing only that "[o]ne or more persons may be authorized to exercise the power of sale under a security instrument." TEX. PROP. CODE § 51.007(a).

[17] TEX. PROP. CODE § 51.002(a) (emphasis added).

[18] *Reisenberg v. Hankins*, 258 S.W. 904, 910 (Tex. Civ. App.–Amarillo 1924, writ dismissed w.o.j.).

[19] *Myrad Props. v. LaSalle Bank Nat'l Assoc.*, 252 S.W.3d 605, 615 (Tex. App.–Austin 2008), *rev'd on other grounds*, 300 S.W.3d 746 (Tex. 2009).

EXHIBIT NO. 7                                                                EX. 7-011

We trust this letter provides you with the advice you were seeking. Please note this letter is not a formal Attorney General opinion under section 402.042 of the Texas Government Code; rather, it is intended only to convey informal legal guidance.

Sincerely,

Ryan Bangert
Deputy First Assistant Attorney General

EXHIBIT NO. 7                                                    EX. 7-012



T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

July 2, 2020

*Via CMRRR: 9414 7266 9904 2167 5063 83
and First Class U.S. Mail*

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Re:     Promissory Note (the "Note") dated April 26, 2017 in the original principal
        sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or
        "Borrower") and payable to BancorpSouth Bank, as successor by merger
        to First State Bank Central Texas, secured by a Deed of Trust, Security
        Agreement and Financing Statement dated April 29, 2017 on 3.95 Acres
        in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion
        of Lot 1, Allandale North Section Five (the "Collateral" or the "Property")
        and guaranteed by Natin Paul and World Class Capital Group, LLC
        (collectively the "Guarantors").

Dear Sir or Madam:

        This law firm represents BancorpSouth Bank, successor by merger to
First State Bank Central Texas (the "Bank") in connection with the above-
referenced Note. As you know, the Note is delinquent.

        Pursuant to the Collateral Assignment of Leases and Rents dated April
26, 2017, executed by the Borrower for the benefit of the Bank, please provide
us with the names, addresses, the current lease for each tenant occupying a
rental space on the Property, and the current rent roll for the Property.

        Demand is hereby made for the immediate payment of the delinquent
payments. The Note is currently past due in the amount of One Hundred Ninety-
Four Thousand Three Hundred Twenty-Five and 86/100 Dollars ($194,325.86).
In the event the Bank has not received $194,325.86 by 4:30 p.m. C.S.T. on July
12, 2020, then the Bank will accelerate the Note and has instructed us thereafter
to take legal action against the Maker and Guarantor and pursue the Bank's
remedies as to the Collateral.

20170804.20190907/3724640.1

EXHIBIT NO. 8                                                            EX. 8-001

WC Teakwood Plaza, LLC
July 2, 2020
Page 2

If any payment by check is returned due to insufficient funds or for any other reason, "good funds" will not have been received.  No extension of time will be granted due to the return of payment.  The Bank reserves the right to accept or reject a partial payment of the total due without waiving any of its rights herein or otherwise.

The Bank reserves all of its rights, remedies, and recourses against the Maker and Guarantors under the Note and Guaranty Agreements.  This demand for payment is being made pursuant to section 38.001 of the Texas Civil Practice and Remedies Code and, as such, the Maker and Guarantors may be liable, in accordance with the terms of the Note and Guaranty Agreements, not only for the outstanding principal balance due and owing together with interest as it accrues at the pre- and post-maturity rate, but also for collection costs, including attorney fees.

By transmitting this demand to you, nothing is intended to suggest that all of the Bank's rights and remedies have been set forth.  Nothing contained in this letter is a waiver of the Bank's rights or remedies, under the Note or any of the other loan documents, at law or in equity.  Specifically, but not by way of limitation, the Maker and Guarantors continue to waive all notices consistent with the loan documents.

The Maker and Guarantors are not entitled to rely upon any oral statements made or purported to be made by or on behalf of the Bank in connection with any alleged agreement by the Bank to refrain from exercising any of its rights in connection with the indebtedness.  Acceptance by the Bank, or any other parties, on behalf of the Bank, of any debt service payment does not, and will not, constitute a waiver of any of the rights, remedies or recourses available under the loan documents, at law, or in equity.  Application of such payments should in no way be construed as a modification, rearrangement, or extension of the existing loan documents.

*This is an attempt to collect a debt and any information will be used for that purpose.*

Sincerely,

HIRSCH & WESTHEIMER, P.C.

By:*/s/ Michael J. Durrschmidt*
Michael J. Durrschmidt

WC Teakwood Plaza, LLC
July 2, 2020
Page 3


cc:     Natin Paul
        c/o World Class
        814 Lavaca St.
        Austin, Texas 78701
        Attn: Natin Paul
        *Via CMRRR: 9414 7266 9904 2167 5063 90*

        World Class Capital Group, LLC
        c/o World Class
        814 Lavaca St.
        Austin, Texas 78701
        Attn: Natin Paul
        *Via CMRRR: 9414 7266 9904 2167 5064 06*

        Linda Thong
        World Class
        244 Fifth Avenue, Suite 2200
        New York, New York 10001
        *Via CMRRR: 9414 7266 9904 2167 5064 13*

        Maryann Norwood
        World Class
        814 Lavaca St.
        Austin, Texas 78701
        *Via email: mnorwood@world-class.com*

EXHIBIT NO. 8                                    EX. 8-003

# USPS Tracking®

FAQs >

## Track Another Package  +

**Tracking Number:** 9414726699042167506383

Remove ✕

Your item was delivered to an individual at the address at 1:28 pm on July 8, 2020 in
AUSTIN, TX 78701.

## ⊘ Delivered

July 8, 2020 at 1:28 pm
Delivered, Left with Individual
AUSTIN, TX 78701

**Get Updates** ⌄

Feedback

| Text & Email Updates | ⌄ |

| Tracking History | ⌄ |

| Product Information | ⌄ |

See Less ⌃

EXHIBIT NO. 8                                        EX. 8-004

**Tracking Number:** 9414726699042167506390                    Remove ✕

Your item has been delivered to an agent for final delivery in AUSTIN, TX 78701 on July 6, 2020 at 12:41 pm.

### ⊘ Delivered to Agent

July 6, 2020 at 12:41 pm
Delivered to Agent for Final Delivery
AUSTIN, TX 78701

**Get Updates** ⌄

See More ⌄

Feedback

**Tracking Number:** 9414726699042167506406                    Remove ✕

Your item has been delivered to an agent for final delivery in AUSTIN, TX 78701 on July 6, 2020 at 12:41 pm.

### ⊘ Delivered to Agent

July 6, 2020 at 12:41 pm
Delivered to Agent for Final Delivery
AUSTIN, TX 78701

**Get Updates** ⌄

See More ⌄

EXHIBIT NO. 8                         EX. 8-005

20-01061-tmd  Doc#1-1  Filed 10/09/20  Entered 10/09/20 15:43:17  State Court Pleadings
Pg 285 of 609

**Tracking Number:** 9414726699042167506413                    Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 12:28 pm on July 7, 2020 in NEW YORK, NY 10001.

## ⊘ Delivered

July 7, 2020 at 12:28 pm
Delivered, Front Desk/Reception/Mail Room
NEW YORK, NY 10001

**Get Updates** ∨

**See More** ∨

Feedback

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**

EXHIBIT NO. 8                                      EX. 8-006

## AFFIDAVIT OF JUSTIN BAYNE

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Justin Bayne, who after being duly sworn under oath, deposed as follows:

1.      My name is Justin Bayne.  I am over the age of eighteen years of age, of sound mind, and fully competent to make this affidavit. I have personal knowledge of the facts set forth in this affidavit, and they are true and correct. I obtained personal knowledge of these facts from my work experience as the President of 8209 Burnet, L.P. ("Lender").

2.      Lender is a privately held member-managed Delaware limited partnership, is duly organized and validly existing under the laws of the State of Delaware, is in good standing, and has the power to own its assets and to transact the business in which it is presently engaged.  Lender is registered to do business in the State of Texas.  The Lender's principal place of business is 500 West 2nd Street, Suite 1900, Austin, Texas 78701-4687. I am the President of Lender with the power and authority to manage the business affairs of the Lender with authority to make all decisions and take all actions for the Lender. Lender is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations) and Lender's U.S. Employer Identification Number is 85-1374717.

3.      On April 26, 2017, BancorpSouth Bank, as successor by merger First State Bank Central Texas (the "Original Lender"), issued a loan, in an original principal sum of $7,600,000 (as amended, supplemented or otherwise modified from time to time prior to the date hereof, the "Loan"), to WC Teakwood Plaza, LLC (the "Borrower"). The Loan is evidenced by that certain

1

promissory note (the "Note") dated April 26, 2017 and by that certain loan agreement dated April 26, 2017 (the "Loan Agreement"). A true and correct copy of the Note and the Loan Agreement, respectively, are attached to Lender's Response in Opposition to Borrower's Application for Temporary Injunction ("Lender's Response") as Exhibit 1 and Exhibit 2. Natin ("Nate") Paul and World Class Capital Group, LLC are guarantors of the Note and certain other related obligations under that certain Guaranty Agreement effective as of April 26, 2017 ("Guarantors"). A true and correct copy of the Guaranty is attached to Lender's Response as Exhibit 4.

4.      As security for the Loan, Borrower executed and delivered to Original Lender a Deed of Trust dated April 26, 2017 (the "Deed of Trust") pursuant to which Borrower granted to Original Lender a first priority deed of trust lien on and security interest in the Property located at 8209 Burnet Road, Austin, Texas, and on all of Borrower's personal property, both tangible and intangible (all of the foregoing, as described in the Deed of Trust, collectively, the "Property"). A true and correct copy of the Deed of Trust is attached to Lender's Response as Exhibit 3.

5.      As additional security for the Loan, Borrower executed and delivered to Original Lender a Collateral Assignment of Leases and Rents dated April 26, 2017 (the "Assignment of Rents"), and recorded at 2017066580 in Travis County, Texas pursuant to which, Lender as Assignee, is entitled to collect rents, revenues, issues, profits, proceeds, receipts, income, accounts, and other receivables on Property. A true and correct copy of the Assignment of Rents is attached to Lender's Response as Exhibit 16.

6.      The Loan Agreement and Deed of Trust allow Lender to fully accelerate the Note in the Event of Default. Failure to pay an installment when due, after applicable notice and failure to cure, constitutes an Event of Default under the Loan Documents.

EXHIBIT NO. 9                                                           EX. 9-002

7.      Original Lender transferred all of its right, title and interest in and to the Loan and Loan Documents to 8209 Burnet, L.P. pursuant to that certain Assignment of Note and Security Instruments (the "Assignment") dated August 21, 2020, at which time the principal balance of the Note was $7,147,893.39.  The Assignment was duly recorded on August 24, 2020 as Instrument Number 2020151969 in the Official Public Records of Travis County, Texas.  A true and correct copy of the Assignment is attached to Lender's Response as <u>Exhibit 5</u>.  Since August 21, 2020, Lender is the owner and holder of the original Note with Allonge affixed.

8.      From my review of the Loan Documents file provided to Lender by Original Lender, I know that the Borrower has made no payments on the Note since February 9, 2020.  On July 2, 2020, a notice of default and demand for payment of delinquent payments in the amount of $194,325.86 was made to Borrower and Guarantors by Original Lender. A true and correct copy of the Notice of Default is attached to Lender's Response as <u>Exhibit 8</u>. The notice also informed Borrower that if payment was not received within ten days, then the Original Lender would "accelerate the Note" and take any further legal action necessary.  Borrower did not cure the event of default.  Therefore, on July 23, 2020, Original Lender sent Borrower a Notice of Acceleration, demanding full payment of the Note, at which time all principal of $7,147,893.39 and accrued interest of $171,122.49 was due and payable.  A true and correct copy of the Notice of Acceleration is attached to Lender's Response as <u>Exhibit 10</u>.  Original Lender also provided Lender with a Loan History reflecting that the fully accelerated Note had not been paid and that no payments on the Note had been made since the Note was accelerated on July 23, 2020. A true and correct copy of the Loan History is attached to Lender's Response as <u>Exhibit 28.</u>

9.      On August 10, 2020, with the event of default uncured, Original Lender posted the Property for non-judicial foreclosure sale in Travis County. A true and correct copy of the Notice

EXHIBIT NO. 9                                                                    EX. 9-003

of Substitute Trustee's Sale is attached to Lender's Response as <u>Exhibit 11.</u> The Property was

scheduled for foreclosure sale on September 1, 2020. On August 31, 2020, Borrower obtained a

temporary restraining order enjoining the foreclosure sale. The Borrower has made no payments

on the Note since the date of the Assignment.

10.     As of September 1, 2020, the amount of outstanding principal and interest on the

Note is $7,387,112.96. This amount does not include attorney's fees, court costs, and collection

expenses incurred to date, and does not include default interest after September 1, 2020 all of

which continue to accrue.

11.     The Note was fully accelerated on July 23, 2020. As of the date of this Affidavit,

the Borrower has not made a payment on the Note.

12.     The Assignment of Rents entitles Lender to collect rents if an uncured Event of

Default exists. Ex. 16 at Art. 3.02. Original Lender provided Borrower with a Notice Demanding

Rent and Rent Proceeds on July 6, 2020. A true and correct copy of the Notice Demanding Rent

and Rent Proceeds is attached to Lender's Response as <u>Exhibit 32</u>. As of the date of this Affidavit,

Borrower has not remitted rental income to Original Lender or the Lender. Borrower therefore

continues to receive and hold rental income that is owed to Lender and continues to fail to pay off

the fully-accelerated Note. If Lender is enjoined from exercising its rights under the Deed of Trust

to foreclose on the Property, Lender will suffer $43,307.53 in lost monthly tenant rents, monthly

payment collections and other expenses it is due.

Justin Bayne
President, 8209 Burnet, LP

SIGNED AND SWORN BEFORE ME on the 9 th day of September 2020, by Justin Bayne.

ROBERT HEED
Notary ID # 130945762
My Commission Expires
December 29, 2020

Notary Public

My Commission Expires: 12/29/20

*[Signature Page of Business Records Affidavit of Justin Bayne]*

5



T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

July 23, 2020

NOTICE OF ACCELERATION

*Via CMRRR: 9414 7266 9904 2167 5072 05
and U.S. First Class Mail*

WC Teakwood Plaza
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

RE:    Promissory Note (the "*Note*") dated April 26, 2017 in the original principal sum
of $7,600,000 executed by WC Teakwood Plaza, LLC ("*Maker*" or "*Borrower*")
and payable to BancorpSouth Bank, as successor by merger to First State Bank
Central Texas, secured by a Deed of Trust, Security Agreement and Financing
Statement dated April 26, 2017 (the "*Deed of Trust*") on 3.95 Acres in the City
of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale
North Section Five (the "*Collateral*") and guaranteed by Natin Paul and World
Class Capital Group, LLC (collectively the "*Guarantors*"), the Collateral
Assignment of Leases and Rents dated April 26, 2017 (the "*Assignment of
Rents*"), the Loan Agreement dated April 26, 2017 (the "*Loan Agreement*"), and
any other documents executed by Borrower, or any other party in connection
with the loan (together with the Note, Deed of Trust, Assignment of Rents, and
Loan Agreement collectively referred to hereinafter as the "*Loan Documents*").

Dear Sir/Madam:

As you know, this law firm represents BancorpSouth Bank, successor by merger
to First State Bank Central Texas (the "*Bank*") in connection with the above-referenced
Note, Guaranties, and Loan Documents.

By letter dated and sent to you on July 2, 2020, this firm, on behalf of the
Lender, notified you that the Note was in default for delinquent payment and that the
Lender may accelerate the entire outstanding balance of the Note and foreclose the
collateral securing the Note under the Deed of Trust if the default was not cured by
July 12, 2020.  The Lender has informed our firm that the default was not cured on or
before July 12, 2020 or within the additional time that has elapsed to the date of this
letter.  Therefore, the entire indebtedness owing on the Note, and all interest accrued
but unpaid thereon, is hereby **ACCELERATED** and due and payable in full.

Pursuant to the terms of the Note and the other Loan Documents, the Lender
hereby accordingly requires immediate payment of the entire unpaid balance due
under the Note and all interest accrued but unpaid thereon, and all costs and fees in
enforcing the Lender's rights under the Note and the Loan Documents.  If you intend
to pay the indebtedness in full, you may contact Bill Babineaux of BancorpSouth Bank

20170804.20190907/3763545.1

EXHIBIT NO. 10                                    EX. 10-001

WC Teakwood Plaza, LLC
July 23, 2020
Page 2

at 315 Settlers Trace Blvd., Lafayette, LA 70508, phone no. (337) 354-8902 to obtain the outstanding balance of the amounts due and owing under the Note and the Loan Documents.  Payment in full will not be considered made unless the Lender receives "good funds" in the form of cash, a cashier's check or money order in the full amount due and owing at the time.  If any such cashier's check or money order is returned to us for insufficient funds or for any other reason, "good funds" will not have been received.

The Lender may seek to foreclose its Collateral unless payment of the full indebtedness is made in good funds as described above and delivered to Bill Babineaux at the address set forth above.

THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

ASSERT AND PROTECT YOUR RIGHTS AS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES. IF YOU OR YOUR SPOUSE IS SERVING ON ACTIVE MILITARY DUTY, INCLUDING ACTIVE MILITARY DUTY AS A MEMBER OF THE TEXAS NATIONAL GUARD OR THE NATIONAL GUARD OF ANOTHER STATE OR AS A MEMBER OF A RESERVE COMPONENT OF THE ARMED FORCES OF THE UNITED STATES, PLEASE SEND WRITTEN NOTICE OF THE ACTIVE MILITARY SERVICE TO THE SENDER OF THIS NOTICE IMMEDIATELY.

IF YOU WERE A SERVICE MEMBER IN MILITARY SERVICE AT ANYTIME WITHIN THE LAST NINE (9) MONTHS, PLEASE CONTACT THE SENDER OF THIS NOTICE IMMEDIATELY UPON RECEIPT OF THIS LETTER. YOU MAY BE ENTITLED TO CERTAIN PROTECTIONS AFFORDED UNDER THE SERVICE MEMBERS CIVIL RELIEF ACT.

Nothing contained in this letter is a waiver of the Lender's rights or remedies under the Note, Deed of Trust, Guaranties, or any of the other Loan Documents, at law or in equity.  Accordingly, but not by way of limitation, you continue to waive all demands and notices in connection with the Note, including presentment, demand, and notice of dishonor, consistent with the terms of the Note.

Should this law firm file a lawsuit on behalf of the Lender, then the Lender will also seek recovery of its legal fees and expenses incurred in the prosecution of its rights under the Loan Documents, as well as all past due interest and costs.

Neither you nor any other party shall be entitled to rely upon any oral statements made or purported to be made by or on behalf of the Lender in connection with any alleged agreement by the Lender to refrain from exercising any of its rights in connection with the indebtedness.  Acceptance by the Lender, or any other parties on behalf of the Lender, of any payment does not and will not constitute a waiver of any of the rights, remedies or recourses available under the Loan Documents, at law, or in equity.  Application of such payments should in no way be construed as a modification, rearrangement, or extension of the existing Loan Documents.

EXHIBIT NO. 10                                          EX. 10-002

WC Teakwood Plaza, LLC
July 23, 2020
Page 3

Sincerely,

HIRSCH & WESTHEIMER, P.C.

By: /s/ Michael J. Durrschmidt
Michael J. Durrschmidt

cc:     Natin Paul
        c/o World Class
        814 Lavaca St.
        Austin, Texas 78701
        Attn: Natin Paul
        *Via CMRRR: 9414 7266 9904 2167 5070 21*

        World Class Capital Group, LLC
        c/o World Class
        814 Lavaca St.
        Austin, Texas 78701
        Attn: Natin Paul
        *Via CMRRR: 9414 7266 9904 2167 5070 83*

        Linda Thong
        World Class
        244 Fifth Avenue, Suite 2200
        New York, New York 10001
        *Via CMRRR: 9414 7266 9904 2167 5071 44*

        Maryann Norwood
        World Class
        814 Lavaca St.
        Austin, Texas 78701
        *Via email: mnorwood@world-class.com*

EXHIBIT NO. 10                                    EX. 10-003

# USPS Tracking®

FAQs >

## Track Another Package ╋

**Tracking Number:** 9414726699042167507205     Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 2:49 pm on July 27, 2020 in AUSTIN, TX 78701.

## ⊘ Delivered

July 27, 2020 at 2:49 pm
Delivered, Front Desk/Reception/Mail Room
AUSTIN, TX 78701

**Get Updates** ⌄

---

**Text & Email Updates**      ⌄

---

**Tracking History**      ⌄

---

**Product Information**      ⌄

---

**See Less** ⌃

Feedback

**Tracking Number:** 9414726699042167507021                    Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 2:49 pm on July 27, 2020 in AUSTIN, TX 78701.

⊘ **Delivered**

July 27, 2020 at 2:49 pm
Delivered, Front Desk/Reception/Mail Room
AUSTIN, TX 78701

**Get Updates** ⌄

**See More** ⌄

Feedback

**Tracking Number:** 9414726699042167507083                    Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 2:49 pm on July 27, 2020 in AUSTIN, TX 78701.

⊘ **Delivered**

July 27, 2020 at 2:49 pm
Delivered, Front Desk/Reception/Mail Room
AUSTIN, TX 78701

**Get Updates** ⌄

**See More** ⌄

EXHIBIT NO. 10                    EX. 10-005

**Tracking Number:** 9414726699042167507144                    Remove ✕

Your item was delivered to an individual at the address at 10:07 am on July 27, 2020 in
NEW YORK, NY 10001.

## ⊘ **Delivered**

July 27, 2020 at 10:07 am
Delivered, Left with Individual
NEW YORK, NY 10001

**Get Updates** ∨

**See More** ∨

Feedback

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**

EXHIBIT NO. 10                                    EX. 10-006

## NOTICE OF TRUSTEE'S SALE

STATE OF TEXAS      §
          §    KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TRAVIS    §

WHEREAS, WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company (the "*Grantor*"), executed a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017, and recorded April 27, 2017 in the Official Public Records of Travis County, Texas (the "*Records*") under Document No. 2017066579 (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Deed of Trust*");

WHEREAS, the Grantor, pursuant to the Deed of Trust, conveyed to T. Gerry Gamble (the "*Original Trustee*") for the benefit of First State Bank Central Texas, its successors and assigns ("*Beneficiary*"), all of the personal property, real property and premises described and referred to in the Deed of Trust (the "*Mortgaged Property*"), including the following described property located in Travis County, Texas:

> 3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBE DBY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

WHEREAS, the Deed of Trust secures payment of that certain Promissory Note dated April 26, 2017, executed by Grantor, as Maker, and payable to the order of Beneficiary, in the original stated amount of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00) (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Note*");

WHEREAS, BancorpSouth Bank, a Mississippi banking corporation (the "*Holder*"), is the successor by merger to Beneficiary;

WHEREAS, the Holder is the current legal owner and holder of the indebtedness secured by the Deed of Trust (the "*Indebtedness*") and, if, for any reason, Holder prefers to appoint a substitute trustee to act instead of the trustee named in the Deed of Trust, Holder has the full power to appoint, at any time and

1

20170804.20190907/3778368.1

without any formality other than by written instrument, one or more successor or alternate successor trustees, each of whom shall succeed to all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Holder has named, constituted and appointed in writing BRADLEY E. RAUCH, a resident of Harris County, Texas, ZACHARY SCHNEIDER, a resident of Harris County, Texas, ANGELA ZAVALA, a resident of Travis County, Texas, and also MICHELLE JONES, a resident of Travis County, Texas, as Substitute Trustees, each with the power to act independently (and without the joinder of the others) under and by virtue of the Deed of Trust and to hold possess and execute all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Grantor has defaulted in the performance of its obligations under the Note and the Deed of Trust, and notice of such defaults have been waived, and/or have occurred, and Grantor has failed to cure such default(s);

WHEREAS, acceleration of maturity and demand have been made upon Grantor for payment of the Indebtedness, and/or have been waived, and/or have occurred;

WHEREAS, the proceeds of the Note were used for commercial purposes, and the Mortgaged Property was not to be used by the debtor for residential purposes;

WHEREAS, the Holder has called upon and requested either or any of Bradley E. Rauch, Zachary Schneider, Angela Zavala, Michelle Jones, or any additional substitute trustee appointed pursuant to the terms of the Deed of Trust, as Substitute Trustees, to perform the Trustee's duties under the Deed of Trust and to post, mail and file, or have posted, mailed, and filed, notice and to sell the Mortgaged Property without prejudice and without creating an election not to proceed against any other collateral securing the obligations of the Grantor to the Holder, and without waiving any rights or remedies which the Holder has against the Grantor or any other parties obligated for payment of the Indebtedness;

NOW, THEREFORE, the undersigned Substitute Trustee, at the request of the Holder, hereby gives notice that after due posting of this Notice as required by the Deed of Trust and law, a Substitute Trustee will sell on **September 1, 2020** (that being the first Tuesday of said month, as provided for in Texas

2

EXHIBIT NO. 11            EX. 11-002

Property Code Sec. 51.002) at public auction to the highest bidder for cash, at THE REAR "SALLYPORT"

OF THE TRAVIS COUNTY COURTHOUSE, 1000 GUADALUPE STREET, AUSTIN, TEXAS 78701,

said location having been designated by the County Commissioners' Court of Travis County, Texas (or such

other location as may be designated by said County Commissioners' Court), the sale to begin no earlier than

1:00 o'clock p.m. and no later than three (3) hours after such time, the Mortgaged Property, including

without limitation, all personal property described in the Deed of Trust, owned by the Grantor, Grantor's

heirs, legal representatives, successors and assigns, and originally covered by the Deed of Trust, whether

or not herein specifically described.

THE SALE OF THE PROPERTY IS "AS IS" AND "WHERE IS" AND WITHOUT
REPRESENTATION OR WARRANTY OF ANY KIND BY THE SUBSTITUTE TRUSTEE OR
HOLDERS OF SAID INDEBTEDNESS, EXPRESS, IMPLIED, STATUTORY, QUASI-
STATUTORY OR OTHERWISE, ANY WARRANT OR MERCHANTIBILITY OR FITNESS FOR
A PARTICULAR PURPOSE BEING EXPRESSLY DISCLAIMED. NEITHER THE HOLDER
NOR THE TRUSTEE OR SUBSTITUTE TRUSTEE MAKES ANY REPRESENTATIONS OR
WARRANTIES WITH RESPECT TO THE COMPLIANCE WITH LAWS, RULES,
AGREEMENTS, OR SPECIFICATIONS, NOR WITH RESPECT TO CONDITION, QUALITY,
CAPACITY, DESIGN, OPERATION, ABSENCE OF ANY LATENT DEFECTS OR ANY OTHER
WARRANTY OR REPRESENTATION WHATSOEVER WITH RESPECT TO THE PROPERTY,
ALL OF WHICH ARE EXPRESSLY WAIVED BY PURCHASER(S).

THE NEXT PAGE IS THE SIGNATURE PAGE

20170804.20190907/3778368.1

EXHIBIT NO. 11                                    EX. 11-003

WITNESS BY HAND this **7th** day of **August, 2020.**

_____
Zachary Schneider, Trustee

COUNTY OF HARRIS      §

                                   §

STATE OF TEXAS        §

       This document was acknowledged before me on this, the **7th** day of **August, 2020,** by Zachary Schneider, Trustee.



_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

**Name and Address of Substitute Trustees:**
Mr. Bradley E. Rauch
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

Angela Zavala
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

Michelle Jones
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

**AFTER RECORDING, PLEASE RETURN TO:**
Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

KAREN M. WADE
My Notary ID # 7846256
Expires June 30, 2023

20170804.20190907/3778368.1

EXHIBIT NO. 11                  EX. 11-004

## EXHIBIT "A"

### Legal Description

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.65 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 66 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

20170804.20190907/3778368.1

EXHIBIT NO. 11                                EX. 11-005

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

1) S 76° 08' 00" E, A DISTANCE OF 139.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

2) N 13° 52' 80" E, A DISTANCE OF 53.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.82 FEET)

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 154.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 60" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.



**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas

**202040410**

Aug 10, 2020 11:12 AM
Fee: $3.00     MACEDOS

6

20170804.20190907/3778368 1

## AFFIDAVIT OF FILING AND POSTING
WC TEAKWOOD PLAZA, LLC

STATE OF TEXAS       §
                         §
COUNTY OF TRAVIS    §

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared _Angela Zavala_, who being duly sworn, upon his oath deposes and says as follows:

That on the _10th_ day of **August, 2020**, Affiant, for and on behalf of **BancorpSouth Bank, a Mississippi banking corporation,** filed the Notice of Substitute Trustee's Sale (the "**Notice**") attached hereto in the office of the County Clerk of Travis County and caused to be posted (which posting was confirmed by the undersigned), a copy of the Notice in the place where such notices are commonly posted by the public as designated by the County Commissioners of Travis County, at the Travis County Courthouse, Austin, Tx, Travis County, Texas.

_Angela Zavala_
Print Name:) Angela Zavala

SIGNED AND SWORN TO BEFORE ME by ANGELA ZAVALA on the 10TH day of **August, 2020**.

RICHARD ZAVALA, JR.
Notary Public, State of Texas
Comm. Expires 08-03-2024
Notary ID 129076603

_Richard Zavala Jr_
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

20170804.20190907/3778991.1

EXHIBIT NO. 12                 EX. 12-001



**HIRSCH & WESTHEIMER**

*Attorneys and Counselors*

T. 713.220.9173
F. 713.223.9319
zschneider@hirschwest.com

August 11, 2020

*Via CMRRR #9414 7266 9904 2167 5059 28*
*and First Class U.S. Mail*
WC Teakwood Plaza
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Promissory Note (the "*Note*") dated April 26, 2017 in the original principal sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("*Maker*" or "*Borrower*") and payable to BancorpSouth Bank, as successor by merger to First State Bank Central Texas, secured by a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017 (the "*Deed of Trust*") on 3.95 Acres in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the "*Collateral*") and guaranteed by Natin Paul and World Class Capital Group, LLC (collectively the "*Guarantors*"), the Collateral Assignment of Leases and Rents dated April 26, 2017 (the "*Assignment of Rents*"), the Loan Agreement dated April 26, 2017 (the "*Loan Agreement*"), and any other documents executed by Borrower, or any other party in connection with the loan (together with the Note, Deed of Trust, Assignment of Rents, and Loan Agreement collectively referred to hereinafter as the "*Loan Documents*").

Dear Sir/Madam:

As you know, this law firm represents BancorpSouth Bank, successor by merger to First State Bank Central Texas (the "*Bank*") in connection with the above-referenced Note, Guaranties, and Loan Documents.

As you are also aware, the Maker has defaulted under the terms of the Note and the Deed of Trust due to, among other things, the failure of the Maker to make the required monthly payments under the Note.  This firm, on behalf of the Lender, sent you written notice on July 2, 2020 of such defaults and provided you an opportunity to cure such defaults, which were not timely cured and remain uncured as of the date of this letter.  This firm also sent you written notice on July 23, 2020 that the Note had been accelerated and was immediately due and payable in full.  You may contact the undersigned to verify the amount of indebtedness due and owing under the Note, Deed of Trust, and all related loan documents.

Please find enclosed a **Notice of Trustee's Sale** which was posted **August 10, 2020**, at the County Courthouse of Travis County, Texas (at the place regularly used by the public for posting of such notices) and is being filed in the Office of the County Clerk of Travis County, Texas.

The foreclosure sale shall take place as provided in the Notice of Trustee's Sale on **September 1, 2020**.  The foreclosure sale will be conducted pursuant to the

EXHIBIT NO. 13                                          EX. 13-001

WC Teakwood Plaza, LLC
August 11, 2020
Page 2

enclosed Notice of Trustee's Sale, Section 51.002 of the Texas Property Code, and other applicable law.

This is an attempt to collect a debt and any information will be used for that purpose.

Very truly yours,

HIRSCH & WESTHEIMER, P.C.

By: _____
Zachary Schneider

cc:  Natin Paul
     c/o World Class
     814 Lavaca St.
     Austin, Texas 78701
     *Via CMRRR# 9414 7266 9904 2167 5059 35*

     World Class Capital Group, LLC
     c/o World Class
     814 Lavaca St.
     Austin, Texas 78701
     Attn: Natin Paul
     *Via CMRRR# 9414 7266 9904 2167 5059 42*

     Linda Thong
     World Class
     244 Fifth Avenue, Suite 2200
     New York, New York 10001
     *Via CMRRR# 9414 7266 9904 2167 5059 59*

     Maryann Norwood
     World Class
     814 Lavaca St.
     Austin, Texas 78701
     *Via email: mnorwood@world-class.com*

     Brian Elliott
     World Class Global Business Services
     814 Lavaca St.
     Austin, Tx 78701
     **Via CMRRR# 9414 7266 9904 2167 5056 07,
     First Class Mail and Email:  belliott@world-class.com**

20170804.20190907/3778974.1

EXHIBIT NO. 13                                    EX. 13-002

**|||||||||||||||||||||** 6 pgs     202040410

## NOTICE OF TRUSTEE'S SALE

STATE OF TEXAS               §
                             §          KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TRAVIS             §

WHEREAS, WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company (the "*Grantor*"), executed a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017, and recorded April 27, 2017 in the Official Public Records of Travis County, Texas (the "*Records*") under Document No. 2017066579 (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Deed of Trust*");

WHEREAS, the Grantor, pursuant to the Deed of Trust, conveyed to T. Gerry Gamble (the "*Original Trustee*") for the benefit of First State Bank Central Texas, its successors and assigns ("*Beneficiary*"), all of the personal property, real property and premises described and referred to in the Deed of Trust (the "*Mortgaged Property*"), including the following described property located in Travis County, Texas:

> 3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBE DBY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

WHEREAS, the Deed of Trust secures payment of that certain Promissory Note dated April 26, 2017, executed by Grantor, as Maker, and payable to the order of Beneficiary, in the original stated amount of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00) (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Note*");

WHEREAS, BancorpSouth Bank, a Mississippi banking corporation (the "*Holder*"), is the successor by merger to Beneficiary;

WHEREAS, the Holder is the current legal owner and holder of the indebtedness secured by the Deed of Trust (the "*Indebtedness*") and, if, for any reason, Holder prefers to appoint a substitute trustee to act instead of the trustee named in the Deed of Trust, Holder has the full power to appoint, at any time and

1

without any formality other than by written instrument, one or more successor or alternate successor trustees, each of whom shall succeed to all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Holder has named, constituted and appointed in writing BRADLEY E. RAUCH, a resident of Harris County, Texas, ZACHARY SCHNEIDER, a resident of Harris County, Texas, ANGELA ZAVALA, a resident of Travis County, Texas, and also MICHELLE JONES, a resident of Travis County, Texas, as Substitute Trustees, each with the power to act independently (and without the joinder of the others) under and by virtue of the Deed of Trust and to hold possess and execute all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Grantor has defaulted in the performance of its obligations under the Note and the Deed of Trust, and notice of such defaults have been waived, and/or have occurred, and Grantor has failed to cure such default(s);

WHEREAS, acceleration of maturity and demand have been made upon Grantor for payment of the Indebtedness, and/or have been waived, and/or have occurred;

WHEREAS, the proceeds of the Note were used for commercial purposes, and the Mortgaged Property was not to be used by the debtor for residential purposes;

WHEREAS, the Holder has called upon and requested either or any of Bradley E. Rauch, Zachary Schneider, Angela Zavala, Michelle Jones, or any additional substitute trustee appointed pursuant to the terms of the Deed of Trust, as Substitute Trustees, to perform the Trustee's duties under the Deed of Trust and to post, mail and file, or have posted, mailed, and filed, notice and to sell the Mortgaged Property without prejudice and without creating an election not to proceed against any other collateral securing the obligations of the Grantor to the Holder, and without waiving any rights or remedies which the Holder has against the Grantor or any other parties obligated for payment of the Indebtedness;

NOW, THEREFORE, the undersigned Substitute Trustee, at the request of the Holder, hereby gives notice that after due posting of this Notice as required by the Deed of Trust and law, a Substitute Trustee will sell on **September 1, 2020** (that being the first Tuesday of said month, as provided for in Texas

20170804.20190907/3778368.1

2

Property Code Sec. 51.002) at public auction to the highest bidder for cash, at THE REAR "SALLYPORT" OF THE TRAVIS COUNTY COURTHOUSE, 1000 GUADALUPE STREET, AUSTIN, TEXAS 78701, said location having been designated by the County Commissioners' Court of Travis County, Texas (or such other location as may be designated by said County Commissioners' Court), the sale to begin no earlier than 1:00 o'clock p.m. and no later than three (3) hours after such time, the Mortgaged Property, including without limitation, all personal property described in the Deed of Trust, owned by the Grantor, Grantor's heirs, legal representatives, successors and assigns, and originally covered by the Deed of Trust, whether or not herein specifically described.

THE SALE OF THE PROPERTY IS "AS IS" AND "WHERE IS" AND WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND BY THE SUBSTITUTE TRUSTEE OR HOLDERS OF SAID INDEBTEDNESS, EXPRESS, IMPLIED, STATUTORY, QUASI-STATUTORY OR OTHERWISE, ANY WARRANT OR MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE BEING EXPRESSLY DISCLAIMED. NEITHER THE HOLDER NOR THE TRUSTEE OR SUBSTITUTE TRUSTEE MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE COMPLIANCE WITH LAWS, RULES, AGREEMENTS, OR SPECIFICATIONS, NOR WITH RESPECT TO CONDITION, QUALITY, CAPACITY, DESIGN, OPERATION, ABSENCE OF ANY LATENT DEFECTS OR ANY OTHER WARRANTY OR REPRESENTATION WHATSOEVER WITH RESPECT TO THE PROPERTY, ALL OF WHICH ARE EXPRESSLY WAIVED BY PURCHASER(S).

THE NEXT PAGE IS THE SIGNATURE PAGE

EXHIBIT NO. 13                    EX. 13-005

WITNESS BY HAND this **7th** day of **August, 2020**.

Zachary Schneider, Trustee

COUNTY OF HARRIS        §
                        §
STATE OF TEXAS          §

This document was acknowledged before me on this, the **7th** day of **August, 2020**, by Zachary Schneider, Trustee.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

**Name and Address of Substitute Trustees:**
Mr. Bradley E. Rauch
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002



Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

Angela Zavala
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

Michelle Jones
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

**AFTER RECORDING, PLEASE RETURN TO:**
Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

20170804.20190907/3778368.1

4

EXHIBIT NO. 13                    EX. 13-006

## EXHIBIT "A"

### Legal Description

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 66 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 61° 03' 42" E, A DISTANCE OF 0.71 FEET;

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

1) S 76° 01' 00" E, A DISTANCE OF 159.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

2) N 13° 52' 50" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.82 FEET)

THENCE, N 60° 26' 08" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 154.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 50" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 24.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS



*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas

202040410

Aug 10, 2020 11:12 AM
Fee: $3.00      MACEDOS

6

20170504.20190907/5773368 1

## AFFIDAVIT OF MAILING
(WC Teakwood Plaza)

STATE OF TEXAS     §
                        §
COUNTY OF HARRIS   §

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared **Enrique DeLaMora**, who being duly sworn, upon his oath deposes and says as follows:

That on the 11th day of **August, 2020**, Affiant, for and on behalf of **BancorpSouth Bank, a Mississippi banking corporation,** deposited a copy of the Notice of Substitute Trustee's Sale attached hereto in a post office or official depository under the care and custody of the United States Postal Service, enclosed in a post-paid wrapper marked "certified mail" and/or enclosed in a first class mail postage-paid wrapper, properly addressed to each of the following parties at the respective addresses indicated below, each address being the most recent address of the respective party as shown by the records of the Holder:

*Via CMRRR #9414 7266 9904 2167 5059 28
and First Class U.S. Mail*
WC Teakwood Plaza
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Copies To:

| Natin Paul<br>c/o World Class<br>814 Lavaca St.<br>Austin, Texas 78701<br>*Via CMRRR# 9414 7266 9904 2167 5059 35* | World Class Capital Group, LLC<br>c/o World Class<br>814 Lavaca St.<br>Austin, Texas 78701<br>Attn: Natin Paul<br>*Via CMRRR# 9414 7266 9904 2167 5059 42* |
|---|---|
| Linda Thong<br>World Class<br>244 Fifth Avenue, Suite 2200<br>New York, New York 10001<br>*Via CMRRR# 9414 7266 9904 2167 5059 59* | Brian Elliott<br>World Class Global Business Services<br>814 Lavaca St.<br>Austin, Tx 78701<br>*Via CMRRR# 9414 7266 9904 2167 5056 07,<br>And First Class Mail* |

*Enrique de la Mora*
Enrique DeLaMora

SIGNED AND SWORN TO BEFORE ME by **Enrique DeLaMora**, this 11th day of **August, 2020**.

NOTARY PUBLIC,
THE STATE OF TEXAS

MELISSA D. ECKART
My Notary ID # 11130019
Expires February 20, 2022

20170804.20190907/3786516.1

EXHIBIT NO. 14                       EX. 14-001

ELECTRONICALLY RECORDED **2017066580**

TRV **16** PGS

~~50~~ CYOT 17-298207-AN

## COLLATERAL ASSIGNMENT OF LEASES AND RENTS

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

THIS COLLATERAL ASSIGNMENT OF LEASES AND RENTS ("Assignment") made as of April 25, 2017, by WC TEAKWOOD PLAZA, LLC, having an address at 401 Congress Avenue, 33rd Floor, Austin, Texas 78701, as assignor ("Assignor") to FIRST STATE BANK CENTRAL TEXAS, having an address at P. O. Box 6136, Temple, Texas 76503-6136, as assignee ("Lender").

RECITALS:

WC TEAKWOOD PLAZA, LLC by virtue of that certain Promissory Note of even date herewith is indebted to Lender in the principal sum of $7,600,000.00 in lawful money of the United States of America (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "Note"), with interest from the date thereof at the rates set forth in the Note, and principal and interest being payable in accordance with the terms and conditions provided in the Note.

Assignor is the owner of or is acquiring the following described real property (the "Real Property"), (which together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon collectively, the "Property") and which Real Property is described as follows:

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

The Note is secured by that certain Deed of Trust, Security Agreement and Financing Statement given by Assignor for the benefit of Lender, of even date herewith, covering the Property (defined below) and intended to be duly recorded (the "Security Instrument") and certain other documents (other than this Assignment) now or hereafter executed by Assignor and/or others in favor of Lender which by their terms wholly or partially secure or guarantee the payments under the Note (the "Other Security Documents").

Assignor desires to secure the payment of the principal sum, interest and all other sums due and payable under the Note, the Security Instrument, this Assignment and the Other Security Documents (collectively, the "Debt") and the performance of all of its obligations under the Note and those other obligations described in Section 1.01 of the Security Instrument ("Other Obligations").

## ARTICLE I. ASSIGNMENT

1.01 PROPERTY ASSIGNED. Assignor hereby irrevocably and unconditionally assigns and grants to Lender the right, title and interest of Assignor in and to all of the following property, rights, interests and estates, whether now owned, or hereafter acquired (the "Assigned Property"):

JNG17\FSBCT\WCTEAKWD\k17121AsnLsev2.wpd
April 10, 2017 (2:00pm)

1
EXHIBIT NO. 15

A.   Leases and Other Agreements.  All existing and future leases and all other agreements, whether or not in writing, affecting the use, enjoyment or occupancy of all or any part of the Property, now or hereafter made, whether before or after the filing by or against Assignor of any petition for relief under 11 U.S.C. § 101 *et seq.*, as the same may be amended from time to time (the "Bankruptcy Code"), together with any extension, renewal or replacement of the same (collectively the "Leases").

B.   Rents.  All rents, additional rents, revenues, income, issues and profits (including, without limitation, fixed rent, minimum rent and percentage rent, if any, and all oil and gas or other mineral royalties and bonuses), deposits, accounts and other benefits arising from the Leases or otherwise from the use, enjoyment and occupancy of the Property and any cash or security deposited in connection therewith, and all other monetary amounts of every type (including, without limitation, damages for breach) which are from time to time payable by tenants (at the Property) to Assignor (as landlord) under the Leases or which are otherwise receivable by Assignor with respect to the Leases or Property including rights and proceeds of any rental interruption insurance, claims arising out of a default in the payment to be made to possess or occupy the Property, any Lease termination fees, reimbursements for tenant finish, as well as all items considered "Rents" under applicable Texas statute, including Texas Property Code Chapter 64 as same may be amended from time to time ("Chapter 64") and all of such previously mentioned sums which are from time to time payable by guarantors (of the obligations of tenants) to Assignor (as landlord) under the Leases and all amounts payable by tenants (and guarantors for tenants) to Assignor (as landlord) under the provisions of the Bankruptcy Code as amended from time to time, and all proceeds of Rents including identifiable proceeds and identifiable cash proceeds whether paid or accruing before or after the filing by or against Assignor of any petition for relief under the Bankruptcy Code (collectively, the "Rents").

C.   Bankruptcy Claims.  All claims and rights to the payment of damages and other claims arising from any rejection by a lessee of any Lease under the Bankruptcy Code (the "Bankruptcy Claims").

D.   Lease Guaranties.  All claims and rights under any and all lease guaranties, letters of credit and any other credit support (individually, a "Lease Guaranty", and collectively, the "Lease Guaranties") given to Assignor by any guarantor in connection with any of the Leases (individually, a "Lease Guarantor", and collectively, the "Lease Guarantors").

E.   Proceeds.  All proceeds from any sale or other disposition of the Leases, the Rents, the Lease Guaranties and the Bankruptcy Claims.

F.   Other Rights of Lessor.  All rights, powers, privileges, options and other benefits of Assignor as lessor under the Leases and beneficiary under the Lease Guaranties, including without limitation the immediate and continuing right to make claim for, receive, collect and apply all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt or the Other Obligations), and to do all other things

which Assignor or any lessor is or may become entitled to do under the Leases or the Lease Guaranties.

G.    Entry and Possession. The right, at Lender's option, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents and enforce the Leases.

H.    Power of Attorney. Assignor's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in Section 5.01 of this Assignment and any or all other actions designated by Lender for the proper management and preservation of the Property.

I.    Other Rights and Agreements. Any and all other rights of Assignor in and to the items set forth in subsections (a) through (h) above, and all amendments, modifications, replacements, renewals, extensions, supplements, restatements and substitutions thereof.

## ARTICLE II. CONSIDERATION

2.01    CONSIDERATION. This Assignment is made in consideration of that certain loan made by Lender to Assignor evidenced by the Note and secured by the Security Instrument and the Other Security Documents.

## ARTICLE III. TERMS OF ASSIGNMENT

3.01    PRESENT ASSIGNMENT. It is intended by Assignor that this Assignment constitutes a present, irrevocable and collateral assignment of the Assigned Property which immediately vests into Lender a perfected security interest in the Assigned Property. This Assignment effects a transfer of the Rents to Lender and grants Lender a first priority lien on the Rents, and is intended to and creates in Lender all the rights of an assignee of Rents as established under Chapter 64 and constitutes Lender as the assignee of the Rents in accordance with the terms and provisions of this Assignment. It shall never be necessary for Lender to institute legal proceedings of any kind to enforce the provisions of this Assignment. This Assignment of all such present and future Leases and present and future agreements comprising the Assigned Property is effective without further or supplemental assignment.

3.02    NOTICE TO LESSEES. Assignor hereby agrees to authorize and direct the lessees named in the Leases or any other or future lessees or occupants of the Property and all Lease Guarantors to pay over to Lender or to such other party as Lender directs all Rents and all sums due under any Lease Guaranties upon receipt from Lender of written notice to the effect that Lender is then the holder of the Security Instrument and that an Event of Default (defined herein) exists, and to continue so to do until otherwise notified by Lender. Lender also has the right to give written enforcement notice ("Enforcement Notice") to Assignor and/or to each tenant under Chapter 64. Upon the occurrence of any such Event of Default and the resulting automatic termination of such Right to Collect (as defined herein), unless Lender gives Assignor notice to the contrary (a matter within the sole discretion of Lender), or upon Assignor's receipt of the Enforcement Notice, all Rents thereafter received by Assignor shall, in their entirety, be promptly (and in no event beyond five (5) calendar days) paid over by Assignor to Lender and Lender may exercise any and all legal and equitable

remedies including, without limitation the remedies provided for under this Assignment and/or Chapter 64.

3.03 NO PRO TANTO PAYMENT. Assignor acknowledges and agrees that the execution and deliver of this Assignment does not constitute any nature of pro tanto payment of the Debt to Lender. In the case of Rents which may hereafter be paid to Assignor, such Rents will not constitute payment to Lender (and hence will not be credited on the Debt) unless and until such Rents are actually paid by Assignor to Lender and applied by Lender in such manner. In the case of Rents paid to Lender by the tenants, such Rents will be pro tanto credited on the Debt only to the extent, if any, that such Rents paid to Lender are neither disbursed by Lender to Assignor nor paid directly by Lender for utilities, maintenance, repairs, taxes, assessments, insurance or other expenses relating to the Property.

3.04 NO COMMINGLING OF RENTS. The Rents (and interest, if any) shall not be commingled with any other funds of Assignor and Assignor shall not deposit any other funds in the accounts containing the Rents other than the Rents.

3.05 NON-PAYMENT OF RENTS. In the event any lessee receiving any such written notice from Lender as described in Section 3.02 hereof, or withholding of such Rents by such lessee or such lessee's paying Rents into the registry of the court in connection with an interpleader or other action, or any other non-payment of such Rents to lender by any lessee, such lessee will be liable to Lender for the Rents not so paid to Lender plus costs of court plus attorney's fees of Lender.

3.06 TERMINATION OF ASSIGNMENT. Upon payment in full of the Debt and the delivery and recording of a satisfaction or discharge of Security Instrument duly executed by Lender, this Assignment shall become null and void and shall be of no further force and effect.

3.07 INCORPORATION BY REFERENCE. All representations, warranties, covenants, conditions and agreements contained in the Security Instrument as same may be modified, renewed, substituted or extended are hereby made a part of this Assignment to the same extent and with the same force as if fully set forth herein.

## ARTICLE IV. RIGHT OF ASSIGNOR
## TO COLLECT RENTS

4.01 RIGHTS OF COLLECTION BY ASSIGNOR. So long as there exists no Event of Default, Assignor shall have the right to receive and collect the Rents (the "Right to Collect"). It is the intent of Assignor and Lender that Lender shall have a perfected security interest in the Rents and identifiable proceeds and identifiable cash proceeds. As such, Assignor specifically agrees to the terms of this Article. The Rents so received and collected by Assignor shall be deposited by Assignor in one or more accounts containing only the Rents so deposited in such accounts (each and collectively a "Rental Deposit Account") plus any interest paid by the depository on the amount from time to time in such accounts. Rents (and interest, if any) shall not be commingled with any other funds of Assignor and Assignor shall not deposit any other funds in such accounts other than the Rents. Assignor shall, within seven (7) days following notice from Lender to Assignor, advise Lender in writing of the names and locations of each Rental Deposit Account as well as the account number of each such account, Assignor shall advise Lender of the balance in each Rental Deposit Account to the extent that such information may be requested by Lender. Assignor

acknowledges and agrees that Assignor's Right to Collect the Rents does not negate or otherwise affect the status of this Assignment as being a valid security interest and lien in favor of Lender as to the Rents.

4.02     USE OF RENTS BY ASSIGNOR. All of the Rents so received or collected by Assignor pursuant to the Right to Collect hereby granted pursuant to Section 4.01 hereof shall be utilized by Assignor for payment of the Note, for timely payment of taxes and assessments on the Property before the accrual of any penalty or interest with respect thereto, for payment of premiums on insurance required under the Security Documents, for payment of the costs of maintenance and repairs which are the obligation of Assignor under the Leases with respect to the Property, for fulfillment of Assignor's other obligations under the Security Documents, all of such previously stated obligations of Assignor to be fulfilled by Assignor prior to Assignor's utilization of the Rents for any other purpose whatsoever.

4.03     AUTOMATIC TERMINATION OF ASSIGNOR'S RIGHT TO COLLECT. Upon and during the occurrence of any Event of Default, upon Lender's sending a written Enforcement Notice (an "Enforcement Notice") to Assignor, the Assignor's Right to Collect under Section 4.01 of this Agreement shall, automatically terminate without the necessity that Lender give Assignor any further notice or institute against Assignor any nature of legal proceedings or take any other action, and Lender also has the right to give a written Enforcement Notice to each tenant under Chapter 64. Upon the occurrence of any such Event of Default and the sending the Enforcement Notice terminating the Right to Collect, upon Assignor's receipt of the Enforcement Notice, all Rents then held or thereafter received by Assignor shall, in their entirety, be promptly (and in no event beyond five (5) calendar days) paid over by Assignor to Lender and Lender may exercise any and all legal and equitable remedies including, without limitation the remedies provided for under Article 6 of this Assignment and/or Chapter 64.

4.04     IMPACT ON TENANTS OF TERMINATION OF ASSIGNOR'S RIGHT TO COLLECT. Notwithstanding any of the other terms or provisions of this Assignment, until receipt from Lender of notice of the occurrence of any Event of Default, or an Enforcement Notice, each tenant may pay rentals directly to Assignor. Upon receipt by any tenant under the Leases, however, of notice from Lender that an Event of Default has occurred, or an Enforcement Notice, irrespective of whether Assignor contests the occurrence or existence of such Event of Default or contests Lender's entitlement to receive the Rents, each such tenant under the Leases is hereby authorized and directed and required to pay directly to Lender all Rents accruing after the date of the Event of Default notice or the date of the Enforcement Notice from Lender (irrespective of any contrary provision of the lease to such tenant or any other circumstances whatsoever); and the receipt by Lender of Rents shall constitute a release of each tenant paying such Rents to the extent of the amounts so paid to Lender by such tenant. The receipt by a tenant of any such notice from Lender constitutes full authorization and mandate for such tenant to make all future payment of Rents directly to Lender and each tenant paying such future Rents to Lender after such notice from Lender shall be permitted to rely on such notice and shall have no liability to Assignor after such notice for any Rents so paid to Lender by such tenant. In the event that any tenant receiving any such notice from Lender does not timely pay such future Rents to Lender, whether on account of continued payment of such Rents by such tenant to Assignor or withholding of such Rents by such tenant or such tenant's paying such Rents into the registry of the court in connection with an interpleader or other action or any other non-payment of such Rents to Lender by any tenant, such tenant will be liable to Lender for the Rents not so paid to Lender plus costs of

court plus attorneys' fees of Lender. Lender may also contact each Tenant before an Event of Default and shall cause each tenant to agree in writing to the terms and provisions of this Section 4.04. Whenever requested by Lender, Assignor shall promptly obtain from each tenant and deliver to Lender an agreement executed by such tenant which provides that tenant has agreed to the terms and provisions hereinabove set forth in this Section 4.04.

### ARTICLE V. COVENANTS, REPRESENTATIONS AND WARRANTIES OF ASSIGNOR

5.01 COVENANTS OF ASSIGNOR. Assignor hereby unconditionally covenants and agrees with Lender as follows:

A. to observe, perform and discharge, diligently and punctually, all the obligations imposed upon the landlord under the Leases and not to do or permit to be done anything to impair the Leases or the Rents obligations or any of the other obligations of the tenants under the Leases; and Assignor shall give prompt notice to Lender of any failure on the part of the Assignor to observe, perform and discharge any of Assignor's obligations under this paragraph or under any other portion of this Assignment;

B. not to receive and accept or collect any of the Rents arising or accruing under any of the Leases or from the Property more than one (1) calendar month in advance, unless Assignor notifies Lender in advance of such pre-payment.

C. except as required by prudent business judgement exercised by Assignor in good faith, not to grant any period of free rental or abated rental under any of the Leases;

D. not to execute any further assignment of the rights or interests of Assignor (as landlord) in the Leases without Lender's prior written consent and not to execute any other assignment or transfer of Rents arising or accruing from the Leases or from the Property;

E. not to subordinate any of the Leases to any of the Security Documents or any other mortgage or other encumbrance, or permit, consent or agree to such subordination without Lender's prior express written consent;

F. except as required by prudent business judgement exercised by Assignor in good faith, not to alter, modify or change the terms of any of the Leases (or the terms of any guaranty of any of the Leases) or give any consent or exercise any option required or permitted by such terms without the prior written consent of Lender which consent shall not be unreasonably withheld or delayed, or cancel or terminate any of the Leases (or any guaranty of any of the Leases) or accept a surrender of any of the Leases or take or permit any action the effect of which is to result in a surrender of any Lease by operation of law; provided however, Assignor may terminate a Lease as a result of Lender's election to apply insurance or condemnation proceeds towards the Debt from a loss or taking that directly affects the leased premises with respect that lease;

G. not to consent to any assignment of or subletting under any of the Leases, except as required in accordance with their terms, without the prior written consent of Lender;

EXHIBIT NO. 15
EX. 15-006

and not to grant any renewal or extension option under any of the Leases or agree to the enlargement or diminution in size or relocation of the leased premises under any Lease without the prior written approval of Lender which consent shall not be unreasonably withheld or delayed;

H.    to execute and deliver to Lender, at the request of Lender all such further assurances and written instruments and take all such other action with respect to the Property and/or the Leases as Lender shall from time to time request in writing in order to carry out the purpose and intent of this Assignment;

I.    to enforce, in the name of Assignor (as landlord), and at the cost, expense and risk of Assignor, the performance of each and every obligation, term, covenant, condition and agreement in the Leases to be performed by any tenant; and Assignor (as landlord) shall appear in and defend any action or proceeding arising under, occurring out of or in any manner connected with the Leases or the obligations, duties or liabilities of Assignor (as landlord) and any tenant thereunder, and, upon request by Lender, Assignor will do so in the name and on behalf of Lender, but at the expense of the Assignor, and Assignor shall pay all costs and expenses of Lender, including attorneys' fees and disbursements, in any action or proceeding in which Lender may appear;

J.    not to waive, excuse, discount, set-off, compromise or in any manner release or discharge any tenant under any Lease (or any guarantor for any such tenant) of and from any monetary or other obligations, covenants, conditions and agreements to be kept, observed and performed by such tenant (or guarantor for such tenant), including, without limitation, the obligation to pay Rents thereunder, in the manner and at the time and place specified therein;

K.    not to incur any indebtedness to any tenant (or guarantor for any tenant) under any of the Leases unless each such tenant (or guarantor) contemporaneously expressly waives in writing any right to offset against (or recoup) any portion of such indebtedness from Rents;

L.    not to grant any Lease such that the effective lease rate over the term of the Lease is substantially below the market rate for similar leases for similar terms in the county where the Property is located without the Lender's prior written consent;

M.    to deliver to Lender, at the request of Lender from time to time, executed copies of all or a portion of the Leases upon all or any part of the Property;

N.    that any non-compliance by Assignor shall after applicable notice and failure to cure as provided for in the Loan Agreement constitute an Event of Default; and

O.    that no option to purchase the Property or right of first refusal in connection with any transfer of the Property will be granted by Assignor under any of the Leases.

5.02    <u>REPRESENTATIONS AND WARRANTIES OF ASSIGNOR</u>.  Assignor unconditionally represents and warrants to Lender now and continuing throughout the term of this Assignment as follows:

A.    Assignor is the sole owner of the Property, and the landlord's interests in the Leases;

B.    Assignor has all of the requisite right, power and authority to assign the Rents to Lender, and no other person, firm, corporation or entity has any right, title or interest in the Rents;

C.    to the best knowledge of Assignor, the Leases are valid and enforceable, in full force and effect and have not been altered, modified or amended in any manner whatsoever except as disclosed to Lender as evidenced by written amendments to the Leases;

D.    to the best knowledge of Assignor, the tenants named in the Leases are not in default under any of the terms, covenants or conditions of the leases and Assignor has duly and punctually performed and shall at all times hereafter duly and punctually perform all and singular, the terms, covenants, conditions and warranties of the leases on the Assignor's part to be kept, observed and performed;

E.    no Rents provided for under any of the Leases have been previously sold, assigned, transferred, mortgaged or pledged by Assignor, and no Rents for any period subsequent to the date of this Assignment have been collected by Assignor or shall be collected by Assignor earlier than the calendar month next preceding the calendar month with respect to which such Rents are due and payable under the terms of any of the Leases;

F.    to the best knowledge of Assignor, no period of free or abated rental has been granted to any tenant under any of the Leases except as is disclosed on the most recent rent roll provided by Assignor to Lender; and

G.    no option to purchase or right of first refusal in favor of a tenant in connection with any transfer of the Property exists in any of the Leases.

### ARTICLE VI. REMEDIES

6.01    REMEDIES OF LENDER.  Assignor hereby unconditionally covenants and agrees with Lender as follows:

A.    Upon or at any time after the occurrence of an Event of Default, without waiving such Event of Default, to the extent permitted by law, without notice and without regard to the adequacy of the security for the Debt, with or without bringing any action or proceeding, either in person or by agent, nominee, attorney, or a receiver appointed by a court, in addition to Lender's rights under Section 4.03 hereof, Lender, at its option, may dispossess Assignor and its agents and servants from the Property, and exclude Assignor and its agents or servants wholly therefrom and take possession of the Property and all books, records and accounts relating thereto without liability for trespass, damages or otherwise.  Thereafter, Lender may have, hold, manage, lease and operate the Property on such terms and for such period of time as Lender may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and other sums payable pursuant to any of the Assigned Property, including those past due and unpaid, with full power to make from time to time all alterations,

renovations, repairs or replacements thereto or thereof as may seem proper to Lender. Subject to the requirements of Chapter 64 of the Texas Property Code, Lender may apply the Rents and sums received pursuant to any of the Assigned Property to the payment of the following in such order and proportion as Lender in its sole discretion may determine: (i) all expenses of managing and securing the Property, including, without limitation, the salaries, fees and wages of a managing agent and such other employees or agents as Lender may deem necessary or desirable; (ii) all expenses of operating and maintaining the Property, including, without limitation, all utility charges, Taxes, and Other Charges (as such terms are defined in the Security Instrument) and any other liens, charges and expenses which Lender may deem necessary or desirable; (iii) the cost of all alterations, renovations, repairs or replacements; (iv) all expenses incident to taking and retaining possession of the Property; and (v) the Debt, together with all costs and reasonable attorneys' fees.

B.    In addition, upon the occurrence of an Event of Default, Lender, at its option, may (i) exercise such other rights and remedies as Lender shall have under applicable law, including Chapter 64; (ii) exercise all rights and powers of Assignor, including, without limitation, the right to enter into, negotiate, execute, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums payable under the Assigned Property; (iii) either require Assignor to pay monthly in advance to Lender, or to any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in possession of Assignor, or require Assignor to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Assignor may be evicted by summary proceedings or otherwise.

6.02    OTHER REMEDIES. Nothing contained in this Assignment and no act done or omitted by Lender pursuant to the power and rights granted to Lender hereunder shall be deemed to be a waiver by Lender of its rights and remedies under the Note, the Security Instrument, or the Other Security Documents and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Lender under the terms thereof. The right of Lender to collect the Debt and to enforce any other security therefor held by it may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder. Assignor hereby absolutely, unconditionally and irrevocably waives any and all rights to assert any setoff, counterclaim or crossclaim of any nature whatsoever with respect to the obligations of Assignor under this Assignment, the Note, the Security Instrument, the Other Security Documents or otherwise with respect to the loan secured hereby in any action or proceeding brought by Lender to collect same, or any portion thereof, or to enforce and realize upon the lien and security interest created by this Assignment, the Note, the Security Instrument, or any of the Other Security Documents (provided, however, that the foregoing shall not be deemed a waiver of Assignor's right to assert any compulsory counterclaim if such counterclaim is compelled under local law or rule of procedure, nor shall the foregoing be deemed a waiver of Assignor's right to assert any claim which would constitute a defense, setoff, counterclaim or crossclaim of any nature whatsoever against Lender in any separate action or proceeding).

6.03    OTHER SECURITY. Lender may take or release other security for the payment of the Debt, may release any party primarily or secondarily liable therefor and may apply any other

security held by it to the reduction or satisfaction of the Debt without prejudice to any of its rights under this Assignment.

6.04    NON-WAIVER. The exercise by Lender of the option granted it in Section 5.01 of this Assignment and the collection of the Rents and other sums payable pursuant to the Assigned Property and the application thereof as herein provided shall not be considered a waiver of any default by Assignor under the Note, the Security Instrument, the Leases, this Assignment or the Other Security Documents. The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment. Assignor shall not be relieved of Assignor's obligations hereunder by reason of (a) the failure of Lender to comply with any request of Assignor or any other party to take any action to enforce any of the provisions hereof or of the Security Instrument, the Note or the Other Security Documents, (b) the release regardless of consideration, of the whole or any part of the Property, or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of this Assignment, the Note, the Security Instrument or the Other Security Documents. Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take any action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to enforce its rights under this Assignment. The rights of Lender under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

6.05    BANKRUPTCY. Assignor hereby unconditionally covenants and agrees with Lender as follows:

A.    Upon or at any time after the occurrence of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Assignor in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Assignor, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

B.    If there shall be filed by or against Assignor a petition under the Bankruptcy Code, and Assignor, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Assignor shall give Lender not less than ten (10) days' prior notice of the date on which Assignor shall apply to the bankruptcy court for authority to reject the Lease. Lender shall have the right, but not the obligation, to serve upon Assignor within such ten-day period a notice stating that (i) Lender demands that Assignor assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Assignor the notice described in the preceding sentence, Assignor shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

## ARTICLE VII. FURTHER ASSURANCES/NO LIABILITY

7.01    FURTHER ASSURANCES.  Assignor will, at the cost of Assignor, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, conveyances, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require for the better assuring, conveying, assigning, transferring and confirming unto Lender the property and rights hereby assigned or intended now or hereafter so to be, or which Assignor may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering or recording this Assignment and, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Assignor to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or comparable security instruments, to evidence more effectively the lien and security interest hereof in and upon the Leases.

7.02    NO LIABILITY OF LENDER.  THIS ASSIGNMENT SHALL NOT BE CONSTRUED TO BIND LENDER TO THE PERFORMANCE OF ANY OF THE COVENANTS, CONDITIONS OR PROVISIONS CONTAINED IN ANY LEASE OR LEASE GUARANTY OR OTHERWISE IMPOSE ANY OBLIGATION UPON LENDER. LENDER SHALL NOT BE LIABLE FOR ANY LOSS SUSTAINED BY GRANTOR RESULTING FROM LENDER'S FAILURE TO LET THE PROPERTY AFTER AN EVENT OF DEFAULT OR FROM ANY OTHER ACT OR OMISSION OF LENDER IN MANAGING THE PROPERTY AFTER AN EVENT OF DEFAULT UNLESS SUCH LOSS IS CAUSED BY THE WILLFUL MISCONDUCT OR BAD FAITH OF LENDER.   LENDER SHALL NOT BE OBLIGATED TO PERFORM OR DISCHARGE ANY OBLIGATION, DUTY OR LIABILITY UNDER THE LEASES OR ANY LEASE GUARANTIES OR UNDER OR BY REASON OF THIS ASSIGNMENT AND GRANTOR SHALL, AND HEREBY AGREES, TO INDEMNIFY LENDER FOR, AND TO HOLD LENDER HARMLESS FROM, ANY AND ALL LIABILITY, LOSS OR DAMAGE WHICH MAY OR MIGHT BE INCURRED UNDER THE ASSIGNED PROPERTY OR UNDER OR BY REASON OF THIS ASSIGNMENT AND FROM ANY AND ALL CLAIMS AND DEMANDS WHATSOEVER, INCLUDING THE DEFENSE OF ANY SUCH CLAIMS OR DEMANDS WHICH MAY BE ASSERTED AGAINST LENDER BY REASON OF ANY ALLEGED OBLIGATIONS AND UNDERTAKINGS ON ITS PART TO PERFORM OR DISCHARGE ANY OF THE TERMS, COVENANTS OR AGREEMENTS CONTAINED IN THE LEASES OR ANY LEASE GUARANTIES, EVEN IF SUCH LOSS IS THE RESULT OF OR CAUSED BY THE NEGLIGENT ACTS OR OMISSIONS OF LENDER (WHETHER SOLE OR CONCURRENT). SHOULD LENDER INCUR ANY SUCH LIABILITY, THE AMOUNT THEREOF, INCLUDING COSTS, EXPENSES AND REASONABLE ATTORNEYS' FEES, SHALL BE SECURED BY THIS ASSIGNMENT AND BY THE SECURITY INSTRUMENT AND THE OTHER SECURITY DOCUMENTS AND GRANTOR SHALL REIMBURSE LENDER THEREFOR IMMEDIATELY UPON DEMAND AND UPON THE FAILURE OF GRANTOR SO TO DO LENDER MAY, AT ITS OPTION, DECLARE ALL SUMS SECURED BY THIS ASSIGNMENT AND BY THE SECURITY INSTRUMENT AND THE OTHER SECURITY DOCUMENTS IMMEDIATELY DUE AND PAYABLE.  THIS ASSIGNMENT SHALL NOT OPERATE TO PLACE ANY OBLIGATION OR LIABILITY FOR THE CONTROL, CARE, MANAGEMENT OR REPAIR OF THE PROPERTY UPON LENDER, NOR

**FOR THE CARRYING OUT OF ANY OF THE TERMS AND CONDITIONS OF THE LEASES OR ANY LEASE GUARANTIES; NOR SHALL IT OPERATE TO MAKE LENDER RESPONSIBLE OR LIABLE FOR ANY WASTE COMMITTED ON THE PROPERTY BY THE TENANTS OR ANY OTHER PARTIES, OR FOR ANY DANGEROUS OR DEFECTIVE CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION THE PRESENCE OF ANY HAZARDOUS SUBSTANCES (AS DEFINED IN THE SECURITY INSTRUMENT), OR FOR ANY NEGLIGENCE IN THE MANAGEMENT, UPKEEP, REPAIR OR CONTROL OF THE PROPERTY RESULTING IN LOSS OR INJURY OR DEATH TO ANY TENANT, LICENSEE, EMPLOYEE OR STRANGER.**

7.03    NO MORTGAGEE IN POSSESSION. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Lender. In the exercise of the powers herein granted Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Assignor.

## ARTICLE VIII. DEFINITIONS

8.01    CERTAIN DEFINITIONS. .Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the phrases "attorneys' fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder, the word "Assignor" shall mean each Assignor and any subsequent owner or owners of the Property or any part thereof or interest therein, the word "Lender" shall mean Lender and any subsequent holder of the Note, the word "Note" shall mean the Note and any other evidence of indebtedness secured by the Security Instrument, the word "person" shall include an individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority, and any other entity, and the word "Property" shall include any portion of the Property and any interest therein.

8.02    NUMBER AND GENDER. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

8.03    EVENT OF DEFAULT. "Event of Default" shall mean any event of default as set forth in the Note or in any of the Other Security Documents, or under the terms of any other instrument given as collateral to Lender as security for the payment of the Note after applicable notice and failure to cure as provided for in the Loan Agreement of even date by and between Assignor and Lender.

## ARTICLE IX. APPLICABLE LAW

9.01    CHOICE OF LAW. This Assignment shall be governed, construed, applied and enforced in accordance with the laws of the State of Texas. Venue shall lie in Bell County, Texas.

9.02    PROVISIONS SUBJECT TO APPLICABLE LAW. All rights, powers and remedies provided in this Assignment may be exercised only to the extent that the exercise thereof does not violate

any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Assignment invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable laws.

## ARTICLE X. MISCELLANEOUS PROVISIONS

10.01 CONFLICT OF TERMS. In case of any conflict between the terms of this Assignment and the terms of the Security Instrument, the terms of the Security Instrument shall prevail.

10.02 NO ORAL CHANGE. This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Assignor or Lender, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

10.03 AUTHORITY. Assignor represents and warrants that it has full power and authority to execute and deliver this Assignment and the execution and delivery of this Assignment has been duly authorized and does not conflict with or constitute a default under any law, judicial order or other agreement affecting Assignor or the Property.

10.04 DUPLICATE ORIGINALS; COUNTERPARTS. This Assignment may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

10.05 NOTICES. All notices required or permitted hereunder shall be given as provided in the Security Instrument.

10.06 LIABILITY. If Assignor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Assignment shall be binding upon and inure to the benefit of Assignor and Lender and their respective successors and assigns forever.

10.07 HEADINGS, ETC. The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

10.08 SOLE DISCRETION OF LENDER. Wherever pursuant to this Assignment (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

10.09 COSTS AND EXPENSES OF ASSIGNOR. Wherever pursuant to this Assignment it is provided that Assignor pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees.

IN WITNESS WHEREOF, Assignor has executed this instrument as of the day and year first above written.

Assignor:

WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company

By:  WC Teakwood Plaza Mezz, LLC, a
Delaware limited liability company,
Manager

By: 
Natin Paul, President

THE STATE OF Texas                    §

COUNTY OF Travis                      §

This instrument was acknowledged before me on the 18 day of April , 2017 , by Natin Paul, President of WC Teakwood Plaza Mezz, LLC, a Delaware limited liability company, on behalf of said limited liability company, in its capacity as Manager of WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company, on behalf of said limited liability company.


Notary Public in and for
The State of Texas

My commission expires: 10/3/20

LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846548

AFTER RECORDING RETURN TO:
Loan Services
FIRST STATE BANK CENTRAL TEXAS
P. O. Box 6136
Temple, Texas 76503-6136

PREPARED BY:

OPPER & GAMBRELL, P.L.L.C.
8582 Katy Freeway, Suite 200
Houston, Texas 77024



3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

EXHIBIT NO. 15                    EX. 15-015

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
April 27 2017 08:39 AM
FEE $.00 2017066580

EXHIBIT NO. 15

EX. 15.01

**ELECTRONICALLY RECORDED**   **2017066581**

TRV      **4**      PGS

*50·CTOT  17·298207·AM*

After recording, please return to:

First Nationwide Title Agency, LLC
Ilya Soybelman
220 East 42nd Street, Suite 3105
New York, NY 10017

### RELEASE OF LIEN

KNOW ALL MEN BY THESE PRESENTS:

WHEREAS, U.S. Bank National Association, successor in interest to Bank of America, National Association, successor by merger to LaSalle Bank National Association, as Trustee for the registered holders of Bear Stearns Commercial Mortgage Securities Inc., Commercial Mortgage Pass-Through Certificates, Series 2005-PWR9 ("**Current Lender**"), under the Pooling and Servicing Agreement dated as of September 1, 2005, whose address is c/o C-III Asset Management LLC 5221 N. O'Connor Blvd., Suite 600, Irving, Texas 75039, is the current owner and holder of the note evidencing the debt secured by that certain Deed of Trust, Security Agreement, Assignment of Rents dated July 26, 2005 ("**Deed of Trust**") executed by CFH Realty III/Teakwood, LP., a Texas limited partnership ("**Original Borrower**"), in favor Principal Commercial Funding, LLC ("**Original Lender**"), and recorded July 28, 2005 as County Clerk's File number 2005135872 of the Official Public Records, Travis County, Texas. ("**Official Public Records**"), as affected by the Consent to Transfer and Loan Assumption dated December 23, 2010 and recorded December 29, 2010 under County Clerk's File number 2010194784 of the Official Public Records, as assigned to U.S. Bank National Association, as Trustee, as Successor-In-Interest to Bank of America, National Association, as Trustee, as Successor-By-Merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Bear Stearns Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, 2005-PWR9 by Assignment Dated: February 25, 2016, recorded March 10, 2016 in County Clerk's File number 2016035461, of the Official Public Records, as modified by Agreement, dated: July 29, 2016, recorded: July 29, 2016 in County Clerk's File number 2016123536, of the Official Public Records, covering certain real estate located in Travis County, Texas, as more fully described in the attached **Exhibit A** (the "**Property**").

NOW, THEREFORE, the undersigned, has this day, and does by these presents hereby RELEASE, DISCHARGE AND QUITCLAIM unto the Original Borrower, its successors or assigns, as the case may be, all the right, title, interest and estate in and to the Property which the undersigned has or may be entitled to by virtue of said Deed of Trust and said Assignment of Leases and Rents, and any contemporaneous vendor's lien, and does hereby declare the same to be fully released and discharged therefrom.

*[Remainder of page intentionally left blank; Signature page to follow]*

EXHIBIT NO. 15                          EX. 15-017

**Dana DeBeauvoir, County Clerk**

**Travis County**

Date:  09/08/2020 09:16 PM

**Real Estate Index Search**

Report # 16546175  Requested By WEBPUBLIC (WEBPUBLIC)  Date Filed on 07/01/2020  and 08/11/2020 Act Type is NOTICE OF
SUBSTITUTE TRUSTEE SALE  [V,N]__

Page    1    of    4

| # | Instrument # | Book | Page | Date Recorded | Document Type | Grantor | More Names | Grantee | More Names | Legal Description | Status | Image |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 202040421 | | | 08/11/2020 | FORECLOSURE | FINDEISEN ROSAMUNDA | ✓ | 09/01/2020 | ✓ | LT 114 SEC 1 LAGO RANCHOS LOC 6516 SIERRA VISTA DR LAGO VISTA TX 78645 | | ✓ |
| 2 | 202040420 | | | 08/11/2020 | FORECLOSURE | NEWBERRY COLIN | ✓ | 09/01/2020 | ✓ | SEE INSTRUMENT | | ✓ |
| 3 | 202040419 | | | 08/11/2020 | FORECLOSURE | HANKINS LANDON | ✓ | 09/01/2020 | ✓ | SEE INSTRUMENT | | ✓ |
| 4 | 202040418 | | | 08/11/2020 | FORECLOSURE | ZAVALA ANGELA | ✓ | 09/01/2020 | ✓ | LT 8 LTTO 10 SEC 1 SUNSET VIEW LOC 7929 GAULT STREET AUSTIN TX 78757 | | ✓ |
| 5 | 202040417 | | | 08/11/2020 | FORECLOSURE | ZAVALA ANGELA | ✓ | 09/01/2020 | ✓ | LT 21 GARDEN VILLA ESTATES ADDN | | ✓ |
| 6 | 202040416 | | | 08/11/2020 | FORECLOSURE | MILLS SUSAN | ✓ | 09/08/2020 | ✓ | SEE INSTRUMENT | | ✓ |
| 7 | 202040415 | | | 08/11/2020 | FORECLOSURE | WOLF BRANDON | ✓ | 09/01/2020 | ✓ | LT 13 BLK B SEC 2 HIGHLAND OAKS | | ✓ |
| 8 | 202040414 | | | 08/10/2020 | FORECLOSURE | MITCHELL STEPHEN A | ✓ | 09/01/2020 | ✓ | LT 3 LTTO 4 BLK 1 MCKINLEY HEIGHTS | | ✓ |
| 9 | 202040413 | | | 08/10/2020 | FORECLOSURE | SCHNEIDER ZACHARY | ✓ | 09/01/2020 | ✓ | UNIT RT-9 THE TRAILS AT 620 COMMERCIAL CONDOMINIUMS | | ✓ |
| 10 | 202040412 | | | 08/10/2020 | FORECLOSURE | CAGLE GREGORY | ✓ | 09/01/2020 | ✓ | UNIT 42 RETAMA GARDEN HOMES LOC 2201 LAKEWAY BLVD UNIT 42 LAKEWAY TX 78734 | | ✓ |
| 11 | 202040411 | | | 08/10/2020 | FORECLOSURE | SMITH L DAVID | ✓ | 09/01/2020 | ✓ | LT 6 MARGARET G SHELTON SUBD LOC 1906 HEATHER STREET AUSTIN TX 78704 | | ✓ |
| 12 | 202040410 | | | 08/10/2020 | FORECLOSURE | SCHNEIDER ZACHARY | ✓ | 09/01/2020 | ✓ | 3 395 AC PT LT 1 ALLANDALE NORTH SEC 5 | | ✓ |

Permanent Index From 01/01/1988 to 08/26/2020  Temporary Index from 08/27/2020 to 09/08/2020  Images from 01/01/1986

EXHIBIT NO. 16

EX. 16-001

| # | Instrument # | Book | Page | Date Recorded | Document Type | Grantor | More Names | Grantee | More Names | Legal Description | Status | Image |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 | 202040409 | | | 08/10/2020 | FORECLOSURE | SCHNEIDER ZACHARY | ✓ | 09/01/2020 | ✓ | SEE INSTRUMENT | | ✓ |
| 14 | 202040408 | | | 08/10/2020 | FORECLOSURE | SCHNEIDER ZACHARY | ✓ | 09/01/2020 | ✓ | LT B SEC 2 ANDERSON SQUARE BUSINESS PARK | | ✓ |
| 15 | 202040407 | | | 08/10/2020 | FORECLOSURE | ZAVALA ANGELA | ✓ | 09/01/2020 | ✓ | LT 1 BLK F SEC 3 WOOTEN TERRACE LOC 8805 FIRESIDE DR AUSTIN TX 78757 | | ✓ |
| 16 | 202040406 | | | 08/10/2020 | FORECLOSURE | ZAVALA ANGELA | ✓ | 09/01/2020 | ✓ | LT 18 BLK U SEC 2 HIGHLAND PARK NORTH LOC 18804 CHRIGHTON CASTLE BEND PFLUGERVILLE TX 78660 PDV C | | ✓ |
| 17 | 202040405 | | | 08/10/2020 | FORECLOSURE | ZAVALA ANGELA | ✓ | 09/01/2020 | ✓ | LT 4-A PETERS ADDN | | ✓ |
| 18 | 202040404 | | | 08/07/2020 | FORECLOSURE | NGUYEN ANH | ✓ | 09/01/2020 | ✓ | LT 7 LTTO 10 BLK 190 ORIGINAL CITY OF AUSTIN | | ✓ |
| 19 | 202040403 | | | 08/06/2020 | FORECLOSURE | O'BOYLE JACK | ✓ | 10/06/2020 | ✓ | LT 35 BLK F THE VILLAGES OF HIDDEN LAKE LOC 3412 HIDDEN LAKE CROSSING PFLUGERVILLE TX 78660 PDV 2A | | ✓ |
| 20 | 202040401 | | | 08/05/2020 | FORECLOSURE | SAM RACHEL | ✓ | 09/01/2020 | ✓ | LT 4 LTTO 6 BLK 4 FAIR GROUNDS ADDN | | ✓ |
| 21 | 202040400 | | | 08/04/2020 | FORECLOSURE | GARDBERG MANNY | ✓ | 09/01/2020 | ✓ | 10 796 AC BALCONES VILLAGE SEC 12-A LOC 13376 NORTH RESEARCH BLVD AUSTIN TX 78750 | | ✓ |
| 22 | 202040399 | | | 07/31/2020 | FORECLOSURE | WILSON ROBERT J | ✓ | 09/01/2020 | ✓ | LT 11 BLK 35 SWEETMANS ADDN AKA R L SWEETMANS ADDN BLKS 35 36 B5 B6 B7 | | ✓ |
| 23 | 202040398 | | | 07/30/2020 | FORECLOSURE | GIBSON BARBARA | ✓ | 09/01/2020 | ✓ | LT D LYNCH & TERRELL SUBD | | ✓ |
| 24 | 202040397 | | | 07/30/2020 | FORECLOSURE | GRAY TRAVIS H | ✓ | 09/01/2020 | ✓ | LT 53 BLK O WINDERMERE SUBD LOC 1105 IVY BRIDGE DR PFLUGERVILLE TX 78660 PDV D | | ✓ |
| 25 | 202040396 | | | 07/30/2020 | FORECLOSURE | SAUCEDO ISRAEL | ✓ | 09/01/2020 | ✓ | LT 129 FLINTROCK AT HURST CREEK LOC 105 REFLECTION BAY COURT AUSTIN TX 78738 PDV 3 | | ✓ |
| 26 | 202040395 | | | 07/30/2020 | FORECLOSURE | SAUCEDO ISRAEL | ✓ | 09/01/2020 | ✓ | LT 5 BLK C RIDGE AT ALTA VISTA LOC 113 WHITLEY DRIVE AUSTIN TX 78738 | | ✓ |
| 27 | 202040394 | | | 07/30/2020 | FORECLOSURE | WALCOTT IMAN | ✓ | 09/01/2020 | ✓ | LT 5 BLK J SEC 4 SETTLERS RIDGE LOC 809 IVY DRIVE PFLUGERVILLE TX 78660 PDV 2 | | ✓ |

EXHIBIT NO. 16

EX. 16-002

| # | Instrument # | Book | Page | Date Recorded | Document Type | Grantor | More Names | Grantee | More Names | Legal Description | Status | Image |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28 | 202040393 | | | 07/28/2020 | FORECLOSU RE | SCHMITT LEE J | ✓ | 09/01/2020 | ✓ | LT 401 BLK D SEC 2 IMPERIAL VALLEY | | ✓ |
| 29 | 202040392 | | | 07/23/2020 | FORECLOSU RE | LONG LORI LIANE | ✓ | 10/06/2020 | ✓ | LT 52 TWIN MESA LOC 4305 HYRIDGE DRIVE AUSTIN TX 78759 | | ✓ |
| 30 | 202040391 | | | 07/23/2020 | FORECLOSU RE | SCOTT CAMISHA | ✓ | 09/01/2020 | ✓ | LT 99 TIMBER RIDGE AT GREENBRIAR SECOND AMENDMENT LOC 1701 TIMBERWOOD DR AUSTIN TX 78741-5546 | | ✓ |
| 31 | 202040390 | | | 07/23/2020 | FORECLOSU RE | SCOTT CAMISHA | ✓ | 09/01/2020 | ✓ | PT WELCH'S SUBD OF OLT 46 DIV O LOC 1510 HOLLY STREET AUSTIN TX 78702 | | ✓ |
| 32 | 202040389 | | | 07/23/2020 | FORECLOSU RE | SAUCEDO ISRAEL | ✓ | 09/01/2020 | ✓ | LT 16 BLK O SEC 1 PRESIDENTIAL MEADOWS LOC 12720 WILLIAM HARRISON STREET MANOR TX 78653 | | ✓ |
| 33 | 202040388 | | | 07/21/2020 | FORECLOSU RE | PECKHAM WILLIAM T | ✓ | 09/01/2020 | ✓ | 2.00 ACS OUT OF LT 2 LOCKWOOD ACRES | | ✓ |
| 34 | 202040387 | | | 07/20/2020 | FORECLOSU RE | NIETO JOSEFINA | ✓ | 09/01/2020/ | ✓ | 3.58 ACS A W NICHOLS SUR NO 57 ABS NO 2287 | | ✓ |
| 35 | 202040386 | | | 07/14/2020 | FORECLOSU RE | HANKINS LANDON | ✓ | 01/05/2021 | ✓ | SEE INSTRUMENT | | ✓ |
| 36 | 202040385 | | | 07/14/2020 | FORECLOSU RE | RILEY MIKE | ✓ | 08/04/2020 | ✓ | LT 7 LTTO 8 BLK 29 ORIGINAL CITY OF ASUTIN | | ✓ |
| 37 | 202040384 | | | 07/14/2020 | FORECLOSU RE | WILLIAMS BENJAMIN K | ✓ | 08/04/2020 | ✓ | UNIT 1 OF 1108 MORROW STREET CONDOMINIUMS | | ✓ |
| 38 | 202040383 | | | 07/14/2020 | FORECLOSU RE | ZAVALA ANGELA | ✓ | 08/04/2020 | ✓ | LT 4-A PETERS ADDITION | | ✓ |
| 39 | 202040382 | | | 07/14/2020 | FORECLOSU RE | ZAVALA ANGELA | ✓ | 08/04/2020 | ✓ | LT 21 GARDEN VILLA ESTATES | | ✓ |
| 40 | 202040381 | | | 07/14/2020 | FORECLOSU RE | TULLY GARY D | ✓ | 08/04/2020 | ✓ | LT 24 BLK D SEC 3 BRIARCREEK SUBD LOC 11504 HUNGRY HORSE DRIVE MANOR TX 78653 | | ✓ |
| 41 | 202040380 | | | 07/13/2020 | FORECLOSU RE | ARNOLD PATRICE | ✓ | 08/04/2020 | ✓ | UNIT 1 BLDG E CROWN COLONY VILLAS LOC 10916-D CROWN COLONY DR AUSTIN TX 78747 | | ✓ |
| 42 | 202040379 | | | 07/13/2020 | FORECLOSU RE | MOON ANDREW J | ✓ | 08/04/2020 | ✓ | LT 14 BLK 11 BROADACRES | | ✓ |

Page   4   of   4

| # | Instrument # | Book | Page | Date Recorded | Document Type | Grantor | More Names | Grantee | More Names | Legal Description | Status | Image |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43 | 202040378 | | | 07/13/2020 | FORECLOSURE | ZAVALA ANGELA | ✓ | 08/04/2020 | ✓ | LT 1-B AMENDED PLAT OF GOLDEN CORRALNORTH LT 1 10,000 NORTH LAMAR AND LT 1 AMENDED PLAT OF GOLDEN CORRALNORTH SUBD | | ✓ |
| 44 | 202040377 | | | 07/13/2020 | FORECLOSURE | SCHROEDER MICHAEL J | ✓ | 08/04/2020 | ✓ | UNIT A-174 BLDG 24 LAKEWAY WORLD OF TENNIS | | ✓ |
| 45 | 202040376 | | | 07/13/2020 | FORECLOSURE | ZAVALA ANGELA | ✓ | 08/04/2020 | ✓ | LT 5 LTTO 7 REAGAN HILL LOC 1300 MCKIE DR AUSTIN TX 78752 | | ✓ |
| 46 | 202040375 | | | 07/13/2020 | FORECLOSURE | SAUCEDO ISRAEL | ✓ | 10/06/2020 | ✓ | LT 23 BLK H SEC 1 MOCKINGBIRD HILLS LOC 10504 TURNER DRIVE AUSTIN TX 78753 | | ✓ |
| 47 | 202040374 | | | 07/10/2020 | FORECLOSURE | SCHNEIDER ZACHARY | ✓ | 08/04/2020 | ✓ | UNIT RT-9 THE TRAILS AT 620 COMMERCIAL CONDOMINIUMS | | ✓ |
| 48 | 202040373 | | | 07/10/2020 | FORECLOSURE | MCCOWN JAMES M | ✓ | 08/04/2020 | ✓ | LT 2 LTTO 3 CREEKSIDE LOC 7104 CREEKSIDE DRIVE AUSTIN TEXAS 78752 PDV 1 | | ✓ |
| 49 | 202040372 | | | 07/10/2020 | FORECLOSURE | NGUYEN ANH | ✓ | 08/04/2020 | ✓ | LT 7 LTTO 10 BLK 190 ORIGINAL CITY OF AUSTIN | | ✓ |
| 50 | 202040371 | | | 07/09/2020 | FORECLOSURE | OCHOA GUILLERMO | | 08/04/2020 | ✓ | UNITS 3 & 4 OF DUCK LAKE COMMERCIAL CONDOS LOC 701 DALTON LANE UNITS 3 & 4 AUSTIN TX 78742 | | ✓ |
| 51 | 202040370 | | | 07/09/2020 | FORECLOSURE | HOEFKER PAUL A | ✓ | 09/01/2020 | ✓ | LT 60 BLK F SEC 1C TRAVISSO PDV 2 | | ✓ |
| 52 | 202040369 | | | 07/02/2020 | FORECLOSURE | SUAREZ SUZANNE | ✓ | 09/01/2020 | ✓ | LT 9 BLK A TIMBER LAKE ADDN LOC 14841 DALLAS PARKWAY SUITE 425 DALLAS TX 75254 | | ✓ |

EXHIBIT NO. 16

EX. 16-004

**Dana DeBeauvoir, County Clerk**

**Travis County**

Date: 09/08/2020 08:01 PM

**Real Estate Index Search**

Report # 16546096  Requested By WEBPUBLIC (WEBPUBLIC)  Party Name Begins With 10/06/2020 Name Type is Grantee  [V,N]__

Page   1   of   2

| # | Instrument # | Book | Page | Date Recorded | Document Type | Grantor | More Names | Grantee | More Names | Legal Description | Status | Image |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 202040438 | | | 09/08/2020 | FORECLOSURE | P 10/06/2020 | ✓ | P ANDERSON JAMES L III | ✓ | LT 4 BLK 2 DEEP EDDY HEIGHTS | T | ✓ |
| 2 | 202040437 | | | 09/08/2020 | FORECLOSURE | P 10/06/2020 | ✓ | P ANDERSON ROBERTS PLLC | ✓ | SEE INSTRUMENT | T | ✓ |
| 3 | 202040436 | | | 09/04/2020 | FORECLOSURE | 10/06/2020 | ✓ | CAGLE GREGORY S | ✓ | UNIT 26 OF EASTWOOD AT RIVERSIDE II CONDOS LOC 2311 HERMIA STREET #25 AUSTIN TX 78741 | T | ✓ |
| 4 | 202040435 | | | 09/04/2020 | FORECLOSURE | 10/06/2020 | ✓ | CAGLE GREGORY S | ✓ | UNIT 2106 BLDG 2 OF PT OF 8888 TALLWOOD CONDOS LOC 8888 TALLWOOD DR #2106 AUSTIN TX 78759 | T | ✓ |
| 5 | 202040434 | | | 09/04/2020 | FORECLOSURE | 10/06/2020 | ✓ | CAGLE GREGORY S | ✓ | UNIT 5 WEST OAK CONDOS LOC 9002 JODIE LANE AUSTIN TX 78748 | T | ✓ |
| 6 | 202040433 | | | 09/03/2020 | FORECLOSURE | 10/06/2020 | ✓ | GRAY TRAVIS H | ✓ | UNIT C-3 BLDG 9 LAKEWAY WORLD OF TENNIS LOC 133 WORLD OF TENNIS SQ LAKEWAY TX 78738 | T | ✓ |
| 7 | 202040432 | | | 08/28/2020 | FORECLOSURE | 10/06/2020 | ✓ | ZAVALA ANGELA | ✓ | LT 30 BLK B SEC 2 HEATHERWILDE PDV 1 | T | ✓ |
| 8 | 202040431 | | | 08/27/2020 | FORECLOSURE | 10/06/2020 | ✓ | ORLANDO MONICA SCHULZ | ✓ | SEE INSTRUMENT LOC 10017 RODRIGUEZ RD AUSTIN TX 78747 | T | ✓ |
| 9 | 202040430 | | | 08/27/2020 | FORECLOSURE | 10/06/2020 | ✓ | ZAVALA ANGELA | ✓ | LT 12 BLK N SEC 2 CARMEL WEST PDV 1 | T | ✓ |
| 10 | 202040429 | | | 08/27/2020 | FORECLOSURE | 10/06/2020 | ✓ | ZAVALA ANGELA | ✓ | LT 30 BLK B SEC 2 HEATHERWILDE PDV 1 | T | ✓ |
| 11 | 202040428 | | | 08/21/2020 | FORECLOSURE | P 10/06/2020 | ✓ | P AMERICAN BANK OF COMMERCE | ✓ | LT 1 BLK A SEC 1 RESUB OF BEARD FAMILY SUBD LOC 6701 JESTER BLVD AUSTIN TX 78750 | | ✓ |

EXHIBIT NO. 17

EX. 17-001

| # | Instrument # | Book | Page | Date Recorded | Document Type | Grantor | More Names | Grantee | More Names | Legal Description | Status | Image |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | 202040426 | | | 08/20/2020 | FORECLOSURE | 10/06/2020 | ✓ | ZAVALA ANGELA | ✓ | UNIT NO B-160 BLDG 15 LAKEWAY WORLD OF TENNIS CONDO LOC 172 WORLD OF TENNIS SQ LAKEWAY TX 78718 | | ✓ |
| 13 | 202040425 | | | 08/20/2020 | FORECLOSURE | 10/06/2020 | ✓ | ZAVALA ANGELA | ✓ | LT 29A BLK N WINDERMERE LOC 1228 ORCHARD PARK CIR PFLUGERVILLE TX 78660 PDV E | | ✓ |
| 14 | 202040424 | | | 08/20/2020 | FORECLOSURE | 10/06/2020 | ✓ | SCOTT CAMISHA | ✓ | LT 7 BLK A MESQUITE SUBDIVISION LOC 6300 TORRES ST AUSTIN TX 78741 | | ✓ |
| 15 | 202040423 | | | 08/20/2020 | FORECLOSURE | 10/06/2020 | ✓ | HUMPHREY TANESHA | ✓ | UNIT 29 DAVENPORT RIM CONDOMINIUMS LOC 2800 WAYMAKER WAY UNIT 29 AUSTIN TX 78746-1847 | | ✓ |
| 16 | 202040422 | | | 08/20/2020 | FORECLOSURE | 10/06/2020 | ✓ | WALCOTT IMAN | ✓ | LT 1 BLK B SEC 3 WELLS BRANCH LOC 1601 GAYLORD DRIVE AUSTIN TX 78728 PDV X | | ✓ |
| 17 | 202040403 | | | 08/06/2020 | FORECLOSURE | 10/06/2020 | ✓ | O'BOYLE JACK | ✓ | LT 35 BLK F THE VILLAGES OF HIDDEN LAKE LOC 3412 HIDDEN LAKE CROSSING PFLUGERVILLE TX 78660 PDV 2A | | ✓ |
| 18 | 202040392 | | | 07/23/2020 | FORECLOSURE | 10/06/2020 | ✓ | LONG LORI LIANE | ✓ | LT 52 TWIN MESA LOC 4305 HYRIDGE DRIVE AUSTIN TX 78759 | | ✓ |
| 19 | 202040375 | | | 07/13/2020 | FORECLOSURE | 10/06/2020 | ✓ | SAUCEDO ISRAEL | ✓ | LT 23 BLK H SEC 1 MOCKINGBIRD HILLS LOC 10504 TURNER DRIVE AUSTIN TX 78753 | | ✓ |

EXHIBIT NO. 17

EX. 17-002

**Dana DeBeauvoir, County Clerk**

**Travis County**

Date: 07/22/2020 05:11 PM

**Real Estate Index Search**

Report # 16374552  Requested By WEBPUBLIC (WEBPUBLIC)  Vendor Begins with NEWBERRY COLIN Date Filed on 06/09/2020  and 07/08/2020  [V,N]__

Page   1   of   1

| # | Instrument # | Book | Page | Date Recorded | Document Type | Grantor | More Names | Grantee | More Names | Legal Description | Status | Image |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 202040322 | | | 06/10/2020 | FORECLOSURE | NEWBERRY COLIN | ✓ | 07/07/2020 | ✓ | LT 8 BLK D AMD PLAT OF FRONTIER AT MONTANA | | ✓ |
| 2 | 2020116261 | | | 07/08/2020 | DEED | NEWBERRY COLIN H | ✓ | P WOLFE CAPITAL INVESTMENTS | | LT 8 BLK D AMD PLAT OF FRONTIER AT MONTANA | | ✓ |

EXHIBIT NO. 18

EX. 18-001

▌║▌█║▌║█║▌║█║▌█▌║▌ 3 pgs   202040322

**STAYS IN FILE**

## NOTICE OF NON-JUDICIAL FORECLOSURE
## AND SUBSTITUTE TRUSTEE'S SALE

Date  _June 9_ , 2020

1.  **Property to be sold:** The property to be sold is described as follows

   **LOT 8, BLOCK D, AMENDED PLAT OF FRONTIER AT MONTANA, a subdivision in Travis County, Texas, according to the map or plat recorded in Document No. 2006000392 of the Official Public Records of Travis County, Texas.**

**Last known owner and address:**          Upgrade LOL, LLC
                                            c/o Guillermo Rangel
                                            P O. Box 17242
                                            Austin, TX 78760

2.  **Instrument granting right and power to foreclose:**  The instrument granting right and power to foreclose is the Deed of Trust recorded on December 4, 2019 under Document No 2019193087 of the Official Public Records of Travis County, Texas

3.  **Date, Time, and Place of Sale:** The sale is scheduled to be held at the following date, time, and place

   Date: Tuesday, July 7, 2020

   Time: No earlier than 10:00 AM, and no later than three hours thereafter

   Place: The Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas, Travis County, 78701.

4.  **Terms of Sale:** The sale will be conducted as a public auction to the highest bidder for cash.

Pursuant to TEX. PROP. CODE § 51.009, the Property will be sold in, AS IS, WHERE IS CONDITION, WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, except as to the warranties of title, if any, provided for under the deed of trust  Prospective bidders are advised to conduct an independent investigation of the nature and physical condition of the property

Prospective bidders are reminded that by law the sale will necessarily be made subject to all prior matters of record affecting the property, if any, to the extent that they remain in force and effect and have not been subordinated to the deed of trust  Prospective bidders are strongly urged to examine the applicable property records to determine the nature and extent of such matters, if any

EXHIBIT NO. 18                                                                    EX. 18-002

Those desiring to purchase the property will need to demonstrate their ability to pay cash on the day the property is sold

5.  **Type of Sale:** The sale is a non-judicial lien foreclosure sale being conducted pursuant to the Deed of Trust

6.  **Obligations Secured:** The Deed of Trust provides that it secures the payment of a Note and associated fees, including all costs and attorneys' fees incurred, namely the amount of **$159,000.00 (plus fees).**

> Substitute Trustee:    Colin Newberry
>
> Lienholder.    Steve Eckart

7.  **Default and Request to Act:** Default has occurred under the Deed of Trust, and the lienholder has appointed the undersigned as Substitute Trustee to conduct this sale.

SIGNED on the ___9___ day of ___June___, 2020

_____
**Colin Newberry**
State Bar No. 24074806

HAY LEGAL GROUP PLLC
611 W 5th Street, Suite 300
Austin, Texas 78701
(512) 467-6060 – Phone
(512) 467-6161 – Fax

ACKNOWLEDGEMENT

STATE OF TEXAS                         §
COUNTY OF _TRAVIS_          §

___ SUBSCRIBED AND SWORN TO before me by Colin Newberry on the _9_ day of _June_____, 2020.

_____
Notary Public, State of Texas

ASHLEY K JOHNSON
Notary Public, State of Texas
Comm. Expires 03-04-2024
Notary ID 130563914



**FILED AND RECORDED**
**OFFICIAL PUBLIC RECORDS**

*Dana DeBeauvoir*

**Dana DeBeauvoir, County Clerk**
**Travis County, Texas**

**202040322**

Jun 10, 2020 02:27 PM

Fee: $3.00          **WELLINB**

EXHIBIT NO. 18                    EX. 18-004

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas
Jul 08, 2020 03:56 PM    Fee: $42.00
**2020116261**
*Electronically Recorded*

## SUBSTITUTE TRUSTEE'S DEED

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**Date:** 7 / 7 / , 2020

**Owner:**    Upgrade LOL, LLC

**Property:**

> **LOT 8, BLOCK D, AMENDED PLAT OF FRONTIER AT MONTANA, a subdivision in Travis County, Texas, according to the map or plat recorded in Document No. 2006000392 of the Official Public Records of Travis County, Texas.**

**Substitute Trustee:**  COLIN H. NEWBERRY

**Lienholder:**    Steve Eckart

**Date of Sale of Property:** 7/7/2020

**Time of Sale:** No earlier than 10 AM, and no later than three hours thereafter.

**Place of Sale:** The Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas, Travis County, 78701.

**Buyer:**  Wolfe Capital Investments

**Buyer's Mailing Address:**  1520 Cole Ave, Clovis CA 93612

**Amount of Sale:**  $224,500

Owner has defaulted in the payment of a Real Estate Note secured by a Deed of Trust, as recorded on December 4, 2019 under Document No. 2019193087 of the Official Public Records of Travis County, Texas. The Lienholder has accordingly requested Substitute Trustee to enforce the power of sale contained in the Deed of Trust and/or as provided by Texas law.

As shown by the affidavit attached to this instrument as Exhibit "A" and incorporated herein by this reference, notices stating the time, place, and terms of sale of the Property were posted and filed, as required by § 51.002 of the Texas Property Code, the Lienholder either personally or by agent, served notice of the sale to each debtor required by statute in compliance with § 51.002 of the Texas Property Code, and all other requirements of that statute have been met. As required by that statute and the Deed of Trust, Substitute Trustee sold the Property to Buyer, who was the highest bidder at the public auction, for the Amount of Sale.

Substitute Trustee, by the authority conferred by the Lienholder, the Deed of Trust, and Texas law, for the amount of sale paid by Buyer as consideration, GRANTS, SELLS AND CONVEYS to Buyer the Property, together with all and singular the rights and appurtenances thereto in anywise belonging, to have and to hold it to Buyer, Buyer's successors or assigns forever. Trustee binds Grantor and Grantor's heirs, executors, administrators and successors to WARRANT AND FOREVER DEFEND all and singular the Property to Buyer and Buyer's heirs, executors, administrators, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof.



**COLIN H. NEWBERRY**
Substitute Trustee

**STATE OF TEXAS**          §
                           §
**COUNTY OF** Travis        §

BEFORE ME, the undersigned Notary Public, on this date personally appeared COLIN H. NEWBERRY, who, being by me duly sworn upon oath, said that he has read and signed the foregoing Substitute Trustee's Deed and that all the facts stated in it are within his personal knowledge and are true and correct.

TO CERTIFY WHICH, witness my hand and official seal on the __7__ day of __July__, 2020.

ASHLEY K. JOHNSON
Notary Public, State of Texas
Comm. Expires 03-04-2024
Notary ID 130563914

**NOTARY PUBLIC, STATE OF TEXAS**

After recording, please return to:

THE HAY LEGAL GROUP PLLC
COLIN H. NEWBERRY
611 W. 5th Street, Suite 300
Austin, Texas 78701

"EXHIBIT A"
FORECLOSURE AFFIDAVIT

**Date:** _____7/7_____, 2020

**Affiant:** COLIN H. NEWBERRY

Affiant on oath swears that he is capable of making this affidavit and that the following statements are true and are within the personal knowledge of Affiant. All references to capitalized terms correspond to those set forth in the deed to which this affidavit is attached.

1.  This affidavit is made with respect to the foreclosure of the Property that occurred on the Date hereof.

2.  The Trustee's sale took place on even date, at approximately _10:38_ AM, at the place at the courthouse designated in the notice being The Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas, Travis County, 78701, at the place designated by the Travis County Commissioners (at the place where such foreclosures are to take place).

3.  At least twenty-one days before the Trustee's sale, Affiant, either personally or by agent, gave notice of the sale to every debtor according to Lender's record, who is: Upgrade LOL, LLC, P.O. Box 17242, Austin, TX 78760, Travis County. The notice was mailed by certified mail, postage prepaid, properly addressed to the person listed above at the address stated.

4.  The Notice of Substitute Trustee's Sale (copy of which is attached hereto) was posted (by Affiant or by agent) on the date set forth in Section 3 of this affidavit, at the place at the courthouse designated in the notice, being the area designated by the county commissioners court for foreclosure sales and was filed (by Affiant or by agent) in the office of the county clerk for the county in which the property is located.

5.  To the best of Affiant's knowledge, Owner was alive on the date of the Trustee's sale and was not in the military service within the ninety days before the Trustee's sale.

6.  All statutory requirements relating to said foreclosure were duly complied with.

_____
**COLIN H. NEWBERRY**
**Substitute Trustee**

SWORN TO AND SUBSCRIBED before me by COLIN H. NEWBERRY, Substitute Trustee, on _____7/7_____, 2020.

ASHLEY K. JOHNSON
Notary Public, State of Texas
Comm. Expires 03-04-2024
Notary ID 130563914

_____
**NOTARY PUBLIC, STATE OF TEXAS**

## NOTICE OF NON-JUDICIAL FORECLOSURE
## AND SUBSTITUTE TRUSTEE'S SALE

Date: _June 9_ , 2020

1.  **Property to be sold:** The property to be sold is described as follows:

    LOT 8, BLOCK D, AMENDED PLAT OF FRONTIER AT MONTANA, a subdivision in Travis County, Texas, according to the map or plat recorded in Document No. 2006000392 of the Official Public Records of Travis County, Texas.

**Last known owner and address:**
Upgrade LOL, LLC
c/o Guillermo Rangel
P.O. Box 17242
Austin, TX 78760

2.  **Instrument granting right and power to foreclose:** The instrument granting right and power to foreclose is the Deed of Trust recorded on December 4, 2019 under Document No. 2019193087 of the Official Public Records of Travis County, Texas.

3.  **Date, Time, and Place of Sale:** The sale is scheduled to be held at the following date, time, and place:

    Date: Tuesday, July 7, 2020

    Time: No earlier than 10:00 AM, and no later than three hours thereafter.

    Place: The Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas, Travis County, 78701.

4.  **Terms of Sale:** The sale will be conducted as a public auction to the highest bidder for cash.

Pursuant to TEX. PROP. CODE § 51.009, the Property will be sold in, AS IS, WHERE IS CONDITION, WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, except as to the warranties of title, if any, provided for under the deed of trust. Prospective bidders are advised to conduct an independent investigation of the nature and physical condition of the property.

Prospective bidders are reminded that by law the sale will necessarily be made subject to all prior matters of record affecting the property, if any, to the extent that they remain in force and effect and have not been subordinated to the deed of trust. Prospective bidders are strongly urged to examine the applicable property records to determine the nature and extent of such matters, if any.

Those desiring to purchase the property will need to demonstrate their ability to pay cash on the day the property is sold.

5.  <u>**Type of Sale:**</u>  The sale is a non-judicial lien foreclosure sale being conducted pursuant to the Deed of Trust.

6.  <u>**Obligations Secured:**</u>  The Deed of Trust provides that it secures the payment of a Note and associated fees, including all costs and attorneys' fees incurred, namely the amount of <u>**$159,000.00 (plus fees).**</u>

    Substitute Trustee:    Colin Newberry

    Lienholder:    Steve Eckart

7.  <u>**Default and Request to Act:**</u>  Default has occurred under the Deed of Trust, and the lienholder has appointed the undersigned as Substitute Trustee to conduct this sale.

SIGNED on the ___9___ day of ___June___, 2020

_____
**Colin Newberry**
State Bar No. 24074806

HAY LEGAL GROUP PLLC
611 W. 5th Street, Suite 300
Austin, Texas 78701
(512) 467-6060 – Phone
(512) 467-6161 – Fax

<center>ACKNOWLEDGEMENT</center>

STATE OF TEXAS       §
COUNTY OF _TRAVIS_    §

    SUBSCRIBED AND SWORN TO before me by Colin Newberry on the _9_ day of _June_, 2020.

_____
Notary Public, State of Texas

ASHLEY K. JOHNSON
Notary Public, State of Texas
Comm. Expires 03-04-2024
Notary ID 130563914

**Dana DeBeauvoir, County Clerk**

**Travis County**

**Real Estate Index Search**

Date: 07/23/2020 02:47 PM

Report # 16378220  Requested By WEBPUBLIC (WEBPUBLIC)  Date Filed on 06/16/2020  and 07/23/2020 Subdivision begins with
ALLANDALE WEST Lot begins with 46 Section 6  [V,N]___

Page    1    of    1

| # | Instrument # | Book | Page | Date Recorded | Document Type | Grantor | More Names | Grantee | More Names | Legal Description | Status | Image |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2020119157 | | | 07/13/2020 | DEED | P ZAVALA ANGELA | ✓ | P DOWNES JOHN P | ✓ | LT 46 SEC 6 ALLANDALE WEST LOC 6116 BULLARD DRIVE AUSTIN TX 78757 | | ✓ |
| 2 | 202040358 | | | 06/16/2020 | FORECLOSURE | ZAVALA ANGELA | ✓ | GCM HOLDINGS INC | | LT 46 SEC 6 ALLANDALE WEST LOC 6116 BULLARD DRIVE AUSTIN TX 78757 | | ✓ |

Permanent Index From 01/01/1988 to 07/13/2020  Temporary Index from 07/14/2020 to 07/23/2020  Images from 01/01/1986

EXHIBIT NO. 18

EX. 18-010

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas
Jul 13, 2020 12:59 PM    Fee: $ 54.00
**2020119157**
*Electronically Recorded*

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

### Substitute Trustee's Deed with Bill of Sale

**Date:**  July 7, 2020

**Substitute Trustee:**  Angela Zavala

**Deed of Trust**

>  **Date:**  February 18, 2016

>  **Grantor:**  GCM Holdings, Inc.

>  **Original Mortgagee:** Capstone Capital Partners, LLC, John P. Downes, First Kingdom Investment Group, L.P., Russell Cooper and Jennifer Cooper

>  **Current Mortgagee:** John P. Downes, Russell and Jennifer Cooper, First Kingdom Investment Group, L.P., Eric A Murray and Karan L Murray, Trustees for The Murray Family Trust, Betsy Zern, Trustee for the J and B Trust, NODO Services Inc., Teresa M Lao & Mark A Woodard, Capstone Fund LLC and Capstone Capital Partners, LLC

>  **Recording information:** Document No. 2016025134 of the Official Public Records of Travis County, Texas

>  **Property:** One lot(s) located at 6116 Bullard Drive, Austin, Travis County, Texas 78757, and more particularly described as follows: LOT 46, ALLANDALE WEST, SEC. 6, according to the map or plat thereof, recorded in Volume 13, Page 92, Plat Records, Travis County, Texas, including all personal property secured by the security agreement included in the Deed of Trust.

**Note**

>  **Date:**  February 18, 2016

>  **Principal amount:**  $990,000.00

>  **Borrower:**  GCM Holdings, Inc.

>  **Original Lender:** Capstone Capital Partners, LLC, John P. Downes, First Kingdom Investment Group, L.P., Russell Cooper and Jennifer Cooper

**Current Holder:** John P. Downes, Russell and Jennifer Cooper, First Kingdom Investment Group, L.P., Eric A Murray and Karan L Murray, Trustees for The Murray Family Trust, Betsy Zern, Trustee for the J and B Trust, NODO Services Inc., Teresa M Lao & Mark A Woodard, Capstone Fund LLC and Capstone Capital Partners, LLC

**Date of Sale** (first Tuesday of month): July 7, 2020

**Time of Sale:** 1:07 p.m.

**Place of Sale:** The rear "Sallyport" of the County Courthouse located on the west side of the Courthouse immediately south and slightly east of the intersection of 11th Street and San Antonio Street.

**Buyer:** John P. Downes, as to 10.928962%, Russell and Jennifer Cooper, as to 6.557377%, First Kingdom Investment Group, L.P., as to 21.857923%, Eric A Murray and Karan L Murray, Trustees for The Murray Family Trust, as to 10.928962%, Betsy Zern, Trustee for the J and B Trust, as to 14.207650%, NODO Services Inc., as to 10.928962%, Teresa M Lao & Mark A Woodard, as to 3.278689%, and Capstone Fund LLC, as to 21.311475%.

**Buyer's Mailing Address:**

Capstone Servicing Corporation
507 Denali Pass #401
Cedar Park, Texas 78613

**Amount of Sale:** **$895,000.00**

A default existed under the Deed of Trust and Current Mortgagee or its agent directed Substitute Trustee to enforce the trust.

Notices stating the time, place, and terms of sale of the Property were posted and filed and as shown by the affidavit attached to this deed as Exhibit "A" and incorporated in it by this reference Current Mortgagee either personally or by agent served notice of the sale to each debtor, as required by section 51.002 of the Texas Property Code. In accordance with that statute and the Deed of Trust, Substitute Trustee sold the Property to Buyer, who was the highest bidder at the public auction, for the Amount of Sale. The sale was made on the Date of Sale, began at the Time of Sale or not later than three hours thereafter, and was concluded by 4:00 p.m.

Substitute Trustee, subject to any prior liens and other exceptions to conveyance and warranty in the Deed of Trust and for the Amount of Sale paid by Buyer as consideration, grants, sells, and conveys the Property to Buyer, "AS IS," together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Buyer and Buyer's heirs, successors, and assigns forever. Substitute Trustee binds Grantor and Grantor's heirs and

successors to warrant and forever defend all and singular the Property to Buyer and Buyer's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the prior liens and other exceptions to conveyance and warranty in the Deed of Trust.

SUBSTITUTE TRUSTEE HAS NOT MADE, AND DOES NOT MAKE, ANY REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PERSONAL PROPERTY AND THE PERSONAL PROPERTY IS SOLD TO BUYER "AS IS, WHERE IS, AND WITH ALL FAULTS." THERE IS NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT, OR THE LIKE IN THIS DISPOSITION OF PERSONAL PROPERTY.

_Angela Zavala_

Angela Zavala

STATE OF TEXAS )

COUNTY OF Williamson )

This instrument was acknowledged before me on July 9 , 2020, by Angela Zavala, Substitute Trustee.

MICHELLE JONES
Notary Public, State of Texas
Comm. Expires 07-07-2022
Notary ID 6444537

_Michelle Jones_
Notary Public, State of Texas
My commission expires: 7·7·22

AFTER RECORDING RETURN TO:

HAJJAR PETERS LLP
3144 Bee Caves Rd
AUSTIN, TX 78746

## EXHIBIT "A"

### Composite Affidavit for Substitute Trustee

STATE OF TEXAS                               )

COUNTY OF TRAVIS                          )

Angela Zavala appeared in person before me today and stated under oath:

"My name is Angela Zavala.  I am competent to make this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct.

"Under the direction of Capstone Servicing Corporation, the mortgage servicer for the legal holder of the deed of trust described below and of the obligations secured thereby, I, as a Substitute Trustee appointed to enforce the power of sale contained in the deed of trust dated February 18, 2016, executed by GCM Holdings, Inc. to Benjamin K. Williams, Trustee, filed for record in Document No. 2016025134 of the Official Public Records of Travis County, Texas, securing payment of the promissory note of the same date in the original principal amount of $990,000.00, executed by GCM Holdings, Inc. on February 18, 2016, and payable to the order of Capstone Capital Partners, LLC, John P. Downes, First Kingdom Investment Group, L.P., Russell Cooper and Jennifer Cooper, did post, on June 16, 2020, signed copies of a notice of foreclosure sale, of which a true and correct copy is attached to and incorporated in this affidavit by reference for all purposes, at the officially designated place, located near an entrance door to the county courthouse of Travis County, Texas and filed a duplicate of the notice of foreclosure sale with the county clerk's office of Travis County, Texas, that same day.

_Angela Zavala_

Angela Zavala

SUBSCRIBED AND SWORN TO before me on ____July 9____, 2020 by Angela Zavala.

_Michelle Jones_

Notary Public, State of Texas

MICHELLE JONES
Notary Public, State of Texas
Comm. Expires 07-07-2022
Notary ID 6444537

 4 pgs     202040358

## NOTICE OF ACCELERATION AND
## NOTICE OF SUBSTITUTE TRUSTEE'S SALE

### NOTE AND DEED OF TRUST INFORMATION:

*STAYS IN FILE*

| | |
|---|---|
| Note: | Real Estate Lien Note |
| Deed of Trust: | Deed of Trust and Security Agreement dated February 18, 2016, filed as Document No. 2016025134 of the Official Public Records of Travis County, Texas |
| Date of Note and Deed of Trust: | February 18, 2016 |
| Grantor: | GCM HOLDINGS, INC. |
| Original Mortgagee: | CAPSTONE CAPITAL PARTNERS, LLC, JOHN P. DOWNES, FIRST KINGDOM INVESTMENT GROUP, L.P., RUSSELL COOPER AND JENNIFER COOPER |
| Original Principal Amount of Note: | $990,000.00 |
| Recording Information: | Document No. 2016025134 of the Official Public Records of Travis County, Texas |
| Property: | One lot(s) located at 6116 Bullard Drive, Austin, Travis County, Texas 78757, and more particularly described as follows: LOT 46, ALLANDALE WEST, SEC. 6, according to the map or plat thereof, recorded in Volume 13, Page 92, Plat Records, Travis County, Texas; and |
| Additional Property: | All improvements, fixtures, materials, supplies, equipment, apparatus, and other items owned by Grantor and attached to, installed in or used in connection with the Property and such other personal property described as Mortgaged Property pursuant to the Deed of Trust. |

### MORTGAGE SERVICING INFORMATION:

The Mortgage Servicer, if not the Current Mortgagee, is representing the Current Mortgagee pursuant to a Mortgage Servicing Agreement.

| | |
|---|---|
| Current Mortgagee: | John P. Downes, Russell and Jennifer Cooper, First Kingdom Investment Group, L.P., Eric A Murray and Karan L Murray, Trustees for The Murray Family Trust, Betsy Zern, Trustee for the J and B Trust, NODO Services Inc., |

*Notice of Sale*
*Page 1 of 3*


4724610

Teresa M Lao & Mark A Woodard, Capstone Fund LLC and
Capstone Capital Partners, LLC

Mortgage Servicer:  Capstone Servicing Corporation

Current Beneficiary:  John P. Downes, Russell and Jennifer Cooper, First
Kingdom Investment Group, L.P., Eric A Murray and Karan
L Murray, Trustees for The Murray Family Trust, Betsy
Zern, Trustee for the J and B Trust, NODO Services Inc.,
Teresa M Lao & Mark A Woodard, Capstone Fund LLC and
Capstone Capital Partners, LLC

Mortgage Servicer
Address:  Capstone Servicing Corporation
507 Denali Pass #401
Cedar Park, Texas 78613

## SALE INFORMATION:

Date of Sale:  July 7, 2020

Time of Sale:  1:00 P.M. or within three hours thereafter.

Place of Sale:  The Property and Additional Property has been scheduled
for foreclosure sale on Tuesday, July 7, 2020, between the
hours of 10:00 A.M. and 4:00 P.M. at the rear "Sallyport" of
the Travis County Courthouse located on the west side of the
Courthouse immediately south and slightly east of the
intersection of 11th Street and San Antonio Street. If the
proceeding area is no longer the designated area, the place
of sale will be at the area most recently designated by the
Travis County Commissioner's Court (pursuant to
§51.002(h) of the TEX. PROP. CODE ANN.). This sale shall
commence at 1:00 P.M. or within three hours thereafter. The
property will be sold to the highest bidder for cash.

Substitute Trustee:  Angela Zavala or Michelle Jones

Substitute Trustee Address:  ServiceLink Agency Sales and Posting, LLC
1320 Greenway Drive, Suite 300
Irving, TX 75038

WHEREAS, the above-named Grantor previously conveyed the above-described property
in trust to secure payment of the Note set forth in the above-described Deed of Trust; and

*Notice of Trustee's Sale*
*Page 2 of 4*

WHEREAS, a default under the Note and Deed of Trust was declared; such default was reported to not have been cured; and all sums secured by such Deed of Trust were declared to be immediately due and payable; and

WHEREAS, the original Trustee, Benjamin K. Williams, and any previously appointed Substitute Trustees have been removed and Angela Zavala or Michelle Jones have been appointed as Substitute Trustees and requested to sell the Property to satisfy the indebtedness; and

WHEREAS, the undersigned has been requested to provide these notices on behalf of the Current Mortgagee, Mortgage Servicer and Substitute Trustees;

NOW, THEREFORE, NOTICE IS HEREBY GIVEN of the foregoing matters and that:

1. The maturity of the Note has been accelerated and all sums secured by the Deed of Trust have been declared to be immediately due and payable.

2. Angela Zavala or Michelle Jones, as Substitute Trustee, will sell the Property and Additional Property to the highest bidder for cash on the date, at the place, and no earlier than the time set forth above in the Sale Information section of this notice. The sale will begin within three hours after that time.

3. This sale shall be subject to any legal impediments to the sale of the Property and Additional Property and to any exceptions referenced in the Deed of Trust or appearing of record to the extent the same are still in effect and shall not cover any property that has been released from the lien of the Deed of Trust.

4. No warranties, express or implied, including but not limited to the implied warranties of merchantability and fitness for a particular purpose shall be conveyed at the sale, save and except the Grantors warranties specifically authorized by the Grantor in the Deed of Trust. The Property and Additional Property shall be offered "AS-IS", purchasers will buy the Property "at the purchasers own risk" and "at his peril", and no representation is made concerning the quality or nature of title to be acquired. Purchasers will receive whatever interest Grantor and Grantor's assigns have in the Property, subject to any liens or interests of any kind that may survive the sale. Interested persons are encouraged to consult counsel of their choice prior to participating in the sale of the Property.

5. **Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.**

*Notice of Trustee's Sale*
*Page 3 of 4*



_____, Substitute Trustee

*Notice of Trustee's Sale*
*Page 4 of 4*

 4 pgs    202040358

## NOTICE OF ACCELERATION AND
## NOTICE OF SUBSTITUTE TRUSTEE'S SALE

### NOTE AND DEED OF TRUST INFORMATION

**STAYS IN FILE**

| | |
|---|---|
| Note | Real Estate Lien Note |
| Deed of Trust | Deed of Trust and Security Agreement dated February 18, 2016, filed as Document No 2016025134 of the Official Public Records of Travis County, Texas |
| Date of Note and Deed of Trust | February 18, 2016 |
| Grantor | GCM HOLDINGS, INC |
| Original Mortgagee | CAPSTONE CAPITAL PARTNERS, LLC, JOHN P DOWNES, FIRST KINGDOM INVESTMENT GROUP, L P , RUSSELL COOPER AND JENNIFER COOPER |
| Original Principal Amount of Note | $990,000 00 |
| Recording Information | Document No 2016025134 of the Official Public Records of Travis County, Texas |
| Property | One lot(s) located at 6116 Bullard Drive, Austin, Travis County, Texas 78757, and more particularly described as follows  LOT 46, ALLANDALE WEST, SEC 6, according to the map or plat thereof, recorded in Volume 13, Page 92, Plat Records, Travis County, Texas,  and |
| Additional Property | All improvements, fixtures, materials, supplies, equipment, apparatus, and other items owned by Grantor and attached to, installed in or used in connection with the Property and such other personal property described as Mortgaged Property pursuant to the Deed of Trust |

### MORTGAGE SERVICING INFORMATION

The Mortgage Servicer, if not the Current Mortgagee, is representing the Current Mortgagee pursuant to a Mortgage Servicing Agreement

| | |
|---|---|
| Current Mortgagee | John P Downes, Russell and Jennifer Cooper, First Kingdom Investment Group, L P , Eric A Murray and Karan L Murray, Trustees for The Murray Family Trust, Betsy Zern, Trustee for the J and B Trust, NODO Services Inc , |


4724610

|                              |                                                                                                                                                                                                                                                                                                 |
| ---------------------------- | ----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                              | Teresa M Lao & Mark A Woodard, Capstone Fund LLC and Capstone Capital Partners, LLC                                                                                                                                                                                                             |
| Mortgage Servicer            | Capstone Servicing Corporation                                                                                                                                                                                                                                                                  |
| Current Beneficiary          | John P Downes, Russell and Jennifer Cooper, First Kingdom Investment Group, L P , Eric A Murray and Karan L Murray, Trustees for The Murray Family Trust, Betsy Zern, Trustee for the J and B Trust, NODO Services Inc , Teresa M Lao & Mark A Woodard, Capstone Fund LLC and Capstone Capital Partners, LLC |
| Mortgage Servicer Address    | Capstone Servicing Corporation<br>507 Denali Pass #401<br>Cedar Park, Texas 78613                                                                                                                                                                                                               |

## SALE INFORMATION

|                |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
| -------------- | ----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| Date of Sale   | July 7, 2020                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
| Time of Sale   | 1 00 P M  or within three hours thereafter                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                   |
| Place of Sale  | The Property and Additional Property has been scheduled for foreclosure sale on Tuesday, July 7, 2020, between the hours of 10 00 A M  and 4 00 P M  at the rear "Sallyport" of the Travis County Courthouse located on the west side of the Courthouse immediately south and slightly east of the intersection of 11th Street and San Antonio Street  If the proceeding area is no longer the designated area, the place of sale will be at the area most recently designated by the Travis County Commissioner's Court (pursuant to §51 002(h) of the TEX PROP CODE ANN )  This sale shall commence at 1 00 P M  or within three hours thereafter  The property will be sold to the highest bidder for cash |
| Substitute Trustee | Angela Zavala or Michelle Jones                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                          |
| Substitute Trustee Address | ServiceLink Agency Sales and Posting, LLC<br>1320 Greenway Drive, Suite 300<br>Irving, TX 75038                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                              |

WHEREAS, the above-named Grantor previously conveyed the above-described property in trust to secure payment of the Note set forth in the above-described Deed of Trust, and

EXHIBIT NO. 18                    EX. 18-020

WHEREAS, a default under the Note and Deed of Trust was declared, such default was reported to not have been cured, and all sums secured by such Deed of Trust were declared to be immediately due and payable, and

WHEREAS, the original Trustee, Benjamin K Williams, and any previously appointed Substitute Trustees have been removed and Angela Zavala or Michelle Jones have been appointed as Substitute Trustees and requested to sell the Property to satisfy the indebtedness, and

WHEREAS, the undersigned has been requested to provide these notices on behalf of the Current Mortgagee, Mortgage Servicer and Substitute Trustees,

NOW, THEREFORE, NOTICE IS HEREBY GIVEN of the foregoing matters and that

1  The maturity of the Note has been accelerated and all sums secured by the Deed of Trust have been declared to be immediately due and payable

2  Angela Zavala or Michelle Jones, as Substitute Trustee, will sell the Property and Additional Property to the highest bidder for cash on the date, at the place, and no earlier than the time set forth above in the Sale Information section of this notice  The sale will begin within three hours after that time

3  This sale shall be subject to any legal impediments to the sale of the Property and Additional Property and to any exceptions referenced in the Deed of Trust or appearing of record to the extent the same are still in effect and shall not cover any property that has been released from the lien of the Deed of Trust

4  No warranties, express or implied, including but not limited to the implied warranties of merchantability and fitness for a particular purpose shall be conveyed at the sale, save and except the Grantors warranties specifically authorized by the Grantor in the Deed of Trust  The Property and Additional Property shall be offered "AS-IS", purchasers will buy the Property "at the purchasers own risk" and "at his peril", and no representation is made concerning the quality or nature of title to be acquired  Purchasers will receive whatever interest Grantor and Grantor's assigns have in the Property, subject to any liens or interests of any kind that may survive the sale  Interested persons are encouraged to consult counsel of their choice prior to participating in the sale of the Property

5  **Assert and protect your rights as a member of the armed forces of the United States  If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately**

*Notice of Trustee s Sale*
*Page 3 of 4*



_____, Substitute Trustee



**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir, County Clerk
Travis County, Texas

**202040358**

Jun 16, 2020 10 05 AM

Fee  $3 00        MACEDOS

*Notice of Trustee s Sale*
*Page 4 of 4*

EXHIBIT NO. 18                    EX. 18-022

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*
Dana DeBeauvoir, County Clerk
Travis County, Texas
Aug 04, 2020 03:35 PM     Fee: $38.00
**2020137299**
*Electronically Recorded*

This page is intentionally added for electronic file stamp.

EXHIBIT NO. 19                    EX. 19-001

## SUBSTITUTE TRUSTEE'S DEED

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

Date: August 4, 2020

**Deed of Trust ("Deed of Trust"):**

**Date:** 3/8/2019

**Trustor:** This Is It, LLC

**Trustee:** Brett M. Shanks

**Beneficiary:** Housemax Funding, LLC

**Recording Information:** Document number 2019074351 of the Land Records of Travis County, Texas

**Property:** Lot Fourteen (14), Block Eleven (11), Broadacres, A subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 3, Page 135, Plat Records of Travis County, Texas; save and except that portion conveyed to the City of Austin by instrument dated October 10, 1939, Recorded in Volume 2102, Page 433, Deed Records, and by Instrument Dated March 31, 1971, Recorded in Volume 4034, Page 1423, Deed Records, of Travis County, Texas.. Also known as 5210 Joe Sayers Ave, Austin, TX 78756.

Date of Sale of Property (first Tuesday of month): August 4, 2020

Time Sale of Property Began: 11:37 AM and was concluded at 11:50 AM.

Place of Sale of Property: West steps of the Travis County Courthouse, 1000 Guadalupe St., Austin, TX 78701

Buyer: Housemax Funding, LLC
Buyer's Mailing Address: 6001 W William Cannon Dr, Ste 102
Austin, TX 78749

Amount of Sale: $737,581.46

By Deed of Trust, Grantor conveyed to Brett M. Shanks, as Trustee, certain property for the purpose of securing and enforcing payment of the indebtedness and obligations therein

described (collectively, the Obligations), including but not limited to the Note and all renewals and extensions of the note, and all present and future indebtedness of Maker to Beneficiary.

A contingency stated in the Deed of Trust as a condition precedent for the appointment of a substitute trustee occurred, and Andrew Moon, Ryan Wittman, and Nathaniel Corbett were appointed by an Appointment of Substitute Trustee executed by Jeff Fechter, dated July 13, 2020.

Default has occurred in the payment of the Obligations when due. The unpaid balance of the principal of the Obligations was accelerated, and default has occurred and is continuing in the payment of the Obligations. Housemax Funding, LLC, the current Holder of the Obligations and the current Beneficiary of the Deed of Trust, requested Andrew Moon, as Substitute Trustee, to enforce the trust of the Deed of Trust.

Pursuant to the requirements of the Deed of Trust and the laws of the state of Texas, written notice of the time, place, date, and terms of the public foreclosure sale of the Property was posted at the courthouse door of Travis County, Texas, the county in which the Property is situated, and a copy of the notice was also filed with the county clerk of Travis County, Texas, each notice having been posted and filed for at least twenty-one days preceding the date of the foreclosure sale.

Additionally, written notice of the time, date, place, and terms of the foreclosure sale was served on behalf of the current Beneficiary by certified mail on each debtor who, according to the records of the current Beneficiary, is obligated to pay any of the Obligations. The certified-mail notices were timely sent by depositing the notices in the United States mail, postage prepaid in proper amount, and addressed to each debtor at the debtor's last known address as shown by the records of the current Beneficiary at least twenty-one days preceding the date of the foreclosure. All conditions precedent were met.

I, as the Substitute Trustee, do hereby bind Grantor and Grantor's heirs and assigns to warrant and forever defend the Property to Buyer and Buyer's heirs and assigns forever, against the claim or claims of all persons claiming the same or any part thereof.

Executed on August 4, 2020.

_____
Andrew Moon, Substitute Trustee



STATE OF TEXAS )

COUNTY OF BEXAR )

    BEFORE ME, the undersigned authority, on this day personally appeared Andrew Moon, as Substitute Trustee, known to me to be the person whose name is subscribed to the foregoing instrument, and who acknowledged to me that he executed the same for the purposes and consideration therein expressed and, in the capacity, therein stated.

Given under my hand and seal of office this 4th Day of August, 2020.

_____
Notary Public, State of Texas

Ryan Charles Wittman
My Commission Expires
06/05/2023
ID No. 132040094

EXHIBIT NO. 19          EX. 19-004

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir, County Clerk
Travis County, Texas
Aug 11, 2020 01:51 PM    Fee: $58.00
**2020142169**
*Electronically Recorded*

This page is intentionally added for electronic file stamp.

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

<div align="center"><b>Substitute Trustee's Deed with Bill of Sale</b></div>

**Date:** August 4, 2020

**Substitute Trustee:** Angela Zavala

**Deed of Trust**

**Date:** August 17, 2018

**Grantor:** 201 Academy LP

**Original Mortgagee:** Ripple Funding LLC, a Texas limited liability company

**Current Mortgagee:** Ripple Funding LLC, a Texas limited liability company

**Recording information:** Document No. 2018131300 of the Official Public Records of Travis County, Texas

**Property:** Lot 4-A, PETERS ADDITION, a subdivision in Travis County, Texas, according to the Map or Plat thereof recorded in Volume 9, Page 137 of the Plat Records, Travis County, Texas, including all personal property secured by the security agreement included in the Deed of Trust.

**Note**

**Date:** August 17, 2018

**Principal amount:** $100,000.00

**Borrower:** 201 Academy LP

**Original Lender:** Ripple Funding LLC, a Texas limited liability company

**Current Holder:** Ripple Funding LLC, a Texas limited liability company

**Date of Sale** (first Tuesday of month):     August 4, 2020

**Time of Sale:** 1:27 p.m.

**Place of Sale:** The rear "Sallyport" of the County Courthouse located on the west side of the Courthouse immediately south and slightly east of the intersection of 11th Street and San Antonio Street.

**Buyer:**   EQUITY TRUST COMPANY CUSTODIAN FBO SEAN REISMAN REF 200374861

**Buyer's Mailing Address:**

P.O. Box 488
Austin, Texas 78767

**Amount of Sale:**   $123,300.00

A default existed under the Deed of Trust and Current Mortgagee or its agent directed Substitute Trustee to enforce the trust.

Notices stating the time, place, and terms of sale of the Property were posted and filed and as shown by the affidavit attached to this deed is marked as Exhibit "A" and incorporated in it by this reference Current Mortgagee either personally or by agent served notice of the sale to each debtor, as required by section 51.002 of the Texas Property Code. In accordance with that statute and the Deed of Trust, Substitute Trustee sold the Property to Buyer, who was the highest bidder at the public auction, for the Amount of Sale. The sale was made on the Date of Sale, began at the Time of Sale or not later than three hours thereafter, and was concluded by 4:00 p.m.

Substitute Trustee, subject to any prior liens and other exceptions to conveyance and warranty in the Deed of Trust and for the Amount of Sale paid by Buyer as consideration, grants, sells, and conveys the Property to Buyer, "AS IS," together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Buyer and Buyer's heirs, successors, and assigns forever. Substitute Trustee binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Buyer and Buyer's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the prior liens and other exceptions to conveyance and warranty in the Deed of Trust.

SUBSTITUTE TRUSTEE HAS NOT MADE, AND DOES NOT MAKE, ANY REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PERSONAL PROPERTY AND THE PERSONAL PROPERTY IS SOLD TO BUYER "AS IS, WHERE IS, AND WITH ALL FAULTS." THERE IS NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT, OR THE LIKE IN THIS DISPOSITION OF PERSONAL PROPERTY.

Angela Zavala
_____
Angela Zavala

EXHIBIT NO. 19                                    EX. 19-007

STATE OF TEXAS            )

COUNTY OF __Travis__     )

This instrument was acknowledged before me on __Aug. 9__, 2020, by Angela Zavala, Substitute Trustee.

_Michelle Jones_
Notary Public, State of Texas
My commission expires: __7-7-2022__

MICHELLE JONES
Notary Public, State of Texas
Comm. Expires 07-07-2022
Notary ID 6444637

AFTER RECORDING RETURN TO:

HAJJAR PETERS LLP
3144 Bee Caves Rd
AUSTIN, TX 78746

## EXHIBIT "A"

**Composite Affidavit for Substitute Trustee**

STATE OF TEXAS                    )

COUNTY OF TRAVIS                 )

Angela Zavala appeared in person before me today and stated under oath:

"My name is Angela Zavala.  I am competent to make this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct.

"Under the direction of Ripple Funding LLC, the mortgage servicer for the legal holder of the deed of trust described below and of the obligations secured thereby, I, as a Substitute Trustee appointed to enforce the power of sale contained in the deed of trust dated August 17, 2018, executed by 201 Academy LP to Ryan B. Shapiro, Trustee, filed for record in Document No. 2018131300 of the Official Public Records of Travis County, Texas, securing payment of the promissory note of the same date in the original principal amount of $100,000.00, executed by 201 Academy LP on August 17, 2018, and payable to the order of Ripple Funding LLC, did post, on July 14, 2020, signed copies of a notice of foreclosure sale, of which a true and correct copy is attached to and incorporated in this affidavit by reference for all purposes, at the officially designated place, located near an entrance door to the county courthouse of Travis County, Texas and filed a duplicate of the notice of foreclosure sale with the county clerk's office of Travis County, Texas, that same day.

_Angela Zavala_
Angela Zavala

SUBSCRIBED AND SWORN TO before me on _____Aug 9_____, 2020 by Angela Zavala.

_Michelle Jones_
Notary Public, State of Texas

MICHELLE JONES
Notary Public, State of Texas
Comm. Expires 07-07-2022
Notary ID 8444537

EXHIBIT NO. 19                                              EX. 19-009

## NOTICE OF ACCELERATION AND
## NOTICE OF SUBSTITUTE TRUSTEE'S SALE

### NOTE AND DEED OF TRUST INFORMATION:

| | |
|---|---|
| Note: | Real Estate Lien Note |
| Deed of Trust: | Deed of Trust and Security Agreement dated August 17, 2018, filed as Document No. 2018131300 of the Official Public Records of Travis County, Texas |
| Date of Note and Deed of Trust: | August 17, 2018 |
| Grantor: | 201 Academy LP |
| Original Mortgagee: | Ripple Funding, LLC |
| Original Principal Amount of Note: | $100,000.00 |
| Recording Information: | Document No. 2018131300 of the Official Public Records of Travis County, Texas |
| Property County: | Travis County, Texas |
| Property: | Lot 4-A, PETERS ADDITION, a subdivision in Travis County, Texas, according to the Map or Plat thereof recorded in Volume 9, Page 137 of the Plat Records, Travis County, Texas. |
| Additional Property: | All improvements, fixtures, materials, supplies, equipment, apparatus, and other items owned by Grantor and attached to, installed in or used in connection with the Property and such other personal property described as Mortgaged Property pursuant to the Deed of Trust. |

*Notice of Sale*
*Page 1 of 4*



4725377

EXHIBIT NO. 19

EX. 19-010

## MORTGAGE SERVICING INFORMATION:

The Mortgage Servicer, if not the Current Mortgagee, is representing the Current Mortgagee pursuant to a Mortgage Servicing Agreement.

| | |
|---|---|
| Current Mortgagee: | Ripple Funding, LLC |
| Mortgage Servicer: | Ripple Funding, LLC |
| Current Beneficiary: | Ripple Funding, LLC |
| Mortgage Servicer Address: | 4407 Bee Cave Road, Bldg 1, Suite 113, Austin, Texas 78746 |

## SALE INFORMATION:

| | |
|---|---|
| Date of Sale: | August 4, 2020 |
| Time of Sale: | 1:00 P.M. or within three hours thereafter. |
| Place of Sale: | The Property has been scheduled for foreclosure sale on Tuesday, August 4, 2020, between the hours of 10:00 A.M. and 4:00 P.M. at the rear "Sallyport" of the Travis County Courthouse located on the west side of the Courthouse immediately south and slightly east of the intersection of 11th Street and San Antonio Street. If the proceeding area is no longer the designated area, the place of sale will be at the area most recently designated by the Travis County Commissioner's Court (pursuant to §51.002(h) of the TEX. PROP. CODE ANN.). This sale shall commence at 1:00 P.M. or within three hours thereafter. The property will be sold to the highest bidder for cash. |
| Substitute Trustee: | Angela Zavala or Michelle Jones |
| Substitute Trustee Address: | ServiceLink Agency Sales and Posting, LLC 1320 Greenway Drive, Suite 300 Irving, TX 75038 |

WHEREAS, the above-named Grantor previously conveyed the above-described property in trust to secure payment of the Note set forth in the above-described Deed of Trust; and

WHEREAS, a default under the Note and Deed of Trust was declared; such default was reported to not have been cured; and all sums secured by such Deed of Trust were declared to be immediately due and payable; and

*Notice of Trustee's Sale*
*Page 2 of 3*

WHEREAS, the original Trustee, Ryan B. Shapiro, and any previously appointed Substitute Trustees have been removed and Angela Zavala or Michelle Jones have been appointed as Substitute Trustees and requested to sell the Property to satisfy the indebtedness; and

WHEREAS, the undersigned has been requested to provide these notices on behalf of the Current Mortgagee, Mortgage Servicer and Substitute Trustees;

NOW, THEREFORE, NOTICE IS HEREBY GIVEN of the foregoing matters and that:

1. The maturity of the Note has been accelerated and all sums secured by the Deed of Trust have been declared to be immediately due and payable.

2. Angela Zavala or Michelle Jones, as Substitute Trustee will sell the Property to the highest bidder for cash on the date, at the place, and no earlier than the time set forth above in the Sale Information section of this notice. The sale will begin within three hours after that time.

3. This sale shall be subject to any legal impediments to the sale of the Property and to any exceptions referenced in the Deed of Trust or appearing of record to the extent the same are still in effect and shall not cover any property that has been released from the lien of the Deed of Trust.

4. No warranties, express or implied, including but not limited to the implied warranties of merchantability and fitness for a particular purpose shall be conveyed at the sale, save and except the Grantors warranties specifically authorized by the Grantor in the Deed of Trust. The property shall be offered "AS-IS", purchasers will buy the property "at the purchasers own risk" and "at his peril", and no representation is made concerning the quality or nature of title to be acquired. Purchasers will receive whatever interest Grantor and Grantor's assigns have in the property, subject to any liens or interests of any kind that may survive the sale. Interested persons are encouraged to consult counsel of their choice prior to participating in the sale of the property.

5. **Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.**

_Angela Zavala_

_____, Substitute Trustee

*Notice of Trustee's Sale*
*Page 3 of 3*

Unofficial Document

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas

**202040383**

Jul 14, 2020 02 42 PM

Fee $3 00          MEDINAE

EXHIBIT NO. 19                          EX. 19-013

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir, County Clerk
Travis County, Texas
Aug 11, 2020 02:17 PM    Fee: $38.00
**2020142246**
*Electronically Recorded*

# This page is intentionally added for electronic file stamp.

## SUBSTITUTE TRUSTEE'S DEED

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

THE STATE OF TEXAS §
§ KNOW ALL MEN BY THESE PRESENTS
COUNTY OF TRAVIS §

THAT LYDIA CENTRAL AVENUE 6523, LLC delivered that Deed of Trust executed on AUGUST 23, 2019, which is recorded in INSTRUMENT NO. 2019132101 of the real property records of TRAVIS County, Texas, to secure the payment of a Promissory Note in the principal amount of $203,200.00 payable to the order of CALCAP LENDING, LLC; and

WHEREAS, the Deed of Trust provides that, if default in payment of the Promissory Note or any part thereof occurs, as the same shall become due and payable, the legal owner thereof may accelerate the maturity of the entire indebtedness, evidenced by the Promissory Note, and at the request of the legal owner of said indebtedness, it shall be the duty of the Trustee or his successor to proceed and sell said property for the satisfaction of said debt, after giving notice in the manner and for the length of time as provided in said Deed of Trust; and

WHEREAS, default having been made in the payment of said indebtedness and the Mortgagee or the Mortgage Servicer having declared same wholly due, I, the undersigned, duly appointed Substitute Trustee, under the provisions of said Deed of Trust, having been requested by the Mortgagee or the Mortgage Servicer to proceed and enforce said trust, did on AUGUST 4, 2020 (that being the first Tuesday in said month), offer said property for sale at the door of the Courthouse of TRAVIS County, Texas, during the hours designated in the Notice of Non-Judicial Foreclosure Sale, at public auction, to the highest bidder for cash; and

WHEREAS, the undersigned, or his/her designated agent, did give notice of the date, time, and place of said sale at least twenty-one (21) days successively prior to the date of said sale; by filing the Notice of Non-Judicial Foreclosure Sale with the Clerk of TRAVIS County, Texas; by serving notice of the proposed sale, by certified mail, on each debtor obligated to pay such indebtedness according to the records of the legal owner, by depositing a copy of the Notice of Non-Judicial Foreclosure Sale enclosed in a postpaid wrapper properly addressed to each such debtor at each debtor's most recent address as shown by the records of the Mortgagee or the records of the Mortgage Servicer, in a post office or official depository under the care and custody of the United States Postal Service; and by posting notice thereof in accordance with the Deed of Trust in said County, Texas, one of which was at the door of the Courthouse of said County, the above-referenced being supported by Affidavit, which is attached hereto and made a part hereto for all purposes; and

WHEREAS, such sale was conducted as set forth in the notice of Non-Judicial Foreclosure Sale and the hereinafter described property was struck off to CALCAP INCOME FUND I, LLC ("Grantee", whether one or more), whose mailing address is 65 N CATALINA AVENUE, PASADENA, CA 91106, for the sum of $204,642.00, that being the highest and best bid obtained for the same.

NOW, THEREFORE, the undersigned ANGELA ZAVALA, Substitute Trustee, for and in consideration of the above-referenced sum to me in hand paid by Grantee, the receipt of which is hereby acknowledged and confessed, does hereby GRANT, BARGAIN, SELL and CONVEY unto Grantee, Grantee's heirs, executors, administrators, successors or assigns forever, the following described property lying and being situated in TRAVIS County, Texas, to wit:

UNIT A-174, BUILDING 24, LAKEWAY WORLD OF TENNIS, A CONDOMINIUM PROJECT IN TRAVIS COUNTY; TOGETHER WITH THE LIMITED COMMON ELEMENTS AND AN UNDIVIDED INTEREST IN AND TO THE GENERAL COMMON ELEMENTS, ACCORDING TO THE MAP OR PLAT RECORDED IN VOLUME 2, PAGE 110, CONDOMINIUM RECORDS OF TRAVIS COUNTY, TEXAS.

TOGETHER WITH ALL FIXTURES PURSUANT TO PARAGRAPH 1.4 OF THE DEED OF TRUST.

I, the undersigned Substitute Trustee, by the authority conferred by the Mortgagee or the Mortgage Servicer, and by, through and under the grantor of the Deed of Trust, subject to prior liens and other exceptions of the Deed of Trust, if any, for and in consideration of the amount paid, hereby sells the above-described property as is, without any express or implied warranties, except as to warranties of title, and hereby sells the property to Grantee at Grantee's own risk, pursuant to the terms of Texas Property Code §51.009.

IN WITNESS HEREOF, this instrument has been executed on AUGUST 9, 2020.

_____
ANGELA ZAVALA
Substitute Trustee

EXHIBIT NO. 19

EX. 19-015

THE STATE OF TEXAS §
§
COUNTY OF TRAVIS §

    This instrument was acknowledged before me on AUGUST 9, 2020, by ANGELA ZAVALA, Substitute Trustee, personally known to me/or proved to me through _____ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Michelle Jones
Notary Public in and for
The State of Texas

MICHELLE JONES
Notary Public, State of Texas
Comm. Expires 07-07-2022
Notary ID 8044537

Loan No.: 399258189
File No.: FCI-1015
Name: LYDIA CENTRAL AVENUE 6523, LLC
Property: 169 WORLD OF TENNIS SQUARE, UNIT A-174
    LAKEWAY, TEXAS 78738

RETURN TO:
MICHAEL J. SCHROEDER
3610 NORTH JOSEY LANE, SUITE 206
CARROLLTON, TEXAS 75007
(972) 394-3086

## AFFIDAVIT IN SUPPORT OF SUBSTITUTE TRUSTEE'S DEED

THE STATE OF TEXAS       §
§
COUNTY OF TRAVIS       §

The undersigned, having knowledge of the matters hereinafter set forth, after being duly sworn, deposes and states under oath as follows:

"1. I am an employee of Law office of Michael J. Schroeder. At the time of the events hereinafter set forth and make this affidavit for the purpose of declaring the incidents of statutory and contractual compliance of the entity or entities set forth herein.

"2. This affidavit is made with respect to that certain Debt described as follows:  LYDIA CENTRAL AVENUE 6523, LLC delivered that Deed of Trust executed on AUGUST 23, 2019, which is recorded in INSTRUMENT NO. 2019132101 of the real property records of TRAVIS County, Texas, to secure the payment of a Promissory Note in the principal amount of $203,200.00 payable to the order of CALCAP LENDING, LLC.

"3.  FCI LENDER SERVICES, INC is the Mortgagee Servicer for CALCAP INCOME FUND I, LLC, the Mortgagee of the Debt secured by the Deed of Trust, whose address is 65 N CATALINA AVENUE, PASADENA, CA  91106.  The Mortgage Servicer is authorized to represent the Mortgagee by virtue of a servicing agreement with the Mortgagee. Pursuant to the servicing agreement and Texas Property Code §51.0025, the Mortgage Servicer is authorized to collect the Debt and to administer any resulting foreclosure sale of the above referenced property.  To the best of my knowledge and belief, proper notice was sent prior to the acceleration of the Debt. All obligations and duties of the Mortgagee or the Mortgage Servicer were performed in the manner required by law and all notices were served on the Debtor at the Debtor's last known address as shown by the records of the Mortgagee or the Mortgage Servicer prior to acceleration of the Debt.

"4. I, or my agent at my direction, on behalf and at the direction of the Mortgagee or the Mortgage Servicer, did, at least twenty-one days preceding AUGUST 4, 2020, the date of the sale made by the Substitute Trustee, serve written notice of the proposed sale, by certified mail, on each debtor obligated to pay such indebtedness according to the records of the Mortgagee or the mortgage servicer, by depositing a copy of the Notice of Non-Judicial Foreclosure Sale ("Notice of Sale"), enclosed in a postage prepaid wrapper, properly addressed to each such debtor at such debtor's most recent address as shown by the records of the Mortgagee or the mortgage servicer, in a post office or official depository under the care and custody of the United States Postal Service; and further did at least twenty-one (21) days preceding the date of said sale cause to have posted a signed copy of the Notice of Sale at the Courthouse door of the county courthouse of TRAVIS county, Texas or any other area which may have been required by the above described Deed of Trust, and caused to have filed the Notice of Sale in the Office of County Clerk in said county in compliance with the laws of the State of Texas.  Further: said foreclosure sale began no later than three (3) hours after the earliest time set forth in the Notice of Sale and was held in the area specified in the Notice of Sale.

"5. To the best of my knowledge and belief, the owner(s) of the property referenced above were alive and not an active or reserve member in the armed forces of the United States of America or a member of the Texas National Guard at any time during the twelve (12) months preceding the date of foreclosure, which is AUGUST 4, 2020.

"6. In accordance with Sections C of the Internal Revenue code, and the regulations promulgated thereunder, I or my designated agent at my direction, did, at least twenty-five (25) days prior to the date of the said foreclosure sale, notify the Internal Revenue Service, by certified mail, return receipt requested, of all Federal Tax Liens, if any, affecting the above named mortgagor and all assumptors, if any, of the above indebtedness."

_____
Michael J. Schroeder

THE STATE OF TEXAS       §
COUNTY OF DENTON       §

SUBSCRIBED AND SWORN to before me, the undersigned authority, on AUGUST 5, 2020, by Michael J. Schroeder, personally known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS.

SAVANNAH PAIGE SAHR
Notary Public, State of Texas
Comm. Expires 10-31-2023
Notary ID 132233359

| Form 306 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>**Filing Fee: $750** | <br>**Application for Registration of a Foreign Limited Partnership** | **Filed in the Office of the Secretary of State of Texas<br>Filing #: 803741754 08/28/2020<br>Document #: 992993640003<br>Image Generated Electronically<br>for Web Filing** |

1. The entity is a foreign limited partnership. The name of the entity is:

**8209 BURNET, L.P.**

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited partnership," or "limited" (or an abbreviation thereof). The name of the entity with the word or abbreviation that it elects to add for use in Texas is:

_____

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:

_____

3. Its federal employer identification number is: **85137471**
☐ Federal employer identification number information is not available at this time.

4. It is organized under the laws of: **DELAWARE, USA**
and the date of its formation in that jurisdiction is: **6/1/2020**

5. As of the date of filing, the undersigned certifies that the foreign limited partnership currently exists as a valid limited partnership under the laws of the jurisdiction of its formation.

6. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is: **08/21/2020**

7. The principal office address of the limited partnership is:
**2726 BISSONNET ST STE 244, Houston, TX, USA 77005-1353**

☑ 8A. The initial registered agent is an organization by the name of:
**Capital Corporate Services, Inc.**
☐ 8B. The initial registered agent is an individual resident of the state whose name is:

___
☐ 8C. The business address of the registered agent and the registered office address is:
**206 E 9TH ST STE 1300    AUSTIN  TX  78701-4411**

**Consent of Registered Agent**
☐ A. A copy of the consent of Registered Agent is attached.
**OR**
☑ B. The consent of the registered agent is maintained by the entity.

EXHIBIT NO. 20                                    EX. 20-001

9. The entity hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

10. The name and address of each governing person is:

| NAME OF GOVERNING PERSON (Enter the name of either an individual or an organization, but not both:) : |
| --- |
| IF INDIVIDUAL |
| |
| OR |
| IF ORGANIZATION |
| **8201 Burnet GP, LLC** |
| ADDRESS OF GOVERNING PERSON : |
| **2726 BISSONNET ST STE 244    HOUSTON  TX, USA  77005-1353** |

## Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

## Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: **August 28, 2020**      **8201 Burnet GP, LLC**

Signature and title of authorized person on behalf of the foreign limited partnership

**FILING OFFICE COPY**



GOVERNOR  GREG  ABBOTT

July 2, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30pm O'CLOCK
JUL 0 2 2020
Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas  78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

A proclamation amending Executive Order GA-28 relating to mass gatherings in Texas
during the disaster posed by the novel coronavirus (COVID-19).

The original proclamation is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES

# PROCLAMATION

**BY THE**

## 𝕲𝖔𝖛𝖊𝖗𝖓𝖔𝖗 𝖔𝖋 𝖙𝖍𝖊 𝕾𝖙𝖆𝖙𝖊 𝖔𝖋 𝕿𝖊𝖝𝖆𝖘

**TO ALL TO WHOM THESE PRESENTS SHALL COME:**

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, in each subsequent month effective through today, I have renewed the disaster declaration for all Texas counties; and

WHEREAS, I issued Executive Order GA-28 on June 26, 2020, relating to the targeted response to the COVID-19 disaster as part of the reopening of Texas; and

WHEREAS, additional measures are needed to slow the spread of COVID-19 in Texas;

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby amend paragraph numbers 5 and 12 of Executive Order GA-28, effective at 12:01 p.m. on July 3, 2020, to read as follows:

5. For any outdoor gathering in excess of 10 people, other than those set forth above in paragraph numbers 1, 2, or 4, the gathering is prohibited unless the mayor of the city in which the gathering is held, or the county judge in the case of a gathering in an unincorporated area, approves of the gathering, and such approval can be made subject to certain conditions or restrictions not inconsistent with this executive order;

12. Except as provided in this executive order or in the minimum standard health protocols recommended by DSHS, found at www.dshs.texas.gov/coronavirus, people shall not be in groups larger than 10 and shall maintain six feet of social distancing from those not in their group;

This proclamation shall remain in effect and in full force for as long as Executive Order GA-28 is in effect and in full force, unless otherwise modified, amended, rescinded, or superseded by the governor.

IN TESTIMONY WHEREOF, I have hereunto signed my name and have officially caused the Seal of State to be affixed at my office in the City of Austin, Texas, this the 2nd day of July, 2020.

_Greg Abbott_

GREG ABBOTT
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30pm O'CLOCK

JUL 0 2 2020

*Governor Greg Abbott*  
July 2, 2020

*Proclamation*  
Page 2

ATTESTED BY:

RUTH R. HUGHS  
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
___2:30 PM___O'CLOCK

JUL 0 2 2020

EXHIBIT NO. 21

EX. 21-003

## STAY HOME, MASK, AND OTHERWISE BE SAFE

## ORDER NO. 20200815-019

OCC RECEIVED AT
AUG 14 '20 PM4:52

### BY

### THE MAYOR OF THE CITY OF AUSTIN

**WHEREAS,** on March 6, 2020, I, Mayor Steve Adler, issued a Declaration of Local Disaster pursuant to Texas Government Code Chapter 418, ratified by City Council Resolution No. 20200312-074, to allow the City of Austin to take measures in response to the COVID-19 pandemic and protect the health and safety of Austin residents;

**WHEREAS**, on March 13, 2020, Governor Greg Abbott proclaimed a state-wide state of disaster due to the COVID-19 pandemic and has since issued numerous Executive Orders related to the pandemic, including Executive Orders GA-28 on June 26, 2020, amended on July 2, 2020, and GA-29 on July 2, 2020;

**WHEREAS,** as of August 14, 2020, Travis County has experienced 23,718 confirmed cases of COVID-19 and 328 deaths as a result of the disease;

**WHEREAS,** current protections must remain in place to ensure that ICUs do not reach capacity;

**WHEREAS,** the local Health Authority finds that the area still needs to increase testing and contact tracing capabilities, to maintain social distancing and hygiene, and to wear face coverings to provide for the safety of the public while businesses are reopening;

**WHEREAS,** infected persons can transmit the COVID-19 virus to others before showing any symptoms, and widespread and consistent use of face coverings over the nose and mouth when in public is a critical and necessary measure to help slow the spread of the virus while allowing local businesses to continuing to reopen and help the Austin economy recover;

**WHEREAS**, Governor Abbott has clarified that his plan to reopen the Texas economy includes maintaining the authority of local governments to require businesses to adopt and enforce health policies that include face covering requirements;

**WHEREAS,** by proclamation Governor Abbott amended GA-28 to ban outdoor gatherings of more than 10 persons, subject to certain exceptions;

**WHEREAS,** Governor Abbott issued Executive Order GA-29 requiring all persons in Texas over the age of 10, subject to certain exceptions, to wear masks while inside a commercial entity or other building or space open to the public, or when outside and unable to properly social distance;

**WHEREAS**, on August 14, 2020, the local Health Authority adopted, in accordance with Ordinance No. 20200709-003, new emergency rules that address operational requirements for schools that the local Health Authority finds are necessary to protect the public health; and

EXHIBIT NO. 22                                                    EX. 22-001

**WHEREAS,** COVID-19 continues to menace the health of Austin residents and the Austin economy, and the local Health Authority has advised on the need for continued vigilance by individuals and Austin businesses in complying with mandatory health measures;

**NOW THEREFORE, I, MAYOR OF THE CITY OF AUSTIN, PURSUANT TO THE AUTHORITY VESTED BY TEXAS GOVERNMENT CODE CHAPTER 418, HEREBY ORDER, EFFECTIVE AS OF 12:01 A.M. ON AUGUST 16, 2020, AND CONTINUING THROUGH DECEMBER 15, 2020, THAT IN THE CITY OF AUSTIN:**

**SECTION 1.** All individuals and business establishments are **ORDERED** to practice the social distancing, hygiene, and face covering behaviors set forth in Sections 2 through 5 and **Exhibits A and C**, unless excepted by this Order or otherwise provided by the Governor's Executive Orders GA-28 (as amended), GA-29, and any other executive order in effect (cumulatively referenced as the "Governor's Order"). Further, to the extent this Order does not mandate or directly address a course of action, all individuals and business establishments shall at a minimum comply with any emergency rules adopted by the local Health Authority and the health protocols otherwise recommended in the Governor's Open Texas Checklists, found at: https://gov.texas.gov/organization/opentexas.

Social gatherings of any size shall be avoided or minimized. Vulnerable individuals (those over 65, who are immunocompromised, or who have underlying health conditions putting them at increased risk of harm from COVID-19) shall particularly avoid groups of more than two beyond the members of their single household or residence.

**Further, pursuant to the Governor's Order and the advice of the local Health Authority, gatherings or presence at any outdoor area, event, or establishment of more than 10 persons are PROHIBITED except as provided in this Section.**

While it is recommended that everyone should avoid taking advantage of the following exceptions if reasonably possible, pursuant to the Governor's Order, there is no occupancy limit for the following:

    a. any services listed by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) in its Guidance on the Essential Critical Infrastructure Workforce, Version 3.1, or any subsequent version;

    b. religious services conducted in churches, congregations, and houses of worship;

    c. local government operations;

    d. child-care services;

    e. youth camps, including but not limited to those defined as such under Chapter 141 of the Texas Health and Safety Code, and including all summer camps and other daytime and overnight camps for youths; and

    f. recreational sports programs for youth and adults.

While it is recommended that everyone should avoid taking advantage of the following exceptions if reasonably possible, pursuant to the Governor's Order, the outdoor gathering ban in

EXHIBIT NO. 22                      EX. 22-002

this Section does not apply to the following outdoor areas, events, or establishments, except that the following outdoor areas or outdoor venues shall operate at no more than 50 percent of the normal operating limits as determined by the owner:

    a. professional, collegiate, or similar sporting events;
    b. swimming pools;
    c. water parks;
    d. museum and libraries;
    e. zoos, aquariums, natural caverns, and similar facilities;
    f. rodeos and equestrian events; and
    g. amusement parks.

All participants in lawful gatherings or groups expressly permitted by this Order or the Governor's Order are nonetheless subject to the required social distancing, hygiene, and face covering behaviors set forth in Sections 2 through 5 and **Exhibits A and C,** including or as may be limited by any other requirements imposed by the Governor's Order. Nothing in this Order prohibits the gathering of members of a household within the household's residence.

Nursing homes, retirement, and long-term care facilities may permit non-critical assistance visitors or providers to access their facilities, in accordance with the guidance and emergency rules issued by the Texas Health and Human Services Commission. All non-residents in nursing homes, retirement, and long-term care facilities must wear a fabric face covering as set forth in Section 3 (Face Covering Behaviors).

Each school that offers instruction to students in one or more grades, pre-kindergarten through grade 12, must follow the phased-in approach in **Exhibit E** unless it will result in a loss of funding from the Texas Education Agency (TEA).

**Wearing a face covering is not a substitute for maintaining 6-feet social distancing and hand washing, as these remain important steps to slowing the spread of the virus.**

If someone in a household is COVID-19 positive or is awaiting the results of a COVID-19 test, the entire household is **ORDERED** to isolate and not travel outside of the City of Austin except to seek medical attention until cleared by Austin Public Health. When seeking medical care or emergency medical care, a person must notify the healthcare provider in advance (or the 9-1-1 call taker and first responders in the event of an emergency) if they have tested positive for COVID-19 or show symptoms consistent with COVID-19 such as cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, vomiting, nausea, and/or diarrhea, or if they have been exposed to another individual who tested positive or displayed symptoms consistent with COVID-19.

**SECTION 2. Social Distancing and Hygiene**. All persons MUST practice social distancing except when in the presence of only members of one's own household or residence, when passing another individual is incidental and momentary, when dining in groups of 10 or less, or when otherwise exempted by this Order. Parents and guardians of children under 10 shall be responsible for maintaining social distance between child members of their household and others' households. For purposes of this Order, and as outlined in the guidelines from the CDC and

EX. 22-003

Austin/Travis County Health Authority, social distancing means maintaining at least a six-foot distance from other individuals, washing hands with soap and water for at least 20 seconds as frequently as possible or using hand sanitizer with at least 60% alcohol if soap and water are unavailable, covering coughs or sneezes (into the sleeve or elbow, not into hands), regularly cleaning high-touch surfaces, and not shaking hands.

**SECTION 3. Individual Face Covering Behaviors:** Because an infected person can transmit the COVID-19 virus to others before showing any symptoms and for other reasons, the covering of a person's nose and mouth is necessary to help slow the spread of the virus. All persons, including those persons attending a protest or demonstration, MUST wear some form of covering that fits snugly over their nose and mouth, such as a commercially made or homemade fabric mask, scarf, bandana, when outside of his or her residence, however, that this face-covering requirement does not apply to the following:

a. any person younger than 10 years of age (though it is still recommended for children two years of age and older);

b. any person with a medical condition or disability that prevents wearing a face covering;

c. any person while the person is eating or drinking, or is seated at a restaurant to eat or drink;

d. any person while the person is (1) exercising outdoors or engaging in physical activity outdoors and (2) maintaining a safe distance from others not in the same household;

e. any person while the person is driving alone or with passengers of the same household as the driver;

f. any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or the need for specific access to the face, such as while visiting a bank or while obtaining a personal care service involving the face, but only to the extent necessary for the temporary removal;

g. any person while the person is in a swimming pool, lake, or similar body of water;

h. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

i. any person who is actively providing or obtaining access to religious worship, but wearing a face covering is strongly encouraged;

j. any person while the person is giving a speech for a broadcast or to an audience;

k. any person while temporary removal of the face covering is necessary for communication by or with a person who is hearing impaired; or

l. any person who is alone, or in the presence of only members of the same household or residence, in a separate room or single space not accessible to the public, and not in an indoor common area.

Parents and guardians of children under the age of 10 are responsible for appropriately masking their children when outside their residence.

All non-residents in nursing homes, retirement and long-term care facilities shall wear a fabric face covering, except as otherwise required by an order issued by the Health Authority. In addition, residents in facilities with confirmed COVID-19 cases shall follow requirements of **Exhibit A**, except when doing so poses a greater mental or physical health, safety or security risk.

See **Exhibit C** for further direction and guidance on Face Covering Behaviors.

**SECTION 4.  Face Coverings at City Facilities.** Individuals over the age of six must wear face coverings at all times (subject only to the exceptions set forth in Section 3.b-3.l) while present on or in City property or facilities, unless expressly exempted by a City policy applicable to the premises or facility.

**SECTION 5. Mandatory Face Covering Policies for Business Establishments (both Publicly Accessible and Accessible Only to Employees).** All businesses (including not-for-profit entities) and commercial entities (including without limitation condominium and multi-family residential, office common areas, and individual office spaces), and the operators of any venues or events open to the public, are **ORDERED** to implement and maintain in force and effect during the term of this Order a health and safety policy or plan related to preventing transmission of the COVID-19 virus.

The health and safety policy or plan must, at a minimum, require that all employees, customers, and visitors wear face coverings over their nose and mouth (subject only to the exceptions set forth in Section 3) while in any part of the business's or venue's premises or facility, and must require of and enforce this health and safety policy or plan as to all who enter upon or into the premises or facility.

The health and safety policy or plan required by this Section may also include the implementation of other mitigating measures designed to control and reduce the transmission of COVID-19 such as temperature checks or health screenings as reasonable and appropriate. This Order does not preclude a business or venue from adopting more stringent face covering or hygiene requirements than those required herein. All business establishments and venues subject to this Order must post conspicuous signage displaying the requirements of the health and safety policy or plan required by this Order at or near each entrance (on each entry door if feasible) to the premises in a manner sufficient to provide clear notice to employees, customers, and visitors at least of the face covering requirement. A sample health and safety policy and signage that is minimally compliant with this Section is attached as **Exhibit B** and can be obtained at http://austintexas.gov/page/printed-materials-and-required-signage.

Business employers shall require all employees to comply with the Face Covering Behaviors in this Section while present on the business premises or conducting the employer's business outside the employee's residence. See **Exhibit C** for further direction and guidance on Face Covering Behaviors.

**SECTION 6.  Reopened Businesses**. All business establishments allowed to remain reopened by the Governor's Orders are strongly encouraged to operate at a capacity less than otherwise permitted to make it more feasible for customers and staff to maintain proper social distancing within their establishment, and to provide services remotely or in a manner maximizing social distancing (e.g., curb-side pickup, delivery, etc.) as much as possible.

**SECTION 7.  City Deadlines.**  Notwithstanding the expiration of this Order, all deadlines and expiration dates for site plans, subdivisions, zoning, building permits, and similar development applications or permits are extended until March 15, 2021, or the date they would have normally expired, whichever is later.  All other deadlines or expiration dates imposed by City code, ordinance, rule, or regulation remain in effect as provided by the code provision, rule, or regulation, unless otherwise extended by separate order or ordinance.

A manufacturer that retools its business for the primary purpose of manufacturing and producing ventilators, masks, personal protective equipment, or any supplies necessary for Healthcare Operations and Critical Infrastructure may apply for a temporary permit or temporary change of use permit for such manufacturing. The Building Official may suspend any City ordinance, order or regulation which would prevent a manufacturer from retooling its business to produce such equipment in the official's sole discretion, and the official's decision on approving the permit is final.

**SECTION 8.  Hospital, Pharmacy, and Clinic Data**.  Hospitals, pharmacies, and clinics, or any other entity or person who performs or obtains testing for COVID-19, shall provide the Health Authority test results at least weekly on Thursdays and, beginning August 31, 2020, twice weekly on Mondays and Thursdays. The test results must include: PCR, antigen, antibody testing, and other information when specifically requested by the Health Authority; and must be provided in electronic form and in the manner directed by Austin Public Health. Any data that is required to be provided to the State under state law, shall be simultaneously provided to the City of Austin Health Authority if the individual is tested within the City of Austin or Travis County.

**SECTION 9.  Retail, Restaurant Dine-In and Reopened Service Logs and Privacy Protection**.  To assist in both the statewide and local contact tracing programs, all retail, restaurants and bars allowing indoor service and all reopened services are encouraged to maintain an activity log of, as reasonably possible, the contact information for all inside or sit-down customers and employees including the dates and times they were present in the business and the location they occupied for more than a passing moment. Voluntary maintaining of such a log may obviate the need for the Austin Public Health normal protocol otherwise of to publicly release, without limitation and in its discretion, the location where people with confirmed infections have been, with relevant dates and timeframes, so as to otherwise trace contacts.

To protect the privacy of customers, the logs shall be maintained only for a one-month period and shall be the property of the business, not the city. The log may be used only by public health authorities if needed for contact tracing. The logs shall not be part of a database and shall not be used for law enforcement purposes.

**SECTION 10.  Criminal Offense.** A violation of this Order is a violation of Austin City Code Section 2-6-24 and a criminal offense. A violation of this Order may be punishable through criminal enforcement, except as limited by state order. Peace officers, City of Austin Code Department inspectors, and the Office of the Austin Fire Marshal are hereby authorized to enforce this Order and the Governor's Order.  Except as provided below, a criminal violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000, but not by confinement.  With respect to Section 5, each day or a portion of each day during which the violation occurs or continues constitutes a separate offense. An individual, rather than a business, who violates any provision of this Order concerning the mandatory wearing of face coverings shall first be given a verbal or written warning. Each subsequent violation is punishable by a fine not to exceed $250 per violation, but not by confinement.

A criminal violation of this Order may be enforced by the filing of a probable cause affidavit alleging the violation with the appropriate court or by issuing a citation to the person violating that contains written notice of the time and place the person must appear before a magistrate of this state, the name and address of the person charged, and the offense charged.

Enforcement of this Order is substantially reliant on self-regulation and a community commitment to public health and safety under the threat of COVID-19.  If there is not widespread compliance with this Order, the City will increase enforcement efforts, as allowed by law.

**SECTION 11. Savings Clause.**  If any provision of this Order or its application to any person or circumstance is held to be invalid, then the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**SECTION 12.  Posting.**  The Austin Public Health Department and the City Clerk will post this Order on their websites.  In addition, the owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public asking for a copy.

**SECTION 13.  Exhibits**.  This Order incorporates by reference the following:

| | |
|---|---|
| **Exhibit A**: | Recommendations and Requirements by the Austin / Travis County Health Authority |
| **Exhibit B**: | Sample Business Health and Safety Policy and Signage |
| **Exhibit C**: | Face Covering Behaviors |
| **Exhibit D**: | Construction Requirements |
| **Exhibit E**: | Phased-in Approach to On-Campus Instruction Based on Risk-Based Stages |

**SECTION 14.** This order supersedes Order No. 20200702-017.

**ORDERED** this the ____ day of August 2020, in the City of Austin, Travis County, Texas, in witness whereof I subscribe my name and cause to be affixed the seal of the City of Austin.

**SECTION 10.  Criminal Offense.**  A violation of this Order is a violation of Austin City Code Section 2-6-24 and a criminal offense. A violation of this Order may be punishable through criminal enforcement, except as limited by state order. Peace officers, City of Austin Code Department inspectors, and the Office of the Austin Fire Marshal are hereby authorized to enforce this Order and the Governor's Order.  Except as provided below, a criminal violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000, but not by confinement.  With respect to Section 5, each day or a portion of each day during which the violation occurs or continues constitutes a separate offense. An individual, rather than a business, who violates any provision of this Order concerning the mandatory wearing of face coverings shall first be given a verbal or written warning. Each subsequent violation is punishable by a fine not to exceed $250 per violation, but not by confinement.

A criminal violation of this Order may be enforced by the filing of a probable cause affidavit alleging the violation with the appropriate court or by issuing a citation to the person violating that contains written notice of the time and place the person must appear before a magistrate of this state, the name and address of the person charged, and the offense charged.

Enforcement of this Order is substantially reliant on self-regulation and a community commitment to public health and safety under the threat of COVID-19.  If there is not widespread compliance with this Order, the City will increase enforcement efforts, as allowed by law.

**SECTION 11. Savings Clause.**   If any provision of this Order or its application to any person or circumstance is held to be invalid, then the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**SECTION 12.  Posting.**  The Austin Public Health Department and the City Clerk will post this Order on their websites.  In addition, the owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public asking for a copy.

**SECTION 13.  Exhibits**.  This Order incorporates by reference the following:

| | |
|---|---|
| **Exhibit A**: | Recommendations and Requirements by the Austin / Travis County Health Authority |
| **Exhibit B**: | Sample Business Health and Safety Policy and Signage |
| **Exhibit C**: | Face Covering Behaviors |
| **Exhibit D**: | Construction Requirements |
| **Exhibit E**: | Phased-in Approach to On-Campus Instruction Based on Risk-Based Stages |

**SECTION 14.** This order supersedes Order No. 20200702-017.

EXHIBIT NO. 22                                                      EX. 22-008

**ORDERED** this the 14th day of August 2020, in the City of Austin, Travis County, Texas, in witness whereof I subscribe my name and cause to be affixed the seal of the City of Austin.

Mayor, City of Austin

Filed with me, the City Clerk of the City of Austin, this ___ day of August 2020, by Mayor Steve Adler, whose signature I hereby attest under my hand and the seal of the City of Austin.

City Clerk

8

EXHIBIT NO. 22                                    EX. 22-009

# Exhibit A

## Austin/Travis County Health Authority
## Requirements and Recommendations
## for Individuals, Families and Businesses

I. **Individuals**  All individuals shall comply with the Governor's Minimum Standard Health Protocols, checklist for all individuals, found at:
https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Checklist-Individuals.pdf

A. **COVID-19 Positive Individuals**, Suspected Positives, those currently being tested, and Untested Individuals with cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, fatigue, vomitin, nausea, and/or diarrhea shall:

i.  Not leave their residence without a mask or fabric face covering to prevent the spread to others.

ii.  Be permitted to do the following while wearing a mask or fabric face covering:

a.  Seek medical care or emergency medical care related or unrelated to COVID-19. In doing so, they shall notify first responders at the time of the call to 9-1-1 or prior to visiting other healthcare providers that they have tested positive for COVID-19, or been exposed to individuals who have tested positive, are suspected positive for COVID-19 or untested individuals with cough and/or fever.

b.  Walk or exercise alone in the immediate vicinity of their residence.

c.  Seek testing for COVID-19.

iii.  Not leave the City of Austin without prior notification to Austin Public Health at APH.Preparedness@austintexas.gov.

iv.  Practice Social Distancing and Hygiene within the residence, observe hygiene practices for prevention of household spread in accordance with the Centers for Disease Control (CDC) guidelines.

v.  Notify Austin Public Health if the residence does not allow for physical separation from other household contacts (separate room and bathroom).

vi.  Notify Austin Public Health if a member of their household is over the age of 65 and/or if they have underlying medical conditions identified by the CDC of increasing the risk of complications from COVID-19.

EXHIBIT NO. 22                                         EX. 22-010

vii. Remain in home quarantine for at least 10 days following the first appearance of systems, at least 24 hours with no fever (without use of fever-reducing medication), and symptoms have improved.

**B**. **Household Members of COVID-19 Positive Individuals**, Suspected Positives, those currently being tested, or Untested Individuals with cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, vomiting, nausea, and/or diarrhea shall:

i. Not leave the residence without a mask or fabric face covering to prevent the spread to others.

ii. Be permitted to do the following while wearing a mask or fabric face covering:

a. Seek medical care or emergency medical care related or unrelated to COVID-19. In doing so, they shall notify first responders at the time of the call to 9-1-1 or prior to visiting other healthcare providers that they have been exposed to individuals who have tested positive, are suspected positive for COVID-19 or untested individuals with cough and/or fever.

b. Walk or exercise alone in the immediate vicinity of their residence.

iii. Not leave the City of Austin without prior notification to Austin Public Health at APH.Preparedness@austintexas.gov.

iv. Practice Social Distancing and Hygiene within the residence, observe hygiene practices for prevention of household spread in accordance with CDC guidelines.

v. Notify Austin Public Health if the residence does not allow for physical separation from other household contacts (separate room and bathroom).

vi. Notify Austin Public Health or your Primary Care Provider if they develop symptoms consistent with COVID-19 as defined by the CDC.

vii. Remain in home quarantine for at least 14 days after the last contact with an individual known or suspected to be COVID-19 positive, regardless of the presence of symptoms.

**C.** Individuals should refrain from reporting to work when falling within any of the following criteria:

i. Has signs or symptoms of a COVID-19 infection, such as cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, vomiting, nausea, and/or diarrhea;

ii. Has a fever greater than 99.6°F;

EXHIBIT NO. 22                    EX. 22-011

iii.  In the previous 14 days has had contact with someone with a confirmed diagnosis of COVID-19 and did not have the appropriate personal protective equipment designated by the Centers for Disease Control and Prevention (CDC); is under investigation for COVID-19; or is ill with a respiratory illness; or

iv.  Has traveled to an area the World Health Organization or CDC considers a "Hotspot."

If someone in a household has tested positive for COVID-19, or is awaiting results of a COVID-19 test, and a member of the household is an employee of an government service or CISA industry, an exception may be made by Austin Public Health allowing that member of the household to voluntarily return to work after finding the risk of reduced essential services is greater than the risk of infection.

### D. Vulnerable Populations

i.  Vulnerable populations include people who:

a.  Are 65 years old and older; or

b.  Have certain health conditions such as heart disease, lung disease, diabetes, kidney disease, Human Immunodeficiency Virus (HIV), Acquired Immune Deficiency Syndrome (AIDS), and weakened immune systems.

ii.  Vulnerable Individuals shall:

a.  Avoid group gatherings unless it is essential;

b.  Avoid people who are sick,

c.  Wear a mask or fabric face covering at all times when in public, and

d.  Comply with the Governor's Special Guidance for Texans Over 65, found at: https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Special-Guidance-For-Texans-Over-65.pdf

### E. Individual Gatherings

i.  All social indoor or outdoor gatherings outside of a single household or dwelling should be avoided or minimized. No more than 10 individuals may stand or gather together, except as expressly permitted by this Order or the Governor's Order.

ii.  Do not attend any events or gatherings if sick.

iii.  For household and other gatherings permitted by the Order:

EXHIBIT NO. 22                    EX. 22-012

a. Have hand washing capabilities, hand sanitizers, and tissues available;

b. Frequently clean high-touch surface areas like countertops, doorknobs, and handrails; and

c. Find ways to create physical space (minimum of six (6) feet distance between people) to minimize close contact as much as possible.

d. Find ways to ensure six feet of social distancing from another group or gathering.

**F. Schools and Daycare. To the extent that schools and daycare are open under current orders:**

i. Do not have your child attend school or daycare if sick.

ii. If you have a child with chronic health conditions, consult the child's doctor about school and daycare attendance.

iii. Frequently re-educate students and staff regarding Social Distancing and Hygiene and Face Covering behaviors and ensure that appropriate signs are posted.

iv. Explore remote teaching and online options to continue learning.

**II.** **Businesses** shall operate only to the extent permitted by order of the Texas Governor.

**III.** **Businesses** and services permitted to operate by the Governor's Order shall comply with the following:

**A.** To prevent stigma and discrimination in the workplace, employers shall only adhere to the recommendations described in this Order to determine risk of COVID-19. Employers should contact their own human resources advisors and shall not make determinations of risk based on race, color, religion, sex, sexual orientation, gender identity, age, familial status, disability, marital status, student status, creed, or national origin. To the extent possible, employers should maintain confidentiality of people with suspected or confirmed COVID-19.

**B.** Employers shall only allow persons in and around their premises that are: (1) essential employees not subject to any of the criteria in Section I of this Exhibit, (2) delivery personnel, suppliers, customers or members of the public practicing Social Distancing and Hygiene and Face Covering behaviors as set forth in Sections 2, 3, and 5 (Mandatory Health Plans) of this Order, and (3) persons with legal authority to enter such as law enforcement.

Page **4** of **6**

**C.** Prior to allowing employees into its facility, employers shall ask all employees if they meet any of the criteria in Section I of this Exhibit, and shall direct employees to return home or other appropriate shelter and services if the employee is exhibiting symptoms and presenting a threat of infecting others.

**D.** Employers shall immediately separate an employee who becomes sick or demonstrates a temperature greater than 99.6°F while at work from other employees and send that employee home or to other appropriate shelter and services.

**E.** Human resources departments shall create alternate work plans to help employees remain productive while keeping the workforce safe and healthy.

**F.** Employers are strongly encouraged to require employees (either those exhibiting symptoms or all employees) to undergo a COVID-19 symptom check and non-invasive temperature readings prior to entering a worksite; however, **employers are not mandated to take the temperature of employees prior to entrance to its worksite**. If the employer does take employees' temperatures and/or has first-hand knowledge that the employee's temperature exceeds 99.6°F, then the employer shall prohibit the employee from entering the facility or property.

**G.** Employers shall create and implement an infectious disease response plan.

**H.** Employers shall comply with the Governor's Minimum Standard Health Protocols, checklist for employers, found at:
https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Checklist-Employers.pdf

**I.** Where appropriate employers shall:

    i.    Suspend nonessential employee travel;

    ii.    Prohibit employees working within six (6) feet of one another unless necessary to provide continuity of essential services;

    iii.    Minimize or cancel in-person meetings and conferences including canceling, postponing or moving to on-line formats for all indoor or outdoor gatherings of any number of people.

    iv.    Require employees to stay home when they are sick and maximize flexibility in sick leave benefits.

    v.    Permit sick employees to stay home without providing a doctor's note.

    vi.    Utilize telecommuting options to minimize person-to-person interaction.

EXHIBIT NO. 22          EX. 22-014

vii.  Alter, stagger or otherwise schedule or separate employees or teams of employees so not all employees are present at one time but are present at alternative days and times, unless necessary to provide continuity of essential services.

viii. Limit or restrict the number of customers or visitors permitted in a workplace at one time.

ix.  Ensure that individuals (employees and clients) queuing inside and outside of the business or workplace can maintain six (6) feet of separation.

x.  Designate special separate shopping times for high-risk clients as designated by the CDC.

xi.  Increase the use and capability of on-line, drive-thru, curbside, or delivery services.

xii.  Provide hand washing capabilities, hand sanitizers, and tissues.

xiii. Clean high-touch surface areas like countertops, doorknobs, and handrails at least twice per day with CDC recommended surface cleaners for COVID-19.

xiv. Require and allow employees to practice the Face Covering Behaviors as set forth in Sections 3 and 5 and **Exhibit C** of this Order.

EXHIBIT NO. 22                                    EX. 22-015

# Exhibit B

## SAMPLE HEALTH AND SAFETY POLICY & SIGNAGE
## [ATTACHED]

# COVID-19 HEALTH & SAFETY POLICY

**POLICY.**   The virus that causes COVID-19 can be spread to others by infected persons who have few or no symptoms. Because of the hidden nature of this threat, it is the policy of this business, as required by City and County Orders, to require the following:

1. **FACE COVERING REQUIRED IN ORDER TO ENTER PREMISES.** All persons over the age of ten (10), including employees, customers, visitors, invitees, and contractors ("Patrons"), who enter this business MUST wear a face covering over their nose and mouth, such as a commercially made or homemade mask, scarf, bandana, or handkerchief. This requirement does not apply if covering the nose or mouth poses a greater mental or physical health, safety, or security risk to the Patron, such as anyone having trouble breathing due to a medical condition, or is unconscious, incapacitated, or otherwise unable to remove the cover without assistance.

2. **SOCIAL DISTANCING PROTOCOLS.** Even with the use of appropriate face coverings, individuals should maintain six (6) feet of social distancing from others outside their own household whenever possible.

   a. Employees should not work within six (6) feet of one another, except to the extent necessary to provide services.

   b. Patrons should maintain six (6) feet of separation from others outside their own household to the extent feasible when inside these premises and must do so while queuing or waiting.

3. **VIOLATIONS.** Patrons who do not wear a face covering will be asked to leave the premises and may not be provided goods or services until the face covering requirements of this policy and City and County Orders are followed.

4. **NOTICE AND SIGNAGE.** Notice of this Health and Safety Policy will be posted in a conspicuous location on these premises.

# Exhibit C

## Face Covering Behaviors

A significant percentage of individuals with the COVID-19 virus lack symptoms.  Because an infected person can transmit the virus to others before showing any symptoms, the covering of a person's nose and mouth when outside their home or residence is necessary to help prevent the spread of COVID-19. This is consistent with the findings of the CDC and Austin-Travis County Health Authority

Unless you already have your own personal used masks that cannot be donated, the fabric face coverings recommended are not surgical masks or N-95 respirators, which are critical supplies that must continue to be reserved for healthcare workers and first responders.  Staying home is the best way to help reduce the spread of the virus, but if an individual must leave their place of residence, wearing a fabric face covering shall be used as outlined in this Exhibit and this Order. **Wearing a face covering is not a substitute for maintaining 6-feet social distancing and hand washing, as these remain important steps to slowing the spread of the virus.**

**The public in general and employers and employees shall adhere to the following:**

a.  All persons shall wear some form of covering over their nose and mouth, such as a commercially made or homemade mask, scarf, or bandana, when outside of his or her residence.

b.  This section shall not apply to:

1.  any person younger than 10 years of age (though masks are recommended for children two years of age and older);

2.  any person with a medical condition or disability that prevents wearing a face covering;

3.  any person while the person is eating or drinking, or is seated at a restaurant to eat or drink;

4.  any person while the person is (a) exercising outdoors or engaging in physical activity outdoors and (b) maintaining a safe distance from others not in the same household;

5.  any person while the person is driving alone or with passengers of the same household as the driver;

6.  any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or the need for specific access to the face, such as while visiting a bank or while obtaining a personal care service involving the face, but only to the extent necessary for the temporary removal;

Page **1** of **3**

7. any person while the person is in a swimming pool, lake, or similar body of water;

8. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

9. any person who is actively providing or obtaining access to religious worship, but wearing a face covering is strongly encouraged;

10. any person while the person is giving a speech for a broadcast or to an audience;

11. any person while temporary removal of the face covering is necessary for communication by or with a person who is hearing impaired; or

12. any person while alone, or in the presence of only members of the same household or residence, in a separate room or single space not accessible to the public, and not in an indoor common area

Parents and Guardians of children under 10 shall be responsible for appropriately masking children when outside their residence.

c.   All non-residents in nursing homes, retirement and long-term care facilities shall wear a fabric face covering as provided for in this Exhibit and set forth in Section 3 of this Order (Face Covering Behaviors), except as otherwise required by an order issued by the Health Authority. In addition, residents in facilities with confirmed COVID-19 cases shall follow requirements of **Exhibit A**, except when doing so poses a greater mental or physical health, safety or security risk.

d.   All COVID-19 Positive Individuals, Suspected Positives, those currently being tested, and untested individuals with cough, fever, sore throat, runny nose or congestion, chills, muscle or body aches, loss of smell, loss of taste, shortness of breath, difficulty breathing, vomiting, nausea, and/or diarrhea and household members of same category of individuals shall not leave their residence without a mask or cloth face covering to prevent the spread to others.

e.   All individuals working for a business shall wear a mask or cloth face covering whenever in public and whenever performing job duties in the presence of others.

f.   Unless you already have your own personal used masks that cannot be donated, medical grade (N95) and surgical masks should be reserved and used only by medical professionals and first responders.

Examples of how to make cloth face coverings can be found online including guidance from the CDC and guidance from Austin/ Travis County Health Authority.

g.   The fabric face covering should:

1.   fit snugly but comfortably against the side of the face;

EXHIBIT NO. 22                                    EX. 22-019

2.     be secured with ties or ear loops;

3.     include multiple layers of fabric;

4.     allow for breathing without restriction; and

5.     be able to be laundered and machine dried without damage or change to shape.

h.     Employers shall require and allow employees to practice Face Covering Behaviors as set forth in Section 3 and this **Exhibit C**.

i.     Even with the use of appropriate face coverings, individuals shall maintain six feet of social distancing whenever possible.

j.     Individuals should avoid touching their face and should wash their hands or use hand sanitizer.

k.     For further information, individuals can access information at https://traviscountytx.gov/news/2020/1945-novel-coronavirus-covid-19-information and www.AustinTexas.gov/COVID19.

EXHIBIT NO. 22                         EX. 22-020

# Exhibit D

# CONSTRUCTION REQUIREMENTS

**1.** The person in charge of the overall site ("Site Manager") shall ensure the following is implemented and maintained at the work site. For sites not large enough by virtue of physical size or number of workers, or which do not have a general contractor, the responsibilities of a Site Manager in this document are also conferred on each subcontractor on a site.

a. Ensure workers practice the Social Distancing and Face Covering Behaviors as set forth in Sections 2 and 3 and **Exhibits A** and **C** of this Order during non-construction activities and, to the greatest extent possible, during construction activities, with careful attention paid to "choke points" and "high-risk areas" where workers are at greater risk to closely gather, such as hallways, hoists and elevators, and break areas;

(1) Follow healthy work practices in **Exhibit A** of this Order;

(2) Ensure all workers wear a fabric face covering consistent with Section 3 and **Exhibit C** of this Order;

(3) For all construction sites within the City, except as noted, Site Manager shall:

i.  Institute staggered shifts for sites with more than 10 active workers and post at these sites, in languages understood by all persons working there, a notice showing the sizes and types of shift crews working there, and directions on how the Site Manager is limiting crew sizes and rotating shifts.

ii. Every day before the commencement of work, for and understood by each worker, conduct a jobsite pre-screening of the general health of each worker, provide a briefing reiterating the COVID-19 safety requirements, and check for personal protective equipment.

iii. Ensure that the site has at least one handwashing station with soap or hand sanitizer and one portable restroom stocked with hand soap and/or hand sanitizer with at least 60% alcohol for every 15 workers, and the handwashing station and restroom(s) must be spaced six feet apart or more from each other.

iv. Mandate handwashing of at least twenty seconds for workers as follows:

(a) Before workers begin work;
(b) After workers remove gloves;
(c) Before and after the use of high-touch items such as tools, electronic devices or multi-user devices;
(d) Before and after any meal or restroom breaks; and
(e) After a worker's shift or work time ends.

EXHIBIT NO. 22

v. Prohibit the use of community water coolers and provide individual water bottles or instruct workers to bring their own.

vi. Ensure that shared tools are disinfected between users, and that common areas (lunch and break areas, toolbox talk areas, large equipment, electronic devices etc.) and collective touch points (doorknobs, counters, keyboards, etc.) are cleaned and disinfected at least twice a day.

vii. Post in a conspicuous place or places on a site where notices to employees are customarily posted, once such signage is made available by the City, a sign in English and Spanish providing the Social Distancing and Hygiene and Face Covering Behaviors as set forth in Sections 2 and 3 and **Exhibits A** and **C** of this Order, the Requirements and Recommendations for Employees in **Exhibit A** of this Order, and information for workers to submit complaints of any violations.

viii. Post at least one Austin Public Health "Help Prevent Disease" sign at each entrance and on each portable restroom door (available for download and print at: http://www.austintexas.gov/sites/default/files/files/Health/General%20Hygiene%20F lyer%20Final2-1-eng-051120.pdf).

ix. Provide single use disposable paper towels and no-touch trash receptacles.

x. Keep toilets clean, sanitary, and operational at all times and ensure proper disposal of waste from these facilities.

xi. Designate a COVID-19 Safety Monitor who has the authority to enforce these rules and shall be on-site at all times. The contact information for the Safety Monitor must be made available to the City. The Safety Monitor may also be the Site Manager and shall advise the City if that is the case when providing their contact information.

b. If a worker at a construction site is confirmed to have contracted COVID-19, the Site Manager shall immediately send the worker home, notify Austin Public Health, and follow all directions from Austin Public Health concerning that worker and workers that may have come in contact with the infected worker.

c. The Site Manager shall ensure that every worker who enters a jobsite has signed in and shall keep a list of and contact information for every worker that enters the jobsite every day for the purpose of identifying and notifying workers if they have shared a jobsite with someone who has been confirmed to have COVID-19.

d. All Construction Industry employers are encouraged to observe the following employment practices for the health of the workers, the health of the community generally, and for the benefit of the overall economy of the City:

(1) Take no adverse action against a worker who declines to work at a construction site if the worker believes in good faith that the site presents an imminent health risk of the worker or others due to COVID-19.

(2) Take no adverse action against a worker who has been quarantined, or advised to self-quarantine, due to possible exposure to COVID-19.

(3) Do not contest a claim for unemployment benefits filed by a worker temporarily furloughed as the result of the closure of a construction site due to COVID-19.

e. Continuing review of health conditions. The City will continue to monitor closely the health condition of the community and the statistical models for the likely spread of the COVID-19 virus in the community on an ongoing basis. If this evidence indicates that the City's ability to provide adequate care for those with serious cases of COVID-19 is significantly compromised, additional emergency orders or guidance may be issued. All persons in the construction industry should be aware of this risk and are strongly encouraged to take all feasible steps to eliminate person-to-person contact at construction sites, and to practice the City's Social Distancing and Hygiene and Face Covering Behaviors at all times.

# Exhibit E
# Phased-in Approach to On-Campus Instruction Based on Risk-Based Stages

Each school must follow this phased-in approach unless following this approach will result in a loss of funding from the Texas Education Agency (TEA). The percentages described below also apply to school gatherings and sports activities. A school can determine the stage by checking http://www.austintexas.gov/page/covid-19-risk-based-guidelines.

## COVID-19: Risk-Based Stages for Phased-in Learning

| | CDC Level of Community Transmission | On-campus Population |
|---|---|---|
| **Stage 1** | No to minimal transmission | Up to 100% on-campus learning |
| **Stage 2** | Minimal to moderate transmission | Up to 75% on-campus learning |
| **Stage 3** | Substantial, controlled transmission | Up to 50% on-campus learning |
| **Stage 4** | Substantial, uncontrolled transmission | Up to 25% on-campus learning |
| **Stage 5** | Widespread uncontrolled transmission threatening our healthcare infrastructure | 100% virtual learning |

19 pgs    2020145196

**STAYS IN FILE**

## ORDER BY THE COUNTY JUDGE OF TRAVIS COUNTY

### County Judge Order 2020-16; Relating to the COVID-19 Community Restrictions

**Whereas,** on March 6, 2020, a Declaration of Local Disaster was issued by the Travis County Judge to allow the County of Travis ("County" or "Travis County"), Texas, to take measures to reduce the possibility of exposure to COVID-19 and promote the health and safety of Travis County residents; and

**Whereas,** on March 13, 2020, a Declaration of State of Disaster was issued by Governor Greg Abbott to take additional steps to prepare for, respond to, and mitigate the spread of COVID-19 to protect the health and welfare of Texans; and

**Whereas,** the virus that causes COVID-19 is contagious and spreads through person-to-person contact, especially in group settings; and

**Whereas,** on June 18, 2020, the County Judge issued Order 2020-12, requiring all commercial entities in Travis County that provide goods or services directly to the public to develop and implement a Health and Safety Policy related to COVID-19 which, at a minimum, shall require that all employees and visitors to the commercial entity's business premises or other facilities wear face coverings;

**Whereas,** on June 26, 2020 the Governor issued Executive Order GA-28 ("GA-28"), related to the reopening of services and business, with reduced occupancy limits and gathering restrictions for individuals and businesses, as well as continuing recommended health protocols and social distancing measures to attempt to mitigate increased transfer of COVID-19 associated with the expanding commercial and social interactions; and

**Whereas,** on July 2, 2020, the Governor issued a Proclamation to amend paragraph 5 of GA-28 to prohibit any outdoor gathering in excess of 10 people, except as specifically exempted in paragraphs 1, 2 and 4 of GA-28, unless approved by the county judge or mayor, subject to conditions and restrictions not inconsistent with GA-28; and

**Whereas,** the Governor's Proclamation of July 2, 2020 also amended paragraph 12 of GA-28 to state "except as provided in this executive order or in the minimum standard health protocols recommended by DSHS, found at www.dshs.texas.gov/coronavirus, people shall not be in groups larger than 10 and shall maintain six feet of social distancing from those not in their group;" and

**Whereas,** on July 2, 2020, the Governor further issued Executive Order GA-29, which requires every person in Texas to wear a face covering over the nose and mouth when inside a commercial entity or other building open to the public, or when in an outdoor public space whenever not feasible to maintain six (6) feet of social distancing from persons outside one's household, and except as provided in the order; and

**Whereas,** on July 9, 2020, the County Judge issued Order 2020-14, effective July 11, 2020, prohibiting any gatherings in excess of 10 people and requiring face coverings, except as permitted by the Governor's orders; and

**Whereas,** as of August 13, 2020, Travis County has experienced 23,718 confirmed cases of COVID-19, with 263 current hospitalizations and 328 deaths as a result of the disease, and although infection rates have currently leveled somewhat, the Health Authority expects the number of infections to rise if current rules regarding masking, social distancing, hygiene, and other health protocols are lifted; and

**Whereas,** Dr. Mark Escott, the interim Health Authority for Austin/Travis County, continues to encourage people to stay home except when necessary and finds that the area still needs to increase testing and contact tracing capabilities, to maintain social distancing and hygiene, and to wear face coverings to provide for the safety of the public while businesses are reopening and when individuals are outside their household; and

**Whereas,** COVID-19 continues to menace the health of County residents and the economy, and the Health Authority has advised on the need for continued vigilance by individuals and County businesses in complying with mandatory health measures; and

**Whereas,** the County Judge has determined that extraordinary emergency measures must be taken to try and mitigate the effects of this public health emergency and to facilitate a response to the public health threat; and

**Whereas,** pursuant to Government Code section 418.108(g), a County Judge is authorized to control ingress and egress from a local disaster area, and control the movement of persons and the occupancy of premises in that disaster area; and

**Whereas,** this Order shall cover all individuals currently living within Travis County, including but not limited to all of the cities and municipalities within the boundaries of Travis County and specifically listed in **Exhibit A**.

**NOW THEREFORE, I, COUNTY JUDGE OF TRAVIS COUNTY, PURSUANT TO THE AUTHORITY VESTED BY TEXAS GOVERNMENT CODE CHAPTER 418, HEREBY FIND AND ORDER THAT:**

Effective as of 12:00 a.m., Sunday, August 16, 2020 ("Effective Date"), and continuing through 11:59 p.m. on December 15, 2020 unless extended, modified or terminated early by the Travis County Judge or as otherwise indicated below:

1. **Public Health Emergency**. That this Order shall continue the local disaster declaration and public health emergency for Travis County for the period specified herein and shall incorporate and adopt the most recent orders issued by Governor Greg Abbott including GA-28, as amended by Proclamation issued July 2, 2020, GA-29 issued July 2, 2020, and any subsequent orders or proclamations by the Governor relating to the COVID-19 disaster.

2. **Gatherings**. Any gatherings that exceed 10 people are hereby PROHIBITED, except as permitted by current Governor's Proclamations and Orders.

3. Pursuant to the Governor's Order GA-28, there is no occupancy limit for the following:
   a. any services listed by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) in its Guidance on the Essential Critical Infrastructure Workforce, Version3. 1 or any subsequent version;
   b. religious services conducted in churches, congregations, and houses of worship;
   c. local government operations, including county and municipal governmental operations relating to licensing (including marriage licenses), permitting, recordation, and document-filing services, as determined by the local government;
   d. child-care services;
   e. youth camps, including but not limited to those defined as such under Chapter 141 of the Texas Health and Safety Code, and including all summer camps and other daytime and overnight camps for youths; and
   f. recreational sports programs for youths and adults;

   All participants in lawful gatherings or groups expressly permitted by this Order or the Governor's Order are nonetheless subject to the face covering behaviors set forth in Sections 6 and 7 of this Order and **Exhibits B and C,** including or as may be limited by any other requirements imposed by the Governor's Order. Nothing in this Order prohibits the gathering of members of a household within the household's residence.

4. Pursuant to the Governor's Order GA-28, the outdoor gathering ban in section 2 of this Order does not apply to the following outdoor areas, events, or establishments, except that the following outdoor areas or outdoor venues shall operate at no more than 50 percent of the normal operating limits as determined by the owner:
   a. professional, collegiate, or similar sporting events;
   b. swimming pools;
   c. water parks;
   d. museums and libraries;
   e. zoos, aquariums, natural caverns, and similar facilities; and
   f. rodeos and equestrian events;

5. Pursuant to the Governor's Order GA-28, the outdoor gathering ban in section 2 of this Order does not apply to amusement parks and carnival, except that amusement parks and carnivals shall operate at no more than 50 percent of the normal operating limits as determined by the owner;

6. **Face Covering Requirements**. In accordance with the Governor's Order GA-29, every person in Travis County IS REQUIRED to wear a face covering over their nose and mouth when inside a commercial entity or other building open to the public, or when in an outdoor public space whenever not feasible to maintain six (6) feet of social distancing from persons outside one's household; provided however that this face covering requirement does not apply to the following:
   a. any person younger than 10 years of age;

b. any person with a medical condition or disability that prevents wearing a face covering;

c. any person while the person is consuming food or drink, or is seated at a restaurant to eat or drink;

d. any person while the person is (1) exercising outdoors or engaging in physical activity outdoors, and (2) is maintaining a safe distance from other people not in the same household;

e. any person while the person is driving alone or with passengers who are part of the same household as the driver;

f. any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or a need for specific access to the face, such as while visiting a bank or while obtaining a personal care service involving the face, but only to the extent necessary for the temporary removal;

g. any person while the person is in a swimming pool, lake, or similar body of water;

h. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

i. any person who is actively providing or obtaining access to religious worship, but wearing a face covering is strongly encouraged; or

j. any person while the person is giving a speech for a broadcast or to an audience; and

k. Not excepted from this face-covering requirement is any person attending a protest or demonstration involving more than 10 people and who is not practicing safe social distancing of six feet from other people not in the same household.

l. any person who is alone, or in the presence of only members of the same household or residence, in a separate room or single space not accessible to the public, and not in an indoor common area.

7. **Social Distancing and Hygiene**. All persons should practice Social Distancing and Hygiene as defined below, except when in the presence of only members of one's own household or residence, or when otherwise exempted by this Order. Parents and Guardians of children under 10 are responsible for maintaining social distance between child members of their household and others' households. For purposes of this Order, and as outlined in the Guidelines from the CDC and Austin/Travis County Health Authority (attached as **Exhibit B**). Social Distancing and Hygiene include maintaining at least a six-foot distance from other individuals, washing hands with soap and water for at least 20 seconds as frequently as possible or using hand sanitizer with at least 60% alcohol, covering coughs or sneezes (into the sleeve or elbow, not into hands), regularly cleaning high-touch surfaces, and not shaking hands.

8. **Mandatory Health and Safety Policy – Commercial Entities**. All commercial entities in Travis County that provide goods or services directly to the public must develop and implement a health and safety policy or plan ("Health and Safety Policy") related to preventing transmission of the COVID-19 virus. Travis County includes all municipalities within the boundaries of Travis County listed in Exhibit A. The Health and Safety Policy must require, at a minimum, that all employees, customers and visitors to the commercial entity's business premises or other facilities wear face coverings over their nose and mouth

when in an area or performing an activity which will necessarily involve close contact or proximity to co-workers, other individuals or members of the public where six feet of separation is not feasible, and subject to the exceptions in Section 6. The Health and Safety Policy required to be developed and implemented by this Order may also include the implementation of other mitigating measures designed to control and reduce the transmission of COVID-19 such alternative methods of service for those unable to wear mask or temperature checks or health screenings. A copy of a sample Health and Safety Policy and sign is attached as **Exhibit D**, and can also be found on the Travis County website.

Commercial entities must post the Health and Safety Policy required by this Order in a conspicuous location sufficient to provide notice to employees, customers and visitors of all health and safety requirements. **Failure to develop and implement the Health and Safety Policy required by this Order may result in a fine not to exceed $1,000 for each violation.**

9. **Extension of Deadlines**. Notwithstanding the expiration of this Order, all deadlines or expiration dates imposed by County code, order, rule, or regulation for site plans, subdivisions, development permits, and similar development applications or approvals are extended until March 15, 2021, or the date they would have normally expired, whichever is later.

10. **Prior Orders**. This Order is issued in accordance with and incorporates by reference all declarations, findings, and recitations set out in the preamble to this Order. This Order replaces and supersedes County Judge Orders 2020-12 and 2020-14 in their entirety, and replaces and supersedes Sections 1, and 3 through 7 of the Travis County Judge's Prevention Guidelines and Order of June 16, 2020 (Order 2020-11). Section 2 (Prevention Guidelines) and Section 8 of the County Judge's Prevention Guidelines and Order of June 16, 2020 (Order 2020-11), including the Recommendations of the Health Authority, Face Covering recommendations and Construction Guidance set forth in exhibits B, C and D, remain in effect.

11. The Austin Public Health Department and the Travis County Clerk will post this Order on their websites. In addition, the owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public asking for a copy. If any subsection, sentence, clause, phrase, or word of this Order or any application of it to any person, structure, gathering, or circumstance is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, then such decision will not affect the validity of the remainder of this Order and its application.

12. **Savings Clause**. If any provision of this Order or its application to any person or circumstance is held to be invalid, then the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

13. **ENFORCEMENT**. That the Travis County Sheriff's Office, the Travis County Fire Marshal's Office, and other peace officers are hereby authorized to enforce this Order and the Governor's Executive Orders.

   a. A violation of Section 2 of this Order (Gatherings) may be punishable through criminal or civil enforcement and may result in a fine not to exceed $1,000. A criminal violation of Section 2 of this Order is a misdemeanor punishable by fine only.

   b. For a violation of Section 6 of this Order (Face Covering Requirements), and following a verbal or written warning for a first-time violator of this face covering requirement, a person's second violation shall be punishable by a fine not to exceed $250.00. Each subsequent violation shall be punishable by a fine not to exceed $250.00 per violation.

   c. A violation of Section 8 (Mandatory Health and Safety Policy) may be punishable through civil enforcement and may result in a fine not to exceed $1,000.

14. This Order incorporates by reference the following:

   a. **Exhibit A**: List of Cities and Municipalities within Travis County Jurisdiction Covered by this Order

   b. **Exhibit B**: Recommendations and Requirements by the Austin / Travis County Health Authority for Individuals, Families and Businesses

   c. **Exhibit C:** Face Covering Behaviors

   d. **Exhibit D:** Sample Health and Safety Policy and Sign

**ORDERED** this the *14th* day of August, 2020, in the County of Travis, Texas.

_Samuel T. Biscoe_

County Judge
County of Travis, Texas

Filed with the Clerk of Travis County, this *14th* day of August, 2020.

_Dana DeBeauvoir_

Dana DeBeauvoir, County Clerk

**Exhibit A: List of Cities and Municipalities within Travis County Jurisdiction covered by the Order**

- City of Austin
- City of Bee Cave
- City of Cedar Park
- City of Creedmoor
- City of Elgin
- City of Jonestown
- City of Lago Vista
- City of Lakeway
- City of Leander
- City of Manor
- City of Mustang Ridge
- City of Pflugerville
- City of Rollingwood
- City of Round Rock
- City of Sunset Valley
- City of West Lake Hills
- Village of Briarcliff
- Village of Point Venture
- Village of San Leanna
- Village of The Hills
- Village of Volente
- Village of Webberville

County Judge Order No. 2020-05
Exhibit A: List of Cities and Municipalities within Travis County Jurisdiction covered by the Order

## Exhibit B

## Austin/Travis County Health Authority
## Requirements and Recommendations
## for Individuals, Families and Businesses

I. **Individuals**  All individuals shall comply with the Governor's Minimum Standard Health Protocols, checklist for all individuals, found at:
https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Checklist-Individuals.pdf

    A. **COVID-19 Positive Individuals**, Suspected Positives, those currently being tested, and Untested Individuals with cough, fever, sore throat, chills, muscle aches, loss of smell, loss of taste, shortness of breath, vomiting, and/or diarrhea shall:

        i.   Not leave their residence without a mask or fabric face covering to prevent the spread to others.

        ii.   Be permitted to do the following while wearing a mask or fabric face covering:

            a.   Seek medical care or emergency medical care related or unrelated to COVID-19. In doing so, they shall notify first responders at the time of the call to 9-1-1 or prior to visiting other healthcare providers that they have tested positive for COVID-19, or been exposed to individuals who have tested positive, are suspected positive for COVID-19 or untested individuals with cough and/or fever.

            b.   Walk or exercise alone in the immediate vicinity of their residence.

            c.   Seek testing for COVID-19.

        iii.   Not leave the County without prior notification to Austin Public Health at APH.Preparedness@austintexas.gov.

        iv.   Practice Social Distancing and Hygiene within the residence, observe hygiene practices for prevention of household spread in accordance with the Centers for Disease Control (CDC) guidelines.

        v.   Notify Austin Public Health if the residence does not allow for physical separation from other household contacts (separate room and bathroom).

        vi.   Notify Austin Public Health if a member of their household is over the age of 65 and/or if they have underlying medical conditions identified by the CDC of increasing the risk of complications from COVID-19.

Page 1 of 6

vii. Remain in home quarantine for at least 10 days following the onset of their illness and at least three days (72 hours) after the conclusion of their illness (resolution of fever without medications and improvement in cough and shortness of breath), whichever is longer.

**B.** **Household Members of COVID-19 Positive Individuals**, Suspected Positives, those currently being tested, or Untested Individuals with cough, fever, sore throat, chills, muscle aches, loss of smell, loss of taste, shortness of breath, vomiting, and/or diarrhea shall:

i. Not leave the residence without a mask or fabric face covering to prevent the spread to others.

ii. Be permitted to do the following while wearing a mask or fabric face covering:

    a. Seek medical care or emergency medical care related or unrelated to COVID-19. In doing so, they shall notify first responders at the time of the call to 9-1-1 or prior to visiting other healthcare providers that they have been exposed to individuals who have tested positive, are suspected positive for COVID-19 or untested individuals with cough and/or fever.

    b. Walk or exercise alone in the immediate vicinity of their residence.

iii. Not leave the County without prior notification to Austin Public Health at APH.Preparedness@austintexas.gov.

iv. Practice Social Distancing and Hygiene within the residence, observe hygiene practices for prevention of household spread in accordance with CDC guidelines.

v. Notify Austin Public Health if the residence does not allow for physical separation from other household contacts (separate room and bathroom).

vi. Notify Austin Public Health or your Primary Care Provider if they develop symptoms consistent with COVID-19 as defined by the CDC.

vii. Remain in home quarantine for at least 14 days since the last contact with an individual known or suspected to be COVID-19 positive, regardless of the presence of symptoms.

**C.** Individuals should refrain from reporting to work when falling within any of the following criteria:

i. Has signs or symptoms of a COVID-19 infection, such as cough, fever, sore throat, chills, muscle aches, loss of smell, loss of taste, shortness of breath, vomiting, and/or diarrhea;

Page **2** of **6**

ii.  Has a fever greater than 99.6°F;

iii.  In the previous 14 days has had contact with someone with a confirmed diagnosis of COVID-19 and did not have the appropriate personal protective equipment designated by the Centers for Disease Control and Prevention (CDC); is under investigation for COVID-19; or is ill with a respiratory illness; or

iv.  Has traveled to an area the World Health Organization or CDC considers a "Hotspot."

If someone in a household has tested positive for COVID-19, or is awaiting results of a COVID-19 test, and a member of the household is an employee of an government service or CISA industry, an exception may be made by Austin Public Health allowing that member of the household to voluntarily return to work after finding the risk of reduced essential services is greater than the risk of infection.

**D. Vulnerable Populations**

    i.  Vulnerable populations include people who:

        a. Are 65 years old and older; or

        b. Have certain health conditions such as heart disease, lung disease, diabetes, kidney disease, Human Immunodeficiency Virus (HIV), Acquired Immune Deficiency Syndrome (AIDS), and weakened immune systems.

    ii.  Vulnerable Individuals shall:

        a. Avoid group gatherings unless it is essential;

        b. Avoid people who are sick,

        c. Wear a mask or fabric face covering at all times when in public, and

        d. Comply with the Governor's Special Guidance for Texans Over 65, found at: https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Special-Guidance-For-Texans-Over-65.pdf

**E. Individual Gatherings**

    i.  All social indoor or outdoor gatherings outside of a single household or dwelling should be avoided or minimized. No more than 10 individuals may stand or gather together, except as expressly permitted by this Order or the Governor's Order.

    ii.  Do not attend any events or gatherings if sick.

Page 3 of 6

iii. For household and other gatherings permitted by the Order:

    a. Have hand washing capabilities, hand sanitizers, and tissues available;

    b. Frequently clean high-touch surface areas like countertops, doorknobs, and handrails; and

    c. Find ways to create physical space (minimum of six (6) feet distance between people) to minimize close contact as much as possible.

    d. Find ways to ensure six feet of social distancing from another group or gathering.

**F. Schools and Daycare. To the extent that schools and daycare are open under current orders:**

i. Do not have your child attend school or daycare if sick.

ii. If you have a child with chronic health conditions, consult the child's doctor about school and daycare attendance.

iii. Frequently re-educate students and staff regarding Social Distancing and Hygiene and Face Covering behaviors and ensure that appropriate signs are posted.

iv. Explore remote teaching and online options to continue learning.

**II.**    **Businesses** shall operate only to the extent permitted by order of the Texas Governor.

**III.**   **Businesses** and services permitted to operate by the Governor's Order shall comply with the following:

**A.** To prevent stigma and discrimination in the workplace, employers shall only adhere to the recommendations described in this Order to determine risk of COVID-19. Employers should contact their own human resources advisors and shall not make determinations of risk based on race, color, religion, sex, sexual orientation, gender identity, age, familial status, disability, marital status, student status, creed, or national origin. To the extent possible, employers should maintain confidentiality of people with suspected or confirmed COVID-19.

**B.** Employers shall only allow persons in and around their premises that are: (1) essential employees not subject to any of the criteria in Section 1 of this Exhibit, (2) delivery personnel, suppliers, customers or members of the public practicing Social Distancing and Hygiene and Face Covering behaviors as set forth in Sections 2, 3, and 5 (Mandatory Health Plans) of this Order, and (3) persons with legal authority to enter such as law enforcement.

Page **4** of **6**

EXHIBIT NO. 23            EX. 23-011

C. Prior to allowing employees into its facility, employers shall ask all employees if they meet any of the criteria in Section I of this Exhibit, and shall direct employees to return home or other appropriate shelter and services if the employee is exhibiting symptoms and presenting a threat of infecting others.

D. Employers shall immediately separate an employee who becomes sick or demonstrates a temperature greater than 99.6°F while at work from other employees and send that employee home or to other appropriate shelter and services.

E. Human resources departments shall create alternate work plans to help employees remain productive while keeping the workforce safe and healthy.

F. Employers are strongly encouraged to require employees (either those exhibiting symptoms or all employees) to undergo a COVID-19 symptom check and non-invasive temperature readings prior to entering a worksite; however, **employers are not mandated to take the temperature of employees prior to entrance to its worksite**. If the employer does take employees' temperatures and/or has first-hand knowledge that the employee's temperature exceeds 99.6°F, then the employer shall prohibit the employee from entering the facility or property.

G. Employers shall create and implement an infectious disease response plan.

H. Employers shall comply with the Governor's Minimum Standard Health Protocols, checklist for employers, found at:
https://gov.texas.gov/uploads/files/organization/opentexas/OpenTexas-Checklist-Employers.pdf

I. Where appropriate employers shall:

i.   Suspend nonessential employee travel;

ii.  Prohibit employees working within six (6) feet of one another unless necessary to provide continuity of essential services;

iii. Minimize or cancel in-person meetings and conferences including canceling, postponing or moving to on-line formats for all indoor or outdoor gatherings of any number of people.

iv.  Require employees to stay home when they are sick and maximize flexibility in sick leave benefits.

v.   Permit sick employees to stay home without providing a doctor's note.

vi.  Utilize telecommuting options to minimize person-to-person interaction.

Page 5 of 6

vii.  Alter, stagger or otherwise schedule or separate employees or teams of employees so not all employees are present at one time but are present at alternative days and times, unless necessary to provide continuity of essential services.

viii. Limit or restrict the number of customers or visitors permitted in a workplace at one time.

ix.  Ensure that individuals (employees and clients) queuing inside and outside of the business or workplace can maintain six (6) feet of separation.

x.  Designate special separate shopping times for high-risk clients as designated by the CDC.

xi.  Increase the use and capability of on-line, drive-thru, curbside, or delivery services.

xii.  Provide hand washing capabilities, hand sanitizers, and tissues.

xiii. Clean high-touch surface areas like countertops, doorknobs, and handrails at least twice per day with CDC recommended surface cleaners for COVID-19.

xiv. Require and allow employees to practice the Face Covering Behaviors as set forth in Sections 3 and 5 and **Exhibit C** of this Order.

# Exhibit C

## Face Covering Behaviors

A significant percentage of individuals with the COVID-19 virus lack symptoms. Because an infected person can transmit the virus to others before showing any symptoms, the covering of a person's nose and mouth when outside their home or residence is necessary to help prevent the spread of COVID-19. This is consistent with the findings of the CDC and Austin-Travis County Health Authority

Unless you already have your own personal used masks that cannot be donated, the fabric face coverings recommended are not surgical masks or N-95 respirators, which are critical supplies that must continue to be reserved for healthcare workers and first responders. Staying home is the best way to help reduce the spread of the virus, but if an individual must leave their place of residence, wearing a fabric face covering shall be used as outlined in this Exhibit and this Order. **Wearing a face covering is not a substitute for maintaining 6-feet social distancing and hand washing, as these remain important steps to slowing the spread of the virus.**

**The public in general and employers and employees shall adhere to the following:**

a.   All persons ten years of age and older shall wear some form of covering over their nose and mouth, such as a commercially made or homemade mask, scarf, or bandana, when outside of his or her residence.

b.   This section shall not apply to:

1. any person younger than 10 years of age;

2. any person with a medical condition or disability that prevents wearing a face covering;

3. any person while the person is eating or drinking, or is seated at a restaurant to eat or drink;

4. any person while the person is (a) exercising outdoors or engaging in physical activity outdoors and (b) maintaining a safe distance from others not in the same household;

5. any person while the person is driving alone or with passengers of the same household as the driver;

6. any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or the need for specific access to the face, such as while visiting a bank or while obtaining a personal care service involving the face, but only to the extent necessary for the temporary removal;

7. any person while the person is in a swimming pool, lake, or similar body of water;

Page 1 of 3

EXHIBIT NO. 23                                                 EX. 23-014

8. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

9. any person who is actively providing or obtaining access to religious worship. but wearing a face covering is strongly encouraged;

10. any person while the person is giving a speech for a broadcast or to an audience;

11. any person while temporary removal of the face covering is necessary for communication by or with a person who is hearing impaired; or

12. any person while alone, or in the presence of only members of the same household or residence, in a separate room or single space not accessible to the public, and not in an indoor common area

      Parents and Guardians of children under 10 shall be responsible for appropriately masking children when outside their residence.

c.    All non-residents in nursing homes, retirement and long-term care facilities shall wear a fabric face covering as provided for in this Exhibit and Order (Face Coverings), except as otherwise required by an order issued by the Health Authority. In addition, residents in facilities with confirmed COVID-19 cases shall follow requirements of **Exhibit B**, except when doing so poses a greater mental or physical health, safety or security risk.

d.    All COVID-19 Positive Individuals, Suspected Positives, those currently being tested, and untested individuals with cough, fever, sore throat, chills, muscle aches, loss of smell, loss of taste, shortness of breath, vomiting, and/or diarrhea and household members of same category of individuals shall not leave their residence without a mask or cloth face covering to prevent the spread to others.

e.    All individuals working for a business shall wear a mask or cloth face covering whenever in public and whenever performing job duties in the presence of others.

f.    Unless you already have your own personal used masks that cannot be donated, medical grade (N95) and surgical masks should be reserved and used only by medical professionals and first responders.

Examples of how to make cloth face coverings can be found online including guidance from the CDC and guidance from Austin/ Travis County Health Authority.

g.    The fabric face covering should:

1.    fit snugly but comfortably against the side of the face,
2.    be secured with ties or ear loops,
3.    include multiple layers of fabric,
4.    allow for breathing without restriction, and

EXHIBIT NO. 23            EX. 23-015

 5. be able to be laundered and machine dried without damage or change to shape.

h. Employers shall require and allow employees to practice Face Covering Behaviors as set forth in the Order and this **Exhibit C**.

i. Even with the use of appropriate face coverings, individuals shall maintain six feet of social distancing whenever possible.

j. Individuals should avoid touching their face and should wash their hands or use hand sanitizer.

k. For further information, individuals can access information at https://traviscountytx.gov/news/2020/1945-novel-coronavirus-covid-19-information and www.AustinTexas.gov/COVID19.

EXHIBIT NO. 23

EX. 23-016

# Health and Safety Policy

**POLICY.** The virus that causes COVID-19 can be spread to others by infected persons who have few or no symptoms. Because of the hidden nature of this threat, it is the policy of this business to require the following:

**1. FACE COVERING REQUIRED IN ORDER TO ENTER PREMISES.** All persons over the age of ten (10), including employees, customers, visitors, invitees and contractors ("Patrons"), who enter this business must wear a face covering over their nose and mouth, such as a homemade mask, scarf, bandana, or handkerchief.

The requirement of face covering does not apply if covering the nose and mouth poses a greater mental or physical health, safety, or security risk, such as anyone who has trouble breathing, or is unconscious, incapacitated, or otherwise unable to remove the cover without assistance.

**2. SOCIAL DISTANCING PROTOCOLS.** Even with the use of appropriate face coverings, individuals should maintain six feet of social distancing whenever possible.

a. Employees should not work within six (6) feet of one another, except to the extent necessary to provide services;

b. Patrons should maintain six (6) feet of separation from other individuals outside their household, to the extent feasible when inside the business premises.

c. Patrons of the business queuing or waiting inside or on the premises of the business must maintain six (6) feet of separation from other individuals outside their household.

**3. VIOLATIONS.** Patrons who do not wear a face covering may be asked to leave the premises, and may not be provided goods or services until the face covering requirements are followed.

**4. NOTICE AND SIGNAGE.** Notice of this Health and Safety Policy will be posted in a conspicuous location of the business. Sample signage is attached.

EXHIBIT NO. 23                                                    EX. 23-017

# ALL CUSTOMERS
# WEAR FABRIC FACE COVERINGS



## PER CITY AND COUNTY ORDER, ALL CUSTOMERS MUST BE WEARING A FACE COVERING

Cloth face coverings should—

- fit snugly but comfortably against the side of the face

- be secured with ties or ear loops

- include multiple layers of fabric

- allow for breathing without restriction

- ability to be laundered

## Fabric face coverings are not a substitute for physical distancing measures. Continue to maintain 6-feet when outside your home.

DIY face cover instructions available at austintexas.gov/covid19



EXHIBIT NO. 23

EX. 23-018 4/13/2020



**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir, County Clerk
Travis County, Texas

**2020145196**

Aug 14, 2020 02:31 PM
Fee: $0.00          WELLINB

| | |
|---|---|
| **From:** | Sam Biscoe <Sam.Biscoe@traviscountytx.gov> |
| **Sent:** | Monday, July 6, 2020 2:47 PM |
| **To:** | Glina, Mel; Bruce Elfant |
| **Cc:** | Carr, Jackie; Elliott Beck; Javier Gutierrez |
| **Subject:** | RE: Foreclosure Postings and Foreclosure Sales - Non-tax |

Bruce and Elliott, can one of you please let Ms. Glina know whether Travis County is conducting non-judicial mortgage foreclosure sales at 1000 GUADALUPE tomorrow.  I have not issued an order regarding such sales and do not plan to.  Please let me know if another person at Travis County should be contacted for the answer to this question.  Sam Biscoe

---

**From:** Glina, Mel <mel.glina@bracewell.com>
**Sent:** Monday, July 6, 2020 10:16 AM
**To:** Sam Biscoe <Sam.Biscoe@traviscountytx.gov>; Bruce Elfant <Bruce.Elfant@traviscountytx.gov>
**Cc:** Carr, Jackie <jackie.carr@bracewell.com>; Elliott Beck <Elliott.Beck@traviscountytx.gov>; Javier Gutierrez <Javier.Gutierrez@traviscountytx.gov>
**Subject:** [CAUTION EXTERNAL] FW: Foreclosure Postings and Foreclosure Sales - Non-tax

Good morning. Please see the below response from Ms. Veidt to our query. We are not requesting legal advice, or advice interpreting the current Executive Order. Our request is specifically whether your office anticipates issuing an emergency order preventing or prohibiting the non-judicial mortgage foreclosure sale from taking place at 1000 Guadalupe tomorrow, July 7th.  Harris County Judge Lina Hidalgo, to our understanding, has specifically issued an order prohibiting such sales in Harris County.   June sales were held in Travis County.

Outdoor gatherings of 10 or more people are prohibited in Travis County, exempting local government operations.  Your reply is very much appreciated.

Kindest regards,





# KEN PAXTON

ATTORNEY GENERAL OF TEXAS

August 1, 2020

Honorable Bryan Hughes
Texas Senate
P.O. Box 12068
Capitol Station
Austin, TX 78711

Dear Senator Hughes,

You ask whether local governmental bodies have authority to limit in-person attendance at a judicial or non-judicial foreclosure sale to 10 persons or fewer. Your question concerns local emergency orders restricting or delaying such sales during the current COVID-19 pandemic. We conclude that a foreclosure sale of residential or commercial real property that is conducted outdoors is subject to the limitation on outdoor gatherings in excess of 10 persons imposed by Executive Order GA-28. Accordingly, an outdoor foreclosure sale may not proceed with more than 10 persons in attendance unless approved by the mayor in whose jurisdiction the sale occurs, or if in an unincorporated area, the county judge. However, to the extent a sale is so limited, and willing bidders who wish to attend are not allowed to do so as a result, the sale should not proceed as it may not constitute a "public sale" as required by the Texas Property Code.

When a mortgage loan is in default, a mortgagee may elect to institute either a judicial foreclosure or, when permitted by the deed of trust, a non-judicial foreclosure.[1] A judicial foreclosure begins with a lawsuit to establish the debt and fix the lien.[2] The judgment in a foreclosure lawsuit generally provides that an order of sale issue to any sheriff or constable directing them to seize the property and sell it under execution in satisfaction of the judgment.[3] After the sale is completed, the sheriff or other officer must provide to the new buyer possession of the property within 30 days.[4]

---

[1] *Bonilla v. Roberson*, 918 S.W.2d 17, 21 (Tex. App.—Corpus Christi 1996, no writ).

[2] *Id.* at 21.

[3] TEX. R. CIV. P. 309; *but see id.* (excepting judgments against executors, administrators, and guardians from orders of sale). The procedures for the sale under judicial foreclosure generally follow the same procedures as sales under non-judicial foreclosures. *Compare id.* 646a–648 *with* TEX. PROP. CODE § 51.002.

[4] TEX. R. CIV. P. 310.

A non-judicial foreclosure, in turn, must be expressly authorized in a deed of trust.[5] The Property Code prescribes the minimum requirements for a non-judicial sale of real property under a power of sale conferred by a deed of trust or other contract lien.[6] The Code requires that a sale under a non-judicial foreclosure be "a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month," unless that day is January 1 or July 4, in which cases the sale must be held on the first Wednesday of the month.[7] The deed of trust or other loan document can establish additional requirements, and if such requirements are established, those requirements must likewise be satisfied in order for there to be a valid foreclosure sale.[8]

We understand that many foreclosure sales in Texas, both judicial and non-judicial, are held outdoors. Frequently, such sales occur on the steps of a courthouse.

With this background in mind, we address your question concerning attendance limitations. Governor Abbott ordered in Executive Order GA-28 that "every business in Texas shall operate at no more than 50 percent of the total listed occupancy of the establishment."[9] This general limitation, however, is subject to several exceptions. One such exception is found in paragraph five of the order, which limits outdoor gatherings to 10 persons or fewer without approval by the mayor or, in the case of unincorporated territory, the county judge in whose jurisdiction the gathering occurs.[10] Accordingly, to the extent a foreclosure sale occurs outdoors, attendance at the sale is limited to 10 persons or fewer unless greater attendance is approved by the relevant mayor or county judge.

While certain services are exempt from the outdoor gathering limitation in Executive Order GA-28, we do not conclude that foreclosure sales are included within them. Executive Order GA-28 exempts from its limitations on outdoor gatherings services described in paragraphs 1, 2, and 4 of the order. Relevant here, paragraph 1 exempts from capacity limitations, *inter alia*, "any services listed by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Workforce, Version 3.1 or any subsequent version."[11] (CISA Guidance). Among the services listed in version 3.1 of

---

[5] *See* TEX. PROP. CODE § 51.002.

[6] *See id.* § 51.002.

[7] *Id.* §§ 51.002(a), (a-1); *see also id.* § 51.002(h) (requiring a sale to be held on or after the 90th day after the date the commissioners court records a designation of a sale at an area other than an area at the county courthouse).

[8] *See Bonilla*, 918 S.W.2d at 21.

[9] Gov. Greg Abbott Exec. Order GA-28.

[10] *Id.* at 3 (as amended by Gov. Greg Abbott Proc. of July 2, 2020).

[11] *Id.* at 2.

EXHIBIT NO. 25                                    EX. 25-002

the CISA Guidance are "[r]esidential and commercial real estate services, including settlement services."[12]

A court's main objective in construing the law is to give effect to the intent of its provisions.[13]  And there is no better indication of that intent than the words that are chosen.[14] One dictionary defines a "service" as "[w]ork that is done for others as an occupation or business."[15] A periodic foreclosure auction conducted at a courthouse—whether by an officer of the court, an attorney, an auction professional, or another person serving as trustee[16]—does not constitute the type of dedicated real estate service work contemplated by the CISA Guidance. Accordingly, we conclude that outdoor foreclosure sales are not exempted from the 10-person attendance limitation imposed by paragraph 5 of Executive Order GA-28.

If a foreclosure sale is subject to, and not exempted from, the 10-person attendance limit imposed in Executive Order GA-28, it should not proceed if one or more willing bidders are unable to participate because of the attendance limit. "[A] sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a *public sale* at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month."[17] The purpose of the public sale requirement is to "secure the attendance of purchasers and obtain a fair price for the property."[18] Strict compliance with the Property Code is required for a trustee to properly make a foreclosure sale.[19] If an attendance limit precludes the conduct of a public sale for the purpose of securing sufficient bidders to obtain a fair price, the propriety of a foreclosure auction may be called into question. Accordingly, to the extent attendance at a foreclosure sale is limited to ten or fewer persons, and that limit precludes the attendance of one or more willing bidders who otherwise would have appeared in person, the sale should not go forward as it likely would not comport with the Property Code requirement that the sale be a "public sale."

---

[12] *See* Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response, at 16, available at https://www.cisa.gov/sites/default/files/publications/Version_3.1_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers.pdf.

[13] *See Summers*, 282 S.W.3d at 437.

[14] *See id.* ("Where text is clear, text is determinative of that intent.").

15 Am. Heritage Dictionary (5th ed. 2020), available at https://www.ahdictionary.com/word/search.html?q=service; *see also Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) (applying an undefined term's ordinary meaning, unless the context of the law in which the term appears suggests a different or more precise definition).

[16] The Texas Property Code does not set forth specific professional requirements for a foreclosure trustee, providing only that "[o]ne or more persons may be authorized to exercise the power of sale under a security instrument." TEX. PROP. CODE § 51.007(a).

[17] TEX. PROP. CODE § 51.002(a) (emphasis added).

[18] *Reisenberg v. Hankins*, 258 S.W. 904, 910 (Tex. Civ. App.–Amarillo 1924, writ dismissed w.o.j.).

[19] *Myrad Props. v. LaSalle Bank Nat'l Assoc.*, 252 S.W.3d 605, 615 (Tex. App.–Austin 2008), *rev'd on other grounds*, 300 S.W.3d 746 (Tex. 2009).

3

We trust this letter provides you with the advice you were seeking. Please note this letter is not a formal Attorney General opinion under section 402.042 of the Texas Government Code; rather, it is intended only to convey informal legal guidance.

Sincerely,

Ryan Bangert
Deputy First Assistant Attorney General

EXHIBIT NO. 25                                        EX. 25-004

## Maryann Norwood

| | |
|---|---|
| **From:** | Adler, Steve <Steve.Adler@austintexas.gov> |
| **Sent:** | Wednesday, August 26, 2020 6:41 PM |
| **To:** | Maryann Norwood |
| **Cc:** | Varghese, Lesley; Shack, Barbara; Clark, Janine |
| **Subject:** | Re: Urgent Clarification Regarding Foreclosure Sales in Austin, Texas |

Ms. Norwood:

This email is to confirm that I have neither approved nor authorized any outdoor gatherings in Austin, Texas, in excess of 10 persons, except as specifically allowed by the Governor. This restriction on such gatherings, which does not specify or call out call out particular types of gathering, are found in *Order No 20200815-019 issued by the Mayor of the City of Austin* and remain in effect through December 15, 2020.

Steve Adler
Mayor of the City of Austin

**From:** Maryann Norwood
**Sent:** Wednesday, August 19, 2020 6:13 PM
**To:** lesley.varghese@austintexas.gov; steve.adler@austintexas.gov
**Cc:** Barbara.shack@austintexas.gov
**Subject:** Urgent Clarification Regarding Foreclosure Sales in Austin, Texas

Mayor Adler and Ms. Varghese:

This letter is in follow-up to my contact with your offices yesterday through the City of Austin website. I am writing to request clarification from your office that foreclosure sales may not be held in Austin, Texas without your express approval so long as governmental orders remain in place prohibiting outdoor gatherings in excess of 10 persons.

There are currently three orders that restrict such gatherings:

1. ***Executive Order GA-28 (as amended)*** (*Addendum A*) issued by Governor Abbot provides that outdoor gatherings in excess of 10 people are prohibitedunless the mayor of the city in which the gathering is held . . . approves of the gathering.
   a. Executive Order GA-28's application to foreclosure sales was specifically addressed in an informal guidance letter issued by the Attorney General's office (*Addendum B*), as further detailed below, in which the Attorney General's office confirmed that foreclosure sales may not satisfy the public requirement without express approval from the city mayor to hold the sale gathering.

2. ***Order No 202-16 by the County Judge of Travis County*** (*Addendum C*), after reciting the restrictions in place on outdoor gatherings under GA-28, provides "any gatherings that exceed 10 people are hereby PROHIBITED, except as permitted by current Governor's Proclamations and Orders."

EXHIBIT NO. 26                                                                                          EX. 26-001

3. ***Order No 20200815-019 issued by the Mayor of the City of Austin*** (*Addendum D*) , after reciting the restrictions in place on outdoor gatherings under GA-28, provides in relevant part that through December 15, 2020 "Further, pursuant to the Governor's Order, and the advice of the local Health Authority, gatherings or presence at any outdoor area, event, or establishment of more than 10 persons are PROHIBITED except at provided in this Section."

As you know, Texas is generally considered to be the most lender-friendly state, as non-judicial foreclosures can be completed in as short as 21 days. The protection for owners against such lender-friendly and expeditious foreclosure is the assurance that foreclosures will only be conducted when there is strict compliance with Texas Property Code Section 51.002.

Governor Abbott's Executive Order 28 which prohibits gatherings of more than 10 persons is in direct contradiction with the requirement for a "public sale" under Texas Property Code Section 51.002(a) ("a sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month."

This impact of GA-28 on the right to hold foreclosure sales in satisfaction of the public sale requirement was specifically discussed and addressed in by the Attorney General of the State of Texas in a letter to Senator Bryan Hughes on August 1, 2020 ("AG Guidance Letter"). The AG Guidance Letter provides in relevant part:

> *With this background in mind, we address your question concerning attendance limitations. Governor Abbott ordered in Executive Order GA-28 that "every business in Texas shall operate at no more than 50 percent of the total listed occupancy of the establishment." This general limitation, however, is subject to several exceptions. One such exception is found in paragraph five of the order, which limits outdoor gatherings to 10 persons or fewer without approval by the mayor or, in the case of unincorporated territory, the county judge in whose jurisdiction the gathering occurs. Accordingly, to the extent a foreclosure sale occurs outdoors, **attendance at the sale is limited to 10 persons or fewer unless greater attendance is approved by the relevant mayor or county judge**.*
>
> *. . .*
>
> ***If a foreclosure sale is subject to, and not exempted from, the 10-person attendance limit imposed in Executive Order GA-28, it should not proceed if one or more willing bidders are unable to participate because of the attendance limit.*** *"[A] sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month." **The purpose of the public sale requirement is to "secure the attendance of purchasers and obtain a fair price for the property." Strict compliance with the Property Code is required for a trustee to properly make a foreclosure sale**. If an attendance limit precludes the conduct of a public sale for the purpose of securing sufficient bidders to obtain a fair price, the propriety of a foreclosure auction may be called into question. **Accordingly, to the extent attendance at a foreclosure sale is limited to ten or fewer persons, and that limit precludes the attendance of one or more willing bidders who otherwise would have appeared in person, the sale should not go forward as it likely would not comport with the Property Code requirement that the sale be a "public sale."***

(internal citations omitted)

In light of the standing orders above, and given that you have not approved outdoor gatherings in excess of 10 people in Austin, Texas, foreclosure sales held in Austin, Texas cannot satisfy the public sale requirement as outlined above.

Nevertheless, there are at least 35 properties listed for foreclosure in Austin, Texas for September 1, 2020, which indicates that lenders are attempting to go forward with the foreclosure sales despite the restrictions. Attached *Addendum E* is a listing of those noticed sales as found on the Travis County real property records website.

In light of the foregoing, we write to request that you formally clarify, by way of order, that foreclosure sales may not occur in Austin, Texas without your express approval. This clarification is necessary to protect citizens and constituents in the Austin community and time is of the essence.

Respectfully,

<image001.jpg>

Maryann Norwood | Corporate Counsel

World Class
814 Lavaca Street | Austin, TX 78701
T 512.420.4144 | F 512.597.0612 | M 512.962.3528
mnorwood@world-class.com | www.world-class.com

The information contained in this e-mail is strictly confidential and for the intended use of the addressee only and may also be privileged or otherwise protected by other legal rules. Any disclosure, use or copying of the information by anyone other than the intended recipient is prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and delete this message from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender does not accept liability for any errors or omissions in the contents of this message or for any damage sustained as a result of software viruses and advise that you carry out your own virus checks before opening any attachment. This email contains the views of the author and should not be interpreted as the views of World Class Holding Company, LLC or its affiliates.
**CAUTION:** This email was received at the City of Austin, from an EXTERNAL source. Please use caution when clicking links or opening attachments. If you believe this to be a malicious and/or phishing email, please forward this email to cybersecurity@austintexas.gov.
<Letter to the Honorable Mayor Adler.pdf><Addenda A through E.pdf>

pCAUSE NO. D-1-GN-20-002781

| | | |
|---|---|---|
| COLORADO THIRD STREET, LLC, | § | IN THE DISTRICT COURT OF |
|    Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| WC 4TH AND COLORADO, LP, | § | |
|    Defendant. | § | |
| | § | 261st JUDICIAL DISTRICT |
| | § | |

## ORDER DENYING REQUEST FOR TEMPORARY INJUNCTION

On this day, the Court considered the Application for Temporary Injunction filed by Defendant WC 4th and Colorado, LP.  After considering the evidence, pleadings, and arguments advanced by counsel, the Court hereby determines that the Temporary Injunction should be, in all respects, DENIED.

IT IS THEREFORE ORDERED, that WC 4th and Colorado, LP's Request for Temporary Injunction is, on all grounds, DENIED.

SIGNED this _31ST_ day of July, 2020.


TRAVIS COUNTY DISTRICT JUDGE

MAYA GUERRA GAMBLE

EXHIBIT NO. 27                                   EX. 27-001

```
MAI           08/18/20              ACCOUNT HISTORY           16:31:38
UR
TL2 000  CTL3 000  CTL4 0000    ACCT 93300011379300     EFF DATE      08/06/2
TL2 000  CTL3 000  CTL4 0000    CUST 00000813920160     NON-ACCRUAL
CRA IND N                       ******** RATES *********  SIMPLE INT - VAR RATE
AYOFF          7258044.48                                AUTO DR
RIG LOAN AMT   7600000.00    CURR RATE    4.2500000      PROD TYPE        CV0
RIG PROCEEDS   7600000.00    ORIG RATE    5.7500000      PRIM OFFICER    2305
T CHG DUE            0.00    PER DIEM   830.0149428       GL KEY 0103  912
EES DUE             0.00 .   ********* DATES ********     CALL CODE        01E
URRENT PRIN    7147893.39    CONTRACT DATE   04/26/17    ***** REPAYMENTS *****
URRENT INT      110151.09    CURR MATURITY   04/09/22    CURR TERM          6
CH PYMT AMT      41643.77    CLOSED DATE                 PYMTS MADE         3
UR PYMT AMT      41643.77    SCHED DUE DATE  08/09/20    PYMTS REM          2
AST DUE AMT     149354.57    OLDEST DUE DATE 04/09/20    MONTHS EXTD   0 REN 00
ARTIAL PAID      35721.03    LAST MAINT DT   08/03/20    MAT DT EXTD   0
************************      LST BAL CHG DT  08/05/20    YTD INT COL  151808.81
C TEAKWOOD PLAZA LLC                                     INT COL PRV  451241.06
14 LAVACA ST                                             ***** CREDIT HIST ****
                                   COLLATERAL            011 016 031 061 091 12
USTIN              TX 78701     CODE: R6                 000 002 001 001 001 00
H (    ) ( 000 ) 000-0000       DESC: 1ST RE COM INCOME
F1-NEXT STAT  PF2-PREV STAT  PF3-ADDL INFO  PF6-ESCROW
MPCGIS1 AM7294 I: FIRST STATUS DISPLAYED                          LAST
```

EXHIBIT NO. 28                    EX. 28-001

| WC Teakwood Plaza LLC Loan History | | | |
|---|---|---|---|
| Transaction Date | Transaction Type | Transaction Amount | Balance after Transaction |
| 04.26.2017 | Loan Set Up - Interest Rate @ 5.00% | | $ 7,600,000.00 |
| 05.16.2017 | Regular Payment | $ 44,428.83 | $ 7,569,105.10 |
| 06.12.2017 | Regular Payment | $ 44,428.83 | $ 7,556,848.98 |
| 07.12.2017 | Regular Payment | $ 44,428.83 | $ 7,543,480.73 |
| 08.09.2017 | Regular Payment | $ 44,428.83 | $ 7,531,091.36 |
| 09.08.2017 | Regular Payment | $ 44,428.83 | $ 7,518,643.87 |
| 10.06.2017 | Regular Payment | $ 44,428.83 | $ 7,505,111.88 |
| 11.09.2017 | Regular Payment | $ 44,428.83 | $ 7,492,548.51 |
| 12.08.2017 | Regular Payment | $ 44,428.83 | $ 7,478,910.97 |
| 01.09.2018 | Regular Payment | $ 44,428.83 | $ 7,466,240.03 |
| 02.09.2018 | Regular Payment | $ 44,428.83 | $ 7,453,517.15 |
| 03.09.2018 | Regular Payment | $ 44,428.83 | $ 7,437,677.16 |
| 04.09.2018 | Regular Payment | $ 44,428.83 | $ 7,424,832.98 |
| 04.26.2018 | Interest Rate Change to 5.75% | | |
| 05.09.2018 | Regular Payment | $ 44,428.83 | $ 7,410,917.17 |
| 06.08.2018 | Regular Payment | $ 47,673.72 | $ 7,401,418.46 |
| 07.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,388,722.55 |
| 08.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,377,132.11 |
| 09.19.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,365,485.07 |
| 10.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,352,620.83 |
| 11.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,340,854.09 |
| 12.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,327,873.45 |
| 01.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,315,985.85 |
| 02.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,304,040.20 |
| 03.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,288,584.30 |
| 04.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,276,504.83 |
| 04.26.2019 | Interest Rate Change to 6.50% | | $ 7,276,504.83 |
| 05.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,265,163.79 |
| 06.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,254,377.45 |
| 07.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,242,239.68 |
| 08.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,231,326.78 |
| 09.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,220,353.64 |
| 10.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,208,034.10 |
| 11.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,196,932.37 |
| 12.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 12.09.2019 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,196,932.37 |
| 12.17.2019 | Regular Payment | $ 50,894.03 | $ 7,184,487.70 |
| 01.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 01.09.2019 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,184,487.70 |
| 02.07.2020 | Regular Payment | $ 50,894.03 | $ 7,173,245.75 |
| 02.09.2020 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,161,901.67 |
| 03.09.2020 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 03.09.2020 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,161,901.67 |
| 04.09.2020 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 04.09.2020 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,161,901.67 |
| 04.26.2020 | Interest Rate Change to 6.50% | | |
| 05.09.2020 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 05.09.2020 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,161,901.67 |
| 06.09.2020 | Regular Payment - Auto Debit | $ 41,463.77 | |
| 06.09.2020 | Regular Payment -  Reversal (NSF) | $ (41,463.77) | $ 7,161,901.67 |
| 07.09.2020 | Regular Payment - Auto Debit | $ 41,463.77 | |
| 07.09.2020 | Regular Payment -  Reversal (NSF) | $ (41,463.77) | $ 7,161,901.67 |
| 07.28.2020 | Regular Payment - Rent Payment (tenant) | $ 43,307.53 | $ 7,155,479.89 |
| 08.05.2020 | Regular Payment - Rent Payment (tenant) | $ 43,307.53 | $ 7,147,893.39 |

WC TEAKWOOD PLAZA, LLC

February 25, 2020

First State Bank Central Texas
P. O. Box 6136
Temple, TX 76503-6136

Bancorp South
6500 N Mopac, Suite 1101
Austin, TX 78731
Attention: Vivienne Ngo

**Re:**   **Notice of Updated Notice Address for Borrower and Guarantors**
          **Loan Ref. No.: 93300011379300**

To Whom It May Concern:

Please refer to that certain Loan Agreement ("Loan") dated as of April 26, 2017 between WC Teakwood Plaza, LLC ("Borrower") and First State Bank Central Texas ("Lender"). Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Loan.

Each of the Borrower and the Guarantors hereby amends its notice address under the Loan Documents. Notices and communications to Borrower and/or Guarantors, as applicable, should hereafter be sent to the following addresses in lieu of the addresses set forth therein:

> c/o World Class
> 814 Lavaca St.
> Austin, Texas 78701
> Attention: Natin Paul

> with a copy to:

> 244 Fifth Avenue, Suite 2200
> New York, NY 10001

Should you require any additional information or have any questions or concerns, please feel free to contact me at lthong@world-class.com.com or 512-327-3300.

Thank you for your attention to this matter.

Sincerely,

Linda Thong, Special Counsel

EXHIBIT NO. 29                    EX. 29-001

| FEE $57.04 UPDATE | **TAX CERTIFICATE**<br>**DATA TRACE**<br>10920 W. SAM HOUSTON PKWY N. SUITE 400<br>HOUSTON~ TX. 77064<br>PHONE (281)890-0381 FAX (281)890-2114 | *REMIT CERT FEE TO:*<br>*DATA TRACE*<br>*P.O BOX 31001-2283*<br>*PASADENA, CA 91110-2283* |

| **CUST: HERITAGE TITLE COMPANY** | | **BRANCH: DT** | | |
|---|---|---|---|---|
| **ORDER: 202001636** | **CLOSER: JPB** | **ORDER TYPE: A-1** | **SUBTYPE: R** | **DATE: 08/20/2020** |

### CAD ACCOUNT NUMBER SUMMARY

02-3906-0903-0000

### SUMMARY OF ALL ACCOUNT(S)

| | SUMMARY OF CURRENT YEAR | | SUMMARY OF ALL TAXES DUE | |
|---|---|---|---|---|
| | **TAX YEAR** | **BASE TAX** | **DUE 08/2020** | **DUE 09/2020** |
| TRAVIS COUNTY | **2019** | 35,626.50 | 42,395.54 | 42,751.80 |
| CITY OF AUSTIN (TRAVIS CO | **2019** | 42,746.82 | 50,868.72 | 51,296.18 |
| ISD - AUSTIN | **2019** | 108,241.79 | 128,807.73 | 129,890.15 |
| TRAVIS COUNTY HOSPITAL | **2019** | 10,184.86 | 12,119.98 | 12,221.83 |
| AUSTIN COMMUNITY COLLEGE | **2019** | 10,119.93 | 12,042.72 | 12,143.92 |
| TOTAL TAX | | **206,919.90** | **246,234.69** | **248,303.88** |

### ********** COMMENTS ********** CAUTION ********** READ BEFORE CLOSING **********

| CAD# 02-3906-0903-0000 | - | **2020 PROPOSED TOTAL VALUE: 9,552,001** |
|---|---|---|
| TRAVIS COUNTY | - | EXEMPTS: HS-20%/5,000; O65-85,000; DIS-85,000 |
| CITY OF AUSTIN (TRAVIS COU | - | EXEMPTS: HS-10%/5000; O65-88,000; DIS-88,000 |
| ISD - AUSTIN | - | EXEMPTS: HS-25,000; O65-35,000; DIS-25,000 |
| TRAVIS COUNTY HOSPITAL | - | EXEMPTS: HS-20%/5,000; O65-85,500; DIS-85,500 |
| AUSTIN COMMUNITY COLLEGE | - | EXEMPTS: HS-1%/5,000; O65-160,000; DIS-160,000 |

| | | 01 02 03 2J 68 |
|---|---|---|
| CAD# **02-3906-0903-0000** | | **HE6/J01** |
| DESC **3.3945 AC OF LOTS 1-2 ALLANDALE NORTH SEC 5 ABST/SUB ID S00156** | | |
| ACREAGE **3.394** | | |
| SITUS **8209 BURNET RD 02** | | |
| MAIL % WORLD CLASS CAPITAL GROUP 401 CONGRESS AVE 33RD FLOOR AUSTIN TX 78701-3792 | | |
| ASSESSED OWNER(S) | | **2019 ASSESSED VALUES** |
| **WC TEAKWOOD PLAZA LLC** | LAND | 9,341,371 |
| | IMPROVEMENT | 305,847 |
| CLASS CODE **F1 - COMMERCIAL IMPROVED** | **TOTAL VALUE** | **9,647,218** |
| **HIGH LIABILITY** | | |
| | TOTAL TAX RATE | 2.1448660 |
| | TOTAL EST TAXES | |
| | W/O EXEMPT | 206919.90 |

### TAX ENTITY INFORMATION

| **TRAVIS COUNTY** | | | **PAYMENTS AS OF** | | **07/13/2020** |
|---|---|---|---|---|---|
| PO BOX 149328 AUSTIN, TX 78714-9328 | | | | 19 TAX RATE | 0.3692930 |
| PHONE 512-854-9473 | | | | **W/O EXEMPT** | **35,626.50** |

| **EXEMPTIONS NONE** | YR | BASE TAX | BASE DUE | DUE 08/2020 | DUE 09/2020 |
|---|---|---|---|---|---|
| AC# 117506 | 19 | 35,626.50 | 35,626.50 | **42,395.54** | **42,751.80** |
| TS 08-20-20 | SUBTOTAL | 35,626.50 | 35,626.50 | **42,395.54** | **42,751.80** |

EXHIBIT NO. 30                    EX. 30-001

## TAX CERTIFICATE
### DATA TRACE
10920 W. SAM HOUSTON PKWY N. SUITE 400
HOUSTON~ TX. 77064
PHONE (281)890-0381 FAX (281)890-2114

*REMIT CERT FEE TO:*
*DATA TRACE*
*P.O BOX 31001-2283*
*PASADENA, CA 91110-2283*

**CUST: HERITAGE TITLE COMPANY**          **BRANCH: DT**

**ORDER: 202001636     CLOSER: JPB     ORDER TYPE: A-1     SUBTYPE: R     DATE: 08/20/2020**

| CITY OF AUSTIN (TRAVIS COUNTY) | | | PAYMENTS AS OF | | 07/13/2020 |
|---|---|---|---|---|---|
| COLLECTED BY TRAVIS CO | | | | 19 TAX RATE | 0.4431000 |
| PHONE 512-854-9473 | | | | W/O EXEMPT | 42,746.82 |
| **EXEMPTIONS NONE** | **YR** | **BASE TAX** | **BASE DUE** | **DUE 08/2020** | **DUE 09/2020** |
| AC# 117506 | 19 | 42,746.82 | 42,746.82 | **50,868.72** | **51,296.18** |
| TS 08-20-20 | SUBTOTAL | 42,746.82 | 42,746.82 | **50,868.72** | **51,296.18** |
| ISD - AUSTIN | | | PAYMENTS AS OF | | 07/13/2020 |
| COLL BY TRAVIS COUNTY | | | | 19 TAX RATE | 1.1220000 |
| PHONE 512-854-9473 | | | | W/O EXEMPT | 108,241.79 |
| **EXEMPTIONS NONE** | **YR** | **BASE TAX** | **BASE DUE** | **DUE 08/2020** | **DUE 09/2020** |
| AC# 117506 | 19 | 108,241.79 | 108,241.79 | **128,807.73** | **129,890.15** |
| TS 08-20-20 | SUBTOTAL | 108,241.79 | 108,241.79 | **128,807.73** | **129,890.15** |
| TRAVIS COUNTY HOSPITAL | | | PAYMENTS AS OF | | 07/13/2020 |
| COLLECTED BY TRAVIS CO | | | | 19 TAX RATE | 0.1055730 |
| PHONE 512-854-9473 | | | | W/O EXEMPT | 10,184.86 |
| **EXEMPTIONS NONE** | **YR** | **BASE TAX** | **BASE DUE** | **DUE 08/2020** | **DUE 09/2020** |
| AC# 117506 | 19 | 10,184.86 | 10,184.86 | **12,119.98** | **12,221.83** |
| TS 08-20-20 | SUBTOTAL | 10,184.86 | 10,184.86 | **12,119.98** | **12,221.83** |
| AUSTIN COMMUNITY COLLEGE | | | PAYMENTS AS OF | | 07/13/2020 |
| COLLECTED BY TRAVIS CO | | | | 19 TAX RATE | 0.1049000 |
| PHONE 512-854-9473 | | | | W/O EXEMPT | 10,119.93 |
| **EXEMPTIONS NONE** | **YR** | **BASE TAX** | **BASE DUE** | **DUE 08/2020** | **DUE 09/2020** |
| AC# 117506 | 19 | 10,119.93 | 10,119.93 | **12,042.72** | **12,143.92** |
| TS 08-20-20 | SUBTOTAL | 10,119.93 | 10,119.93 | **12,042.72** | **12,143.92** |

### CONDITIONS, DISCLAIMERS AND EXCLUSIONS

This Tax Certificate/Tax Order Report does not constitute a report on or certification of: (1) mineral (productive and/or non-productive) taxes or leases; (2) personal property taxes; or (3) other non ad valorem taxes (such as paving liens, stand-by charges or maintenance assessments).

Data Trace Information Services LLC ("Data Trace") may have warranted the accuracy of this Tax Certificate/Tax Order Report to its customer (the "Data Trace Customer") pursuant to the terms and conditions of a written tax service agreement between Data Trace and said Data Trace Customer (the "Tax Service Agreement"). Any such warranty (hereinafter, "Data Trace Customer Warranty") does not: (a) extend to a third party bearer of this Tax Certificate/Tax Order Report; (b) cover any changes made to the records of the taxing authority after the "payments as of," "paid," or "payment" dates delineated above; and (c) cover any invalid tax information shown on the records of the taxing authority or resulting from an error by the Data Trace Customer (including, without limitation, submission of incorrect property information by said Data Trace Customer). DATA TRACE MAKES NO WARRANTIES (EXPRESS OR IMPLIED) WITH RESPECT TO THIS TAX CERTIFICATE/TAX ORDER REPORT OTHER THAN (WHERE APPLICABLE) THE DATA TRACE CUSTOMER WARRANTY. Any and all claims under a Data Trace Customer Warranty must be submitted to Data Trace by the corresponding Data Trace Customer and are subject to the terms and conditions set forth in the pertinent Tax Service Agreement (including, without limitation, the filing deadlines applicable to such claims). In some jurisdictions Data Trace's validation of a Tax Certificate/Tax Order Report is required to activate a Data Trace Customer Warranty.

**PRINTED BY HE6/J01**

EXHIBIT NO. 30                    EX. 30-002

| HOA CERTIFICATE | REMIT CERT FEE TO: |
|---|---|
| **DATA TRACE** | *DATA TRACE* |
| 10920 W. SAM HOUSTON PKWY N. SUITE 400 | *P.O BOX 31001-2283* |
| HOUSTON~ TX. 77064 | *PASADENA, CA 91110-2283* |
| PHONE (281)890-0381 FAX (281)890-2114 | |

| CUST: HERITAGE TITLE COMPANY | BRANCH: DT | | |
|---|---|---|---|
| ORDER: 202001636 CLOSER: JPB | ORDER TYPE: A-1 | SUBTYPE: R | DATE: 08/20/2020 |

**SELLER**    WC TEAKWOOD PLAZA LLC

**BUYER**

**COUNTY**    TRAVIS

**SUBD NAME / BLK** ALLANDALE NORTH SEC 5

     NO MAINTENANCE ASSESSED

### *** THIS SUBDIVISION IS NOT ASSESSED BY AN HOA ***
### SUMMARY OF ACCOUNT 02-3906-0903-0000

**DESC**      3.3945 AC OF LOTS 1-2 ALLANDALE NORTH SEC 5 ABST/SUB ID S00156

**SITUS**      8209 BURNET RD 02

---

### CONDITIONS, DISCLAIMERS AND EXCLUSIONS

This HOA Certificate does not constitute a report on or certification of: (1) mineral (productive and/or non-productive) taxes or leases; (2) personal property taxes; or (3) other non ad valorem taxes (such as paving liens, stand-by charges or maintenance assessments).

Data Trace Information Services LLC ("Data Trace") may have warranted the accuracy of this HOA Certificate to its customer (the "Data Trace Customer") pursuant to the terms and conditions of a written tax service agreement between Data Trace and said Data Trace Customer (the "Tax Service Agreement"). Any such warranty (hereinafter, "Data Trace Customer Warranty") does not: (a) extend to a third party bearer of this HOA Certificate; (b) cover any changes made to the records of the association or other assessment authority after the "payments as of," "paid," or "payment" dates delineated above; and (c) cover any invalid assessment information shown on the records of the association or other assessment authority authority or resulting from an error by the Data Trace Customer (including, without limitation, submission of incorrect property information by said Data Trace Customer). DATA TRACE MAKES NO WARRANTIES (EXPRESS OR IMPLIED) WITH RESPECT TO THIS HOA CERTIFICATE OTHER THAN (WHERE APPLICABLE) THE DATA TRACE CUSTOMER WARRANTY. Any and all claims under a Data Trace Customer Warranty must be submitted to Data Trace by the corresponding Data Trace Customer and are subject to the terms and conditions set forth in the pertinent Tax Service Agreement (including, without limitation, the filing deadlines applicable to such claims). In some jurisdictions Data Trace's validation of a HOA Certificate is required to activate a Data Trace Customer Warranty.



T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

July 6, 2020

*Via CMRRR: 9414 7266 9904 2167 5066 73
and First Class U.S. Mail*

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Re:     Promissory Note (the "Note") dated April 26, 2017 in the original principal
        sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or
        "Borrower") and payable to BancorpSouth Bank, as successor by merger
        to First State Bank Central Texas, secured by a Deed of Trust, Security
        Agreement and Financing Statement dated April 26, 2017 (the "Deed of
        Trust") on 3.95 Acres in the City of Austin, Travis County, Texas, being all
        of Lot 2 and a portion of Lot 1, Allandale North Section Five (the
        "Collateral" or the "Property") and guaranteed by Natin Paul and World
        Class Capital Group, LLC (collectively the "Guarantors").

Dear Sir or Madam:

        As you know, this law firm represents BancorpSouth Bank, successor by
merger to First State Bank Central Texas (the "Bank") in connection with the
above-referenced Note. As you also know, the Note is delinquent.

        Pursuant to the Deed of Trust, the Borrower may collect rents until the
Borrower receives a notice of default from the Bank. The Bank has provided
notice to Borrower of its default under the Note by letter dated July 2, 2020.
The Bank hereby notifies Borrower to not collect rents from any tenant or
lessee on the Property. Any rents collected by Borrower must be held in kind
and remitted to Bill Babineaux of BancorpSouth Bank at 315 Settlers Trace
Blvd., Lafayette, Louisiana 70508.

20170804.20190907/3743893.1

EXHIBIT NO. 31                                    EX. 31-001

WC Teakwood Plaza, LLC
July 6, 2020
Page 2


     In accordance with the obligations of the Borrower under the Deed of Trust, please provide us with copies of the lease for every tenant or lessee occupying a rental space on the Property and the rent roll for the Property.

     Sincerely,

     HIRSCH & WESTHEIMER, P.C.


     By: */s/ Michael J. Durrschmidt*
       Michael J. Durrschmidt


cc:   Natin Paul
     c/o World Class
     814 Lavaca St.
     Austin, Texas 78701
     Attn: Natin Paul
     *Via CMRRR: 9414 7266 9904 2167 5065 05*

     World Class Capital Group, LLC
     c/o World Class
     814 Lavaca St.
     Austin, Texas 78701
     Attn: Natin Paul
     *Via CMRRR: 9414 7266 9904 2167 5066 66*

     Linda Thong
     World Class
     244 Fifth Avenue, Suite 2200
     New York, New York 10001
     *Via CMRRR: 9414 7266 9904 2167 5067 27*

     Maryann Norwood
     World Class
     814 Lavaca St.
     Austin, Texas 78701
     *Via email: mnorwood@world-class.com*

EXHIBIT NO. 31          EX. 31-002

# TAB 8

9/9/2020 11:53 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-20-004508**
**Sandra Santos**

## BUSINESS RECORDS AFFIDAVIT OF JUSTIN BAYNE

THE STATE OF TEXAS      §

                            §

COUNTY OF TRAVIS      §

BEFORE ME, the undersigned authority, on this day personally appeared Justin Bayne, who after being duly sworn under oath, deposed as follows:

1.       My name is Justin Bayne. I am over the age of eighteen years of age, of sound mind, and fully competent to make this declaration. I have personal knowledge of the facts set forth in this declaration, and they are true and correct. I obtained personal knowledge of these facts from my work experience as the President of 8209 Burnet, L.P. ("Lender").

2.       I am the custodian of records for Lender. I am familiar with the manner in which Lender's records are created and maintained by virtue of my duties and responsibilities as Lender's Manager. Attached hereto as Exhibits 1-8, 10-14, 16, 20, 28-30, 31-33 are records from Lender. Exhibits 1-4, 6, 8, 10-14, 16, 28-29, and 31 were transferred to Lender by Original Lender in the process of the loan sale, a number of which were pursuant to the loan sale agreement. Such records were prepared by persons with knowledge of the matters set forth therein. The records attached thereto are the originals or exact duplicates of the originals and are true and certified copies of the original documents. It is the regular practice of Lender to make the attached type of records at or near the time of each act, event, condition, opinion, or diagnosis set forth in the records. Some of the records were from information transmitted by persons with knowledge of the matters set forth. It is the regular practice of Lender for this type of records to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them. The attached records are kept by Lender in the regular course of business, and it is the regular course of business of Lender

1

for such records to be made by, or from information transmitted by an employee, representative, or

agent of Lender with knowledge of the act, event, or opinion recorded.

Justin Bayne
President, 8209 Burnet, L.P.

SIGNED AND SWORN BEFORE ME on the __9__ th day of September 2020, by Justin Bayne.

ROBERT HEED
Notary ID # 130945762
My Commission Expires
December 29, 2020

Notary Public

My Commission Expires: 12/29/20

*[Signature Page of Business Records Affidavit of Justin Bayne]*

# 11379300

SCANNED
5-17-17

**PROMISSORY NOTE**

$7,600,000.00                                                                April 26, 2017

For value received, after date, without grace and in the manner, on the dates and in the amounts herein stipulated, the undersigned, WC TEAKWOOD PLAZA, LLC ("Maker"), promises to pay to FIRST STATE BANK CENTRAL TEXAS ("Payee"), a state banking association, or order, in lawful money of the United States of America, at P. O. Box 6136, Temple, Bell County, Texas, or at such other place designated in writing by Payee, or other holder hereof:

(1)     The principal sum of SEVEN MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($7,600,000.00), together with interest from the date hereof, on the principal amount remaining unpaid hereunder from time to time outstanding, at a rate per annum equal to the lesser of (a) the rate (the "Contract Rate"), which is equal to the sum of the prime interest rate (the "Base Rate") published in The Wall Street Journal (herein defined), plus ONE AND NO/100 percent (1.00%) per annum, which Base Rate shall be variable and shall be adjusted on each annual anniversary of this Note (this "Note") during the term hereof, effective at the commencement of business on the day of any such change in the Base Rate; or, (b) the Maximum Rate (as herein defined);

(2)     This Note shall be due and payable in sixty (60) monthly installments, the first fifty-nine (59) of which, shall be in the amount of FORTY-FOUR THOUSAND FOUR HUNDRED TWENTY-EIGHT AND 83/100 DOLLARS ($44,428.83) each (the "Installment Sum"), with the first installment, in the amount of the Installment Sum, being due and payable on May 9, 2017, and additional installments in the amount of the Installment Sum shall be due and payable on the same day of each and every consecutive month thereafter until April 9, 2022 (the "Maturity Date"), the maturity hereof, at which time the final installment of all unpaid principal and all accrued and unpaid interest shall be due and payable in full; and,

Interest shall accrue on a basis of actual days over a year of 365 or 366 days, as the case may be.

The periodic payment amount of principal and interest specified above has been calculated to allow for the full amortization of a debt in the amount of this Note at the current interest rate over an amortization term of three hundred (300) months beginning on the date of this Note (the "Amortization Period"). Notwithstanding the amount of the monthly principal and interest payment referenced above, it is the intention of Maker and Payee that the monthly principal and interest payment allow for full amortization of the principal balance of this Note over the remaining term of the Amortization Period. This Note provides for a variable interest rate to be adjusted annually. Therefore, Payee shall have the unilateral right in Payee's sole discretion to change the amount of the monthly payments of principal and interest at any time during the term hereof, if the interest rate on this Note changes, in order to cause the then current monthly payment to be adequate to amortize the then remaining principal balance of this Note over the then remaining term of the Amortization Period.

All scheduled payments as made shall be applied first to the interest then accrued, and the balance, if any, to the principal.

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 7, 2017 (12:32pm)

INITIAL FOR IDENTIFICATION                 NOTE

EXHIBIT NO. 1                                                          EX. 1-001

Notwithstanding the foregoing, if at any time the Contract Rate shall exceed the Maximum Rate and thereafter, the Contract Rate shall become less than the Maximum Rate, the rate of interest payable hereunder shall, at the option of Payee, be the Maximum Rate until the cumulative interest received by Payee or other holder hereof, equals the interest which would have been received at the Contract Rate.

This Note may be prepaid at any time, and from time to time, in whole or in part, without penalty or premium. Any prepayment shall be applied in any order at Payee's discretion as among any then unpaid collections costs or charges for which Maker is liable (either hereunder or under the terms of any document securing the payment hereof), accrued but unpaid interest hereof, or the principal hereof. In the case of partial prepayments, any amount of the partial prepayment that is applied by Payee to the principal hereof shall be applied in the inverse order of maturity, if applicable, such that the then remaining number of scheduled principal installments, if any, shall be reduced accordingly, but no such partial prepayment of principal shall reduce the amount of any scheduled installment of principal on any subsequent principal installment due date, until the entire indebtedness evidenced by this Note is fully paid, it being the intention that any such partial prepayment of principal shall advance the final maturity date hereof, but shall not affect, prior to such new final maturity, the amount or payment due date of any such scheduled principal installment.

If payment of principal or interest on this Note shall become due on a Saturday, Sunday or public holiday as defined under the laws of the State of Texas, such payment shall be made on the next succeeding business day and such extension of time shall in such case be included in computing interest in connection with such payment. Any check, draft, money order or other instrument given in payment of all or any portion hereof may be accepted by the holder hereof and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the holder hereof except to the extent that actual cash proceeds of such instrument are unconditionally received by the holder and applied to this Note in the manner herein provided. Maker agrees not to send Payee payments marked "paid in full", "without recourse", or similar language. If Maker sends such a payment, Payee may accept it without losing any of Payee's rights under this Note, and Maker shall remain obligated to pay any further amount owed to Payee. All written communications concerning disputed amounts from Maker, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount shall be mailed or delivered to Payee at the following address: P. O. Box 6136, Temple, Texas 76503-6136.

In the event any check used to make a payment to Payee is dishonored for any reason, Maker shall pay to Payee, in addition to any other amounts to which Payee may be entitled hereunder, a reasonable processing fee of $30.00 (or the maximum amount provided from time to time in Section 3.506.(b) of the Texas Business and Commerce Code as it may be amended). This processing fee should be paid once with respect to each dishonor of a check. It is further agreed that the imposition of any such processing fee shall in no way prejudice or limit Payee's rights or remedies against Maker under this Note or any of the loan documents or any other instrument securing or executed in connection with this Note.

Payments received by Payee in Payee's banking offices after 2:00 p.m. local time for purposes of posting of payments shall be considered as received on the next succeeding business day of Payee (excluding Saturdays, Sundays, and public holidays as defined under the laws of the State of Texas). Payments which are otherwise scheduled for the 29th, 30th or 31st day of any particular month that does not have the regularly scheduled day (e.g. - February, April, June, September or November) shall instead be due and payable on the last day of that particular month.

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 6, 2017 (3:09pm)

2

INITIAL FOR IDENTIFICATION          NOTE

As an alternative to matured unpaid monthly installment amounts accruing interest at the Maximum Rate (or such lesser default rate as may be specified herein), in the event any installment (but not the principal amount due upon Maturity) shall become overdue for a period in excess of ten (10) calendar days, a late payment charge equal to a reasonable amount not to exceed five percent (5%) of the amount of each installment may be charged by the holder hereof for the purpose of defraying the expense incident to handling such delinquent payments. This late charge should be paid only once, but promptly, as to each respective late payment. The provisions of this paragraph shall not limit Payee's right to compel prompt performance under this Note, or grant an option to Maker to make late payments and the charging of such late fee shall not waive any default under this Note.

It is especially agreed that if an Event of Default be made in any of the payments of principal and/or interest due hereon beyond the notice and cure period in the Loan Agreement or if there is an Event of Default in any of the covenants or provisions set forth in the Loan Agreement of even date by and between Maker and Payee ("Loan Agreement"), or in any Deed of Trust, Security Agreement or other security document given to secure the payment hereof, or should any maker, endorser or guarantor revoke, or dispute the validity of, or liability under this Note or any guaranty of the indebtedness evidenced by this Note, or become insolvent or commit any act of bankruptcy or make an assignment for the benefit of creditors or enter into any type of creditor workout, or authorize the filing or file a voluntary Petition in Bankruptcy or should a receiver of any of their property be appointed, or should involuntary bankruptcy proceedings be filed or threatened against any of said parties, or should there occur commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Maker or by any governmental agency against any collateral securing this Note, including a garnishment of any of Maker's accounts, including deposit accounts, with Payee, then, in any such event, after applicable notice and failure to cure as provided for in the Loan Agreement, at the option of the holder hereof, at any time thereafter, without further notice, the unpaid principal of this Note and all accrued interest shall at once become due and payable and, at the option of Payee, shall bear interest at the rate aforesaid from the date of such default or event. Failure to exercise any of said options shall not constitute a waiver on the part of the holder hereof of the right to exercise the same at any other time. Terms not defined herein are as defined in the Loan Agreement.

For the purposes hereof, the term "Base Rate" shall mean the domestic "Prime Rate" as published in The Wall Street Journal on that day under the section entitled "Money Rates". If this section of The Wall Street Journal reflects more than one rate as being the domestic Prime Rate, then the highest domestic rate shall be the Base Rate. On days when The Wall Street Journal is not published, the Base Rate shall be the Prime Rate stated in the most recently published edition of The Wall Street Journal. In the event that The Wall Street Journal ceases to be published altogether, or ceases to publish the Prime Rate then Payee, its successors or assigns, shall establish and use a new Base Rate disclosed to the Maker which closely approximates the Prime Rate, as defined above; provided, however, that such new Base Rate is reasonably available to and verifiable by the Maker. The rate is used by Payee as a general reference rate of interest, taking into account such factors as Payee may deem appropriate. It is understood that many of Payee's commercial or other loans are priced in relation to such rate, but it is not necessarily the lowest or best rate actually charged to some customers of Payee and that Payee may make various commercial or other loans at rates of interest having no relationship to such rate.

It is further agreed that if Payee seeks to enforce collection on this Note or to realize on any collateral securing this Note, including Payee's hiring an attorney, for the purposes of bringing suit upon or establishing this debt in any manner in any court, or for judicial or non-judicial foreclosure, then in any of said events,

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 6, 2017 (3:09pm)                                    3

INITIAL FOR IDENTIFICATION        NOTE

Maker, any endorsers and guarantors hereof, promise to pay Payee's or other holder's reasonable attorney's fees and costs of collection, including, but not limited to, pre-foreclosure expenses, environmental report fees, unpaid ad valorem taxes, insurance premiums and appraisal fees, all of which sums shall become a part of the principal hereof.

It is the intention of the parties hereto to comply with applicable usury laws; accordingly, notwithstanding any provision to the contrary in this Note, or in any of the documents securing the payment hereof or otherwise relating hereto, in no event shall this Note or such documents require the payment or permit the collection of interest in excess of the maximum amount permitted by such laws. If any such excess of interest is contracted for, charged or received under this Note or under the terms of the documents securing the payment hereof, or otherwise relating hereto, or in the event the maturity of the indebtedness evidenced by this Note is accelerated in whole or in part, or in the event that all or any part of the principal or interest of this Note shall be prepaid, so that under any such circumstances the amount of interest contracted for, charged or received under this Note or under any of the instruments securing the payment hereof or otherwise relating hereto, on the amount of principal actually outstanding from time to time under this Note shall exceed the maximum amount of interest permitted by applicable usury laws, then in any such event, (a) the provisions of this paragraph shall govern and control, (b) any such excess which may have been collected shall, at final maturity of said indebtedness, either be applied as a credit against the then unpaid principal amount hereof or refunded to Maker, at Payee's option, and (c) upon such final maturity, the effective rate of interest shall automatically be reduced to the maximum lawful contract rate allowed under the applicable usury laws. Without limiting the foregoing, all calculations as to the rate of interest contracted for, charged or received under this Note or under such other documents which are made for the purposes of determining whether such rate exceeds the maximum lawful contract rate shall be made, to the extent permitted by applicable usury laws, by amortizing, prorating, allocating and spreading, in equal parts, during the period of the full stated term of the loan evidenced hereby, all interest at any time contracted for, charged or received from Maker or otherwise by Payee in connection with such indebtedness. NOTWITHSTANDING any term or provision of this Note to the contrary, Maker confirms to Payee that neither Maker nor its legal counsel, if any, is aware that this Note, or the transaction in connection with which the Note was issued, is or may be usurious in any respect. To induce Payee to make the loan evidenced by this Note, Maker agrees with and covenants to Payee that if at any time Maker believes or discovers that any term or provision of this Note or any action taken by Payee in connection with this Note is or may be in violation of the usury laws or any other applicable law, Maker will immediately give notice to Payee specifying with particularity the nature and extent of any such potential violation of the usury laws or any other applicable law, and afford to Payee a reasonable period (of not less than 60 days) within which to cure same. Maker agrees with and covenants to Payee that in no instance will Maker make any claim, bring any suit, prosecute or otherwise assert any cause of action, claim, counterclaim, or defense in respect of any violation of the usury laws or any other applicable law, unless, as a condition precedent thereto, Maker has given to Payee such notice and afforded to Payee such opportunity to cure as provided in this paragraph.

This Note and the Maximum Rate of nonusurious interest applicable to the loan evidenced hereby shall be governed by the laws of the United States of America and the State of Texas in effect on the date of the loan evidenced hereby, and, to the extent allowed by law, as now or as may hereafter be in effect. Unless changed in accordance with law, the applicable method of calculating the usury ceiling rate under Texas law shall be the weekly ceiling rate from time to time in effect, as provided for in Texas Finance Code Sections 303.002, 303.003 and 303.009; provided however, that the ceiling rate provided for in Texas Finance Code subsection 303.009(d) (which regulates certain open-end account credit agreements) shall not apply to the loan evidenced hereby.

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 6, 2017 (3:09pm)

4

INITIAL FOR IDENTIFICATION          NOTE

As further security for this Note, Maker grants to Payee a first lien and contractual right of set-off in and to all money and property of Maker now or at any time hereafter coming within the custody or control of the Payee, including (without limitation) all certificates of deposit and other accounts, whether such certificates of deposit and/or accounts have matured or not, and whether the exercise of such right of set-off results in loss of interest or other penalty under the terms of the certificate of deposit or account agreement. It is further agreed that the Payee shall have a first lien on all deposits and other sums at any time credited by or due from the Payee to Maker or any guarantor, as security for the payment of this Note, and Payee, at its option and whether before, upon or after acceleration of the maturity of this Note (however said maturity may be brought about) may without notice and without any liability, hold all or any part of any such deposits or other sums until all amounts owing on this Note have been paid in full, and/or Payee may apply or set-off all or any part of any such deposits or other sums credited by or due from Payee to or against any sums due on this Note in any manner and in any order of preference which the Payee, in its sole discretion, chooses. This includes all accounts Maker holds jointly with someone else and all accounts Maker may open in the future.

The Maker, endorsers and guarantors hereof and all other persons who are or may become liable for all or any part of the obligations represented by this Note shall be considered as principals as to the making of this Note and shall have joint and several liability and except as provided for in the Loan Agreement, the Maker, endorsers and Guarantors hereof severally waive presentment for payment, protest, notice of protest, and of nonpayment, notices of intention to accelerate the maturity and notice of acceleration, as to this Note and as to each, every and all installments hereof, and consent to the renewal or extension of the time of payment hereof and to the release of all or any part of the security described herein or any person liable hereon upon the terms deemed by the holder hereof, in the holder's sole discretion, to be adequate. Any renewal or extension or release of any of such security or person may be made without notice to any of said parties and without affecting their liability.

Maker understands and agrees that (i) Payee's document retention policy may involve the imaging of executed loan documents and other miscellaneous documents, papers, reports and other correspondence, and the destruction of the paper originals, and (ii) the Maker hereby waives any right that Maker may have to claim that the imaged copies of the loan documents, other than this Note, and other miscellaneous documents, papers and other correspondence related thereto are not originals.

The payment of this Note is guaranteed by NATIN PAUL and WORLD CLASS CAPITAL GROUP, LLC. The payment of this Note is secured by a Collateral Assignment of Leases and Rents and by a Deed of Trust of even date herewith to T. GERRY GAMBLE, TRUSTEE, covering the following described real property:

> 3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

**GOVERNING LAW AND VENUE**. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS NOTE IS DEEMED EXECUTED

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 6, 2017 (3:09pm)

5

INITIAL FOR IDENTIFICATION          NOTE

IN AND IS PERFORMABLE IN BELL COUNTY, TEXAS.  Any action or proceeding under or in connection with this Note against Maker or any other party ever liable for payment of any sums of money payable on this Note may be brought in any state court located in Bell County, Texas, or in the federal court in Bell County, Texas. Maker and each such other party hereby irrevocably: (i) submits to the nonexclusive jurisdiction of such courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.

**DEFAULT INTEREST.**  If an Event of Default exists as defined in the Loan Agreement, the outstanding principal balance of this Note shall, at the option of the Payee, bear interest at a rate (the "Default Rate") as follows: (i) in the event of a monetary default, interest on the loan shall accrue at a rate equal to the lesser of: (a) eighteen percent (18%) per annum, and (b) the maximum lawful rate permitted by applicable usury law (the "Maximum Rate"); and (ii) in the event of a non-monetary default, interest on the loan shall accrue at a rate equal to the lesser of (y) five percent (5%) over the contractual rate of interest under the loan documents, and (z) the maximum lawful rate. If interest has accrued at the Default Rate during any period, the difference between such accrued interest and interest which would have accrued at the Note Rate during such period shall be payable on demand. If a court of competent jurisdiction determines that any interest charged has exceeded the maximum rate allowed by law, the excess of the amounts collected over the legal rate of interest will be applied to the indebtedness as a principal prepayment without premium, retroactively, as of the date of receipt, or returned to the borrower if the indebtedness has been fully paid.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in this Note, Maker further covenants and agrees with Payee as follows:

(1)     In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or non-judicial foreclosure sale, Maker agrees as follows. Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Maker agrees that Payee shall be entitled to seek a deficiency judgment from Maker and any other party obligated on this Note equal to the difference between the amount owing on this Note and the amount for which the Property was sold pursuant to judicial or non-judicial foreclosure sale. Maker expressly recognizes that this Section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Maker and other persons against whom recovery of deficiencies is sought or any guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Maker further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Maker, any guarantor, and others against whom recovery of a deficiency is sought.

(2)     Alternatively, in the event the waiver provided for in Subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time): (i) the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or

expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than twelve (12) months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including, without limitation, utilities expenses, Property management fees, taxes and assessments (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least ten (10) years experience in appraising Property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factor set forth above.

WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company

By:   WC Teakwood Plaza Mezz, LLC, a Delaware limited liability company, Manager

By: _____
     Natin Paul, President

JNG17\FSBCT\WCTEAKWD\i17121Note.wpd
April 6, 2017 (3:09pm)
        7

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT ___
PAGE ___ OF 2 PAGES

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

> 1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

> 2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

ALLONGE
($7,600,000.00)

ALLONGE

Reference is hereby made to that certain promissory note executed by WC Teakwood Plaza, LLC, dated April 26, 2017, payable to the order of First State Bank, Central Texas, a Texas state banking association, in the original principal amount of $7,600,000.00, bearing loan number 11379300. The undersigned BancorpSouth Bank is the owner and holder of said note as successor by merger to First State Bank, Central Texas, a Texas state banking association.

It is intended that this Allonge be attached to and become a part of said note and that the endorsement below shall be effective to assign said note as if set forth on the reverse of the original of said note.

PAY TO THE ORDER OF: 8209 Burnet, L.P., WITHOUT RECOURSE.

Dated: August 2/ , 2020

BANCORPSOUTH BANK

By: _____

Name: Billy I Babineaux Sr

Title: SVP

# LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is made and delivered as of April _26_, 2017 (the "Effective Date"), by and between WC TEAKWOOD PLAZA, LLC ("Borrower") and FIRST STATE BANK CENTRAL TEXAS ("Lender").  For and in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE I. DEFINITIONS

1.01    Defined Terms.  In addition to terms defined elsewhere in this Agreement, the following terms, as used in this Agreement, shall have the meanings set forth below.  The singular number shall be deemed to include the plural, the masculine gender shall include the feminine and neuter genders, and vice versa.

"Collateral" shall mean, as the context dictates, the Real Property and the Personal Property given, collaterally assigned, pledged or granted or to be given to secure the Indebtedness and all of the respective owner(s) rights, title and interest in and to the same.

"Default" shall mean any condition or event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

"GAAP" shall mean generally accepted accounting principles consistently applied.

"Grantor(s)" shall mean any Loan Party who shall own an interest in any property that is to be subject to a Lien which secures any of the Indebtedness.

"Guarantor(s)" shall mean, as the context dictates, any person(s) (other than the Borrower) who shall, at any time, guarantee or otherwise be or become obligated for the repayment or the performance of all or any part of the Indebtedness.

"Improvements" shall mean all existing and future buildings, structures and other improvements made to the Land, along with all fixtures and permanently installed machinery and equipment on the Land and personal property owned by a Loan Party and used to maintain or service the improvements on the Land.

"Indebtedness" shall mean all loans, advances, indebtedness, obligations and liabilities of Borrower to Lender under any Loan Document, together with all other indebtedness, obligations and liabilities whatsoever of Borrower to Lender, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, voluntary or involuntary, known or unknown, or originally payable to Lender or to a third party and subsequently acquired by Lender including, without limitation, any: late charges; loan fees or charges; overdraft indebtedness; costs incurred by Lender in establishing, determining, continuing or defending the validity or priority of any Lien or in pursuing any of its rights or remedies under any Loan Document or in connection with any proceeding involving Lender as a

EXHIBIT NO. 2                                          EX. 2-001

result of any financial accommodation to Borrower; debts, obligations and liabilities for which Borrower would otherwise be liable to the Lender were it not for the invalidity or enforceability of them by reason of any Bankruptcy, insolvency or other law or for any other reason; and reasonable costs and expenses of attorneys and paralegals, whether any suit or other action is instituted, and to court costs if suit or action is instituted, and whether any such fees, costs or expenses are incurred at the trial court level or on appeal, in Bankruptcy, in administrative proceedings, in probate proceedings or otherwise; provided, however, that the term Indebtedness shall not include any consumer loan to the extent treatment of such loan as part of the Indebtedness would violate any law, rule or regulation.

"**Land**" shall mean the following described real property:

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

"**Lease**" shall mean, individually and collectively, each lease that encumbers the Land by and between each respective tenant thereto as tenant (each and collectively the "Tenant") and Borrower as landlord.

"**Lien**" shall mean any valid and enforceable interest in any property, whether real, personal or mixed, securing an indebtedness, obligation or liability owed to or claimed by any person other than the owner of such property, whether such indebtedness is based on the common law or any statute or contract.

"**Loan**" shall mean, in general, that portion of the Indebtedness evidenced by the Note and the Loan Documents.

"**Loan Documents**" shall mean collectively, this Agreement, the Note and any other promissory notes evidencing Indebtedness, any approved subordination agreement, any reimbursement agreement or other documentation executed in connection with any letter of credit, and any other documents, instruments or agreements evidencing, governing, securing, guaranteeing or otherwise relating to or executed pursuant to or in connection with any of the Indebtedness or any Loan Document (whether executed and delivered prior to, concurrently with or subsequent to this Agreement), as such documents may have been or may hereafter be amended from time to time.

"**Loan Party**" shall mean Borrower and each other person who shall be liable for the payment or performance of any of the Indebtedness including any Guarantors, if any, and any Grantor who shall own any property that is subject to a Lien which secures any of the Indebtedness.

"**Material Adverse Effect**" shall mean any act, event, condition or circumstance which could materially and adversely affect the business, operations, condition (financial or

otherwise), performance or assets of any Loan Party, the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party or by which it is bound or the enforceability of any Loan Document.

**"Maximum Legal Rate"** shall mean the maximum rate of nonusurious interest per annum permitted to be paid by Borrower or, if applicable, another Loan Party or received by Lender with respect to the applicable portion of the Indebtedness from time to time under applicable state or federal law as now or as may be hereafter in effect, including Chapter 1 D of Title 79 Vernon's Texas Civil Statutes (and as the same may be incorporated by reference in other Texas statutes), but otherwise without limitation, that rate based upon the "weekly ceiling rate" (as defined in §303 of the Texas Finance Code).

**"Note"** shall mean the Promissory Note of even date in the principal sum of SEVEN MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($7,600,000.00) executed by Borrower and payable to the order of Lender and all modifications, renewals, rearrangements, extensions and increases thereof.

**"Permitted Encumbrances"** shall mean: (a) Liens in favor of the Lender; (b) Liens for taxes, assessments or other governmental charges which are not yet due and payable, incurred in the ordinary course of business and for which no interest, late charge or penalty is attaching or which are being contested in good faith by appropriate proceedings and, if requested by Lender, bonded in an amount and manner satisfactory to Lender; (c) Liens, not delinquent, arising in the ordinary course of business and created by statute in connection with worker's compensation, unemployment insurance, social security and similar statutory obligations; (d) Liens of mechanics, materialmen, carriers, warehousemen or other like statutory or common law Liens securing obligations incurred in good faith in the ordinary course of business without violation of any Loan Document that are not yet due and payable; and (e) Liens existing as of the date hereof which have been specifically disclosed in writing to Lender and have been approved by Lender in writing.

**"Person"** or **"person"** shall mean any individual, corporation, partnership, joint venture, limited liability company, association, trust, estate, unincorporated association, joint stock company, government, municipality, political subdivision or agency, or other entity.

**"Personal Property"** shall mean all machinery, equipment, fixtures and other tangible personal property or intangible personal property given or to be given by a Loan Party to secure the Indebtedness in which Lender has or is to have a security interest or rights.

**"Real Property"** shall mean, the Land and the Improvements given, pledged or granted or to be pledged to secure the Indebtedness.

**"Required Accounting Method"** shall mean, with respect to the financial covenants contained herein, cash basis accounting principles, consistently applied for any individual Guarantor and GAAP (accrued basis) for each other Loan Party.

1.02    Accounting Terms. All accounting terms not specifically defined in this Agreement shall be determined and construed in accordance with the Required Accounting Method.

## ARTICLE II. FEES AND MAXIMUM INTEREST RATE

2.01 <u>Fees</u>. Upon Borrower's execution hereof, Borrower shall pay to Lender an origination fee in the amount of $76,000.00, as well as Lender's out-of-pocket costs, expenses and advances expended towards the closing including reasonable attorney fees and title company fees.

2.02 <u>Maximum Interest Rate</u>. At no time shall any interest rate in respect of any Indebtedness, exceed the Maximum Legal Rate. In the event that any interest is charged or otherwise received by Lender in excess of the Maximum Legal Rate, Borrower hereby acknowledges and agrees that any such excess interest shall be the result of an accidental and bona fide error, and any such excess shall be deemed to have been payment of principal, and not of interest, and shall be applied, first, to reduce the principal Indebtedness then outstanding, second, any remaining excess, if any, shall be applied to reduce any other Indebtedness, and third, any remaining excess, if any, shall be returned to Borrower. Notwithstanding the foregoing or anything to the contrary contained in this Agreement or any other Loan Document, but subject to all limitations contained in this Section, if at any time any rate of interest applicable to any portion of the Indebtedness is computed on the basis of the Maximum Legal Rate, any subsequent reduction in the rate of interest that would otherwise be applicable shall not reduce such applicable interest rate thereafter payable below the Maximum Legal Rate until the aggregate amount of interest accrued equals the total amount of interest that would have accrued if interest had, at all times, been computed solely on the basis of such applicable interest rate. This Section shall control all agreements between the Borrower and the Lender.

## ARTICLE III. REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants, and such representations and warranties shall be deemed to be continuing representations and warranties during the entire life of this Agreement, and so long as Lender shall have any commitment or obligation to make any loans or issue any letter of credit and so long as any Indebtedness remains unpaid and outstanding under any Loan Document, as follows:

3.01 <u>Due Authorization</u>. Each Loan Party has all requisite power and authority to execute, deliver and perform its obligations under each Loan Document to which it is a party or is otherwise bound, all of which have been duly authorized by all necessary action, and are not in contravention of law or the terms of any Loan Party's organizational or other governing documents.

3.02 <u>Title to Property</u>. Each Loan Party has good title to all property and assets purported to be owned by it, including those assets identified on the financial statements most recently delivered by Borrower to Lender.

3.03 <u>Encumbrances</u>. There are no security interests or other Liens or encumbrances on, and no financing statements on file with respect to, any of the Collateral of Borrower, except for Permitted Encumbrances.

EXHIBIT NO. 2                                          EX. 2-004

3.04    <u>Non-contravention</u>. The execution, delivery and performance by each Loan Party of the Loan Documents to which such Loan Party is a party or otherwise bound, are not in contravention of the terms of any indenture, agreement or undertaking to which any such Loan Party is a party or by which it is bound, except to the extent that such terms have been waived or that failure to comply with any such terms would not have a Material Adverse Effect.

3.05    <u>Actions, Suits, Litigation or Proceedings</u>.  There are no actions, suits, litigation or proceedings, at law or in equity, and no proceedings before any arbitrator or by or before any governmental authority, pending, or, to the best knowledge of Borrower, threatened against or affecting any Loan Party, which, if adversely determined, could materially impair the right of any Loan Party to carry on its business substantially as now conducted or could have a Material Adverse Effect. No Loan Party is under investigation by, or is operating under any restrictions imposed by, any governmental authority.

3.06    <u>Bankruptcy</u>. No Loan Party is involved as a debtor or obligor in any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or litigation proceeding, and to the best knowledge of Borrower, no such proceeding is contemplated by or threatened against any Loan Party.

3.07    <u>Accuracy of Information</u>. All financial statements previously furnished to Lender have been prepared in accordance with the Required Accounting Method and fairly present the financial condition of Borrower and, the results of Borrower's operations as of the dates and for the periods covered thereby; and since the date(s) of said financial statements, there has been no material adverse change in the financial condition of Borrower or any other person covered by such financial statements.  Each Loan Party is solvent, able to pay its debts as they mature, has capital sufficient to carry on its business and has assets the fair market value of which exceed its liabilities, and no Loan Party will be rendered insolvent, under-capitalized or unable to pay debts generally as they become due by the execution or performance of any Loan Document to which it is a party or by which it is otherwise bound.

3.08    <u>Enforceability of Agreement and Loan Documents</u>. Each Loan Document has been duly executed and delivered by duly authorized officer(s) or other representative(s) of each Loan Party, and constitutes the valid and binding obligations of each such respective executing Loan Party, enforceable in accordance with their respective terms, except to the extent that enforcement thereof may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting the enforcement of creditors' rights generally at the time in effect.

## ARTICLE IV. GENERAL NOTE TERMS AND ADVANCE REQUIREMENTS

4.01    <u>Permitted Use</u>. Lender and Borrower agree that the proceeds of the Note are to be used for the purpose of the refinancing existing debt on a retail strip center located on the Real Property (the "Permitted Use").

4.02    <u>Deed of Trust</u>. The Note is primarily secured by a first lien Deed of Trust ("Deed of Trust") on the Real Property.

4.03    Additional Collateral. The Note shall be additionally secured by the following collateral:

    A.    Collateral Assignment of Leases and Rents with respect to the Real Property.

4.04    Disbursement of Note Proceeds. The proceeds of the Note may be disbursed for the Permitted Use in one or more installments as provided for herein or in the Note.

4.05    Limitation on Note Funding. Lender shall lend to Borrower under the Note such amounts as Borrower shall request up to, but not exceeding the lesser of (a) 75% of the appraised value of the Real Property, and (b) $7,600,000.00. Borrower shall execute and deliver to Lender the Note to evidence the Loan. Payment of the Note shall be secured by the Deed of Trust and the liens, security interest and collateral assignments created or evidenced by the other Loan Documents. Lender's commitment is not revolving in nature and any amount paid hereunder which reduces the outstanding unpaid principal amount of the Loan may not be re-borrowed.

4.06    **Legal Lending Limit. Any provision in the Loan Documents to the contrary notwithstanding, Lender shall have no obligation to make any advance under the Note or under any of the other Loan Documents if, as a result of such advance, Lender would be in violation of any applicable federal or state statute, law, regulation, or interpretation thereof, whether effective or prospective, regarding lending limits imposed upon Lender, including but not limited to the Garn-St. Germain Depository Institutions Act of 1982, the Federal Reserve Act, the Texas Finance Code and applicable interpretive letters issued by the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation and or the Texas Department of Banking.**

4.07    Conditions to Lender's Obligations. Notwithstanding anything contained to the contrary in the Note, this Agreement or in any of the other Loan Documents, Lender shall have no liability or obligation under this Agreement, the Note, or any of the other Loan Documents until the following matters are received, reviewed by Lender and completed or resolved to the satisfaction of Lender:

    A.    Lender shall have received originals of the Policies or Certificates of Insurance for each of the Required Insurance Policies as set forth in Article VI hereof.

    B.    Lender shall have received fully executed and complete Loan Documents.

    C.    Receipt of one or more fully executed Participation Agreement(s) with such third party lender(s) as Lender deems necessary or advisable.

    D.    Lender shall have received an appraisal ("Appraisal") of the Land and Improvements valued on an "as completed" basis reflecting a loan to value ratio of less than or equal to 75%.

E.   Lender shall have received an Environmental Site Assessment report on the Real Property in form and content satisfactory to Lender.

In the event that Lender does advance funds prior to the above conditions being met, no such event of funding shall be a waiver by Lender of Borrower's obligations to meet the conditions set forth above as a condition to any subsequent advance of Loan proceeds, or an assumption or occurrence of any further liability or obligation by Lender under this Agreement, the Note, or any of the other Loan Documents until the said above matters are received, reviewed by Lender and completed or resolved to the satisfaction of Lender.

## ARTICLE V. AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until all instruments and agreements evidencing each and every loan, letter of credit and other financial accommodation by the Lender to the Borrower or any Loan Party are fully discharged and terminated, and thereafter, so long as any Indebtedness remains outstanding, it will, and, as applicable, it will cause each Loan Party who is within its control or under common control to:

5.01   Preservation of Existence, Payment of Taxes.  Preserve and maintain its existence and preserve and maintain such of its rights, licenses, permits, franchise agreements, branding agreements and privileges as are material to the business and operations conducted by it; qualify and remain qualified to do business in each jurisdiction in which such qualification is material to its business and operations or ownership of its properties, continue to conduct and operate its business substantially as conducted and operated during the present and preceding calendar year; at all times maintain, preserve and protect all of its property and keep the same in good repair, working order and condition; and from time to time make, or cause to be made, all needed and proper repairs, renewals, replacements, betterments and improvements thereto. File, on or before their respective due dates, all federal, state, local and foreign tax returns which are required to be filed, or obtain extensions for filing such tax returns, and pay all taxes which have become due pursuant to those returns or pursuant to any assessments received by any such party, as the case may be, except to the extent such tax payments are being actively and diligently contested in good faith by appropriate proceedings and, if requested by Lender, have been bonded or reserved in an amount and manner satisfactory to Lender.

5.02   Keeping of Books.  Keep proper books of record and account in which full and correct entries shall be made of all of its financial transactions and its assets and businesses so as to permit the presentation of financial statements prepared in accordance with the Required Accounting Method; and permit Lender, or its representatives, at reasonable times and intervals upon reasonable advance notice on a confidential basis, at Borrower's cost and expense, to examine its books and records and to discuss its financial matters with its officers and independent certified public accountants.

5.03   Reporting Requirements.  Furnish to Lender, or cause to be furnished to Lender, the financial statements and reports of each applicable Loan Party as provided for in that certain Agreement to Provide Financial Statements of even date by and among Lender and each applicable Loan Party.

5.04    Further Assurances; Financing Statements. Furnish Lender, at Borrower's cost and expense, upon Lender's request and in form satisfactory to Lender (and execute and deliver or cause to be executed and delivered), such additional pledges, assignments, mortgages, Lien instruments or other security instruments, consents, acknowledgments, subordinations, financing statements and other documents pertaining to any or all of the property and rights which may now or hereafter secure or be intended as security for any portion of the Indebtedness as Lender may require to effectuate more fully the purposes of any Loan Document.

5.05    Applicable Law and Environmental Covenants. Comply with all applicable laws, rules, regulations, orders decrees and directives of every governmental or quasi-governmental authority pertaining to hazardous waste, hazardous substances and other hazardous, toxic or dangerous materials ("Hazardous Material") including those governing the use, generation, manufacture, storage, disposal or treatment of same including but not limited to CERCLA, RCRA, SARA, the federal Clean Water Act and the Texas Water Code and those otherwise intended to regulate or improve health, safety or the environment and or relating to the release or threatened release of hazardous waste or any hazardous substance ("Environmental Laws"), and maintain all permits, licenses and approvals required under applicable Environmental Laws. Promptly notify Lender, in writing, as soon as Borrower becomes aware of any condition or circumstance which makes any of the environmental representations or warranties set forth in this Agreement or in the Loan Documents incomplete, incorrect or inaccurate in any material respect as of any date. Promptly notify Lender, in writing, as soon as Borrower becomes aware of any condition or circumstance which may indicate a violation of any Environmental Law; and promptly provide to Lender, immediately upon receipt thereof, copies of any material correspondence, notice, pleading, citation, indictment, complaint, order, decree, or other document from any source asserting or alleging a violation of any Environmental Law by Borrower, or of any circumstance or condition which requires or may require, a financial contribution by Borrower or a clean-up, removal, remedial action or other response by or on behalf of Borrower under applicable Environmental Law, or which seeks damages or civil, criminal or punitive penalties from Borrower or any violation or alleged violation of any Environmental Law. Provide to Lender a Phase 1 environmental site assessment (and if recommended by the Phase 1 report, a Phase 2 environmental review each performed in accordance with then existing industry standards) in the event that Lender has reason to believe that there may have been a release or a violation of any of the Environmental Laws on any Real Property as collateral for the Note, all at Borrower's sole cost and expense. **Borrower hereby agrees to indemnify, defend and hold Lender, and any of Lender's past, present and future officers, directors, shareholders, employees, representatives and consultants, harmless from any and all claims, losses, damages, suits, penalties, costs, liabilities, obligations and out-of-pocket expenses (including, without limitation, reasonable legal expenses and attorneys' fees) incurred or arising out of any claim, loss or damage of any property, injuries to or death of any persons, contamination of or adverse effects on the environment, or other violation of any applicable Environmental Law, in any case, caused by Borrower or in any way related to any property owned or operated by Borrower or due to any acts of Borrower or any of its officers, directors, shareholders, employees, consultants and/or representatives INCLUDING ANY CLAIMS, LOSSES, DAMAGES, SUITS, PENALTIES, COSTS, LIABILITIES, OBLIGATIONS OR**

EXPENSES, RESULTING FROM LENDER'S OWN NEGLIGENCE; provided however, that the foregoing indemnification shall not be applicable, and Borrower shall not be liable for any such claims, losses, damages, suits, penalties, costs, liabilities, obligations or expenses, to the extent (but only to the extent) the same arise or result from any GROSS NEGLIGENCE OR WILLFUL MISCONDUCT of Lender or any of its agents or employees. The indemnities from Borrower contained herein shall survive the termination of this Agreement and the payment of the Note but shall terminate with respect to any claims arising out of any occurrences after Borrower no longer owns the Property due to Lender's foreclosure. The terms "hazardous waste", "hazardous substance", "disposal", "release", and "threatened release", as used in this Agreement, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. Section 6901, et seq. ("RCRA"), or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

5.06    Governmental and Other Approvals.  Apply for, obtain and/or maintain in effect, as applicable, all authorizations, consents, approvals, licenses, qualifications, exemptions, filings, declarations and registrations (whether with any court, governmental agency, regulatory authority, securities exchange or otherwise) which are necessary in connection with the execution, delivery and/or performance by any Loan Party of any Loan Document to which it is a party.

5.07    Lease.  Take all such actions as are commercially reasonable to maintain each Lease in full force and effect.  Lender shall have the right, but no obligation, to cure any events of default by Borrower under the Lease in order to protect the Lease rights as collateral for Lender. Any such monetary amount as may be advanced by Lender may come from any then unadvanced portion of the Note, or may be advanced from Lender's own funds, which in either event, shall be deemed as a protective advance by Lender which shall be part of the Indebtedness evidenced by the Note and secured by the Loan Documents.

### ARTICLE VI.  INSURANCE

6.01    Insurance.

A.    Required Insurance.  Borrower shall, at Borrower's sole cost and expense, obtain, maintain or cause to be obtained and maintained the minimum insurance requirements set forth in this Agreement ("Required Insurance") beginning on the date this Agreement and, except as expressly provided to the contrary herein, continuing for as long any portion of the Loan is unadvanced or unpaid, and providing at least the following coverages:

(1) <u>Property Insurance</u>. Insurance with respect to the Improvements and Personal Property with coverage at least as broad as that provided by the current version of Insurance Services Office, Inc. ("ISO") ISO Form CP 10 30 Causes of Loss - Special Form (formerly referred to as an "all-risk" policy). Each such Property Insurance policy shall be maintained insuring against any peril now or hereafter included within the classification "Cause of Loss - Special Form" in amounts at all times sufficient to prevent Lender from becoming a co-insurer within the terms of the Policy and under applicable law, but in any event such Property Insurance Policies shall be maintained in an amount which, after application of the deductible, shall be equal to the full insurable value of the Improvements and Personal Property. The term "full insurable value" shall mean the actual replacement cost of the Improvements and Personal Property (without taking into account any depreciation, and exclusive of excavations, footings and foundations, landscaping and paving) determined annually by an insurer, a recognized independent insurance broker or an independent appraiser selected and paid by Borrower and in no event less than the coverage required pursuant to the terms of any Lease (the "Replacement Cost"). Each such Property Insurance policy shall not contain any protective safeguard warranties.

(2) <u>Liability Insurance</u>. Commercial General Liability insurance (Occurrence Basis) with coverage at least as broad as ISO Form CG 00 01 and including liability claims for bodily injury, death and property damage liability, insurance against any and all claims, including all legal liability to the extent insurable and imposed upon Lender and all court costs and legal fees and expenses, arising out of or connected with the possession, use, leasing, operation, maintenance or condition of the Property in such amounts as are generally available at commercially reasonable premiums and are generally required by institutional lenders for properties comparable to the Property but in any event for a limit per occurrence of at least **$1,000,000** and an annual aggregate of at least **$2,000,000**.

(3) <u>Flood Insurance</u>. If required by Lender or applicable banking regulations, flood insurance in an amount at least equal to the greater of (A) the Replacement Cost together with business interruption coverage and (B) the maximum limit of coverage available for the Property under the National Flood Insurance Act of 1968, The Flood Disaster Protection Act of 1973 and the National Flood Insurance Reform Act of 1994, as each may be amended (the "Flood Insurance Acts");

(4) <u>Other Insurance</u>. Such other insurance with respect to the Collateral Property or on any replacements or substitutions or additions or increased coverage limits as may from time to time be reasonably required by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated, including, without limitation, sinkhole, mine subsidence, earthquake and

EXHIBIT NO. 2                                      EX. 2-010

environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

B.   <u>General Requirements</u>. All insurance policies for the Required Insurance shall be for a term of not less than one (1) year and obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), and shall be issued by one or more other domestic primary insurer(s) having a general policy rating of A or better and a financial class of X or better by A.M. Best Company, Inc. (or if a rating of A.M. Best Company Inc. is no longer available, a similar rating from a similar or successor service). All insurers providing Required Insurance shall be authorized and admitted to issue insurance in the state in which the Collateral Property is located. Each Policy which is a liability policy shall name Lender as an additional insured. Each Policy which is a property insurance policy shall name Lender as insured under a standard mortgagee clause  (also referred to as a "lender loss payable" clause and a "closed clause" or "standard/union" clause). Each Policy which is a property insurance policy shall also contain: (i) a standard "non-contributory mortgagee" endorsement or its equivalent relating, *inter alia,* to recovery by Lender notwithstanding the negligent or willful acts or omission of Borrower; (ii) to the extent available at commercially reasonable rates, a waiver of subrogation endorsement as to Lender; and (iii) an endorsement providing for a deductible per loss of an amount not more than that which is customarily maintained by prudent owners of similar properties in the general vicinity of the Property, but in no event in excess of **$25,000** except in the case of windstorm, flood, or earthquake, the deductible shall not be in excess of **$25,000** without Lender's prior approval. All Policies shall contain (i) a provision that such Policies shall not be denied renewal, materially changed (other than to increase the coverage provided), cancelled or terminated, nor shall they expire, without at least thirty (30) days' prior written notice to Lender in each instance; and (ii) include effective waivers by the insurer of all claims for applicable premiums ("Insurance Premiums") against any mortgagee, loss payees, additional insureds and named insureds (other than Borrower). All Policies shall be endorsed to be primary, with any applicable policies of Lender being excess, secondary and noncontributing. No Policy shall contain any endorsement restricting, limiting or excluding coverage in any manner without the prior written approval of Lender.

C.   <u>Evidence of Insurance</u>.

(1)   Insurance must be evidenced by an ACORD ™ Form 25 Certificate of Liability Insurance for each policy for liability coverages; and an ACORD ™ Form 28 Evidence of Commercial Property Insurance (2003 edition) for each property policy (or if required by Lender, an ACORD ™ Form 27 to the extent the Collateral is residential property or personal property) for such applicable property policies (each a "Certificate of Insurance");

(2)   Each Certificate of Insurance shall be delivered to Lender prior to commencing operations at the Property and at least 30 days prior to the expiration of current policies;

(3)     Each Certificate of Insurance shall must show the Lender as certificate holders (with Lender's mailing address), show Borrower as the "Named Insured", show the insurance companies producing each coverage and the policy number and policy date of each coverage, name the producer of the certificate (with correct address and telephone number) and have the signature of the authorized representative of the producer, specify the additional insured status (on a separate ACORD ™ Form 45) and/or waivers of subrogation, state the amounts of all deductibles and self-insured retentions, show the primary status and aggregate limit per project where required and be accompanied by copies of all required additional insured endorsements; and

(4)     In addition to the Certificates of Insurance, Borrower shall provide to Lender the originals or true and correct copies of each of the Policies and all endorsements thereon comprising the Required Insurance. In the event of the acquisition of a new Policy, a temporary insurance binder (evidenced by ACORD ™ Form 75) shall then be provided to Lender; the underlying actual Policy and all endorsements thereon or a true and correct copy thereof shall be delivered to Lender prior to the expiration of the applicable binder. Evidence of insurance with respect to all renewal and replacement Policies for Required Insurance shall be delivered to Lender not less than fifteen (15) days prior to the expiration date of any of the Policies which evidence shall bear notations evidencing payment of Insurance Premiums. Originals or evidence of such replacement Policies shall be delivered to Lender promptly after Borrower's receipt thereof but in any case within thirty (30) days after the effective date thereof and not less than fifteen (15) days prior to the termination of the then existing Policies previously delivered to Lender.

D.     Forms

(1)     If the forms of Policies, endorsements, certificates, or evidence of insurance required by this Agreement are superseded or discontinued, Lender will have the right to require other equivalent forms; and

(2)     Any policy or endorsement form other than a form specified in this Agreement must be approved in advance by Lender; and

(3)     If requested in writing by Lender, Borrower will provide to Lender a certified copy of any or all insurance policies or endorsements required by this Agreement.

E.     Force Placed Insurance. Borrower's failure to obtain and maintain the required insurance will constitute a material breach of, and default under, this Agreement. If Borrower fails to remedy such breach within two (2) days after notice from Lender, Lender may, in addition to any other remedy available to Lender, at

Lender's option, purchase such insurance, at Borrower's expense. Borrower will indemnify the Lender against any claims arising from Borrower's failure to purchase and/or maintain the insurance coverages required by this Agreement.

Pursuant to Texas Finance Code Section 307.052, the Borrower or Grantor (as applicable, the "Debtor") as owner of the Collateral is notified as follows:

(1) **DEBTOR IS REQUIRED TO (I) KEEP THE COLLATERAL INSURED AGAINST DAMAGE IN THE AMOUNT THE LENDER SPECIFIES; (II) PURCHASE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THIS STATE OR AN ELIGIBLE SURPLUS LINES INSURER; AND (III) NAME THE LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS.**

(2) **THE DEBTOR MUST, DELIVER TO THE LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF THE PREMIUMS.**

(3) **IF THE DEBTOR FAILS TO MEET ANY REQUIREMENT LISTED IN SUBPARAGRAPH (1) OR (2) IMMEDIATELY ABOVE, THE LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF THE DEBTOR AT THE DEBTOR'S EXPENSE.**

F. Prohibited Acts. Borrower shall comply with all insurance requirements and shall not bring or keep or permit to be brought or kept any article upon any of the Real Property or cause or permit any condition to exist thereon which would be prohibited by an insurance requirement, or would invalidate the insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Collateral Property pursuant to this Agreement and shall not purchase any additional amounts of insurance that would cause Lender to become a co-insurer within the terms of the Policies.

G. Proof of Loss. During an Event of Default, Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. Nothing in this paragraph shall require Lender to incur any expense or take any action.

H. No Waiver. The failure of Lender to demand full compliance by Borrower with respect to the minimum coverages and terms outlined herein will not constitute a waiver by Lender with respect to Borrower's obligation to maintain such coverages.

Borrower will purchase such additional insurance policies and/or endorsements or increase the policy limits of any policy set forth herein, if required by Lender.

I.  Indemnity and Waiver by Borrower. Borrower also agrees to indemnify, defend and save Lender harmless from any and all claims, losses, costs, damages, liabilities, obligations and expenses, including, without limitation, reasonable attorneys' fees, incurred by Lender and waives as to the Lender, all claims and losses arising, or alleged to arise, from all of the following during Borrower's period of ownership of the Property:

(1)  the use, nonuse, possession, occupation, condition, operation, design, construction, acquisition, repair, maintenance or management of the Property;

(2)  failure by Borrower to maintain, or cause to be maintained, the Required Insurance;

(3)  any violation of or failure by a Loan Party to comply with applicable law;

(4)  any breach of a Loan Party's applicable covenants, representations or warranties under this Agreement or any other Loan Document; and

(5)  defending or protecting the Liens which secure or purport to secure all or any portion of the Indebtedness, whether existing under any Loan Document or otherwise or the priority thereof, or in enforcing the obligations of Borrower or any other Person under or pursuant to any Loan Document, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or connected with the Collateral or any Loan Document.

THE INDEMNITIES AND WAIVERS OF BORROWER CONTAINED IN THIS AGREEMENT,

(1)  ARE INDEPENDENT OF THE REQUIRED INSURANCE,

(2)  **WILL NOT BE LIMITED BY ANY ONE ACTION RULE UNDER WORKERS' COMPENSATION OR SIMILAR EMPLOYEE BENEFIT ACTS OR ANY PROHIBITION AGAINST THE RIGHT OF CONTRIBUTION FROM JOINT TORTFEASORS UNDER COMPARATIVE NEGLIGENCE STATUTES,**

(3)  WILL SURVIVE REPAYMENT OF THE LOAN OR FORECLOSURE OF THE COLLATERAL BY LENDER OR EXECUTION BY GRANTOR OF A DEED IN LIEU OF FORECLOSURE WITH RESPECT TO THE COLLATERAL, and

EXHIBIT NO. 2                    EX. 2-014

(4)  WILL APPLY EVEN IF THE LOSS IS CAUSED IN PART BUT NOT IN WHOLE BY THE ORDINARY NEGLIGENCE OR STRICT LIABILITY OF THE LENDER, BUT WILL NOT APPLY TO THE EXTENT THE LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE LENDER.

All applicable law affecting the validity or enforceability of any indemnity or waiver contained in this Agreement is made a part of such provision and will operate to amend such indemnity or waiver to the minimum extent necessary to bring the provision into conformity with applicable law and cause the provision, as modified, to continue in full force and effect.

J.  Blanket Policies. Unless Lender requires Borrower to obtain a separate Policy or Policies the insurance coverage required may be effected under a blanket Policy or Policies covering the Real Property; provided that any such blanket Policy shall specify, except in the case of commercial general liability insurance, the premises address of each building, the portion of the total coverage of such Policy that is allocated to the Real Property, and shall in any case provide the same protection as would a separate policy insuring only the Real Property and otherwise comply with all other respects with the requirements of this Agreement.

## ARTICLE VII. EVENTS OF DEFAULT

7.01  Events of Default. The occurrence or existence of any of the following conditions or events shall, after applicable notice and failure to cure as provided for in Section 7.03, constitute an "Event of Default" hereunder: (a) material breach of any representation or warranty contained in this Agreement or any other Loan Document or material default in the observance or performance of any of the other conditions, covenants or agreements of any Loan Party set forth in this Agreement or any other Loan Document; (b) any default or event of default, as the case may be, shall occur under any other Loan Document and shall continue beyond the applicable grace period, if any; (c) any change in the management or control of Borrower involving the replacement or removal of Natin Paul, whether by reason of incapacity, death, resignation, termination or otherwise which, in Lender's sole judgment, could become a Material Adverse Effect; subject to Section 7.04 hereof; (d) any change in the ownership of Borrower, whether by reason of incapacity, death, or otherwise which, in Lender's sole judgment, could become a Material Adverse Effect; subject to Section 7.04 hereof; provided however that from and after the date hereof a cumulative change of up to 100% of the ownership interests in Borrower shall not be deemed an Event of Default, so long as Lender is timely notified of the change in ownership of Borrower and Borrower is owned at least 50% directly or indirectly by Natin Paul and is controlled directly or indirectly by Natin Paul; and (e) if, during the loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Indebtedness.

7.02  Interim Remedies After Default. Upon and after a Default by any Loan Party under any of the Loan Documents, regardless of whether a Loan Party is entitled to notice and/or an

opportunity to cure a Default, whether said notice or right to cure is provided for under the Loan Documents or provided by law, and regardless of whether said Default has matured into an Event of Default, each Loan Party hereto agrees that whether or not a Loan Party is given notice of the Default and whether or not, at the point in time of determination, the right to cure period has lapsed, Lender shall have the following rights, all without any prior notice to the applicable Loan Party;

A.  Lender shall not be obligated to further process any draw requests that have been submitted, or to fund any remaining portion of any draw requests that have been approved by Lender;

B.  Lender shall continue to have the right to post advances to the Note for interest carry to the extent of any accrued and unpaid interest on the Note but only to the extent that interest carry is available under the Budget for the Loan;

C.  Lender shall have the right to post advances to the Note for protective advances for the benefit of Lender as otherwise provided for in the Loan Documents; and

D.  Lender shall have the right to seek any equitable remedies available under law to protect any of the collateral securing the Note.

7.03  Notice of Default and Right to Cure. Any provision of this Loan Agreement or any of the Loan Documents to the contrary notwithstanding, Borrower and Guarantors shall not be in default under this Loan Agreement or the Loan Documents unless:

A.  in the case of a breach of a monetary covenant, Lender shall have given the applicable Loan Party written notice of such monetary breach setting forth the due date and the amount due on such date and Borrower shall not have cured the breach of the monetary covenant within ten (10) days after delivery of said notice; and

B.  in the case of a breach of a non-monetary covenant, Lender shall have given Borrower or other applicable Loan Party, written notice of such non-monetary breach setting forth in reasonable detail the nature and extent of such failure and Borrower or other applicable Loan Party, shall not have cured the breach of the non-monetary covenant within thirty (30) days after delivery of said notice;

provided however, all notices required under this paragraph regarding breaches, and all other notices permitted in this Loan Agreement or in the other Loan Documents, shall be in writing and shall be deemed to be delivered when delivered personally or when deposited with the United States Postal Service, postage prepaid, by registered or certified mail, return receipt requested, addressed to the Borrower, the Guarantors, other applicable Loan Party or the Lender, as the case may be, at the respective addresses given below or elsewhere in the Loan Documents, or to such other changed address, the notice of which change is given pursuant hereto or as otherwise provided elsewhere in the Loan Documents; and

provided further, however, that with respect to notices of monetary default, Borrower shall only be entitled to receive and Lender shall only be required to give two (2) such notices in

EXHIBIT NO. 2                                                                     EX. 2-016

any one twelve (12) month period from the date hereof and cumulative total of six (6) such notices during the term hereof, such that after the second notice in any twelve (12) month period or after the sixth such notice during the term hereof, Borrower and any other applicable Loan Party shall no longer be entitled to any notice and right to cure for monetary events of default.

7.04    Death or Incapacity of a Guarantor. Any provision herein or in the Loan Documents to the contrary notwithstanding, the Lender shall waive the death or incapacity of Natin Paul as a default hereunder or under any of the Loan Documents executed in connection with the Note including direct or indirect effects on the ownership, control or management of the Borrower, or the legal ability of Natin Paul to perform under his guaranty agreement as Guarantor so long as within ninety (90) days from the date of death or adjudication of incapacity, a replacement guarantor acceptable to Lender in Lender's sole discretion has expressly assumed and ratified the deceased or incapacitated Guarantor's obligations under the guaranty agreement in the form of a replacement guaranty or assumption of guaranty, all in form and subject to such conditions as are acceptable to Lender in its sole discretion. References herein to the incapacity of an individual Guarantor shall mean that a court of competent jurisdiction has declared the individual as legally incompetent under applicable state law.

7.05    Remedies Upon Event of Default. Upon the occurrence and at any time during the existence or continuance of any Event of Default, but without impairing or otherwise limiting the Lender's right to demand payment of all or any portion of the Indebtedness which is payable on demand, at Lender's option, Lender may give notice to Borrower declaring all or any portion of the Indebtedness remaining unpaid and outstanding, whether under the notes evidencing the Indebtedness or otherwise, to be due and payable in full without presentation, demand, protest, notice of dishonor, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby expressly waived, whereupon all such Indebtedness shall immediately become due and payable. Furthermore, upon the occurrence of a Default or Event of Default and at any time during the existence or continuance of any Default or Event of Default, but without impairing or otherwise limiting the right of Lender, if reserved under any Loan Document, to make or withhold financial accommodations at its discretion, to the extent not yet disbursed, any commitment by Lender to make any further loans or, if applicable, issue any further letters of credit shall automatically terminate. The foregoing rights and remedies are in addition to any other rights, remedies and privileges Lender may otherwise have or which may be available to it, whether under this Agreement, any other Loan Document, by law, or otherwise.

7.06    Setoff. In addition to any other rights or remedies of Lender under any Loan Document, by law or otherwise, upon the occurrence and during the continuance or existence of any Event of Default, Lender may, at any time and from time to time, without notice to Borrower (any requirements for such notice being expressly waived by Borrower), setoff and apply against any or all of the Indebtedness (whether or not then due), in any manner and in any order of preference which the Lender, in its sole discretion, chooses any or all deposits (general or special, time or demand, provisional or final) at any time held by Borrower (whether owned outright or held with a third party) and other indebtedness at any time owing by Lender to or for the credit or for the account of Borrower, and any property of Borrower, from time

EXHIBIT NO. 2                                          EX. 2-017

to time in possession or control of Lender, irrespective of whether or not Lender shall have made any demand hereunder or for payment of the Indebtedness and although such obligations may be contingent or unmatured, regardless of whether any Collateral then held by Lender is adequate to cover the Indebtedness and regardless of whether the exercise of such right of set-off results in loss of interest or other penalty under the terms of the certificate of deposit or account agreement. The rights of Lender under this Section are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which Lender may otherwise have. Borrower hereby grants Lender a Lien on and security interest in all such deposits, indebtedness and other property as additional collateral for the payment and performance of the Indebtedness.

7.07    Waiver of Defaults. No Default or Event of Default shall be waived by Lender except in a written instrument specifying the scope and terms of such waiver and signed by an authorized officer of Lender, and such waiver and shall be effective only for the specific time(s) and purpose(s) given. No single or partial exercise of any right, power or privilege hereunder, or any delay in the exercise thereof, shall preclude other or further exercise of Lender's rights. No waiver of any Default or Event of Default shall extend to any other or further Default or Event of Default. No forbearance on the part of Lender in enforcing any of Lender's rights or remedies under any Loan Document shall constitute a waiver of any of its rights or remedies. Borrower expressly agrees that this Section may not be waived or modified by Lender by course of performance, estoppel or otherwise.

7.08    Receiver. Lender, in any action or suit to foreclose upon any of the Collateral, shall be entitled, without notice or consent, and completely without regard to the adequacy of any security for the Indebtedness, to the appointment of a receiver of the business and premises in question, and of the rents and profits derived therefrom. This appointment shall be in addition to any other rights, relief or remedies afforded Lender. Such receiver, in addition to any other rights to which the receiver shall be entitled, shall be authorized to sell, foreclose or complete foreclosure on Collateral for the benefit of Lender, pursuant to provisions of applicable law.

7.09    Application of Proceeds of Collateral. Notwithstanding anything to the contrary set forth in any Loan Document, after an Event of Default, the proceeds of any of the Collateral, together with any offsets, voluntary payments, and any other sums received or collected in respect of the Indebtedness, may be applied towards the Indebtedness in such order and manner as determined by Lender in its sole and absolute discretion.

## ARTICLE VIII.  MISCELLANEOUS

8.01    Notices. Any notice, certificate, consent, determination or other communication required or permitted to be given or made under this Agreement shall be in writing and shall be effectively given and made if (i) delivered personally, (ii) sent by prepaid courier service or mail, or (iii) sent prepaid by fax or other similar means of electronic communication, in each case to the following respective addresses:

| | |
|---|---|
| If to Borrower: | WC TEAKWOOD PLAZA, LLC |
| | 401 Congress Avenue, 33rd Floor |
| | Austin, Texas 78701 |
| Phone: | (512) 327-3300 |
| Fax: | (512) 322-9238 |
| E-mail address: | Npaul@wccapitalgroup.com |
| | |
| With copy to: | WORLD CLASS CAPITAL GROUP, LLC |
| | 767 Fifth Avenue; 16th Floor |
| | New York, New York 10153 |
| | Attention: Samuel Mizrahi |
| Phone: | (917) 702-3344 |
| E-mail address: | smizrahi@wccapitalgroup.com |
| | |
| If to Lender: | FIRST STATE BANK CENTRAL TEXAS |
| | P. O. Box 6136 |
| | Temple, Texas 76503-6136 |
| Phone: | (512) 231-8821 |
| Fax: | (512) 231-1625 |
| Email address: | vivienen@fsbcentex.com |

Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a regular Business Day and the communication is so delivered, faxed or sent prior to 4:30 p.m. (local recipient time) on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day. Any such communication sent by mail shall be deemed to have been given and made and to have been received on the earlier of actual receipt or the fifth Business Day following the mailing thereof; provided however that no such communication shall be mailed during any actual or apprehended irregular disruption of postal services. Any such communication given or made in any other manner shall be deemed to have been given or made and to have been received only upon actual receipt in writing.

8.02   Governing Law. Each Loan Document shall be deemed to have been delivered in the State of Texas, and shall be governed by and construed and enforced in accordance with the laws of the State of Texas, and applicable federal law except to the extent that the Uniform Commercial Code or other personal property law or real property law of another jurisdiction where Collateral is located is applicable, and except to the extent expressed to the contrary in any Loan Document.

8.03   Costs and Expenses. The Borrower agrees to pay Lender, on demand, all reasonable costs and expenses in connection with the preparation, execution, delivery and administration of this Agreement, the Note, the Loan Documents, and the other documents to be delivered hereunder, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Lender with respect thereto and with respect to advising the Lender as to its rights and responsibilities under this Agreement and/or under any of the other Loan

Documents. Borrower shall pay Lender, on demand, all costs and expenses, including, without limitation, reasonable attorneys' fees and legal expenses, incurred by Lender in perfecting, revising, protecting or enforcing any of its rights or remedies against any Loan Party or any Collateral, or otherwise incurred by Lender in connection with any Default or Event of Default or the enforcement of the Loan Documents or the Indebtedness. Following Lender's demand upon Borrower for the payment of any such costs and expenses, and until the same are paid in full, the unpaid amount of such costs and expenses shall constitute Indebtedness and shall bear interest at the highest default rate of interest provided in any Loan Document.

8.04    Receipt of Payments by Lender. Any payment by Borrower of any of the Indebtedness made by mail will be deemed tendered and received by Lender only upon actual receipt thereof by Lender at the address designated for such payment, whether or not Lender has authorized payment by mail or in any other manner, and such payment shall not be deemed to have been made in a timely manner unless actually received by Lender on or before the date due for such payment, time being of the essence. Borrower expressly assumes all risks of loss or liability resulting from non-delivery or delay of delivery of any item of payment transmitted by mail or in any other manner. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and any failure to pay the entire amount then due shall constitute and continue to be an Event of Default. Borrower waives the right to direct the application of any and all payments received by Lender hereunder at any time or times after the occurrence and during the continuance of any Default. Borrower further agrees that after the occurrence and during the continuance of any Default, Lender shall have the continuing exclusive right to apply and to reapply any and all payments received by Lender at any time or times, whether as voluntary payments, proceeds from any Collateral, offsets, or otherwise, against the Indebtedness in such order and in such manner as Lender may, in its sole discretion, deem advisable, notwithstanding any entry by Lender upon any of its books and records. Borrower hereby expressly agrees that, to the extent that Lender receives any payment or benefit of or otherwise upon any of the Indebtedness, and such payment or benefit, or any part thereof, is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid to a trustee, receiver, or any other Person under any bankruptcy act, state or federal law, common law, equitable cause or otherwise, then to the extent of such payment or benefit, the Indebtedness, or part thereof, intended to be satisfied shall be revived and continued in full force and effect as if such payment or benefit had not been made or received by Lender, and, further, any such repayment by Lender shall be added to and be deemed to be additional Indebtedness.

8.05    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of Borrower and Lender and their respective heirs, administrators, executors, successors and assigns. The foregoing shall not authorize any assignment or transfer by Borrower, of any of its respective rights, duties or obligations hereunder, such assignments or transfers being expressly prohibited. Lender, however, may freely assign, whether by assignment, participation or otherwise, its rights and obligations hereunder, and is hereby authorized to disclose to any such assignee or participant (or proposed assignee or participant) any financial or other information in its knowledge or possession regarding any Loan Party or relating to the Indebtedness.

EXHIBIT NO. 2                                    EX. 2-020

8.06    <u>Participation</u>. Borrower expressly recognizes and agrees that Lender may sell to other lenders participations in the loans incurred by Borrower pursuant hereto. As security for the due payment and performance of all Indebtedness of Borrower to Lender under this Agreement and/or any other of the Loan Documents, whether now existing or hereafter arising, and to such lenders by reason of such participations, Borrower hereby grants to Lender and to such lenders a lien on and security interest in (i) any and all deposits or other sums at any time credited by or due from Lender and such lenders or either or any of them, to Borrower, whether in regular or special depository accounts or otherwise, (ii) any and all money, securities and other property of Borrower, and the proceeds thereof now or hereafter held or received by or in transit to Lender and such lenders or either or any of them, from or for Borrower whether for safekeeping, custody, pledge, transmission, collection or otherwise. Any such deposit, sums, monies, securities and other property may at any time be set-off, appropriated and applied by the Lender and by such lenders, or either or any of them, against any Indebtedness whether now existing or hereafter arising to Lender and to such lenders, or either or any of them, under this agreement or the Note or otherwise, whether or not such Indebtedness is then due or secured by any collateral or, if it is so secured, whether or not such collateral held by Lender or such lenders is considered to be adequate.

8.07    <u>Sale of Loan</u>. Lender may freely assign, whether by sale or transfer, all or any portion of its rights in and to all or any portion of the Indebtedness including the Note to any a third party or any Loan Party, including, but not limited to, a sale, transfer or assignment to any Guarantor, Grantor or other obligor on the Indebtedness.

8.08    <u>Election of Remedies</u>. Lender shall have all of the rights and remedies granted in the Loan Documents and available at law or in equity and these same rights and remedies shall be cumulative and may be pursued separately, successively, or concurrently against Borrower, any Guarantor, Grantor, other Loan Party or any collateral property covered under the Loan Documents, at the sole discretion of Lender.

8.09    <u>Indulgence</u>. No delay or failure of Lender in exercising any right, power or privilege hereunder or under any of the Loan Documents shall affect such right, power or privilege. Any single or partial exercise thereof shall not preclude any further exercise thereof.

8.10    <u>Amendment and Waiver</u>. No course of dealings by the Lender, its officers, employees, consultants, or agents in the exercise of any right hereunder, under the Note, or under any other of the Loan Documents shall operate as a waiver thereof. No amendment or waiver of any provision of any Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance(s) and for the specific time(s) and purpose(s) for which given.

8.11    <u>Severability</u>. In case any one or more of the obligations of any Loan Party under any Loan Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining obligations of such Loan Party shall not in any way be affected or impaired thereby, and such invalidity, illegally or unenforceability in one

EXHIBIT NO. 2                                     EX. 2-021

jurisdiction shall not affect the validity, legality or enforceability of the obligations of such Loan Party under any Loan Document in any other jurisdiction. Each term, covenant, and condition of this Agreement and/or any of the other Loan Documents shall be valid and enforceable to the fullest extent permitted by law.

8.12    <u>Reliance on and Survival of Various Provisions</u>.  All terms, covenants, agreements, representations and warranties of any Loan Party made in any Loan Document, or in any certificate, report, financial statement or other document furnished by or on behalf of any Loan Party in connection with any Loan Document shall be deemed to have been relied upon by Lender, notwithstanding any investigation heretofore or hereafter made by Lender or on Lender's behalf.  All representations and warranties of the Borrower herein or in the other Loan Documents and all covenants and agreements herein and in the other Loan Documents, shall survive until repayment in full of the Indebtedness.

8.13    <u>Execution of Loan Documents in Counterparts</u>.  Each original of the Loan Documents executed in connection with the Note including the Note may be executed as counterpart originals and may  contains multiple original signature pages and/or corresponding acknowledgments.  Two or more counterparts of any particular Loan Document may be executed and/or acknowledged and one or more of the multiple original signature pages from one counterpart of that particular Loan Document executed in connection with the Loan may be replaced by one or more original signature pages from other counterparts thereof, in order to produce fully executed counterparts, each of which shall be considered as an original, and all of which shall constitute the same agreement or document.

8.14    <u>Document Retention Policy</u>. Each undersigned Loan Party understands and agrees that (i) Lender's document retention policy may involve the imaging of executed Loan Documents including the Note, as well as other miscellaneous documents, papers, reports and other correspondence, and the destruction of the paper originals, and (ii) each undersigned Loan Party waives any right that any Loan Party may have to claim that the imaged copies of the Loan Documents (other than the Note) and other miscellaneous documents, papers and other correspondence related thereto are not originals.

8.15    **NOTICE UNDER SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE:**

**<u>AN AGREEMENT FOR A LOAN IN WHICH THE AMOUNT INVOLVED IN THE LOAN EXCEEDS $50,000.00 IN VALUE IS NOT ENFORCEABLE UNLESS THE AGREEMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE BOUND OR BY THAT PARTY'S AUTHORIZED REPRESENTATIVE.</u>**

**<u>THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT SUBJECT TO SUBSECTION (b) OF SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE SHALL BE DETERMINED SOLELY FROM THE WRITTEN LOAN DOCUMENTS, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THE LOAN DOCUMENTS.</u>**

EXHIBIT NO. 2                                    EX. 2-022

**THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

8.16　Captions. The captions, headings, and arrangements used in this agreement are for convenience only and do not in any manner affect, limit, amplify, or modify the terms and provisions hereof.

8.17　Form and Substance. All documents, certificates, insurance policies, and other items required to be executed and/or delivered to Lender, whether under this Agreement or under any of the other Loan Documents, shall be in form and substance satisfactory to Lender.

8.18　Borrower In Control. In no event shall Lender's rights and interests under the Loan Documents be construed to give Lender the right to control, or be deemed to indicate that Lender is in control of, the business, management or properties of Borrower or the daily management functions and operating decisions to be made by Borrower.

8.19　No Third Party Beneficiary. This Agreement is made for the sole protection and benefit of Borrower and Lender and is not intended for the protection or benefit of any other Person, and no other Person shall be deemed to have any privity of contract hereunder nor any right of action of any kind hereon, or be entitled to rely hereon to any extent whatsoever.

8.20　Number and Gender. Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. The duties, covenants, obligations, and warranties of each party defined as Borrower under this Agreement shall be joint and several obligations of each such Borrower.

8.21　References. The words "herein," "hereof," "hereunder" and other words of similar import when used in this Agreement refer to this Agreement as a whole, and not to any particular article, section or subsection.

8.22　Ambiguities. Borrower and Lender acknowledge that they were each represented by counsel or had the opportunity to be represented by counsel and waived such right in connection with this Agreement, that each of them and/or their respective counsel reviewed this Agreement to their satisfaction, that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, and that the language in all parts of this Agreement shall in all cases be construed as a whole and in accordance with its fair meaning.

8.23　Exhibits. The exhibits attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail; provided however, that any

attached metes and bounds description of the Land shall control over the summary description defining the Land herein.

8.24     <u>Time of the Essence</u>. Time is of the essence with respect to the dates, terms and provisions of this Agreement, and as to each and every other Loan Document executed in connection herewith.

8.25     <u>Independent Party</u>. It is mutually understood and agreed that Borrower is an independent party in the performance of all activities, functions, duties and obligations pursuant to this Agreement and the other Loan Documents, and that nothing contained in this Agreement or in any of the other Loan Documents is intended or shall be construed in any manner or under any circumstances whatsoever as creating or establishing the relationship of co-partners, a partnership or joint venture, or joint ownership between Lender and Borrower, or with any officers, employees, agents, brokers or contractors, for any purpose or in any manner whatsoever. Borrower hereby agrees not to represent to anyone that Borrower is an agent of Lender or has authority to act on behalf of Lender.

8.26     <u>Days and Deadlines</u>. As used in this Agreement, "*days*" shall mean and refer to calendar days. However, if a deadline falls or notice is required on a Saturday, Sunday, or a legal banking holiday, then the deadline or notice shall be extended to the next calendar day which is not a Saturday, Sunday, or a legal banking holiday. As may be used in this Agreement, the term "*Business Days*" means any day which is not a Saturday, Sunday, or a legal banking holiday.

8.27     **<u>GOVERNING LAW AND VENUE</u>. THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THE LOAN DOCUMENTS ARE DEEMED EXECUTED IN AND ARE PERFORMABLE BY EACH LOAN PARTY IN BELL COUNTY, TEXAS.** Any action or proceeding under or in connection with the Loan Documents against Borrower or any other party ever liable for payment of any sums of money payable on the Loan Documents may be brought in any state court located in Bell County, Texas, or in the federal court in Bell County, Texas. Borrower and each such other party hereby irrevocably: (i) submits to the nonexclusive jurisdiction of such courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.

EXHIBIT NO. 2      EX. 2-024

Executed in one more counterpart originals to be effective on the Effective Date defined on page 1 hereof.

WC TEAKWOOD PLAZA, LLC, a Delaware
limited liability company

By: WC Teakwood Plaza Mezz, LLC, a
Delaware limited liability company,
Manager

By: _____
Natin Paul, President

Address: 401 Congress Avenue, 33rd Floor
Austin, Texas 78701

FIRST STATE BANK CENTRAL TEXAS

By: _____
Printed Name: _____
Title: _____

Address: 6500 North Mopac Expressway,
Building One, Suite 1101
Austin, Texas 78731

EXHIBIT NO. 2                    EX. 2-025

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

   1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

   2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

ELECTRONICALLY RECORDED          2017066579

                    TRV     30     PGS

50  CUOT  17·298207·mm

## DEED OF TRUST, SECURITY AGREEMENT
## AND FINANCING STATEMENT

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL
PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE
FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS
AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN
THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR
DRIVER'S LICENSE NUMBER.

THE STATE OF TEXAS              §
                               §
COUNTY OF TRAVIS               §

WC TEAKWOOD PLAZA, LLC (herein called "Grantor"), for and in consideration of the indebtedness
hereinafter described, has granted, bargained, transferred, sold and conveyed, and by these presents does grant, bargain,
transfer, sell and convey, in trust, unto T. GERRY GAMBLE, TRUSTEE and unto Trustee's successors in this trust
and Trustee's substitutes and assigns (herein called "Trustee"), forever, for the use and benefit of the Beneficiary
(hereafter defined) all and singular the property hereinafter described situated in the County of TRAVIS, State of Texas,
to-wit:  (a)

> 3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS,
> BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION
> FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS
> OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY
> DESCRIBED BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND
> MADE A PART HEREOF FOR ALL PURPOSES (all such real property in this subsection (a)
> herein sometimes called the "Land");

(b) all rights, titles, interests, estates, reversions and remainders now owned or hereafter acquired by Grantor in and to
the Land and in and to all other properties covered hereby and all other lands now owned or hereafter acquired by
Grantor abutting, adjacent or contiguous to the Land; (c) all buildings and other improvements now or hereafter situated
on the Land and in and to the properties covered hereby (herein sometimes called the "Improvements"); (d) all rights,
titles and interests now owned or hereafter acquired by Grantor in and to all drainage easements, easements, licenses,
parking rights, streets and rights-of-way of every kind and nature adjoining, serving, belonging, appertaining or otherwise
affording access, ingress and or egress to or otherwise benefitting the Land whether now existing or hereafter arising and
all public or private utility connections thereto and all appurtenances, tenements, hereditaments, franchises, servitudes,
rights, ways, privileges and prescriptions thereto; (e) all goods, equipment, fixtures, manufactured housing, mobile
homes, furnishings, inventory, crops, other farm products, timber, shrubs, and any other vegetation, and any and all other
personal property of any kind or character defined in and subject to the applicable provisions of the Texas Business and
Commerce Code as now adopted and existing and as it may hereafter be amended or succeeded (herein called the
"Uniform Commercial Code") now owned or hereafter acquired by Grantor and now or hereafter affixed to, planted or
grown on, located on or within, or severed from the Land or the Improvements, and any and all personal property
purchased with a portion of the proceeds of the Note (hereinafter defined), regardless of the location of such property,
and all replacements thereof, substitutions therefor, additions thereto, and proceeds and products thereof, including
without limitation, all rights, titles and interests of Grantor now owned or hereafter acquired in and to any of such
personal property that may be subject to any title retention or security agreement superior in lien or security interest to
the lien or security interest of this Deed of Trust, Security Agreement and Financing Statement (herein called "Deed of
Trust"); (f) all rights and interests of Grantor now owned or hereafter acquired in and to (i) all development rights, rights
as declarant, all rights to enforce easements, covenants and restrictions that benefit the Land and or Improvements, and
all contracts, subcontracts, building permits, and plans and specifications relating to the Improvements and all deposits,
funds, accounts, contract rights, instruments, documents, general intangibles (including but not limited to, trademarks,
trade names and symbols used in connection therewith), contracts for deed, notes or chattel paper arising from or by
virtue of any transactions relating to the Land or the Improvements; (ii) all water rights, all right, title and interest of

JNG17\FSBCT\WCTEAKWD\17121DTv3.wpd
April 11, 2017 (1:02pm)                          1                              DEED OF TRUST

Grantor in and to any and all wastewater capacity reservations of any kind or character covering the Land or Improvements, issued or which may be issued by any governmental agencies having jurisdiction thereof, and all other rights relating to sewage treatment capacity, water capacity and utilities serving the Land or Improvements, including easements, agreements, usage rights and course of dealings concerning irrigation, drainage lines, sheet-flow, surface drainage, flood control, drainage facilities and detention ponds (said rights described in this subparagraph (ii) being collectively sometimes called "Utilities Rights"), permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Land or the Improvements; (iii) all proceeds and proceeds of proceeds arising from or by virtue of the sale, lease or other disposition of any of the real or personal property covered hereby; (iv) all proceeds and proceeds of proceeds (including premium refunds) payable or to be payable under each policy of insurance relating to the Land or the Improvements; and (v) all proceeds and proceeds of proceeds arising from the taking of all or any part of the Land or any rights appurtenant thereto, including, but not limited to, change of grade of streets, curb cuts or other rights of access, for any public or quasi-public use under any law, or by right of eminent domain, or by private or other purchase in lieu thereof (all of the items described in (e) and (f), inclusive, being herein called the "Goods"); and (g) without limiting the foregoing, any and all rights, royalties, rents, revenues, profits, benefits, leases, statutory landlord's liens, security interests, contracts, accounts, general intangibles (including but not limited to, trademarks, trade names and symbols used in connection therewith), money, instruments, chattel paper, insurance proceeds, documents, tenements, hereditaments and appurtenances now owned or hereafter acquired by Grantor and appertaining to, generated from, arising out of or belonging to any of the foregoing (all of the foregoing items described in (g) being herein called the "Intangibles" and all of the foregoing items described in (a) through (g), inclusive, being herein called the "Mortgaged Property"). All of the Goods which constitute tangible personal property shall be deemed to be part of and affixed to the Land for all purposes to the maximum extent permitted by law.

TO HAVE AND TO HOLD the Mortgaged Property, unto Trustee, and Trustee's successors in this trust, and Trustee's assigns, forever, to secure the payment of the Indebtedness (hereafter defined) and to secure the performance of the covenants, agreements, and obligations of the Grantor herein contained, and Grantor does hereby bind Grantor, and Grantor's respective heirs, personal representatives, successors and assigns, to warrant and forever defend the Mortgaged Property unto Trustee, and Trustee's successors and assigns, forever, against the claim or claims of all persons whomsoever claiming or to claim the same, or any part thereof.

## ARTICLE I. INDEBTEDNESS SECURED

I.01    This conveyance is made in trust, however, to secure and enforce the payment and performance of all of the following obligations (herein collectively called the "Indebtedness"):

A.      All sums due or to become due pursuant to that one certain promissory note (herein called the "Note"), of even date herewith, executed by WC TEAKWOOD PLAZA, LLC (sometimes also referred to herein as the "Borrower"), payable to the order of FIRST STATE BANK CENTRAL TEXAS (said party or any subsequent owner or holder of the Note being herein called "Beneficiary"), whose address is as specified below, in the original principal amount of SEVEN MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($7,600,000.00) bearing interest at the rate therein stated and finally maturing April 9, 2022, the Note providing that, if default occurs, the unpaid principal thereof and all accrued unpaid interest thereon may, at Beneficiary's option, be declared due and payable prior to the stated maturity thereof and providing further for the payment of attorneys' fees and other expenses of collection under certain circumstances;

B.      All funds advanced by Beneficiary to or for the benefit of Borrower and/or Grantor pursuant to the Loan Agreement ("Loan Agreement") of even date herewith by and between Borrower and Beneficiary; and

C.      All funds advanced by Beneficiary relating to costs or expenses that are Grantor's obligations hereunder and/or made to or for the benefit of Borrower and/or Grantor pursuant to any other document securing or relating to the Indebtedness or otherwise, and all other debts, obligations and liabilities of Grantor and/or Borrower to Beneficiary of whatever kind or character, whether now existing or hereafter arising, secured or unsecured, direct or indirect,

JNG17\FSBCT\WCTEAKWD\17121DTv3.wpd
April 11, 2017 (1:02pm)                              2                                    DEED OF TRUST

fixed or contingent, primary or secondary, whether then due, not due or past due, and whether joint or several or both, including, without limitation, all present and future debts, obligations and liabilities of Grantor and/or Borrower (i) as principal, surety, endorser, guarantor, accommodation party or otherwise, (ii) arising by virtue of open accounts, overdraft, operation of law or otherwise, (iii) as a member of any partnership, joint venture, company, firm, trust or other association, or (iv) payable to or in favor of third parties and hereafter acquired by Beneficiary with or without the knowledge, consent or insistence of Grantor and/or Borrower. The payment of all such debts, obligations and liabilities of Grantor and/or Borrower shall not terminate this Deed of Trust unless the lien created hereby is released in writing by Beneficiary, it being contemplated that Grantor and/or Borrower from time to time will become additionally indebted to Beneficiary, all of which indebtedness shall be secured by this Deed of Trust until the lien hereof is so released in writing by Beneficiary; and

D.    All renewals, rearrangements, modifications and extensions of any of the foregoing.

1.02    The Indebtedness shall be payable at the address specified in the Note or at such other place as Beneficiary from time to time may hereafter designate in writing; and, unless otherwise expressly provided in the instruments evidencing the Indebtedness, all portions of the Indebtedness shall bear interest from the due date thereof until paid at the same rate per annum as provided in the Note for interest accruing on past due amounts; provided however, in no event shall Beneficiary compute the interest in a manner that would cause Beneficiary to contract for, charge or receive interest that would exceed the maximum legal contract rate of interest that Beneficiary may charge.

1.03    All payments received by Beneficiary, whether designated as payments of principal or interest, shall be applied to the principal or interest of the Indebtedness or to expenses and liabilities provided for herein, or any combination of the foregoing, as directed by Beneficiary at Beneficiary's option, exercised in its sole discretion.

## ARTICLE II. COVENANTS OF GRANTOR

2.01    In order to secure payment of the Indebtedness, and performance of Grantor's obligations hereunder, Grantor covenants and agrees with Beneficiary and with Trustee as follows:

A.    Grantor shall pay or cause there to be paid when due all of the Indebtedness, together with the interest and all other charges accruing thereon and thereunder in accordance with the terms of the Note and all other instruments evidencing, securing or otherwise relating to the Indebtedness.

B.    Grantor represents and warrants that (1) Grantor has good and indefeasible title in fee simple to the Mortgaged Property, (2) unless otherwise herein provided and in Beneficiary's title insurance policy, the Mortgaged Property is free from restrictions, easements, outstanding mineral or royalty interests, liens and security interests, (3) the Land has legal and sufficient access, for its intended use, to a public roadway, either by direct access or by virtue of Grantor's rights in one or more easements, which are part of the Mortgaged Property, and (4) Grantor has full right and authority to make this conveyance. Grantor agrees to maintain and preserve Grantor's legal existence and all related rights, franchises and privileges. If Grantor is an entity other than an individual, Grantor shall not amend its Articles of Formation or other governing documents that govern the formation or operation of Grantor or change its name or identity without Beneficiary's prior written consent. For purposes hereof, the term "Articles of Organization" shall include, as they exist on the date hereof, (a) Grantor's Articles of Formation or Articles of Incorporation and By-Laws, if Grantor is a corporation, (b) Grantor's Partnership Agreement or Joint Venture Agreement, if Grantor is a general partnership or joint venture, (c) Grantor's Limited Partnership Agreement and Certificate of Limited Partnership or Certificate of Formation, if Grantor is a limited partnership or a registered limited liability partnership, (d) the Trust Agreement creating Grantor, if Grantor

is a trust or (e) Grantor's Articles of Organization, Articles of Formation, Company Agreement, Operating Agreement and/or and Regulations, if Grantor is a limited liability company.

C.      Grantor shall promptly obtain, pay for and deliver to Beneficiary and maintain insurance policies with proof of premiums paid for at least one year in advance providing extended coverage for all Improvements and other property covered by this Deed of Trust against damage by fire, lightning and such other risks as Beneficiary shall reasonably require, all in amounts reasonably required by Beneficiary, but in any event in an amount at least equal to the Indebtedness, but not exceeding 100% of full replacement cost of all Improvements and all other property covered by this Deed of Trust, such insurance to be written on a replacement cost form promulgated by the Texas State Board of Insurance and with insurers that are authorized to do business in Texas or an eligible surplus lines insurer, but in any event with companies approved by Beneficiary, with (1) loss made payable to Beneficiary pursuant to the standard mortgagee clause promulgated by the Texas State Board of Insurance, without contribution; and (2) provision that (a) each of said policies shall not be terminated, reduced or limited, regardless of any breach of the representations and agreements set forth therein, and (b) no such policy shall be cancelled, endorsed or amended to any extent unless the issuer thereof shall have first given Beneficiary at least thirty (30) days' prior written notice. If Grantor fails to furnish such policies, Beneficiary, at Beneficiary's option, may procure such insurance at Grantor's expense. All renewal and substitute policies of insurance shall be delivered to the office of Beneficiary, premiums paid for at least one year, at least fifteen (15) days before expiration of the insurance protection to be replaced by such renewal or substituted policies. In case of loss to the Mortgaged Property, so long as the Grantor is not then in default under the Loan Agreement, Beneficiary shall allow Grantor to use the proceeds for the repair of the Improvements or for the erection of new improvements in their place, but Beneficiary shall not be obligated to see to the proper application of any amounts so paid to Grantor. Except as provided for in the preceding sentence, in case of loss to the Mortgaged Property, Beneficiary, at Beneficiary's option, shall be entitled to receive and retain the proceeds of the insurance policies, applying the same toward payment of the Indebtedness in such manner as Beneficiary may elect, or at Beneficiary's option, Beneficiary may pay the same over wholly or in part to Grantor for the repair of the Improvements or for the erection of new improvements in their place, or for any other purpose satisfactory to Beneficiary, but Beneficiary shall not be obligated to see to the proper application of any amounts so paid to Grantor. If insurance proceeds are to be paid to Grantor for rebuilding, disbursement shall be made on such terms and subject to such conditions as Beneficiary may specify including those provided for in Section 2.01Y hereof; and any insurance proceeds in excess of the Indebtedness shall be refunded by Beneficiary to Grantor. Regardless of whether the insurance proceeds payable to Grantor are sufficient to pay the full costs of repair and restoration of the Mortgaged Property, except in the event Beneficiary elects to apply the insurance proceeds towards the payment of the Indebtedness as provided for herein, Grantor shall promptly commence and carry out the repair, replacement, restoration and rebuilding of any and all of the Improvements damaged or destroyed so as to return same, to the extent practicable, to the same form and condition as existed immediately prior to such damage to or destruction thereof, with such modifications or additions as may be required to comply with applicable laws, ordinances, rules and regulations of all governmental agencies having jurisdiction thereof. Grantor shall not permit or carry on any activity within or relating to the Mortgaged Property that is prohibited by the terms of any insurance policy covering any part of the Mortgaged Property or which permits cancellation of or increase in the premium payable for any insurance policy covering any part of the Mortgaged Property. In the event of a foreclosure of this Deed of Trust, the purchaser of the Mortgaged Property shall succeed to all the rights of Grantor, including any right to unearned premiums, in and to all policies of insurance assigned and delivered to Beneficiary pursuant to the provisions of this instrument. Regardless of the types or amounts of insurance required and approved by Beneficiary, Grantor shall assign and deliver to Beneficiary all

policies of insurance that insure against any loss or damage to the Mortgaged Property, as collateral and further security for the payment of the Indebtedness. Grantor also shall obtain and maintain in force and effect at Grantor's expense such liability and other insurance policies and protection as Beneficiary from time to time may require. Furthermore, if any portion of the Mortgaged Property is situated in an area, or is subsequently designated in an area, having special flood hazards (as defined in the Flood Disaster Protection Act of 1973, as amended from time to time, or any similar legislation), Grantor shall provide flood insurance to Beneficiary in an amount equal to the replacement cost of the improvements or the maximum amount of flood insurance available, whichever is the lesser.

D.  Grantor shall pay, prior to delinquency, all taxes, assessments, ground rents, maintenance charges, all other charges and impositions (herein called the "Impositions") now or hereafter assessed, levied or otherwise charged against the Mortgaged Property, or any part thereof, and shall promptly furnish proof, satisfactory in form and substance to Beneficiary, of such payment. Without the prior written express consent of Beneficiary, Grantor shall not be permitted to allow a third party or a property tax lender to finance the payment of ad valorem property taxes if any such related lien would result in a lien that is or is claimed to be superior to this Deed of Trust. Grantor shall not defer the collection of or payment of taxes on the Mortgaged Property, in the event deferral of such taxes is permitted under applicable law. In the event of the passage after date of this Deed of Trust of any law, ordinance, or regulation, deducting from the Mortgaged Property for the purposes of taxation any lien thereon, or changing in any way the laws now in force for the taxation of mortgages, deeds of trust, or indebtedness secured thereby, or the manner of the operation of any such taxes so as to affect the interest of Beneficiary, then and in such event, Grantor shall bear and pay the full amount of such taxes, unless the payment thereof by Grantor would be unlawful or if the payment thereof would constitute usury or render the Indebtedness wholly or partially usurious. If Grantor fails to pay any such taxes and assessments, Beneficiary may pay the same, together with all costs and penalties thereon, at Grantor's expense; provided, however, that if for any reason payment by Grantor or by Beneficiary of any such new or additional taxes would be unlawful or if the payment thereof would constitute usury or render the Indebtedness wholly or partially usurious, Beneficiary, at Beneficiary's option, may declare the unpaid Indebtedness with all accrued interest thereon to be immediately due and payable, or Beneficiary, at Beneficiary' option, may pay the amount or portion of such taxes which otherwise would render the Indebtedness unlawful or usurious, in which event Grantor shall concurrently therewith pay the remaining lawful and non-usurious portion or balance of said taxes. Grantor represents and warrants that Grantor has paid all ad valorem property taxes ("Ad valorem Taxes") that are assessed or assessable against all property that Grantor owns or has an interest in which are taxable by the State of Texas or any taxing unit thereunder under the Texas Tax Code, whether said property is real, personal, mixed, tangible or intangible (the "Taxable Assets"), regardless of whether the Taxable Assets are pledged or assigned as collateral to Beneficiary. Grantor will pay all Ad valorem Taxes on the Taxable Assets before they are past due. Upon demand by Beneficiary, Grantor shall provide to Beneficiary, on or before January 31st in each year, written evidence in form and content satisfactory to Beneficiary of payment of all Ad valorem Taxes (and any and all related interest, penalties, court costs, and fees imposed by the taxing units) against Grantor's Taxable Assets and an accurate listing of all tax account numbers for all applicable taxing units which pertain to any of the Taxable Assets. Grantor represents and warrants to Beneficiary that all exemptions claimed by Grantor against any of the Ad valorem Taxes are valid exemptions under Texas law. Grantor represents and warrants to Beneficiary that Grantor has properly and accurately rendered for taxation all Taxable Assets and has filed all required rendition statements and property reports required by the Texas Tax Code. Grantor agrees that Grantor's execution of this document shall evidence Grantor's authority that any such rendition statements and/or property reports may be made available to Beneficiary by any applicable appraisal district or taxing unit.

E.     Grantor represents to Beneficiary that to Grantor's knowledge and belief no eminent domain proceedings affecting the Mortgaged Property or any part thereof are pending or threatened, nor has Grantor received notice of any proposed condemnation or other like proceeding affecting the Mortgaged Property, and no part of the Mortgaged Property has been transferred in lieu of condemnation or other like proceeding, and no Certificate of Taking for a limited or indefinite term has been issued with respect to the Mortgaged Property. In the event Grantor acquires knowledge or notice that any entity (public or private) having the right of eminent domain (herein called a "Condemning Authority") may or does intend to acquire or has threatened to institute or has instituted condemnation proceedings to acquire the Mortgaged Property, any part thereof or any interest therein, Grantor shall promptly give Beneficiary written notice of full details with regard thereto. Beneficiary shall be notified of, and, if the condemnation proceeds are anticipated to exceed $750,000.00, have the right to participate in all negotiations with any Condemning Authority and Grantor shall not grant to any Condemning Authority any right, title or interest in or to the Mortgaged Property or any part thereof (in lieu of eminent domain or condemnation proceedings or otherwise), if the condemnation proceeds are anticipated to exceed $750,000.00, without the prior written consent of Beneficiary to, and the joinder of Beneficiary with Grantor in, any such grant. Grantor has transferred and assigned, and does hereby transfer and assign unto Beneficiary (i) the full amount of and right to receive and be paid the full amount of all consideration and, or, damages for injury or damage to the Mortgaged Property paid or to be paid by any Condemning Authority for and, or, by virtue of the grant, in lieu of eminent domain or condemnation proceeding, of any right, title or interest in the Mortgaged Property, and (ii) all judgments, decrees and awards or payments for the taking of and, or, for injury or damage to the Mortgaged Property (including but not limited to all awards and judgments pursuant to any condemnation proceedings), including interest thereon. Beneficiary shall apply all sums actually paid to and received by Beneficiary pursuant to any such grant, judgment, decree or award first to reimbursement of all costs and expenses (including but not limited to attorneys' fees) incurred by Beneficiary in connection with any such matters, and the balance shall be applied to the Indebtedness in such manner as Beneficiary may elect, subject to the terms hereof. Beneficiary shall have the right, if the condemnation proceeds are anticipated to exceed $750,000.00, to participate in any such condemnation proceedings and Beneficiary is hereby authorized, in the name of Grantor, to direct the conduct of any such proceedings, compromise and settle any such proceedings and, or, to execute and deliver valid satisfactions of, and to appeal from, any award, judgment or decree in any such condemnation proceeding. In case of condemnation awards with respect to the Mortgaged Property, so long as the Grantor is not then in default under the Loan Agreement, Beneficiary shall allow Grantor to use the proceeds for the repair of the Improvements or for the erection of new improvements in their place, but Beneficiary shall not be obligated to see to the proper application of any amounts so paid to Grantor. Except as provided for in the preceding sentence, in case of condemnation awards with respect to the Mortgaged Property, Beneficiary, at Beneficiary's option, shall be entitled to receive and retain the condemnation awards, applying the same toward payment of the Indebtedness in such manner as Beneficiary may elect, or at Beneficiary's option, Beneficiary may pay the same over wholly or in part to Grantor for the repair of the Improvements or for the erection of new improvements in their place, or for any other purpose satisfactory to Beneficiary, but Beneficiary shall not be obligated to see to the proper application of any amounts so paid to Grantor. If the proceeds of any grant in lieu of threatened condemnation or condemnation proceedings are to be paid to Grantor to be used in rebuilding, restoration or repair of the Mortgaged Property, then the disbursement of such proceeds shall be on such terms and subject to such conditions as Beneficiary may specify including those provided for in Section 2.01Y hereof. In the event that as a result of any grant in lieu of threatened condemnation or of any such judgment, decree or award and notwithstanding application by Beneficiary of the proceeds thereof in any manner herein provided, Beneficiary nevertheless determines that the payment of the Indebtedness or performance of any obligations under this Deed of Trust

EXHIBIT NO. 3                              EX. 3-006

is impaired, Beneficiary, without demand, notice or presentment to Grantor, may declare all of the Indebtedness immediately due and payable.

F.  Grantor shall keep every part of the Mortgaged Property maintained in at least its current condition and presenting a first-class appearance, make promptly all repairs, renewals and replacements necessary to such end, prevent waste to any part of the Mortgaged Property, and do promptly all else necessary to such end; and Grantor shall promptly discharge all claims for labor performed and material furnished therefor, and shall promptly discharge or bond over any lien of mechanics or materialmen therefor to attach to any part of the Mortgaged Property. Grantor shall guard every part of the Mortgaged Property from removal, destruction and damage, and shall not do or suffer to be done any act whereby the value of any part of the Mortgaged Property may be lessened. No building, improvement or other property now or hereafter covered by the lien or security interest of this Deed of Trust shall be removed, demolished or materially altered or enlarged, nor shall any new building or other improvements be constructed, without the prior written consent of Beneficiary. Grantor shall not release, modify or allow to terminate any easement that benefits the Mortgaged Property, and shall not initiate, join in, or consent to any change in any private restrictive covenants, zoning ordinances or other public or private restrictions limiting or defining the uses that may be made of the Mortgaged Property or any part thereof without the prior express written consent of Beneficiary which consent shall be unreasonably withheld, delayed or conditioned. Grantor at all times shall comply with and perform all obligations and maintain the Mortgaged Property in compliance with, and shall not cause or permit the Mortgaged Property to be in violation of any obligation imposed by any applicable environmental, air quality, water, zoning, planning, building, health, fire, traffic, safety, wetlands, endangered species, coastal and other governmental or regulatory rules, laws, statutes, regulations, ordinances and restrictive covenants relating to the Mortgaged Property (collectively the "Applicable Governmental Law") and the existence, use and operation thereof. Grantor represents and warrants to Beneficiary that the Mortgaged Property does currently comply with and its intended use shall comply fully with (and no notices of violation have been received in connection with) Applicable Governmental Law with respect to the Mortgaged Property. Grantor represents and warrants to Beneficiary that zoning approval (if applicable) for the Property is not dependent upon the ownership or use of any other property or rights which are not included within the definition of the Property and covered by this Deed of Trust. In the event Grantor discovers any previously unknown or undiscovered violation of Applicable Governmental Law, Grantor shall immediately notify Beneficiary in writing and Grantor shall immediately take any such corrective action as may be necessary to bring the premises into compliance with Applicable Governmental Law. Beneficiary and Beneficiary's agents or representative shall have access to the Mortgaged Property at all reasonable times upon reasonable notice in order to inspect same and verify Grantor's compliance with Grantor's duties and obligations under this document. Grantor shall not, without the prior written consent of Beneficiary, engage in or permit any mining or drilling activities on the Land.

G.  If, without the prior written consent of Beneficiary, which consent may be given or withheld by Beneficiary in the exercise of its sole and absolute discretion, (a) all or any part of the Mortgaged Property, or any interest therein, is sold, transferred or otherwise conveyed, or (b) any contract or instrument for the sale, transfer or conveyance of all or any part of the Mortgaged Property, or any legal, equitable, beneficial or other interest therein, is entered into, or (c) [intentionally deleted], or (d) any lien or encumbrance is hereafter created or arises covering all or any part of the Mortgaged Property, or any interest therein (including but not limited to a tax lien or transfer of a tax lien as contemplated by Texas Tax Code Chapter 32, or as allowed to property tax lenders under Texas Finance Code Chapter 351), or all or any part of the Mortgaged Property, or any interest therein, is hereafter pledged or encumbered in any manner, or (e) any easement, right-of-way or any other right whatsoever with respect to the Mortgaged Property (excluding leasing activity occurring as a result of

JNG17\FSBCT\WCTEAKWD\\17121DTv3.wpd
April 11, 2017 (1:02pm)                            7                            DEED OF TRUST

the exercise of sound business judgment of Grantor and in accordance with local market leasing standards), is hereafter created or granted, or released, modified or allowed to terminate, or (f) all or any portion of the Mortgaged Property, or any interest therein, is leased or possession thereof is transferred, for any purpose, including, without limitation, one or more oil, gas or other mineral leases, for a period longer than one (1) year (excluding leasing activity occurring as a result of the exercise of sound business judgment of Grantor and in accordance with local market leasing standards) (any of the above being hereinafter called a "Transfer" or collectively "Transfers"), and irrespective of whether any such Transfers are done directly or indirectly, voluntarily or involuntarily, by written instrument (whether or not filed for record), by operation of law or otherwise, then Beneficiary may, at its option, declare all or any part or parts of the Indebtedness immediately due and payable, and Beneficiary shall be entitled to exercise any and all rights and remedies provided under this Deed of Trust and under any other document securing payment of the Indebtedness or executed in connection therewith. Grantor shall immediately notify Beneficiary in writing of any Transfer (herein called "Transfer Notice") by certified mail, postage prepaid, return receipt requested, addressed to Beneficiary at the address set out herein (or to such other address as Beneficiary may have designated by notice to Grantor) or by any other method of notice in accordance with Article VIII of the Loan Agreement. The consent of Beneficiary to any Transfer may be given or withheld for any reason in the exercise of Beneficiary's sole and absolute discretion, unless in connection with the Transfer all of the Indebtedness as determined by Beneficiary shall be paid in full. Without limiting the foregoing or being limited thereby, Beneficiary's consent (1) may be withheld even though the Transfer will not (i) jeopardize or impair the security for the Indebtedness or Beneficiary's ability or right to enforce its liens and security interests against such security, or (ii) increase the risk of default in the payment of Indebtedness hereunder, or (iii) increase in the likelihood that Beneficiary may have to resort to other collateral for the payment of the Indebtedness, or (iv) release or discharge any person or party liable, directly or indirectly, for the payment of the Indebtedness, and (2) may be conditioned upon, any one or more of, (a) an increase in the rate of interest payable on the Indebtedness or any part thereof to a rate acceptable to Beneficiary or the rearrangement or acceleration of the payment of the Indebtedness or any part thereof, (b) the payment to Beneficiary of a transfer fee, in an amount determined by Beneficiary, and all costs and expenses, including, without limitation, attorneys' fees, incurred by Beneficiary in connection with the Transfer or the giving of its consent, (c) the assumption or guarantee of the Indebtedness or any part thereof, by any party determined by Beneficiary to be necessary or desirable, (d) the payment of any part of the Indebtedness whether then otherwise due or not and regardless of whether the payment source would be from Grantor, Borrower, any other person liable for the Indebtedness or from any or all proceeds from the Mortgaged Property, (e) the pledge of additional collateral to secure the payment thereof, or (f) the amendment, modification, rearrangement or other change in any of terms and provisions of any document evidencing the Indebtedness, or any part thereof, or in any of the terms and provisions of any document securing the payment of the Indebtedness or any part thereof. The option of Beneficiary may be exercised at any time after the occurrence of the Transfer and until one (1) year after receipt by Beneficiary of said Transfer Notice; and if no such Transfer Notice is received by Beneficiary, then there shall be no limitation on the period of time within which Beneficiary may exercise said option.

H.    In the event the ownership of the Mortgaged Property or any part thereof becomes vested in a person other than Grantor, Beneficiary, at Beneficiary's option, may deal with such successor or successors in interest with reference to this Deed of Trust, the Mortgaged Property and the Indebtedness in the same manner and to the same extent as with Grantor, without in any way vitiating or discharging Grantor's liability hereunder or upon the Indebtedness. No sale of the Mortgaged Property and no forbearance on the part of Beneficiary, or extension of the time for the payment of the Indebtedness, shall operate to release, discharge, modify, change or affect, either in whole or in part, any liability of

EXHIBIT NO. 3                    EX. 3-008

Grantor or the liability of any guarantors or sureties of Grantor or of any other party liable for payment of the Indebtedness.

I.  In the event any part of the Indebtedness is not secured by this Deed of Trust, all payments hereafter made by Grantor or any other person shall be applied first to the part of the Indebtedness not so secured until such part is paid in full. In the event any lien or security interest securing part of the Indebtedness does not cover or apply to all of the Mortgaged Property, then all payments paid hereunder by Grantor or any other person shall be applied first to the part of such Indebtedness which is not secured by all of the Mortgaged Property and then to that part which is so secured by all of the Mortgaged Property.

J.  Grantor hereby unconditionally and presently assigns to Beneficiary all presently owing or future rents, royalties, issues, profits, revenue, income and other benefits derived or arising from (i) the Mortgaged Property, or (ii) the use or enjoyment of any portion thereof or interest therein, or (iii) any lease or agreement pertaining thereto (all of which being collectively hereinafter called "Rents and Profits"), such assignment being upon the following terms; (a) until receipt from Beneficiary of notice of the occurrence of a Default (as defined herein), each lessee may pay Rents and Profits directly to Grantor, but after Default Grantor covenants to hold all Rents and Profits so paid in trust for the use and benefit of Beneficiary; (b) upon receipt from Beneficiary of notice that a Default exists, each lessee is hereby authorized and directed to pay directly to Beneficiary all Rents and Profits thereafter accruing; and the receipt of Rents and Profits by Beneficiary shall be a release of such lessee's obligation to pay Rents and Profits to the extent of all amounts so paid; (c) Rents and Profits so received by Beneficiary shall be applied by Beneficiary first to the expenses, if any, of collection and then in accordance with Section 1.03 of this Deed of Trust; (d) without impairing its rights hereunder, Beneficiary may, at its option, at any time and from time to time, release to Grantor Rents and Profits so received by Beneficiary, or any part thereof; (e) Beneficiary shall not be liable for its failure to collect, or its failure to exercise diligence in the collection of Rents and Profits, but shall be accountable only for Rents and Profits that it shall actually receive; and (f) the assignment contained in this Section 2.01 J. shall terminate upon the release of this Deed of Trust by Beneficiary, but no lessee shall be required to take notice of termination until a copy of such release shall have been delivered to such lessee. As between Beneficiary and Grantor, and any person claiming through or under Grantor, other than any lessee who has not received notice of Default pursuant to Section 2.01 J. (b), the assignment contained in this Section 2.01 J. is intended to be unconditional and presently effective and the provisions of Sections 2.01 J. (a) and 2.01 J. (b) are intended solely for the benefit of each lessee and shall never inure to the benefit of the Grantor or any person claiming through or under Grantor, other than a lessee who has not received such notice. It shall never be necessary for Grantor to institute legal proceedings of any kind whatsoever to enforce the provisions of this Section 2.01 J. No reference in this 2.01 J to leases or rents shall be deemed to allow any Transfer in violation of Section 2.01 G of the Deed of Trust.

K.  In addition to the foregoing, on any such Default, Beneficiary shall also have the right, but no obligation (i) either directly or through an action for forcible entry and detainer or other legal action, to take exclusive possession of the Mortgaged Property, remove all persons and property therefrom without being guilty of trespass or incurring any liability to Grantor or Grantor's tenants or assigns, (ii) rent the same for the account of Grantor, and employ such agents and attorneys as Beneficiary may deem necessary with respect thereto, and (iii) take possession of all books and records of Grantor that relate to the Mortgaged Property or any part thereof. Further, on any such Default, Beneficiary shall have the right, but no obligation, to have a receiver appointed to take possession of the Mortgaged Property and to collect the Rents and Profits, all without any notice to Grantor and without regard to the solvency or insolvency of Grantor or any other person liable for any part of the Indebtedness and without any showing as to the inadequacy of the Mortgaged Property as security. Beneficiary, or

EXHIBIT NO. 3                                    EX. 3-009

Beneficiary's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Mortgaged Property before or after giving notice of default to Grantor. However, Beneficiary, or Beneficiary's agents or a judicially appointed receiver, may do so at any time when a default occurs. The rights provided for in this Section 2.01, are cumulative of all other rights of Beneficiary, including those under Texas Property Code Chapter 64 and any separate Assignments of Rents, and no action of Beneficiary hereunder shall in any way minimize, subordinate or affect in any way the liens, security interests or rights or remedies hereunder of Beneficiary or any rights of a purchaser of the Mortgaged Property at a sale hereunder. Beneficiary shall not be deemed to be a mortgagee in possession prior to taking possession of the Mortgaged Property and shall not be obligated to perform or discharge any obligation of Grantor under any lease or other agreement, appear in or defend any action or proceeding relating to the same or the Mortgaged Property, to take any action hereunder, or to expend any money, incur any expenses or perform or discharge any obligation, duty or liability under any lease or other agreement, or assume any obligation or responsibility for any security or other deposit delivered to Grantor by any lessees and not delivered to Beneficiary, nor shall Beneficiary be liable in any way for any injury or damage to any person or property sustained by any person, or other legal entity in or about the Mortgaged Property; and Grantor hereby agrees to indemnify Beneficiary and hold Beneficiary harmless against and from any and all liability, loss or damage which Beneficiary may or might incur under any lease or other agreement or under or by reason of this Deed of Trust and of and from any and all claims and demands whatsoever which may be asserted against Beneficiary by reason of any alleged obligation or undertaking on its part to perform or discharge any of the terms of any lease or other agreement (excluding Beneficiary's gross negligence and willful misconduct); and should Beneficiary incur any such liability, loss or damage under any lease or other agreement or under or by reason of this Deed of Trust, or in defense against any such claims or demands, the amount thereof, including all costs, expenses and reasonable attorneys' fees, together with interest thereon at the maximum lawful rate of interest permitted by applicable law, shall be secured hereby, and Grantor shall reimburse Beneficiary therefor immediately upon demand.

L.      Grantor will not, without Beneficiary's consent, (i) execute an assignment of any of its right, title or interest in the Rents and Profits, or (ii) unless required to do so by the terms of the lease, terminate or consent to the cancellation or surrender of any lease of the Mortgaged Property or any part thereof, now or hereafter existing; provided however, Grantor may terminate a lease as a result of Beneficiary's election to apply insurance or condemnation proceeds towards the Indebtedness from a loss or taking that directly affects the leased premises with respect to that lease, (iii) modify any lease of the Mortgaged Property or any part thereof so as to reduce the unexpired term thereof, to decrease the amount of rent payable thereunder, or release or discharge, in whole or in part, the lessee or any guarantor of lessee's liability under the lease from any obligation under the lease, or (iv) accept prepayment of any installments of rent to become due under any of such leases in excess of one month, except prepayments in the nature of security for the performance of the lessee thereunder, or (v) in any other manner impair the value of the Mortgaged Property or the security of this Deed of Trust. Grantor shall not execute any lease of all or any portion of the Mortgaged Property except for leases that contemplate actual occupancy by the lessee thereunder, and will at all times promptly and faithfully perform, or cause to be performed, each covenant, condition and agreement contained in each lease of the Mortgaged Property now or hereafter existing, on the part of lessor thereunder to be kept and performed. Grantor shall furnish to Beneficiary, within ten (10) days after a request by Beneficiary to do so, a written statement containing the names of all lessees of the Mortgaged Property, the terms of their respective leases, the space occupied and the rentals payable thereunder, and such other information relative to such lessees and leases as Beneficiary may request, together with copies of any and all written leases then existing which affect or pertain to the Mortgaged Property.

EXHIBIT NO. 3                                          EX. 3-010

M.   To the extent that any advance of funds by Beneficiary is used to pay any indebtedness secured by an outstanding lien, security interest, charge or encumbrance against the Mortgaged Property or any part thereof, such funds have been advanced by Beneficiary at Grantor's request, shall constitute a part of the Indebtedness, and Beneficiary shall be subrogated to any and all rights, power, equities, liens and security interests owned or granted to any owner or holder of such indebtedness, irrespective of whether said security interests, liens, charges or encumbrances are transferred to Beneficiary or are released of record.

N.   Grantor agrees that Grantor shall execute and deliver such other and further documents and do and perform such other acts as may be reasonably necessary and proper in Beneficiary's judgment to carry out the intention of the parties as herein expressed and to effect the purposes of this Deed of Trust and the loan transaction referred to herein. Without limitation of the foregoing, Grantor agrees to execute and deliver such documents as may be necessary to cause the liens and security interests granted hereby to cover and apply to any property placed in, on or about the Mortgaged Property in addition to, or replacement or substitution for, any of the Mortgaged Property, and to execute and deliver such documents requested by Beneficiary as Beneficiary may deem necessary or desirable to transfer to Beneficiary the Utilities Rights.

O.   In order to further secure the Indebtedness, Grantor shall pay to Beneficiary, upon Beneficiary's request, in addition to all amounts of principal, interest and other sums required to be paid by the terms of the Note, this Deed of Trust or any other instruments evidencing, securing or otherwise relating to the Indebtedness, on the first day of each calendar month hereafter until the Indebtedness shall be paid in full, a sum determined from time to time by Beneficiary to be equal to 1/12th of (i) all Impositions, as herein defined, and (ii) all premiums for insurance required to be maintained in force and effect by Grantor pursuant to the foregoing terms hereof. Beneficiary shall not be required to post any bond for any such amount so deposited with it by Grantor and shall not be required to pay any interest or other compensation for or on account of any such sums so deposited with it. Likewise, Beneficiary shall not be liable for any failure to pay any such taxes or other charges or premiums for which deposit has been made with it pursuant to the foregoing provisions. Beneficiary may use and invest any such sums so deposited with it without any duty or obligation to compensate Grantor for the use thereof or for any profit or benefit therefrom realized by Beneficiary. If the amount of the deposits paid to Beneficiary are insufficient to pay all of the Impositions and insurance premiums as and when same become due, Beneficiary may, but shall have no obligation to notify Grantor of the amount of such deficiency and, if so notified, Grantor shall deposit the full amount necessary to satisfy such deficiency with Beneficiary within five (5) days after its receipt of such notice of deficiency. Any sale and conveyance of the Mortgaged Property shall serve as a transfer by Grantor to the grantee of the Mortgaged Property of all of its rights to any sums then held by Beneficiary pursuant to the terms of this paragraph. Beneficiary shall have the right, at its option and without being required to do so, to advance its own funds for the purpose of paying any of the Impositions or insurance premiums, and any such amounts so paid shall bear interest from the date advanced at the maximum lawful rate of interest permitted by applicable law, now or hereafter mentioned, until the full amount thereof shall be paid in full and all such sums so advanced shall constitute a part of the Indebtedness and shall be secured by this Deed of Trust. Grantor hereby grants to Beneficiary a security interest in and right of setoff against any and all funds so held by Beneficiary in order to additionally secure the payment and performance of the Indebtedness and Grantor's observance of the covenants in this Deed of Trust and any other instruments securing the payment of the Indebtedness or relating thereto, and Beneficiary shall be entitled, at any time and without notice, demand or presentment to Grantor, to set off all or any part of such funds in said account against any sums then due and payable on the Indebtedness in such manner, order or priority, as determined by Beneficiary. In the event of a Default resulting in foreclosure, such conversion of such amounts so

deposited with Beneficiary to the exclusive and sole ownership of Beneficiary shall be automatic without the necessity of any action on the part of the Beneficiary.

P. Grantor shall keep proper books and records of accounts in accordance with generally accepted accounting principles, or other comprehensive basis of accounting, applied on a consistent basis, except as may be disclosed in the footnotes to such financial statements. Beneficiary shall have the right to examine the books of account of the Grantor, to discuss the affairs, finances and accounts of the Grantor and also the Mortgaged Property and Grantor's operation thereof, and to be informed as to the same by Grantor's officers or other duly authorized representatives, all at such times designated by Beneficiary. Grantor shall further furnish from time to time to Beneficiary, upon request, copies of balance sheets of Grantor, copies of statements of income and retained earnings of Grantor, and copies of statements of changes in financial position of Grantor, covering such periods of time and containing such reasonable detail as Beneficiary shall from time to time request, prepared and\or certified by a person or firm acceptable to Beneficiary.

Q. Grantor represents and agrees that if Grantor is an individual, no part of the Mortgaged Property constitutes or shall constitute any part of Grantor's business, residential, urban or rural homestead.

R. Grantor, at any time and from time to time, shall furnish promptly upon request, a written statement or affidavit, in such form as may be required by Beneficiary, stating the unpaid balance of the Note and that there are no offsets or defenses against full payment of the Note and performance of the terms hereof or of any document securing payment of the Note or executed in connection therewith, or if there are any such offsets and defenses, specifying them in reasonable detail.

S. Grantor shall comply with all laws, ordinances, rules and regulations of all governmental or quasi-governmental agencies relating to the Mortgaged Property or any part thereof and shall secure and maintain in full force and affect all contracts, franchises, permits and licenses necessary or desirable for the construction and/or the efficient operation of the Improvements and/or business conducted on the Mortgaged Property.

T. Grantor shall reimburse Beneficiary and Trustee for all reasonable attorneys' fees and other reasonable out-of-pocket costs and expenses of any kind which either of them may incur in connection with any collection, foreclosure or any legal proceedings or matters related to the Indebtedness including, but not limited to collection, judicial or non-judicial foreclosure, condemnation proceedings, probate proceedings or bankruptcy proceedings and reasonable out-of-pocket costs incurred relating to appraisals, environmental reports, inspection reports, title searches, ad valorem property taxes and insurance.

U. Grantor shall not, without the prior written consent of Beneficiary, engage in or permit any person to conduct geologic and geophysical surveys, or investigate, explore, prospect, drill, mine for or produce, store, treat or transport oil, gas and all other minerals or engage in activities related thereto on the Land.

V. Grantor hereby agrees that Beneficiary shall be entitled to obtain at any time, and from time to time, when deemed appropriate by Beneficiary (but no more frequently than annually if there is no default), a current appraisal of the Mortgaged Property from an appraiser acceptable to Beneficiary. The appraisals shall be at the sole cost and expense of Grantor.

W. The terms "hazardous waste", "hazardous substance", "disposal", "release", and "threatened release", as used in this Deed of Trust, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and

JNG17\FSBCT\WCTEAKWD\17121DTv3.wpd
April 11, 2017 (1:02pm)                          12                                    DEED OF TRUST

Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. Section 6901, et. seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos. Grantor represents and warrants to Beneficiary that: (a) during the period of Grantor's ownership of the Mortgaged Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, or about the Mortgaged Property; (b) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Beneficiary in writing, (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance by any prior owners or occupants of the Mortgaged Property or (ii) any actual litigation or litigation threatened in writing or written claims of any kind by any person relating to such matters; and (c) except as previously disclosed to and acknowledged by Beneficiary in writing, (i) neither Grantor nor any tenant, contractor, agent or other authorized user of the Mortgaged Property shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, or about the Mortgaged Property and (ii) should any such activity occur, it shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation those laws, regulations, and ordinances described above. Grantor further represents and warrants to Beneficiary that Grantor has no knowledge of or reason to believe that there have been or currently are any underground storage tanks located under the Mortgaged Property. Grantor authorizes Beneficiary and its agents to enter upon the Mortgaged Property to make such inspections and tests as Beneficiary may deem appropriate, from time to time, to determine compliance, or the continued compliance of the Mortgaged Property with this section of this Deed of Trust or to verify the then current environmental condition of the Mortgaged Property. Any inspections or tests made by Beneficiary shall be at Grantor's sole cost and expense and shall be for Beneficiary's purposes only and shall not be construed to create any responsibility or liability on the part of Beneficiary to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Mortgaged Property for hazardous waste. Grantor hereby (a) releases and waives any future claims against Beneficiary for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Beneficiary against any and all claims, losses, liabilities, damages, penalties, and expenses which Beneficiary may directly or indirectly sustain or suffer resulting from a breach of this section of this Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to or during Grantor's ownership or interest in the Mortgaged Property, whether or not the same was or should have been known to Grantor. The provisions of this section of this Deed of Trust, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and release of the lien of this Deed of Trust and shall not be affected by Beneficiary's acquisition of any interest in the Mortgaged Property, whether by foreclosure or otherwise.

X.     Grantor represents and warrants to Beneficiary that during Grantor's ownership of the Mortgaged Property neither Grantor nor any other person has committed any act or omission, or has consented to any act or omission, with respect to the Mortgaged Property, which would afford the federal government or any state or local government the right or remedy of forfeiture of all or any part of the Mortgaged Property, any other collateral securing the Note or the Indebtedness described herein, or any property (including but not limited to money paid) delivered to Beneficiary or any other party in performance of Grantor's obligations arising in connection with the Indebtedness, or any interest in or income, profits or proceeds of any of the property described in this sentence (the Mortgaged Property and such property, income, profits or proceeds collectively in this paragraph being referred to as the "Assets").

EXHIBIT NO. 3                                    EX. 3-013

Grantor agrees not to engage in any act or permit any act or omission to exist which would afford the federal government or any state or local government the right or remedy of forfeiture of all or any part of the Assets. Without limiting the generality of the preceding sentence, the filing of any charges or the commencement or threatened commencement of any proceeding against Grantor or any other person liable on the Indebtedness, or against any of the Assets or anyone having an interest in, or use or possession of any of the Assets, which allows or could afford the federal government or any state or local government the right or remedy to forfeit any of such Assets, shall constitute, at Beneficiary's election, an event of default under this Deed of Trust and all Indebtedness described herein and secured hereby. Grantor shall protect, indemnify and hold harmless Beneficiary, its directors, officers, employees, agents, attorneys, successors and assigns from and against any and all loss, damage, cost, expense or liability (including attorneys fees and costs) directly or indirectly arising out of or attributable to any failure of the representations or breach of any agreement set forth in this paragraph.

Y.   After the happening of (a) any casualty to the Mortgaged Property or any part thereof or (b) the taking of any portion of the Mortgaged Property either under condemnation or eminent domain or through settlement in lieu of proceedings under the power of eminent domain (said clauses (a) and (b) being referred to in this Section 2.01 Y as a "Loss"), Grantor shall give prompt written notice of the Loss to Beneficiary. Notwithstanding any provision in this Deed of Trust to the contrary, Beneficiary shall make the proceeds of insurance relating to a casualty loss or Grantor's portion of the award paid in condemnation or eminent domain or in settlement in lieu thereof (all such proceeds and awards being hereinafter referred to in this Section 2.01 Y as the "Proceeds") available to Grantor to pay all or a portion of the costs of repair or restoring the Mortgaged Property to as nearly as practicable to the condition of the Mortgaged Property immediately preceding the Loss, provided that such funds shall be made available to Grantor only on compliance with the following conditions (collectively, the "Required Conditions"): (i) within ninety (90) days of a Loss, Grantor shall notify Beneficiary of Grantor's intention to use the Proceeds to repair or restore the Mortgaged Property to as nearly as practicable their condition immediately prior to the Loss; (ii) no Event of Default hereunder or under the Note or any other Loan Documents shall otherwise have occurred and be continuing; (iii) Beneficiary shall have determined, in its reasonable judgment, that sufficient funds (including the Proceeds) are available or committed on terms reasonably satisfactory to Beneficiary to complete and pay for the restoration and repair of the Mortgaged Property in accordance with all then applicable building code requirements and such funds (including the Proceeds) shall be delivered to and held by Beneficiary during the course of such repair and restoration for administration in accordance with the provisions of the Loan Agreement and this Section 2.01 Y; (iv) Grantor shall furnish to Beneficiary plans and specifications for the repair or restoration of the Mortgaged Property in form reasonably satisfactory to Beneficiary; (v) business interruption or rent loss insurance or other funds available to Grantor shall be dedicated and sufficient to pay during the period required to restore or repair the Mortgaged Property the required payments of principal of and interest on the Note and all unabated operating expenses of the Mortgaged Property; (vi) compliance by Grantor under the terms of any lease which is affected by the Loss; (vii) the repair and restoration must be able to be completed no later than 90 days prior to the maturity date of the Note; (viii) the Loss must not allow any of the retail tenants nor any office tenant to terminate its lease; and (ix) the general contractor selected by Grantor to perform the work of repairing or restoring the Mortgaged Property (in this Section 2.01 Y, the "Contractor") shall be a general contractor approved by Beneficiary, and the contract between Grantor and the Contractor and an estimated progress schedule shall be submitted to, and approved by Beneficiary. Beneficiary may condition its approval of Contractor on, among other things, a review of the Contractor's financial statements satisfactory to Beneficiary. Any funds required in addition to the Proceeds to complete and pay for the cost of restoring the Mortgaged Property shall be the first funds applied to pay such costs; thereafter, as such restoration or repair progresses, Beneficiary will make periodic payments from the Proceeds

EXHIBIT NO. 3          EX. 3-014

to Grantor and/or the Contractor or otherwise in accordance with the general procedures of Beneficiary applicable to the disbursement of construction loans at the time of such damages or destruction (and subject to the submission of the required documentation). Until disbursed to pay for the cost of repairing or restoring the Mortgaged Property, Beneficiary shall have a security interest in the Proceeds and other funds at any time held by it pursuant to this paragraph.

Except to the extent that Proceeds are received by Beneficiary and applied to the Indebtedness secured hereby, nothing herein contained shall be deemed to excuse Grantor from repairing or maintaining the Mortgaged Property or restoring all damage or destruction to the Mortgaged Property, regardless of the availability or sufficiency of Proceeds. The application or release by Beneficiary of any Proceeds shall not cure or waive any default or notice of default under this Deed of Trust or invalidate any act done pursuant to such notice. In the case of a partial taking pursuant to a condemnation or exercise of the right of eminent domain, the amount of impairment of the value of the collateral (not eliminated through a restoration or repair of the Mortgaged Property) shall be paid to Beneficiary and applied to as a partial prepayment of the Note.

Notwithstanding any other provision of this Section 2.01Y, if in the reasonable determination of Beneficiary the total amount of Proceeds is equal to or less than $100,000.00 and the repair and restoration of the Mortgaged Property can be completed in less than one hundred eighty (180) days and provided no Event of Default has otherwise occurred and is continuing, Beneficiary shall, upon request of Grantor, permit Grantor to apply for and receive the Proceeds directly from the issuer or condemnor, provided the Grantor shall apply such Proceeds solely to the prompt and diligent commencement and completion of such repairs or restoration.

Provided the Grantor complies with this Section 2.01Y and has completely satisfied the Required Conditions described above, any default arising by virtue of the condemnation or destruction of improvements shall be deemed to have been waived by the Beneficiary.

2.02    If, while this Deed of Trust is in force, the title of Trustee to the Mortgaged Property, or any part thereof, or any interest therein, shall be endangered or shall be attacked directly or indirectly, Grantor hereby authorizes Beneficiary, at Grantor's cost and expense, to take all necessary and proper steps for the defense of said title, including the employment of counsel, the prosecution or defense of litigation, and the compromise or discharge of any such claims made against said title.

2.03    All costs, expenses, and attorneys' fees incurred by Grantor, or by Beneficiary on Grantor's behalf, in performing and complying with Grantor's covenants herein or which are the obligations of Grantor herein shall be borne solely by Grantor. Beneficiary shall have the right, at its option and without being required to do so, to advance its own funds for the purpose of paying any of the Grantor's obligations or liabilities herein. All out-of-pocket costs, expenses and reasonable attorney's fees incurred by Beneficiary relating to or otherwise in pursuance of any covenant herein contained shall be due and payable by Grantor to Beneficiary upon demand at the place where the Note is payable and all of such sums shall bear interest at the maximum lawful rate of interest permitted by applicable law, now or hereafter enacted, to be charged to and paid by Grantor from and after the date of Beneficiary's making such payment. The sum of each such payment shall be added to the Indebtedness and thereafter shall form a part of the same and shall be secured by this Deed of Trust. Beneficiary shall be automatically subrogated to all the rights of the person, corporation, or body politic receiving such payment made by Beneficiary. Grantor does hereby appoint Beneficiary as its agent and attorney-in-fact to do, make, procure, execute and deliver, in the name of and on behalf of Grantor, without notice to Grantor, all acts, things, moneys, assignments, affidavits, financing statements, instruments and assurances as Beneficiary, from time to time, may deem proper or necessary in order to protect, assure or enforce its interests as created by and provided under this Deed of Trust or any other document evidencing, securing payment or otherwise relating to the Indebtedness. The power of attorney herein

granted to Beneficiary shall be deemed to be coupled with an interest, shall not terminate on disability of Grantor, and may not be revoked or terminated until the Indebtedness shall have been paid in full.

2.04 Grantor, on behalf of Grantor and Grantor's heirs, devisees, personal representatives, successors or assigns, hereby waives to the full extent permitted by law, any right to assert any statute or rule of law pertaining to the marshaling of assets, a sale in inverse order of alienation, the exemption of homestead, the administration of estates of incompetents or decedents, or any other matter whatever, to defeat, reduce or affect the lien, security interest or other rights of Beneficiary under the terms hereof.

2.05 In the event that there be a trustee's sale hereunder, and, if at the time of such sale, Grantor, or Grantor's heirs, personal representatives, successors or assigns, is or are occupying the Mortgaged Property so sold, each and all shall immediately surrender and deliver possession of the Mortgaged Property so sold to the purchaser at such sale, and in the event of their failure to do so, they shall thereupon become the tenant of the purchaser at such sale, which tenancy shall be a tenancy at sufferance, terminable at the will of such purchaser as landlord, at a rental per day determined by such purchaser, such rental to be due and payable daily to such purchaser. An action of forcible entry and detainer, and any other legal proceedings may be brought by any purchaser if the tenant holds over after a demand in writing for possession of any of the Mortgaged Property; and this Deed of Trust and the trustee's deed delivered at such sale shall constitute the lease and agreement under which any such tenant's possession arose.

2.06 The covenants herein contained shall inure to the benefit of Beneficiary and Trustee, their respective heirs, personal representatives, successors and assigns, and shall be binding upon the respective heirs, personal representatives, successors and assigns of Grantor and any other party now or hereafter liable for payment of the Indebtedness, but nothing in this paragraph shall constitute an authorization for Grantor to sell, transfer, lease or in any way dispose of the Mortgaged Property or any part thereof if otherwise prohibited by any of the terms hereof.

2.07 Pursuant to Texas Finance Code § 307.052, this Deed of Trust shall evidence notice by Beneficiary to Grantor of and Grantor's agreement to the following:

A. THE GRANTOR IS REQUIRED TO (i) KEEP THE COLLATERAL INSURED AGAINST DAMAGE IN THE AMOUNT THE BENEFICIARY SPECIFIES; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS;

B. THE GRANTOR MUST, IF REQUIRED BY THE BENEFICIARY, DELIVER TO THE BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF THE PREMIUMS; AND,

C. IF THE GRANTOR FAILS TO MEET ANY REQUIREMENT LISTED IN PARAGRAPH (A) OR (B), THE BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF THE GRANTOR AT THE GRANTOR'S EXPENSE.

D. Nothing in this notice shall impair or be deemed a waiver by Beneficiary of any of Beneficiary's rights under Chapters 1 through 9 of the Texas Business and Commerce Code, or Beneficiary's other remedies, rights, or options available to Beneficiary under any law, rule, regulation, ruling, court order or agreement.

E. Grantor will be given written notice in accordance with applicable Texas law if the Beneficiary places collateral protection insurance during the term of the Indebtedness on

JNG17\FSBCT\WCTEAKWD\j17121DTv3.wpd
April 11, 2017 (1:02pm)                                         16                                        DEED OF TRUST

Grantor's behalf and at Grantor's expense. Insurance placed by the Beneficiary may be considerably more costly than comparable insurance Grantor could obtain for Grantor's own account and may not satisfy any need Grantor may have for property damage coverage or any mandatory liability insurance requirements imposed by applicable law. Any amounts disbursed by the Beneficiary to place collateral protection insurance in connection with the Indebtedness would become additional debt and will be secured by this Deed of Trust or other security interest instrument signed by Grantor securing the Indebtedness, shall bear interest at the applicable note interest rate of the Indebtedness from the date of disbursement of any such amounts until paid, and will be payable with such interest thereon upon notice to Grantor from Beneficiary requesting payment.

### ARTICLE III. DEFAULT AND REMEDIES

3.01 The term "Default" or "Event of Default" as used in this Deed of Trust shall mean the occurrence of one or more of the following:

A.    After applicable notice and failure to cure as provided for in the Loan Agreement, Grantor shall fail, refuse or neglect to promptly pay or cause there to be paid all Indebtedness due and payable under the Note, under this Deed of Trust or under any instrument relating to or securing the payment of the Indebtedness or any part thereof, as the same shall become due and payable;

B.    After applicable notice and failure to cure as provided for in the Loan Agreement, Grantor shall fail to keep and perform (or shall fail to furnish evidence of the performance of) any of the covenants or agreements contained herein or in the Note or in any other document evidencing, securing payment of, or otherwise relating to, the Indebtedness (collectively the "Loan Documents") including but not limited to the Loan Agreement of even date herewith by and between Borrower and Beneficiary;

C.    Grantor, or any other person liable for the Indebtedness, or any portion thereof, files a voluntary petition in bankruptcy or for corporate reorganization, makes an assignment for the benefit of any creditor, or is the subject of an Order of Relief entered in any bankruptcy, insolvency, reorganization, rehabilitation or other such proceeding;

D.    The Mortgaged Property or any property owned by a person now or hereafter liable for payment of the Indebtedness, or any interest therein or portion thereof, is placed under control or in the custody of any court or receiver;

E.    [Intentionally deleted];

F.    Dissolution, termination, cessation of business, merger or similar event affecting Grantor or any other party now or hereafter liable for payment of the Indebtedness or any part thereof or any material adverse change in the business, operations or financial condition of Grantor or any other party now or hereafter liable for payment of the Indebtedness or any part thereof;

G.    [Intentionally deleted];

H.    If, during the loan application process, Grantor or any persons or entities acting at the direction of Grantor or with Grantor's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Beneficiary (or failed to provide Beneficiary with material information) in connection with the Indebtedness; or if Beneficiary discovers that any statement, representation, or warranty in the Note, this Deed of Trust or in any other document or instrument delivered to or relied upon by Beneficiary in connection with the Indebtedness is false, misleading or erroneous in any respect;

I.    Grantor admits in writing Grantor's inability to pay its debts generally as they become due;

J.    Grantor abandons any of the Mortgaged Property;

K.    If anyone (besides Beneficiary) applies for or consents to the appointment of a custodian, trustee, or liquidator of Grantor (or any of them) or of any guarantor of or surety for the performance of any obligation hereunder or of all or a substantial part of Grantor's assets;

L.    Grantor institutes or voluntarily is or becomes a party to any judicial proceedings intended to effect a discharge of the debts of Grantor (or any of them) or of any guarantor or surety, in whole or in part, or to effect a postponement of the maturity or the collection thereof or to effect a suspension of any of the rights or powers of Beneficiary granted in the Note, this Deed of Trust or in any other document or instrument evidencing or securing payment of the Indebtedness;

M.    An order, judgment or decree shall be entered by any court of competent jurisdiction appointing a trustee, custodian or liquidator of Grantor (or any of them) or of any guarantor or surety or of all or any substantial part of the assets of Grantor (or any of them) or any such guarantor or surety, or if Grantor (or any of them) or any guarantor or surety shall fail to pay any money judgment against it at least ten (10) days prior to the date on which the assets of Grantor (or any of them) or any such guarantor or surety may be sold to satisfy such judgment; or

N.    If Grantor (or any of them) or any such guarantor or surety shall fail to have discharged within a period of thirty (30) days after the commencement thereof any attachment, sequestration, or similar proceeding against any assets of Grantor (or any of them) or of any guarantor or surety, or if any of the assets of Grantor (or any of them) or of any such guarantor or surety are levied upon, sequestered, garnished, attached or otherwise seized by or through any similar process.

Upon the occurrence of any Event of Default, Beneficiary, at Beneficiary's option, and without further notice of intention to accelerate, notice of acceleration or notice of any kind or nature whatsoever, demand or presentment, all of which are hereby expressly waived by Grantor and any and all other parties liable with respect to the Indebtedness or any part thereof, to the extent not prohibited by law, may declare the entire unpaid Indebtedness (other than interest therein which has not yet accrued) immediately due and payable, whereupon it shall be so due and payable, and may exercise or invoke all rights and remedies granted hereunder or in any other instrument securing payment of or relating to the Indebtedness and all rights and remedies available at law or in equity.

3.02    In addition, upon the occurrence of any Event of Default, Beneficiary shall have the option, without declaring the entire Indebtedness due, to proceed with foreclosure either through the courts or by directing Trustee to proceed as if under a full foreclosure, conducting the sale as hereinafter provided. Such sale may be made subject to the unmatured portion of the Note or other Indebtedness without any effect thereon, but as to such unmatured portion of the Note or other Indebtedness, this Deed of Trust shall remain in full force and effect just as though no sale had been made under the provisions of this paragraph. In addition, several sales may be made hereunder without exhausting the right of sale for any unmatured portion of the Note or other Indebtedness, it being the intention of the parties hereto to provide for a foreclosure and sale of the security for any matured portion of the Indebtedness without exhausting the power to foreclose and to sell the security for any other portion of the Indebtedness whether matured at the time or subsequently maturing.

3.03    Upon the occurrence of any Event of Default, Grantor hereby authorizes and empowers Trustee, at any time thereafter, at the request of Beneficiary (which request is hereby conclusively presumed), to sell to any third party, including Beneficiary, at public sale the Mortgaged Property or any part thereof, or any interest therein, to the highest bidder, for cash, at the area of the county courthouse in which

EXHIBIT NO. 3            EX. 3-018

the Land (or any part thereof to be sold) is situated, as designated by the Commissioner's Court of such county as the area in which foreclosure sales are to take place, as evidenced by the designation of such area recorded in the real property records of the county in which the Land (or any part thereof to be sold) is situated, and, if no area is so designated, then in the area designated in the Notice of Sale as being the area for foreclosure sales to take place, between the hours of 10:00 a.m. and 4:00 p.m. of the first Tuesday of any month, after Trustee, or Trustee's agent, has given notice of the time, place and terms of said sale, and the property to be sold (such property in this Section 3.03 being called the "Posted Mortgaged Property"), by posting (or by having any person acting for Trustee post) for at least twenty-one (21) days preceding the date of the sale, written notice of the proposed sale at the Courthouse door of said county in which the Posted Mortgaged Property is situated and as otherwise required by the applicable provisions of the Texas Property Code, as then amended. If the Posted Mortgaged Property is in more than one county, one such notice of sale shall be posted at the courthouse door of each county in which part of the Posted Mortgaged Property is situated and the Posted Mortgaged Property may be sold in any one of such counties, and the notice so posted shall designate in which county the Posted Mortgaged Property shall be sold. In addition to such posting of notice, Trustee (or any person acting for Trustee), at least twenty-one (21) days preceding the date of the sale, shall file a copy of such written notice of the proposed sale in the office of the county clerk of the county in which the sale is to be made, and if the Posted Mortgaged Property is situated in more than one county, a copy of such written notice of sale shall be so filed in the office of the county clerk of each county in which any of the Posted Mortgaged Property is situated. In addition to such posting and filing of notice, Beneficiary (or any person acting for Beneficiary), at least twenty-one (21) days preceding the date of the sale, shall serve written notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to records of Beneficiary and as otherwise required by the applicable provision of the Texas Property Code, as then amended. Service of such notice shall be completed upon deposit of the notice, enclosed in a postpaid wrapper, properly addressed to such debtor at said debtor's most recent address as shown by the records of Beneficiary, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. Grantor agrees that no notice of any sale other than as set out in this paragraph need be given by Trustee, Beneficiary or any other person. Grantor designates as Grantor's address for the purposes of such notice, the address set out below, and each other debtor, if any, obligated to pay the Indebtedness agrees that such address shall likewise constitute such other debtor's address for such notice, unless a different address is designated by such other debtor; no change of such address or designation of a different address shall be binding on Beneficiary until thirty (30) days after Beneficiary has received notice of such change sent to Beneficiary by certified mail postage prepaid, return receipt requested, addressed to Beneficiary at the address for Beneficiary set out herein (or to such other address as Beneficiary may have designated by notice given as above provided to Grantor and such other debtors). Any change of address of Beneficiary shall be effective three (3) business days after written notice thereof addressed to Grantor and sent by regular United States mail, postage prepaid, has been deposited in the care and custody of the United States Postal Service. Grantor authorizes and empowers Trustee to sell the Posted Mortgaged Property, or any part thereof (which partial sale shall be governed by Section 3.07 hereof) or any interest therein, as an entirety or in parcels, by one sale or by several sales held at one time or at different times as the Trustee shall deem advisable at the time of sale, and to execute and deliver to the purchaser or purchasers thereof good and sufficient deed or deeds of conveyance thereof and bills of sale with covenants of general warranty binding on Grantor and Grantor's heirs, personal representatives, successors and assigns. Trustee making such sale shall receive the proceeds thereof and shall apply the same (or if Beneficiary is the successful bidder, Beneficiary shall allocate its bid price) as follows: (i) to the payment of all expenses of taking possession of, maintaining, leasing, repairing, equipping, guarding, improving, advertising, selling, and conveying the Mortgaged Property or part thereof, and /or prosecuting or otherwise collecting Rents, proceeds, premiums, or other sums including reasonable attorneys' fees, and a reasonable fee or commission to Trustee (which Trustee's fee shall not exceed five percent (5%) of the sales proceeds thereof or sums so received); (ii) to the remainder of the Indebtedness as follows: first, to any other expenses or liabilities of Grantor and/or Borrower comprising part of the Indebtedness, second, to the remaining accrued but unpaid interest, third, to the matured portion of

EXHIBIT NO. 3                                    EX. 3-019

principal of the Indebtedness, and fourth, to prepayment of the unmatured portion, if any, of principal of the Indebtedness applied to installments of principal in inverse order of maturity; (iii) the balance, if any and to the extent applicable, remaining after the full and final payment of the Indebtedness and full performance and discharge of the Obligations, to the holder or beneficiary of any inferior liens covering the Mortgaged Property, if any, in order of the priority of such inferior liens (Trustee and Beneficiary shall hereby be entitled to rely exclusively upon a commitment for title insurance issued to determine such priority); and (iv) the cash balance, if any, to Grantor and Grantor's respective heirs, personal representatives, successors or assigns. Payment of the purchase price to Trustee shall satisfy the obligation of the purchaser at such sale therefor, and such purchaser shall not be bound to look after the application thereof. Notwithstanding the foregoing, if any person or party other than the then owners of the Mortgaged Property shall notify Beneficiary or Trustee of a claim to said sums or any part thereof prior to disbursement thereof by Trustee, then Trustee or Beneficiary or both of them at their option, may interplead all or any part of said funds into a court of competent jurisdiction, and in such event, Beneficiary and Trustee each shall be entitled to recover from such sums so deposited an amount equal to the attorneys' fees and other costs and expenses incurred by them or either of them, in connection with such proceeding, to the full extent permitted by all applicable laws.

3.04    Grantor hereby ratifies and confirms any and all acts that Trustee shall do lawfully by virtue hereof. Grantor hereby agrees, on behalf of Grantor and Grantor's respective heirs, personal representatives, successors and assigns, that the recitals contained in any deed or deeds or other instrument executed in due form by any Trustee, acting under the provisions of this instrument, shall be prima facie evidence of the facts recited, and that it shall not be necessary to prove in any court, otherwise than by such recitals, the existence of the facts essential to authorize the execution and delivery of such deed or deeds or other instrument and the passing of title thereby, and all prerequisites and requirements of any sale or sales shall be conclusively presumed to have been performed, and all persons subsequently dealing with the Mortgaged Property purported to be conveyed by such deed or deeds or other instrument, including without limitation, the purchaser or purchasers thereof, shall be fully protected in relying upon the truthfulness of such recitals. Trustee, acting in accordance with the terms hereof, shall not be personally liable for any action taken pursuant hereto.

3.05    Beneficiary may bid, and being the highest bidder therefor, become the purchaser of any or all of the Mortgaged Property at any trustee's or foreclosure sale hereunder and shall have the right to credit the amount of the bid upon the unpaid amount of the Indebtedness in lieu of cash payment.

3.06    The purchaser at any trustee's or foreclosure sale hereunder may disaffirm any easement granted, or lease or other agreement made in violation of any provision of this Deed of Trust, and may take immediate possession of the Mortgaged Property free from and notwithstanding the terms of, such grant of easement, lease or other agreement.

3.07    The sale or sales by the Trustee of less than the whole of the Mortgaged Property shall not exhaust the power of sale herein granted, and the Trustee is specifically empowered to make successive sale or sales, under such power, of such portion of or interest in the Mortgaged Property and in such order as Trustee may determine until the whole of the Mortgaged Property shall be sold; and if the proceeds of such sale or sales of less than the whole of such Mortgaged Property shall be less than the aggregate of the Indebtedness and the expense of executing this trust, this Deed of Trust shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale or sales had been made; provided, however, that Grantor shall never have the right to require that the Mortgaged Property be sold, as an entirety or in parcels, but Beneficiary shall have the right, as a matter of Beneficiary's sole discretion, to request the Trustee to sell the Mortgaged Property as an entirety or to sell any portion of or interest in the Mortgaged Property. In addition, if any sale hereunder is not completed or is defective in the opinion of Beneficiary, such sale shall not exhaust the power of sale hereunder, and Beneficiary shall have the right to have a subsequent sale or sales to be made by the Trustee.

EXHIBIT NO. 3                                        EX. 3-020

3.08    In the event Trustee mails, files and/or posts the notices of foreclosure sale as required hereunder, Beneficiary may decide not to proceed with a foreclosure sale on the date set forth in such notice, and such decision shall in no manner prevent Beneficiary from directing the Trustee to give notice of a foreclosure sale, as provided herein, at any future date, nor effect a waiver of any of Beneficiary's rights and remedies hereunder. Further, in the event a foreclosure sale is commenced hereunder by Trustee, Beneficiary, at any time prior to the completion of such sale, may direct such Trustee to abandon the sale and may thereafter institute suit for foreclosure of any of the liens and security interests created by this Deed of Trust. If Beneficiary shall so elect to institute a suit for collection of the Indebtedness or any part thereof and for foreclosure of the liens and security interests evidenced hereby, it is agreed further that Beneficiary, at any time before entry of final judgment, may cause such suit to be dismissed and thereafter direct and require that Trustee proceed to sell the Mortgaged Property, or any part thereof, in accordance with the terms hereof, including but not limited to, the terms of Section 3.03 hereof and the terms of the Uniform Commercial Code, as herein provided.

3.09    Each and all of the rights, powers and remedies hereunder are cumulative of and in addition to all other rights, powers and remedies herein contained or contained in any other instrument or document evidencing, securing or otherwise relating to the Indebtedness or which Beneficiary may have under all applicable laws. None of the terms and provisions hereof and no action or omission by or on behalf of Beneficiary shall ever make Beneficiary a trustee for, or otherwise create a trust, partnership or other fiduciary relationship between, Beneficiary and Grantor.

3.10    Upon the occurrence of an Event of Default by Grantor as set out in Section 3.01, Beneficiary may, without limitation of any other rights or remedies of Beneficiary, exercise the rights and remedies set forth in Section 2.01.J. hereof.

### ARTICLE IV.  SUBSTITUTE AND SUCCESSOR TRUSTEE

4.01    If Trustee shall die or become disqualified from acting in the execution of this trust, or shall fail or refuse to execute the same when requested by Beneficiary so to do, or if, for any reason, Beneficiary shall prefer to appoint a substitute trustee to act instead of the herein named Trustee, Beneficiary shall have full power to appoint, at any time and without any formality other than by written instrument executed by Beneficiary, one or more successor or alternate successor trustees, each of whom shall succeed to all the estate, rights, powers and duties of Trustee named herein, and no notice of such appointment need be given to Grantor or to any other person or filed for record in any public office. Such appointment may be executed by Beneficiary or any agent of Beneficiary and, if Beneficiary is a corporation or other entity, such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any executive officer of the corporation or otherwise.

### ARTICLE V.  DEFEASANCE

5.01    All of the covenants and agreements of Grantor herein shall survive the execution and delivery of this document and shall continue in force until an express written release hereof is executed by Beneficiary. Accordingly, if Grantor shall perform faithfully each and all of the covenants and agreements herein contained and shall pay the Indebtedness in full, and shall satisfy all obligations secured hereby, then, and then only, this conveyance shall be released upon Grantor's written request and at Grantor's expense, by documentation in form and substance satisfactory to Beneficiary. No release of this conveyance or the lien thereof shall be valid unless executed by Beneficiary.

### ARTICLE VI.  SECURITY AGREEMENT

6.01    To further secure the payment and performance of the Indebtedness and Grantor's observance of the covenants of this Deed of Trust and any other instruments securing the payment of the Indebtedness or relating thereto, Grantor hereby grants a security interest to Beneficiary in and to all the Goods and Intangibles, and the products and proceeds thereof (all of the Goods, and Intangibles, and the proceeds

JNG17\FSBCT\WCTBAKWD\J17121D'Tv3.wpd
April 11, 2017 (1:02pm)                              21                                   DEED OF TRUST

and products thereof being herein called the "Collateral", provided, however, (a) the mention of proceeds of Collateral herein shall not be construed as an authorization for the sale or surrender by Grantor of the Collateral, and (b) the term Collateral as used in this Article VI shall be included in the term "Mortgaged Property" when used in this Deed of Trust). This document shall constitute a security agreement as well as a mortgage and deed of trust. The following applies with respect to the Collateral:

A.   In addition to and cumulative of any other remedies granted in this Deed of Trust to Beneficiary, Beneficiary, upon default hereunder, may proceed under Chapter 9 of the Uniform Commercial Code as to all or any part of the Collateral and shall have and may exercise with respect to all or any part of the Collateral all of the rights, remedies and powers of a secured party under the Uniform Commercial Code, including, without limitation, the right and power to repossess, retain and sell, at public or private sale or sales, or otherwise dispose of, lease or utilize the Collateral or any part thereof and dispose of the proceeds and products in any manner authorized or permitted under the applicable provisions of the Uniform Commercial Code, and to apply the proceeds and products thereof toward payment of Beneficiary's attorneys' fees and other expenses and costs of pursuing, searching for, receiving, taking, keeping, storing, advertising, and selling the Collateral thereby incurred by Beneficiary, and toward payment of the Indebtedness in such order and manner as Beneficiary may elect consistent with the provisions of the Uniform Commercial Code. Nothing in this Article VI shall be construed to impair or limit any other right or power to which Beneficiary may be entitled at law or in equity.

B.   Among the rights of Beneficiary upon default and acceleration of the Indebtedness pursuant to the provisions hereof, and without limitation, Beneficiary shall have the right (but not the obligation), without being deemed guilty of trespass and without liability for damages thereby occasioned, and to the extent such may now or hereafter be permitted under Texas law (i) to enter upon any premises where the Collateral may be situated and take possession of the Collateral, or render it unusable, or dispose of the Collateral on Grantor's premises, and Grantor agrees not to resist or to interfere, and (ii) to take any action deemed necessary or appropriate or desirable by Beneficiary at Beneficiary's option and in Beneficiary's discretion, to repair, refurbish or otherwise prepare the Collateral for sale, lease or other use or disposition as herein authorized. Beneficiary, at Beneficiary's discretion, may require Grantor to assemble the Collateral and make it available to Beneficiary at a place designated by Beneficiary that is reasonably convenient to both parties.

C.   Beneficiary shall give Grantor notice, by certified mail, postage prepaid, of the time and place of any public sale of any of the Collateral or of the time after which any private sale or other intended disposition thereof is to be made by sending notice to Grantor at the address of Grantor as specified below at least ten (10) days before the time of the sale or other disposition, which provisions for notice Grantor and Beneficiary agree are reasonable and shall fully satisfy any requirement for giving of any such notice; notwithstanding the foregoing, Grantor further agrees that, upon the occurrence of an Event of Default, Beneficiary may sell or otherwise dispose of all or any part of the Mortgaged Property which is subject to the Uniform Commercial Code in the manner provided therein or as provided in this Deed of Trust, or under both the Uniform Commercial Code and this Deed of Trust, as Beneficiary may determine, and any and all proceeds received at any such sale shall be applied in the manner set forth in Section 3.03 hereof.

D.   To the extent such now or hereafter may be permitted under Texas law, Beneficiary is authorized to execute and/or file financing statements and continuation statements under the Uniform Commercial Code with respect to the Collateral without joinder of Grantor in such execution or filing. Grantor shall execute and deliver to Beneficiary such financing statements, continuation statements and other documents relating to the Collateral or any portion thereof as Beneficiary may reasonably request from time to time to preserve and

maintain the perfection and control of the Collateral and the priority of the security interest created by this Deed of Trust and shall pay to Beneficiary on demand any expenses and attorneys' fees incurred by Beneficiary in connection with the preparation, execution, filing and perfection and continuation of the liens and security interest of this Deed of Trust and of any financing statements, continuation statements, partial releases, termination statements or other documents necessary or desirable to continue or confirm Beneficiary's security interest, or any modification thereof, and in connection with any Uniform Commercial Code searches performed by Beneficiary. This document or any reproduction of this document may be filed by Beneficiary and shall be sufficient as a financing statement. All or part of the Collateral is or is to become fixtures on the real estate constituting a portion of the Mortgaged Property, but this statement shall not impair or limit the effectiveness of this document as a security agreement or financing statement for other purposes, and, without limitation of any other provision hereof, this Deed of Trust shall constitute a fixture financing statement and, as such, shall be filed for record in the real estate records of each county in which the Land, or any part thereof, is located. Grantor shall not change Grantor's name, identity, structure or location without the prior express written consent of Beneficiary. The name of the record owner of the Land is the party or parties defined herein as Grantor.

E.  Grantor represents that, except for the security interest granted hereby in the Collateral, Grantor is the owner of the Collateral free of any adverse claim, security interest or encumbrance, and Grantor shall defend the Collateral against all claims and demands of any person at any time claiming the same or any interest therein. Grantor has not heretofore allowed or caused there to be filed any financing statement and no financing statement allowed or authenticated by Grantor is now on file in any public office except those statements, true and correct copies of which have been delivered to Beneficiary. So long as any amount remains unpaid on the Indebtedness, Grantor shall not allow and there shall not be filed in any public office any such financing statement or statements affecting the Collateral other than financing statements in favor of Beneficiary hereunder unless the express prior written consent and approval of the Beneficiary shall have first been obtained.

F.  The security interest granted herein shall not be construed or deemed to constitute Beneficiary or Trustee as a trustee or mortgagee in possession of the Mortgaged Property so as to obligate Beneficiary or Trustee to lease the Mortgaged Property or attempt to do the same, or take any action, incur any expenses or perform or discharge any obligation, duty or liability with respect to the Mortgaged Property or any part thereof or otherwise.

G.  Grantor's address is as stated below and Beneficiary's address is as stated below. Either party may notify the other of a new address in the manner specified in Section 3.03 above.

6.02  Grantor does hereby further grant and assign to Beneficiary a security interest in and right of setoff against all deposits and other sums now or at any time hereafter credited by or due from Beneficiary to Grantor, as security for the payment and performance of the Indebtedness and Grantor's observance of the covenants of this Deed of Trust and any other instruments securing the payment of the Indebtedness or relating thereto. In the event of any Default, Beneficiary, at its option, at any time thereafter and without notice, demand or presentment to Grantor, may hold all or any part of any such deposits or other sums until the Indebtedness shall have been paid in full, or may apply or set off all or any part of such deposits or sums credited by or due from Beneficiary to or against any sums then due on the Indebtedness in any manner and in such order of preference as Beneficiary, in its sole discretion, shall determine.

## ARTICLE VII. MISCELLANEOUS

7.01  In the event Beneficiary shall elect to invoke any of the rights or remedies provided for herein, but shall thereafter determine to withdraw or discontinue same for any reason, Beneficiary shall have the unqualified right to do so, whereupon all parties shall be automatically restored and returned to their

JNG17\FSBCT\WCTEAKWD\j17121DTv3.wpd
April 11, 2017 (1:02pm)                                                      23                                                      DEED OF TRUST

respective positions regarding the Indebtedness and this Deed of Trust as shall have existed prior to the invocation of Beneficiary's rights hereunder and the rights, powers and remedies of Beneficiary hereunder shall be and remain in full force and effect.

7.02 Any part of the Mortgaged Property, or any interest therein, may be released by Beneficiary without affecting Beneficiary's liens, security interests and other rights against the remainder of the Mortgaged Property; provided however, that nothing in this paragraph shall obligate Beneficiary to consider or grant any partial releases of the Land or the Mortgaged Property. The lien, security interest and other rights hereby granted shall not affect or be affected by any other security taken or acquired by the Beneficiary for the Indebtedness or any part thereof. The taking of additional security, or the modification, extension, renewal or increase of the Indebtedness or any part thereof, shall at no time release or impair the liens, security interests and the rights granted hereby, or affect the liability of any endorser, guarantor, surety, or any other party liable on the Indebtedness, or improve the right or priority of any junior lien holder; and this Deed of Trust, as well as any instrument given to secure any modification, renewal, extension or increase of the Indebtedness, or any part thereof, shall be and remain a first and prior lien and security interest on all of the Mortgaged Property not expressly released, unless otherwise herein provided. Any such release, the taking of additional collateral, or the modification, extension, renewal or increase of the Indebtedness or any part thereof shall be on any such terms as Grantor, Borrower and Beneficiary may agree to, and may be effected without notice to or consent of any endorser, guarantor, surety, or any other person now or hereafter obligated for the payment of the whole or any part of the Indebtedness, or any other third party, including any permitted subordinate lienholder (except for such notice and/or consent that may be agreed to by Beneficiary in writing). Any other lienholder of record whether now existing or hereafter arising is hereby given notice that all such rights of Grantor, Borrower and/or Beneficiary to modify, extend, renew or increase the Indebtedness secured hereby shall not be deemed to prejudice any other existing or future lienholder, and any other liens on the Mortgaged Property are and shall be subject to this limitation. At Beneficiary's request, Borrower and/or Grantor shall provide to Beneficiary a modification endorsement from a title company acceptable to Beneficiary covering the modification, extension or renewal of the Indebtedness, and in case of any increase, a new loan policy issued by a title insurance underwriter acceptable to Beneficiary; all at Borrower's sole cost and expense.

7.03 The invalidity, or unenforceability in particular circumstances, of any provision of this Deed of Trust shall not extend beyond such provision or such circumstances and no other provision of this Deed of Trust shall be affected thereby. It is the intention of the parties hereto to comply with the applicable usury laws, now or hereafter enacted (herein called "Applicable Usury Laws"); accordingly, notwithstanding any provisions to the contrary in the Note, in any document evidencing or securing the Indebtedness, in this Deed of Trust or in any document securing payment of the Indebtedness or otherwise relating thereto, in no event shall the Note or such documents require the payment or permit the collection of interest in excess of the maximum amount permitted by such Applicable Usury Laws. If any such excess of interest is contracted for, charged or received, under the Note or any document evidencing the Indebtedness, under this Deed of Trust or under the terms of any of the other documents securing payment of the Indebtedness or otherwise relating thereto, or in the event the maturity of any of the Indebtedness is accelerated in whole or in part, or in the event that all or part of the principal or interest of the Indebtedness shall be prepaid, so that under any of such circumstances, the amount of interest contracted for, charged or received, under the Note or any document evidencing the Indebtedness, under this Deed of Trust or under any document securing payment of the Indebtedness or otherwise relating thereto, on the amount of principal actually outstanding from time to time under the Note and other document evidencing or securing the Indebtedness, shall exceed the maximum amount of interest permitted by the Applicable Usury Laws, then in any such event (a) the provisions of this paragraph shall govern and control, (b) neither Grantor nor any other person or entity now or hereafter liable for the payment of the Note or any document evidencing the Indebtedness shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum amount of interest permitted by the Applicable Usury Laws, (c) any such excess that may have been collected shall be either applied as a credit against the then unpaid principal amount hereof or refunded to Grantor, at the Beneficiary's option, and (d) the effective rate of interest

EXHIBIT NO. 3                    EX. 3-024

shall be automatically reduced to the maximum lawful contract rate allowed under the Applicable Usury Laws. Without limitation of the foregoing, all calculations of the rate of interest contracted for, charged or received under the Note, or any document evidencing the Indebtedness, under this Deed of Trust or under such other documents that are made for the purpose of determining whether such rate exceeds the maximum lawful contract rate, shall be made, to the extent permitted by the Applicable Usury Laws, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the loans evidenced by the Note or the documents evidencing the Indebtedness, all interest at any time contracted for, charged or received from Grantor or otherwise by Beneficiary in connection with such loans.

7.04     Beneficiary may accept any payment tendered by Grantor after the due date of such payment or after acceleration of maturity of the Indebtedness and may apply the same to the principal, interest thereon or attorneys' fees and expenses of collection, or any combination thereof, as determined by Beneficiary, whether such payment was designated as a payment of principal, interest or otherwise; any such acceptance of a late payment shall not constitute a waiver of the rights of Beneficiary thereafter to accelerate the maturity of the Indebtedness because of such default and foreclose the liens securing the payment thereof or, if the maturity of the Indebtedness has theretofore been accelerated, such acceptance of late payment shall not constitute a reinstatement of the Indebtedness or otherwise affect the rights of Beneficiary to proceed with foreclosure of the liens securing the payment thereof. It is expressly agreed that (a) no waiver of any default on the part of Grantor or breach of any of the provisions of this Deed of Trust shall be considered a waiver of any other or subsequent default or breach, and no delay or omission in exercising or enforcing the rights and powers herein granted shall be construed as a waiver of such rights and powers, and likewise no exercise or enforcement of any rights or powers hereunder shall be held to exhaust such rights and powers, and every such right and power may be exercised from time to time; (b) any failure by Beneficiary to insist upon the strict performance by Grantor of any of the terms and provisions hereof shall not be deemed to be a waiver of any of the terms and provisions hereof, and Beneficiary, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Grantor of any and all of the terms and provisions of this Deed of Trust; (c) neither Grantor nor any endorser, guarantor, surety, nor any other person now or hereafter obligated for the payment of the whole or any part of the Indebtedness shall be relieved of such obligation by reason of the failure of Beneficiary or Trustee to comply with any request of Grantor, or of any other person so obligated, to take action to foreclose this Deed of Trust or otherwise enforce any of the provisions of this Deed of Trust or of any obligations secured by this Deed of Trust, or by reason of the release, regardless of consideration, of the whole or any part of the security held for the Indebtedness, or by reason of the subordination in whole or in part by Beneficiary of the lien, security interest or other rights evidenced hereby, or by reason of any agreement or stipulation with any subsequent owner or owners of the Mortgaged Property renewing or extending the time of payment or modifying the terms of the Indebtedness or this Deed of Trust without first having obtained the consent of Grantor or such other person, and in the latter event, Grantor and all such other persons shall continue liable to make such payments according to the terms of any such agreement of renewal, extension or modification unless expressly released and discharged in writing by Beneficiary; (d) regardless of consideration, and without the necessity for any notice to or consent by the holder of any subordinate lien or security interest on the Mortgaged Property, Beneficiary may release the obligation of anyone at any time liable for any of the Indebtedness or any part of the security held for the Indebtedness and may renew or extend the time of payment or otherwise modify the terms of the documents evidencing or securing the Indebtedness or this Deed of Trust without impairing or affecting the lien or security interest of this Deed of Trust or the priority of such lien or security interest over any subordinate lien or security interest; (e) the holder of any subordinate lien or security interest shall have no right to terminate any leases affecting the Mortgaged Property whether or not such lease be subordinate to this Deed of Trust; and (f) Beneficiary may resort for the payment of the Indebtedness to any security therefor held by Beneficiary in such order and manner as Beneficiary may elect.

7.05     The terms and provisions of this Deed of Trust shall be governed by and construed in accordance with the laws of the State of Texas.

JNG17\FSBCT\WCTEAKWD\17121DTv3.wpd
April 11, 2017 (1:02pm)                                     25                                                     DEED OF TRUST

7.06    Time is of the essence in the performance of this Deed of Trust.

7.07    Wherever used in this document, unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the words "Deed of Trust" shall mean this Deed of Trust, Security Agreement and Financing Statement and any modifications, renewals or supplements hereto, the word "Grantor", shall mean Grantor, Grantor's heirs, personal representatives, successors and assigns, and/or any subsequent owner or owners of the Mortgaged Property, or any part thereof or any interest therein, the word "Beneficiary" shall mean Beneficiary and/or any subsequent transferee, assignee, owner or holder of the Note or any interest therein at the time in question, the word "Note" shall mean the Note secured by this Deed of Trust and any renewals, extensions and rearrangements thereof, the word "person" shall mean an individual, corporation, trust, partnership, joint venture or unincorporated association, and the pronouns of any gender shall include the other genders, and either the singular or plural shall include the other. In the event that the person who is the maker of the Note (herein called "Borrower") is not the same person as the Grantor, all terms and provisions of this Deed of Trust shall apply to and be binding on the Borrower, as well as the Grantor notwithstanding any term or provision contained herein to the contrary.

7.08    This Deed of Trust, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective on a grantor hereunder unless given in writing and signed by said party or parties sought to be charged or bound by the alteration or amendment.

7.09    Beneficiary may freely assign, whether by sale or transfer, all or any portion of its lien rights hereunder in and to all or any portion of the Indebtedness secured hereby to any purchaser of the Note or of any portion or participation in the Note, including, but not limited to, a sale, transfer or assignment to any guarantor or other obligor of the Indebtedness.

7.10    Notwithstanding anything to the contrary contained in this Deed of Trust, if any person executing this Deed of Trust is a "consumer" as defined in Regulation AA of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 227, or the Federal Trade Commission Credit Practices Act, 16 C.F.R. Part 444, as applicable, no lien or security interest created or evidenced by this Deed of Trust shall extend to or cover a nonpossessory lien or security interest in "household goods", other than a purchase money lien or security interest, in accordance with such regulations as applicable.

### WAIVER OF CERTAIN LAWS

7.11    ADDITIONAL COVENANTS. In addition to the covenants and agreements made in this Deed of Trust, Grantor further covenants and agrees with Beneficiary as follows:

    A.    In the event an interest in any of the Mortgaged Property is foreclosed upon pursuant to a judicial or non-judicial foreclosure sale, Grantor agrees as follows. Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Grantor agrees that Beneficiary shall be entitled to seek a deficiency judgment from Borrower, Grantor and any other party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Mortgaged Property was sold pursuant to judicial or non-judicial foreclosure sale. Grantor expressly recognizes that this Section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Borrower, Grantor and other persons against whom recovery of deficiencies is sought or any guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Mortgaged Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure

sale price is equal to the fair market value of the Mortgaged Property for purposes of calculating deficiencies owed by Borrower, Grantor, any guarantor, and others against whom recovery of a deficiency is sought.

B.  Alternatively, in the event the waiver provided for in Subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Mortgaged Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time): (i) the Mortgaged Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Mortgaged Property will be repaired or improved in any manner before a resale of the Mortgaged Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Mortgaged Property for cash promptly (but no later than twelve (12) months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Mortgaged Property, including, without limitation, brokerage commissions, title insurance, a survey of the Mortgaged Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Mortgaged Property shall be further discounted to account for any estimated holding costs associated with maintaining the Mortgaged Property pending sale, including, without limitation, utilities expenses, Mortgaged Property management fees, taxes and assessments (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Mortgaged Property must be given by persons having at least ten (10) years experience in appraising Mortgaged Property similar to the Mortgaged Property and who have conducted and prepared a complete written appraisal of the Mortgaged Property taking into consideration the factor set forth above.

EXECUTED on or before the date(s) acknowledged below, to be effective April 26, 2017.

WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company

By:  WC Teakwood Plaza Mezz, LLC, a Delaware limited liability company, Manager

By: _____
    Nate Paul, President

Address of GRANTOR:  401 Congress Avenue, 33rd Floor
Austin, Texas 78701

Address of TRUSTEE:  P. O. Box 6136
Temple, Texas 76503-6136

Address of BENEFICIARY:  P. O. Box 6136
Temple, Texas 76503-6136

JNG17\FSBCT\WCTEAKWD\j17121DTv3.wpd
April 11, 2017 (1:41pm)          27                    DEED OF TRUST

EXHIBIT NO. 3                                          EX. 3-027

THE STATE OF Texas §

COUNTY OF Travis §

This instrument was acknowledged before me on the 18 day of April , 2017 , by Nalin Paul, President of WC Teakwood Plaza Mezz, LLC, a Delaware limited liability company, on behalf of said limited liability company, in its capacity as Manager of WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company, on behalf of said limited liability company.

LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846548

Notary Public in and for
The State of Texas

My commission expires: 10/3/20

AFTER RECORDING RETURN TO:
Loan Services
FIRST STATE BANK CENTRAL TEXAS
P. O. Box 6136
Temple, Texas 76503-6136

PREPARED BY:

OPPER & GAMBRELL, P.L.L.C.
8582 Katy Freeway, Suite 200
Houston, Texas 77024



CTOT

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
April 27 2017 08:39 AM
FEE: $ 142.00 2017066579

# GUARANTY AGREEMENT

THIS GUARANTY (the "Guaranty") is dated effective April 2*ℓ*, 2017 and is executed by **NATIN PAUL** and **WORLD CLASS CAPITAL GROUP, LLC** (hereinafter collectively referred to as "Guarantor"), for value received, and to induce **FIRST STATE BANK CENTRAL TEXAS**, having an address at P. O. Box 6136, Temple, Texas 76503-6136 ("Lender"), to lend to **WC TEAKWOOD PLAZA, LLC**, having an address at 401 Congress Avenue, 33rd Floor, Austin, Texas 78701 ("Borrower"), the principal sum of **SEVEN MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($7,600,000.00)** (the "Loan"), evidenced by a certain promissory note (the note together with all extensions, renewals, modifications, substitutions, replacements, restatements and amendments thereof shall collectively be referred to as the "Note") dated of even date herewith, executed pursuant to the terms of that certain Loan Agreement dated of even date herewith by and between Lender and Borrower (the "Loan Agreement") and secured by, among other things, that certain Deed of Trust, Security Agreement and Financing Statement (together with any and all extensions, renewals, substitutions, replacements, amendments, modifications and/or restatements thereof, the "Security Instrument"), as described in Exhibit "A" attached hereto and made a part hereof for all purposes. Other than the Note, all of the documents and the Security Instrument now or hereafter executed by Borrower and/or others and by or in favor of Lender, which wholly or partially secure or guarantee payment of the Note or are otherwise executed and/or delivered in connection with the Loan including the Loan Agreement, together with any and all extensions, renewals, substitutions, replacements, amendments, modifications and/or restatements thereof, are referred to as the "Other Loan Documents".

(1)     Each undersigned Guarantor, jointly and severally (if more than one) hereby absolutely and unconditionally guarantees to Lender the prompt and unconditional payment and performance of the following (the "Guaranteed Obligations"):

     (a)     The entire Debt (as defined herein);

     (b)     The payment and performance of all of Borrower's monetary and non-monetary obligations to Lender under the Security Instrument and Other Loan Documents; and

     (c)     All costs and expenses, including reasonable fees and out of pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty.

(2)     If any of the Guaranteed Obligations shall become due and remain unpaid in whole or in part, each undersigned Guarantor will on demand (and without further notice of dishonor, and without any notice having been given to the Guarantor previous to such demand of the acceptance by the Lender of this Guaranty) pay to the Lender, its successors or assigns, at Lender's office in Temple, Bell County, Texas, the full amount due and owing on the Guaranteed Obligations and it shall not be necessary for the Lender, in order to enforce such payment by the Guarantor, to first institute suit, or exhaust its remedies against the Borrower, or others liable on the Guaranteed Obligations, or to enforce its rights or remedies against any security which shall have been given the Lender to secure any of the Guaranteed Obligations.

(3)     It is expressly understood and agreed that this is a continuing guaranty and that the obligations of Guarantor hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Note, the Security Instrument, or the Other Loan Documents, a true copy of each of said documents Guarantor hereby acknowledges having received and reviewed.

(4)     The term "Debt" as used in this Guaranty shall mean the principal sum evidenced by the Note and secured by the Security Instrument, or so much thereof as may be outstanding from time to time, together with interest thereon at the rate of interest specified in the Note and all other sums other than principal or interest which may or shall become due and payable pursuant to the provisions of the Note, the Security Instrument or the Other Loan Documents.

(5)     Any indebtedness of Borrower to Guarantor now or hereafter existing (including, but not limited to, any rights to subrogation Guarantor may have as a result of any payment by Guarantor under this Guaranty), together with any interest thereon, shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior payment in full of the Guaranteed Obligations. Until payment in full of the Guaranteed Obligations (and including interest accruing on the Note after the commencement of a proceeding by or against Borrower under the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. Sections 101 et seq., and the regulations adopted and promulgated pursuant thereto (collectively, the "Bankruptcy Code") which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally), Guarantor agrees not to accept any payment or satisfaction of any kind of indebtedness of Borrower to Guarantor and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization. Further, if Guarantor shall comprise more than one person, firm or corporation, Guarantor agrees that until such payment in full of the Guaranteed Obligations, (a) no one of them shall accept payment from the others by way of contribution on account of any payment made hereunder by such party to Lender, (b) no one of them will take any action to exercise or enforce any rights to such contribution, and (c) if any of Guarantor should receive any payment, satisfaction or security for any indebtedness of Borrower to any of Guarantor or for any contribution by the others of Guarantor for payment made hereunder by the recipient to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate for application on account of, or as security for, the Guaranteed Obligations and until so delivered, shall be held in trust for Lender as security for the Guaranteed Obligations.

(6)     Guarantor agrees that, with or without notice or demand, Guarantor will reimburse Lender, to the extent that such reimbursement is not made by Borrower, for all reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by Lender in connection with the collection of the Guaranteed Obligations or any portion thereof or with the enforcement of this Guaranty.

(7)     All moneys available to Lender for application in payment or reduction of the Guaranteed Obligations may be applied by Lender in such manner and in such amounts and at such time or times and in such order and priority as Lender may see fit to the payment or reduction of such portion of the Guaranteed Obligations as Lender may elect.

(8)     Guarantor hereby waives notice of the acceptance hereof, presentment, protest, notice of protest, or any and all notice of intention to accelerate, non-payment, non-performance or non-observance, or other proof, or notice or demand, whereby to charge Guarantor therefor. Guarantor shall receive the same notice and opportunity to cure given Borrower under the Loan Agreement, Note or Security Instrument, if any. At any time or from time to time and any number of times, without notice to or consent of Guarantor and without affecting the liability of Guarantor, (a) the time for payment of the principal of or interest on the Debt may be extended or the Debt may be renewed in whole or in part; (b) the time for Borrower's performance of or compliance with any covenant or agreement contained in the Note, the Security Instrument or any of the Other Loan Documents, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived; (c) the maturity of the Debt may be accelerated as provided in the Note, the Security Instrument, or any of the Other Loan Documents; (d) the Note, the Security Instrument, or any of the Other Loan Documents may be modified or amended by Lender and Borrower in any respect, including any increase in the principal amount of the Debt; and (e) any security for the Guaranteed Obligations may be modified, exchanged, surrendered or otherwise dealt with or additional security may be pledged or mortgaged for the Debt.

(9)     Guarantor further agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired (a) by reason of the assertion by Lender of any rights or remedies which it may have under or with respect to either the Note, the Security Instrument, or the Other Loan Documents, against any person obligated thereunder or against any owner of all or any portion of the Mortgaged Property (as defined in the Security Instrument), or (b) by reason of any failure to file or record any of such instruments or to take or perfect any security intended to be provided thereby, or (c) by reason of the release or exchange of any property covered by the Security Instrument or other collateral for the Loan, or (d) by reason of Lender's failure to exercise, or delay in exercising, any such right or remedy or any right or remedy Lender may have hereunder or in respect to this Guaranty, or (e) by reason of the commencement of a case under the Bankruptcy Code by or against any person obligated under the Note, the Security Instrument or the Other Loan Documents, or the death of any Guarantor, or (f) by reason of any payment made on the Debt or any other indebtedness arising under the Note, the Security Instrument or the Other Loan Documents, whether made by Borrower or Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Guaranteed Obligations, nor shall it have the effect of reducing the liability of Guarantor hereunder. It is further understood, that if Borrower shall have taken advantage of, or be subject to the protection of, any provision in the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against Borrower, including the exercise of any option Lender has to declare the Debt or any of the other Guaranteed Obligations due and payable on the happening of any default or event by which under the terms of the Note, the Security Instrument or the Other Loan Documents, the Debt or any of the other Guaranteed Obligations shall become due and payable, Lender may, as against Guarantor, nevertheless, declare the Debt or any of the other Guaranteed Obligations due and payable and enforce any or all of its rights and remedies against Guarantor provided for herein.

(10)     Guarantor further covenants that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of the Note, the Security Instrument, or any of the Other Loan Documents, that Lender shall not be under a duty to protect, secure or insure any security or lien provided by the Security Instrument or other such collateral, and that other indulgences or forbearance may be granted under any or all of such documents, all of which may be made, done or suffered without notice to, or further consent of, Guarantor.

(11)     As a further inducement to Lender to make the Loan and in consideration thereof, Guarantor further covenants and agrees (a) Guarantor will maintain a domicile, place of business or an agent for service of process in the state in which the Mortgaged Property is located (the "Property Jurisdiction") and give prompt notice to Lender of the address of any such domicile, place of business and of the name and address of any new agent appointed by it, as appropriate, (b) the failure of Guarantor's agent for service of process to give it notice of any service of process will not impair or affect the validity of such service or of any judgment based thereon, (c) if, despite the foregoing, there is for any reason no agent for service of process of Guarantor available to be served, and if Guarantor at that time has no place of business in the Property Jurisdiction then Guarantor irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in or pursuant to the first paragraph hereof, Guarantor hereby waiving personal service thereof, (d) that within thirty days after such mailing, Guarantor so served shall appear or answer to any summons and complaint or other process and should Guarantor so served fail to appear or answer within said thirty-day period, said Guarantor shall be deemed in default and judgment may be entered by Lender against the said party for the amount as demanded in any summons and complaint or other process so served, (e) with respect to any claim or action arising hereunder, Guarantor (i) irrevocably submits to the nonexclusive jurisdiction of the courts of Bell County in the State of Texas and the United States District Court located in Temple, Texas, and appellate courts from any thereof, (ii) irrevocably waives any objection which it may have at any time to the laying on venue of any suit, action or proceeding arising out of or relating to this Guaranty brought in any such court, and (iii) irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum, and (f) nothing in this Guaranty will be deemed to preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

(12)     This is a guaranty of payment and not of collection and upon any occurrence of an event of default under the Note, the Security Instrument or the Other Security Documents, after applicable notice and failure to cure as provided for in the Loan Agreement, Lender may, at its option, proceed directly and at once, without further notice, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrower or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying against any of the mortgaged property or other collateral for the Loan. Guarantor hereby waives the pleading of any statute of limitations as a defense to the obligation hereunder.

(13)     Guarantor hereby represents, warrants and certifies to Lender the following:

(a)    Neither the Guarantor nor any general partner or controlling stockholder or managing member of the Guarantor, as applicable, is currently a debtor in any bankruptcy, reorganization, insolvency or similar proceeding;

(b)    No material adverse change in the financial condition of the Guarantor or any general partner or controlling shareholder or managing member of the Guarantor, as applicable, has occurred since the respective dates of the most recent financial statements submitted to Lender;

(c)    The Guarantor is not presently insolvent, and entering into and performing its obligations under this Guaranty will not render the Guarantor insolvent. As used herein, the term "insolvent" means that the sum total of all of an entity's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all of such entity's non-exempt assets, i.e., all of the assets of the entity that are available to satisfy claims of creditors; and

(d)    After the Loan is made and this Guaranty executed and delivered, the Guarantor will have sufficient working capital to pay all of the Guarantor's outstanding debts as they come due.

(14)   As security for the payment of the Guaranteed Obligations, each Guarantor hereby grants to Lender a security interest in and a contractual pledge and assignment of, and a right to setoff and apply against this Guaranty or the Guaranteed Obligations or both, at any time and from time to time, to the fullest extent permitted by applicable law, (without demand upon or notice to Guarantor with respect to the right of setoff, any such demand or notice being hereby expressly waived by Guarantor to the fullest extent permitted by applicable law), any and all money, property, accounts, securities, documents, chattel paper, claims, demands, instruments, items or deposits of Guarantor, and each of them, or to which any of them is a party now, held or hereafter coming within Lender's custody or control, including, but not limited to certificates of deposit and other depository accounts, whether same shall have matured or the exercise of Lender's rights result in loss of interest or other penalty on any such deposit. Without prior notice to or demand upon any Guarantor, Lender may exercise any rights granted herein, as well as other rights and/or remedies at law or in equity, all of which are cumulative, at any time when a default has occurred in any of the Guaranteed Obligations and is continuing. If any notice is required by law, Guarantor hereby agrees that ten (10) days notice shall be deemed reasonable.

(15)   Each reference herein to Lender shall be deemed to include its successors and assigns, to whose favor the provisions of this Guaranty shall also inure. Each reference herein to Guarantor shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty.

(16)   If any party hereto shall be a partnership, the agreements and obligations on the part of Guarantor herein contained shall remain in force and application notwithstanding any changes in the individuals composing the partnership and the term "Guarantor" shall include any altered or successive partnerships but the predecessor partnerships and their partners shall not thereby be released from any obligations or liability hereunder.

(17)     Guarantor (and its representative, executing below, if any) has full power, authority and legal right to execute this Guaranty and to perform all its obligations under this Guaranty.

(18)     All understandings, representations and agreements heretofore had with respect to this Guaranty are merged into this Guaranty which alone fully and completely expresses the agreement of Guarantor and Lender.

(19)     This Guaranty may be executed in one or more counterparts by some or all of the parties hereto, each of which counterparts shall be an original and all of which together shall constitute a single agreement of Guaranty. The failure of any party hereto to execute this Guaranty, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder. The liability of the Guarantors hereunder shall be joint and several with the liability of any other guarantors under separate guaranties.

(20)     **GOVERNING LAW AND VENUE.** THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS GUARANTY IS DEEMED EXECUTED IN AND IS PERFORMABLE IN BELL COUNTY, TEXAS. Any action or proceeding under or in connection with this Guaranty against Guarantors or any other party ever liable for payment of any sums of money payable on this Guaranty may be brought in any state court located in Bell County, Texas, or in the federal court in Bell County, Texas. Each of the Guarantors and each such other party hereby irrevocably: (i) submits to the nonexclusive jurisdiction of such courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.

**WAIVER OF CERTAIN LAWS**

(21)     Additional Covenants. In addition to the covenants and agreements made in this Guaranty, each Guarantor further covenants and agrees with Lender as follows:

(22)     In the event an interest in any of the Collateral Property is foreclosed upon pursuant to a judicial or non-judicial foreclosure sale, each Guarantor agrees as follows. Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, each Guarantor agrees that Lender shall be entitled to seek a deficiency judgment from Borrower, Guarantors and any other Loan Party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Collateral Property was sold pursuant to judicial or non-judicial foreclosure sale. Each Guarantor expressly recognizes that this Section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Borrower, Guarantors and other persons against whom recovery of deficiencies is sought or any guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Collateral Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Each Guarantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Collateral Property for purposes of calculating deficiencies owed by Borrower, Guarantors, any other guarantor, and others against whom recovery of a deficiency is sought.

(23)     Alternatively, in the event the waiver provided for in Subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Collateral Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time): (i) the Collateral Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Collateral Property will be repaired or improved in any manner before a resale of the Collateral Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Collateral Property for cash promptly (but no later than twelve (12) months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Collateral Property, including, without limitation, brokerage commissions, title insurance, a survey of the Collateral Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Collateral Property shall be further discounted to account for any estimated holding costs associated with maintaining the Collateral Property pending sale, including, without limitation, utilities expenses, Collateral Property management fees, taxes and assessments (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Collateral Property must be given by persons having at least ten (10) years experience in appraising Collateral Property similar to the Collateral Property and who have conducted and prepared a complete written appraisal of the Collateral Property taking into consideration the factor set forth above.

IN WITNESS WHEREOF, each Guarantor has duly executed this Guaranty on or before the respective date(s) acknowledged below, to be effective for all purposes as of the date first written above.

NATIN PAUL

Address:        7800 Cava Place
                Austin, Texas 78735

WORLD CLASS CAPITAL GROUP, LLC

By: _____
    Natin Paul, Manager

Address:        401 Congress Avenue, 33rd Floor
                Austin, Texas 78701

**NOTICE UNDER SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE**

**A LOAN AGREEMENT IN WHICH THE AMOUNT INVOLVED IN THE LOAN AGREEMENT EXCEEDS $50,000.00 IN VALUE IS NOT ENFORCEABLE UNLESS**

**THE AGREEMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE BOUND OR BY THAT PARTY'S AUTHORIZED REPRESENTATIVE.**

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT SUBJECT TO SUBSECTION (b) OF SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE SHALL BE DETERMINED SOLELY FROM THE WRITTEN LOAN AGREEMENT, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THE LOAN AGREEMENT.**

**THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

_____

NATIN PAUL

WORLD CLASS CAPITAL GROUP, LLC

By: _____

Natin Paul, Manager

FIRST STATE BANK CENTRAL TEXAS

By: _____

Printed Name: ___Nicue Nco___

Title: ___SVP___

THE STATE OF TEXAS §

COUNTY OF __Travis__ §

This instrument was subscribed and acknowledged before me on the __18__ day of __April__,
201 __7__, by NATIN PAUL.

_____

Notary Public in and for
The State of T E X A S

My commission expires: __10/13/20__

> LAURA BYRD
> Notary Public, State of Texas
> Comm. Expires 10-03-2020
> Notary ID 130846548

THE STATE OF TEXAS          §

COUNTY OF __Travis_____          §

    This instrument was subscribed and acknowledged before me on the __16__ day of __April__ , 201__7__, by Natin Paul, Manager of WORLD CLASS CAPITAL GROUP, LLC, a Texas limited liability company, on behalf of said limited liability company.



_____
Notary Public in and for
The State of T E X A S

My commission expires: __10/3/20__

LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846948

## EXHIBIT A

### (DESCRIPTION OF NOTE AND SECURITY INSTRUMENT)

(1)    Promissory Note dated April __26__, 2017, in the amount of $7,600,000.00, executed by WC TEAKWOOD PLAZA, LLC, payable to the order of FIRST STATE BANK CENTRAL TEXAS; and

(2)    Deed of Trust, Security Agreement and Financing Statement dated April __26__, 2017 executed by WC TEAKWOOD PLAZA, LLC, for the benefit of FIRST STATE BANK CENTRAL TEXAS.

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas
Aug 24, 2020 02:35 PM    Fee: $38.00
**2020151969**
*Electronically Recorded*

# This page is intentionally added for electronic file stamp.

MORTGAGE ASSIGNMENT
($7,600,000.00)

## ASSIGNMENT OF NOTE AND SECURITY INSTRUMENTS

THE STATE OF TEXAS§
§KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TRAVIS§

BANCORPSOUTH BANK, a Mississippi banking corporation (the successor by merger to First State Bank, Central Texas, a Texas state banking association) (the "*Assignor*") for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to Assignor in hand paid by 8209 Burnet, L.P., a Delaware limited partnership (the "*Assignee*"), the receipt and sufficiency of which are hereby acknowledged, has GRANTED, TRANSFERRED and ASSIGNED WITHOUT RECOURSE, and does hereby GRANT, TRANSFER and ASSIGN WITHOUT RECOURSE, unto the Assignee, the following:

(a)     Promissory Note executed by WC Teakwood Plaza, LLC, a Delaware limited liability company (the "*Borrower*"), and payable to the order of First State Bank, Central Texas, a Texas state banking association,  dated April 26, 2017, in the original principal amount of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00), bearing loan number 11379300, and as such note may have been thereafter modified, amended, restated, or extended (collectively, the "*Note*") held by Assignor as successor by merger to First State Bank, Central Texas;

(b)     All rights, titles, interests, liens, security interests, pledges, privileges, claims, demands and equities existing and to exist in connection with, pertaining to, governing, guaranteeing, renewing, extending, modifying, or as security for the payment of the Note including, without limitation, the following

(i)     Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017, executed by Borrower for the benefit of Assignor, and recorded in the Official Public Records of Travis County, Texas under Document No. 2017066579, as such deed of trust may have been thereafter further modified, amended, restated or extended;;

(ii)     Collateral Assignment of Leases and Rents dated April 26, 2017, executed by Borrower for the benefit of Assignor, and recorded in the Official Public Records of Travis County, Texas under Document No. 2017066580, as it may have been thereafter further modified, amended, restated or extended;

(iii)     Loan Agreement dated April 26, 2017, by and between the Assignor, the Borrower, the Guarantors;

1

20170804.20190907/3795663.1

(iv)    UCC Financing Statement recorded on April 28, 2017 under File No. 17-0014544632 with the Texas Secretary of State and UCC Financing Statement recorded on May 1, 2017 under Travis County Clerk's File No. 2017068684;

(v)    Guaranty Agreements dated April 26, 2017 executed by Natin Paul and World Class Capital Group, LLC (collectively, the "*Guarantors*") for the benefit of the Assignor.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THAT LOAN SALE AGREEMENT DATED AUGUST 21, 2020 (THE "*Loan Sale Agreement*") EXECUTED BY THE ASSIGNOR, AS SELLER, AND ASSIGNEE, AS PURCHASER, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT ASSIGNOR HAS NOT MADE AND HEREBY DISCLAIMS ANY AND ALL REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, REGARDING ANY ASPECT OF THE ASSETS OR THE UNDERLYING REALTY, PERSONALTY OR INTANGIBLE PROPERTY SECURING THE NOTE (THE "*Mortgaged Premises*"), INCLUDING, BUT NOT LIMITED TO THOSE RELATING TO ENFORCEABILITY OR TERMS OF THE ASSETS, THE NATURE AND CONDITION OF THE ASSETS AND THE MORTGAGED PREMISES (INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, AND THE SUITABILITY THEREOF FOR ANY AND ALL ACTIVITIES AND USES WHICH ASSIGNEE MAY ELECT TO CONDUCT THEREON, AND THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS OF THE COLLATERAL), THE COMPLIANCE OF THE ASSETS OR MORTGAGED PREMISES WITH ALL APPLICABLE LAWS, ORDINANCES, RULES OR REGULATIONS (INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LAWS); (B) THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHERWISE AFFECTING THE MORTGAGED PREMISES; AND (C) THE COMPLIANCE OF THE ASSETS OR THE MORTGAGED PREMISES, OR ITS OPERATION, WITH ANY APPLICABLE LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY.

ASSIGNEE, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, EXPRESSLY ACCEPTS THE ASSIGNMENT OF THE ASSETS SUBJECT TO ALL OF THE TERMS, CONDITIONS, AGREEMENTS, DISCLAIMERS AND REPRESENTATIONS CONTAINED IN THE LOAN SALE AGREEMENT, INCLUDING, WITHOUT LIMITATION, THOSE SET FORTH IN SECTIONS 9 AND 11 THEREOF.

TO HAVE AND TO HOLD the Assets, together and along with all rights, titles, interests, privileges, claims, demands and equities under the foregoing instruments now or hereafter owned by Assignor, Assignor's successors or assigns, in connection therewith or as security therefor unto Assignee, its successors or assigns forever.

This transfer and assignment is made WITHOUT WARRANTY OR RECOURSE WHATSOEVER, except as expressly set forth in the Loan Sale Agreement.

20170804 20190907/3795663.1

2

This transfer and assignment is made WITHOUT WARRANTY OR RECOURSE WHATSOEVER, except as expressly set forth in the Loan Sale Agreement.

EXECUTED effective on this the _21_ day of August, 2020.

BANCORPSOUTH BANK

By: _____
Name: _Billy J. Babineaux Jr_
Title: _Sr. Vice President_

STATE OF _Louisiana_ §
~~COUNTY~~ Parish OF _Lafayette_ §
§

On _August 21_____, 2020 before me, _Renee Rodrigue_____, a notary public, personally appeared _Billy J. Babineaux, Jr._, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature_ _Renee Rodrigue_____
(Seal)

**After Recording, Return to:**

8203 Burnet, L.P.
2726 Bissonnet St. #240-244
Houston, Texas 77005-1352

RENEE RODRIGUE
Notary Public
ID Number 150401
My Commission is For Life

3

20170804.20190907/3795663.1

EXHIBIT NO. 5                                              EX. 5-004



HIRSCH & WESTHEIMER

*Attorneys and Counselors*

T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

August 21, 2020

*Via CMRRR: 9414 7266 9904 2167 5085 85*
*and First Class U.S. Mail*

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Re:   Promissory Note (the "Note") dated April 26, 2017 in the original principal
      sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or
      "Borrower") and payable to BancorpSouth Bank, as successor by merger
      to First State Bank Central Texas, secured by a Deed of Trust, Security
      Agreement and Financing Statement dated April 26, 2017 (the "Deed of
      Trust") on 3.395 Acres in the City of Austin, Travis County, Texas, being
      all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the
      "Collateral" or the "Property") and guaranteed by Natin Paul and World
      Class Capital Group, LLC (collectively the "Guarantors").

Dear Sir or Madam:

      On August 21, 2020, BancorpSouth Bank, successor by merger to First
State Bank Central Texas (the "**Bank**") sold to 8209 Burnet, L.P. (the
"**Purchaser**") all of the Bank's ownership, right, title and interest in the Note,
Deed of Trust, Guaranty and related documents and instruments (collectively
the "**Loan**").

      Any and all future payments on the Note and all communications
regarding the Loan should be made to

      8209 Burnet, L.P.
      500 West 2nd Street, #1900
      Austin, Texas 78701

---

1415 Louisiana   36th Floor   Houston, Texas 77002   T. 713 223 5181   *hirschwest.com*

EXHIBIT NO. 6                                                   EX. 6-001

WC Teakwood Plaza, LLC
August 21, 2020
Page 2

Should you have any further questions, please direct your inquiries to the Purchaser.

Sincerely,

HIRSCH & WESTHEIMER, P.C.

By:/s/ Michael J. Durrschmidt
   Michael J. Durrschmidt

cc:    Natin Paul
       c/o World Class
       814 Lavaca St.
       Austin, Texas 78701
       Attn: Natin Paul
       *Via CMRRR: 9414 7266 9904 2167 5085 54*

       World Class Capital Group, LLC
       c/o World Class
       814 Lavaca St.
       Austin, Texas 78701
       Attn: Natin Paul
       *Via CMRRR: 9414 7266 9904 2167 5085 78*

       Linda Thong
       World Class
       244 Fifth Avenue, Suite 2200
       New York, New York 10001
       *Via CMRRR: 9414 7266 9904 2167 5086 15*

       Maryann Norwood
       World Class
       814 Lavaca St.
       Austin, Texas 78701
       *Via email: mnorwood@world-class.com*

       Brian Elliott
       World Class Global Business Services
       814 Lavaca St.
       Austin, Tx 78701
       *Via email: belliott@world-class.com*

# BRACEWELL

August 25, 2020

**BY E-MAIL AND CMRRR**

Maryann Norwood
WC Teakwood Plaza, LLC
814 Lavaca Street
Austin, Texas 78701
mnorwood@world-class.com

Re:    September 1, 2020 foreclosure sale for that certain property secured by the Promissory Note (the
        "Note") dated April 26, 2017, in the original principal sum of $7,600,000 executed by WC
        Teakwood Plaza, LLC ("Maker" or "Borrower") and payable to 8209 Burnet, LP, a Delaware limited
        partnership ("Lender"), successor by assignment to BancorpSouth Bank, as successor by merger
        to First State Bank Central Texas (the "Loan"), secured by a Deed of Trust, Security Agreement
        and Financing Statement dated April 26, 2017 (the "Deed of Trust") on 3.95 Acres in the City of
        Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five
        (the "Collateral" or the "Property") and guaranteed by Natin Paul and World Class Capital Group,
        LLC (collectively the "Guarantors")

Dear Ms. Norwood:

I write in response to your August 21, 2020 correspondence to Mr. Durrschmidt, counsel to BancorpSouth
Bank ("Original Lender").  I am counsel to 8209 Burnet, LP, which on August 21, 2020, acquired from
Original Lender all of Original Lender's rights, title, and interest in and to the Loan and the Loan
Documents[1] under that certain Assignment of Note and Security Instruments, which was duly recorded
on August 24, 2020, in the Office of the County Clerk of Travis County, Texas in Instrument No.
2020151969 and is attached hereto as Exhibit 1.  Original Lender sent you notice of such assignment on
August 24, 2020, a copy of which is attached as Exhibit 2.

Lender is aware of the Attorney General's "Informal Guidance" but disagrees with Borrower's
characterization of same in your letter.  Therefore, Lender does not agree to withdraw the Notice of
Trustee's Sale of the Property schedule for September 1.

The Informal Guidance regarding foreclosure sales in Texas changes nothing in connection with the
September 1 non-judicial foreclosure sale on the Property at issue.  Contrary to your characterization, the
AG's "Informal Guidance" does not "confirm[] that foreclosure sales that have not been specifically
approved by the Mayor of the city in which they will take place cannot satisfy the public sale requirement

---

[1] The Note, the Deed of Trust, the Collateral Assignment of Leases and Rents, the Guaranty Agreements and
Financing Statements are collectively referred to herein as the "Loan Documents."

**Christopher L. Dodson**
Partner

T: +1.713.221.1373      F: +1.800.404.3970
711 Louisiana Street, Suite 2300, Houston, Texas 77002-2770
chris.dodson@bracewell.com      bracewell.com

EXHIBIT NO. 7                                                    EX. 7-001

Maryann Norwood
August 25, 2020
Page 2

under Texas Property Code Chapter 51." Ltr. at 1. Rather, it states that a foreclosure sale may not proceed if more than 10 "willing bidders" are in attendance unless approved by the mayor. Exhibit 3.

While Borrower contends that the "proposed foreclosure sale will not satisfy the public sale requirement in the Texas Property Code," at this time, there is no evidence or suggestion that the September 1 foreclosure sale for this Property will be attended by more than 10 willing bidders, so it would be inappropriate to preemptively cancel the foreclosure sale on this basis. Ltr. at 3. Lender is aware of the relevant gathering restrictions, other state and local health and safety guidelines, and the AG's Informal Guidance, and Lender will fully comply therewith in conducting the foreclosure sale.

Moreover, the Informal Guidance states "this letter is not a formal Attorney General opinion under section 402.042 of the Texas Government Code; rather, it is intended only to convey informal legal guidance." Ex. 3 at 4. The Informal Guidance, therefore, does not deserve the weight Borrower recommends. Attorney general opinions, especially informal ones, are "not controlling on the courts." *See Comm'rs Ct. of Titus Cty. v. Agan*, 940 S.W.2d 77, 82 (Tex. 1997) (disagreeing with Attorney General's opinion).

Finally, as I am sure you are aware, your colleague, Brian Elliott, unsuccessfully made this same argument related to the August foreclosure sale in *Colorado Third Street, LLC v. WC 4th and Colorado, LP*, Cause No. D-1-GN-20-002781. In spite of this argument, a Travis County district court denied Mr. Elliott's request to enjoin a foreclosure sale in August. And after the issuance of this Informal Guidance, other foreclosure sales occurred in Travis County in August, without express Mayoral approval.

For all of these reasons, Lender intends to proceed with the posted foreclosure sale on September 1. If Borrower intends to seek legal action in connection with the Loan, we request that you provide us with notice as required by the Texas Rules and Travis County Local Rules.

Very truly yours,

Christopher L. Dodson

CLD
Enclosure

cc:     Mr. Brian Elliott
        814 Lavaca Street
        Austin, Texas 78701
        By Email: belliott@world-class.com

#6223895

EXHIBIT NO. 7                                                    EX. 7-002

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas
Aug 24, 2020 02:35 PM    Fee: $38.00
**2020151969**
*Electronically Recorded*

# This page is intentionally added for electronic file stamp.

MORTGAGE ASSIGNMENT
($7,600,000.00)

## ASSIGNMENT OF NOTE AND SECURITY INSTRUMENTS

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF TRAVIS | § | |

BANCORPSOUTH BANK, a Mississippi banking corporation (the successor by merger to First State Bank, Central Texas, a Texas state banking association) (the "*Assignor*") for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to Assignor in hand paid by 8209 Burnet, L.P., a Delaware limited partnership (the "*Assignee*"), the receipt and sufficiency of which are hereby acknowledged, has GRANTED, TRANSFERRED and ASSIGNED WITHOUT RECOURSE, and does hereby GRANT, TRANSFER and ASSIGN WITHOUT RECOURSE, unto the Assignee, the following:

    (a)    Promissory Note executed by WC Teakwood Plaza, LLC, a Delaware limited liability company (the "*Borrower*"), and payable to the order of First State Bank, Central Texas, a Texas state banking association, dated April 26, 2017, in the original principal amount of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00), bearing loan number 11379300, and as such note may have been thereafter modified, amended, restated, or extended (collectively, the "*Note*") held by Assignor as successor by merger to First State Bank, Central Texas;

    (b)    All rights, titles, interests, liens, security interests, pledges, privileges, claims, demands and equities existing and to exist in connection with, pertaining to, governing, guaranteeing, renewing, extending, modifying, or as security for the payment of the Note including, without limitation, the following

    (i)    Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017, executed by Borrower for the benefit of Assignor, and recorded in the Official Public Records of Travis County, Texas under Document No. 2017066579, as such deed of trust may have been thereafter further modified, amended, restated or extended;;

    (ii)    Collateral Assignment of Leases and Rents dated April 26, 2017, executed by Borrower for the benefit of Assignor, and recorded in the Official Public Records of Travis County, Texas under Document No. 2017066580, as it may have been thereafter further modified, amended, restated or extended;

    (iii)    Loan Agreement dated April 26, 2017, by and between the Assignor, the Borrower, the Guarantors;

1

20170804.20190907/3795663.1

      (iv)    UCC Financing Statement recorded on April 28, 2017 under File No. 17-0014544632 with the Texas Secretary of State and UCC Financing Statement recorded on May 1, 2017 under Travis County Clerk's File No. 2017068684;

      (v)    Guaranty Agreements dated April 26, 2017 executed by Natin Paul and World Class Capital Group, LLC (collectively, the "***Guarantors***") for the benefit of the Assignor.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THAT LOAN SALE AGREEMENT DATED AUGUST 21, 2020 (THE "***Loan Sale Agreement***") EXECUTED BY THE ASSIGNOR, AS SELLER, AND ASSIGNEE, AS PURCHASER, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT ASSIGNOR HAS NOT MADE AND HEREBY DISCLAIMS ANY AND ALL REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, REGARDING ANY ASPECT OF THE ASSETS OR THE UNDERLYING REALTY, PERSONALTY OR INTANGIBLE PROPERTY SECURING THE NOTE (THE "***Mortgaged Premises***"), INCLUDING, BUT NOT LIMITED TO THOSE RELATING TO ENFORCEABILITY OR TERMS OF THE ASSETS, THE NATURE AND CONDITION OF THE ASSETS AND THE MORTGAGED PREMISES (INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, AND THE SUITABILITY THEREOF FOR ANY AND ALL ACTIVITIES AND USES WHICH ASSIGNEE MAY ELECT TO CONDUCT THEREON, AND THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS OF THE COLLATERAL), THE COMPLIANCE OF THE ASSETS OR MORTGAGED PREMISES WITH ALL APPLICABLE LAWS, ORDINANCES, RULES OR REGULATIONS (INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LAWS); (B) THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHERWISE AFFECTING THE MORTGAGED PREMISES; AND (C) THE COMPLIANCE OF THE ASSETS OR THE MORTGAGED PREMISES, OR ITS OPERATION, WITH ANY APPLICABLE LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY.

ASSIGNEE, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, EXPRESSLY ACCEPTS THE ASSIGNMENT OF THE ASSETS SUBJECT TO ALL OF THE TERMS, CONDITIONS, AGREEMENTS, DISCLAIMERS AND REPRESENTATIONS CONTAINED IN THE LOAN SALE AGREEMENT, INCLUDING, WITHOUT LIMITATION, THOSE SET FORTH IN SECTIONS 9 AND 11 THEREOF.

TO HAVE AND TO HOLD the Assets, together and along with all rights, titles, interests, privileges, claims, demands and equities under the foregoing instruments now or hereafter owned by Assignor, Assignor's successors or assigns, in connection therewith or as security therefor unto Assignee, its successors or assigns forever.

This transfer and assignment is made WITHOUT WARRANTY OR RECOURSE WHATSOEVER, except as expressly set forth in the Loan Sale Agreement.

20170804 20190907/3795663.1

2

This transfer and assignment is made WITHOUT WARRANTY OR RECOURSE WHATSOEVER, except as expressly set forth in the Loan Sale Agreement.

EXECUTED effective on this the 21 day of August, 2020.

**BANCORPSOUTH BANK**

By: _____
Name: _Billy J. Babineaux Jr_
Title: _Sr. Vice President_

STATE OF _Louisiana_ §
~~Parish~~ OF _Lafayette_ §
~~COUNTY~~ §

On _August 21_ , 2020 before me, _Renée Rodrigue_ , a notary public, personally appeared _Billy J. Babineaux, Jr_ , who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Renée Rodrigue_
(Seal)

**After Recording, Return to:**

8203 Burnet, L.P.
2726 Bissonnet St. #240-244
Houston, Texas 77005-1352

RENEE RODRIGUE
Notary Public
ID Number 150401
My Commission is For Life

3

EXHIBIT NO. 7                    EX. 7-006



HIRSCH & WESTHEIMER
*Attorneys and Counselors*

T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

August 21, 2020

*Via CMRRR: 9414 7266 9904 2167 5085 85*
*and First Class U.S. Mail*

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Re:  Promissory Note (the "Note") dated April 26, 2017 in the original principal
     sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or
     "Borrower") and payable to BancorpSouth Bank, as successor by merger
     to First State Bank Central Texas, secured by a Deed of Trust, Security
     Agreement and Financing Statement dated April 26, 2017 (the "Deed of
     Trust") on 3.395 Acres in the City of Austin, Travis County, Texas, being
     all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the
     "Collateral" or the "Property") and guaranteed by Natin Paul and World
     Class Capital Group, LLC (collectively the "Guarantors").

Dear Sir or Madam:

     On August 21, 2020, BancorpSouth Bank, successor by merger to First
State Bank Central Texas (the "**Bank**") sold to 8209 Burnet, L.P. (the
"**Purchaser**") all of the Bank's ownership, right, title and interest in the Note,
Deed of Trust, Guaranty and related documents and instruments (collectively
the "**Loan**").

     Any and all future payments on the Note and all communications
regarding the Loan should be made to

     8209 Burnet, L.P.
     500 West 2nd Street, #1900
     Austin, Texas 78701

1415 Louisiana   36th Floor   Houston, Texas 77002   T. 713 223 5181   *hirschwest.com*

20170804.20190907/3797011.1

EXHIBIT NO. 7

EX. 7-007

WC Teakwood Plaza, LLC
August 21, 2020
Page 2

   Should you have any further questions, please direct your inquiries to the Purchaser.

                          Sincerely,

                          HIRSCH & WESTHEIMER, P.C.


                          By:/s/ Michael J. Durrschmidt
                              Michael J. Durrschmidt

cc:   Natin Paul
      c/o World Class
      814 Lavaca St.
      Austin, Texas 78701
      Attn: Natin Paul
      *Via CMRRR: 9414 7266 9904 2167 5085 54*

      World Class Capital Group, LLC
      c/o World Class
      814 Lavaca St.
      Austin, Texas 78701
      Attn: Natin Paul
      *Via CMRRR: 9414 7266 9904 2167 5085 78*

      Linda Thong
      World Class
      244 Fifth Avenue, Suite 2200
      New York, New York 10001
      *Via CMRRR: 9414 7266 9904 2167 5086 15*

      Maryann Norwood
      World Class
      814 Lavaca St.
      Austin, Texas 78701
      *Via email: mnorwood@world-class.com*

      Brian Elliott
      World Class Global Business Services
      814 Lavaca St.
      Austin, Tx 78701
      *Via email: belliott@world-class.com*



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

August 1, 2020

Honorable Bryan Hughes
Texas Senate
P.O. Box 12068
Capitol Station
Austin, TX 78711

Dear Senator Hughes,

You ask whether local governmental bodies have authority to limit in-person attendance at a judicial or non-judicial foreclosure sale to 10 persons or fewer. Your question concerns local emergency orders restricting or delaying such sales during the current COVID-19 pandemic. We conclude that a foreclosure sale of residential or commercial real property that is conducted outdoors is subject to the limitation on outdoor gatherings in excess of 10 persons imposed by Executive Order GA-28. Accordingly, an outdoor foreclosure sale may not proceed with more than 10 persons in attendance unless approved by the mayor in whose jurisdiction the sale occurs, or if in an unincorporated area, the county judge. However, to the extent a sale is so limited, and willing bidders who wish to attend are not allowed to do so as a result, the sale should not proceed as it may not constitute a "public sale" as required by the Texas Property Code.

When a mortgage loan is in default, a mortgagee may elect to institute either a judicial foreclosure or, when permitted by the deed of trust, a non-judicial foreclosure.[1] A judicial foreclosure begins with a lawsuit to establish the debt and fix the lien.[2] The judgment in a foreclosure lawsuit generally provides that an order of sale issue to any sheriff or constable directing them to seize the property and sell it under execution in satisfaction of the judgment.[3] After the sale is completed, the sheriff or other officer must provide to the new buyer possession of the property within 30 days.[4]

---

[1] *Bonilla v. Roberson*, 918 S.W.2d 17, 21 (Tex. App.—Corpus Christi 1996, no writ).

[2] *Id.* at 21.

[3] TEX. R. CIV. P. 309; *but see id.* (excepting judgments against executors, administrators, and guardians from orders of sale). The procedures for the sale under judicial foreclosure generally follow the same procedures as sales under non-judicial foreclosures. *Compare id.* 646a–648 *with* TEX. PROP. CODE § 51.002.

[4] TEX. R. CIV. P. 310.

A non-judicial foreclosure, in turn, must be expressly authorized in a deed of trust.[5] The Property Code prescribes the minimum requirements for a non-judicial sale of real property under a power of sale conferred by a deed of trust or other contract lien.[6] The Code requires that a sale under a non-judicial foreclosure be "a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month," unless that day is January 1 or July 4, in which cases the sale must be held on the first Wednesday of the month.[7] The deed of trust or other loan document can establish additional requirements, and if such requirements are established, those requirements must likewise be satisfied in order for there to be a valid foreclosure sale.[8]

We understand that many foreclosure sales in Texas, both judicial and non-judicial, are held outdoors. Frequently, such sales occur on the steps of a courthouse.

With this background in mind, we address your question concerning attendance limitations. Governor Abbott ordered in Executive Order GA-28 that "every business in Texas shall operate at no more than 50 percent of the total listed occupancy of the establishment."[9] This general limitation, however, is subject to several exceptions. One such exception is found in paragraph five of the order, which limits outdoor gatherings to 10 persons or fewer without approval by the mayor or, in the case of unincorporated territory, the county judge in whose jurisdiction the gathering occurs.[10] Accordingly, to the extent a foreclosure sale occurs outdoors, attendance at the sale is limited to 10 persons or fewer unless greater attendance is approved by the relevant mayor or county judge.

While certain services are exempt from the outdoor gathering limitation in Executive Order GA-28, we do not conclude that foreclosure sales are included within them. Executive Order GA-28 exempts from its limitations on outdoor gatherings services described in paragraphs 1, 2, and 4 of the order. Relevant here, paragraph 1 exempts from capacity limitations, *inter alia*, "any services listed by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Workforce, Version 3.1 or any subsequent version."[11] (CISA Guidance). Among the services listed in version 3.1 of

---

[5] *See* TEX. PROP. CODE § 51.002.

[6] *See id.* § 51.002.

[7] *Id.* §§ 51.002(a), (a-1); *see also id.* § 51.002(h) (requiring a sale to be held on or after the 90th day after the date the commissioners court records a designation of a sale at an area other than an area at the county courthouse).

[8] *See Bonilla*, 918 S.W.2d at 21.

[9] Gov. Greg Abbott Exec. Order GA-28.

[10] *Id.* at 3 (as amended by Gov. Greg Abbott Proc. of July 2, 2020).

[11] *Id.* at 2.

2

the CISA Guidance are "[r]esidential and commercial real estate services, including settlement services."[12]

A court's main objective in construing the law is to give effect to the intent of its provisions.[13] And there is no better indication of that intent than the words that are chosen.[14] One dictionary defines a "service" as "[w]ork that is done for others as an occupation or business."[15] A periodic foreclosure auction conducted at a courthouse—whether by an officer of the court, an attorney, an auction professional, or another person serving as trustee[16]—does not constitute the type of dedicated real estate service work contemplated by the CISA Guidance. Accordingly, we conclude that outdoor foreclosure sales are not exempted from the 10-person attendance limitation imposed by paragraph 5 of Executive Order GA-28.

If a foreclosure sale is subject to, and not exempted from, the 10-person attendance limit imposed in Executive Order GA-28, it should not proceed if one or more willing bidders are unable to participate because of the attendance limit. "[A] sale of real property under a power of sale conferred by a deed of trust or other contract lien must be a *public sale* at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month."[17] The purpose of the public sale requirement is to "secure the attendance of purchasers and obtain a fair price for the property."[18] Strict compliance with the Property Code is required for a trustee to properly make a foreclosure sale.[19] If an attendance limit precludes the conduct of a public sale for the purpose of securing sufficient bidders to obtain a fair price, the propriety of a foreclosure auction may be called into question. Accordingly, to the extent attendance at a foreclosure sale is limited to ten or fewer persons, and that limit precludes the attendance of one or more willing bidders who otherwise would have appeared in person, the sale should not go forward as it likely would not comport with the Property Code requirement that the sale be a "public sale."

---

[12] *See* Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response, at 16, available at https://www.cisa.gov/sites/default/files/publications/Version_3.1_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers.pdf.

[13] *See Summers*, 282 S.W.3d at 437.

[14] *See id.* ("Where text is clear, text is determinative of that intent.").

15 Am. Heritage Dictionary (5th ed. 2020), available at https://www.ahdictionary.com/word/search.html?q=service; *see also Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) (applying an undefined term's ordinary meaning, unless the context of the law in which the term appears suggests a different or more precise definition).

[16] The Texas Property Code does not set forth specific professional requirements for a foreclosure trustee, providing only that "[o]ne or more persons may be authorized to exercise the power of sale under a security instrument." TEX. PROP. CODE § 51.007(a).

[17] TEX. PROP. CODE § 51.002(a) (emphasis added).

[18] *Reisenberg v. Hankins*, 258 S.W. 904, 910 (Tex. Civ. App.–Amarillo 1924, writ dismissed w.o.j.).

[19] *Myrad Props. v. LaSalle Bank Nat'l Assoc.*, 252 S.W.3d 605, 615 (Tex. App.–Austin 2008), *rev'd on other grounds*, 300 S.W.3d 746 (Tex. 2009).

3

EXHIBIT NO. 7                                                    EX. 7-011

We trust this letter provides you with the advice you were seeking. Please note this letter is not a formal Attorney General opinion under section 402.042 of the Texas Government Code; rather, it is intended only to convey informal legal guidance.

Sincerely,

Ryan Bangert
Deputy First Assistant Attorney General

4

EXHIBIT NO. 7



HIRSCH & WESTHEIMER
*Attorneys and Counselors*

T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

July 2, 2020

*Via CMRRR: 9414 7266 9904 2167 5063 83
and First Class U.S. Mail*

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Re:   Promissory Note (the "Note") dated April 26, 2017 in the original principal sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or "Borrower") and payable to BancorpSouth Bank, as successor by merger to First State Bank Central Texas, secured by a Deed of Trust, Security Agreement and Financing Statement dated April 29, 2017 on 3.95 Acres in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the "Collateral" or the "Property") and guaranteed by Natin Paul and World Class Capital Group, LLC (collectively the "Guarantors").

Dear Sir or Madam:

This law firm represents BancorpSouth Bank, successor by merger to First State Bank Central Texas (the "Bank") in connection with the above-referenced Note. As you know, the Note is delinquent.

Pursuant to the Collateral Assignment of Leases and Rents dated April 26, 2017, executed by the Borrower for the benefit of the Bank, please provide us with the names, addresses, the current lease for each tenant occupying a rental space on the Property, and the current rent roll for the Property.

Demand is hereby made for the immediate payment of the delinquent payments. The Note is currently past due in the amount of One Hundred Ninety-Four Thousand Three Hundred Twenty-Five and 86/100 Dollars ($194,325.86). In the event the Bank has not received $194,325.86 by 4:30 p.m. C.S.T. on July 12, 2020, then the Bank will accelerate the Note and has instructed us thereafter to take legal action against the Maker and Guarantor and pursue the Bank's remedies as to the Collateral.

20170804.20190907/3724640.1

EXHIBIT NO. 8                                    EX. 8-001

WC Teakwood Plaza, LLC
July 2, 2020
Page 2

If any payment by check is returned due to insufficient funds or for any other reason, "good funds" will not have been received.  No extension of time will be granted due to the return of payment.  The Bank reserves the right to accept or reject a partial payment of the total due without waiving any of its rights herein or otherwise.

The Bank reserves all of its rights, remedies, and recourses against the Maker and Guarantors under the Note and Guaranty Agreements.  This demand for payment is being made pursuant to section 38.001 of the Texas Civil Practice and Remedies Code and, as such, the Maker and Guarantors may be liable, in accordance with the terms of the Note and Guaranty Agreements, not only for the outstanding principal balance due and owing together with interest as it accrues at the pre- and post-maturity rate, but also for collection costs, including attorney fees.

By transmitting this demand to you, nothing is intended to suggest that all of the Bank's rights and remedies have been set forth.  Nothing contained in this letter is a waiver of the Bank's rights or remedies, under the Note or any of the other loan documents, at law or in equity.  Specifically, but not by way of limitation, the Maker and Guarantors continue to waive all notices consistent with the loan documents.

The Maker and Guarantors are not entitled to rely upon any oral statements made or purported to be made by or on behalf of the Bank in connection with any alleged agreement by the Bank to refrain from exercising any of its rights in connection with the indebtedness.  Acceptance by the Bank, or any other parties, on behalf of the Bank, of any debt service payment does not, and will not, constitute a waiver of any of the rights, remedies or recourses available under the loan documents, at law, or in equity.  Application of such payments should in no way be construed as a modification, rearrangement, or extension of the existing loan documents.

*This is an attempt to collect a debt and any information will be used for that purpose.*

Sincerely,

HIRSCH & WESTHEIMER, P.C.

By:*/s/ Michael J. Durrschmidt*
     Michael J. Durrschmidt

WC Teakwood Plaza, LLC
July 2, 2020
Page 3


cc:     Natin Paul
        c/o World Class
        814 Lavaca St.
        Austin, Texas 78701
        Attn: Natin Paul
        *Via CMRRR: 9414 7266 9904 2167 5063 90*

        World Class Capital Group, LLC
        c/o World Class
        814 Lavaca St.
        Austin, Texas 78701
        Attn: Natin Paul
        *Via CMRRR: 9414 7266 9904 2167 5064 06*

        Linda Thong
        World Class
        244 Fifth Avenue, Suite 2200
        New York, New York 10001
        *Via CMRRR: 9414 7266 9904 2167 5064 13*

        Maryann Norwood
        World Class
        814 Lavaca St.
        Austin, Texas 78701
        *Via email: mnorwood@world-class.com*

EXHIBIT NO. 8                                    EX. 8-003

# USPS Tracking®

FAQs >

## Track Another Package  +

**Tracking Number:** 9414726699042167506383

Remove ✕

Your item was delivered to an individual at the address at 1:28 pm on July 8, 2020 in AUSTIN, TX 78701.

✓ **Delivered**

July 8, 2020 at 1:28 pm
Delivered, Left with Individual
AUSTIN, TX 78701

**Get Updates** ⌄

Feedback

| **Text & Email Updates** | ⌄ |
|---|---|
| **Tracking History** | ⌄ |
| **Product Information** | ⌄ |

**See Less** ⌃

EXHIBIT NO. 8                                    EX. 8-004

**Tracking Number:** 9414726699042167506390                    Remove ✕

Your item has been delivered to an agent for final delivery in AUSTIN, TX 78701 on July 6, 2020 at 12:41 pm.

### ⊘ **Delivered to Agent**

July 6, 2020 at 12:41 pm
Delivered to Agent for Final Delivery
AUSTIN, TX 78701

**Get Updates** ⌄

See More ⌄

Feedback

**Tracking Number:** 9414726699042167506406                    Remove ✕

Your item has been delivered to an agent for final delivery in AUSTIN, TX 78701 on July 6, 2020 at 12:41 pm.

### ⊘ **Delivered to Agent**

July 6, 2020 at 12:41 pm
Delivered to Agent for Final Delivery
AUSTIN, TX 78701

**Get Updates** ⌄

See More ⌄

EXHIBIT NO. 8                                      EX. 8-005

**Tracking Number:** 9414726699042167506413                    Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 12:28 pm on July 7, 2020 in NEW YORK, NY 10001.

## ⊘ Delivered

July 7, 2020 at 12:28 pm
Delivered, Front Desk/Reception/Mail Room
NEW YORK, NY 10001

**Get Updates** ⌄

See More ⌄

Feedback

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**



T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

July 23, 2020

NOTICE OF ACCELERATION

*Via CMRRR: 9414 7266 9904 2167 5072 05*
*and U.S. First Class Mail*

WC Teakwood Plaza
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

RE:     Promissory Note (the "***Note***") dated April 26, 2017 in the original principal sum
of $7,600,000 executed by WC Teakwood Plaza, LLC ("***Maker***" or "***Borrower***")
and payable to BancorpSouth Bank, as successor by merger to First State Bank
Central Texas, secured by a Deed of Trust, Security Agreement and Financing
Statement dated April 26, 2017 (the "***Deed of Trust***") on 3.95 Acres in the City
of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale
North Section Five (the "***Collateral***") and guaranteed by Natin Paul and World
Class Capital Group, LLC (collectively the "***Guarantors***"), the Collateral
Assignment of Leases and Rents dated April 26, 2017 (the "***Assignment of
Rents***"), the Loan Agreement dated April 26, 2017 (the "***Loan Agreement***"), and
any other documents executed by Borrower, or any other party in connection
with the loan (together with the Note, Deed of Trust, Assignment of Rents, and
Loan Agreement collectively referred to hereinafter as the "***Loan Documents***").

Dear Sir/Madam:

As you know, this law firm represents BancorpSouth Bank, successor by merger
to First State Bank Central Texas (the "***Bank***") in connection with the above-referenced
Note, Guaranties, and Loan Documents.

By letter dated and sent to you on July 2, 2020, this firm, on behalf of the
Lender, notified you that the Note was in default for delinquent payment and that the
Lender may accelerate the entire outstanding balance of the Note and foreclose the
collateral securing the Note under the Deed of Trust if the default was not cured by
July 12, 2020.  The Lender has informed our firm that the default was not cured on or
before July 12, 2020 or within the additional time that has elapsed to the date of this
letter.  Therefore, the entire indebtedness owing on the Note, and all interest accrued
but unpaid thereon, is hereby **ACCELERATED** and due and payable in full.

Pursuant to the terms of the Note and the other Loan Documents, the Lender
hereby accordingly requires immediate payment of the entire unpaid balance due
under the Note and all interest accrued but unpaid thereon, and all costs and fees in
enforcing the Lender's rights under the Note and the Loan Documents.  If you intend
to pay the indebtedness in full, you may contact Bill Babineaux of BancorpSouth Bank

EXHIBIT NO. 10                              EX. 10-001

WC Teakwood Plaza, LLC
July 23, 2020
Page 2

at 315 Settlers Trace Blvd., Lafayette, LA 70508, phone no. (337) 354-8902 to obtain the outstanding balance of the amounts due and owing under the Note and the Loan Documents.  Payment in full will not be considered made unless the Lender receives "good funds" in the form of cash, a cashier's check or money order in the full amount due and owing at the time.  If any such cashier's check or money order is returned to us for insufficient funds or for any other reason, "good funds" will not have been received.

The Lender may seek to foreclose its Collateral unless payment of the full indebtedness is made in good funds as described above and delivered to Bill Babineaux at the address set forth above.

THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

ASSERT AND PROTECT YOUR RIGHTS AS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES. IF YOU OR YOUR SPOUSE IS SERVING ON ACTIVE MILITARY DUTY, INCLUDING ACTIVE MILITARY DUTY AS A MEMBER OF THE TEXAS NATIONAL GUARD OR THE NATIONAL GUARD OF ANOTHER STATE OR AS A MEMBER OF A RESERVE COMPONENT OF THE ARMED FORCES OF THE UNITED STATES, PLEASE SEND WRITTEN NOTICE OF THE ACTIVE MILITARY SERVICE TO THE SENDER OF THIS NOTICE IMMEDIATELY.

IF YOU WERE A SERVICE MEMBER IN MILITARY SERVICE AT ANYTIME WITHIN THE LAST NINE (9) MONTHS, PLEASE CONTACT THE SENDER OF THIS NOTICE IMMEDIATELY UPON RECEIPT OF THIS LETTER. YOU MAY BE ENTITLED TO CERTAIN PROTECTIONS AFFORDED UNDER THE SERVICE MEMBERS CIVIL RELIEF ACT.

Nothing contained in this letter is a waiver of the Lender's rights or remedies under the Note, Deed of Trust, Guaranties, or any of the other Loan Documents, at law or in equity.  Accordingly, but not by way of limitation, you continue to waive all demands and notices in connection with the Note, including presentment, demand, and notice of dishonor, consistent with the terms of the Note.

Should this law firm file a lawsuit on behalf of the Lender, then the Lender will also seek recovery of its legal fees and expenses incurred in the prosecution of its rights under the Loan Documents, as well as all past due interest and costs.

Neither you nor any other party shall be entitled to rely upon any oral statements made or purported to be made by or on behalf of the Lender in connection with any alleged agreement by the Lender to refrain from exercising any of its rights in connection with the indebtedness.  Acceptance by the Lender, or any other parties on behalf of the Lender, of any payment does not and will not constitute a waiver of any of the rights, remedies or recourses available under the Loan Documents, at law, or in equity.  Application of such payments should in no way be construed as a modification, rearrangement, or extension of the existing Loan Documents.

EXHIBIT NO. 10                                                    EX. 10-002

WC Teakwood Plaza, LLC
July 23, 2020
Page 3

Sincerely,

Hɪʀsᴄʜ & Wᴇsᴛʜᴇɪᴍᴇʀ, P.C.

By: /s/ Michael J. Durrschmidt
Michael J. Durrschmidt

cc:   Natin Paul
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul
*Via CMRRR: 9414 7266 9904 2167 5070 21*

World Class Capital Group, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul
*Via CMRRR: 9414 7266 9904 2167 5070 83*

Linda Thong
World Class
244 Fifth Avenue, Suite 2200
New York, New York 10001
*Via CMRRR: 9414 7266 9904 2167 5071 44*

Maryann Norwood
World Class
814 Lavaca St.
Austin, Texas 78701
*Via email: mnorwood@world-class.com*

EXHIBIT NO. 10                                    EX. 10-003

# USPS Tracking®

FAQs >

## Track Another Package +

**Tracking Number:** 9414726699042167507205                    Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 2:49 pm on July 27, 2020 in AUSTIN, TX 78701.

### ⊘ Delivered

July 27, 2020 at 2:49 pm
Delivered, Front Desk/Reception/Mail Room
AUSTIN, TX 78701

**Get Updates** ∨

Feedback

| Text & Email Updates | ∨ |
|---|---|

| Tracking History | ∨ |
|---|---|

| Product Information | ∨ |
|---|---|

See Less ∧

EXHIBIT NO. 10                              EX. 10-004

**Tracking Number:** 9414726699042167507021                    Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 2:49 pm on July 27, 2020 in AUSTIN, TX 78701.

## ⊘ **Delivered**

July 27, 2020 at 2:49 pm
Delivered, Front Desk/Reception/Mail Room
AUSTIN, TX 78701

**Get Updates** ⌄

**See More** ⌄

Feedback

**Tracking Number:** 9414726699042167507083                    Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 2:49 pm on July 27, 2020 in AUSTIN, TX 78701.

## ⊘ **Delivered**

July 27, 2020 at 2:49 pm
Delivered, Front Desk/Reception/Mail Room
AUSTIN, TX 78701

**Get Updates** ⌄

**See More** ⌄

EXHIBIT NO. 10                    EX. 10-005

**Tracking Number:** 9414726699042167507144                    Remove ✕

Your item was delivered to an individual at the address at 10:07 am on July 27, 2020 in NEW YORK, NY 10001.

## ⊘ Delivered

July 27, 2020 at 10:07 am
Delivered, Left with Individual
NEW YORK, NY 10001

**Get Updates** ⌄

**See More** ⌄

Feedback

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**

|||||||||||||||||||||||||||| 6 pgs     202040410

## NOTICE OF TRUSTEE'S SALE

STATE OF TEXAS          §
                        §          KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TRAVIS        §

WHEREAS, WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company (the

"*Grantor*"), executed a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017,

and recorded April 27, 2017 in the Official Public Records of Travis County, Texas (the "*Records*") under

Document No. 2017066579 (together with all extensions, modification, and renewals, if any, collectively

referred to hereinafter as the "*Deed of Trust*");

WHEREAS, the Grantor, pursuant to the Deed of Trust, conveyed to T. Gerry Gamble (the

"*Original Trustee*") for the benefit of First State Bank Central Texas, its successors and assigns

("*Beneficiary*"), all of the personal property, real property and premises described and referred to in the

Deed of Trust (the "*Mortgaged Property*"), including the following described property located in Travis

County, Texas:

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY,
TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH
SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE
PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE
PARTICULARLY DESCRIBE DBY METES AND BOUNDS ON EXHIBIT "A"
ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

WHEREAS, the Deed of Trust secures payment of that certain Promissory Note dated April 26,

2017, executed by Grantor, as Maker, and payable to the order of Beneficiary, in the original stated amount

of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00) (together

with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Note*");

WHEREAS, BancorpSouth Bank, a Mississippi banking corporation (the "*Holder*"), is the

successor by merger to Beneficiary;

WHEREAS, the Holder is the current legal owner and holder of the indebtedness secured by the

Deed of Trust (the "*Indebtedness*") and, if, for any reason, Holder prefers to appoint a substitute trustee to

act instead of the trustee named in the Deed of Trust, Holder has the full power to appoint, at any time and

1

EXHIBIT NO. 11          EX. 11-001

without any formality other than by written instrument, one or more successor or alternate successor trustees, each of whom shall succeed to all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Holder has named, constituted and appointed in writing BRADLEY E. RAUCH, a resident of Harris County, Texas, ZACHARY SCHNEIDER, a resident of Harris County, Texas, ANGELA ZAVALA, a resident of Travis County, Texas, and also MICHELLE JONES, a resident of Travis County, Texas, as Substitute Trustees, each with the power to act independently (and without the joinder of the others) under and by virtue of the Deed of Trust and to hold possess and execute all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Grantor has defaulted in the performance of its obligations under the Note and the Deed of Trust, and notice of such defaults have been waived, and/or have occurred, and Grantor has failed to cure such default(s);

WHEREAS, acceleration of maturity and demand have been made upon Grantor for payment of the Indebtedness, and/or have been waived, and/or have occurred;

WHEREAS, the proceeds of the Note were used for commercial purposes, and the Mortgaged Property was not to be used by the debtor for residential purposes;

WHEREAS, the Holder has called upon and requested either or any of Bradley E. Rauch, Zachary Schneider, Angela Zavala, Michelle Jones, or any additional substitute trustee appointed pursuant to the terms of the Deed of Trust, as Substitute Trustees, to perform the Trustee's duties under the Deed of Trust and to post, mail and file, or have posted, mailed, and filed, notice and to sell the Mortgaged Property without prejudice and without creating an election not to proceed against any other collateral securing the obligations of the Grantor to the Holder, and without waiving any rights or remedies which the Holder has against the Grantor or any other parties obligated for payment of the Indebtedness;

NOW, THEREFORE, the undersigned Substitute Trustee, at the request of the Holder, hereby gives notice that after due posting of this Notice as required by the Deed of Trust and law, a Substitute Trustee will sell on **September 1, 2020** (that being the first Tuesday of said month, as provided for in Texas

20170804.20190907/3778368.1

2

Property Code Sec. 51.002) at public auction to the highest bidder for cash, at THE REAR "SALLYPORT"

OF THE TRAVIS COUNTY COURTHOUSE, 1000 GUADALUPE STREET, AUSTIN, TEXAS 78701,

said location having been designated by the County Commissioners' Court of Travis County, Texas (or such

other location as may be designated by said County Commissioners' Court), the sale to begin no earlier than

1:00 o'clock p.m. and no later than three (3) hours after such time, the Mortgaged Property, including

without limitation, all personal property described in the Deed of Trust, owned by the Grantor, Grantor's

heirs, legal representatives, successors and assigns, and originally covered by the Deed of Trust, whether

or not herein specifically described.

**THE SALE OF THE PROPERTY IS "AS IS" AND "WHERE IS" AND WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND BY THE SUBSTITUTE TRUSTEE OR HOLDERS OF SAID INDEBTEDNESS, EXPRESS, IMPLIED, STATUTORY, QUASI-STATUTORY OR OTHERWISE, ANY WARRANT OR MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE BEING EXPRESSLY DISCLAIMED. NEITHER THE HOLDER NOR THE TRUSTEE OR SUBSTITUTE TRUSTEE MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE COMPLIANCE WITH LAWS, RULES, AGREEMENTS, OR SPECIFICATIONS, NOR WITH RESPECT TO CONDITION, QUALITY, CAPACITY, DESIGN, OPERATION, ABSENCE OF ANY LATENT DEFECTS OR ANY OTHER WARRANTY OR REPRESENTATION WHATSOEVER WITH RESPECT TO THE PROPERTY, ALL OF WHICH ARE EXPRESSLY WAIVED BY PURCHASER(S).**

THE NEXT PAGE IS THE SIGNATURE PAGE

EXHIBIT NO. 11                    EX. 11-003

WITNESS BY HAND this **7th** day of **August, 2020**.



Zachary Schneider, Trustee

COUNTY OF HARRIS     §

                       §

STATE OF TEXAS      §

       This document was acknowledged before me on this, the **7th** day of **August, 2020**, by Zachary Schneider, Trustee.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

**Name and Address of Substitute Trustees:**
Mr. Bradley E. Rauch
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

Angela Zavala
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

Michelle Jones
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

**AFTER RECORDING, PLEASE RETURN TO:**
Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

> KAREN M. WADE
> My Notary ID # 7646256
> Expires June 30, 2023

**4**

EXHIBIT NO. 11           EX. 11-004

## EXHIBIT "A"

### Legal Description

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "B" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 66 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT NO. 11                    EX. 11-005

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

1) S 76° 08' 00" E, A DISTANCE OF 139.49 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.82 FEET)

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF)

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 30.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS



*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas

**202040410**

Aug 10, 2020 11:12 AM
Fee: $3.00        MACEDOS

20170804.20190907/3773368 1

EXHIBIT NO. 11        EX. 11-006

## AFFIDAVIT OF FILING AND POSTING
WC TEAKWOOD PLAZA, LLC

STATE OF TEXAS  §
§
COUNTY OF TRAVIS  §

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared _Angela Zavala_, who being duly sworn, upon his oath deposes and says as follows:

That on the _10th_ day of **August, 2020**, Affiant, for and on behalf of **BancorpSouth Bank, a Mississippi banking corporation,** filed the Notice of Substitute Trustee's Sale (the "**Notice**") attached hereto in the office of the County Clerk of Travis County and caused to be posted (which posting was confirmed by the undersigned), a copy of the Notice in the place where such notices are commonly posted by the public as designated by the County Commissioners of Travis County, at the Travis County Courthouse, Austin, Tx, Travis County, Texas.

Print Name: Angela Zavala

SIGNED AND SWORN TO BEFORE ME by **ANGELA ZAVALA** on the **10TH** day of **August, 2020**.

RICHARD ZAVALA, JR.
Notary Public, State of Texas
Comm. Expires 08-03-2024
Notary ID 129076603

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

20170804.20190907/3778991.1

EXHIBIT NO. 12                    EX. 12-001


**HIRSCH & WESTHEIMER**
*Attorneys and Counselors*

T. 713.220.9173
F. 713.223.9319
zschneider@hirschwest.com

August 11, 2020

*Via CMRRR #9414 7266 9904 2167 5059 28*
*and First Class U.S. Mail*
WC Teakwood Plaza
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

> Promissory Note (the "*Note*") dated April 26, 2017 in the original principal sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("*Maker*" or "*Borrower*") and payable to BancorpSouth Bank, as successor by merger to First State Bank Central Texas, secured by a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017 (the "*Deed of Trust*") on 3.95 Acres in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the "*Collateral*") and guaranteed by Natin Paul and World Class Capital Group, LLC (collectively the "*Guarantors*"), the Collateral Assignment of Leases and Rents dated April 26, 2017 (the "*Assignment of Rents*"), the Loan Agreement dated April 26, 2017 (the "*Loan Agreement*"), and any other documents executed by Borrower, or any other party in connection with the loan (together with the Note, Deed of Trust, Assignment of Rents, and Loan Agreement collectively referred to hereinafter as the "*Loan Documents*").

Dear Sir/Madam:

As you know, this law firm represents BancorpSouth Bank, successor by merger to First State Bank Central Texas (the "*Bank*") in connection with the above-referenced Note, Guaranties, and Loan Documents.

As you are also aware, the Maker has defaulted under the terms of the Note and the Deed of Trust due to, among other things, the failure of the Maker to make the required monthly payments under the Note.  This firm, on behalf of the Lender, sent you written notice on July 2, 2020 of such defaults and provided you an opportunity to cure such defaults, which were not timely cured and remain uncured as of the date of this letter.  This firm also sent you written notice on July 23, 2020 that the Note had been accelerated and was immediately due and payable in full.  You may contact the undersigned to verify the amount of indebtedness due and owing under the Note, Deed of Trust, and all related loan documents.

Please find enclosed a **Notice of Trustee's Sale** which was posted **August 10, 2020**, at the County Courthouse of Travis County, Texas (at the place regularly used by the public for posting of such notices) and is being filed in the Office of the County Clerk of Travis County, Texas.

The foreclosure sale shall take place as provided in the Notice of Trustee's Sale on **September 1, 2020**.  The foreclosure sale will be conducted pursuant to the

1415 Louisiana   36th Floor   Houston, Texas 77002   T. 713 223 5181   *hirschwest.com*

20170804 20190907/3778974.1

EXHIBIT NO. 13                    EX. 13-001

WC Teakwood Plaza, LLC
August 11, 2020
Page 2

enclosed Notice of Trustee's Sale, Section 51.002 of the Texas Property Code, and other applicable law.

This is an attempt to collect a debt and any information will be used for that purpose.

Very truly yours,

HIRSCH & WESTHEIMER, P.C.

By: _____
Zachary Schneider

cc:   Natin Paul
      c/o World Class
      814 Lavaca St.
      Austin, Texas 78701
      *Via CMRRR# 9414 7266 9904 2167 5059 35*

      World Class Capital Group, LLC
      c/o World Class
      814 Lavaca St.
      Austin, Texas 78701
      Attn: Natin Paul
      *Via CMRRR# 9414 7266 9904 2167 5059 42*

      Linda Thong
      World Class
      244 Fifth Avenue, Suite 2200
      New York, New York 10001
      *Via CMRRR# 9414 7266 9904 2167 5059 59*

      Maryann Norwood
      World Class
      814 Lavaca St.
      Austin, Texas 78701
      *Via email: mnorwood@world-class.com*

      Brian Elliott
      World Class Global Business Services
      814 Lavaca St.
      Austin, Tx 78701
      Via CMRRR# 9414 7266 9904 2167 5056 07,
      First Class Mail and Email: belliott@world-class.com

EXHIBIT NO. 13                    EX. 13-002

 6 pgs     202040410

## NOTICE OF TRUSTEE'S SALE

STATE OF TEXAS             §
                          §          KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TRAVIS           §

WHEREAS, WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company (the "*Grantor*"), executed a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017, and recorded April 27, 2017 in the Official Public Records of Travis County, Texas (the "*Records*") under Document No. 2017066579 (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Deed of Trust*");

WHEREAS, the Grantor, pursuant to the Deed of Trust, conveyed to T. Gerry Gamble (the "*Original Trustee*") for the benefit of First State Bank Central Texas, its successors and assigns ("*Beneficiary*"), all of the personal property, real property and premises described and referred to in the Deed of Trust (the "*Mortgaged Property*"), including the following described property located in Travis County, Texas:

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBE DBY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

WHEREAS, the Deed of Trust secures payment of that certain Promissory Note dated April 26, 2017, executed by Grantor, as Maker, and payable to the order of Beneficiary, in the original stated amount of SEVEN MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($7,600,000.00) (together with all extensions, modification, and renewals, if any, collectively referred to hereinafter as the "*Note*");

WHEREAS, BancorpSouth Bank, a Mississippi banking corporation (the "*Holder*"), is the successor by merger to Beneficiary;

WHEREAS, the Holder is the current legal owner and holder of the indebtedness secured by the Deed of Trust (the "*Indebtedness*") and, if, for any reason, Holder prefers to appoint a substitute trustee to act instead of the trustee named in the Deed of Trust, Holder has the full power to appoint, at any time and

20170804.20190907/3778368.1

1

without any formality other than by written instrument, one or more successor or alternate successor trustees, each of whom shall succeed to all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Holder has named, constituted and appointed in writing BRADLEY E. RAUCH, a resident of Harris County, Texas, ZACHARY SCHNEIDER, a resident of Harris County, Texas, ANGELA ZAVALA, a resident of Travis County, Texas, and also MICHELLE JONES, a resident of Travis County, Texas, as Substitute Trustees, each with the power to act independently (and without the joinder of the others) under and by virtue of the Deed of Trust and to hold possess and execute all the estate, rights, powers and duties conferred upon the Original Trustee in the Deed of Trust and by applicable law;

WHEREAS, Grantor has defaulted in the performance of its obligations under the Note and the Deed of Trust, and notice of such defaults have been waived, and/or have occurred, and Grantor has failed to cure such default(s);

WHEREAS, acceleration of maturity and demand have been made upon Grantor for payment of the Indebtedness, and/or have been waived, and/or have occurred;

WHEREAS, the proceeds of the Note were used for commercial purposes, and the Mortgaged Property was not to be used by the debtor for residential purposes;

WHEREAS, the Holder has called upon and requested either or any of Bradley E. Rauch, Zachary Schneider, Angela Zavala, Michelle Jones, or any additional substitute trustee appointed pursuant to the terms of the Deed of Trust, as Substitute Trustees, to perform the Trustee's duties under the Deed of Trust and to post, mail and file, or have posted, mailed, and filed, notice and to sell the Mortgaged Property without prejudice and without creating an election not to proceed against any other collateral securing the obligations of the Grantor to the Holder, and without waiving any rights or remedies which the Holder has against the Grantor or any other parties obligated for payment of the Indebtedness;

NOW, THEREFORE, the undersigned Substitute Trustee, at the request of the Holder, hereby gives notice that after due posting of this Notice as required by the Deed of Trust and law, a Substitute Trustee will sell on **September 1, 2020** (that being the first Tuesday of said month, as provided for in Texas

20170804.20190907/3778368.1

2

Property Code Sec. 51.002) at public auction to the highest bidder for cash, at THE REAR "SALLYPORT" OF THE TRAVIS COUNTY COURTHOUSE, 1000 GUADALUPE STREET, AUSTIN, TEXAS 78701, said location having been designated by the County Commissioners' Court of Travis County, Texas (or such other location as may be designated by said County Commissioners' Court), the sale to begin no earlier than 1:00 o'clock p.m. and no later than three (3) hours after such time, the Mortgaged Property, including without limitation, all personal property described in the Deed of Trust, owned by the Grantor, Grantor's heirs, legal representatives, successors and assigns, and originally covered by the Deed of Trust, whether or not herein specifically described.

THE SALE OF THE PROPERTY IS "AS IS" AND "WHERE IS" AND WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND BY THE SUBSTITUTE TRUSTEE OR HOLDERS OF SAID INDEBTEDNESS, EXPRESS, IMPLIED, STATUTORY, QUASI-STATUTORY OR OTHERWISE, ANY WARRANT OR MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE BEING EXPRESSLY DISCLAIMED. NEITHER THE HOLDER NOR THE TRUSTEE OR SUBSTITUTE TRUSTEE MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE COMPLIANCE WITH LAWS, RULES, AGREEMENTS, OR SPECIFICATIONS, NOR WITH RESPECT TO CONDITION, QUALITY, CAPACITY, DESIGN, OPERATION, ABSENCE OF ANY LATENT DEFECTS OR ANY OTHER WARRANTY OR REPRESENTATION WHATSOEVER WITH RESPECT TO THE PROPERTY, ALL OF WHICH ARE EXPRESSLY WAIVED BY PURCHASER(S).

THE NEXT PAGE IS THE SIGNATURE PAGE

20170804.20190907/3778368.1

3

WITNESS BY HAND this 7th day of **August, 2020**.

_____
Zachary Schneider, Trustee

COUNTY OF HARRIS      §
                        §
STATE OF TEXAS       §

       This document was acknowledged before me on this, the **7th day of August, 2020**, by Zachary Schneider, Trustee.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

**Name and Address of Substitute Trustees:**
Mr. Bradley E. Rauch
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002



KAREN M. WADE
My Notary ID # 7848256
Expires June 30, 2023

Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

Angela Zavala
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

Michelle Jones
Foreclosure Network of Texas
10406 Rockley Road
Houston, TX 77099

**AFTER RECORDING, PLEASE RETURN TO:**
Mr. Zachary Schneider
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002

20170804.20190907/3778368.1

4

## EXHIBIT "A"

### Legal Description

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 66 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "F" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.73 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 61° 05' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT NO. 13                    EX. 13-007

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

1) S 76° 04' 00" E, A DISTANCE OF 139.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

2) N 13° 53' 00" E, A DISTANCE OF 53.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 59" E, A DISTANCE OF 1.82 FEET)

THENCE, N 60° 26' 08" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 154.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 53' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 28.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.



**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas

**202040410**

Aug 10, 2020 11:12 AM
Fee: $3.00        MACEDOS

## AFFIDAVIT OF MAILING
### (WC Teakwood Plaza)

STATE OF TEXAS      §
                             §

COUNTY OF HARRIS    §

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared **Enrique DeLaMora**, who being duly sworn, upon his oath deposes and says as follows:

That on the 11th day of August, 2020, Affiant, for and on behalf of BancorpSouth Bank, a Mississippi banking corporation, deposited a copy of the Notice of Substitute Trustee's Sale attached hereto in a post office or official depository under the care and custody of the United States Postal Service, enclosed in a post-paid wrapper marked "certified mail" and/or enclosed in a first class mail postage-paid wrapper, properly addressed to each of the following parties at the respective addresses indicated below, each address being the most recent address of the respective party as shown by the records of the Holder:

*Via CMRRR #9414 7266 9904 2167 5059 28
and First Class U.S. Mail*
WC Teakwood Plaza
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Copies To:

| | |
|---|---|
| Natin Paul<br>c/o World Class<br>814 Lavaca St.<br>Austin, Texas 78701<br>*Via CMRRR# 9414 7266 9904 2167 5059 35* | World Class Capital Group, LLC<br>c/o World Class<br>814 Lavaca St.<br>Austin, Texas 78701<br>Attn: Natin Paul<br>*Via CMRRR# 9414 7266 9904 2167 5059 42* |
| Linda Thong<br>World Class<br>244 Fifth Avenue, Suite 2200<br>New York, New York 10001<br>*Via CMRRR# 9414 7266 9904 2167 5059 59* | Brian Elliott<br>World Class Global Business Services<br>814 Lavaca St.<br>Austin, Tx 78701<br>*Via CMRRR# 9414 7266 9904 2167 5056 07,*<br>*And First Class Mail* |

*Enrique de la Mora.*
Enrique DeLaMora

SIGNED AND SWORN TO BEFORE ME by **Enrique DeLaMora**, this 11th day of August, 2020.

NOTARY PUBLIC,
THE STATE OF TEXAS

MELISSA D. ECKART
My Notary ID # 11130019
Expires February 20, 2022

20170804\20190907/3786516.1

**ELECTRONICALLY RECORDED**      **2017066580**

TRV    **16**    PGS

50 CTOT 17-298207-AN

## COLLATERAL ASSIGNMENT OF LEASES AND RENTS

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

THIS COLLATERAL ASSIGNMENT OF LEASES AND RENTS ("Assignment") made as of April 25, 2017, by WC TEAKWOOD PLAZA, LLC, having an address at 401 Congress Avenue, 33rd Floor, Austin, Texas 78701, as assignor ("Assignor") to FIRST STATE BANK CENTRAL TEXAS, having an address at P. O. Box 6136, Temple, Texas 76503-6136, as assignee ("Lender").

### RECITALS:

WC TEAKWOOD PLAZA, LLC by virtue of that certain Promissory Note of even date herewith is indebted to Lender in the principal sum of $7,600,000.00 in lawful money of the United States of America (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "Note"), with interest from the date thereof at the rates set forth in the Note, and principal and interest being payable in accordance with the terms and conditions provided in the Note.

Assignor is the owner of or is acquiring the following described real property (the "Real Property"), (which together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon collectively, the "Property") and which Real Property is described as follows:

3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS, SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

The Note is secured by that certain Deed of Trust, Security Agreement and Financing Statement given by Assignor for the benefit of Lender, of even date herewith, covering the Property (defined below) and intended to be duly recorded (the "Security Instrument") and certain other documents (other than this Assignment) now or hereafter executed by Assignor and/or others in favor of Lender which by their terms wholly or partially secure or guarantee the payments under the Note (the "Other Security Documents").

Assignor desires to secure the payment of the principal sum, interest and all other sums due and payable under the Note, the Security Instrument, this Assignment and the Other Security Documents (collectively, the "Debt") and the performance of all of its obligations under the Note and those other obligations described in Section 1.01 of the Security Instrument ("Other Obligations").

### ARTICLE I. ASSIGNMENT

1.01    PROPERTY ASSIGNED. Assignor hereby irrevocably and unconditionally assigns and grants to Lender the right, title and interest of Assignor in and to all of the following property, rights, interests and estates, whether now owned, or hereafter acquired (the "Assigned Property"):

JNG17\FSBCT\WCTEAKWD\k17121AsnLsev2.wpd
April 10, 2017 (2:00pm)      1
EXHIBIT NO. 16      ASSIGNMENT OF LEASES AND RENTS
EX. 15-001

A.    <u>Leases and Other Agreements</u>.  All existing and future leases and all other agreements, whether or not in writing, affecting the use, enjoyment or occupancy of all or any part of the Property, now or hereafter made, whether before or after the filing by or against Assignor of any petition for relief under 11 U.S.C. § 101 *et seq.*, as the same may be amended from time to time (the "Bankruptcy Code"), together with any extension, renewal or replacement of the same (collectively the "Leases").

B.    <u>Rents</u>.  All rents, additional rents, revenues, income, issues and profits (including, without limitation, fixed rent, minimum rent and percentage rent, if any, and all oil and gas or other mineral royalties and bonuses), deposits, accounts and other benefits arising from the Leases or otherwise from the use, enjoyment and occupancy of the Property and any cash or security deposited in connection therewith, and all other monetary amounts of every type (including, without limitation, damages for breach) which are from time to time payable by tenants (at the Property) to Assignor (as landlord) under the Leases or which are otherwise receivable by Assignor with respect to the Leases or Property including rights and proceeds of any rental interruption insurance, claims arising out of a default in the payment to be made to possess or occupy the Property, any Lease termination fees, reimbursements for tenant finish, as well as all items considered "Rents" under applicable Texas statute, including Texas Property Code Chapter 64 as same may be amended from time to time ("Chapter 64") and all of such previously mentioned sums which are from time to time payable by guarantors (of the obligations of tenants) to Assignor (as landlord) under the Leases and all amounts payable by tenants (and guarantors for tenants) to Assignor (as landlord) under the provisions of the Bankruptcy Code as amended from time to time, and all proceeds of Rents including identifiable proceeds and identifiable cash proceeds whether paid or accruing before or after the filing by or against Assignor of any petition for relief under the Bankruptcy Code (collectively, the "Rents").

C.    <u>Bankruptcy Claims</u>.  All claims and rights to the payment of damages and other claims arising from any rejection by a lessee of any Lease under the Bankruptcy Code (the "Bankruptcy Claims").

D.    <u>Lease Guaranties</u>.  All claims and rights under any and all lease guaranties, letters of credit and any other credit support (individually, a "Lease Guaranty", and collectively, the "Lease Guaranties") given to Assignor by any guarantor in connection with any of the Leases (individually, a "Lease Guarantor", and collectively, the "Lease Guarantors").

E.    <u>Proceeds</u>.  All proceeds from any sale or other disposition of the Leases, the Rents, the Lease Guaranties and the Bankruptcy Claims.

F.    <u>Other Rights of Lessor</u>.  All rights, powers, privileges, options and other benefits of Assignor as lessor under the Leases and beneficiary under the Lease Guaranties, including without limitation the immediate and continuing right to make claim for, receive, collect and apply all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt or the Other Obligations), and to do all other things

which Assignor or any lessor is or may become entitled to do under the Leases or the Lease Guaranties.

G.    <u>Entry and Possession</u>. The right, at Lender's option, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents and enforce the Leases.

H.    <u>Power of Attorney</u>. Assignor's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in Section 5.01 of this Assignment and any or all other actions designated by Lender for the proper management and preservation of the Property.

I.    <u>Other Rights and Agreements</u>. Any and all other rights of Assignor in and to the items set forth in subsections (a) through (h) above, and all amendments, modifications, replacements, renewals, extensions, supplements, restatements and substitutions thereof.

## ARTICLE II. CONSIDERATION

2.01    <u>CONSIDERATION</u>. This Assignment is made in consideration of that certain loan made by Lender to Assignor evidenced by the Note and secured by the Security Instrument and the Other Security Documents.

## ARTICLE III. TERMS OF ASSIGNMENT

3.01    <u>PRESENT ASSIGNMENT</u>. It is intended by Assignor that this Assignment constitutes a present, irrevocable and collateral assignment of the Assigned Property which immediately vests into Lender a perfected security interest in the Assigned Property. This Assignment effects a transfer of the Rents to Lender and grants Lender a first priority lien on the Rents, and is intended to and creates in Lender all the rights of an assignee of Rents as established under Chapter 64 and constitutes Lender as the assignee of the Rents in accordance with the terms and provisions of this Assignment. It shall never be necessary for Lender to institute legal proceedings of any kind to enforce the provisions of this Assignment. This Assignment of all such present and future Leases and present and future agreements comprising the Assigned Property is effective without further or supplemental assignment.

3.02    <u>NOTICE TO LESSEES</u>. Assignor hereby agrees to authorize and direct the lessees named in the Leases or any other or future lessees or occupants of the Property and all Lease Guarantors to pay over to Lender or to such other party as Lender directs all Rents and all sums due under any Lease Guaranties upon receipt from Lender of written notice to the effect that Lender is then the holder of the Security Instrument and that an Event of Default (defined herein) exists, and to continue so to do until otherwise notified by Lender. Lender also has the right to give written enforcement notice ("Enforcement Notice") to Assignor and/or to each tenant under Chapter 64. Upon the occurrence of any such Event of Default and the resulting automatic termination of such Right to Collect (as defined herein), unless Lender gives Assignor notice to the contrary (a matter within the sole discretion of Lender), or upon Assignor's receipt of the Enforcement Notice, all Rents thereafter received by Assignor shall, in their entirety, be promptly (and in no event beyond five (5) calendar days) paid over by Assignor to Lender and Lender may exercise any and all legal and equitable

remedies including, without limitation the remedies provided for under this Assignment and/or Chapter 64.

3.03  NO PRO TANTO PAYMENT.  Assignor acknowledges and agrees that the execution and deliver of this Assignment does not constitute any nature of pro tanto payment of the Debt to Lender.  In the case of Rents which may hereafter be paid to Assignor, such Rents will not constitute payment to Lender (and hence will not be credited on the Debt) unless and until such Rents are actually paid by Assignor to Lender and applied by Lender in such manner.  In the case of Rents paid to Lender by the tenants, such Rents will be pro tanto credited on the Debt only to the extent, if any, that such Rents paid to Lender are neither disbursed by Lender to Assignor nor paid directly by Lender for utilities, maintenance, repairs, taxes, assessments, insurance or other expenses relating to the Property.

3.04  NO COMMINGLING OF RENTS.  The Rents (and interest, if any) shall not be commingled with any other funds of Assignor and Assignor shall not deposit any other funds in the accounts containing the Rents other than the Rents.

3.05  NON-PAYMENT OF RENTS.  In the event any lessee receiving any such written notice from Lender as described in Section 3.02 hereof, or withholding of such Rents by such lessee or such lessee's paying Rents into the registry of the court in connection with an interpleader or other action, or any other non-payment of such Rents to lender by any lessee, such lessee will be liable to Lender for the Rents not so paid to Lender plus costs of court plus attorney's fees of Lender.

3.06  TERMINATION OF ASSIGNMENT.  Upon payment in full of the Debt and the delivery and recording of a satisfaction or discharge of Security Instrument duly executed by Lender, this Assignment shall become null and void and shall be of no further force and effect.

3.07  INCORPORATION BY REFERENCE.  All representations, warranties, covenants, conditions and agreements contained in the Security Instrument as same may be modified, renewed, substituted or extended are hereby made a part of this Assignment to the same extent and with the same force as if fully set forth herein.

## ARTICLE IV.  RIGHT OF ASSIGNOR
## TO COLLECT RENTS

4.01  RIGHTS OF COLLECTION BY ASSIGNOR.  So long as there exists no Event of Default, Assignor shall have the right to receive and collect the Rents (the "Right to Collect").  It is the intent of Assignor and Lender that Lender shall have a perfected security interest in the Rents and identifiable proceeds and identifiable cash proceeds.  As such, Assignor specifically agrees to the terms of this Article.  The Rents so received and collected by Assignor shall be deposited by Assignor in one or more accounts containing only the Rents so deposited in such accounts (each and collectively a "Rental Deposit Account") plus any interest paid by the depository on the amount from time to time in such accounts.  Rents (and interest, if any) shall not be commingled with any other funds of Assignor and Assignor shall not deposit any other funds in such accounts other than the Rents.  Assignor shall, within seven (7) days following notice from Lender to Assignor, advise Lender in writing of the names and locations of each Rental Deposit Account as well as the account number of each such account, Assignor shall advise Lender of the balance in each Rental Deposit Account to the extent that such information may be requested by Lender.  Assignor

acknowledges and agrees that Assignor's Right to Collect the Rents does not negate or otherwise affect the status of this Assignment as being a valid security interest and lien in favor of Lender as to the Rents.

4.02  USE OF RENTS BY ASSIGNOR. All of the Rents so received or collected by Assignor pursuant to the Right to Collect hereby granted pursuant to Section 4.01 hereof shall be utilized by Assignor for payment of the Note, for timely payment of taxes and assessments on the Property before the accrual of any penalty or interest with respect thereto, for payment of premiums on insurance required under the Security Documents, for payment of the costs of maintenance and repairs which are the obligation of Assignor under the Leases with respect to the Property, for fulfillment of Assignor's other obligations under the Security Documents, all of such previously stated obligations of Assignor to be fulfilled by Assignor prior to Assignor's utilization of the Rents for any other purpose whatsoever.

4.03  AUTOMATIC TERMINATION OF ASSIGNOR'S RIGHT TO COLLECT. Upon and during the occurrence of any Event of Default, upon Lender's sending a written Enforcement Notice (an "Enforcement Notice") to Assignor, the Assignor's Right to Collect under Section 4.01 of this Agreement shall, automatically terminate without the necessity that Lender give Assignor any further notice or institute against Assignor any nature of legal proceedings or take any other action, and Lender also has the right to give a written Enforcement Notice to each tenant under Chapter 64. Upon the occurrence of any such Event of Default and the sending the Enforcement Notice terminating the Right to Collect, upon Assignor's receipt of the Enforcement Notice, all Rents then held or thereafter received by Assignor shall, in their entirety, be promptly (and in no event beyond five (5) calendar days) paid over by Assignor to Lender and Lender may exercise any and all legal and equitable remedies including, without limitation the remedies provided for under Article 6 of this Assignment and/or Chapter 64.

4.04  IMPACT ON TENANTS OF TERMINATION OF ASSIGNOR'S RIGHT TO COLLECT. Notwithstanding any of the other terms or provisions of this Assignment, until receipt from Lender of notice of the occurrence of any Event of Default, or an Enforcement Notice, each tenant may pay rentals directly to Assignor. Upon receipt by any tenant under the Leases, however, of notice from Lender that an Event of Default has occurred, or an Enforcement Notice, irrespective of whether Assignor contests the occurrence or existence of such Event of Default or contests Lender's entitlement to receive the Rents, each such tenant under the Leases is hereby authorized and directed and required to pay directly to Lender all Rents accruing after the date of the Event of Default notice or the date of the Enforcement Notice from Lender (irrespective of any contrary provision of the lease to such tenant or any other circumstances whatsoever); and the receipt by Lender of Rents shall constitute a release of each tenant paying such Rents to the extent of the amounts so paid to Lender by such tenant. The receipt by a tenant of any such notice from Lender constitutes full authorization and mandate for such tenant to make all future payment of Rents directly to Lender and each tenant paying such future Rents to Lender after such notice from Lender shall be permitted to rely on such notice and shall have no liability to Assignor after such notice for any Rents so paid to Lender by such tenant. In the event that any tenant receiving any such notice from Lender does not timely pay such future Rents to Lender, whether on account of continued payment of such Rents by such tenant to Assignor or withholding of such Rents by such tenant or such tenant's paying such Rents into the registry of the court in connection with an interpleader or other action or any other non-payment of such Rents to Lender by any tenant, such tenant will be liable to Lender for the Rents not so paid to Lender plus costs of

EXHIBIT NO. 16

EX. 15-005

court plus attorneys' fees of Lender. Lender may also contact each Tenant before an Event of Default and shall cause each tenant to agree in writing to the terms and provisions of this Section 4.04. Whenever requested by Lender, Assignor shall promptly obtain from each tenant and deliver to Lender an agreement executed by such tenant which provides that tenant has agreed to the terms and provisions hereinabove set forth in this Section 4.04.

## ARTICLE V. COVENANTS, REPRESENTATIONS AND WARRANTIES OF ASSIGNOR

5.01 COVENANTS OF ASSIGNOR. Assignor hereby unconditionally covenants and agrees with Lender as follows:

A. to observe, perform and discharge, diligently and punctually, all the obligations imposed upon the landlord under the Leases and not to do or permit to be done anything to impair the Leases or the Rents obligations or any of the other obligations of the tenants under the Leases; and Assignor shall give prompt notice to Lender of any failure on the part of the Assignor to observe, perform and discharge any of Assignor's obligations under this paragraph or under any other portion of this Assignment;

B. not to receive and accept or collect any of the Rents arising or accruing under any of the Leases or from the Property more than one (1) calendar month in advance, unless Assignor notifies Lender in advance of such pre-payment.

C. except as required by prudent business judgement exercised by Assignor in good faith, not to grant any period of free rental or abated rental under any of the Leases;

D. not to execute any further assignment of the rights or interests of Assignor (as landlord) in the Leases without Lender's prior written consent and not to execute any other assignment or transfer of Rents arising or accruing from the Leases or from the Property;

E. not to subordinate any of the Leases to any of the Security Documents or any other mortgage or other encumbrance, or permit, consent or agree to such subordination without Lender's prior express written consent;

F. except as required by prudent business judgement exercised by Assignor in good faith, not to alter, modify or change the terms of any of the Leases (or the terms of any guaranty of any of the Leases) or give any consent or exercise any option required or permitted by such terms without the prior written consent of Lender which consent shall not be unreasonably withheld or delayed, or cancel or terminate any of the Leases (or any guaranty of any of the Leases) or accept a surrender of any of the Leases or take or permit any action the effect of which is to result in a surrender of any Lease by operation of law; provided however, Assignor may terminate a Lease as a result of Lender's election to apply insurance or condemnation proceeds towards the Debt from a loss or taking that directly affects the leased premises with respect that lease;

G. not to consent to any assignment of or subletting under any of the Leases, except as required in accordance with their terms, without the prior written consent of Lender;

and not to grant any renewal or extension option under any of the Leases or agree to the enlargement or diminution in size or relocation of the leased premises under any Lease without the prior written approval of Lender which consent shall not be unreasonably withheld or delayed;

H.     to execute and deliver to Lender, at the request of Lender all such further assurances and written instruments and take all such other action with respect to the Property and/or the Leases as Lender shall from time to time request in writing in order to carry out the purpose and intent of this Assignment;

I.      to enforce, in the name of Assignor (as landlord), and at the cost, expense and risk of Assignor, the performance of each and every obligation, term, covenant, condition and agreement in the Leases to be performed by any tenant; and Assignor (as landlord) shall appear in and defend any action or proceeding arising under, occurring out of or in any manner connected with the Leases or the obligations, duties or liabilities of Assignor (as landlord) and any tenant thereunder, and, upon request by Lender, Assignor will do so in the name and on behalf of Lender, but at the expense of the Assignor, and Assignor shall pay all costs and expenses of Lender, including attorneys' fees and disbursements, in any action or proceeding in which Lender may appear;

J.      not to waive, excuse, discount, set-off, compromise or in any manner release or discharge any tenant under any Lease (or any guarantor for any such tenant) of and from any monetary or other obligations, covenants, conditions and agreements to be kept, observed and performed by such tenant (or guarantor for such tenant), including, without limitation, the obligation to pay Rents thereunder, in the manner and at the time and place specified therein;

K.     not to incur any indebtedness to any tenant (or guarantor for any tenant) under any of the Leases unless each such tenant (or guarantor) contemporaneously expressly waives in writing any right to offset against (or recoup) any portion of such indebtedness from Rents;

L.      not to grant any Lease such that the effective lease rate over the term of the Lease is substantially below the market rate for similar leases for similar terms in the county where the Property is located without the Lender's prior written consent;

M.     to deliver to Lender, at the request of Lender from time to time, executed copies of all or a portion of the Leases upon all or any part of the Property;

N.     that any non-compliance by Assignor shall after applicable notice and failure to cure as provided for in the Loan Agreement constitute an Event of Default; and

O.     that no option to purchase the Property or right of first refusal in connection with any transfer of the Property will be granted by Assignor under any of the Leases.

5.02    REPRESENTATIONS AND WARRANTIES OF ASSIGNOR.  Assignor unconditionally represents and warrants to Lender now and continuing throughout the term of this Assignment as follows:

A.   Assignor is the sole owner of the Property, and the landlord's interests in the Leases;

B.   Assignor has all of the requisite right, power and authority to assign the Rents to Lender, and no other person, firm, corporation or entity has any right, title or interest in the Rents;

C.   to the best knowledge of Assignor, the Leases are valid and enforceable, in full force and effect and have not been altered, modified or amended in any manner whatsoever except as disclosed to Lender as evidenced by written amendments to the Leases;

D.   to the best knowledge of Assignor, the tenants named in the Leases are not in default under any of the terms, covenants or conditions of the leases and Assignor has duly and punctually performed and shall at all times hereafter duly and punctually perform all and singular, the terms, covenants, conditions and warranties of the leases on the Assignor's part to be kept, observed and performed;

E.   no Rents provided for under any of the Leases have been previously sold, assigned, transferred, mortgaged or pledged by Assignor, and no Rents for any period subsequent to the date of this Assignment have been collected by Assignor or shall be collected by Assignor earlier than the calendar month next preceding the calendar month with respect to which such Rents are due and payable under the terms of any of the Leases;

F.   to the best knowledge of Assignor, no period of free or abated rental has been granted to any tenant under any of the Leases except as is disclosed on the most recent rent roll provided by Assignor to Lender; and

G.   no option to purchase or right of first refusal in favor of a tenant in connection with any transfer of the Property exists in any of the Leases.

### ARTICLE VI. REMEDIES

6.01   REMEDIES OF LENDER.  Assignor hereby unconditionally covenants and agrees with Lender as follows:

A.   Upon or at any time after the occurrence of an Event of Default, without waiving such Event of Default, to the extent permitted by law, without notice and without regard to the adequacy of the security for the Debt, with or without bringing any action or proceeding, either in person or by agent, nominee, attorney, or a receiver appointed by a court, in addition to Lender's rights under Section 4.03 hereof, Lender, at its option, may dispossess Assignor and its agents and servants from the Property, and exclude Assignor and its agents or servants wholly therefrom and take possession of the Property and all books, records and accounts relating thereto without liability for trespass, damages or otherwise. Thereafter, Lender may have, hold, manage, lease and operate the Property on such terms and for such period of time as Lender may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and other sums payable pursuant to any of the Assigned Property, including those past due and unpaid, with full power to make from time to time all alterations,

EXHIBIT NO. 16                                    EX. 15-008

renovations, repairs or replacements thereto or thereof as may seem proper to Lender. Subject to the requirements of Chapter 64 of the Texas Property Code, Lender may apply the Rents and sums received pursuant to any of the Assigned Property to the payment of the following in such order and proportion as Lender in its sole discretion may determine: (i) all expenses of managing and securing the Property, including, without limitation, the salaries, fees and wages of a managing agent and such other employees or agents as Lender may deem necessary or desirable; (ii) all expenses of operating and maintaining the Property, including, without limitation, all utility charges, Taxes, and Other Charges (as such terms are defined in the Security Instrument) and any other liens, charges and expenses which Lender may deem necessary or desirable; (iii) the cost of all alterations, renovations, repairs or replacements; (iv) all expenses incident to taking and retaining possession of the Property; and (v) the Debt, together with all costs and reasonable attorneys' fees.

B.  In addition, upon the occurrence of an Event of Default, Lender, at its option, may (i) exercise such other rights and remedies as Lender shall have under applicable law, including Chapter 64; (ii) exercise all rights and powers of Assignor, including, without limitation, the right to enter into, negotiate, execute, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums payable under the Assigned Property; (iii) either require Assignor to pay monthly in advance to Lender, or to any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in possession of Assignor, or require Assignor to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Assignor may be evicted by summary proceedings or otherwise.

6.02  OTHER REMEDIES.  Nothing contained in this Assignment and no act done or omitted by Lender pursuant to the power and rights granted to Lender hereunder shall be deemed to be a waiver by Lender of its rights and remedies under the Note, the Security Instrument, or the Other Security Documents and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Lender under the terms thereof. The right of Lender to collect the Debt and to enforce any other security therefor held by it may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder. Assignor hereby absolutely, unconditionally and irrevocably waives any and all rights to assert any setoff, counterclaim or crossclaim of any nature whatsoever with respect to the obligations of Assignor under this Assignment, the Note, the Security Instrument, the Other Security Documents or otherwise with respect to the loan secured hereby in any action or proceeding brought by Lender to collect same, or any portion thereof, or to enforce and realize upon the lien and security interest created by this Assignment, the Note, the Security Instrument, or any of the Other Security Documents (provided, however, that the foregoing shall not be deemed a waiver of Assignor's right to assert any compulsory counterclaim if such counterclaim is compelled under local law or rule of procedure, nor shall the foregoing be deemed a waiver of Assignor's right to assert any claim which would constitute a defense, setoff, counterclaim or crossclaim of any nature whatsoever against Lender in any separate action or proceeding).

6.03  OTHER SECURITY.  Lender may take or release other security for the payment of the Debt, may release any party primarily or secondarily liable therefor and may apply any other

security held by it to the reduction or satisfaction of the Debt without prejudice to any of its rights under this Assignment.

6.04    NON-WAIVER. The exercise by Lender of the option granted it in Section 5.01 of this Assignment and the collection of the Rents and other sums payable pursuant to the Assigned Property and the application thereof as herein provided shall not be considered a waiver of any default by Assignor under the Note, the Security Instrument, the Leases, this Assignment or the Other Security Documents. The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment. Assignor shall not be relieved of Assignor's obligations hereunder by reason of (a) the failure of Lender to comply with any request of Assignor or any other party to take any action to enforce any of the provisions hereof or of the Security Instrument, the Note or the Other Security Documents, (b) the release regardless of consideration, of the whole or any part of the Property, or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of this Assignment, the Note, the Security Instrument or the Other Security Documents. Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take any action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to enforce its rights under this Assignment. The rights of Lender under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

6.05    BANKRUPTCY. Assignor hereby unconditionally covenants and agrees with Lender as follows:

A.    Upon or at any time after the occurrence of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Assignor in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Assignor, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

B.    If there shall be filed by or against Assignor a petition under the Bankruptcy Code, and Assignor, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Assignor shall give Lender not less than ten (10) days' prior notice of the date on which Assignor shall apply to the bankruptcy court for authority to reject the Lease. Lender shall have the right, but not the obligation, to serve upon Assignor within such ten-day period a notice stating that (i) Lender demands that Assignor assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Assignor the notice described in the preceding sentence, Assignor shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

## ARTICLE VII. FURTHER ASSURANCES/NO LIABILITY

7.01 FURTHER ASSURANCES. Assignor will, at the cost of Assignor, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, conveyances, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require for the better assuring, conveying, assigning, transferring and confirming unto Lender the property and rights hereby assigned or intended now or hereafter so to be, or which Assignor may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering or recording this Assignment and, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Assignor to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or comparable security instruments, to evidence more effectively the lien and security interest hereof in and upon the Leases.

7.02 NO LIABILITY OF LENDER. THIS ASSIGNMENT SHALL NOT BE CONSTRUED TO BIND LENDER TO THE PERFORMANCE OF ANY OF THE COVENANTS, CONDITIONS OR PROVISIONS CONTAINED IN ANY LEASE OR LEASE GUARANTY OR OTHERWISE IMPOSE ANY OBLIGATION UPON LENDER. LENDER SHALL NOT BE LIABLE FOR ANY LOSS SUSTAINED BY GRANTOR RESULTING FROM LENDER'S FAILURE TO LET THE PROPERTY AFTER AN EVENT OF DEFAULT OR FROM ANY OTHER ACT OR OMISSION OF LENDER IN MANAGING THE PROPERTY AFTER AN EVENT OF DEFAULT UNLESS SUCH LOSS IS CAUSED BY THE WILLFUL MISCONDUCT OR BAD FAITH OF LENDER. LENDER SHALL NOT BE OBLIGATED TO PERFORM OR DISCHARGE ANY OBLIGATION, DUTY OR LIABILITY UNDER THE LEASES OR ANY LEASE GUARANTIES OR UNDER OR BY REASON OF THIS ASSIGNMENT AND GRANTOR SHALL, AND HEREBY AGREES, TO INDEMNIFY LENDER FOR, AND TO HOLD LENDER HARMLESS FROM, ANY AND ALL LIABILITY, LOSS OR DAMAGE WHICH MAY OR MIGHT BE INCURRED UNDER THE ASSIGNED PROPERTY OR UNDER OR BY REASON OF THIS ASSIGNMENT AND FROM ANY AND ALL CLAIMS AND DEMANDS WHATSOEVER, INCLUDING THE DEFENSE OF ANY SUCH CLAIMS OR DEMANDS WHICH MAY BE ASSERTED AGAINST LENDER BY REASON OF ANY ALLEGED OBLIGATIONS AND UNDERTAKINGS ON ITS PART TO PERFORM OR DISCHARGE ANY OF THE TERMS, COVENANTS OR AGREEMENTS CONTAINED IN THE LEASES OR ANY LEASE GUARANTIES, EVEN IF SUCH LOSS IS THE RESULT OF OR CAUSED BY THE NEGLIGENT ACTS OR OMISSIONS OF LENDER (WHETHER SOLE OR CONCURRENT). SHOULD LENDER INCUR ANY SUCH LIABILITY, THE AMOUNT THEREOF, INCLUDING COSTS, EXPENSES AND REASONABLE ATTORNEYS' FEES, SHALL BE SECURED BY THIS ASSIGNMENT AND BY THE SECURITY INSTRUMENT AND THE OTHER SECURITY DOCUMENTS AND GRANTOR SHALL REIMBURSE LENDER THEREFOR IMMEDIATELY UPON DEMAND AND UPON THE FAILURE OF GRANTOR SO TO DO LENDER MAY, AT ITS OPTION, DECLARE ALL SUMS SECURED BY THIS ASSIGNMENT AND BY THE SECURITY INSTRUMENT AND THE OTHER SECURITY DOCUMENTS IMMEDIATELY DUE AND PAYABLE. THIS ASSIGNMENT SHALL NOT OPERATE TO PLACE ANY OBLIGATION OR LIABILITY FOR THE CONTROL, CARE, MANAGEMENT OR REPAIR OF THE PROPERTY UPON LENDER, NOR

**FOR THE CARRYING OUT OF ANY OF THE TERMS AND CONDITIONS OF THE LEASES OR ANY LEASE GUARANTIES; NOR SHALL IT OPERATE TO MAKE LENDER RESPONSIBLE OR LIABLE FOR ANY WASTE COMMITTED ON THE PROPERTY BY THE TENANTS OR ANY OTHER PARTIES, OR FOR ANY DANGEROUS OR DEFECTIVE CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION THE PRESENCE OF ANY HAZARDOUS SUBSTANCES (AS DEFINED IN THE SECURITY INSTRUMENT), OR FOR ANY NEGLIGENCE IN THE MANAGEMENT, UPKEEP, REPAIR OR CONTROL OF THE PROPERTY RESULTING IN LOSS OR INJURY OR DEATH TO ANY TENANT, LICENSEE, EMPLOYEE OR STRANGER.**

7.03    NO MORTGAGEE IN POSSESSION.  Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Lender.  In the exercise of the powers herein granted Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Assignor.

## ARTICLE VIII.  DEFINITIONS

8.01    CERTAIN DEFINITIONS.  .Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the phrases "attorneys' fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder, the word "Assignor" shall mean each Assignor and any subsequent owner or owners of the Property or any part thereof or interest therein, the word "Lender" shall mean Lender and any subsequent holder of the Note, the word "Note" shall mean the Note and any other evidence of indebtedness secured by the Security Instrument, the word "person" shall include an individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority, and any other entity, and the word "Property" shall include  any portion of the Property and any interest therein.

8.02    NUMBER AND GENDER.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

8.03    EVENT OF DEFAULT.  "Event of Default" shall mean any event of default as set forth in the Note or in any of the Other Security Documents, or under the terms of any other instrument given as collateral to Lender as security for the payment of the Note after applicable notice and failure to cure as provided for in the Loan Agreement of even date by and between Assignor and Lender.

## ARTICLE IX.  APPLICABLE LAW

9.01    CHOICE OF LAW.  This Assignment shall be governed, construed, applied and enforced in accordance with the laws of the State of Texas.  Venue shall lie in Bell County, Texas.

9.02    PROVISIONS SUBJECT TO APPLICABLE LAW.  All rights, powers and remedies provided in this Assignment may be exercised only to the extent that the exercise thereof does not violate

EXHIBIT NO. 15                                        EX. 15-012

any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Assignment invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable laws.

## ARTICLE X. MISCELLANEOUS PROVISIONS

10.01   CONFLICT OF TERMS. In case of any conflict between the terms of this Assignment and the terms of the Security Instrument, the terms of the Security Instrument shall prevail.

10.02   NO ORAL CHANGE. This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Assignor or Lender, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

10.03   AUTHORITY. Assignor represents and warrants that it has full power and authority to execute and deliver this Assignment and the execution and delivery of this Assignment has been duly authorized and does not conflict with or constitute a default under any law, judicial order or other agreement affecting Assignor or the Property.

10.04   DUPLICATE ORIGINALS; COUNTERPARTS. This Assignment may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

10.05   NOTICES. All notices required or permitted hereunder shall be given as provided in the Security Instrument.

10.06   LIABILITY. If Assignor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Assignment shall be binding upon and inure to the benefit of Assignor and Lender and their respective successors and assigns forever.

10.07   HEADINGS, ETC. The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

10.08   SOLE DISCRETION OF LENDER. Wherever pursuant to this Assignment (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

10.09   COSTS AND EXPENSES OF ASSIGNOR. Wherever pursuant to this Assignment it is provided that Assignor pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees.

EXHIBIT NO. 15                                                    EX. 15-013

IN WITNESS WHEREOF, Assignor has executed this instrument as of the day and year first above written.

Assignor:

WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company

By:     WC Teakwood Plaza Mezz, LLC, a
        Delaware limited liability company,
        Manager

        By: 

        Natin Paul, President

THE STATE OF Texas                §

COUNTY OF Travis                  §

This instrument was acknowledged before me on the 18 day of April , 2017 , by Natin Paul, President of WC Teakwood Plaza Mezz, LLC, a Delaware limited liability company, on behalf of said limited liability company, in its capacity as Manager of WC TEAKWOOD PLAZA, LLC, a Delaware limited liability company, on behalf of said limited liability company.

[Notary seal:]
LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846548

Notary Public in and for
The State of Texas

My commission expires: 10/3/20

AFTER RECORDING RETURN TO:
Loan Services
FIRST STATE BANK CENTRAL TEXAS
P. O. Box 6136
Temple, Texas 76503-6136

PREPARED BY:

OPPER & GAMBRELL, P.L.L.C.
8582 Katy Freeway, Suite 200
Houston, Texas 77024



3.395 ACRES OF LAND SITUATED IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING ALL OF LOT 2 AND A PORTION OF LOT 1, ALLANDALE NORTH SECTION FIVE, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 11 OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS; SAID 3.395 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING, AT A 1/2 INCH IRON ROD FOUND IN THE EASTERLY LINE OF BURNET ROAD (140' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF LOT 1, JACKSON TERRACE NO. 2 AMENDED, A SUBDIVISION OF RECORD IN VOLUME 41, PAGE 13 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHWESTERLY CORNER HEREOF;

THENCE, S 60° 26' 00" E, ALONG THE SOUTHERLY LINES OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND LOT 4 OF SAID JACKSON TERRACE NO. 2 AMENDED, BEING THE NORTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHERLY LINE HEREOF, PASSING AT A DISTANCE OF 164.74 FEET A 1/2 INCH IRON ROD FOUND AT THE COMMON SOUTHERLY CORNER OF SAID LOT 1, JACKSON TERRACE NO. 2 AMENDED AND SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED AND CONTINUING FOR A TOTAL DISTANCE OF 259.66 FEET TO A 1/2 INCH IRON PIPE FOUND AT THE SOUTHEASTERLY CORNER OF SAID LOT 4, JACKSON TERRACE NO. 2 AMENDED, BEING THE SOUTHWESTERLY CORNER OF LOT 1, BLOCK "H" LANIER TERRACE SECTION 4, A SUBDIVISION OF RECORD IN VOLUME 18, PAGE 65 OF SAID PLAT RECORDS AND THE NORTHWESTERLY CORNER OF LOT 8, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 17, PAGE 20 OF SAID PLAT RECORDS AND ALSO BEING THE NORTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE NORTHEASTERLY CORNER HEREOF;

THENCE, S 13° 52' 00" W, ALONG THE WESTERLY LINES OF LOTS 2, 3, 6, 7 AND 8, BLOCK "P" OF SAID ALLANDALE NORTH SECTION THREE AND ALONG THE WESTERLY LINES OF LOT 4A AND LOT 5A, RESUBDIVISION OF LOTS 4 AND 5, BLOCK "P" ALLANDALE NORTH SECTION THREE, A SUBDIVISION OF RECORD IN VOLUME 25, PAGE 42 OF SAID PLAT RECORDS AND ALSO BEING ALONG THE WESTERLY LINE OF LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO, A SUBDIVISION OF RECORD IN VOLUME 15, PAGE 91 OF SAID PLAT RECORDS, BEING THE EASTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE EASTERLY LINE HEREOF, A DISTANCE OF 598.75 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE NORTHERLY LINE OF TEAKWOOD DRIVE (64' R.O.W.), BEING THE SOUTHWESTERLY CORNER OF SAID LOT 1, BLOCK "P" ALLANDALE NORTH SECTION TWO AND THE SOUTHEASTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHEASTERLY CORNER HEREOF;

THENCE, N 76° 08' 00" W, ALONG THE NORTHERLY LINE OF TEAKWOOD DRIVE, BEING THE SOUTHERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHERLY LINE HEREOF, A DISTANCE OF 249.97 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE SOUTHERLY LINE OF BURNET ROAD, BEING THE SOUTHWESTERLY CORNER OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR THE SOUTHWESTERLY CORNER HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 548.24 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND AT THE SOUTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A 1/2 INCH IRON ROD FOUND BEARS N 68° 03' 42" E, A DISTANCE OF 0.71 FEET;

EXHIBIT A
PAGE 1 OF 2 PAGES

THENCE, LEAVING THE EASTERLY LINE OF BURNET ROAD, OVER AND ACROSS SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

    1) S 76° 08' 00" E, A DISTANCE OF 129.40 FEET TO A P.K. NAIL WITH SHINER FOUND FOR AN ANGLE POINT HEREOF;

    2) N 13° 52' 00" E, A DISTANCE OF 63.63 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF, FROM WHICH A CUT "X" FOUND IN CONCRETE BEARS N 66° 34' 39" E, A DISTANCE OF 1.02 FEET;

THENCE, N 60° 26' 00" W, ALONG THE COMMON LINE OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE AND SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 134.41 FEET TO A 1/2 INCH IRON ROD WITH CAP FOUND IN THE EASTERLY LINE OF BURNET ROAD, BEING THE NORTHWESTERLY CORNER OF SAID LOT 1, ALLANDALE NORTH SECTION FIVE, FOR AN ANGLE POINT HEREOF;

THENCE, N 13° 52' 00" E, ALONG THE EASTERLY LINE OF BURNET ROAD, BEING A PORTION OF THE WESTERLY LINE OF SAID LOT 2, ALLANDALE NORTH SECTION FIVE, FOR A PORTION OF THE WESTERLY LINE HEREOF, A DISTANCE OF 20.77 FEET TO THE POINT OF BEGINNING, CONTAINING AN AREA OF 3.395 ACRES (147,865 SQ. FT.) OF LAND, MORE OR LESS.

EXHIBIT A
PAGE 2 OF 2 PAGES

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
April 27 2017 08:39 AM
FEE $ 86.00 2017066580

ELECTRONICALLY RECORDED          2017066581

TRV     4     PGS

*50 CTOT 17-298207-M*

After recording, please return to:

First Nationwide Title Agency, LLC
Ilya Soybelman
220 East 42nd Street, Suite 3105
New York, NY 10017

## RELEASE OF LIEN

KNOW ALL MEN BY THESE PRESENTS:

WHEREAS, U.S. Bank National Association, successor in interest to Bank of America, National
Association, successor by merger to LaSalle Bank National Association, as Trustee for the registered
holders of Bear Stearns Commercial Mortgage Securities Inc., Commercial Mortgage Pass-Through
Certificates, Series 2005-PWR9 ("**Current Lender**"), under the Pooling and Servicing Agreement dated as
of September 1, 2005, whose address is c/o C-III Asset Management LLC 5221 N. O'Connor Blvd., Suite
600, Irving, Texas 75039, is the current owner and holder of the note evidencing the debt secured by that
certain Deed of Trust, Security Agreement, Assignment of Rents dated July 26, 2005 ("**Deed of Trust**")
executed by CFH Realty III/Teakwood, LP., a Texas limited partnership ("**Original Borrower**"), in favor
Principal Commercial Funding, LLC ("**Original Lender**"), and recorded July 28, 2005 as County Clerk's
File number 2005135872 of the Official Public Records, Travis County, Texas. ("**Official Public
Records**"), as affected by the Consent to Transfer and Loan Assumption dated December 23, 2010 and
recorded December 29, 2010 under County Clerk's File number 2010194784 of the Official Public
Records, as assigned to U.S. Bank National Association, as Trustee, as Successor-In-Interest to Bank of
America, National Association, as Trustee, as Successor-By-Merger to LaSalle Bank National Association,
as Trustee for the Registered Holders of Bear Stearns Commercial Mortgage Securities, Inc., Commercial
Mortgage Pass-Through Certificates, 2005-PWR9 by Assignment Dated: February 25, 2016, recorded
March 10, 2016 in County Clerk's File number 2016035461, of the Official Public Records, as modified by
Agreement, dated: July 29, 2016, recorded: July 29, 2016 in County Clerk's File number 2016123536, of
the Official Public Records, covering certain real estate located in Travis County, Texas, as more fully
described in the attached **Exhibit A** (the "**Property**").

NOW, THEREFORE, the undersigned, has this day, and does by these presents hereby RELEASE,
DISCHARGE AND QUITCLAIM unto the Original Borrower, its successors or assigns, as the case may
be, all the right, title, interest and estate in and to the Property which the undersigned has or may be
entitled to by virtue of said Deed of Trust and said Assignment of Leases and Rents, and any
contemporaneous vendor's lien, and does hereby declare the same to be fully released and discharged
therefrom.

*[Remainder of page intentionally left blank; Signature page to follow]*

EXHIBIT NO. 15                    EX. 15-017

| Form 306 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>**Filing Fee: $750** | <br>**Application for<br>Registration<br>of a Foreign Limited<br>Partnership** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 803741754 08/28/2020<br>Document #: 992993640003<br>Image Generated Electronically<br>for Web Filing** |

1. The entity is a foreign limited partnership. The name of the entity is:

**8209 BURNET, L.P.**

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited partnership," or "limited" (or an abbreviation thereof). The name of the entity with the word or abbreviation that it elects to add for use in Texas is:

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:

3. Its federal employer identification number is: **85137471**
☐ Federal employer identification number information is not available at this time.

4. It is organized under the laws of: **DELAWARE, USA**
and the date of its formation in that jurisdiction is: **6/1/2020**

5. As of the date of filing, the undersigned certifies that the foreign limited partnership currently exists as a valid limited partnership under the laws of the jurisdiction of its formation.

6. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is: **08/21/2020**

7. The principal office address of the limited partnership is:
**2726 BISSONNET ST STE 244, Houston, TX, USA 77005-1353**

☑ 8A. The initial registered agent is an organization by the name of:
**Capital Corporate Services, Inc.**
☐ 8B. The initial registered agent is an individual resident of the state whose name is:
___
☐ 8C. The business address of the registered agent and the registered office address is:
**206 E 9TH ST STE 1300    AUSTIN  TX  78701-4411**

### Consent of Registered Agent
☐ A. A copy of the consent of Registered Agent is attached.
### OR
☑ B. The consent of the registered agent is maintained by the entity.

EXHIBIT NO. 20                    EX. 20-001

9. The entity hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

10. The name and address of each governing person is:

| NAME OF GOVERNING PERSON (Enter the name of either an individual or an organization, but not both:) : |
| --- |
| IF INDIVIDUAL |
| |
| |
| OR |
| IF ORGANIZATION |
| **8201 Burnet GP, LLC** |
| ADDRESS OF GOVERNING PERSON : |
| **2726 BISSONNET ST STE 244    HOUSTON  TX, USA  77005-1353** |

## Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

## Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: **August 28, 2020**      **8201 Burnet GP, LLC**

Signature and title of authorized person on behalf of the foreign limited partnership

**FILING OFFICE COPY**

```
MAI            08/18/20            ACCOUNT INQUIRY            16:31:38
UR
TL2 000  CTL3 000  CTL4 0000    ACCT 93300011379300      EFF DATE        08/06/2
TL2 000  CTL3 000  CTL4 0000    CUST 00000813920160      NON-ACCRUAL
CRA IND N                       ******** RATES ********* SIMPLE INT - VAR RATE
AYOFF            7258044.48                              AUTO DR
RIG LOAN AMT     7600000.00     CURR RATE     4.2500000  PROD TYPE          CV0
RIG PROCEEDS     7600000.00     ORIG RATE     5.7500000  PRIM OFFICER      2305
T CHG DUE              0.00     PER DIEM     830.0149428  GL KEY 0103  912
EES DUE                0.00   . ********* DATES ********  CALL CODE          01E
URRENT PRIN      7147893.39     CONTRACT DATE   04/26/17 ***** REPAYMENTS *****
URRENT INT        110151.09     CURR MATURITY   04/09/22 CURR TERM            6
CH PYMT AMT        41643.77     CLOSED DATE              PYMTS MADE           3
UR PYMT AMT        41643.77     SCHED DUE DATE  08/09/20 PYMTS REM            2
AST DUE AMT       149354.57     OLDEST DUE DATE 04/09/20 MONTHS EXTD  0 REN 00
ARTIAL PAID        35721.03     LAST MAINT DT   08/03/20 MAT DT EXTD  0
***********************         LST BAL CHG DT  08/05/20 YTD INT COL  151808.81
C TEAKWOOD PLAZA LLC                                     INT COL PRV  451241.06
14 LAVACA ST                                             ***** CREDIT HIST ****
                                   COLLATERAL            011 016 031 061 091 12
USTIN             TX 78701      CODE: R6                 000 002 001 001 001 00
H (   ) ( 000 ) 000-0000        DESC: 1ST RE COM INCOME
F1-NEXT STAT  PF2-PREV STAT  PF3-ADDL INFO  PF6-ESCROW
MPCGIS1 AM7294 I: FIRST STATUS DISPLAYED                           LAST
```

| WC Teakwood Plaza LLC Loan History | | | |
|---|---|---|---|
| Transaction Date | Transaction Type | Transaction Amount | Balance after Transaction |
| 04.26.2017 | Loan Set Up - Interest Rate @ 5.00% | | $ 7,600,000.00 |
| 05.16.2017 | Regular Payment | $ 44,428.83 | $ 7,569,105.10 |
| 06.12.2017 | Regular Payment | $ 44,428.83 | $ 7,556,848.98 |
| 07.12.2017 | Regular Payment | $ 44,428.83 | $ 7,543,480.73 |
| 08.09.2017 | Regular Payment | $ 44,428.83 | $ 7,531,091.36 |
| 09.08.2017 | Regular Payment | $ 44,428.83 | $ 7,518,643.87 |
| 10.06.2017 | Regular Payment | $ 44,428.83 | $ 7,505,111.88 |
| 11.09.2017 | Regular Payment | $ 44,428.83 | $ 7,492,548.51 |
| 12.08.2017 | Regular Payment | $ 44,428.83 | $ 7,478,910.97 |
| 01.09.2018 | Regular Payment | $ 44,428.83 | $ 7,466,240.03 |
| 02.09.2018 | Regular Payment | $ 44,428.83 | $ 7,453,517.15 |
| 03.09.2018 | Regular Payment | $ 44,428.83 | $ 7,437,677.16 |
| 04.09.2018 | Regular Payment | $ 44,428.83 | $ 7,424,832.98 |
| 04.26.2018 | Interest Rate Change to 5.75% | | |
| 05.09.2018 | Regular Payment | $ 44,428.83 | $ 7,410,917.17 |
| 06.08.2018 | Regular Payment | $ 47,673.72 | $ 7,401,418.46 |
| 07.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,388,722.55 |
| 08.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,377,132.11 |
| 09.19.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,365,485.07 |
| 10.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,352,620.83 |
| 11.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,340,854.09 |
| 12.09.2018 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,327,873.45 |
| 01.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,315,985.85 |
| 02.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,304,040.20 |
| 03.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,288,584.30 |
| 04.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,276,504.83 |
| 04.26.2019 | Interest Rate Change to 6.50% | | $ 7,276,504.83 |
| 05.09.2019 | Regular Payment - Auto Debit | $ 47,673.72 | $ 7,265,163.79 |
| 06.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,254,377.45 |
| 07.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,242,239.68 |
| 08.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,231,326.78 |
| 09.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,220,353.64 |
| 10.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,208,034.10 |
| 11.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,196,932.37 |
| 12.09.2019 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 12.09.2019 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,196,932.37 |
| 12.17.2019 | Regular Payment | $ 50,894.03 | $ 7,184,487.70 |
| 01.09.2020 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 01.09.2019 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,184,487.70 |
| 02.07.2020 | Regular Payment | $ 50,894.03 | $ 7,173,245.75 |
| 02.09.2020 | Regular Payment - Auto Debit | $ 50,894.03 | $ 7,161,901.67 |
| 03.09.2020 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 03.09.2020 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,161,901.67 |
| 04.09.2020 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 04.09.2020 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,161,901.67 |
| 04.26.2020 | Interest Rate Change to 6.50% | | |
| 05.09.2020 | Regular Payment - Auto Debit | $ 50,894.03 | |
| 05.09.2020 | Regular Payment -  Reversal (NSF) | $ (50,894.03) | $ 7,161,901.67 |
| 06.09.2020 | Regular Payment - Auto Debit | $ 41,463.77 | |
| 06.09.2020 | Regular Payment -  Reversal (NSF) | $ (41,463.77) | $ 7,161,901.67 |
| 07.09.2020 | Regular Payment - Auto Debit | $ 41,463.77 | |
| 07.09.2020 | Regular Payment -  Reversal (NSF) | $ (41,463.77) | $ 7,161,901.67 |
| 07.28.2020 | Regular Payment - Rent Payment (tenant) | $ 43,307.53 | $ 7,155,479.89 |
| 08.05.2020 | Regular Payment - Rent Payment (tenant) | $ 43,307.53 | $ 7,147,893.39 |

EXHIBIT NO. 28

WC TEAKWOOD Plaza, LLC

February 25, 2020

First State Bank Central Texas
P. O. Box 6136
Temple, TX 76503-6136

Bancorp South
6500 N Mopac, Suite 1101
Austin, TX 78731
Attention: Vivienne Ngo

> **Re:**   **Notice of Updated Notice Address for Borrower and Guarantors**
>             **Loan Ref. No.: 93300011379300**

To Whom It May Concern:

Please refer to that certain Loan Agreement ("Loan") dated as of April 26, 2017 between WC
Teakwood Plaza, LLC ("Borrower") and First State Bank Central Texas ("Lender"). Capitalized terms
used herein but not otherwise defined shall have the meanings ascribed to them in the Loan.

Each of the Borrower and the Guarantors hereby amends its notice address under the Loan Documents.
Notices and communications to Borrower and/or Guarantors, as applicable, should hereafter be sent to
the following addresses in lieu of the addresses set forth therein:

> c/o World Class
> 814 Lavaca St.
> Austin, Texas 78701
> Attention: Natin Paul
>
> with a copy to:
>
> 244 Fifth Avenue, Suite 2200
> New York, NY 10001

Should you require any additional information or have any questions or concerns, please feel free to
contact me at lthong@world-class.com.com or 512-327-3300.

Thank you for your attention to this matter.

Sincerely,

_Linda Thong_

Linda Thong, Special Counsel

EXHIBIT NO. 29                                   EX. 29-001

| FEE | $57.04 | | | | |
|---|---|---|---|---|---|
| | UPDATE | | **TAX CERTIFICATE** | | *REMIT CERT FEE TO:* |
| | | | **DATA TRACE** | | *DATA TRACE* |
| | | | 10920 W. SAM HOUSTON PKWY N. SUITE 400 | | *P.O BOX 31001-2283* |
| | | | HOUSTON~ TX. 77064 | | *PASADENA, CA 91110-2283* |
| | | | PHONE (281)890-0381 FAX (281)890-2114 | | |

| **CUST: HERITAGE TITLE COMPANY** | | **BRANCH: DT** | | |
|---|---|---|---|---|
| **ORDER: 202001636** | **CLOSER: JPB** | **ORDER TYPE: A-1** | **SUBTYPE: R** | **DATE: 08/20/2020** |

### CAD ACCOUNT NUMBER SUMMARY

02-3906-0903-0000

### SUMMARY OF ALL ACCOUNT(S)

| | SUMMARY OF CURRENT YEAR | | SUMMARY OF ALL TAXES DUE | |
|---|---|---|---|---|
| | **TAX YEAR** | **BASE TAX** | **DUE 08/2020** | **DUE 09/2020** |
| TRAVIS COUNTY | **2019** | 35,626.50 | 42,395.54 | 42,751.80 |
| CITY OF AUSTIN (TRAVIS CO | **2019** | 42,746.82 | 50,868.72 | 51,296.18 |
| ISD - AUSTIN | **2019** | 108,241.79 | 128,807.73 | 129,890.15 |
| TRAVIS COUNTY HOSPITAL | **2019** | 10,184.86 | 12,119.98 | 12,221.83 |
| AUSTIN COMMUNITY COLLEGE | **2019** | 10,119.93 | 12,042.72 | 12,143.92 |
| TOTAL TAX | | **206,919.90** | **246,234.69** | **248,303.88** |

### ********** COMMENTS ********** CAUTION ********** READ BEFORE CLOSING **********

| CAD# 02-3906-0903-0000 | - | **2020 PROPOSED TOTAL VALUE: 9,552,001** |
|---|---|---|
| TRAVIS COUNTY | - | EXEMPTS: HS-20%/5,000; O65-85,000; DIS-85,000 |
| CITY OF AUSTIN (TRAVIS COU | - | EXEMPTS: HS-10%/5000; O65-88,000; DIS-88,000 |
| ISD - AUSTIN | - | EXEMPTS: HS-25,000; O65-35,000; DIS-25,000 |
| TRAVIS COUNTY HOSPITAL | - | EXEMPTS: HS-20%/5,000; O65-85,500; DIS-85,500 |
| AUSTIN COMMUNITY COLLEGE | - | EXEMPTS: HS-1%/5,000; O65-160,000; DIS-160,000 |

| | | | 01 02 03 2J 68 |
|---|---|---|---|
| CAD# | **02-3906-0903-0000** | | **HE6/J01** |
| DESC | **3.3945 AC OF LOTS 1-2 ALLANDALE NORTH SEC 5 ABST/SUB ID S00156** | | |
| ACREAGE | **3.394** | | |
| SITUS | *8209 BURNET RD 02* | | |
| MAIL | % WORLD CLASS CAPITAL GROUP 401 CONGRESS AVE 33RD FLOOR AUSTIN TX 78701-3792 | | |
| ASSESSED OWNER(S) | | | **2019 ASSESSED VALUES** |
| *WC TEAKWOOD PLAZA LLC* | | LAND | 9,341,371 |
| | | IMPROVEMENT | 305,847 |
| CLASS CODE  **F1 - COMMERCIAL IMPROVED** | | **TOTAL VALUE** | **9,647,218** |
| **HIGH LIABILITY** | | | |
| | | TOTAL TAX RATE | 2.1448660 |
| | | TOTAL EST TAXES | |
| | | W/O EXEMPT | 206919.90 |

### TAX ENTITY INFORMATION

| **TRAVIS COUNTY** | | | | **PAYMENTS AS OF** | **07/13/2020** |
|---|---|---|---|---|---|
| PO BOX 149328 AUSTIN, TX 78714-9328 | | | | 19 TAX RATE | 0.3692930 |
| PHONE 512-854-9473 | | | | **W/O EXEMPT** | **35,626.50** |

| **EXEMPTIONS NONE** | **YR** | **BASE TAX** | **BASE DUE** | **DUE 08/2020** | **DUE 09/2020** |
|---|---|---|---|---|---|
| AC# 117506 | 19 | 35,626.50 | 35,626.50 | **42,395.54** | **42,751.80** |
| TS 08-20-20 | SUBTOTAL | 35,626.50 | 35,626.50 | **42,395.54** | **42,751.80** |

EXHIBIT NO. 30                    EX. 30-001

## TAX CERTIFICATE
**DATA TRACE**
10920 W. SAM HOUSTON PKWY N. SUITE 400
HOUSTON~ TX. 77064
PHONE (281)890-0381 FAX (281)890-2114

*REMIT CERT FEE TO:*
*DATA TRACE*
*P.O BOX 31001-2283*
*PASADENA, CA 91110-2283*

**CUST: HERITAGE TITLE COMPANY**          **BRANCH: DT**
**ORDER: 202001636    CLOSER: JPB    ORDER TYPE: A-1    SUBTYPE: R    DATE: 08/20/2020**

| CITY OF AUSTIN (TRAVIS COUNTY) | | | PAYMENTS AS OF | | 07/13/2020 |
|---|---|---|---|---|---|
| COLLECTED BY TRAVIS CO | | | | 19 TAX RATE | 0.4431000 |
| PHONE 512-854-9473 | | | | W/O EXEMPT | 42,746.82 |
| **EXEMPTIONS NONE** | YR | BASE TAX | BASE DUE | DUE 08/2020 | DUE 09/2020 |
| AC# 117506 | 19 | 42,746.82 | 42,746.82 | **50,868.72** | 51,296.18 |
| TS 08-20-20 | SUBTOTAL | 42,746.82 | 42,746.82 | **50,868.72** | 51,296.18 |
| ISD - AUSTIN | | | PAYMENTS AS OF | | 07/13/2020 |
| COLL BY TRAVIS COUNTY | | | | 19 TAX RATE | 1.1220000 |
| PHONE 512-854-9473 | | | | W/O EXEMPT | 108,241.79 |
| **EXEMPTIONS NONE** | YR | BASE TAX | BASE DUE | DUE 08/2020 | DUE 09/2020 |
| AC# 117506 | 19 | 108,241.79 | 108,241.79 | **128,807.73** | 129,890.15 |
| TS 08-20-20 | SUBTOTAL | 108,241.79 | 108,241.79 | **128,807.73** | 129,890.15 |
| TRAVIS COUNTY HOSPITAL | | | PAYMENTS AS OF | | 07/13/2020 |
| COLLECTED BY TRAVIS CO | | | | 19 TAX RATE | 0.1055730 |
| PHONE 512-854-9473 | | | | W/O EXEMPT | 10,184.86 |
| **EXEMPTIONS NONE** | YR | BASE TAX | BASE DUE | DUE 08/2020 | DUE 09/2020 |
| AC# 117506 | 19 | 10,184.86 | 10,184.86 | **12,119.98** | 12,221.83 |
| TS 08-20-20 | SUBTOTAL | 10,184.86 | 10,184.86 | **12,119.98** | 12,221.83 |
| AUSTIN COMMUNITY COLLEGE | | | PAYMENTS AS OF | | 07/13/2020 |
| COLLECTED BY TRAVIS CO | | | | 19 TAX RATE | 0.1049000 |
| PHONE 512-854-9473 | | | | W/O EXEMPT | 10,119.93 |
| **EXEMPTIONS NONE** | YR | BASE TAX | BASE DUE | DUE 08/2020 | DUE 09/2020 |
| AC# 117506 | 19 | 10,119.93 | 10,119.93 | **12,042.72** | 12,143.92 |
| TS 08-20-20 | SUBTOTAL | 10,119.93 | 10,119.93 | **12,042.72** | 12,143.92 |

### CONDITIONS, DISCLAIMERS AND EXCLUSIONS

This Tax Certificate/Tax Order Report does not constitute a report on or certification of: (1) mineral (productive and/or non-productive) taxes or leases; (2) personal property taxes; or (3) other non ad valorem taxes (such as paving liens, stand-by charges or maintenance assessments).

Data Trace Information Services LLC ("Data Trace") may have warranted the accuracy of this Tax Certificate/Tax Order Report to its customer (the "Data Trace Customer") pursuant to the terms and conditions of a written tax service agreement between Data Trace and said Data Trace Customer (the "Tax Service Agreement"). Any such warranty (hereinafter, "Data Trace Customer Warranty") does not: (a) extend to a third party bearer of this Tax Certificate/Tax Order Report; (b) cover any changes made to the records of the taxing authority after the "payments as of," "paid," or "payment" dates delineated above; and (c) cover any invalid tax information shown on the records of the taxing authority or resulting from an error by the Data Trace Customer (including, without limitation, submission of incorrect property information by said Data Trace Customer). DATA TRACE MAKES NO WARRANTIES (EXPRESS OR IMPLIED) WITH RESPECT TO THIS TAX CERTIFICATE/TAX ORDER REPORT OTHER THAN (WHERE APPLICABLE) THE DATA TRACE CUSTOMER WARRANTY. Any and all claims under a Data Trace Customer Warranty must be submitted to Data Trace by the corresponding Data Trace Customer and are subject to the terms and conditions set forth in the pertinent Tax Service Agreement (including, without limitation, the filing deadlines applicable to such claims). In some jurisdictions Data Trace's validation of a Tax Certificate/Tax Order Report is required to activate a Data Trace Customer Warranty.

**PRINTED BY HE6/J01**

## HOA CERTIFICATE

**DATA TRACE**

10920 W. SAM HOUSTON PKWY N. SUITE 400

HOUSTON~ TX. 77064

PHONE (281)890-0381 FAX (281)890-2114

*REMIT CERT FEE TO:*

*DATA TRACE*

*P.O BOX 31001-2283*

*PASADENA, CA 91110-2283*

| | | |
|---|---|---|
| **CUST: HERITAGE TITLE COMPANY** | **BRANCH: DT** | |
| **ORDER: 202001636** **CLOSER: JPB** | **ORDER TYPE: A-1** **SUBTYPE: R** | **DATE: 08/20/2020** |

**SELLER**     WC TEAKWOOD PLAZA LLC

**BUYER**

**COUNTY**     TRAVIS

**SUBD NAME / BLK** ALLANDALE NORTH SEC 5

    **NO MAINTENANCE ASSESSED**

### *** THIS SUBDIVISION IS NOT ASSESSED BY AN HOA ***
### SUMMARY OF ACCOUNT 02-3906-0903-0000

**DESC**     3.3945 AC OF LOTS 1-2 ALLANDALE NORTH SEC 5 ABST/SUB ID S00156

**SITUS**     8209 BURNET RD 02

### CONDITIONS, DISCLAIMERS AND EXCLUSIONS

This HOA Certificate does not constitute a report on or certification of: (1) mineral (productive and/or non-productive) taxes or leases; (2) personal property taxes; or (3) other non ad valorem taxes (such as paving liens, stand-by charges or maintenance assessments).

Data Trace Information Services LLC ("Data Trace") may have warranted the accuracy of this HOA Certificate to its customer (the "Data Trace Customer") pursuant to the terms and conditions of a written tax service agreement between Data Trace and said Data Trace Customer (the "Tax Service Agreement"). Any such warranty (hereinafter, "Data Trace Customer Warranty") does not: (a) extend to a third party bearer of this HOA Certificate; (b) cover any changes made to the records of the association or other assessment authority after the "payments as of," "paid," or "payment" dates delineated above; and (c) cover any invalid assessment information shown on the records of the association or other assessment authority authority or resulting from an error by the Data Trace Customer (including, without limitation, submission of incorrect property information by said Data Trace Customer). DATA TRACE MAKES NO WARRANTIES (EXPRESS OR IMPLIED) WITH RESPECT TO THIS HOA CERTIFICATE OTHER THAN (WHERE APPLICABLE) THE DATA TRACE CUSTOMER WARRANTY. Any and all claims under a Data Trace Customer Warranty must be submitted to Data Trace by the corresponding Data Trace Customer and are subject to the terms and conditions set forth in the pertinent Tax Service Agreement (including, without limitation, the filing deadlines applicable to such claims). In some jurisdictions Data Trace's validation of a HOA Certificate is required to activate a Data Trace Customer Warranty.



T. 713.220.9165
F. 713.223.9319
mdurrschmidt@hirschwest.com

July 6, 2020

*Via CMRRR: 9414 7266 9904 2167 5066 73*
*and First Class U.S. Mail*

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul

Re:     Promissory Note (the "Note") dated April 26, 2017 in the original principal
        sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or
        "Borrower") and payable to BancorpSouth Bank, as successor by merger
        to First State Bank Central Texas, secured by a Deed of Trust, Security
        Agreement and Financing Statement dated April 26, 2017 (the "Deed of
        Trust") on 3.95 Acres in the City of Austin, Travis County, Texas, being all
        of Lot 2 and a portion of Lot 1, Allandale North Section Five (the
        "Collateral" or the "Property") and guaranteed by Natin Paul and World
        Class Capital Group, LLC (collectively the "Guarantors").

Dear Sir or Madam:

        As you know, this law firm represents BancorpSouth Bank, successor by
merger to First State Bank Central Texas (the "Bank") in connection with the
above-referenced Note. As you also know, the Note is delinquent.

        Pursuant to the Deed of Trust, the Borrower may collect rents until the
Borrower receives a notice of default from the Bank. The Bank has provided
notice to Borrower of its default under the Note by letter dated July 2, 2020.
The Bank hereby notifies Borrower to not collect rents from any tenant or
lessee on the Property. Any rents collected by Borrower must be held in kind
and remitted to Bill Babineaux of BancorpSouth Bank at 315 Settlers Trace
Blvd., Lafayette, Louisiana 70508.

20170804.20190907/3743893.1

EXHIBIT NO. 31                                              EX. 31-001

WC Teakwood Plaza, LLC
July 6, 2020
Page 2

   In accordance with the obligations of the Borrower under the Deed of Trust, please provide us with copies of the lease for every tenant or lessee occupying a rental space on the Property and the rent roll for the Property.

       Sincerely,

       HIRSCH & WESTHEIMER, P.C.


       By: */s/ Michael J. Durrschmidt*
        Michael J. Durrschmidt


cc: Natin Paul
  c/o World Class
  814 Lavaca St.
  Austin, Texas 78701
  Attn: Natin Paul
  *Via CMRRR: 9414 7266 9904 2167 5065 05*

  World Class Capital Group, LLC
  c/o World Class
  814 Lavaca St.
  Austin, Texas 78701
  Attn: Natin Paul
  *Via CMRRR: 9414 7266 9904 2167 5066 66*

  Linda Thong
  World Class
  244 Fifth Avenue, Suite 2200
  New York, New York 10001
  *Via CMRRR: 9414 7266 9904 2167 5067 27*

  Maryann Norwood
  World Class
  814 Lavaca St.
  Austin, Texas 78701
  *Via email: mnorwood@world-class.com*

# BRACEWELL

September 9, 2020

WC Teakwood Plaza, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul
Certified Mail RRR # 9414726699042147947625
And First Class Mail

Mr. Natin Paul
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Certified Mail RRR # 9414726699042147947649
First Class Mail

World Class Capital Group, LLC
814 Lavaca St.
Austin, Texas 78701
Attn: Natin Paul
Certified Mail RRR # 9414726699042147947632
And First Class Mail

World Class
244 Fifth Avenue, Suite 2200
New York, New York 10001
Attn: Linda Thong
Certified Mail RRR # 9414726699042171879497
First Class Mail

Mr. Brian Elliott
World Class Global Business Services
814 Lavaca St.
Austin, Texas 78701
Via email: belliott@world-class.com

Ms. Maryann Norwood
World Class
814 Lavaca St.
Austin, Texas 78701
Via email: mnorwood@world-class.com

## NOTICE DEMANDING RENT AND RENT PROCEEDS

Ladies and Gentlemen:

As you are aware, this law firm represents 8209 Burnet, L.P., successor by assignment to BancorpSouth Bank, successor by merger to First State Bank Central Texas (the "Lender") in connection with the below-referenced Note[1]. You were notified by letters dated July 6, 2020, July 23, 2020 and again August 13, 2020 by the law firm Hirsch & Westheimer, P.C. that you **may not**

---

[1] Promissory Note (the "Note") dated April 26, 2017 in the original principal sum of $7,600,000 executed by WC Teakwood Plaza, LLC ("Maker" or "Borrower") and payable to BancorpSouth Bank, as successor by merger to First State Bank Central Texas, secured by a Deed of Trust, Security Agreement and Financing Statement dated April 26, 2017 (the "Deed of Trust") on 3.95 Acres in the City of Austin, Travis County, Texas, being all of Lot 2 and a portion of Lot 1, Allandale North Section Five (the "Collateral" or the "Mortgaged Property") and guaranteed by Natin Paul and World Class Capital Group, LLC (collectively the "Guarantors").

**Christopher L. Dodson**
Partner

T: +1.713.221.1373          F: +1.800.404.3970
711 Louisiana Street, Suite 2300, Houston, Texas 77002-2770
chris.dodson@bracewell.com          bracewell.com

EXHIBIT NO. 32

# BRACEWELL

September 9, 2020
Page 2

collect rents from any tenant or lessee on the Mortgaged Property and any rents collected by you must be held in kind and remitted to Lender.

This notice serves as a reminder that you may not collect any rents from any tenant or lessee of the Mortgaged Property. In addition, we request an accounting of any rents you have collected from any tenant or lessee on the Mortgaged Property from July 6, 2020 to the current date and request that you immediately remit such rents to Lender at the address provided below.

Further, you have not provided Lender with copies of the lease for every tenant or lessee occupying a rental space on the Mortgaged Property and the current rent roll for the Mortgaged Property. These documents have been requested in each of the letters referenced herein and to date you have failed to provide them.

Pursuant to the terms of the Deed of Trust, you are hereby again directed to provide us with copies of the lease for every tenant or lessee occupying rental space on the Mortgaged Property and the current rent roll for the Mortgaged Property, and to deliver all rents and proceeds of any rents you receive concerning the Mortgaged Property to Lender at the address below.

The Lender expressly reserves all of its rights and remedies relating to the Note, Deed of Trust, or any of the loan document executed in connection therewith (collectively, together with the Note and Deed of Trust, the "Loan Documents"). Neither this notice nor any past, present, or future action, inaction, or discussions by the Lender has been intended or shall constitute: (a) a waiver or relinquishment of, or an agreement to delay or refrain from exercising, any rights or remedies provided for by law or in the Loan Documents, (b) an election of remedies, (c) an agreement to engage in negotiating, or to obtain approval for, any proposal for refinancing or renewal of the Note, or (d) an agreement relating to any other matter not expressly addressed herein. This notice and any notices previously sent by the Lender should not be construed as requiring Lender to give any notice not expressly required by the Loan Documents, or applicable law.

This notice is not intended to advise you of your legal rights and obligations. You should obtain counsel of your choice to discuss your legal rights and obligations.

# BRACEWELL

September 9, 2020
Page 3

Very truly yours,

BRACEWELL LLP

Christopher L. Dodson

**ADDRESS FOR DELIVERY OF RENTAL
PAYMENTS EFFECTIVE IMMEDIATELY:**

500 West 2nd Street, #1900
Austin, Texas 78701

cc:   Mr. Mark Riley
      (Via electronic mail: Mark.Riley@Riley-CPA-Law.com )

      8209 Burnet, L.P.
      (Via electronic mail)



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF LIMITED PARTNERSHIP OF "8209 BURNET, L.P.", FILED IN THIS OFFICE ON THE FIRST DAY OF JUNE, A.D. 2020, AT 6:36 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

7996169  8100
SR# 20205401647

Authentication: 203030224
Date: 06-02-20

You may verify this certificate online at corp.delaware.gov/authver.shtml

EXHIBIT NO. 33                    EX. 33-001

State of Delaware
Division of Corporations
Delivered  06:36 PM 06/01/2020
FILED  06:36 PM 06/01/2020
SR 20205401647 - File Number 7996169

# CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## 8209 BURNET, L.P.

The undersigned general partner, desiring to form a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act, hereby executes this Certificate of Limited Partnership.

1.  The name of the limited partnership (the "*Partnership*") is 8209 Burnet, L.P.

2.  The address of the registered office of the Partnership is 1209 Orange Street, Wilmington, Delaware, 19801.  The name of the Partnership's registered agent for service of process, whose business office address is identical with the registered office of the Partnership, is The Corporation Trust Company.

3.  The name and the business and mailing address of the sole general partner of the Partnership are as follows:

| Name | Business and Mailing Address |
|---|---|
| 8201 Burnet GP, LLC | 1209 Orange Street<br>Wilmington, Delaware, 19801 |

4.  This Certificate of Limited Partnership shall be effective upon the filing hereof with the Secretary of State of the State of Delaware.

Dated: June 1, 2020.

GENERAL PARTNER:

**8201 Burnet GP, LLC**
(a Delaware limited liability company)

By:  _Timothy C. Taylor, Sr._
Timothy C. Taylor, Sr.
Authorized Person

EXHIBIT NO. 33

EX. 33-002

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Diana Alday on behalf of W Benesh
Bar No. 2132050
diana.alday@bracewell.com
Envelope ID: 46074615
Status as of 9/11/2020 2:01 PM CST

Associated Case Party: WC Teakwood Plaza, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Manfred Sternberg | | manfred@msternberg.com | 9/9/2020 11:53:36 AM | SENT |

Associated Case Party: BancorpSouth Bank

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brian Buescher | | bbuescher@hirschwest.com | 9/9/2020 11:53:36 AM | SENT |

Associated Case Party: 8209 Burnet, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher L.Dodson | | chris.dodson@bracewell.com | 9/9/2020 11:53:36 AM | SENT |
| W. Stephen Benesh | | steve.benesh@bracewell.com | 9/9/2020 11:53:36 AM | SENT |
| Jaclyn Carr | | jaclyn.carr@bracewell.com | 9/9/2020 11:53:36 AM | SENT |
| Robert P.Grattan | | bob.grattan@bracewell.com | 9/9/2020 11:53:36 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Dana LKirkpatrick | | dana@msternberg.com | 9/9/2020 11:53:36 AM | SENT |
| Christopher Dodson | | chris.dodson@bracewell.como | 9/9/2020 11:53:36 AM | ERROR |
| Mark Riley | | Riley@Riley-CPA-Law.com | 9/9/2020 11:53:36 AM | SENT |
| Michael J.Durrschmidt | | mdurrschmidt@hirschwest.com | 9/9/2020 11:53:36 AM | SENT |

# TAB 9

CAUSE NO. D-1-GN-20-004508

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC and<br>AFFILIATED COMMERCIAL SERVICES,<br>INC. | § <br> § <br> § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § <br> § | TRAVIS COUNTY, TEXAS |
| v. | § <br> § | 261st JUDICIAL DISTRICT |
| | § <br> § | |
| 8209 BURNET, LP, AND<br>BANCORPSOUTH BANK | § <br> § | |
| Defendants. | | |

## TEMPORARY INJUNCTION

This Court, having heard and considered WC Teakwood Plaza, LLC, Texas a limited liability corporation,  ("Plaintiff") Petition for a Temporary Injunction, and all evidence and arguments of counsel and judicial notice with respect to matters presently before this Court with notice to and appearance by 8209 Burnet, LP,    the Court finds that there is a probable right to relief  for Plaintiff's pleaded causes of action and it appears to the Court that immediate and irreparable injury, loss, or damage will result to WC Teakwood Plaza, LLC, Texas  unless a Temporary Injunction is issued to restrain 8209 Burnet, LP  from attempting to proceed with a non judicial foreclosure on the steps of the Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas, until either (a) each of the City of Austin, Travis County, and the State of Texas terminate their respective standing governmental orders ("Standing Orders") prohibiting public gatherings, or (b) 8209 Burnet, LP obtains express authorization from each of the foregoing for an exception to the Standing Orders for a public gathering in connection with its proposed non-judicial foreclosure sale.

TEMPORARY INJUNCTION

The Court's finding of immediate and irreparable harm and injury is based on the Court's conclusion that Defendant is unable to conduct a public sale under the Texas Property Code and the Deed of Trust made the subject of this lawsuit because the Standing Orders that prevent gatherings of ten (10) or more people in public presently prevents interested public sale participants from being able to attend the proposed sale and violates Borrower's statutory and contractual rights to a public non judicial foreclosure sale.

The Application should therefore be GRANTED.

Therefore, it is ORDERED that this Temporary Injunction will be operative until the earlier of (a) the date the Standing Orders are modified or terminated so as to allow public gatherings or (b) the date 8209 Burnet, LP obtains express authorization for an exception to the Standing Orders for a public gathering in connection with its proposed non-judicial foreclosure sale .

It is further ORDERED that 8209 Burnet, LP or any of its officers, agents, servants, employees, attorneys, representatives, or any persons in active concert or participation with them who receive actual notice of this Order are hereby restrained from taking any action in exercising the power of foreclosure, including but not limited to posting or foreclosing on the property described as follows:

**EXHIBIT A Legal Description**

It is further ORDERED that plaintiff executes and files with the clerk a bond, in conformity with the law, in the amount of $1,000.00, which is as of this date on file with the Clerk of Court and is deemed good and sufficient.

A trial on the merits of this Cause will be held on _____, _____, 202___.

2

SIGNED this _____ day of _____, 2020.


_____
JUDGE PRESIDING




APPROVED AS TO FORM AND SUBSTANCE:



_____
Manfred Sternberg
SBN: 19175775
1700 Post Oak Blvd. Suite 600
Houston, TX 77056
Telephone:   (713) 622-4300
Facsimile:   (713) 622-9899
Email: manfred@msternberg.com

**COUNSEL FOR PLAINTIFF**

# TAB 10

CAUSE NO. D-1-GN-20-004508

| | § | IN THE DISTRICT COURT OF |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| | § | |
| 8209 BURNET, L.P., | § | |
| Defendant. | § | |
| | § | 261st JUDICIAL  DISTRICT |

## ORDER DENYING APPLICATION FOR TEMPORARY INJUNCTION

On September 10, 2020, the Court held an evidentiary hearing on the Application for Temporary Injunction filed by Plaintiff WC Teakwood Plaza, LLC.  After considering the evidence presented at the hearing, any post-hearing evidence submitted by the parties, the pleadings, the briefing provided by the parties, the legal authorities provided by the parties, and the arguments advanced by counsel, the Court hereby determines that the Temporary Injunction should be, in all respects, DENIED.

IT IS THEREFORE ORDERED, that WC Teakwood Plaza, LLC's Application for Temporary Injunction is, on all grounds, DENIED.

SIGNED this 15th day of September, 2020.


_____
TIM SULAK, JUDGE PRESIDING

# TAB 11

CAUSE NO. D-1-GN-20-004508

| | | |
|---|---|---|
| WC TEAKWOOD PLAZA, LLC,<br>Plaintiff, | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§<br>§ | TRAVIS COUNTY, TEXAS |
| 8209 BURNET, L.P.,<br>Defendant. | §<br>§<br>§ | 261st JUDICIAL  DISTRICT |

## 8209 BURNET, L.P.'S ORIGINAL ANSWER

8209 Burnet, L.P. ("Lender") files this Original Answer to Plaintiff WC Teakwood Plaza, LLC's ("Borrower" or "Plaintiff") Original Petition.

### GENERAL DENIAL

1.      Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Lender generally denies each and every, all and singular, of the material allegations contained in Plaintiff's Original Petition and requests that this Court require Plaintiff to prove their allegations by a preponderance of the evidence as is required by the laws of the State of Texas.

### AFFIRMATIVE DEFENSES

2.      Pursuant to Rule 94 of the Texas Rules of Civil Procedure, Lender asserts, subject to and without waiving the foregoing General Denial, the following affirmative defenses which bar Plaintiff's claims in whole or in part.

3.      Lender affirmatively asserts that Borrower's claims are barred, in whole or in part, by Borrower's prior material breach of contract.

4.      Lender affirmatively asserts that Borrower's claims are barred, in whole or in part, by waiver.

5.      Lender affirmatively asserts that Borrower's claims are barred, in whole or in part, by estoppel and quasi-estoppel.

6.      Lender affirmatively asserts that Borrower's claims are barred, in whole or in part, by Borrower's own failure to mitigate its damages.

7.      Lender affirmatively asserts that Borrower's claims are barred, in whole or in part, by Borrower's own fault.

<div align="center">

**PRAYER**

</div>

Defendant 8209 Burnet, L.P. prays that Plaintiff WC Teakwood Plaza, LLC take nothing by reason of this suit, and that its claims be dismissed with prejudice.

Respectfully submitted,

BRACEWELL LLP


By: */s/ W. Stephen Benesh*
    W. Stephen Benesh
    State Bar No. 02132050
    Email:  steve.benesh@bracewell.com
    111 Congress Avenue, Suite 2300
    Austin, Texas 78701
    713-223-2300 (Telephone)
    713-221-1212 (Facsimile)

    Christopher L. Dodson
    State Bar No. 24050519
    Email:  chris.dodson@bracewell.com
    Jaclyn Carr
    State Bar No. 24093776
    Email: jaclyn.carr@bracewell.com
    Robert P. Grattan
    State Bar No. 24116452
    Email: bob.grattan@bracewell.com
    711 Louisiana, Suite 2300
    Houston, Texas  77002
    713-223-2300 (Telephone)
    800-404-3970 (Facsimile)

    ATTORNEYS FOR DEFENDANT
    8209 BURNET, L.P.

<div align="center">

2

</div>

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record pursuant to the Texas Rules of Civil Procedure on September 21, 2020 as follows:

Manfred Sternberg
1700 Post Oak Blvd., Suite 600
Houston, Texas 77056
Counsel for Plaintiff

*/s/ Christopher L. Dodson*
Christopher L. Dodson

#6229864

3